# EXHIBIT 2



Deposition of:
## Robert Buczkowski

*August 22, 2019*

In the Matter of:

## Madison Mechanical, Inc. Vs. Twin City Fire Insurance Company

Veritext Legal Solutions
800.808.4958 | calendar-dmv@veritext.com |

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3     MADISON MECHANICAL, INC.,:

4     et al.              :

5        Plaintiffs        :

6           Vs.           : Case No.:

7     TWIN CITY FIRE INSURANCE :   1:17-cv-01357-GLR

8     COMPANY, et al.        :

9        Defendants         :

10               --------------------

11

12           Deposition of ROBERT BUCZKOWSKI, was

13     taken on Thursday, August 22, 2019, commencing at

14     11:08 a.m., at Baxter, Baker, Sidle, Conn & Jones,

15     120 East Baltimore Street, 21st Floor, Baltimore,

16     Maryland, before MICHELE D. LAMBIE, Notary Public.

17               --------------------

18

19

20     Reported By:

21           Michele D. Lambie, CSR-RPR

**Page 2**

1 APPEARANCES:

2     ON BEHALF OF THE PLAINTIFFS:

3 Baxter, Baker, Sidle, Conn & Jones

4     DANIELLE M. VRANIAN, ESQUIRE

5     dmv@bbsclaw.com

6     CAROLINE PAYTON, ESQUIRE

7     120 East Baltimore Street, 21st Floor

8     Baltimore, Maryland 21202

9     (410) 230-3800

10     ON BEHALF OF THE DEFENDANTS:

11 Wiley Rein LLP

12     CHARLES C. LEMLEY, ESQUIRE

13     clemley@wileyrein.com

14     ANNA J. SCHAFFNER, ESQUIRE

15     aschaffner@wileyrein.com

16     1776 K Street, N.W

17     Washington, D.C. 20006

18     (202) 719-7000

19

20

21 ALSO PRESENT: Edward J. Longosz, II, Esquire

**Page 3**

1     EXAMINATION INDEX

2

WITNESS: ROBERT BUCZKOWSKI    PAGE

3   BY MR. LEMLEY    5
    BY MS. VRANIAN    67

4   R BY MR. LEMLEY    11

5

6     EXHIBIT INDEX

7     (Attached to Transcript.)

8         MARKED
ROBERT BUCZKOWSKI

9 Exhibit 1 Renewal Application    11

10 Exhibit 2 Email dated September 25, 2015   21

11 Exhibit 3 Letter dated November 11, 2015   29

12 Exhibit 4 Letter dated November 18, 2015   33

13 Exhibit 5 Stockholder's Agreement   37

14 Exhibit 6 Letter dated January 14, 2016   41

15 Exhibit 7 Letter dated May 10, 2016   44

16 Exhibit 8 Letter dated May 11, 2016   48

17 Exhibit 9 Consent of Sole Director   51

18 Exhibit 10 Affidavit of Robert Buczkowski  51

19 Exhibit 11 Confidential Settlement Agreement 51
    and Release

20

    Exhibit 12 Email dated November 19, 2011 with 59

21     attachment

**Page 4**

1 BUCZKOWSKI EXHIBITS CONTINUED:   MARKED

2 Exhibit 13 Email dated March 6, 2015 with   61
    attachment

3

    Exhibit 14 Email dated March 17, 2015   63

4

    Exhibit 15 Complaint    66

5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21

**Page 5**

1     P R O C E E D I N G S

2     ROBERT BUCZKOWSKI

3 the Deponent, called for examination by the

4 Defendants, being first duly sworn to tell the

5 truth, the whole truth, and nothing but the truth,

6 testified as follows:

7     EXAMINATION

8   BY MR. LEMLEY:

9   Q. Good morning still. Mr. Buczkowski, is

10 that how you pronounce it?

11   A. Yes.

12   Q. Buczkowski, okay. I may say Bob

13 sometimes, because if I have to say Mr. Buczkowski

14 so many times, we'll be here till 4:00.

15   A. That's fine.

16   Q. What do you do for a living?

17   A. Right now I do construction, home

18 improvement.

19   Q. Who do you work for?

20   A. Myself.

21   Q. I understand there was a time when you

**Page 6**

1 were affiliated with Madison Mechanical OS Corp.
2 and Madison Mechanical, Inc.; is that correct?
3    A.  Yes.
4    Q.  When did you first become involved with
5 either of those companies?
6    A.  I believe it was around about 2000, the
7 summer of 2000.
8    Q.  How did you come to be involved with
9 them?
10    A.  In 2000, I was actually doing some
11 consulting work.  I went over there to help out,
12 get their books straight.  Mr. Garofalo, from
13 Harkins Builders, had called me.
14    Q.  Harkins Builders you said?
15    A.  Yes.
16    Q.  What was the -- I think I know this, but
17 what was the relationship between Harkins Builders
18 and Madison Mechanical?
19    A.  Back in 2000, Blase Cooke was the owner
20 of both entities.
21    Q.  And then at some point, did Mr. Garofalo

**Page 7**

1 and others end up buying what is -- what became
2 Madison Mechanical from him?
3    A.  Blase Cooke passed away, --
4    Q.  Oh.
5    A.  -- and we purchased Madison from the
6 estate.
7    Q.  Okay.  So, do you remember approximately
8 what year that was?
9    A.  I believe that was 2007.
10    Q.  Were you one of the -- were you one of
11 the shareholders in Madison Mechanical at that
12 time?
13    A.  When we purchased it, yes.
14    Q.  And, as I understand it, Madison
15 Mechanical OS Corp. was the corporation that you
16 owned shares in, and then Madison Mechanical, Inc.
17 was the wholly-owned operating subsidiary; is that
18 right?
19    A.  Yes.
20    Q.  Did Madison Mechanical OS Corp. do
21 anything -- have any other operations, other than

**Page 8**

1 what were done by Madison Mechanical, Inc.?
2    A.  No.
3    Q.  And what did you have -- you also had a
4 position as an officer of one of those entities; is
5 that correct?
6    A.  Yes.
7    Q.  What was that position?
8    A.  I believe it was secretary.
9    Q.  Secretary of which one, do you know?  It
10 probably didn't matter.
11    A.  Madison Mechanical, Inc. --
12    Q.  Okay.
13    A.  -- I believe.
14    Q.  And were you also -- were you the chief
15 financial officer?
16    A.  Yes.
17    Q.  During what period of time was that when
18 you were the chief financial officer?
19    A.  I was in charge of the accounting
20 from -- I think I started at Madison in 2002 --
21    Q.  Okay.

**Page 9**

1    A.  -- full time.  Roughly I believe that's
2 the time period, until termination.
3    Q.  And termination, when was that?
4    A.  I received a letter, I believe, in
5 October of 2015.
6    Q.  Did you have any other employment during
7 that time frame, other than with Madison
8 Mechanical?
9    A.  No.
10    Q.  How were you compensated at Madison
11 Mechanical?  I know that you were a shareholder of
12 the corporation and also an officer.  What was your
13 compensation?
14    A.  There was a base salary and then a
15 percentage of profits.
16    Q.  What was the base salary?
17    A.  The base, I think, was 83 to 88,000.  I
18 can't recall exactly.
19    Q.  So, Mr. Garofalo, was he also employed by
20 Madison Mechanical?
21    A.  He was not employed by Madison

3 (Pages 6 - 9)

Page 10

1 Mechanical. He did -- I believe he -- he got a
2 percentage of profits.
3    Q. Okay. Did he work for someone else, do
4 you know?
5    A. He worked for Harkins Builders.
6    Q. How about Mr. Haslam, was he employed by
7 Madison Mechanical?
8    A. He was the president.
9    Q. Did he also work for Harkins?
10    A. No, he did not.
11    Q. Did you work for Harkins at any time?
12    A. No, I didn't. I did some -- I'm trying
13 to remember exactly. I think it was just Madison
14 that I did work for when I did consulting back in
15 2000. I don't believe it was anything for Harkins.
16    Q. While you were employed with Madison
17 Mechanical, did you have an employment
18 agreement --
19    A. No.
20    Q. -- a formal employment agreement? No
21 employment agreement?

Page 11

1    A. No employment agreement.
2    Q. You were a party to the shareholder's
3 agreement, correct?
4    A. Yes.
5    Q. As I understand it, there was a
6 shareholder's agreement that was dated 2007, and
7 that was the shareholder's agreement throughout the
8 time period --
9    A. Correct.
10    Q. -- that you were with Madison Mechanical;
11 is that right? I'm going to just show you some
12 documents, and just walk through and ask you a few
13 questions with those, and if -- if -- obviously, if
14 I ask anything you don't understand, which is
15 possible, just let me know.
16    A. Okay.
17       MR. LEMLEY: And we'll have the court
18 reporter mark this one as Exhibit 1.
19       (Whereupon, Buczkowski Deposition Exhibit
20 1, Renewal Application, marked for identification.)
21 BY MR. LEMLEY:

Page 12

1    Q. So, I have showed you what was marked as
2 Exhibit 1 to your deposition, and the first page
3 has numbers at the bottom. It's PL000121; do you
4 see that?
5    A. Yes.
6    Q. If you flip to the -- on the front page,
7 it says it's a private company renewal application
8 for The Hartford, and if you look at the last page,
9 it ends in 127. It has your signature there and
10 the date of April 6th, 2015; do you see that?
11    A. Yes.
12    Q. Do you -- how did you come to be the
13 person who signed this application?
14    A. I was the individual at Madison that
15 worked with the insurance company on the renewals.
16    Q. So, you would -- this was, I would
17 presume, not the only application that you signed
18 while you were with Madison Mechanical?
19    A. Correct.
20    Q. When you say you worked with the
21 insurance, who did you work with?

Page 13

1    A. I would work with an individual named
2 Kevin Bartley and Pat Bierderman. They were
3 employed with Alliant Insurance, --
4    Q. Okay.
5    A. -- and then I'd also work with Bill
6 Franey, who was employed with Alliant Insurance.
7    Q. So, what was the relationship between
8 Alliant and Madison Mechanical?
9    A. Alliant provided the business insurance
10 for Madison Mechanical.
11    Q. Okay. Did Alliant -- did Madison
12 Mechanical purchase all of its insurance through
13 Alliant?
14    A. I believe everything was through Alliant.
15    Q. What other kinds of insurance did Madison
16 Mechanical have during the 2015/2016 time frame, if
17 you can recall?
18    A. The normal business insurance; Workers'
19 Comp, general liability, you know, excess
20 liability.
21    Q. Okay. And in this policy -- how would

4 (Pages 10 - 13)

Page 14

1  you refer to The Hartford policy that we're talking
2  about?  The D&O policy, is that -- I have seen that
3  used in there.
4      A.  Yes, I'm sure that was part of it.  We
5  had a full -- full line of insurance products from
6  them.
7      Q.  Was all of the other -- were all of the
8  other insurance policies through The Hartford, or
9  did you get those through other companies?
10     A.  I don't recall exactly who provided all
11 of the underwriting.
12     Q.  And do you recall, as far as directors
13 and officers insurance, do you recall having
14 directors and officers insurance as far back as
15 2007/2008?
16     A.  I believe we had it the entire time I was
17 there.
18     Q.  Do you recall Madison Mechanical having
19 directors and officers insurance with any companies
20 other than The Hartford?
21     A.  The only one I really recall is The

Page 15

1  Hartford as the company.
2      Q.  Did you purchase insurance through
3  Mr. Franey from -- you may have answered this, but
4  let me just make sure.  Did you purchase insurance
5  from Mr. Franey -- through Mr. Franey from other
6  insurance companies?
7      A.  I paid -- my dealings was with Alliant on
8  the renewals.
9      Q.  Alliant?
10     A.  Yes.  Alliant insurances or with Bill
11 Franey, and then we would typically pay Alliant on
12 a monthly basis, or whatever the payment plan was.
13 So, I don't recall exactly who the other carriers
14 were, the underlying carriers were.
15     Q.  Like, for example, I have seen documents
16 referencing Chubb Insurance Company.  Do you know
17 what kind of insurance came from Chubb?
18     A.  To my recollection, Chubb was our bonding
19 company.
20     Q.  Okay.
21     A.  They provided the bonding.

Page 16

1      Q.  Okay.
2      A.  I don't recall any product lines on the
3  insurance side of the house from Chubb.
4      Q.  So, did you have any dealings with
5  Mr. Franey or anyone else at Alliant regarding
6  anything other than insurance?
7      A.  We had the bonding with Mr. Franey, and
8  Mr. Franey also would -- we'd meet with him, you
9  know, sometimes during the course of the year and
10 talk about business.
11     Q.  Was he sort of an advisor to Madison
12 Mechanical?
13     A.  He was an advisor to us, yes.
14     Q.  Would he advise about business affairs
15 that weren't necessarily related to insurance?
16     A.  He became -- over the course of time, I
17 know we met with him over the years.  He became
18 heavily involved as we were having some financial
19 difficulties in the '13/'14/'15 time period.
20     Q.  And wasn't there a time period in which
21 he was contemplating investing in Madison

Page 17

1  Mechanical?
2      A.  Yes.
3      Q.  Do you know whatever became of that?  Did
4  he ever invest or --
5      A.  He never invested where -- there was a
6  lot of back and forth and us sending him reports
7  and discussions, but nothing came of it.
8      Q.  Did Madison Mechanical work with Alliant
9  throughout the time that you were there from 2007
10 through 2015?
11     A.  For insurance renewals?
12     Q.  Yes.
13     A.  Yes.
14     Q.  Okay.  During that time period.  Okay.
15 Did you ever work with Alliant in making claims on
16 insurance or on surety bonds?
17     A.  Yes.
18     Q.  How would you work with Alliant in that
19 regard?
20     A.  If we had a -- an insurance event that
21 took place on one of the jobs, then I would be the

5 (Pages 14 - 17)

Page 18

1 point person that would gather up all of the
2 documentation, put the package together, and submit
3 it over to Alliant.
4    Q.  Do you know, what did you anticipate
5 Alliant would do with what you sent them?
6    A.  Hopefully, process it, go through it, and
7 push it to get us money.
8    Q.  Did you ever ask anyone at Alliant for
9 advice on how to deal with a claim under an
10 insurance policy?
11    A.  I worked in great detail with Kevin
12 Bartley mostly on the claims that were submitted.
13    Q.  Okay.
14    A.  Bill Franey and Pat Bierderman somewhat
15 on them in discussions.
16    Q.  So, would they advise you on whether to
17 provide notice or how to provide notice of claims
18 to insurance companies, for example?
19    A.  Not that I recall.  I mean, I would
20 package it, any information.  I would contact them
21 about a claim and then send the information over to

Page 19

1 them, and that's pretty much the process that I had
2 with them.
3    Q.  Okay.  Did you -- while you were there
4 from 2007 through 2015, did you ever -- were you
5 ever involved in making any other claims on
6 directors and officers liability policies?
7    A.  Nothing on directors and officers.
8    Q.  What other kinds of claims can you
9 recall, other than surety bond claims?
10    A.  Well, we didn't make any -- well, we
11 never made any surety bond claims.  Just basic, you
12 know, liability claims.
13    Q.  And did you -- on those claims, did you
14 ever provide notice directly to the insurance
15 company, or was it always through Alliant?
16    A.  The only thing I recall contacting any of
17 the underlying policyholders or -- was The Hartford
18 for Workers' Comp claims.
19    Q.  Did you -- for example, did you read the
20 insurance policy that is -- either the insurance
21 policies that have been at issue in this case, the

Page 20

1 ones from The Hartford, the 2015 or 2016 policies?
2    A.  The actual policy itself?
3    Q.  Yes.
4    A.  In detail?  Mr. Franey would come in once
5 he got the policies after the renewal, and we'd sit
6 and briefly go through them.
7    Q.  Okay.
8    A.  If there was -- you know, if there was
9 anything in particular, I would assume he would
10 have told me about it, but I did not read the
11 policy in detail.
12    Q.  What about as far as the -- for example,
13 on the second page of this document, it ends in
14 122.  I see there's some check marks in some of the
15 boxes down towards the bottom of the page?
16    A.  Yes.
17    Q.  And then there's some numbers filled in
18 here.  Did you fill in those numbers and those
19 check marks?
20    A.  I would submit to Mr. Franey a
21 handwritten form, --

Page 21

1    Q.  Okay.
2    A.  -- and then they would -- I never typed
3 this up.  Mine would be in handwriting, and then
4 they would, I guess, fill it in online.
5    Q.  You can set that aside for now.
6       MR. LEMLEY:  Mark that as Number 2,
7 please.
8       (Whereupon, Buczkowski Deposition Exhibit
9 2, Email dated September 25, 2015, marked for
10 identification.)
11 BY MR. LEMLEY:
12    Q.  So, we have handed you a document marked
13 as Exhibit 2, and there's two sets of numbers
14 there.  The first set of numbers starts with a PL.
15    A.  Um-hum.
16    Q.  Actually, it looks like there's three
17 sets of numbers.
18       MS. VRANIAN:  Yeah.
19       MR. LEMLEY:  There's something underneath
20 that.
21 BY MR. LEMLEY:

6 (Pages 18 - 21)

Page 22

1    Q.   Two sets of numbers that are more than
2  one digit long.  So, the first set starts with a
3  PL, and then the first page ends in 3782.  And then
4  the other one on the lower right-hand corner says
5  DEFS'3419; do you see that?
6    A.   Yes.
7    Q.   Okay.  Do you know what those numbers are
8  or how they came to be on the paper?
9    A.   I'm assuming they're references to my
10  case, to the documents that were used in the case I
11  had against Madison.
12    Q.   Okay.
13      MS. VRANIAN:  Charlie, just for the
14  record to make it clear, I'm not sure why the
15  plaintiff one has an overlay on there.
16      MR. LEMLEY:  Yes.
17      MS. VRANIAN:  The defendants' 3419
18  through, you know, wherever this one ends, 3422,
19  that was the original Bates stamp number from
20  Mr. Buczkowski's underlying litigation in the
21  Buczkowski vs. Madison case, and then we rebates it

Page 23

1  so that we could track it here.  But it looks like
2  it got a little bit messed up because there is an
3  overlay on the last number.
4      MR. LEMLEY:  Yes.  Although, it looks
5  like maybe there was like a -- there was a number
6  there, like it was in page numbers or something.
7      MS. VRANIAN:  Maybe.
8      MR. LEMLEY:  Anyway, I'm happy.
9      MS. VRANIAN:  Okay.
10  BY MR. LEMLEY:
11    Q.   So, on the first page, that's -- let's
12  just say the lower right-hand number is 3419.  It's
13  an email dated September 25th, 2015 from you to
14  Chris Rogan?
15    A.   Yes.
16    Q.   And Chris Rogan was a lawyer; is that
17  right?
18    A.   Yes.
19    Q.   Do you recall why you were writing to
20  Mr. Rogan at the time?
21    A.   Can I read the document real quick?

Page 24

1    Q.   Sure.
2    A.   Okay.  Yeah, just to refresh my memory.
3      (Whereupon, there was a pause for
4  document examination.)
5      THE WITNESS:  Okay.  What was your
6  question again?
7  BY MR. LEMLEY:
8    Q.   I just want to know what happened that
9  prompted you to be writing to Mr. Rogan on
10  September 25th, 2015?
11    A.   As I mentioned earlier, Madison had
12  gotten itself into some financial difficulties and
13  some problem jobs.  There was disagreement among
14  one partner and others of what we should be doing
15  and how we should be approaching things.
16      That had been going on for -- since the
17  2012/'13 time period, so I guess there was a little
18  tension in the office on some things.  So, there
19  had been discussions of setting up new companies,
20  continuing on as we were, a lot of different
21  scenarios, and in this time period, I learned that

Page 25

1  they were going to set up a new company without me,
2  and I was looking to reach out to Chris here
3  for some advice.
4    Q.   On the second page of the document, which
5  in the lower right-hand corner is 3420, --
6    A.   Um-hum.
7    Q.   -- you're identifying the different
8  people involved in Madison, and the third one is
9  yourself?
10    A.   Yes.
11    Q.   And it says 13 percent.  So, does that
12  mean you were a 13-percent shareholder of Madison?
13    A.   Yes.
14    Q.   Was that the percentage that you owned
15  from the first time that you owned shares, which I
16  think was 2007?
17    A.   Yes.  That's the beginning percentage,
18  yes.
19    Q.   And that was the percentage that you held
20  until you were terminated; is that right?
21    A.   Yes.

7 (Pages 22 - 25)

Page 26

1   Q.   I noticed in the paragraph down below
2   Larry Kraemer, there's a paragraph that begins,
3   There was no upfront cash payment required in the
4   purchase of Madison.  Do you see that?
5   A.   Correct.  Um-hum.
6   Q.   It says in the third sentence, In
7   discussions leading up to bringing Dick and Larry,
8   it was verbally discussed that the ownership
9   interests of Glenn, myself, and Gary were earned
10  via sweat equity over the years.  What does that
11  mean?
12  A.   Well, Glenn and I actually were employed
13  at Madison working at getting things turned -- they
14  had some financial problems early in the 2000s and
15  turning things around and growing the company.
16       Gary always had received -- Gary
17  was -- was there when I set up, but my
18  understanding is that Gary was tasked with
19  overseeing Madison for Blase for quite a few years.
20  And he got a management fee for doing that, that we
21  paid to him, and that fee continued on from, you

Page 27

1   know, prior to me getting there until -- he got it
2   till the day I left, I believe.
3   Q.   So, as far as your understanding, your 13
4   percent of stock was -- was earned essentially?
5   You didn't owe money for your stock, right?  Is
6   that right?
7   A.   The way the transaction was done is it
8   was all paid for out of profits from the company.
9   Q.   Okay.
10  A.   So, no one wrote a check upfront for the
11  purchase of Madison.
12  Q.   Okay.
13  A.   There was a note taken by the Cooke
14  Estate that we paid when we did distributions from
15  profits each year, and that went to pay the note
16  down.
17  Q.   And in the next sentence it says, Dick
18  and Larry's interests were supposed to be earned
19  in.  I guess that's referring to Dick Lombardo and
20  Larry Kraemer; is that right?
21  A.   Yes.

Page 28

1   Q.   And what does that mean, earned in?  It's
2   in quotation marks.
3   A.   Well, Glenn, myself, and Gary were
4   involved with Madison for -- you know, myself since
5   2002, when I came on, up until 2007; Glenn and Gary
6   from the beginning.
7       Dick and Larry had no involvement
8   whatsoever in Madison.  As it mentions in the email
9   there, Gary wanted to bring Dick and Larry in as
10  partners, give them an opportunity, but the
11  discussion we had was since they had nothing to do
12  with building Madison that there would be a -- some
13  sort of preferential distribution paid out to the
14  three of us, and it would be, you know, whatever
15  the actual number was, 20 percent of like 3.8 or
16  3 -- 3.5 million.  So, 720,000 roughly I believe it
17  was, but it was never written down.
18  Q.   Okay.
19  A.   It was just discussion between Gary
20  Garofalo and myself.
21  Q.   And the last paragraph on the

Page 29

1   page -- wait a minute.  I might be on the wrong
2   page.  I'm sorry, I lost -- I was going to ask you
3   a question about the last paragraph on the page,
4   but I think I'm wrong.  Okay.  Never mind.  It was
5   probably a brilliant question, too.  Okay.  I think
6   that's all I had on that one.
7       MR. LEMLEY:  Let's mark this one as
8   Exhibit 3, please.
9       (Whereupon, Buczkowski Deposition Exhibit
10  3, Letter dated November 11, 2015, marked for
11  identification.)
12  BY MR. LEMLEY:
13  Q.   I'm showing you what was marked as
14  Exhibit 3, and this is the November 11th, 2015
15  letter that your counsel sent to Mr. Haslam,
16  Mr. Garofalo, Mr. Lombardo, Mr. Kraemer and Richard
17  Arnold; do you see that?
18  A.   Yes.
19  Q.   And do you recall this document?
20  A.   Yes.
21  Q.   And just for the record, Richard Arnold

8 (Pages 26 - 29)

Page 30

1   is -- who is Richard Arnold?
2     A.   We had started discussions with
3   Mr. Arnold in 2014 some time I believe about --
4   there were a couple of different scenarios.  One
5   was us purchasing his company that he owned with
6   his brothers and making it part of Madison.
7     Q.   Yes.
8     A.   The other was him coming on board as a
9   partner with the rest of us.
10    Q.   Okay.  And had he come on board as a
11  partner with the rest of you as of November 11th,
12  2015?
13    A.   No.
14    Q.   So, on the second page of that document,
15  it identifies -- well, beginning at the bottom of
16  the first page you say, It is my understanding the
17  ownership of Madison Mechanical OS Corp. is as
18  follows:  And it lists the five.  It has Garofalo,
19  Lombardo, Kraemer, and yourself, and it identifies
20  you as a 13-percent shareholder; is that right?
21    A.   Yes.

Page 31

1     Q.   Is that your understanding of your
2   ownership as of November 11th, 2015?
3     A.   Yes.
4     Q.   And then you identify the -- another
5   limited liability company had been formed called
6   Madison Mechanical Contracting, LLC, and that one
7   includes Mr. Arnold, right?
8     A.   Yes.
9     Q.   So, it was your understanding that
10  Mr. Arnold had come on board with Mr. Haslam,
11  Garofalo, Lombardo, and Kraemer, but not with you,
12  correct?
13    A.   They had set up a new LLC.
14    Q.   And in the next paragraph after the list
15  of the owners of the new LLC, it starts off, It
16  appears to my client that the purpose of Madison
17  Mechanical Contracting, LLC is to divert the
18  business and client base of Madison Mechanical for
19  the benefit of Madison Mechanical Contracting, LLC
20  and to the detriment of Madison Mechanical.  Do you
21  see that?

Page 32

1     A.   Yes.
2     Q.   Can you just explain that in your own
3   words?  What was the -- what was your dispute that
4   was being raised in this letter?
5     A.   Basically, they were setting up -- they
6   set up a new company to take the place of Madison
7   Mechanical and continue the operation of the
8   company.
9     Q.   So, why was that a concern to you?
10    A.   Well, I was 13-percent owner of Madison
11  Mechanical, and if they are setting up a new
12  company to transfer the jobs over and any new
13  projects, then that would mean that Madison
14  Mechanical would suffer going forward.
15    Q.   So, fair to say that with this letter,
16  you're asserting your interest as a shareholder of
17  Madison Mechanical OS Corp.; is that right?
18    A.   Yes.
19    Q.   At this point, as of November 11th, 2015,
20  your employment had not actually been terminated
21  yet; is that right?

Page 33

1     A.   Honestly, the exact date I don't recall,
2   but I would -- I believe the letter was after.
3     Q.   I think I'm going to show it to you.
4     A.   Okay.
5     Q.   It doesn't mention --
6     A.   The exact dates I can't remember, yeah.
7     Q.   The letter doesn't mention anything about
8   being terminated, and I was just making that point.
9     A.   Um-hum.
10    Q.   Okay.  Set that aside.
11       MR. LEMLEY:  Mark this as Exhibit 4.
12       (Whereupon, Buczkowski Deposition Exhibit
13  4, Letter dated November 18, 2015, marked for
14  identification.)
15  BY MR. LEMLEY:
16    Q.   What we have just marked as Exhibit 4 I
17  believe is the letter that I was just telling you I
18  thought I was going to be doing.  This is a letter
19  dated November 18, 2015 to you from Glenn Haslam,
20  president, Madison Mechanical, Inc.  Do you
21  recognize that letter?

9 (Pages 30 - 33)

Page 34

1   A.  Yes.
2   Q.  And you can take the time to look at it
3 if you don't recall it in detail, but is this the
4 letter where you were terminated, your employment
5 was terminated?
6   A.  Yes.
7   Q.  And it says -- at the beginning, it says,
8 For the reasons that have been discussed with you
9 on numerous occasions, you were previously advised
10 that your employment with Madison Mechanical, Inc.
11 was being terminated for cause.  Do you recall
12 being advised before this date that your employment
13 was being terminated for cause?
14   A.  No.
15   Q.  Do you recall being advised before this
16 date that your employment was being terminated?
17   A.  There were some discussions that I had
18 with Glenn and Gary Garofalo during -- leading up
19 to the November time frame.
20   Q.  Just to the best of your recollection,
21 can you describe those conversations?  What was

Page 35

1 discussed?
2   A.  We discussed Madison and going forwards
3 and different things.  There was discussion of not
4 being part of Madison, but them wanting me to
5 continue to work on closing up projects and jobs
6 and working on closing out Madison.
7   Q.  So, was this the first time you had ever
8 heard that they were talking about terminating you
9 for cause?
10   A.  Yes.
11   Q.  What did that mean to you, being
12 terminated for cause?  Is there any significance to
13 that?
14   A.  The significance for me would be that
15 that would be them stating that there was something
16 I did that would be a basis for termination, which
17 I do not believe there was.
18   Q.  It says at the end of that paragraph,
19 Despite having no obligation to do so, the company
20 will continue to pay your regular pay less
21 applicable taxes and withholdings through the

Page 36

1 originally scheduled termination date of November
2 25th, 2015.  Did they do that, do you recall?
3   A.  I believe I got paid through the end of
4 November.
5   Q.  And the next paragraph says that, The
6 company previously offered to pay you severance.
7 It is the understanding of the company that you
8 have rejected that offer.  Was that accurate?
9   A.  The discussion with Mr. Garofalo and
10 Mr. Haslam leading up to -- I can't recall exact
11 dates, but prior to this, there was discussion
12 about some form of payments contention upon some
13 other activities, financial, and I can't recall
14 exactly what it was.  So, yes, there was something
15 there.
16   Q.  At this time, you said before, I believe,
17 you did not have an employment agreement, right?
18   A.  Correct.
19   Q.  So, the for cause -- I know that for
20 cause is mentioned in the shareholder's agreement?
21   A.  Yes.

Page 37

1   Q.  But as far as just terminating your
2 employment, as far as your understanding, you were
3 employed at will; is that right?
4   A.  Yes.
5   Q.  What did you do like for work after you
6 were terminated here?
7   A.  I actually went into construction,
8 renovating homes, flipping houses, and home
9 improvements.
10   Q.  All right.  You can set that aside.
11     MR. LEMLEY:  Can you mark this Number 5?
12     (Whereupon, Buczkowski Deposition Exhibit
13 5, Stockholder's Agreement, marked for
14 identification.)
15 BY MR. LEMLEY:
16   Q.  So, we just handed you Exhibit 5, and
17 that's the Madison Mechanical OS Corp.
18 shareholder's agreement; is that right?
19   A.  Yes.
20   Q.  And if you look at page 4 of the
21 document, and it's number 4088 in the lower

10 (Pages 34 - 37)

Page 38

1 right-hand corner, there's a section there
2 that -- Section 4A, it says, Transfers By Reason of
3 Termination of Employment, do you see that?
4    A.   Yes.
5    Q.   And the third one, sub-paragraph 3, says,
6 In the event that a stockholder has been terminated
7 for cause, then the purchase price shall be the
8 lesser of the formula for purchase price as
9 determined in Section 6 or the amount the offering
10 stockholder paid for such shares, do you see that?
11   A.   Yes.
12   Q.   Do you understand that the reason for
13 your being terminated for cause was for the purpose
14 of purchasing your shares pursuant to this
15 provision?
16      MS. VRANIAN:  Objection.
17      THE WITNESS:  My belief was that
18 the -- was that there was no cause.  There had been
19 no discussions leading up to the receipt of the
20 letter that we just looked at, so my understanding
21 was that the reason they were putting for cause in

Page 39

1 there was because of this section.
2 BY MR. LEMLEY:
3    Q.   In fact, they -- I think I can show you a
4 document, but did they not shortly after this,
5 they -- did they offer to purchase your shares for
6 zero dollars per share as book value?
7    A.   There was a communication, I believe,
8 with Mr. Scarlett that had a reference to that.
9    Q.   And you never did sell your shares back
10 to them, did you?
11   A.   The actual shares, the physical shares
12 were left at Madison Mechanical, I believe, in the
13 safe.  I don't -- I believe they got lost.  There
14 was a settlement with the parties.  At that point,
15 I believe I -- my understanding on my side is that
16 I sold the shares at that point in time.
17   Q.   I'm sorry.  I should have put a time
18 frame on it.
19   A.   I'm sorry.
20   Q.   Up until the time of the settlement, your
21 understanding is that you retained your 13-percent

Page 40

1 ownership up until the time of the settlement; is
2 that right?
3    A.   Yes.
4    Q.   All right.  So, if you could turn to page
5 6 of the document.  It's 4090 at the lower
6 right-hand corner.
7    A.   Um-hum.
8    Q.   Subsection D, it talks about transfer due
9 to a failure of the stockholder to contribute upon
10 a default of the corporation's obligations to
11 transferor, do you see that?
12   A.   Yes.
13   Q.   Do you know if the corporation ever
14 defaulted on its obligations to the transferor?
15   A.   No.
16   Q.   The transferor was Dawn Cooke that's
17 described on the first page?
18   A.   The Cooke Estate, yes.
19   Q.   So, they did not default on their
20 obligations to the Cooke Estate as far as you know?
21   A.   No.  We actually paid the note to the

Page 41

1 Cooke Estate off I think -- I believe at the end of
2 2012.
3    Q.   You can set that aside.
4      MR. LEMLEY:  The good thing is we can use
5 these exhibits.  Most of the marking is being done
6 now, I think.
7      So, will you mark that as 6, please?
8      (Whereupon, Buczkowski Deposition Exhibit
9 6, Letter dated January 14, 2016, marked for
10 identification.)
11 BY MR. LEMLEY:
12   Q.   Exhibit 6 is a letter dated January 14th,
13 2016 to your attorney, Robert Scarlett, regarding
14 you, and it came from a Daryl Sidle of THE Baxter,
15 Baker law firm where we are now; is that right?
16      (Whereupon, there was a pause for
17 document examination.)
18 BY MR. LEMLEY:
19   Q.   Is that what you have in front of you?
20   A.   Yes.
21   Q.   Okay.

11 (Pages 38 - 41)

Page 42

1    A.  I'm sorry.

2    Q.  And so the first paragraph of this

3  document is, I write to you as counsel for Madison

4  Mechanical OS Corp.  As you are aware, your client,

5  Robert J. Buczkowski's employment with Madison

6  terminated on November 24th, 2015.  Accordingly,

7  pursuant to the Madison stockholder's agreement, of

8  which your client is a party, Mr. Buczkowski is now

9  obligated to sell his stock in Madison, do you see

10  that?

11    A.  Yes.

12    MS. VRANIAN:  Can we go off the record

13  for a second?

14    (Recess taken -- 11:52 a.m.)

15    (After recess -- 11:52 a.m.)

16  BY MR. LEMLEY:

17    Q.  So, this January 14th, 2016, --

18    A.  Yes.

19    Q.  -- to the best of your recollection, was

20  this the first time that anyone on behalf of

21  Madison proposed to purchase your stock in Madison?

Page 43

1    A.  I believe it was.

2    Q.  All right.  And then the third paragraph

3  begins, Accordingly, pursuant to the stockholder's

4  agreement, the purchase price for your client's

5  capital stock in Madison is currently calculated to

6  be zero.  And the paragraph ends, Please have your

7  client endorse the stock certificate in blank and

8  forward it to me to consummate the stock purchase.

9  So, you did not accept that offer?

10    A.  No.

11    Q.  The second page that ends in 214 at the

12  lower right-hand corner, it says -- the third

13  sentence says, In late December 2015, Madison

14  Mechanical, Inc., the wholly-owned subsidiary of

15  Madison Mechanical OS Corp., entered into a

16  voluntary dissolution.  At this point, Madison

17  Mechanical, the operating subsidiary, exists solely

18  for the purpose of winding up its existing business

19  and consummating the orderly liquidation and

20  distribution of its net assets, if any, do you see

21  that?

Page 44

1    A.  Yes.

2    Q.  Were you aware of that before this

3  letter -- before your lawyer received this letter

4  on January 14th, 2016?

5    A.  I believe that Mr. Scarlett had come

6  across some information online when he was doing

7  some research that showed that they had filed

8  paperwork with the state.

9    Q.  Okay.  And Madison Mechanical that was

10  dissolved, Madison Mechanical, Inc., that was the

11  company for which you were the CFO; is that right?

12    A.  Madison Mechanical, Inc., yes.

13    Q.  Okay.  You can set that aside.

14    MR. LEMLEY:  Let's mark this as Number 7.

15    (Whereupon, Buczkowski Deposition Exhibit

16  7, Letter dated May 10, 2016, marked for

17  identification.)

18  BY MR. LEMLEY:

19    Q.  What's been marked as Exhibit 7 is a

20  letter dated May 10th, 2016 from you to Mr. Haslam

21  and to Madison Mechanical OS Corp., care of

Page 45

1  Mr. Haslam, correct?

2    A.  Yes.

3    Q.  And it says it's a RE: Shareholder Demand

4  and Request to Inspect Corporate Records, do you

5  see that?

6    A.  Yes.

7    Q.  Okay.  In the first sentence you say, I'm

8  writing to you in my capacity as a minority

9  shareholder of Madison Mechanical OS Corp.  What

10  did you mean by that?

11    A.  To be honest with you, the letter was

12  drafted by Mr. Scarlett, my attorney.

13    Q.  Okay.

14    A.  I guess you can probably guess that, so I

15  just transferred it to my letterhead.

16    Q.  Okay.

17    A.  But I was a minority shareholder at 13

18  percent.

19    Q.  If you look at the second page, I guess

20  it's the second full paragraph that begins,

21  Furthermore?

12 (Pages 42 - 45)

Page 46

1    A.   Um-hum.

2    Q.   It says, Furthermore, you purported to

3    terminate my employment from Madison Mechanical OS

4    Corp. allegedly for cause despite the fact that

5    there was no cause for my termination.  You did

6    this for the improper purpose of attempting to

7    force me to transfer my shares to the corporation.

8    In furtherance of this effort, your lawyer demanded

9    that I transfer my stock back to the corporation

10   for no consideration.

11          Understanding that you didn't draft the

12   exact words, do you recall what you were -- what

13   you meant by that, the allegations in that

14   paragraph?

15   A.   Again, based upon the couple of years of

16   discussions and everything that was going on at

17   Madison and how things were playing out from what I

18   found out was that, again, my side there was no

19   basis for termination.  It was a -- you know, the

20   letter was to get me out of ownership of Madison

21   Mechanical.

Page 47

1    Q.   So, it seems to me that it's saying that

2    they terminated you purportedly for cause, even

3    though you didn't think there was cause, and that

4    they did that to force you to sell your stock, is

5    that what you were saying?

6    A.   Yes.

7    Q.   Just to be clear, you weren't alleging

8    that you were terminated because of your race or

9    your sex or your national origin or your religion

10   or anything along those lines.  It was you were

11   being terminated allegedly for cause to force your

12   sale of stock; is that right?

13   A.   Yes.

14   Q.   And you weren't alleging that there was a

15   breach of any employment agreement, because there

16   was not an employment agreement, right?

17   A.   Correct.

18   Q.   Do you recall in this letter or in your

19   Complaint in the lawsuit, do you recall if you ever

20   asked for back-pay or front-pay or anything along

21   those lines?

Page 48

1    A.   In regards to the?

2    Q.   For termination of your employment.  Did

3    you --

4    A.   From memory, I believe that as part of

5    the lawsuits, there -- there were initial

6    conversations with, I believe, Mr. Scarlett.  Early

7    on there was discussions of pursuing that maybe.  I

8    don't believe the lawsuit that JGL did for me,

9    Joseph, Greenwald, had that in it.  I can't recall

10   exactly.

11   Q.   All right.  You can set that aside.

12          MR. LEMLEY:  Mark this one as Exhibit 8.

13          (Whereupon, Buczkowski Deposition Exhibit

14   8, Letter dated May 11, 2016, marked for

15   identification.)

16   BY MR. LEMLEY:

17   Q.   What I have marked -- have had marked as

18   Exhibit 8 is a letter dated May 11th, 2016 from

19   Daryl Sidle to you responding to your letter of May

20   10th, 2016, correct?

21   A.   Yes.

Page 49

1    Q.   And the third paragraph begins, As you

2    are well aware, --

3    A.   Um-hum.

4    Q.   -- your employment with the corporation

5    terminated on November 24th, 2015.  Pursuant to the

6    terms of the corporation's stockholder's agreement,

7    of which you are a party, upon the termination of

8    your employment, you are obligated to sell your

9    stock pursuant to the agreement, do you see that?

10   A.   Yes.

11   Q.   So, as of this time, May 11th, 2016, you

12   had not sold your stock, correct?

13   A.   No, I had not.

14   Q.   And at the end of the next paragraph, the

15   second to the last sentence in the next paragraph

16   says -- it's underlined, Your failure to cooperate

17   with that request in no way changes the fact that

18   you have ceased to be a stockholder in the

19   corporation, do you see that?

20   A.   Yes.

21   Q.   Do you know if any -- do you know how you

13 (Pages 46 - 49)

Page 50

1 ceased to be a stockholder in the corporation if
2 you hadn't sold back your shares?
3      MS. VRANIAN: Objection.
4 BY MR. LEMLEY:
5   Q.  You may not know. I'm asking if you know
6 what that meant.
7   A.  I don't know.
8   Q.  And then on the next paragraph -- the
9 next page, excuse me, the second full paragraph
10 that begins, Again, contrary to, and the fourth
11 sentence in there says, You were an at-will
12 employee whose employment could be terminated at
13 any time for any reason or for no reason, do you
14 see that?
15   A.  Yes.
16   Q.  I believe you already told me before you
17 do agree that you were an at-will employee,
18 correct?
19   A.  I'm sorry?
20   Q.  You were an at-will employee, correct?
21   A.  Yes.

Page 51

1   Q.  All right. Set that aside.
2      MS. VRANIAN: Charlie, can we take a
3 five-minute break when it's good for you?
4      MR. LEMLEY: Yeah. Yeah. Absolutely.
5 It's always good for me to take a break.
6      (Recess taken -- 12:03 p.m.)
7      (Whereupon, Buczkowski Deposition Exhibit
8 9, Consent of Sole Director, marked for
9 identification.)
10     (Whereupon, Buczkowski Deposition Exhibit
11 10, Affidavit of Robert Buczkowski, marked for
12 identification.)
13     (Whereupon, Buczkowski Deposition Exhibit
14 11, Confidential Settlement Agreement and Release,
15 marked for identification.)
16     (After recess -- 12:10 p.m.)
17 BY MR. LEMLEY:
18   Q.  All right. So, what I have handed you
19 marked as Exhibit 9 is Consent of Sole Director
20 Madison Mechanical OS Corp. dated September 15th,
21 2016, do you see that?

Page 52

1   A.  Yes.
2   Q.  And did you -- you've seen this document
3 before?
4   A.  Yes.
5   Q.  Did you see it in the course of your
6 litigation?
7   A.  Yes, during litigation.
8   Q.  Do you have an understanding of what this
9 document was intended to accomplish?
10   A.  The document refers to, I guess, capital
11 contributions, on the first page, made by the
12 shareholders, and then the second page is showing a
13 reallocation of the original ownership percentages.
14   Q.  So, if you look at the bottom of the
15 first page it says, Now, therefore, the
16 undersigned, being the sole director of the
17 corporation, does hereby declare that the actions
18 expressed in the following resolutions shall be and
19 are hereby taken by the director of the corporation
20 as of the date first herein above written.  That
21 seems to refer back to the September 15th, 2016,

Page 53

1 would you agree?
2   A.  Yes.
3   Q.  On the next page it says, Resolved, that
4 effective April 1st, 2015, the corporation's stock
5 certificates numbered 1 through 6 are hereby
6 voided, and the corporation's stock certificates
7 numbered 7 through 11 be issued to reflect the
8 aggregate capital contribution set forth above and
9 the resulting shares of stock owned by the
10 stockholders as calculated based on a consistent
11 per-share value of the corporation from March 1st,
12 2014 through March 31st, 2015.  All of said
13 certificates to be dated as of April 1st, 2015.
14 And below that it has the reallocated ownership
15 percentages, correct?
16   A.  Yes.
17   Q.  And that shows you owning 7.006 percent,
18 right?
19   A.  That's what it reflects, yes.
20   Q.  To the best of your knowledge, did you
21 own 13 percent of the shares up until this action

14 (Pages 50 - 53)

Page 54

1  was taken on September 15th, 2016?
2      A.   My contention and my lawsuit was based
3  upon my belief that I owned 13 percent.  This is a
4  document that Mr. Haslam executed that I was
5  unaware of until the litigation occurred.
6      Q.   But is it your understanding this
7  document was -- this action was taken on September
8  15th, 2016, correct?
9      A.   It's dated September 15th, 2016, yes.
10     Q.   And it was made retroactive to -- it was
11  made effective as of April 1st, 2015, right?
12     A.   Yes, that's what it states.
13     Q.   Are you aware of any other action that
14  was taken before September 15th, 2016 to reduce
15  your percentage ownership of stock?
16     A.   A formal document executed by Mr. Haslam?
17     Q.   Are you aware of anything, any action
18  that was taken before September 15th, 2016?
19     A.   During the course of litigation, there
20  were some emails that I saw that went back through
21  a couple different scenarios that they were looking

Page 55

1  at, I believe.
2      Q.   Okay.
3      A.   But --
4      Q.   As far as you know, this is -- is
5  this -- and I'm not trying to -- this is not a
6  trick question.
7      A.   Yeah.
8      Q.   Were there any other scenarios that, as
9  far as you know, actually came to fruition where
10  there was an actual action taken to reduce your
11  ownership, other than this one?
12     A.   I believe this is the only written
13  executed document.
14     Q.   And I will show you what we have marked
15  as Exhibit 10.
16         MR. LEMLEY:  If you can pass those along.
17  BY MR. LEMLEY:
18     Q.   Exhibit 10 is your Affidavit dated May
19  25th, 2018, correct?
20     A.   Yes.
21     Q.   This Affidavit was executed in connection

Page 56

1  with your settlement of the underlying litigation,
2  right?
3      A.   Yes.
4      Q.   And paragraph 5 says, As of April 1st,
5  2015, Mr. Haslam and OS Corp. diluted my ownership
6  interest from 13 percent to 7.74 percent, correct?
7      A.   Yes.
8      Q.   And paragraph 6 says, The dilution
9  occurred and was effective as of April 1st, 2015,
10  correct?
11     A.   Yes.
12     Q.   Those two numbers, you are referring to
13  the corporate action that we just looked at that
14  was taken in September of 2016, correct?
15     A.   There -- it appears to be referencing it,
16  but the percentages between the two documents are
17  off slightly.
18     Q.   You can set those aside.  I will show
19  you -- after I find mine here, there it is -- what
20  we have marked as Exhibit 11.  So, Exhibit 11 is
21  the settlement agreement dated May 24th, 2018 by

Page 57

1  and among yourself, Madison Mechanical OS Corp.,
2  Madison Mechanical Contracting, LLC, Glenn Haslam,
3  Gary Garofalo, Lawrence Kraemer, Richard Lombardo,
4  and Richard Arnold, correct?
5      A.   Yes.
6      Q.   And at the bottom of the second page,
7  paragraph 4 starts off, Release by Plaintiff, and
8  it says, In consideration for -- in consideration
9  of the sum of $725,000 to be paid as provided in
10  paragraph 6 and in consideration for the dismissal
11  of the action, the promises and agreements of the
12  parties contained herein and other good and
13  valuable consideration, the receipt of which is
14  hereby acknowledged, Plaintiff releases and forever
15  discharges, and I will not read the rest of that.
16         So, do you know how the sum of $725,000
17  was calculated or what's the basis for that number?
18     A.   There had been a valuation report that I
19  had paid to have done that assigned a value to the
20  value of the stock or the value of Madison.
21     Q.   Okay.

15 (Pages 54 - 57)

Page 58

1    A.  So, there was some back and forth at
2  mediation, and it was an agreed-upon amount.
3    Q.  Do you recall what that valuation was,
4  even roughly?
5    A.  From the report, a million 2, somewhere
6  in that neighborhood.
7    Q.  So, would it be fair to say this is a
8  negotiated figure for the valuation of your
9  ownership of Madison Mechanical?
10   A.  That's how I look at it, yes.
11   Q.  Then on page 5 of 9, paragraph 8 says,
12  Cooperation in insurance coverage litigation,
13  Plaintiff agrees that upon execution of this
14  agreement by all parties, he will execute an
15  Affidavit concerning his ownership interest in OS
16  Corp., do you see that?
17   A.  Yes.
18   Q.  Was that the Affidavit that we just
19  looked at that was marked as Exhibit 10?  Is that
20  the Affidavit that you --
21   A.  Yes.

Page 59

1    Q.  -- executed?  Did you draft that
2  Affidavit, or did someone else draft that for you?
3    A.  Someone else drafted it.
4    Q.  Do you know who drafted it?
5    A.  I believe Madison group's attorneys.
6    Q.  Okay.
7    A.  I'm not sure.
8    Q.  You can set that aside.
9        MR. LEMLEY:  Mark that as Number 12.
10       (Whereupon, Buczkowski Deposition Exhibit
11  12, Email dated November 19, 2011 with attachment,
12  marked for identification.)
13  BY MR. LEMLEY:
14   Q.  Exhibit 12 is an email from back in
15  October 19th, 2011 from Gary Garofalo to Glenn
16  Haslam, you, Dick Lombardo, and Larry Kraemer.
17   A.  Yes.
18   Q.  The Subject is Consequences of Failure to
19  Pay Call, right?
20   A.  Yes.
21   Q.  It says, At our September 1st meeting in

Page 60

1  Madison's office, we discussed that since the
2  current stockholder's agreement was silent on what
3  would happen if a shareholder did not make their
4  requested cash-call obligation, that I would look
5  into some alternatives from which we could generate
6  a policy that we would use to amend the SA, which
7  is stockholder's agreement, --
8    A.  Um-hum.
9    Q.  -- do you see that?
10   A.  Yes.
11   Q.  And the document that's attached is a
12  memorandum from Mr. Garofalo dated October 17th,
13  2011 that has some various alternatives, correct?
14   A.  Yes.
15       MS. VRANIAN:  Just to clarify, it's a
16  memo to Mr. Garofalo.
17       MR. LEMLEY:  A memo to Mr. Garofalo.  I
18  apologize.  Thank you.  That's correct.  A memo to
19  Mr. Garofalo.
20  BY MR. LEMLEY:
21   Q.  And, for example, the first alternative

Page 61

1  is personal debt to the company.  The unpaid
2  contribution is considered a personal debt due to
3  the company from Stockholder B and is repaid with
4  interest from future distributions, dividends to
5  Stockholder B or upon the sale of the company.
6  There would be no adjustment of ownership interest.
7  This is a relatively benign approach, do you see
8  that?
9    A.  Yes.
10   Q.  And then there are four other
11  possibilities, correct?
12   A.  Um-hum.
13   Q.  But the stockholder's agreement was never
14  amended to reflect any of these, was it?
15   A.  No, the stockholder agreement was never
16  amended.
17   Q.  All right.  You can set that aside.
18       MR. LEMLEY:  Thirteen.
19       (Whereupon, Buczkowski Deposition Exhibit
20  13, Email dated March 6, 2015 with attachment,
21  marked for identification.)

16 (Pages 58 - 61)

Page 62

1 BY MR. LEMLEY:

2   Q.   Exhibit 13 is a memo, I think, from Glenn
3 Haslam dated March 6th, 2015 to you, Mr. Garofalo,
4 Mr. Lombardo, and Mr. Kraemer, and the Subject is,
5 Forward Madison Equity 03-01-2015, right?

6   A.   Yes.

7   Q.   Okay.  And it says, Guys:  See attached
8 accounting of capital calls/loans by all partners.
9 We need to do a capital call to pay BBT next week.
10 You will see the amounts needed listed as March
11 bank payment.  As always, we will follow the
12 operating agreement as it relates to capital calls.
13 Thanks, Glenn.

14         Do you know what operating agreement
15 that's referring to?

16   A.   We only had one operating agreement.

17   Q.   And what was that?  Was that the
18 shareholder's agreement?

19   A.   Yes.  The shareholder's agreement, yes.

20   Q.   Thanks.  You can set that aside.

21         (Whereupon, Buczkowski Deposition Exhibit

Page 63

1 14, Email dated March 17, 2015, marked for
2 identification.)

3 BY MR. LEMLEY:

4   Q.   So, Exhibit 14 is from you dated March
5 17th, 2015 to Bill Franey, Sr., copied Brenda
6 Patterson and Jerry Russell.  The Subject is RE:
7 Madison Mechanical's Financials 2014, do you see
8 that?

9   A.   Yes.

10   Q.   Do you know why you were sending this
11 information to Mr. Franey?

12   A.   Why I was sending it to him?

13   Q.   Yes.

14   A.   Why -- I cannot recall why I was sending
15 it to him --

16   Q.   Okay.

17   A.   -- exactly.  I mean --

18   Q.   On the second page of this document, it
19 says 4080 in the lower right-hand corner.  Right in
20 the middle, there's something from you to
21 Mr. Franey dated March 17th, 2015, and it says,

Page 64

1 Bill:  Here's the draft that was sent over to
2 Reznick.  Any questions, let me know.  Do you know
3 who Reznick is?

4   A.   The auditors.

5   Q.   I'm sorry?

6   A.   The audit company.

7   Q.   Auditors.

8   A.   Reznick and -- well, Reznick Cohn now I
9 believe it is called.

10   Q.   Was Mr. Franey somehow involved in the
11 audit of Madison Mechanical?

12   A.   Like I said, Bill, or Mr. Franey, was
13 used as a consultant or a sounding board by
14 Mr. Haslam and Mr. Garofalo.

15   Q.   I may have asked you this before, but was
16 that true, that Mr. Franey was a consultant or
17 sounding board throughout the time from 2002 all of
18 the time that you were there?

19   A.   I don't recall how much involvement
20 Mr. Franey had leading up to the 2011/2012 time
21 period.  We would meet with them every so often

Page 65

1 during the course of the year.

2   Q.   Was there a time in -- 2011/2012 you
3 mentioned.  Was there -- did something happen then?
4 Did his involvement increase or --

5   A.   Well, as I've mentioned previously, we
6 ran into some severe financial difficulties and
7 problem jobs with Clark Construction, and Bill
8 became heavily involved with us.

9   Q.   Okay.  So, is it fair to say -- and I'm
10 not -- I'm probably making these questions sound
11 more difficult than they are.

12         So, Mr. Franey, there was a relationship
13 between Madison and Mr. Franey going back as far as
14 2002; is that correct?

15   A.   Mr. Franey has -- was involved, my
16 understanding, with Harkins Builders from back in
17 the early '70s --

18   Q.   Okay.

19   A.   -- as an insurance broker, and then
20 Madison's inception from '93 has been involved.

21   Q.   Okay.  Thank you.

17 (Pages 62 - 65)

**Page 66**

1    (Whereupon, Buczkowski Deposition Exhibit
2  15, Complaint, marked for identification.)
3    MR. LEMLEY: Don't worry, we're not going
4  to go through every paragraph.
5    MS. VRANIAN: Thank you.
6  BY MR. LEMLEY:
7    Q.  So, what was marked as Exhibit 15, I
8  believe, is -- this is the Complaint that you filed
9  in your lawsuit in Baltimore County.
10    A.  Yes.
11    Q.  I won't go through this, but there are
12  numerous places in here where it alleges that you
13  were a 13-percent shareholder of Madison
14  Mechanical, and is it a fair representation of your
15  testimony today that that was your position up
16  until the time that you settled the lawsuit?
17    A.  Yes.
18    Q.  I don't think I have anything else to ask
19  on that. I wanted to get it in the record and have
20  it. You can set it aside now.
21    MR. LEMLEY: Do you have any questions?

**Page 67**

1    MS. SCHAFFNER: No.
2    MR. LEMLEY: I don't think I have any
3  more questions.
4    THE WITNESS: Okay.
5    MS. VRANIAN: I just have a couple.
6    EXAMINATION
7  BY MS. VRANIAN:
8    Q.  I promise to be quick and go totally out
9  of order because I'm just going --
10    A.  Okay.
11    Q.  -- to respond to what Mr. Lemley had to
12  say. Okay. So, I want to go back to Exhibit 2.
13  Mr. Buczkowski, if you look at Exhibit 2, it's an
14  email from you dated September 25th of 2015; is
15  that correct?
16    A.  Yes.
17    Q.  On page -- well, on the first page there
18  under 4, you say you're looking for guidance on,
19  and 4 is negotiating some type of settlement in
20  regards to my exit either some time in the near
21  future or hanging around and closing up of Madison,

**Page 68**

1  is that accurate?
2    A.  Yes.
3    Q.  Then I also believe that later in that
4  same email to Mr. Rogan on the third page of it,
5  which is marked Defendant's 3421, you're talking
6  about reasons for your departure. And you say, My
7  take on it was for various reasons.
8    Is it fair to say that as of that Friday,
9  September 25th, 2015 date, you were aware that your
10  employment with Madison was coming to an end?
11    A.  There was discussions with Mr. -- I would
12  have discussions with Mr. Haslam, and during the
13  course of the time that we started having problems
14  and stuff, that there were 20 different scenarios
15  that would come up. He would talk about him and I
16  going and just doing something. He would talk
17  about me not being part of it. He'd talk about him
18  not being part of it, so there were a lot -- a lot
19  of discussions.
20    So, at this point, there was discussions
21  of me not being part of it, and I wasn't one

**Page 69**

1  hundred percent sure of what the final result would
2  be, but I was trying to do whatever I could to
3  possibly protect myself.
4    Q.  So --
5    A.  So, as of this date, whatever the
6  discussion was is I was not going to be part of.
7    Q.  So, it's fair to say that as of September
8  25th, you knew that you weren't going to be a part
9  of it?
10    A.  Not a hundred percent, again, because of
11  the discussions with Mr. Haslam that things just
12  may stay. The discussions that I was having with
13  Mr. Haslam, he was having other discussions at the
14  same time. The -- I believe the operating
15  agreement for the new co was done in August, but he
16  was still telling me, at points in time, that we'll
17  probably just keep Madison just the way it is and
18  keep going forward.
19    Q.  But you put this in this email --
20    A.  At this point, there's a distinct
21  possibility based on everything that I was not

18 (Pages 66 - 69)

Page 70

1 going to be part of things going forward.

2   Q.   You put in this email that you

3 were -- that you were going to "exit", as you put

4 it, Madison?

5   A.   It appeared that way, yes.

6   Q.   So, then let's go to Exhibit 4, which is

7 the November 18th termination letter.  You

8 testified earlier about there not having been any

9 discussions about your employment with Madison, but

10 you just testified just now that there had been

11 discussions with Mr. Haslam about Madison and your

12 continued employment there, right?

13   A.   There were -- there were discussions with

14 Mr. Haslam back and forth about nothing changing at

15 Madison and us continuing on with operations with

16 the way they were.  There were discussions about he

17 would say that he was going to just leave.

18     So, you know, again, it's not a clear

19 that I was not going to be part of it.  There was

20 discussions, again, on various different avenues.

21   Q.   So, let me try to make it just a little

Page 71

1 bit clearer.

2   A.   Yes.

3   Q.   With respect to the timing of this

4 letter, it's fair to say that you had had

5 discussions with Mr. Haslam, prior to being

6 terminated, about your future with Madison?

7   A.   Yes.

8   Q.   Okay.  Now, you testified multiple times

9 that up until your termination, you were a

10 13-percent shareholder, correct?

11   A.   Yes, 13 percent.

12   Q.   Now, you don't disagree that there were

13 capital calls made, correct?

14   A.   There were requests for capital or money

15 to be put into the company, yes, by Mr. Haslam.

16   Q.   And let's go to -- let me find the

17 exhibit.  Hold on one second.  Could you look at

18 Exhibit 10, which is your Affidavit?  You agree

19 that in March and December of 2014 and throughout

20 the months of January through March of 2015 that

21 capital calls were made by Mr. Haslam?

Page 72

1   A.   Yes.

2   Q.   And you agree that your equitable

3 percentage, which was 13 percent, totaled $283,609?

4   A.   Yes.

5   Q.   And you agree that you only contributed

6 $143,609?

7   A.   Yes.

8   Q.   So, you also agree that as of April 1st,

9 Mr. Haslam and OS Corp. diluted your ownership from

10 13 percent down to the 7.774 percent?

11   A.   Right.  The item number 5 where it says

12 that Mr. Haslam diluting it, that is what he did.

13   Q.   You agree that he did that effective

14 April 1st of 2015, --

15   A.   Based on the documents --

16   Q.   -- fair?

17   A.   -- that I was given; yes.

18   Q.   Now, give me just a minute to go through

19 my notes.  I think I only have a couple more for

20 you.

21     At the time that you signed this

Page 73

1 Affidavit, you were still represented by Joseph,

2 Greenwald & Laake?

3   A.   Yes.

4   Q.   And did Joseph, Greenwald & Laake give

5 you advice?  We don't want to know anything about

6 what they told you about it, but is it fair to say

7 that you were advised by them with respect to this

8 Affidavit, so you had counsel?

9   A.   Yes.

10   Q.   Now, let's go to Exhibit 13.  Exhibit 13

11 is an email from Mr. Haslam dated March 6th of

12 2015, and it's to you, Gary Garofalo, Dick

13 Lombardo, and Larry Kramer; is that correct?

14   A.   Yes.

15   Q.   If you go to the second page of that

16 email, can you tell us what that is?

17   A.   It's a schedule that reflects the owners

18 of the company, their ownership percentages --

19   Q.   And --

20   A.   -- monies -- oh.

21   Q.   I'm sorry.  On that schedule, which is

19 (Pages 70 - 73)

Page 74

1  labeled Madison Equity Balances, what does it show
2  your ownership percentage at, at that time?
3     A.  Thirteen percent.
4     Q.  Where do you see 13 percent?
5     A.  At the top.
6     Q.  Right.  If you look under the 13 percent
7  under your column, Percentage of Capital Funded,
8  what does it show your percentage of capital funded
9  to be?
10    A.  9.71 percent.
11    Q.  And I assume you're better at math than I
12  am, --
13    A.  Well, maybe.
14    Q.  -- but do you know if that 9.71 percent
15  figure includes your loans as well as the capital
16  calls?
17    A.  I --
18    Q.  If you don't know off of the top of your
19  head, that's fine.
20    A.  It appears to be the total cash fundings.
21    Q.  So, it appears to include the loans as

Page 75

1  well?
2     A.  Yes.
3     Q.  Okay.  And then let's look at 14, Exhibit
4  14.  That is an email from you to Mr. Franey,
5  copying Brenda Patterson and Jerry Russell, and if
6  you turn to the last page of that exhibit, is that
7  the same Madison equity balances chart that we just
8  looked at?
9     A.  It appears to be the exact same thing.
10    Q.  Okay.  Now, your -- the underlying
11  Complaint in this action that was marked as Exhibit
12  15, let's look at that quickly.
13    A.  Um-hum.
14       MS. VRANIAN:  I'm going to go through
15  every paragraph.  No, I'm not.
16  BY MS. VRANIAN:
17    Q.  If you'd turn to page 18 of that
18  Complaint, it starts in the middle of the page with
19  Section F, Termination of Mr. Buczkowski, and then
20  there's numerous paragraphs about your termination.
21    A.  Um-hum.

Page 76

1     Q.  If you then turn to page 26, there's a
2  declaratory judgment count there.  And if you
3  go -- contained within that account, but -- within
4  that count, but several pages later on page 30, it
5  says, Wherefore, the Plaintiff demands, A, that
6  this court issue a declaratory judgment that
7  Plaintiff remains an employee and a shareholder of
8  Madison Mechanical OS Corp.
9        Is it fair to say that at the time that
10 you filed this Complaint, that you were requesting
11 that the court reinstate you as an employee of
12 Madison Mechanical?
13    A.  Yes.
14    Q.  And is it fair to say that at the time
15 Mr. Scarlett sent the November 11th, 2015 letter,
16 which is marked as Exhibit 3, that at that time,
17 you had already had discussions with Mr. Haslam and
18 were aware that you would not be a part of the new
19 entity?
20       MR. LEMLEY:  Object to the form.
21       THE WITNESS:  Based on the time frame,

Page 77

1  yes.
2        MS. VRANIAN:  That's all I have.
3        MR. LEMLEY:  I have one follow-up on
4  that.  It was a compound question, so that's why I
5  objected to the form.
6           REEXAMINATION
7        BY MR. LEMLEY:
8     Q.  She said you had discussions with him,
9  and you were aware that you would not be with the
10 company.  And a little while ago you were very
11 clear that you had a discussion, and one
12 possibility was that you would not be with the
13 company, but there were other possibilities.  So, I
14 just want to make sure you answered both parts of
15 the question.
16    A.  The exact dates of -- in November are a
17 little -- it's been a few years.  I can't remember
18 the exact dates.  The confusion is that, again,
19 based on the lawsuit and everything, there were
20 apparently a lot of conversations taking place that
21 I was not aware of while I was also being told that

Page 78

1  things are going to stay the same.

2      So, you know, you know, I'm being told

3  that, you know, there is no -- you know,

4  the -- there is no new company, no new co being set

5  up, that we're just going to keep -- probably keep

6  things the same, but that was not exactly a true

7  statement that I was being told. So, I was a

8  little bit confused on what direction we were

9  ultimately going to end up in if that's fair to

10 say.

11    Q.  Okay.

12        MR. LEMLEY:  We're good.  I'm good unless

13 you have anything.

14        MS. VRANIAN:  No.  Thank you.

15        (Whereupon, the deposition of Robert

16 Buczkowski was concluded at 12:44 p.m., and the

17 reading and signing of the transcript was waived.)

18

19

20

21

Page 79

1  State of Maryland

2  County of Baltimore, to wit:

3      I, Michele D. Lambie, a Notary Public of

4  the State of Maryland, County of Baltimore, do

5  hereby certify that the within-named witness

6  personally appeared before me at the time and place

7  herein set out, and after having been duly sworn by

8  me, according to law, was examined by counsel.

9      I further certify that the examination

10 was recorded stenographically by me and this

11 transcript is a true record of the proceedings.

12      I further certify that I am not of

13 counsel to any of the parties, nor related to any

14 of the parties, nor in any way interested in the

15 outcome of this action.

16      As witness my hand this 27th day of

17 August 2019.

18

19     *Michele D. Lambie*

       Michele Lambie

20

21 My Commission Expires:  April 29, 2020

21 (Pages 78 - 79)





---

Name of Insurance Company to which application is made

# PRIVATE COMPANY RENEWAL APPLICATION

**NOTICE:** LIABILITY COVERAGE PARTS PROVIDE CLAIMS MADE COVERAGE.  EXCEPT AS OTHERWISE SPECIFIED:  COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND WHICH HAS BEEN REPORTED TO THE INSURER IN ACCORDANCE WITH THE APPLICABLE NOTICE PROVISIONS.  COVERAGE IS SUBJECT TO THE INSURED'S PAYMENT OF THE APPLICABLE RETENTION.  PAYMENTS OF DEFENSE COSTS ARE SUBJECT TO, AND REDUCE, THE AVAILABLE LIMIT OF LIABILITY.  PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

## 1.  GENERAL INFORMATION

a)  Name of Applicant Company: Madison Mechanical, Inc.
(Together with any subsidiaries for whom this policy is intended, hereinafter, "Applicant(s).")

b)  Address: 1539 Fannie Dorsey Road  Sykesville, MD 21784

## 2.  COVERAGE RENEWING

a)  Are the Applicants requesting to renew coverage as-expiring?    ☒Yes ☐No
If "YES," please proceed directly to section 4.
If "NO," please complete the rest of this section and section 3 before proceeding to section 4.

b)  Are the Applicant requesting higher limits at renewal for any coverage renewing?    ☐Yes ☐No
Please check the boxes below with an "X" to indicate which coverage is being renewed.  If you are not renewing a type of coverage, please leave the rest of the row blank.

| Coverage Renewing | Higher Limit Requested | Limits Requested | Current Limits |
|---|---|---|---|
| Directors, Officers & Entity Liability ☐Yes ☐No | ☐Yes ☐No | | |
| Employment Practices Liability ☐Yes ☐No | ☐Yes ☐No | | |
| Fiduciary Liability ☐Yes ☐No | ☐Yes ☐No | | |
| Crime ☐Yes ☐No | ☐Yes ☐No | | |
| Kidnap & Ransom/Extortion ☐Yes ☐No | ☐Yes ☐No | | |

This application is not used to request a Coverage Part not currently purchased.  If you would like to purchase a Coverage Part for the first time, please request a new business application.

**3. PRIOR KNOWLEDGE**

The following question must be answered if the Applicants are requesting higher limits at renewal.

Does an Applicant or any natural person for whom insurance is intended have any knowledge or information of any error, misstatement, misleading statement, act, omission, neglect, breach of duty or other matter that may give rise to a claim?  ☐Yes☐No

If "YES," provide full details (attach a separate sheet if necessary).

IT IS AGREED THAT IF ANY SUCH KNOWLEDGE OR INFORMATION EXISTS, ANY CLAIM BASED ON, ARISING FROM, OR IN ANY WAY RELATING TO SUCH ERROR, MISSTATEMENT, MISLEADING STATEMENT, ACT, OMISSION, NEGLECT, BREACH OF DUTY OR OTHER MATTER OF WHICH THERE IS KNOWLEDGE OR INFORMATION SHALL BE EXCLUDED FROM COVERAGE REQUESTED.  HOWEVER, THIS EXCLUSION SHALL APPLY UNDER A SPECIFIC COVERAGE PART ONLY TO THE EXTENT THAT THE "LIMITS REQUESTED" ARE HIGHER THAN THE "CURRENT LIMTS" PURCHASED FOR THAT COVERAGE PART.

**4. APPLICANT INFORMATION**

a)  Total number of employees currently:

| Please provide the following based on the Applicants' most recent fiscal year end ("FYE") and the year prior. Please indicate negative figurers using "( )" or "-" | Most Recent FYE (Month/Year) 12/2014 |
|---|---|
| Current Assets | $8,443,124.00 |
| Goodwill | |
| Total Assets | $9,718,478.00 |
| Current Liabilities | $8,317,929.00 |
| Long Term Debt | $1,853,544.00 |
| Total Liabilities | $10,171,475.00 |
| Retained Earnings | -$453,197.00 |
| Shareholder Equity | $200.00 |
| Total Revenues | $23,814,491.00 |
| Net Income after taxes | -$196,363.00 |
| Interest Expense | $192,265.00 |
| Cash flow from Operations | |

If the response is "YES" to any question below, please provide full details (attach separate sheet if necessary).

b)  Has an Applicant experienced, within the past 12 months, any of the following events:

    I.    Merger, acquisition, sale of any assets or other similar transaction?  ☐Yes☑No

    II.    Any financial restructuring, reorganization or filing for bankruptcy?  ☐Yes☑No

    III.    Any downsizing, layoffs, reduction in force, plant or office closings?  ☑Yes☐No

Does an Applicant anticipate any of the preceding events within the next 12 months?  ☑Yes☐No

c)  Is an Applicant a Federal or other Governmental Contractor?  ☐Yes☑No

PL000122

**5. DIRECTORS, OFFICERS & ENTITY LIABILITY COVERAGE PART (Complete Only If Renewing this Coverage)**

a) How many total individuals/entities own shares in the Applicant listed in 1(a) above? 5

b) What is the total number of outstanding shares in the Applicant listed in 1(a) above? 200

c) What is the total number of shares referenced in question (b) above held directly or beneficially by directors, officers or equivalents? 134

| For all classes of stock or other ownership of the Applicant listed in 1(a) above, list all shareholders over 5% (attach additional sheet if required) | Percentage Held | Is she/he currently a Director or Officer? |
|---|---|---|
| Glenn Haslam | 54 | yes |
| Robert Buczkowski | 13 | yes |
| Larry Kraemer | 10 | no |
| Richard Lombardo | 10 | no |
| Gary Garofalo | 13 | no |

If the response is "YES" to any question below, please provide full details (attach separate sheet if necessary).

d) Within the past 12 months, has there been any change in an Applicants' ownership? ☐Yes ☑No

e) Within the past 12 months, has an Applicant been in breach or violation of any debt covenant or loan agreement or any other material contractual obligation? ☑Yes ☐No

f) Are the Applicants currently anticipating any public or private offering of securities (including, but not limited to, IPO, Secondary Exchanges, or Crowd Funding/Crowd Financing)? ☐Yes ☑No

**PLEASE PROVIDE THE FOLLOWING INFORMATION:**

Most recent audited Financial Statement and CPA opinion

**6. EMPLOYMENT PRACTICES LIABILITY COVERAGE PART (Complete Only If Renewing this Coverage)**

a) Please list the following information based on the Applicants' current facts as of today:

| | | Currently |
|---|---|---|
| I. | Non-Union Full Time US Employees | 40 |
| II. | Non-Union Part Time US Employees | 1 |
| III. | Independent Contractors | |
| iv. | Union Employees | |
| v. | Foreign Based Employees | |
| vi. | TOTAL EMPLOYEES and CONTRACTORS (line vi should be the sum of lines i-v.) | 41 |

vii. Of the total number of employees/contractors listed above, please indicate how many are located in:

| | Currently |
|---|---|
| California | 0 |
| New Jersey | 0 |

b) Please also list the following:

| | | Within Last 12 months: | Within Last 24 months: |
|---|---|---|---|
| I. | Involuntary Terminations: | 5 | 7 |
| II. | Layoffs: | 10 | 26 |

- Was severance available to all affected? ☐N/A ☐Yes ☑No
- Did all severance recipients sign a release? ☐N/A ☐Yes ☑No

PL000123

If "NO" to either question, please provide full details (attach a separate sheet if necessary).

c) Do the Applicants have written procedures in place regarding:
   i.   Sexual Harassment                                             ☑Yes ☐No
   ii.  Discrimination                                                ☑Yes ☐No

d)  Within the past 12 months, has an Applicant updated or modified its employment practices handbook, or human resources policies, procedures, or department?                                      ☐Yes ☑No

---

## 7.  FIDUCIARY LIABILITY COVERAGE PART (Complete Only if Renewing this Coverage)

a)  For each plan to be covered, please list the following:

| PLAN NAME | PLAN TYPE* | # OF PARTICIPANTS | PLAN ASSETS (CURRENT YEAR) | PLAN STATUS** |
|---|---|---|---|---|
| Madison Mechanical, Inc 401k | DC | 73 | $4,167,000.00 | Active |
| | | | | |
| | | | | |

* Plan Type: Defined Benefit (DB), Defined Contribution (DC), Welfare (W), Employee Stock Ownership (ESOP) or Other (O).
** Plan Status:  Active (A), Merged (M), Terminated (T) or Frozen (F).

If the response is "YES" to any question below, please provide full details (attach separate sheet if necessary).

b)  Are any plans not in compliance with ERISA or plan agreements?                                     ☐Yes ☑No

c)  Within the past 12 months has there been any reduction in benefits, including the merging, termination or creation of any plan(s)?                                     ☐Yes ☑No

d)  Does an Applicant anticipate any reduction in benefits in the coming 12 months including the merging, termination or creation of any plan(s)??                                     ☐Yes ☑No

---

## 8.  CRIME COVERAGE PART (Complete Only if Renewing this Coverage)

a)  Are all of the Applicants' locations in the United States?                                     ☑Yes ☐No

b)  Do the Applicants prohibit any employee (other than the owner) who reconciles bank statements from also:
   i.    Signing checks                                             ☑Yes ☐No
   ii.   Handling bank deposits                                     ☑Yes ☐No
   iii.  Making withdrawals                                         ☑Yes ☐No

If "NO" to any of the questions above, please provide full details (attach separate sheet if necessary).

c)  Have there been any changes to the Applicants' system of internal controls in the past 12 months?                                     ☐Yes ☑No

---

## 9.  KIDNAP AND RANSOM/EXTORTION COVERAGE PART (Complete Only if Requesting this Coverage)

a) Please complete the following regarding the Applicants for each foreign (non-U.S.) location:
   (If none, leave this space blank.)

| Country, city, and description of operations | # of Employees |
|---|---|
| | |
| | |

b)  Please complete the following regarding travel to foreign countries:
   (If none, leave this space blank.)

PL000124

| Country and city(ies) | Number of Trips Per Year | Average length of stay | # of Employees |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

c)   If an Applicant has foreign locations or travel, describe security precautions on a separate sheet.

**California Notice:** The Hartford may charge a fee if this bond or policy is cancelled before the end of its term. The fee can range between 5% to 100% of the pro rata unearned premium.  Please refer to the terms and conditions stated in the policy or bond.  This notice does not apply to cancellations initiated by The Hartford.

### FRAUD WARNING STATEMENTS

**ALABAMA:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO RESTITUTION FINES OR CONFINEMENT IN PRISON, OR ANY COMBINATION THEREOF.

**ARKANSAS APPLICANTS:**  ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**COLORADO APPLICANTS:**  IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

**DISTRICT OF COLUMBIA APPLICANTS:**  IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON.  PENALTIES INCLUDE IMPRISONMENT AND/OR FINES.  IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."

**FLORIDA APPLICANTS:**  ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE.

**HAWAII APPLICANTS:**  FOR YOUR PROTECTION, HAWAII LAW REQUIRES YOU TO BE INFORMED THAT PRESENTING A FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT IS A CRIME PUNISHABLE BY FINES OR IMPRISONMENT, OR BOTH.

**KANSAS APPLICANTS:** A " FRAUDULENT INSURANCE ACT " MEANS AN ACT COMMITTED BY ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO DEFRAUD, PRESENTS, CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY FOR PERSONAL OR COMMERCIAL INSURANCE, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY FOR COMMERCIAL OR PERSONAL INSURANCE WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO; OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO.

**KENTUCKY APPLICANTS:**  ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION

CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

LOUISIANA APPLICANTS: ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

MAINE APPLICANTS: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS.

MARYLAND APPLICANTS: EFFECTIVE JANUARY 1, 2013, ANY PERSON WHO KNOWINGLY OR WILLFULLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY OR WILLFULLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

NEW JERSEY APPLICANTS: ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

NEW MEXICO APPLICANTS: ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

OHIO APPLICANTS: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD.

OKLAHOMA APPLICANTS: WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

OREGON APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD AN INSURER: (1) BY SUBMITTING AN APPLICATION OR; (2) FILING A CLAIM CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT MAY BE VIOLATING STATE LAW.

PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

PUERTO RICO APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD AN INSURANCE COMPANY PRESENTS FALSE INFORMATION IN AN INSURANCE APPLICATION, OR PRESENTS, HELPS, OR CAUSES THE PRESENTATION OF A FRAUDULENT CLAIM FOR THE PAYMENT OF A LOSS OR ANY OTHER BENEFIT, OR PRESENTS MORE THAN ONE CLAIM FOR THE SAME DAMAGE OR LOSS, SHALL INCUR A FELONY AND, UPON CONVICTION, SHALL BE SANCTIONED FOR EACH VIOLATION WITH THE PENALTY OF A FINE OF NOT LESS THAN FIVE THOUSAND (5,000) DOLLARS AND NOT MORE THAN TEN THOUSAND (10,000) DOLLARS, OR A FIXED TERM OF IMPRISONMENT FOR THREE (3) YEARS, OR BOTH PENALTIES. IF AGGRAVATED CIRCUMSTANCES PREVAIL, THE FIXED ESTABLISHED IMPRISONMENT MAY BE INCREASED TO A MAXIMUM OF FIVE (5) YEARS; IF EXTENUATING CIRCUMSTANCES PREVAIL, IT MAY BE REDUCED TO A MINIMUM OF TWO (2) YEARS.

RHODE ISLAND APPLICANTS: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**TENNESSEE APPLICANTS:** IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

**VIRGINIA APPLICANTS:** IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

**VERMONT APPLICANTS:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE STATEMENT IN AN APPLICATION FOR INSURANCE MAY BE GUILTY OF A CRIMINAL OFFENSE AND SUBJECT TO PENALTIES UNDER STATE LAW.

**WASHINGTON APPLICANTS:** IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES, AND DENIAL OF INSURANCE BENEFITS."

**WEST VIRGINIA APPLICANTS:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**NEW YORK APPLICANTS:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

THE UNDERSIGNED AUTHORIZED OFFICER OF THE APPLICANT DECLARES THAT THE STATEMENTS SET FORTH HEREIN ARE TRUE. THE UNDERSIGNED AUTHORIZED OFFICER AGREES THAT IF THE INFORMATION SUPPLIED ON THIS APPLICATION CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE EFFECTIVE DATE OF THE INSURANCE, HE/SHE (UNDERSIGNED) WILL, IN ORDER FOR THE INFORMATION TO BE ACCURATE ON THE EFFECTIVE DATE OF THE INSURANCE, IMMEDIATELY NOTIFY THE INSURER OF SUCH CHANGES, AND THE INSURER MAY WITHDRAW OR MODIFY ANY OUTSTANDING QUOTATIONS AND/OR AUTHORIZATIONS OR AGREEMENTS TO BIND THE INSURANCE. THE "EFFECTIVE DATE" IS THE DATE THE COVERAGE IS BOUND OR THE FIRST DAY OF THE CURRENT POLICY PERIOD, WHICHEVER IS LATER. SIGNING OF THIS APPLICATION DOES NOT BIND THE APPLICANT OR THE INSURER TO COMPLETE THE INSURANCE, BUT IT IS AGREED THAT THIS APPLICATION SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED AND IT WILL BE ATTACHED TO AND BECOME A PART OF THE POLICY. ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS APPLICATION ARE HEREBY INCORPORATED BY REFERENCE INTO THIS APPLICATION AND MADE A PART HEREOF. THIS APPLICATION MUST BE SIGNED BY THE CHAIRMAN OF THE BOARD, CHIEF EXECUTIVE OFFICER, CHIEF FINANCIAL OFFICER OR THE PRESIDENT OF THE COMPANY.

SIGNATURE _____

TITLE: CFO_____     DATE 04/06/2015_____

PLEASE SUBMIT THIS PROPOSAL AND APPROPRIATE MATERIALS TO:

(Enter the address and phone number of the local The Hartford office.)

Required applicants in Florida, Iowa & New Hampshire

NAME OF BROKER Alliant Insurance Services_____     BROKER LICENSE NO._____

ADDRESS 9901 Business Parkway, Lanham, MD 20706_____

BROKER SIGNATURE (Required: New Hampshire only)_____

From: Bob Buczkowski [mailto:bobb@madisonmechanical.net]
Sent: Friday, September 25, 2015 4:56 PM
To: Chris Rogan <crogan@rmzlawfirm.com>
Subject: Madison



Chris,

First of thanks for all of you input on this issue and helping us to get closure.

I wanted to reach out to you on a persona level here as I am looking for some advice and guidance. We discussed the fact that Madison was considering closing  its doors and starting up something new. While that decision has officially been made and I am not going to be part of the new company that is being setup. The reason for me not being part of the new venture going forward is due to the position that I took  in regards to what I felt was the best "business"  decision for Madison and not for all of the partners. My positon on the matter was that if we made the right decisions for Madison as an entity we would then be making what in the end would be the best decision   for all parties involved both partners and employees. I will try to layout some of the basic facts for you here in the email but it is probably going to make more sense to have a discussion either by phone or in person for a full understanding. Once you have   the understanding of everything I would be looking for guidance on:

1)     What do I need to do in order to protect myself in regard to Madison and any open/potential liabilities.

2)     What are my rights/options, if any, in regards to the decisions that have been made that I do not feel were in the best interests of Madison and therefore   myself by the others which has cost me both in terms of a) equity that I had built up in the company, b) monies that I put back into the company and c) the loss of future equity by being carved out as a member in the new entity going forwards.

3)     This probably somewhat relates to item 1, and that would be the creation of some type of indemnification agreement that would release me from the items   noted above as well as any other items that I may have overlooked. As well as some sort of agreement that would protect me from , lack of a better way of putting, being the "fall guy" for any issues that might get conveniently blamed on the "money guy" in  the organization. Who by the way is not part of the "new" ongoing operations. Makes it look like I was the issue. Don't need any negative comments or innuendos following me around upon my departure.

4)     Negotiating some type of settlement in regards to my exit either sometime in the near future or hanging around and closing up of Madison.

Here is some basic information and we can get in to more details later and what else you may or may not need:

Ownership:

Madison is currently owned by 5 individuals as noted below. Company was purchased from the Cooke Estate as of December 31, 2007 for approximately $2.8m.

Glenn Haslam- 54% has been with Madison since it started. Madison was setup by Blasé Cook( owner of Harkins Builders) to complete jobs that Glenn's old company  was doing for them when Glenn's old company went into bankruptcy. Blasé owned the company until his death in 2007. Glenn had an agreement where he could purchase 90% of the company upon his death.

Gary Garofalo- 13% Gary is the CFO of Harkins Builders and helped setup Madison. Gary had the right to purchase the other 10% of Madiosn upon Blases' death.

Robert Buczkowski- 13% I came to Madison in 2002 and as part of my agreement to come on board it was agreed with Glenn and myself that if and when Madiosn was   purchased from the Blasé that I would be entitled to become part owner.

Dick Lombardo- Dick is the President of Harkins Builders. Dick was offered ownership in Madison because we felt that he would provide business guidance to Madison.

Larry Kraemer – Larry is VP of Estimating for Harkins Builders. Larry was also offered ownership for the same reason as Dick.

There was no upfront cash payments required in the purchase of Madison. A note was executed with the Cooke estate and payment were made from the profits of the  company. In discussions leading up to bringing Dick and Larry it was verbally discussed that the ownership interests of Glenn, myself and Gary were earned via "sweat equity" over the years. Dick and Larry's interests were supposed to be "earned in". This definition   for us meant that they were not required to put in any money but that prior to any distributions(other than tax) going out that the three of us would get a "preferential payment of 20% of the purchase price. This was never put down in writing by Gary who was  handling the issue.

Madison:

Madison had some good years and we were able to build up equity until we signed several large jobs with Clark Construction. Due to improper staffing and management   of these jobs Madison lost significant amounts of money. We went from an equity balance of $7m to a negative equity of (1.7m) in 2013 followed up with a loss of ($1.6m) in 2014. Ownership has put in $975,000 in loans and capital contributions of $1.5m in 2014   and an additional $593k in 2015. My portion of these amounts are $150k in loans and $143,000 in equity contributions.

Defs'3420

Loans - Madison owed BBT $2.9m for loc loans which were personally guaranteed by all shareholders. Loan has been paid down to $1.3m currently.

Bonding -- prior to July 2014 no one was personally signed on bonds. Due to some poor advice from our Bonding agent we ended up signing for two new bonds which  had the effect of making us liable for all previously issued bonds as well. This was something that was not communicated to us and we made the mistake of not reading the "fine print" in the agreement. Madison's bonding company, Chubb, is the same bonding company   for Harkins Builders.

Jobs- other than the large jobs that we sustained the large losses on the work that we do has been profitable and averages in the 20% margin range. Going back   to our "bread and butter" work that we should have never strayed from shows us returning back to the profitable years that we used to have.

New Company- the new company will consist of all parties but myself, with an individual named Rick Arnold coming in. Glenn will give up 20% of his ownership,   Gary will give up 1% and with my 13% he will have 34%, Glenn now 34% , Gary 12%, Dick and Larry stay at 10% each.

Daily Operations- For the past 2.5 years we have been in a week to week situation with cash on hand and being able to make payroll. We have used the profits from   all of the new jobs to fund

Reason for my departure-

My take on it was for various reasons:

1)     My positon that we needed to do the best thing for Madison as an entity which would be the best thing for all. This was not looked upon as an option   by Gary, Dick and Larry for several reasons. A) we shared bonding companies and they thought by Madison walking away from the jobs that it would have an adverse impact upon them.

2)     The fact that Larry, Dick and Gary are part of Madison is not known to people. They are the top three that run Harkins and it would not look good that   they have been investors/partners in a company that they do work with and it not being disclosed to all Harkins employees(they are an ESOP).

3)      Related to the above is the fact that over the years there have been questions about Madison/Harkins relationship and it has been told to some of our   bigger repeat customers(Whiting Turner) that there was no relationship that existed. If it was to get out then this could have an adverse impact upon Glenn as he was the one telling people there was no involvement.

Defs'3421

4)      Dick is involved in a lot of community and business activities being the President of Harkins. He did not want it to get out that he was part of Madison   who had filed for bankruptcy.

5)      In the latter half of last year I made a stand and told them that I was not going to put in any more money until there was a meeting amongst all and   we actually had an overall game plan on how we would work our way out of the current situation and what we would do going forwards. There have been no meetings and I did not make any contribution that last time they wanted to make a capital call. It would   have been throwing good money after bad money. This seems to of been the right call in many ways as now I am not part of what is going to be "New Co" for Madiosn and there was never any guarantee that me putting money in would of made a difference.

I am going to stop writing here as I was trying to get you a "brief" overview and as I write it appears that I could go on for pages laying everything out for   you. It would be best if you were to let me know when you could talk and we could have a conversation on the topic and you could let me know what if anything you could help me on or point me in the right direction.

Thanks- Bob

Bob Buczkowski. CPA

Madison Mechanical, Inc. CFO

410-461-7301 (O)

410-461-8470 (F)

410-984-1636 (C)

From: Chris Rogan [mailto:crogan@rmzlawfirm.com]

Defs'3422



# SCARLETT, CROLL & MYERS, P.A.

ATTORNEYS AT LAW
SUITE 600
201 NORTH CHARLES STREET
BALTIMORE, MARYLAND 21201-4110

(410) 468-3100
TELEFAX (410) 332-4026

ROBERT B. SCARLETT*
ANDREW M. CROLL
MICHAEL S. MYERS

* ALSO ADMITTED IN D.C.

RScarlett@ScarlettCroll.com

VIRGINA OFFICE:
515 KING STREET
SUITE 400
ALEXANDRIA, VIRGINIA 22314

November 11, 2015

**VIA FEDERAL EXPRESS**

Mr. Glenn A. Haslam
12154 Mt. Albert Road
Ellicott City, MD 21042

Mr. Gary Garofalo
2818 Hunt Valley Drive
Glenwood, MD 21738

Mr. Richard Lombardo
3194 Danmark Drive
West Friendship, MD 21794

Mr. Lawrence Kraemer
c/o Harkins Builders, Inc.
2201 Warwick Way
Marriottsville, MD 21104

Mr. Richard G. Arnold
2929 Excelsior Springs Court
Ellicott City, MD 21042

Re:   Robert J. Buczkowski and Madison Mechanical, Inc.

Gentlemen:

The undersigned represents Robert Buczkowski with respect to his interests in Madison Mechanical OS Corp., which owns directly, or indirectly Madison Mechanical, Inc. and Madison Contracting, LLC. It is my understanding the ownership of Madison Mechanical OS Corp. ("Madison Mechanical") is as follows:

{00162128.DOCX.1}

Mr. Glenn A. Haslam
Mr. Gary Garofalo
Mr. Richard Lombardo
Mr. Lawrence Kraemer
Mr. Richard G. Arnold
November 11, 2015
Page 2

| | | |
|---|---|---|
| Glenn A. Haslam | - | 54% |
| Gary Garofalo | - | 13% |
| Richard Lombardo | - | 10% |
| Lawrence Kraemer | - | 10% |
| Robert Buczkowski | - | 13% |

Is also my understanding from my client that Madison Mechanical is currently operating and has assets, primarily being accounts receivables, trucks other fixed assets.  In addition to these assets, Madison Mechanical also has work in progress.

It has come to my client's attention that a new limited liability company was formed on August 20, 2015 known as Madison Mechanical Contracting, LLC.  The ownership of this company is divided among the following:

Glenn A. Haslam
Gary Garofalo
Richard Lombardo
Lawrence Kraemer
Richard G. Arnold

It appears to my client that the purpose of Madison Mechanical Contracting, LLC is to divert the business and client base of Madison Mechanical for the benefit of Madison Mechanical Contracting, LLC and to the detriment of Madison Mechanical.  If that is true, please consider this letter notice that such action could be considered legally improper in that such a diversion is a diversion of business opportunity directly and financially harming my firm's client.  On initial review, such actions, if true, could lead to a cause of action for breach of fiduciary duty, interference with a contractual relationship, interference with an economic relationship, civil conspiracy and other potential causes of action.  I am especially suspicious that this diversion of corporate opportunity and contracts is an objective of Madison Mechanical Contracting, LLC simply by the fact that the name of Madison Mechanical and Madison Mechanical Contracting, LLC are so similar.

If it is your plan to divert the contracts and corporate opportunity of Madison Mechanical, please consider this letter putting you on notice of the potential litigation liability of such actions both on a corporate and personal level.  Please cease and desist any such action to divert any corporate opportunity that Madison Mechanical has to either yourselves or Madison Mechanical Contracting, LLC without the consent of my firm's client, Robert Buczkowski.

{00162128.DOCX.1}

Mr. Glenn A. Haslam
Mr. Gary Garofalo
Mr. Richard Lombardo
Mr. Lawrence Kraemer
Mr. Richard G. Arnold
November 11, 2015
Page 3

    My client has made it clear to me that he does not want to enter into civil litigation, given his long-standing relationship with each of you.  He would prefer to sit down and try to work out any potential differences while at the same time preserving his thirteen percent (13%) interest in Madison Mechanical.  I would suggest that each of you take this letter to your respective attorneys so they can advise you as to the law on this matter and then call me so we can schedule a convenient date and time to further discuss the issues set forth in this letter.  Once again, I must emphasize that my client would rather discuss these matters with each of you and try to resolve the differences between the parties in an amicable fashion.

    Please either contact me or have your counsel contact me within thirty (30) days from the date of this letter to avoid potential legal action.

    I will look forward to working with each of you.

            Very truly yours,

            SCARLETT, CROLL & MYERS, P.A.

            Robert B. Scarlett

RBS/akr

cc: Robert Buczkowski (via email)

{00162128.DOCX.1}

November 18, 2015

Mr. Robert Buczkowski
804 Winchester Drive
Westminster, MD 21157



Dear Mr. Buczkowski,

For the reasons that have been discussed with you on numerous occasions, you were previously advised that your employment with Madison Mechanical, Inc. (the Company) was being terminated for cause. Although the projected date of termination was originally expected to be November 25, 2015, the Company has decided to accelerate the date of your termination, and your employment is hereby terminated for cause, effective immediately. Despite having no obligation to do so, the Company will continue to pay you your regular pay, less applicable taxes and withholdings, through the originally scheduled termination date of November 25, 2015.

As you are aware, in order to ease your transition, the Company previously offered to pay you severance. It is the understanding of the Company that you have rejected that offer. Accordingly, unless otherwise agreed, all wages and benefits will cease subsequent to November 25, 2015. Additional information regarding continuation of benefits will be provided under separate cover.

Please immediately return all Company property, including the laptop that was provided to you by the Company as well as all Company materials and documentation. You may retain your company issued cell phones, but service for all phones in your possession will be discontinued and your phones will be removed from the Company's service plan. Please certify that you have not retained any copies, electronic or otherwise, of the Company's confidential and proprietary information. As you are aware, your duty to maintain confidentiality of the Company's non-public, confidential and proprietary information continues beyond the date of your termination.

We will continue to work towards resolution of any outstanding issues through our respective legal representatives.

Sincerely,

Glenn Haslam
President
Madison Mechanical, Inc.

PL008968

HART00001946



## STOCKHOLDERS AGREEMENT

THIS AGREEMENT is made effective as of the 31ˢᵗ day of December, 2007, by and between ROBERT J. BUCZKOWSKI, GLENN A. HASLAM, GARY J. GAROFALO, RICHARD M. LOMBARDO and LAWRENCE P. KRAEMER (separately the "Stockholder" and together the "Stockholders"), and MADISON MECHANICAL OS CORP., a Maryland corporation (the "Corporation").

### RECITALS:

WHEREAS, the Corporation was formed on December 13, 2007 for the purpose of acquiring all of the issued and outstanding capital stock of and operating Madison Mechanical, Inc.;

WHEREAS, the Corporation has authorized Ten Thousand (10,000) Shares of one class of Common Stock with a One Cent ($0.01) par value;

**WHEREAS, the Stockholders presently own 200 Shares of Common Stock representing all of the issued and outstanding shares of Corporation stock (the "Shares");**

WHEREAS, of even date herewith, the Corporation has acquired all of the issued and outstanding Common Stock of Madison Mechanical, Inc. ("MMI Stock") from Dawn Cooke (the "Transferor") in exchange for a Promissory Note from the Corporation secured by a pledge of the MMI Stock and joint and several guaranties from the Stockholders hereunder;

WHEREAS, of even date herewith, Stockholder Garofalo, Stockholder Lombardo and Stockholder Kraemer will exchange their Shares of Common Stock for Voting Trust Certificates and Richard A. Kohr, Jr., Voting Trustee of the Corporation's Voting Trust (the "Voting Trustee") will hold the Stock Certificates in trust to give the Corporation a discrete Identity of Interest from Harkins Builders, Inc.;

WHEREAS, it is the intention of the Stockholders that there are adequate insurance proceeds to fund the purchase of the stock held by any existing or future Stockholder by reason of death; and

WHEREAS, it is the intention of the Stockholders that there be an effective mechanism to deal with the termination of employment by reason of death, disability, retirement or other voluntary or involuntary withdrawal of any Stockholder.

NOW, THEREFORE, AND IN CONSIDERATION of the recitals herein contained, which shall be deemed to be a substantive part of this Agreement, and the mutual covenants,

〇〇〇〇 1

promises, representations and warranties of the parties hereto, the parties do hereby covenant, promise, agree, represent and warrant as follows:

1.    **Restrictions on Shares.**  None of the stock of any Stockholder nor any right, title, or interest therein, whether now owned or hereafter acquired, shall be voluntarily or involuntarily sold, assigned, pledged, encumbered, exchanged, gifted, disposed of or otherwise transferred (hereinafter collectively referred to in the singular as a "Transfer"), except in accordance with the provisions of this Agreement.  In no event shall all or any shares of a Stockholder's Stock be transferred directly to a minor.  Any disposition or encumbrance of stock contrary to the provisions hereof shall be void.  The Corporation shall not issue any additional shares of stock.

2.    **Authorized Transfers.**  Notwithstanding the provisions of Paragraph 1, any Stockholder may transfer all or part of his or her stock by sale, gift or bequest to his or her spouse, lineal descendants, or other members of his or her immediate family who are actively employed full-time by Madison Mechanical, Inc., Madison Mechanical OS Corp., or any other entity related to said entities (the "Corporation and its affiliates") as determined by a majority of the Stockholders, but any stock so transferred shall be subject to the terms, conditions, and restrictions of this Agreement.  The transferee shall be considered to be a "Stockholder" hereunder only after acknowledging and accepting this Agreement.  Any transfer shall be subject to the tax provisions in Section 13 of this Agreement.

3.    **Transfer Procedure.**

(a)    For purposes of this Agreement, the Stockholder who becomes disabled or insolvent, who fails to contribute upon a default of the Corporation's obligations to Transferor, who desires to transfer any portion of his or her Corporation stock during life or who dies, all of which is more particularly delineated below, may be referred to as the "Offering Stockholder" and the other Stockholders subject to this Agreement who have not become disabled or insolvent or who do not desire to transfer their Corporation stock or who have not died shall be referred to as "Other Stockholders."

(b)    **Corporation Meeting.**

(1)    The Offering Stockholder or his or her representative shall give at least thirty (30) days notice in writing by registered or certified mail, return receipt requested, to the Other Stockholders and the Corporation, setting forth the number of shares the Offering Stockholder owns and that will be transferred.  Within the 30-day period, the Corporation shall call a meeting of the directors to which the Stockholders shall be invited upon not less than five days or more than ten days written notice to all directors and

ꔛꔛꔛꔛ 2

Stockholders. Such meeting shall be held at the Corporation's principal office or such other place as may be designated in the notice, during normal business hours. At such meeting, the shares of the Offering Stockholder shall be offered for sale and shall be subject to the Other Stockholders' option to purchase. The Other Stockholders may elect to buy those shares in proportion to their ownership interest in the Corporation (disregarding the shares owned by the Offering Stockholder and by those Other Stockholders who do not wish to purchase shares). Should any of the Other Stockholders elect to exercise his or her option, he or she shall do so only at the time of such meeting or any adjourned date thereof not to exceed ten days.

(2)     If the Other Stockholders do not purchase all of the shares offered by the Offering Stockholder, the remaining shares shall be offered for sale and shall be subject to an option in favor of the Corporation to purchase the shares. If any option is exercised, the exercise shall be at the time of the directors' meeting called pursuant to the provisions of this paragraph, or any adjourned date thereof not to exceed ten days.

(3)     If the Corporation does not purchase all of the shares offered by the Offering Stockholder, the remaining shares shall be offered to a person that the Stockholders unanimously agree upon. This person shall be referred to as the "Purchaser." The Purchaser must acknowledge and accept all of the terms of this agreement before any transfer to the Purchaser may be commenced.

(4)     Within five days after the meeting of directors, the Secretary of the Corporation shall notify the Offering Stockholder of the action taken at the meeting. Such notice shall state how many shares, if any, the Other Stockholders have elected to purchase. If the Other Stockholders have not elected to purchase all of the shares, the number of shares, if any, that the Corporation has elected to purchase, and if the Corporation has not elected to purchase all of the shares, the number of shares, if any, the Purchaser has elected to purchase.

3

PL004450                                    Defs'4087

4.   <u>Transfers During Lifetime</u>.

    (a)    **Transfers by Reason of Termination of Employment:**

        (1)    Unless a Stockholder is terminated for cause as provided in Paragraph (a)(3), the Offering Stockholder shall transfer the Offering Stockholder's stock according to the provisions of Section 3 at the price and terms as set forth in Paragraph (a)(4) below.

        (2)    The Corporation and its affiliates shall have the right, at all times, to determine what shall constitute "termination of employment." Such determinations may be made pursuant to oral or written policy and said policy is subject to waiver at the option of the Corporation and its affiliates.

        (3)    In the event that a Stockholder has been terminated for cause, then the purchase price shall be the lesser of the formula for the purchase price as determined in Section 6 or the amount the Offering Stockholder paid for such shares. Termination for cause shall mean termination for persistent non-performance of the Stockholder's duties as an employee or officer of the Corporation and its affiliates or for criminal conduct involving a crime of moral turpitude, gross negligence, willful misconduct or a breach of the Stockholder's fiduciary duty to the Corporation and its affiliates as an employee, director or officer.

        (4)    The price and terms of a sale in the case of retirement or a voluntary termination from the Corporation or its affiliates shall be provided in Section 6 hereof, except that in the event the Corporation is still obligated to the Transferor for its purchase of MMI Stock, the Offering Stockholder shall surrender his shares in exchange for an indemnification for and/or release from the Guaranty for the Corporation's obligation to Transferor.

    (b)    **Transfers by Reason of Disability:**

        (1)    If a Stockholder becomes disabled as defined in Paragraph (b)(2) of this Section 4, then and in such event the Disabled Offering Stockholder or his or her representative shall transfer the Disabled Offering Stockholder's stock according to the provisions of Section 3 at the price and terms as set forth in Section 6 hereof.

ꠠꠠꠠꠠ 4

Defs'4088

(2)     For purposes of this agreement, "Disabled" shall mean, with
        respect to any Stockholder, that such Stockholder is unable to
        perform his or her normal duties for the Corporation because of
        injury or physical or mental illness for three hundred sixty-five
        (365) consecutive days and his or her disability is of a nature that
        he or she will not be able to resume his or her duties for another
        one hundred eighty (180) days. If the Stockholders do not agree
        whether a Stockholder is disabled to the extent specified in and for
        the purpose of this section, then any Stockholder (the "Requiring
        Stockholder") may require the disabled Stockholder to be
        examined by a physician by so notifying the Disabled Stockholder.
        The notice shall contain the name and address of the physician
        selected by the Requiring Stockholder. The Disabled Stockholder
        may select a physician within thirty (30) days after notice from the
        Requiring Stockholder. If the Disabled Stockholder does not
        select a physician within that thirty (30) day period, then the
        physician selected by the Requiring Stockholder may act alone,
        and the Corporation and the Stockholders shall be bound by the
        opinion of the physician selected by the Requiring Stockholder. If
        the Disabled Stockholder selects a physician and the two
        physicians selected are unable to agree whether the Disabled
        Stockholder is disabled, then, within fifteen (15) days after the
        second physician delivers his written opinion, the two physicians
        shall select a third physician to examine the Disabled Stockholder.
        If the two physicians do not agree upon the selection of a third
        physician within fifteen (15) days, then any Stockholder, within
        the next fifteen (15) days, may request that the President of the
        Medical and Chirurgical Faculty of Maryland select a third
        physician. Within thirty (30) days after his or her selection, each
        physician who examines the Disabled Stockholder shall prepare
        and deliver to the Corporation and the Stockholders a written
        opinion as to whether the Disabled Stockholder is, in fact, disabled
        within the meaning of this section. The Corporation and the
        Stockholders shall be bound by the opinions of the physicians they
        select or, if the physicians cannot agree, then by the opinion of the
        third physician. Each Stockholder shall pay the fee of the
        physician he or she selects, and the Stockholders shall share
        equally the fees of the third physician. The "Date of Disability"
        shall be the earlier of: (i) the date that the final opinion of
        disability is given, or (ii) the date the Stockholders unanimously
        agree that a Stockholder is disabled to the extent specified in this
        section.

                            ▢▢▢▢ 5

                     Defs' 4089

    (3)    Such obligation to transfer the Disabled Offering Stockholder's stock as set forth in Paragraph (b)(1) of this Section 4 shall arise on the Date of Disability as set forth in Paragraph (b)(2).

(c)    **Transfers by Reason of Insolvency:**

    (1)    If a Stockholder voluntarily or involuntarily enters into or is placed into bankruptcy, insolvency, rehabilitation, liquidation, receivership, trusteeship or similar arrangement under, or with respect to, any federal or state law, ruling or regulation (hereinafter called "Insolvency"), then and in such event the Offering Stockholder shall transfer the Offering Stockholder's stock according to the provisions of Section 3.

    (2)    Such obligation to sell and such obligation to purchase as set forth in Paragraph (c)(1) of this Section 4 shall arise one (1) day before any court, government body or administrative body obtains jurisdiction over or any trustee or receiver comes into possession of the Insolvent Offering Stockholder's assets and estate (hereafter called "Date of Insolvency"), it being the intention of this Agreement to provide a marketplace for the sale of the Insolvent Stockholder's Corporation stock at a fair value, to the benefit of both the Other Stockholders and the estate of the Insolvent Stockholder. Except for price, the terms of any sale under this paragraph shall be similar to those found in Section 6.

(d)    **Transfer due to a Failure of the Stockholder to Contribute upon a Default of the Corporation's Obligations to Transferor:**

    (1)    Stockholder has agreed to a joint and several guaranty of the Corporation's obligations to Transferor. In the event of a default of the Corporation's obligations, the Transferor may choose to enforce said guaranties against the Stockholders. If any Stockholder hereunder fails to contribute upon the enforcement of the guaranty by Transferor and the Other Stockholders are forced to contribute to cover the Non-contributing Stockholders pro-rata share of the Corporation's obligations, the Non-contributing Stockholder shall be deemed an Offering Stockholder and he shall offer to sell his stock according to the provisions of Section 3 at the price and terms as set forth in Paragraph (d)(2) below.

〇〇〇〇 6

PL004458                                        Defs'4090

(2)    The Offering Stockholder's shall surrender his stock to the Other Stockholders unless he reimburses the Other Stockholders who covered the Corporation's obligations to the Transferor. If the Other Stockholders or the Corporation shall sell the Offering Stockholder's Stock within ninety days of the Offering Stockholder's surrender, the Other Stockholder's or the Corporation shall remit any amounts paid by the purchaser of said stock over the Offering Stockholder's pro rata share of any amounts advanced by the Other Stockholders.

(e)    **Other Transfers During Life:** If a Stockholder desires to "Transfer" (as defined above) part or all of his stock in the Corporation for reasons other than disability, insolvency, or failure to contribute upon a default of the Corporation's obligations to Transferor as set forth above or death as set forth below, then and in such event the Offering Stockholder shall notify the Corporation and the Offering Stockholder shall offer to sell the Offering Stockholder's stock according to the provisions of Section 3 at the price and terms as set forth in Sections 6 or as otherwise provided.

5.    <u>Transfer at Death.</u>  Upon the death of a Stockholder, the Other Stockholders shall purchase and the personal representative or administrator shall sell all of the Corporation stock owned by the deceased Offering Stockholder to the Other Stockholders in portions equal to their respective shares in the Corporation among the Other Stockholders. The amount and payment of the purchase price shall be upon the terms and conditions set forth in Section 8 hereof.

6.    <u>Purchase and Terms of Payment.</u>

(a)    **Value of the Corporation's Stock:** The value of the Corporation's stock required to calculate the purchase price hereunder shall be the Book Value of the Corporation for the most recently completed year. Book Value shall be determined from the Corporation's GAAP-basis books as determined the Corporation's Certified Public Accountant, except that the investment in MMI Stock shall be valued according to the Book Value of Madison Mechanical, Inc. on a GAAP-basis as long as it is a wholly-owned subsidiary of the Corporation.

(b)    **Purchase Price:** The value of the Corporation's stock multiplied by the Offering Stockholder's percentage interest in the Shares is the tentative purchase price ("TPP"). The formula for the purchase price is calculated by taking the TPP and adding an amount equal to the Offering Stockholder's distributable share of taxable income or capital gains from the Corporation for any tax year shortened due to the termination under Paragraph (b) of Section 13 multiplied by the Offering Stockholder's respective marginal rate of income tax or the capital gains rate and the state income tax rate (the

ꭐꭐꭐꭐ 7

"Adjusted TPP"). If the transfer is completed without the need for the termination under said paragraph or if there is a tax loss, then the formula for the purchase price shall be equal to the TPP. If the Offering Stockholder has received the benefit of a deferral of taxable income, then an amount equal to the taxable income deferred multiplied by the Offering Stockholder's respective marginal rate of income tax and/or the capital gains rate and the Stockholder's marginal state income tax rate shall be deducted from the Adjusted TPP or the TPP, as the case may be. The purchase price shall be paid by the Corporation, the Other Stockholders, or the Purchaser in proportion to the amount of shares each has purchased. The Purchase Price shall be determined by the Corporation's Certified Public Accountant.

(c)     **Payment Terms:**

(1)     **Time of Payment:** Except as otherwise provided, purchase of stock will be made no earlier than one (1) year from the Secretary's notice provided under Section 3(b)(4) or earlier at the option of the majority of the Other Stockholders. In the event of a transfer by reason of disability under Section 4(b) or retirement under Section 4(d), purchase of stock will be made within ninety (90) days of the Secretary's notice provided under Section 3(b)(4).

(2)     **Manner of Payment:** The purchase price shall be paid in cash if the value of the Offering Stockholder's stock is One Hundred Thousand Dollars ($100,000) or less. If the value is more than One Hundred Thousand Dollars ($100,000), the purchase price shall be paid by promissory note from the Corporation, Stockholder, or Purchaser payable with interest at an Annual Percentage Rate at the greater of five percent (5%) or the Applicable Federal Rate on the last business day of the month preceding the date of execution and delivery of the note with curtailments of no less than One Hundred Thousand Dollars ($100,000) per annum until paid. The Corporation, Stockholder, or Purchaser may prepay the outstanding balance at any time without penalty. Any default not cured within thirty (30) days of written notice, will entitle the note holder to accelerate the outstanding balance of the note. The note shall be secured by a pledge of the Offering Stockholder's stock and a guaranty by the Corporation, if the Other Stockholders or a Purchaser purchases the stock, or a joint and several guaranty by the Other Stockholders if the Corporation purchases the stock.

ᴐᴐᴐᴐ 8

(3)     Upon receipt by the Offering Stockholder of the purchase price in cash, or in cash and promissory notes secured by the stock, the Offering Stockholder shall endorse and deliver the stock to the Corporation, Other Stockholders, or Purchaser in portions consistent with the Secretary's notice provided under Section 3(b)(4).

(d)     **Withholding of Payments:**  Unless the Corporation may exercise its right of offset to fully satisfy the amounts due from the Offering Stockholder as provided by Section 7, the Purchaser or Other Stockholders that have agreed to purchase the Offering Stockholder's stock shall withhold payments due to the Offering Stockholder and make the payments to the Corporation until the outstanding balance and accrued interest owed by the Offering Stockholder to the Corporation as of the date of closing on the stock sale has been satisfied.

7.     <u>Right of Offset.</u>  To the extent that there is any unpaid balance owed by the Offering Stockholder to the Corporation, the obligation of the Corporation on the purchase of the stock shall be offset by an amount equal to the outstanding balance and accrued interest as of the date of closing on the repurchase and/or the redemption of the stock.

8.     <u>Payment of Purchase Price upon Death.</u>

(a)     **Purchase Price:**  The purchase price of a deceased Stockholder's shares shall be the greater of two times (2x) the purchase price as determined in Paragraph (b) of Section 6 or any life insurance proceeds from life insurance obtained on the Stockholder's life by the Corporation, the Other Stockholders, or any related entity owned by the Other Stockholders for the purpose of financing a buyout of the Stockholder's shares.

(b)     **Payment Terms:**

(1)     Time of Payment:  Except as provided below, the purchase price shall be paid by the Stockholders in cash to the decedent's estate within the later of: (1) thirty (30) days after the appointment of a Personal Representative, or (2) the payment of the death benefits of any insurance policy on the life of the decedent, but in no event later than 240 days from the date of death.

(2)     Promissory Note:  If the insurance proceeds are insufficient to fund the amount due to the estate of the deceased Stockholder then the balance shall be paid by promissory note from the Other Stockholders payable with interest with interest at an Annual

0000 9

Percentage Rate at the greater of five percent (5%) or the Applicable Federal Rate on the last business day of the month preceding the date of execution and delivery of the note with curtailments of no less than One Hundred Thousand Dollars ($100,000) per annum until paid. The Other Stockholders may prepay the outstanding balance at any time without penalty. Any default not cured within thirty (30) days of written notice will entitle the note holder to accelerate the outstanding balance of the note. The note shall be secured by a pledge of the Offering Stockholder's stock and a guaranty by the Corporation.

(3)     Upon receipt by the estate of the deceased Stockholder of the purchase price in cash, or in cash and promissory notes secured by the stock, the estates legal representative shall endorse and deliver the decedent's stock to the Other Stockholders in shares in proportion to their ownership interest in the Corporation (disregarding the shares owned by the Offering Stockholder and by those Other Stockholders who did not purchase shares).

9.    **Insurance.** The Corporation may maintain insurance on the life of each Stockholder, naming itself as a beneficiary in the amount as decided by the Stockholders. Insurability for future Stockholders is an important consideration to the Corporation and any new Stockholder shall cooperate so as to obtain life insurance in amounts requested by the Stockholders to fund the purchase of a Stockholder's stock in the Corporation. All such policies shall be subject to the terms of this Agreement. The Corporation shall pay all premiums due on the policies and shall give proof of payment to the Stockholders within fifteen (15) days after the due date of each premium. Stockholder agrees to freely consent to the Corporation's acquisition of any life insurance policies on the Stockholder's life. Nothing contained herein shall prevent the Stockholders from establishing another entity for the purposes of acquiring the life insurance contemplated herein. Any such entity created shall be obligated to adopt the terms and conditions of this Agreement, as amended.

10.    **Rights and Obligations Concerning Policies.** If the Corporation purchases life insurance policies, the Corporation shall be the sole owner of all policies taken out on the lives of Stockholders, and may exercise all rights under such policies. Any person, such as the Corporation, the Other Stockholders, or the Purchaser, who is obligated on the note for the purchase of an Offering Stockholder's stock, shall be obligated to keep in full force and effect any insurance policies on the life of an Offering Stockholder. If the Offering Stockholder dies during the term of the unpaid loan obligation to him or her, the insurance proceeds shall be used to fund the unpaid balance owed to the Offering Stockholder. If obligated, the Corporation shall pay the premiums on the Offering Stockholder's policy, or the Other Stockholders or the Purchaser shall make cash contributions for the premiums to the Corporation. If the Corporation

PL004459         **Defs'4094**

has given the Offering Stockholder a note for all or a portion of the Offering Stockholder's stock, the Corporation shall be designated, in whole or in part, as the beneficiary of said policy until the unpaid loan obligation has been fully paid.

11.      Distributions. Before the Corporation admits New Stockholders, it shall be permitted to make a distribution to any existing Stockholder. The Corporation also agrees to utilize its best efforts to distribute sufficient payments to fund the Stockholder's tax liabilities on their share of Sub S Taxable Income.

12.      Corporate Restrictions After Purchase. So long as any part of the purchase price of stock purchased in accordance with this Agreement or the Corporation's obligation to the Transferor remains unpaid, the Corporation shall not: (a) reorganize its capital structure (except to reduce its capital as required by the provisions of Section 11 of the Agreement); (b) merge or consolidate with any other Corporation or sell any of its assets except in the regular course of business; or (c) increase the salary or bonus of any officer of the Corporation except for reasonable increases; (d) or take any action to dilute the Book Net Income of the Corporation; or (e) to divest any corporate opportunity, directly or indirectly. So long as any part of such purchase price remains unpaid, the transferor or the Decedent's personal representatives, as the case may be, shall have the right to examine the Corporation's books and records from time to time and receive copies of all accounting reports and tax returns prepared for or on behalf of it. If the Corporation breaches any of its obligations under this Paragraph, the transferor or the Decedent's personal representative, as the case may be, in addition to all other remedies available, may elect to declare the entire unpaid purchase price due and payable forthwith.

13.      Tax Provisions.

(a)      Subchapter S Status: No Stockholder shall take any action that would cause the Corporation to lose its Subchapter S status or cause the Subchapter S status to be terminated except upon election by the Stockholders and Corporation in accordance with Section 1361 et seq. of the Internal Revenue Code of 1986, as amended (the "Code").

(b)      Termination of Taxable Year of Corporation: The Corporation and the Stockholders agree that on the date of purchase of an Offering Stockholder's stock the tax year of the Corporation shall be terminated in accordance with Section 1377(a)(2) of the Code.

14.      Investment Representations; Endorsement on Stock Certificates.

(a)      Each Stockholder represents to the Corporation that he has acquired the Corporation stock for the sole purpose of investment and without a view to the public

0000 11

distribution thereof, and that the Corporation stock has not been registered or qualified under the Securities Act of 1933, as amended, or under the Maryland Securities Act, and may not be assigned, hypothecated, pledged, sold or otherwise transferred for a period of two (2) years without an effective registration or qualification under said Acts, unless an exemption under said Acts from registration or qualification is in fact available.

(b)      Upon the execution of this Agreement, the certificates of stock subject hereto shall be surrendered to the Corporation and endorsed as follows:

"The shares of Corporation stock represented by this Certificate have been acquired for the sole purpose of investment and without a view to public distribution thereof. None of the Corporation stock represented by this certificate have been registered or qualified under the Securities Act of 1933, as amended, or under the Maryland Securities Act, and may not be assigned, hypothecated, pledged, sold or otherwise transferred for a period of two (2) years without an effective registration or qualification under said Acts, unless an exemption from registration or qualification under said Acts is in fact available. This certificate is transferable only upon compliance with the provisions of the Stockholders Agreement between **ROBERT J. BUCZKOWSKI, GLENN A. HASLAM, GARY J. GAROFALO, RICHARD M. LOMBARDO, LAWRENCE P. KRAEMER, and MADISON MECHANICAL OS CORP.**, a Maryland corporation effective the 31st day of December, 2007, a copy of which is on file with the Secretary of the Corporation."

(c)      After endorsement, the certificates shall be returned to the Stockholders who shall, subject to the terms of this Agreement, be entitled to exercise all rights of ownership of such stock.

16.      **Specific Performance.** If any party hereto or the personal representative of a Decedent institutes any action or proceeding to enforce the provisions hereof, any person (including the Corporation) against whom such action or proceeding is brought hereby waives the claim or defense therein that such party or such personal representative has an adequate remedy at law and accept a remedy of specific performance and such other as may exist in law and equity.

17.      **Attorneys Fees.** In the event of a breach or default by any party to this Agreement, the non-defaulting parties shall be entitled to reasonable attorney's fees, costs and expenses against the defaulting party or parties in enforcing, prosecuting or defending any dispute or litigation under this Agreement.

18.      **Further Assurances.** Each of the parties hereto will cooperate and provide all

☐☐☐☐ 12

Defs'4096

necessary documentation and take such other actions as necessary to carry out the meaning and intention of this Agreement.

19.   **Notices.**  All notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing by registered or certified mail, return receipt requested.  Such notices shall be addressed, in the case of the Corporation, to its principal office, and in the case of any Stockholder, to his or her address appearing on the books of the Corporation or his or her residence or to such other address as he or she may designate.

20.   **Invalid Provision.**  The invalidity or unenforceability of any provision of this Agreement shall not affect the other provisions hereof, and the Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

21.   **Entire Agreement.**  This Agreement supersedes all prior agreements between the parties relating to its subject matter.  There are no other understandings or agreements between them concerning the subject matter.

22.   **Non-waiver.**  No delay or failure by a party to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

23.   **Headings.**  Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

24.   **Governing Law.**  This Agreement shall be construed in accordance with the laws of the state of Maryland.

25.   **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

26.   **Binding effect.**  The provisions of this Agreement shall be binding upon and inure to the benefit of each of the parties and their respective successors and assigns.  Any required action of the Voting Trustee in connection with a sale of any stock under this Agreement shall be implicitly authorized according to the terms of this Agreement and the Voting Trust Agreement.  Any needed action of a Stockholder, his personal representatives or assigns, thereunder shall not be unreasonably withheld.

27.   **Spousal Consent.**  If the spouse of a Stockholder is not actually a party to this agreement, the Stockholder must obtain his/her spouse's consent to its terms by executing the consent attached as Exhibit A.

PL004460                                    Defs'4097

28.    <u>Amendments.</u> This Agreement may be altered, amended or terminated upon the mutual written consent of all parties hereto.

**[Signatures appear on following page]**

Defs'4098

**IN WITNESS WHEREOF**, the Corporation has caused this Agreement to be signed by its duly authorized officer, and its corporate seal to be affixed hereto, and the Stockholders have hereunto set their hand and seal, both the day and year as hereinbefore noted.

WITNESS/ATTEST:                          **STOCKHOLDERS:**

_____          _____ (SEAL)
                                         Robert J. Buczkowski

_____          _____ (SEAL)
                                         Glenn A. Haslam

_____          _____ (SEAL)
                                         Gary J. Garofalo

_____          _____ (SEAL)
                                         Richard M. Lombardo

_____          _____ (SEAL)
                                         Lawrence P. Kraemer

WITNESS/ATTEST:                          **MADISON MECHANICAL OS CORP.**
                                         a Maryland corporation

_____          By: _____ (SEAL)
                                         Glenn A. Haslam, President

Stockholders Agmt.v2.DOC

                          Defs'4099

EXHIBIT A

Spousal Consent

The Spouse of _____ hereby consents to the terms and restrictions of this Stockholders Agreement, effective this 31st day of December, 2007, by and between **ROBERT J. BUCZKOWSKI, GLENN A. HASLAM, GARY J. GAROFALO, RICHARD M. LOMBARDO, LAWRENCE P. KRAEMER,** and **MADISON MECHANICAL OS CORP.**, a Maryland corporation.

**IN WITNESS WHEREOF,** the Stockholder has caused this Spousal Consent to be signed by his Spouse, and the Spouse has hereunto set her hand and seal, on this ___ day of _____, 2007.

WITNESS/ATTEST:

_____

_____(SEAL)
Name:

**Defs'4100**

Spousal Consent

The Spouse of ROBERT J. BUCZKOWSKI hereby consents to the terms and restrictions of this Stockholders Agreement, effective this 31st day of December, 2007, by and between ROBERT J. BUCZKOWSKI, GLENN A. HASLAM, GARY J. GAROFALO, RICHARD M. LOMBARDO, LAWRENCE P. KRAEMER, and MADISON MECHANICAL OS CORP., a Maryland corporation.

**IN WITNESS WHEREOF**, the Stockholder has caused this Spousal Consent to be signed by his Spouse, and the Spouse has hereunto set her hand and seal, on this 26 day of December , 2007.

WITNESS/ATTEST:

Name: Brant German                                    (SEAL)

**Defs'4101**

Spousal Consent

The Spouse of GLENN A. HASLAM hereby consents to the terms and restrictions of this Stockholders Agreement, effective this 31st day of December, 2007, by and between ROBERT J. BUCZKOWSKI, GLENN A. HASLAM, GARY J. GAROFALO, RICHARD M. LOMBARDO, LAWRENCE P. KRAEMER, and MADISON MECHANICAL OS CORP., a Maryland corporation.

**IN WITNESS WHEREOF**, the Stockholder has caused this Spousal Consent to be signed by his Spouse, and the Spouse has hereunto set her hand and seal, on this 26th day of December , 2007.

WITNESS/ATTEST:

Name: _____ (SEAL)        _____ (SEAL)
                                       Robert Buczkowski.   Witness

Defs'4102

Spousal Consent

The Spouse of GARY J. GAROFALO hereby consents to the terms and restrictions of this Stockholders Agreement, effective this 31st day of December, 2007, by and between ROBERT J. BUCZKOWSKI, GLENN A. HASLAM, GARY J. GAROFALO, RICHARD M. LOMBARDO, LAWRENCE P. KRAEMER, and MADISON MECHANICAL OS CORP., a Maryland corporation.

**IN WITNESS WHEREOF**, the Stockholder has caused this Spousal Consent to be signed by his Spouse, and the Spouse has hereunto set her hand and seal, on this 3o day of December , 2007.

~~WITNESS/ATTEST:~~

_Kerry Garofalo_

Name:

_Kelly Garofalo_ (SEAL)

_Robert Buczkowski_

Witness

_Robert Buczkowski_

PL004466

**Defs'4103**

Spousal Consent

    The Spouse of LAWRENCE P. KRAEMER hereby consents to the terms and restrictions of this Stockholders Agreement, effective this 31st day of December, 2007, by and between ROBERT J. BUCZKOWSKI, GLENN A. HASLAM, GARY J. GAROFALO, RICHARD M. LOMBARDO, LAWRENCE P. KRAEMER, and MADISON MECHANICAL OS CORP., a Maryland corporation.

**IN WITNESS WHEREOF**, the Stockholder has caused this Spousal Consent to be signed by his Spouse, and the Spouse has hereunto set her hand and seal, on this ⟨30⟩ day of ⟨December⟩ 2007.

~~WITNESS/ATTEST~~:

_____          _____ (SEAL)
Name:

_____          _____
Witness                                                    Robert Buzkawski

**Baxter, Baker, Sidle, Conn & Jones, P.A.**
Attorneys at Law
120 E. Baltimore Street, Suite 2100
Baltimore, Maryland 21202-1643

EXHIBIT
Buczkowski
8·22·19   mc

Daryl J. Sidle
Direct Line (410) 385-8077
e-mail: djs@bbsclaw.com

Telephone (410) 230-3800
Facsimile (410) 230-3801

January 14, 2016

Robert B. Scarlett
Scarlett, Croll & Myers, P.A.
201 North Charles Street, Suite 600
Baltimore, MD  21201-4100

Re:    Robert J. Buczkowski

Dear Mr. Scarlett:

I write to you as counsel for Madison Mechanical OS Corp. ("Madison"). As you are aware, your client, Robert J. Buczkowski's employment with Madison terminated on November 24, 2015. Accordingly, pursuant to the Madison Stockholders Agreement, of which your client is a party, Mr. Buczkowski is now obligated to sell his stock in Madison.

I understand that your client has been furnished with the independently prepared financial statements for Madison's year ending December 31, 2014. The December 31, 2014, consolidated balance sheet for Madison reflects a negative book value of approximately $3 million. Pursuant to the Stockholders Agreement, that negative book value forms the foundation for the purchase price of your client's stock. The negative number will be increased by the taxes imposed on your client's distributable share of taxable income for the portion of calendar year 2015 in which he was employed. While that number is not yet available to us, it is our belief that Madison's taxable income for calendar year 2015 will be less than the negative book value as of the end of 2014.

Accordingly, pursuant to the Stockholders Agreement, the purchase price for your client's capital stock in Madison is currently calculated to be $0. If the independently prepared income statement for 2015 reveals income in excess of the negative December 31, 2014 book value, an appropriate portion of the excess will be remitted to your client as additional purchase price. Please have your client endorse his stock certificate in blank and forward it to me to consummate the stock purchase.

On a related note, it is our understanding that Madison is indebted to your client in the amount of approximately $150,000, plus accrued interest, pursuant to a promissory note from Madison payable to the order of your client, dated October 17, 2014. In addition, however, your client is indebted to Madison in the amount of approximately $140,609, which represents his

HART00000213

Robert B. Scarlett
Scarlett, Croll & Myers, P.A.
January 14, 2016
Page 2

---

delinquent capital contributions.  We propose to set-off the amount due from your client against the amount due to your client and pay the excess to him.

Finally, I want to address certain allegations contained in your letter dated November 11, 2015, concerning alleged diversion of Madison's business opportunities.  At the time of your letter, no business had been diverted from Madison to any affiliate.  In late December, 2015, Madison Mechanical, Inc., the wholly-owned subsidiary of Madison Mechanical OS Corp., entered into a voluntary dissolution.  At this point, Madison Mechanical (the operating subsidiary) exists solely for the purpose of winding up its existing business and consummating the orderly liquidation and distribution of its net assets (if any).  It is not accepting any new business.

Please do not hesitate to contact me if you should have any questions in connection with this matter.

Very truly yours,

Daryl J. Sidle

DJS:dar

cc:    Glenn Haslam

HART00000214

Robert Buczkowski
804 Winchester Drive
Westminster, Maryland



Glenn A. Haslam                                          May 10, 2016
12154 Mt. Albert Road
Ellicott City, MD 21042

Madison Mechanical OS Corp.                              VIA – EMAIL, US MAIL
c/o Glenn A. Haslam
1539 Fannie Dorsey Road
Sykesville, MD 21784

Madison Mechanical OS Corp.
c/o Glenn A. Haslam
5621 Old Frederick Road
Catonsville, MD 21228

Re:    Shareholder Demand and Request to Inspect Corporate Records

Dear Mr. Haslam:

I am writing to you in my capacity as a minority shareholder of Madison Mechanical OS
Corp. This letter constitutes a demand for Board action to recover damages suffered by the
corporation and to prevent further financial harm to the corporation, and a request to inspect
books and records of account of the corporation.

On or about August 20, 2015, you, Richard Arnold, Gary Garofalo, Richard Lombardo,
and Lawrence Kraemer formed Madison Mechanical Contracting, LLC. Within months of its
formation, Madison Mechanical Contracting, LLC took over ongoing projects that were
previously being performed by Madison Mechanical, Inc.—a wholly-owned subsidiary of
Madison Mechanical OS Corp.—and began performing the projects for the benefit of Madison
Mechanical Contracting, LLC and its members. Madison Mechanical Contracting, LLC assumed
ongoing projects under subcontracts that were entered into by Madison Mechanical, Inc. Upon
information and belief, Madison Mechanical Contracting, LLC is using the trade name, Madison
Mechanical, Inc. Madison Mechanical Contracting, LLC misappropriated the name, goodwill,
assets, trade secrets, and accounts receivable of Madison Mechanical, Inc.

In addition, you, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer—all of whom are
shareholders of Madison Mechanical OS Corp.—have diverted corporate opportunities for new
projects from Madison Mechanical, Inc. and Madison Mechanical OS Corp. to Madison
Mechanical Contracting, LLC. You, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer used
knowledge and information obtained through your positions as shareholders, officers, directors,
and/or employees of Madison Mechanical OS Corp. to compete with Madison Mechanical OS

HART00000217

Corp. and to divert corporate opportunities from Madison Mechanical OS Corp. for the benefit of Madison Mechanical Contracting, LLC and its members.

You wrongfully and unlawfully dissolved Madison Mechanical, Inc., without properly informing the shareholders of Madison Mechanical OS Corp. or the creditors of Madison Mechanical, Inc. You did this in order to facilitate the above-referenced misappropriation of the

name, goodwill, assets, records, trade secrets, and accounts receivable of Madison Mechanical, Inc. for the benefit of Madison Mechanical Contracting, LLC and its members.

Furthermore, you purported to terminate my employment for Madison Mechanical OS Corp., allegedly for cause, despite the fact that there was no cause for my termination. You did this for the improper purpose of attempting to force me to transfer my shares to the corporation. In furtherance of this effort, your lawyer demanded that I transfer my stock back to the corporation for no consideration.

These actions by you, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer constitute breaches of your fiduciary duties to the corporation and myself.

The above-described actions are unlawful, have caused monetary and non-monetary harm to Madison Mechanical OS Corp., and give rise to causes of action for (i) oppression of minority shareholder, (ii) breach of fiduciary duty, (iii) tortious interference with economic relations, (iv) unjust enrichment, (v) unfair competition (misappropriation of trade secrets), and (vi) constructive trust, and possibly others. As a shareholder of Madison Mechanical OS Corp., I request that the corporation file suit against you, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison Mechanical Contracting, LLC, to recover damages and prevent further harm to the corporation.

This letter shall constitute a demand that the Board of Directors of Madison Mechanical OS Corp. vote to institute legal action against you, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison Mechanical Contracting, LLC. Should the Board fail to do so within 15 days of the date of this letter, I intend to bring a derivative action on behalf of Madison Mechanical OS Corp. against you, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison Mechanical Contracting, LLC.

In addition, as a 13% shareholder of Madison Mechanical OS Corp., I request that, within 20 days of the date of this letter, the corporation provide copies of or access to the following records:

- All books, records, and other documents related to Madison Mechanical, Inc. from December 13, 2007 to the present. This request includes the following: all financial records relating to the company, including accounts receivable, accounts payable, ledgers, copies of invoices, profit & loss statements, loan balances, liability statements, documents concerning any loans, or other document reflecting company finances; all documents regarding distributions, loans, loan repayments, reimbursements of any kind, costs and expenses (including invoices), or capital contributions; all information regarding the state of the business and financial

HART00000218

condition of the company; all other information regarding the affairs of the company; and all federal, state, or local income tax returns of the company;

- In regard to Madison Mechanical, Inc., the articles of incorporation, articles of organization, operating agreement, stockholders' agreement, and all amendments to the aforementioned documents; the minutes of all meetings of the board of directors; the minutes of all meetings of the shareholders; and all corporate resolutions;

- 

- All books, records, and other documents related to Madison Mechanical OS Corp. from December 13, 2007 to the present. This request includes the following: all financial records relating to the company, including accounts receivable, accounts payable, ledgers, copies of invoices, profit & loss statements, loan balances, liability statements, documents concerning any loans, or other document reflecting company finances; all documents regarding distributions, loans, loan repayments, reimbursements of any kind, costs and expenses (including invoices), or capital contributions; all information regarding the state of the business and financial condition of the company; and all federal, state, or local income tax returns of the company;

- In regard to Madison Mechanical OS Corp., the articles of incorporation, articles of organization, operating agreement, stockholders' agreement, and all amendments to the aforementioned documents; the minutes of all meetings of the board of directors; the minutes of all meetings of the shareholders; and all corporate resolutions;

Sincerely,

Robert Buczkowski.

cc:   Gary Garofalo
      Lawrence Kraemer
      Richard Lombardo



**Baxter, Baker, Sidle, Conn & Jones, P.A.**
Attorneys at Law
120 E. Baltimore Street, Suite 2100
Baltimore, Maryland 21202-1643

Daryl J. Sidle
Direct Line (410) 385-8077
e-mail: djs@bbsclaw.com

Telephone (410) 230-3800
Facsimile (410) 230-3801

May 11, 2016

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Robert J. Buczkowski
804 Winchester Drive
Westminster, Maryland 21157-5735

Re:     Letter dated May 10, 2016

Dear Mr. Buczkowski:

I am writing in response to the captioned letter you addressed to Mr. Haslam and Madison Mechanical OS Corp.

Your request to inspect the books and records of Madison Mechanical OS Corp. (the "Corporation") is denied.  Under Maryland law, only current stockholders of a corporation have inspection rights.  It is the position of the Corporation that you are no longer a stockholder of the Corporation.

As you are well aware, your employment with the Corporation terminated on November 24, 2015.  Pursuant to the terms of the Corporation's Stockholders Agreement of which you are a party (the "Agreement"), upon the termination of your employment you were obligated to sell your stock pursuant to the Agreement.

By letter dated January 14, 2016, a copy of which is enclosed, I notified your counsel, Mr. Scarlett, of your obligation to sell your stock and explained that pursuant to the terms of the Agreement the purchase price for the stock was $0.  I requested at that point that Mr. Scarlett secure your endorsement of your stock certificate and forward it to me to consummate the stock purchase.  <u>Your failure to cooperate with that request in no way changes the fact that you have ceased to be a stockholder in the Corporation</u>.  As a result, you have no statutory inspection rights.

Your allegations of diversion of corporate opportunities are also unfounded.  Regardless of when Madison Mechanical Contracting, LLC (the "LLC") was formed, no business was done by that entity until after the dissolution of the Corporation's wholly-owned operating subsidiary

Robert J. Buczkowski
May 11, 2016
Page 2

———————————————

(the "Subsidiary"). Again, contrary to your allegations, the Subsidiary was dissolved because it was no longer expedient to conduct business within it. Once that entity was dissolved, there were no business opportunities to divert.

As a wholly-owned subsidiary of the Corporation, it is the stockholder of the subsidiary and the subsidiary's Board of Directors that determine whether it will continue to conduct business in the ordinary course or dissolve. This does not require the approval of the Corporation's shareholders, nor does it require them to be informed of that fact. In fact, all of your allegations concerning the terms and conditions of the Subsidiary's dissolution are misplaced. Since you were not a stockholder of the Corporation when those actions occurred, you have no standing to complain about them.

Again, contrary to the statements contained in your letter, your employment was not "purported" to be terminated. It was in fact terminated. Whether your employment was terminated with or without cause is irrelevant. You were an at-will employee whose employment could be terminated at any time for any reason, or for no reason.

Your request to inspect books and records of the subsidiary has no basis in Maryland corporate law, since you were never a shareholder of the Subsidiary.

Your demand that the Board of the Corporation institute legal action against Messrs. Haslam, Garafolo, Lombardo, Kraemer, Arnold and the LLC has been considered by the Corporation's Board and rejected as baseless. The Board also believes that there is no rightful basis on which you may bring a derivative action, since you are no longer a shareholder of the Corporation. Under Maryland law, it is clear that to bring a derivative action on behalf of the Corporation you must hold stock in the Corporation "continuously from the time of the wrong through the end of the litigation" (James J. Hank, Jr. Maryland Corporation Law §7.21).

I am sending this letter to you since it was you, and not your counsel, Mr. Scarlett, who signed the letter to which I respond. Mr. Scarlett will receive a copy of this letter and may inform me if all future communications on this matter should be addressed to him.

Sincerely,

Daryl J. Sidle

DJS:dar
Enclosure
cc:   Robert B. Scarlett, Esq. (without enclosure)



# Madison Mechanical OS Corp.

## CONSENT OF SOLE DIRECTOR

September 15, 2016

WHEREAS, any action required or permitted to be taken at a meeting of the board of directors of a corporation may be taken without a meeting if a unanimous written consent which sets forth the action is signed by each member of the board and is filed with the minutes of proceedings of the board; and

WHEREAS, the sole director of Madison Mechanical OS Corp. (the "Corporation"), desires to take the actions hereinafter set forth; and

WHEREAS, the Corporation has been in need of cash to fund its operations; and

WHEREAS, the stockholders of the Corporation have, between March 1, 2014 and March 31, 2015, made the aggregate capital contributions set forth next to their names:

| | |
|---|---|
| Glenn A. Haslam | $1,178,071.00 |
| Robert J. Buczkowski | $ 143,000.00 |
| Gary Garofalo | $ 283,609.00 |
| Lawrence Kraemer | $ 218,160.00 |
| Richard Lombardo | $ 218,160.00 |

WHEREAS, at all times between March 1, 2014 and March 31, 2015, the Corporation had a negative book value in excess of $2.5 Million, hence eliminating any pre-existing stockholders' equity and reflecting a business with very little value as a going concern; and

WHEREAS, the Corporation wishes to issue additional shares of its Common Stock to reflect the aggregate capital contributions made by the stockholders; and

WHEREAS, the Board desires that all of the stockholders continue to own shares of Common Stock in proportion to their aggregate capital contributions to the Corporation; and

WHEREAS, the Board has granted each stockholder the opportunity to make capital contributions on a proportionate basis and avoid any dilutive effect of such capital contributions, notwithstanding the fact that the Corporation's Articles of Incorporation provide that no stockholder shall have any preemptive right to subscribe for the Corporation's Common Stock; and

WHEREAS, the Corporation's Articles of Incorporation grant the Board full and plenary power to issue shares of Common Stock in exchange for cash contributions to the Corporation and to determine the particulars of any such issuance;

NOW, THEREFORE, the undersigned, being the sole director of the Corporation, does hereby declare that the actions expressed in the following resolutions shall be and are hereby taken by the director of the Corporation as of the date first hereinabove written:

RESOLVED, that effective April 1, 2015, the Corporation's stock certificates numbered 1 through 6 are hereby voided and that the Corporation's stock certificates numbered 7 through 11 be issued to reflect the aggregate capital contributions set forth above and the resulting shares of stock owned by the stockholders as calculated based on a consistent per share value of the Corporation from March 1, 2014 through March 31, 2015, all of such certificates to be dated as of April 1, 2015.

| Name of Shareholder | No. Shares | % of Shares |
|---|---|---|
| Glenn A. Haslam | 214.25 | 57.733% |
| Robert J. Buczkowski | 26.00 | 7.006% |
| Gary Garofalo | 51.58 | 13.90% |
| Lawrence Kraemer | 39.64 | 10.6805% |
| Richard Lombardo | 39.64 | 10.6805% |
| | 371.11 | 100.00% |

RESOLVED, that the Corporation acknowledges that certain stockholders have assigned their shares of Common Stock to a Voting Trust and accordingly, replacement stock certificates will be issued in the name of the trustee of such Voting Trust.

Glenn A. Haslam

cpa/madison mechanical/consent of director to issuance of new stock certificates



## AFFIDAVIT OF ROBERT BUCZKOWSKI

I, Robert Buczkowski, hereby state and affirm as follows:

1. I am over the age of eighteen years and competent to testify.

2. The following is based upon my personal knowledge.

3. Beginning in the spring of 2014, a capital call was made by Glenn Haslam as President and CEO of Madison Mechanical OS Corp. ("OS Corp."), which is a holding company for Madison Mechanical, Inc. ("MMI").

4. Each shareholder of OS Corp. was asked to contribute his equitable share to the capital contribution. In March and December of 2014, and throughout the months of January through March of 2015, capital calls were made by Glenn Haslam in which my equitable percentage (13%) totaled $283,609. I contributed $143,609 in total. Specifically, I only made two capital contributions. The first was in the amount of $130,000 on March 1, 2014. The second was in the amount of $13,000 on December 16, 2014. While the remaining shareholders made additional contributions during the time period from January through March of 2015, I did not.

5. As of April 1, 2015, Mr. Haslam and OS Corp diluted my ownership interest from 13% to 7.774%.

6. The dilution occurred and was effective as of April 1, 2015.

I SOLEMNLY AFFIRM under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true.

5/25/18
Date

Robert Buczkowski

EXHIBIT 12
*Buczlowski*
8-22-19 ML

**From:** Gary Garofalo
**Sent:** Wednesday, October 19, 2011 5:10 PM
**To:** Glenn Haslam; Bob Buczkowski; Dick Lombardo; Larry Kraemer
**Subject:** FW: Consequences of failure to pay call
**Attachments:** email re adjustment of ownership interests.DOC; Madison Mechanical--Reallocation Calculations (2).XLS

**Categories:** Red Category

Gents,
At our September 1st meeting in Madison's office, we discussed that since the current Stockholders Agreement (SA) was silent on what would happen if a shareholder did not make their requested cash call obligation, that I would look into some alternatives, from which we could generate a policy that we would use to amend the SA. Attached are some suggestions that Bill Davidow came up with, that are pretty straightforward to help us out. Please let me know which alternative you prefer, or feel free to suggest another means of reallocation. If possible, I'd like to be able to discuss the matter at our next quarterly meeting.

Bob,
When do you think you will have the 9/30/11 FS completed, so we can schedule our next meeting?

**Gary J. Garofalo**
**CFO/VP Finance**
**Harkins Builders, Inc.**
**2201 Warwick Way**
**Marriottsville, MD 21104**
**410.480.4232 (W)**
**410.480.4299 (F)**
**443.277.1555 (C)**
**ggarofalo@harkinsbuilders.com**
**www.harkinsbuilders.com**



*Construction, Preconstruction, and Design-Build Excellence Since 1965*

> COMMERCIAL  > MIXED USE  > MULTIFAMILY  > HEALTHCARE  > STUDENT HOUSING  > SENIOR LIVING  > MILITARY

Follow us on Facebook and LinkedIn



---

**From:** Davidow, Jr., William M. [mailto:wdavidow@gfrlaw.com]
**Sent:** Monday, October 17, 2011 5:10 PM
**To:** Gary Garofalo
**Subject:** Consequences of failure to pay call

Gary: apologies for the delay....attached is the analysis re failure to pay capital calls. Bill

---------------------------

The information supplied in this message may be legally privileged.  If you are the intended recipient of this message, the sender does not intend delivery to you to waive any privilege or right pertaining to this message.  If you have received this message in error, please immediately notify the sender by return e-mail, and delete the errant message.  Thank you.

Circular 230 Disclosure:  Treasury Department Regulations require us to notify you that any federal tax advice contained in this communication (including any attachments unless otherwise expressly stated) is not intended or written to be used, and cannot be used, for purposes of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

---------------------------

Defs'0012

## MEMORANDUM

TO:   Gary Garofalo

FROM:  William M. Davidow, Jr., Ext. 4253

DATE:  October 17, 2011

RE:   Consequences of Failing to Pay Capital Calls

---------------------------------------------------------------------------------------

The purpose of this memorandum is to summarize the basic approaches to adjusting ownership interests in cases where one of the owners does not satisfy a required capital call. The alternatives range from relatively "benign" consequences to "punitive" consequences. For example, assume the following ownership interests:

| | |
|---|---|
| Stockholder A | 55% |
| Stockholder B | 30% |
| Stockholder C | 15% |

If a capital call in the amount of $100,000 were made and Stockholder B did not respond to the call, i.e., did not pay $30,000, the basic alternatives are as follows:

1.   <u>Personal Debt to the Company</u>. The Unpaid Contribution is considered a personal debt due to the Company from Stockholder B and is repaid with interest from future distributions/dividends to Stockholder B or upon sale of the Company. There would be no adjustment of ownership interests. This is a relatively benign approach.

2.   <u>Personal Debt to the Other Stockholders</u>. The Unpaid Contribution (in the amount of $30,000) is contributed by Stockholders A and C and is considered a personal debt due to them from Stockholder B and paid from future dividends/distributions to Stockholder B, upon sale of the company or upon a date certain in the future. Again, there is no adjustment of ownership interests; Stockholders A and C have effectively loaned $30,000 to Stockholder B.

3.   <u>Dilution Based on Value</u>. The Unpaid Contribution is contributed to the Company by Stockholders A and C and ownership is adjusted in accordance with "fair market value" of the Company as determined <u>after</u> the contribution. For example, if the fair market value of the Company is $1,000,000 pre-contribution, then the Unpaid Contribution and the other contributions made at the time of the

call are added to the pre-contribution value as a means of determining ownership interests. This approach is illustrated by the worksheet attached as Exhibit A.

4.   <u>Dilution Based on Capital Invested</u>.  The Unpaid Contribution is contributed by Stockholders A and C and the proportionate ownership of the entity is reallocated in accordance with the sum of each owner's invested capital <u>and</u> the aggregate amount of the required contributions.  (This amount in the case of an S Corporation can be in accordance with tax basis, where the tax basis is a fair indicator of capital investment.)  This approach is more punitive than Alternative 3 because the dilution ignores the value of the defaulting stockholder's stock. This approach is illustrated by the worksheet attached as Exhibit B.

5.   <u>Forfeiture</u>.  The ownership interest of the defaulting owner is forfeited.  This is extremely punitive and may not be enforceable as a legal matter.

2

**EXHIBIT A—REALLOCATION BASED ON VALUE**

Amount of Capital Call           $100,000
Pre-Contribution Value           $1,000,000

| Stockholder | Pre-Contribution Value per Stockholder | Pre-Contribution Ownership % | Initial Amount Contributed in Response to Capital Call | Additional Amount Contributed on behalf of B | Post-Contribution Value per Stockholder | Post-Contribution Ownership % |
|---|---|---|---|---|---|---|
| A | $550,000 | 55% | $55,000 | $23,571 | $628,571 | 57.14% |
| B | $300,000 | 30% | $0 | $0 | $300,000 | 27.27% |
| C | $150,000 | 15% | $15,000 | $6,429 | $171,429 | 15.58% |
| Total | $1,000,000 | 100% | $70,000 | $30,000 | $1,100,000 | 100.00% |

Defs'0015

EXHIBIT
13
Buczkowski
8-22-19 ML

| | |
|---|---|
| **From:** | Glenn Haslam <glennh@madisonmechanical.net> |
| **Sent:** | Friday, March 6, 2015 9:26 AM |
| **To:** | Bob Buczkowski; Gary Garofalo; Dick Lombardo; Larry Kraemer |
| **Subject:** | FW: Madison Equity 03 01 2015.xlsx |
| **Attachments:** | Madison Equity 03 01 2015.xlsx |
| | |
| **Categories:** | Red Category |

Guys see attached a accounting of capital calls /loans by all partners we need to do a capital call to pay bbt next week you will see the amounts needed listed as march bank payment as always we will follow the operating agreement as it relates to capital calls thanks Glenn

---

**From:** Bob Buczkowski
**Sent:** Wednesday, March 04, 2015 6:07 PM
**To:** Glenn Haslam; Gary Garofalo
**Subject:** Madison Equity 03 01 2015.xlsx

Glenn,

Here is the equity schedule we discussed.

Bobdick

Defs'0113

## Madison Equity Balances

| | 54% Haslam | 13% Buczkowski | 13% Garofalo | 10% Kraemer | 10% Lombardo | 100% |
|---|---|---|---|---|---|---|
| **Capital Call Deposits** | | | | | | |
| 3/1/2014 | $ 540,000.00 | $ 130,000.00 | $ 130,000.00 | $ 100,000.00 | $ 100,000.00 | $ 1,000,000.00 |
| 12/4/2014 | $ 270,000.00 | $ - | $ 65,000.00 | $ 50,000.00 | $ 50,000.00 | $ 435,000.00 |
| 12/16/2014 | $ - | $ 13,000.00 | $ - | $ - | $ - | $ 13,000.00 |
| 1/27/2015 | $ - | $ - | $ 65,000.00 | $ 25,000.00 | $ 50,000.00 | $ 140,000.00 |
| 1/28/2015 | $ 270,000.00 | | | $ - | $ - | $ 270,000.00 |
| 2/5/2015 | $ - | | | $ 25,000.00 | $ - | $ 25,000.00 |
| March Bank Pymt | $ 98,071.00 | | $ 23,609.00 | $ 18,160.00 | $ 18,160.00 | $ 158,000.00 |
| | $ 1,178,071.00 | $ 143,000.00 | $ 283,609.00 | $ 218,160.00 | $ 218,160.00 | $ 2,041,000.00 |
| **Loan Deposits** | | | | | | |
| 7/22/2014 | $ 150,000.00 | $ 150,000.00 | $ 125,000.00 | $ 37,500.00 | $ 125,000.00 | $ 587,500.00 |
| 8/12/2014 | $ 100,000.00 | $ - | $ 125,000.00 | $ 37,500.00 | $ 125,000.00 | $ 387,500.00 |
| | $ 250,000.00 | $ 150,000.00 | $ 250,000.00 | $ 75,000.00 | $ 250,000.00 | $ 975,000.00 |
| **Total Cash Fundings** | $ 1,428,071.00 | $ 293,000.00 | $ 533,609.00 | $ 293,160.00 | $ 468,160.00 | $ 3,016,000.00 |
| **Percentage of Capital Funded** | 47.35% | 9.71% | 17.69% | 9.72% | 15.52% | 100.00% |

PL000479

Defs'0114

EXHIBIT
_Buczkowski_
14
8·22·19
PENGAD 800-631-6989

| | |
|---|---|
| **From:** | Bob Buczkowski |
| **Sent:** | Tuesday, March 17, 2015 2:25 PM |
| **To:** | Bill Franey, Sr. |
| **Cc:** | Brenda Patterson; Jeri Russell |
| **Subject:** | RE: Madison Mechanical Financials 2014 |
| **Attachments:** | Madison Equity 03 17 2015.xlsx |

See attached. Hilited in yellow is 2015 money that was put in. If you need anything else let me know.

Bob

&

Bob Buczkowski. CPA

Madison Mechanical, Inc. CFO

410-461-7301 (O)

410-461-8470 (F)

410-984-1636 (C)

&

**From:** Bill Franey, Sr. [mailto:wfraney@alliant.com]
**Sent:** Tuesday, March 17, 2015 12:01 PM
**To:** Bob Buczkowski
**Cc:** Brenda Patterson; Jeri Russell
**Subject:** RE: Madison Mechanical Financials 2014

&

Bob, have the shareholders contributed money to the Corporation in 2015? If so how much? Thanks Bill

&

**William G. Franey**

Executive Vice President

Commercial and Corporate Group

Alliant Americas

9901 Business Parkway

Ste. B

**Defs'4079**

Lanham, MD& 20706

D& & 301 306 3066

O& & 301 459 0055

C& & 410 980 9903

F& & & 301 459 9521

www.alliant.com&

CA License No. 0C36861&



Alliant Americas is a division of Alliant Insurance Services, Inc.

&

**From:** Bob Buczkowski [mailto:bobb@madisonmechanical.net]
**Sent:** Tuesday, March 17, 2015 11:19 AM
**To:** Bill Franey, Sr.
**Subject:** FW: Madison Mechanical Financials 2014

&

Bill,

&

Here is the draft 6that was sent over to Reznick. Any questions let me know.

&

Thanks-Bob

&

Bob Buczkowski. CPA

Madison Mechanical, Inc. CFO

410-461-7301 (O)

410-461-8470 (F)

410-984-1636 (C)

This e-mail and all attachments to it are for the sole use of the intended recipients and may contain proprietary information and trade secrets of Alliant Insurance Services, Inc. and its subsidiaries. This e-mail may also

2

contain information which is confidential or which is protected from disclosure by privilege. Any unauthorized use, disclosure or distribution of this e-mail and its attachments is prohibited. If you are not the intended recipient, let us know by reply e-mail and then erase and destroy all electronic or other copies of this message.

Defs'4081

Madison Equity Balances

| | 54% Haslam | 13% Buczkowski | 13% Garofalo | 10% Kraemer | 10% Lombardo | 100% |
|---|---|---|---|---|---|---|
| **Capital Call Deposits** | | | | | | |
| 3/1/2014 | $ 540,000.00 | $ 130,000.00 | $ 130,000.00 | $ 100,000.00 | $ 100,000.00 | $ 1,000,000.00 |
| 12/4/2014 | $ 270,000.00 | $ - | $ 65,000.00 | $ 50,000.00 | $ 50,000.00 | $ 435,000.00 |
| 12/16/2014 | $ - | $ 13,000.00 | $ - | $ | $ - | $ 13,000.00 |
| 1/27/2015 | $ - | $ - | $ 65,000.00 | $ 25,000.00 | $ 50,000.00 | $ 140,000.00 |
| 1/28/2015 | $ 270,000.00 | $ - | $ - | $ | $ - | $ 270,000.00 |
| 2/5/2015 | $ - | $ - | $ - | $ 25,000.00 | $ - | $ 25,000.00 |
| March Bank Pymt | $ 98,071.00 | $ - | $ 23,609.00 | $ 18,160.00 | $ 18,160.00 | $ 158,000.00 |
| | $ 1,178,071.00 | $ 143,000.00 | $ 283,609.00 | $ 218,160.00 | $ 218,160.00 | $ 2,041,000.00 |
| **Loan Deposits** | | | | | | |
| 7/22/2014 | $ 150,000.00 | $ 150,000.00 | $ 125,000.00 | $ 37,500.00 | $ 125,000.00 | $ 587,500.00 |
| 8/12/2014 | $ 100,000.00 | $ - | $ 125,000.00 | $ 37,500.00 | $ 125,000.00 | $ 387,500.00 |
| | $ 250,000.00 | $ 150,000.00 | $ 250,000.00 | $ 75,000.00 | $ 250,000.00 | $ 975,000.00 |
| **Total Cash Fundings** | $ 1,428,071.00 | $ 293,000.00 | $ 533,609.00 | $ 293,160.00 | $ 468,160.00 | $ 3,016,000.00 |
| **Percentage of Capital Funded** | 47.35% | 9.71% | 17.69% | 9.72% | 15.52% | 100.00% |

PL004443

Defs 4082

STAMP & RETURN

IN THE CIRCUIT COURT FOR BALTIMORE COUNTY, MARYLAND

ROBERT BUCZKOWSKI,

    804 Winchester Drive
    Westminster, MD 21157

    Plaintiff

v.

MADISON MECHANICAL
CONTRACTING, LLC,

    <u>Serve:</u>
    Richard G. Arnold
    2929 Excelsior Springs Ct.
    Ellicott City, MD 21042

and

MADISON MECHANICAL OS
CORP.,

    <u>Serve:</u>
    State Department of
    Assessments & Taxation
    301 W. Preston Street
    Baltimore, MD 21201

and

GLENN A. HASLAM,

    <u>Serve:</u>
    Glenn A. Haslam
    12154 Mt. Albert Road
    Ellicott City, MD 21042

and

Case No. _____



EXHIBIT
Buczkowski
15
8-22-19



EXHIBIT
1

GARY GAROFALO,

>   Serve:
>   Gary Garofalo
>   2818 Hunt Valley Drive
>   Glenwood, MD 21738

and

RICHARD LOMBARDO,

>   Serve:
>   Richard Lombardo
>   3194 Danmark Drive
>   West Friendship, MD 21794

and

LAWRENCE KRAEMER,

>   Serve:
>   Lawrence Kraemer
>   2201 Warwick Way
>   Marriottsville, MD 21104

and

RICHARD G. ARNOLD,

>   Serve:
>   Richard G. Arnold
>   2929 Excelsior Springs Ct.
>   Ellicott City, MD 21042

>   Defendants

## COMPLAINT

COMES NOW, the Plaintiff, Robert Buczkowski, by and through counsel, and sues the Defendants, Madison Mechanical Contracting, LLC, Madison Mechanical OS Corporation, Glenn A. Haslam, Gary Garofalo, Richard Lombardo, Lawrence Kraemer, and Richard G. Arnold, and for cause states as follows:

### The Parties and Related Entities

1.     Plaintiff Robert Buczkowski is a resident of the State of Maryland, who resides at 804 Winchester Drive, Westminster, MD 21157.

2.     Defendant Madison Mechanical Contracting, LLC is a Maryland limited liability company with its principal place of business located at 5621 Old Frederick Road, Catonsville, MD 21228.

3.     Defendant Madison Mechanical OS Corp. is a Maryland corporation with its principal place of business located at 5621 Old Frederick Road, Suite 1, Catonsville, MD 21228.

4.     Defendant Glenn Haslam is a resident of the State of Maryland, who resides at 12154 Mt. Albert Road, Ellicott City, MD 21042.

5.     Defendant Gary Garofalo is a resident of the State of Maryland, who resides at 2818 Hunt Valley Drive, Glenwood, MD 21738.

6.     Defendant Richard Lombardo is a resident of the State of Maryland, who resides at 3194 Danmark Drive, West Friendship, MD 21794.

3

7.      Defendant Lawrence Kraemer is a resident of the State of Maryland, whose place of employment is located at 2201 Warwick Way, Marriottsville, MD 21104.

8.      Defendant Richard G. Arnold is a resident of the State of Maryland, who resides at 2929 Excelsior Springs Court, Ellicott City, MD 21042.

### Jurisdiction and Venue

9.      This Court has jurisdiction over this action under Md. Code, Cts. & Jud. Proc. § 1-501.

10.     This Court has jurisdiction over the parties to this action under Md. Code, Cts. & Jud. Proc. § 6-102, as the natural persons who are parties to this action are domiciled in and/or maintain their principal places of business in Maryland, and the entity parties to this action were organized under the laws of Maryland.

11.     This Court is a proper venue for this action under Md. Code, Cts. & Jud. Proc. § 6-201, as Defendants Madison Mechanical Contracting, LLC and Madison Mechanical OS Corp. have their principal places of business in Baltimore County, Maryland. There is no single venue applicable to all Defendants. Because Baltimore County is a venue in which one of the Defendants could be sued, it is an appropriate venue under Cts. & Jud. Proc. § 6-201(b).

### Facts Common to All Counts

A.      Formation of Madison Mechanical, Inc.

4

12.     In the early 1990s, Defendant Glenn Haslam was a partner in an entity known as Baltimore Mechanical Services, Inc., a construction subcontractor.

13.     Baltimore Mechanical Services performed work as a subcontractor for Harkins Builders, Inc. and other general contractors. The sole shareholder of Harkins Builders was J.P. "Blasé" Cooke.

14.     In 1992, Baltimore Mechanical Services filed a petition for bankruptcy under Chapter 11 of the Bankruptcy Code.

15.     In 1993, Blasé Cooke founded Madison Mechanical, Inc. Madison Mechanical, Inc. was incorporated as a Maryland corporation on March 10, 1993. Mr. Cooke was the sole shareholder of Madison Mechanical, Inc.

16.     The initial purpose of Madison Mechanical, Inc. was to complete work that had been left incomplete by Baltimore Mechanical Services when it filed for bankruptcy. However, Madison Mechanical, Inc. began to bid for other work as well, and became profitable within several years after its founding.

17.     Mr. Haslam was the president of Madison Mechanical, Inc. Upon information and belief, Mr. Cooke and Mr. Haslam had an agreement permitting Mr. Haslam to purchase Mr. Cooke's 100% ownership interest in Madison Mechanical, Inc.

18.     Plaintiff Robert Buczkowski is a certified public accountant with extensive experience in the construction industry.

19.     In 2001 Madison Mechanical, Inc. was having operational and financial difficulties.

5

20.    In 2001, Defendant Gary Garofalo—who was then and still is employed by Harkins Builders and provided oversight of Madison Mechanical, Inc. for Mr. Cooke—retained the services of Mr. Buczkowski as a consultant to assist in updating and organizing Madison Mechanical, Inc.'s accounting records and procedures.

21.    In 2002, Madison Mechanical, Inc. offered Mr. Buczkowski a fulltime employment position.

22.    Mr. Buczkowski met with Mr. Haslam and Mr. Garofalo to negotiate the terms of his employment for Madison Mechanical, Inc. Mr. Buczkowski learned of Mr. Haslam's buyout agreement with Mr. Cooke. Mr. Buczkowski made it clear that if he accepted employment for Madison Mechanical, Inc., he expected to be part of the buyout, receiving a 20% ownership interest and 10% of profits. Mr. Haslam orally agreed to these terms. Mr. Buczkowski began his employment for Madison Mechanical, Inc. in April 2002. He held the position of Chief Financial Officer.

23.    From 2002-2007, Madison Mechanical, Inc.'s revenues and profits steadily increased. During this time period Mr. Buczkowski was involved in both the financial and operational side of the business, helping to control the growth and profitability of the corporation and manage its day–to-day operations.

**B.    Formation of Madison Mechanical OS Corp. and purchase of Madison Mechanical, Inc. stock.**

24.    In or around 2006 or 2007, as Mr. Cooke was suffering from cancer, Mr. Haslam, Mr. Garofalo, and Mr. Buczkowski had various discussions regarding the purchase of Mr. Cooke's 100% interest in Madison Mechanical, Inc.

25.     Mr. Garofalo strongly recommended that the parties allow two other individuals to buy into Madison Mechanical, Inc.: Defendant Richard Lombardo, who was the Chief Executive Officer of Harkins Builders, and Defendant Lawrence Kraemer, who was Vice President of Estimating at Harkins Builders.

26.     Mr. Cooke died on October 2, 2007.

27.     On or about December 13, 2007, Mr. Haslam, Mr. Garofalo, Mr. Buczkowski, Mr. Lombardo, and Mr. Kraemer formed a new entity called Madison Mechanical OS Corp.

28.     The purpose of Madison Mechanical OS Corp. was to purchase all of the stock of Madison Mechanical, Inc. and to operate Madison Mechanical, Inc. as a wholly-owned subsidiary of Madison Mechanical OS Corp.

29.     On or about December 31, 2007, the above parties entered into a Stockholders Agreement with Madison Mechanical OS Corp.

30.     The Stockholders Agreement provided that the corporation had been formed "for the purpose of acquiring all of the issued and outstanding capital stock of and operating Madison Mechanical, Inc." (Stockholders Ag. at 1.)

31.     The Stockholders Agreement further provided that "the Corporation has acquired all of the issued and outstanding Common Stock of Madison Mechanical, Inc. ('MMI Stock') from Dawn Cooke (the 'Transferor') in exchange for a Promissory Note from the Corporation secured by a pledge of the MMI Stock and joint and several guaranties from the Stockholders hereunder." (Stockholders Ag. at 1.)

7

32.     Thus, as of December 31, 2007, Madison Mechanical OS Corp. was the sole shareholder of Madison Mechanical, Inc.; Madison Mechanical, Inc. was a wholly-owned subsidiary of Madison Mechanical OS Corp.

33.     The shareholders of Madison Mechanical OS Corp. were, and still are, Mr. Haslam, Mr. Garofalo, Mr. Buczkowski, Mr. Lombardo, and Mr. Kraemer.

34.     Upon information and belief, Mr. Haslam is the sole Director of Madison Mechanical OS Corp.

35.     Upon information and belief, Madison Mechanical OS Corp. agreed to purchase the shares of Madison Mechanical, Inc. from the Cooke Estate for a purchase price of $3.8 million, with $1 million paid prior to closing via an owner distribution and a Promissory Note for the balance of $2.8 million, which was to be paid from Madison Mechanical, Inc. profits.

36.     Upon information and belief, the shares of Madison Mechanical OS Corp. were owned as follows:

| Glenn Haslam: | 54% |
| Gary Garofalo: | 13% |
| Robert Buczkowski: | 13% |
| Richard Lombardo: | 10% |
| Lawrence Kraemer: | 10% |

37.     Having been involved with Madison Mechanical, Inc. for many years, Mr. Haslam, Mr. Garofalo, and Mr. Buczkowski all had substantial "sweat equity" in the corporation. Mr. Lombardo and Mr. Kraemer had no prior involvement with Madison Mechanical, Inc. It was agreed that Mr. Haslam, Mr. Garofalo, and Mr.

8

Buczkowski would be entitled to a "preferential distribution/note" in the amount of

$760,000—20% of the $3.8 million purchase price—in order to purchase their shares.

Mr. Garofalo was tasked with memorializing this transaction in a written document

signed by all parties, but he failed to do so. There was never a "preferential

"distribution made, so effectively Mr. Lombardo and Mr. Kraemer each acquired a

10% ownership interest in Madison Mechanical OS Corp. for no consideration. Upon

the purchase of Mr. Cooke's shares, Mr. Buczkowski's receipt of profits was increased

to 5%. There was an oral agreement between Mr. Buczkowski and Mr. Haslam that

Mr. Buczkowski's profit share would be gradually increased to 10%, as originally

discussed in his employment negotiations. However, this did not occur.

C.     **Madison Mechanical OS Corp. Stockholders Agreement regarding
       transfer of shares.**

       38.     As explained above, upon the formation of Madison Mechanical OS

Corp., Mr. Buczkowski became a 13% shareholder of the corporation.

       39.     Under the Madison Mechanical OS Corp. Stockholders Agreement, the

stockholders' stock could be transferred only in the following circumstances: (a) sale,

gift, or bequest to a shareholder's direct family member, (b) disability of a shareholder,

(c) insolvency of a shareholder, (d) failure by a shareholder to contribute upon a

default of the corporation's obligations to a transferor of shares, (e) desire by the

shareholder to transfer his stock, (f) death, or (g) termination for cause.

       40.     The Stockholders Agreement defines "termination for cause" as

"termination for persistent non-performance of the Stockholder's duties as an

9

employee or officer of the Corporation and its affiliates or for criminal conduct involving a crime of moral turpitude, gross negligence, willful misconduct or a breach of the Stockholder's fiduciary duty to the Corporation and its affiliates as an employee, director, or officer." (Stockholders Ag. § 4(a)(3).)

41.     The Stockholders Agreement provides: "In the event of a breach or default by any party to his Agreement, the non-defaulting parties shall be entitled to reasonable attorney's fees, costs and expenses against the defaulting party or parties in enforcing, prosecuting or defending any dispute or litigation under this Agreement." (Stockholders Ag. § 17.)

**D.     Financial difficulties of Madison Mechanical, Inc.**

42.     As described above, Madison Mechanical OS Corp. was formed in 2007 and became the sole shareholder of Madison Mechanical, Inc. Madison Mechanical OS Corp. continued to operate Madison Mechanical, Inc. as it had operated previously.

43.     From 2007-2012, Madison Mechanical, Inc. continued to be profitable. As of December 31, 2012, the five shareholders of Madison Mechanical OS Corp. had equity in the corporation of $7,165,066. That same year, Madison Mechanical OS Corp. made its last payment to the Cooke Estate for Mr. Cooke's shares, and thereby owned Madison Mechanical, Inc. free and clear.

44.     In 2011 and 2012, at the urging of Mr. Haslam and over the objections of Mr. Buczkowski and other employees, Madison Mechanical, Inc. took on six large construction projects simultaneously. Five of the projects were subcontracts under

Clark Construction Group, LLC: City Center (a $17.5 million project), City Market (a

$16.3 million project), Wardman (a $10 million project), Lot31/31A (a $4.6 million

project), and 14W (a $7.4 million project) located in Washington, D.C. and Maryland.

A sixth project was a subcontract under The Whiting Turner Contracting Company for

a project known as Mid-Pike Block 10 (a $10 million project) located in Montgomery

County, Maryland.

45.     Mr. Haslam would not allow the hiring of the appropriate amount of

additional staff needed to run these jobs simultaneously.

46.     Under the oversight of Mr. Haslam, the above-referenced projects were

incorrectly bid, insufficiently staffed, and mismanaged.

47.     As a result, Madison Mechanical, Inc. incurred severe financial

difficulties in 2013-2015.

48.     In 2013, Clark Construction expressed an intention to "call" Madison

Mechanical, Inc.'s bonds. Although this would have been problematic, the Madison

Mechanical OS Corp. shareholders were not personally liable on the bonds.

49.     In June-July 2013, Madison Mechanical, Inc. incurred significant cash-

flow difficulties on the Clark projects. As a result, Madison Mechanical, Inc.'s $1.5

million line of credit with BB&T Bank was exhausted. Mr. Buczkowski successfully

negotiated with the Bank to convert the existing $1.5 million line of credit to a term

note and was able to obtain an additional $2 million line of credit, both with extended

payment terms favorable to Madison Mechanical.

11

50.     By December 2013, due to continued cash-flow problems on the Clark projects, Madison Mechanical exhausted the new $2 million line of credit.

51.     Under the $1.5 million note, payments of $375,000 were due in December 2013 and March 2014. Due to continuing financial difficulties in the Clark projects, Madison Mechanical had no funds available for these payments when they came due. In December 2013, Mr. Buczkowski was able to negotiate with the Bank for a waiver of the December 2013 payment and a three-month extension of the note.

52.     When the $375,000 payment was due in March 2014, Madison Mechanical, Inc. was still unable to make the payment. Mr. Buczkowski continued to communicate with the Bank and was able to maintain the status quo of the situation, without the Bank declaring a default, through June 2014.

53.     In June 2014, due to Madison Mechanical, Inc.'s continued inability to make payments on the notes, the local BB&T branch with whom Madison Mechanical, Inc. was working turned the loans over to BB&T's "troubled asset" division.

54.     Mr. Buczkowski once again proposed to Mr. Haslam and Mr. Garofalo that Madison Mechanical, Inc. consider filing for bankruptcy to protect the equity in the corporation. He also proposed that the corporation make a nominal payment to BB&T and continue to negotiate with the Bank in order to preserve much-needed cash flow.

55.     Mr. Haslam and Mr. Garofalo once again declined to even discuss the possibility of filing for bankruptcy. They stated that they would not consider these

12

options because it would put them in a bad light and could harm their reputations in

the business community. This was particularly a concern of Mr. Lombardo, Mr.

Kraemer, and Mr. Garofalo, who were officers of Harkins Builders. Harkins Builders

used the same bonding company as Madison Mechanical, Inc. and Mr. Lombardo, Mr.

Kraemer, and Mr. Garofalo were concerned about the implications with the bonding

company if Madison were to file for bankruptcy protection.

     56.    Mr. Haslam and Mr. Garofalo decided to become directly involved in the

discussions with BB&T.

     57.    Mr. Haslam and Mr. Garofalo decided not to include Madison

Mechanical, Inc.'s legal counsel in their discussions with BB&T or the decision-

making process as strongly recommended by Mr. Buczkowski. Over the objections of

Mr. Buczkowski, Mr. Haslam and Mr. Garofalo decided to use Madison Mechanical,

Inc.'s little available cash to pay the notes and related fees, without any further

discussion or negotiation with the bank, which was to the immediate detriment of

Madison Mechanical, Inc.'s day-to-day operations and ability to pay vendors.

     58.    During this time period, Mr. Haslam suffered serious mental and

emotional distress.

     59.    As noted above, Mr. Buczkowski's role with Madison Mechanical OS

Corp. and Madison Mechanical, Inc. was as Chief Financial Officer. However, because

of his extensive experience in the construction industry, he often spent much of his

time at jobsites serving as a de facto Project Manager.

13

60.     Given the poor planning and mismanagement involved in the Clark Construction projects, Mr. Buczkowski began to spend most of his time on a daily basis on jobsites attempting to resolve numerous problems and placate the General Contractor and Owners. At the same time, Mr. Haslam retained final say on virtually all major business decisions, and often vetoed Mr. Buczkowski's proposed solutions, such as hiring additional personnel to help manage the troubled projects.

61.     As Madison Mechanical, Inc.'s and Madison Mechanical OS Corp.'s financial situation deteriorated, Mr. Buczkowski urged the other shareholders to consider all options to protect the equity in the corporation, including bankruptcy if necessary. The other shareholders resisted. As noted above, Mr. Lombardo, Mr. Garofalo, and Mr. Kraemer—who retained their positions as officers of Harkins Builders—were concerned about their personal and professional reputations in the industry and did not want others outside of Madison Mechanical OS Corp. to even know they were involved with Madison.

62.     In June 2014, Madison Mechanical, Inc. sought to obtain two bonds totaling $1.5 million. Mr. Haslam and Mr. Garofalo led the negotiations of the bonds while Mr. Buczkowski was consumed with the day-to-day management of the Clark Construction projects and juggling vendor issues and relations due to the day-to-day cash-flow issues.

63.     Mr. Haslam and/or Mr. Garofalo informed Mr. Buczkowski that they had secured the $1.5 million bonds, but the shareholders would have to sign personal

14

guarantees. Mr. Haslam and/or Mr. Garofalo assured Mr. Buczkowski that the guarantees applied only to the $1.5 million bonds. In reliance on this assurance, Mr. Buczkowski signed the guarantees. Mr. Buczkowski later learned that guarantees actually applied to the prior bonds as well, which totaled over $35 million. In addition to misleading Mr. Buczkowski into guaranteeing the prior bonds, Mr. Haslam and Mr. Garofalo failed to even negotiate better terms for the bonds before causing all the shareholders to retroactively guarantee them.

64.     Madison Mechanical, Inc.'s and Madison Mechanical OS Corp.'s financial situation continued to deteriorate. In 2014, the shareholders made loans and capital contributions to the corporations totaling more than $3 million in an effort to keep the corporations financially viable.

65.     Madison Mechanical, Inc. sustained losses of $12-15 million on the Clark Construction projects, which completely negated the shareholders' previous retained earnings, profitable job earnings, and the more than $3 million in loans and capital contributions.

66.     Mr. Buczkowski repeatedly informed the other shareholders that it was his position that they should all be focused on doing what is best for the long-term health of Madison Mechanical, Inc. and Madison Mechanical OS Corp., rather than what is best for each of them individually and their own personal reputations.

E.     **Formation of Madison Mechanical Contracting, LLC.**

67.     Throughout 2013-2015, Madison Mechanical OS Corp. had ongoing discussions with Defendant Richard Arnold regarding Mr. Arnold's buying into the corporation or joining the shareholders in forming a new entity. Mr. Haslam and Mr. Garofalo were directly engaged in these discussions and kept Mr. Buczkowski informed of the various proposed terms. The proposals that were relayed to Mr. Buczkowski all entailed either Mr. Arnold buying shares of Madison Mechanical OS Corp. or forming a new entity with the shareholders, to include Mr. Buczkowski.

68.     In late 2014 and early 2015, Mr. Haslam and Mr. Garofalo updated Mr. Buczkowski less frequently. When Mr. Buczkowski inquired, Mr. Haslam stated that it appeared there would not be a deal involving Mr. Arnold.

69.     In the summer of 2015, Mr. Haslam told Mr. Buczkowski that Mr. Lombardo was unhappy with Mr. Buczkowski's position that all the shareholders should be more concerned with the financial health of Madison Mechanical, Inc. and Madison Mechanical OS Corp. than with their own personal reputations. According to Mr. Haslam, Mr. Lombardo—who was apparently more concerned about his own reputation than about the well-being of the Madison entities—took offense at Mr. Buczkowski's position.

70.     Sometime in 2015, Mr. Haslam and Mr. Garofalo stopped informing Mr. Buczkowski of their ongoing negotiations with Mr. Arnold.

16

71.     Unbeknownst to Mr. Buczkowski, on or about August 20, 2015, the other

shareholders of Madison Mechanical OS Corp., along with Richard Arnold, formed a

new entity called Madison Mechanical Contracting, LLC.

72.     Madison Mechanical Contracting, LLC consists of the following

members:

| Richard Arnold: | 34% |
| Glenn Haslam: | 34% |
| Gary Garofalo: | 12% |
| Richard Lombardo: | 10% |
| Lawrence Kraemer: | 10% |

73.     The members of Madison Mechanical Contracting, LLC entered into an

Operating Agreement on or about October 15, 2015.

74.     Upon information and belief, the purpose of this new company was to

take business and corporate opportunities from Madison Mechanical, Inc. and

Madison Mechanical OS Corp. for the benefit of Madison Mechanical Contracting,

LLC and its members.

75.     In October 2015, Mr. Haslam and Mr. Garofalo informed Mr.

Buczkowski that they intended to "part ways" with him. They indicated that they no

longer wanted him as a business partner, but offered to hire him as an outside

consultant. They did not tell him about Madison Mechanical Contracting, LLC or their

intent to take business and corporate opportunities from Madison Mechanical, Inc.

76.     Mr. Buczkowski continued to work on behalf of Madison Mechanical, Inc.

and Madison Mechanical OS Corp., as he had before.

17

77.   Mr. Buczkowski first learned of the existence of Madison Mechanical Contracting, LLC in November 2015. He also uncovered evidence that Madison Mechanical Contracting, LLC was diverting business and corporate opportunities from Madison Mechanical, Inc.

78.   On November 11, 2015, Mr. Buczkowski, through counsel, informed Mr. Haslam, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, and Mr. Arnold that their diversion of business and corporate opportunities from Madison Mechanical, Inc. to Madison Mechanical Contracting, LLC was unlawful, and demanded that they cease and desist doing so.

F.   **Termination of Mr. Buczkowski.**

79.   On November 6, 2015, Mr. Buczkowski informed several Madison Mechanical, Inc. employees that the corporation had not received certified payrolls from certain sub-subcontractors on a project for which Madison Mechanical, Inc. was a subcontractor for Plano-Coudon, LLC, the general contractor. It was required by law that the sub-subcontractors provide certified payrolls to Madison Mechanical, Inc. Mr. Buczkowski was informed by the accounting manager that Mr. Haslam had told him and other employees not to worry about getting the certified payrolls from the subcontractors on this job.

18

80.    On November 16, 2015, Mr. Buczkowski informed Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer of the issue with the lack of certified payrolls and requested guidance on how to approach this matter with Plano-Coudon. Mr. Buczkowski initially received no response. Mr. Kraemer eventually responded, stating that he was not aware of the issue. Mr. Garofalo and Mr. Lombardo never responded.

81.    On or about November 18, 2015, Mr. Haslam gave Mr. Buczkowski a letter on Madison Mechanical, Inc. letterhead, and signed by Mr. Haslam in his capacity as president of Madison Mechanical, Inc. The letter stated that Mr. Buczkowski was terminated "for cause, effective immediately."

82.    The letter stated, "[f]or the reasons that have been discussed with you on numerous occasions, you were previously advised that your employment with Madison Mechanical, Inc. (the Company) was being terminated for cause." In fact, Mr. Buczkowski had never previously been informed that he would be terminated, with our without cause

83.    When Mr. Haslam gave the letter to Mr. Buczkowski on November 18, 2015, Mr. Buczkowski read it in the presence of Mr. Haslam and Brant Geiman, the Accounting Manager for Madison Mechanical, Inc.  Mr. Buczkowsk asked Mr. Haslam what the "cause" was for his termination, as no one at Madison Mechanical had ever accused Mr. Buczkowski of any actions that would constitute cause for termination. Mr. Haslam responded there was no cause for Mr. Buczkowski's termination, and that "the lawyer just put that language in there," or words to that effect.

19

84.     Mr. Haslam further stated to Mr. Buczkowski that he had no problems with anything Mr. Buczkowski had done, and that he appreciated all he had done for Madison Mechanical, Inc. over the years. Mr. Haslam indicated that it was the other shareholders who wanted to terminate Mr. Buczkowski. Mr. Haslam stated that the other shareholders—particularly Mr. Lombardo—disagreed with Mr. Buczkowski's position that they should put the financial health of Madison Mechanical, Inc. and Madison Mechanical OS Corp. ahead of their own personal reputations. Mr. Haslam further stated that the other shareholders of Madison Mechanical OS Corp. had decided they did not want Mr. Buczkowski to be a part of their new business venture.

85.     The effort to terminate Mr. Buczkowski "for cause" was an attempt to force a transfer of his stock in Madison Mechanical OS Corp.

86.     However, the letter of termination came not from Madison Mechanical OS Corp., the parent corporation, but from Madison Mechanical, Inc., the subsidiary. Therefore, it could not possibly have been a termination (with or without cause) by Madison Mechanical OS Corp.

87.     Furthermore, there was no cause for Mr. Buczkowski's termination. He had not engaged in persistent non-performance of his duties as an employee or officer of Madison Mechanical OS, nor had he engaged in criminal conduct involving a crime of moral turpitude, gross negligence, willful misconduct, or a breach of his fiduciary duties to the corporation. As Mr. Haslam admitted to Mr. Buczkowski, there was no cause for the termination.

20

88.    Nevertheless, on or about January 14, 2016, Madison Mechanical OS Corp., through counsel, informed Mr. Buczkowski's counsel that (a) Mr. Buczkowski's employment with Madison Mechanical OS Corp. had allegedly been terminated on November 24, 2015, (b) Mr. Buczkowski was obligated to sell his shares in Madison Mechanical OS Corp. based on the book value of Madison Mechanical OS Corp. in 2014, (c) the book value of Madison Mechanical OS Corp. in 2014 was negative, and (d) the purchase price for Mr. Buczkowski's stock in Madison Mechanical OS Corp. was $0.

89.    In the January 14, 2016 letter, Madison Mechanical OS demanded that Mr. Buczkowski "endorse his stock certificate in blank and forward it to [Madison Mechanical OS Corp.'s counsel] to consummate the stock purchase." Mr. Buczkowski, rightfully, has not done so.

90.    Mr. Buczkowski has not endorsed his stock certificate to Madison Mechanical OS Corp. or to anyone else. He remains a stockholder of the corporation.

**G.    Dissolution of Madison Mechanical, Inc.**

91.    On December 21, 2015, Defendants dissolved Madison Mechanical, Inc.

92.    Mr. Haslam signed Articles of Dissolution of the corporation under penalties of perjury, which were filed with the Department of Assessments and Taxation on December 21, 2015.

21

93.     Upon information and belief, Mr. Haslam did not give notice to or hold a meeting of the stockholders of Madison Mechanical OS Corp. before he unilaterally dissolved its subsidiary, Madison Mechanical, Inc.

94.     Under Md. Code, Corps. & Assocs. § 3-404, "[n]ot less than 20 days prior to the filing of articles of dissolution with the Department, the corporation shall mail notice that dissolution of the corporation has been approved to all its known creditors at their addresses as shown on the records of the corporation and to its employees, either at their home addresses as shown on the records of the corporation, or at their business addresses."

95.     In the Articles of Dissolution that Mr. Haslam signed, he stated that "[n]otice of the approved dissolution was mailed to all known creditors of the Corporation on December 21, 2015."

96.     Mr. Haslam's statement in the Articles of Dissolution that notice was sent to all known creditors was false. Notice of the dissolution of Madison Mechanical, Inc. was not sent to all of the corporation's creditors.

97.     Mr. Buczkowski is a creditor of Madison Mechanical, Inc. pursuant to a Promissory Note in the amount of $150,000 that was signed by Mr. Haslam on behalf the corporation in favor of Mr. Buczkowski on or about October 17, 2014, little more than a year before the dissolution.

98.     Despite the fact that Mr. Buczkowski was a creditor of Madison Mechanical, Inc.—and despite Mr. Haslam's statement under oath that notice was

sent to all known creditors of the corporation—notice of the dissolution of Madison Mechanical, Inc. was not sent to Mr. Buczkowski.

99.    Mr. Buczkowski learned of the dissolution of Madison Mechanical, Inc. by reviewing the corporate status of the various Madison entities after his termination.

100.    The dissolution of Madison Mechanical, Inc. was an act of default under the above-referenced Promissory Note.

101.    Mr. Buczkowski brought an action against Madison Mechanical, Inc. on the Note. On March 3, 2016, the Circuit Court for Howard County entered a judgment by confession in favor of Mr. Buczkowski and against Madison Mechanical, Inc. in the amount of $204,297.94. As such, Mr. Buczkowski remains a creditor of Madison Mechanical, Inc.

102.    Upon information and belief, Madison Mechanical, Inc. also failed to send notice of its dissolution to other creditors in addition to Mr. Buczkowski.

103.    Even if Mr. Haslam's statement that notice was sent to all creditors was accurate (which, as explained above, it was not), his filing of the Articles of Dissolution was premature. Corps. & Assocs. § 3-407(a)(1) states that a "corporation shall file articles of dissolution for record with the Department . . . If there are any known creditors of the corporation, after the 19th day following the mailing of notice to them." Mr. Haslam stated that notice was mailed to creditors on December 21, 2015,

the same day as the filing of the Articles of Dissolution. The Articles of Dissolution

was therefore filed prematurely.

F.   **Diversion of corporate opportunities from Madison Mechanical, Inc. and Madison Mechanical OS Corp. to Madison Mechanical Contracting, LLC.**

104.   Upon information and belief—at or around the time of the formation of

Madison Mechanical Contracting, LLC, termination of Mr. Buczkowski, and

dissolution of Madison Mechanical, Inc.—Madison Mechanical Contracting, LLC took

over ongoing projects that were previously being performed by Madison Mechanical,

Inc. as well as several contracts that had been negotiated under Madison Mechanical,

Inc.'s name and began performing the projects for the benefit of Madison Mechanical

Contracting, LLC.

105.   Effective January 1, 2016, all Madison Mechanical, Inc. employees

became employed by Madison Mechanical Contracting, LLC.

106.   Madison Mechanical, Inc. corporate records show that as of September

30, 2015, Madison Mechanical, Inc. had subcontracts and/or commitments for the

following projects: Ashby Ponds 2.4; Ashby Ponds Reconfiguration; Brentwood; Pier

Hotel II; Perryhall BV; and Havre de Grace Readiness.

107.   Madison Mechanical Contracting, LLC records show that as of February

1, 2016, Madison Mechanical Contracting, LLC was performing these same

subcontracts.

108.   Madison Mechanical Contracting, LLC effectively misappropriated the name, goodwill, records, trade secrets, assets, and accounts receivables of Madison Mechanical, Inc. for no consideration.

109.   Because Madison Mechanical, Inc. was a wholly-owned subsidiary of Madison Mechanical OS Corp., the misappropriation of Madison Mechanical, Inc. by Madison Mechanical Contracting, LLC was to the detriment of Madison Mechanical OS Corp. and its shareholders and to the benefit of Madison Mechanical Contracting, LLC and its members.

110.   In addition to misappropriating current, ongoing projects and accounts receivable to benefit their new company, Madison Mechanical Contracting, LLC, Mr. Garofalo, Mr. Haslam, Mr. Kraemer, and Mr. Lombardo have diverted corporate opportunities from Madison Mechanical OS Corp. to Madison Mechanical Contracting, LLC.

111.   Upon information and belief, Madison Mechanical Contracting, LLC is performing services on numerous projects that were previously Madison Mechanical, Inc. subcontracts.

112.   Upon information and belief, all of these projects are the types of projects that could have—and, absent the interference of Madison Mechanical Contracting, LLC—would have been performed by Madison Mechanical OS Corp. through its wholly-owned subsidiary, Madison Mechanical, Inc.

113.    Defendants have persisted in their unlawful diversion of business and income from Madison Mechanical, Inc. to Madison Mechanical Contracting, LLC.

114.    Defendants simply took over and misappropriated the name, goodwill, trade secrets, assets, and accounts receivable of Madison Mechanical, Inc.—a wholly-owned subsidiary of Madison Mechanical OS Corp.—with no consideration to Madison Mechanical OS Corp. and in direct competition with Madison Mechanical OS Corp.

115.    Defendants continue to use the Madison Mechanical, Inc. name, goodwill, trade secrets, assets, and accounts receivable, but for their own benefit and with no benefit to Madison Mechanical, Inc. or its parent, Madison Mechanical OS Corp.

### Count 1 – Declaratory Judgment

**(Against Madison Mechanical OS Corp., Glenn A. Haslam,
Gary Garofalo, Richard Lombardo, and Lawrence Kraemer)**

116.    The Plaintiff incorporates by reference the substance of all the foregoing factual allegations.

117.    This declaratory judgment action is brought pursuant to Md. Code, Cts. & Jud. Proc. §§ 3-406 and 3-407 for the purpose of determining questions of actual controversy between the parties and terminating uncertainty and controversy giving rise to this proceeding.

118.    Mr. Buczkowski owns 13% of the shares of Defendant Madison Mechanical OS Corp.

119.    The remaining 87% of the shares of Madison Mechanical OS Corp. are owned by Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer.

120.    On or about December 31, 2007, Mr. Buczkowski, Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer entered into a Stockholders Agreement with Madison Mechanical OS Corp.

121.    The Stockholders Agreement is a valid and binding contract.

122.    Mr. Buczkowski has not breached the Stockholders Agreement.

123.    Under the Madison Mechanical OS Corp. Stockholders Agreement, the stockholders' stock could be transferred only in the following circumstances: (a) sale, gift, or bequest to a shareholder's direct family member, (b) disability of a shareholder, (c) insolvency of a shareholder, (d) failure by a shareholder to contribute upon a default of the corporation's obligations to a transferor of shares, (e) desire by the shareholder to transfer his stock, (f) death, or (g) termination for cause.

124.    The Stockholders Agreement defines "termination for cause" as "termination for persistent non-performance of the Stockholder's duties as an employee or officer of the Corporation and its affiliates or for criminal conduct involving a crime of moral turpitude, gross negligence, willful misconduct or a breach of the Stockholder's fiduciary duty to the Corporation and its affiliates as an employee, director, or officer." (Stockholders Ag. § 4(a)(3).)

125.    On or about November 18, 2015, Mr. Haslam gave Mr. Buczkowski a letter on Madison Mechanical, Inc. letterhead, and signed by Mr. Haslam in his

capacity as president of Madison Mechanical, Inc. The letter stated that Mr. Buczkowski was terminated "for cause, effective immediately."

126.    The effort to terminate Mr. Buczkowski "for cause" was an attempt to force a transfer of his stock in Madison Mechanical OS Corp.

127.    However, the letter of termination came not from Madison Mechanical OS Corp., but from Madison Mechanical, Inc. Therefore, it could not possibly have been a termination (with or without cause) by Madison Mechanical OS Corp.

128.    Furthermore, there was no cause for Mr. Buczkowski's termination. He had not engaged in persistent non-performance of his duties as an employee or officer of Madison Mechanical OS Corp., nor had he engaged in criminal conduct involving a crime of moral turpitude, gross negligence, willful misconduct, or a breach of his fiduciary duties to the corporation. There was no cause for his purported termination.

129.    Nevertheless, on or about January 14, 2016, Madison Mechanical OS Corp., through counsel, informed Mr. Buczkowski's counsel that (a) Mr. Buczkowski's employment with Madison Mechanical OS Corp. had allegedly been terminated on November 24, 2015, (b) Mr. Buczkowski was obligated to sell his shares in Madison Mechanical OS Corp. based on the book value of Madison Mechanical OS Corp. in 2014, (c) the book value of Madison Mechanical OS Corp. in 2014 was negative, and (d) the purchase price for Mr. Buczkowski's stock in Madison Mechanical OS Corp. was $0.

28

130.   In the January 14, 2016 letter, Madison Mechanical OS demanded that Mr. Buczkowski "endorse his stock certificate in blank and forward it to [Madison Mechanical OS Corp.'s counsel] to consummate the stock purchase." Mr. Buczkowski, rightfully, has not done so.

131.   Mr. Buczkowski has not endorsed his stock certificate to Madison Mechanical OS Corp. or to anyone else. He remains a stockholder of the corporation.

132.   It is Mr. Buczkowski's position that he was never actually terminated by Madison Mechanical OS Corp. because the letter of termination came not from Madison Mechanical OS Corp., but from Madison Mechanical, Inc. Mr. Buczkowski therefore retains his employment and shares in Madison Mechanical OS Corp.

133.   In the alternative, even if the letter from Madison Mechanical, Inc. can be considered a termination by Madison Mechanical OS Corp., there was no cause for the termination.

134.   There therefore exists an actual controversy concerning justiciable issues between Plaintiff and Defendants within the jurisdiction of this Court, involving the issue of whether Mr. Buczkowski has been terminated by Madison Mechanical OS and, if so, whether there was cause for his termination and whether he remains an employee and/or a shareholder of Madison Mechanical OS.

135.   Antagonistic claims are present between the parties. Those claims indicate imminent and inevitable litigation.

136.   Under §§ 3-401 through 3-415 of the Courts and Judicial Proceedings Article, Plaintiff is entitled to a judgment declaring the rights and responsibilities of the Plaintiff and Defendants, and further settling the legal relations, rights, and responsibilities of the parties.

WHEREFORE, the Plaintiff demands:

a.      That the Court issue a declaratory judgment that Plaintiff remains an employee and a shareholder of Madison Mechanical OS Corp.; and

b.      That the Court issue injunctive relief ordering the Defendants to take any and all appropriate action to recognize Plaintiff's continued employment and ownership of shares in Madison Mechanical OS; and

c.      That the Court award Plaintiff his reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action pursuant to the terms of the Stockholders Agreement; and

d.      That the Court award the Plaintiff such other and further relief as in law and justice he may be entitled to receive.

### Count 2 – Breach of Contract

**(Against Madison Mechanical OS Corp., Glenn A. Haslam, Gary Garofalo, Richard Lombardo, and Lawrence Kraemer)**

137.   The Plaintiff incorporates by reference the substance of all the foregoing factual allegations.

138.   Mr. Buczkowski owns 13% of the shares of Defendant Madison Mechanical OS Corp.

139.   The remaining 87% of the shares of Madison Mechanical OS Corp. are owned by Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer.

140.   On or about December 31, 2007, Mr. Buczkowski, Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer entered into a Stockholders Agreement with Madison Mechanical OS Corp.

141.   The Stockholders Agreement is a valid and binding contract.

142.   Mr. Buczkowski has not breached the Stockholders' Agreement.

143.   Under the Madison Mechanical OS Corp. Stockholders Agreement, the stockholders' stock could be transferred only in the following circumstances: (a) sale, gift, or bequest to a shareholder's direct family member, (b) disability of a shareholder, (c) insolvency of a shareholder, (d) failure by a shareholder to contribute upon a default of the corporation's obligations to a transferor of shares, (e) desire by the shareholder to transfer his stock, (f) death, or (g) termination for cause.

144.   The Stockholders Agreement defines "termination for cause" as "termination for persistent non-performance of the Stockholder's duties as an employee or officer of the Corporation and its affiliates or for criminal conduct involving a crime of moral turpitude, gross negligence, willful misconduct or a breach of the Stockholder's fiduciary duty to the Corporation and its affiliates as an employee, director, or officer." (Stockholders Ag. § 4(a)(3).)

145.   On or about November 18, 2015, Mr. Haslam gave Mr. Buczkowski a letter on Madison Mechanical, Inc. letterhead, and signed by Mr. Haslam in his

31

capacity as president of Madison Mechanical, Inc. The letter stated that Mr. Buczkowski was terminated "for cause, effective immediately."

146.   The effort to terminate Mr. Buczkowski "for cause" was an attempt to force a transfer of his stock in Madison Mechanical OS Corp.

147.   However, the letter of termination came not from Madison Mechanical OS Corp., but from Madison Mechanical, Inc. Therefore, it could not possibly have been a termination (with or without cause) by Madison Mechanical OS Corp.

148.   Furthermore, there was no cause for Mr. Buczkowski's termination. He had not engaged in persistent non-performance of his duties as an employee or officer of Madison Mechanical OS Corp., nor had he engaged in criminal conduct involving a crime of moral turpitude, gross negligence, willful misconduct, or a breach of his fiduciary duties to the corporation. There was no cause for his purported termination.

149.   Nevertheless, on or about January 14, 2016, Madison Mechanical OS Corp., through counsel, informed Mr. Buczkowski's counsel that (a) Mr. Buczkowski's employment with Madison Mechanical OS had allegedly been terminated on November 24, 2015, (b) Mr. Buczkowski was obligated to sell his shares in Madison Mechanical OS based on the book value of Madison Mechanical OS in 2014, (c) the book value of Madison Mechanical OS in 2014 was negative, and (d) the purchase price for Mr. Buczkowski's stock in Madison Mechanical OS was $0.

150.   In the January 14, 2016 letter, Madison Mechanical OS Corp. demanded that Mr. Buczkowski "endorse his stock certificate in blank and forward it to [Madison

32

Mechanical OS Corp.'s counsel] to consummate the stock purchase." Mr. Buczkowski, rightfully, has not done so.

151.    Defendant's efforts to terminate Mr. Buczkowski without cause and obtain his shares in Madison Mechanical OS Corp. for no consideration constitute a breach of the Stockholders Agreement.

152.    As a result of this breach, Mr. Buczkowski has suffered monetary damages and non-monetary harm.

WHEREFORE, the Plaintiff demands:

a.    That the Court enter judgment in favor of Plaintiff and against Defendants, and award damages to Plaintiff in an amount exceeding $75,000;

b.    That the Court issue a declaratory judgment that Plaintiff remains an employee and a shareholder of Madison Mechanical OS Corp.; and

c.    That the Court issue injunctive relief ordering the Defendants to take any and all appropriate action to recognize Plaintiff's continued employment and ownership of shares in Madison Mechanical OS Corp.; and

d.    That the Court award Plaintiff his reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action pursuant to the terms of the Stockholders Agreement; and

e.    That the Court award the Plaintiff such other and further relief as in law and justice he may be entitled to receive.

## Count 3 – Oppression of Minority Shareholder

33

**(Against Glenn A. Haslam, Gary Garofalo, Richard Lombardo, and
Lawrence Kraemer)**

153.   The Plaintiff incorporates by reference the substance of all the foregoing
factual allegations.

154.   At all times relevant to this case, Mr. Buczkowski was, and remains, a
13% shareholder of Madison Mechanical OS Corp., a Maryland corporation.

155.   Defendants Glenn Haslam (54%), Gary Garofalo (13%), Lawrence
Kraemer (10%), and Richard Lombardo (10%) are the other shareholders of Madison
Mechanical OS Corp.

156.   As a majority shareholder, Mr. Haslam owes a fiduciary duty to Mr.
Buczkowski to not exercise his control to the disadvantage of Mr. Buczkowski. Mr.
Haslam owes a fiduciary duty to Mr. Buczkowski to not use his voting power for his
own benefit or for a purpose adverse to the interests of the corporation and its
stockholders.

157.   As a majority of the shareholders, Mr. Haslam, Mr. Garofalo, Mr.
Kraemer, and Mr. Lombardo owe a fiduciary duty to Mr. Buczkowski to not exercise
their control to the disadvantage of Mr. Buczkowski. The majority shareholders owe a
fiduciary duty to Mr. Buczkowski to not use their voting power for their own benefit
or for a purpose adverse to the interests of the corporation and its stockholders.

158.   Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer breached
the above duties when they (a) formed a new entity, Madison Mechanical
Contracting, LLC, to compete directly with Madison Mechanical OS Corp. and its

34

subsidiary, Madison Mechanical, Inc.; (b) concealed their plan and actions from Mr.

Buczkowski; (c) purported to terminate Mr. Buczkowski's employment without cause;

(d) demanded that Mr. Buczkowski transfer his shares in Madison Mechanical OS

Corp. back to the corporation for no consideration; (e) usurped the ongoing business of

Madison Mechanical, Inc. for the benefit of their new entity and themselves; (f)

usurped the name, goodwill, assets, trade secrets, and accounts receivable of Madison

Mechanical, Inc.; (g) usurped corporate opportunities for the benefit of their new

entity and themselves, which rightfully belonged to Madison Mechanical, Inc. and

Madison Mechanical OS Corp.; and (h) dissolved Madison Mechanical, Inc.

159.    Madison Mechanical OS Corp. has suffered monetary and non-monetary

harm as a result of the above breaches of fiduciary duty.

160.    Mr. Buczkowski suffered direct harm as a result of these breaches,

separate and distinct from the harm suffered by the corporation, in that Defendants

wrongfully terminated his employment and demanded that he transfer his shares in

Madison Mechanical OS Corp. back to the corporation for no consideration.

161.    Furthermore, unlike all of the other shareholders of Madison Mechanical

OS Corp., Mr. Buczkowski is not a member of Madison Mechanical Contracting, LLC.

WHEREFORE, the Plaintiff demands:

a.      That the Court enter judgment in favor of Plaintiff and against

Defendants, and award damages in an amount exceeding $75,000;

     b.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. from December 13, 2007 to the present;

     c.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical, Inc. from December 13, 2007 to the present;

     d.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical Contracting, LLC from August 20, 2015 to the present;

     e.   That the Court enter a preliminary and permanent injunction prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of themselves individually or Madison Mechanical Contracting, LLC; (ii) performing services for the benefit of Madison Mechanical Contracting, LLC under subcontracts entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or Madison Mechanical OS Corp.;

     e.   That the Court issue a declaratory judgment that Defendants wrongfully and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation be revived;

f.      That the Court award Plaintiff his reasonable attorneys' fees, costs, and
expenses incurred in prosecuting this action; and

g.      That the Court award the Plaintiff such other and further relief as in law
and justice he may be entitled to receive.

## Count 4 – Oppression of Minority Shareholder

**(Derivative Action on Behalf of Madison Mechanical OS Corp.)**

**(Against Glenn A. Haslam, Gary Garofalo, Richard Lombardo, and
Lawrence Kraemer)**

162.    The Plaintiff incorporates by reference the substance of all the foregoing
factual allegations.

163.    At all times relevant to this case, Mr. Buczkowski was, and remains, a
13% shareholder of Madison Mechanical OS Corp., a Maryland corporation.

164.    Defendants Glenn Haslam (54%), Gary Garofalo (13%), Lawrence
Kraemer (10%), and Richard Lombardo (10%) are the other shareholders of Madison
Mechanical OS Corp.

165.    As a majority shareholder, Mr. Haslam owes a fiduciary duty to Mr.
Buczkowski to not exercise his control to the disadvantage of Mr. Buczkowski. Mr.
Haslam owes a fiduciary duty to Mr. Buczkowski to not use his voting power for his

own benefit or for a purpose adverse to the interests of the corporation and its stockholders.

166.   As a majority of the shareholders, Mr. Haslam, Mr. Garofalo, Mr. Kraemer, and Mr. Lombardo owe a fiduciary duty to Mr. Buczkowski to not exercise their control to the disadvantage of Mr. Buczkowski. The majority shareholders owe a fiduciary duty to Mr. Buczkowski to not use their voting power for their own benefit or for a purpose adverse to the interests of the corporation and its stockholders.

167.   Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer breached the above duties when they (a) formed a new entity, Madison Mechanical Contracting, LLC, to compete directly with Madison Mechanical OS Corp. and its subsidiary, Madison Mechanical, Inc.; (b) concealed their plan and actions from Mr. Buczkowski; (c) purported to terminate Mr. Buczkowski's employment without cause; (d) demanded that Mr. Buczkowski transfer his shares in Madison Mechanical OS Corp. back to the corporation for no consideration; (e) usurped the ongoing business of Madison Mechanical, Inc. for the benefit of their new entity and themselves; (f) usurped the name, goodwill, assets, trade secrets, and accounts receivable of Madison Mechanical, Inc.; (g) usurped corporate opportunities for the benefit of their new entity and themselves, which rightfully belonged to Madison Mechanical, Inc. and Madison Mechanical OS Corp.; and (h) dissolved Madison Mechanical, Inc.

168.   Madison Mechanical OS Corp. has suffered monetary and non-monetary harm as a result of the above breaches of fiduciary duty.

38

169.   Any demand by Mr. Buczkowski on Madison Mechanical OS Corp. to take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer would be futile because a majority of the directors and shareholders of the corporation are so personally and directly conflicted or committed to the decisions in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

170.   Nevertheless, on May 10, 2016, Mr. Buczkowski informed Mr. Haslam, the Director and President of the corporation, of these breaches of fiduciary duty and demanded that the corporation take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer.

171.   By letter from counsel on May 13, 2016, Mr. Haslam on behalf of Madison Mechanical OS Corp. informed Mr. Buczkowski that his demand "has been considered by the Corporation's Board and rejected as baseless."

WHEREFORE, the Plaintiff, on behalf of Madison Mechanical OS Corporation, demands:

a.      That the Court enter judgment in favor of Plaintiff and against Defendants, and award damages in an amount exceeding $75,000;

b.      That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. from December 13, 2007 to the present;

39

c.      That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical, Inc. from December 13, 2007 to the present;

d.      That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical Contracting, LLC from August 20, 2015 to the present;

e.      That the Court enter a preliminary and permanent injunction prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of themselves individually or Madison Mechanical Contracting, LLC; (ii) performing services for the benefit of Madison Mechanical Contracting, LLC under subcontracts entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or Madison Mechanical OS Corp.;

e.      That the Court issue a declaratory judgment that Defendants wrongfully and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation be revived;

f.      That the Court award Plaintiff his reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

g.   That the Court award the Plaintiff such other and further relief as in law and justice he may be entitled to receive.

### Count 5 – Breach of Fiduciary Duty

**(Against Glenn A. Haslam, Gary Garofalo, Richard Lombardo, and Lawrence Kraemer)**

172.   The Plaintiff incorporates by reference the substance of all the foregoing factual allegations.

173.   Defendants Glenn Haslam (54%), Gary Garofalo (13%), Lawrence Kraemer (10%), and Richard Lombardo (10%) are the other shareholders of Madison Mechanical OS Corp.

174.   Upon information and belief, Defendant Haslam is the sole Director of Madison Mechanical OS Corp, and is the President of the corporation.

175.   As a director and officer of Madison Mechanical OS Corp, Mr. Haslam owes fiduciary duties to the corporation and its shareholders.

176.   Among other duties, Mr. Haslam owes duties of care, loyalty, and good faith to the corporation and its shareholders.

177.   Under Md. Code, Corps. & Assocs. § 2-405.1(a), Mr. Haslam has a duty to, at all times, manage the corporation in good faith, in a manner he reasonably believes to be in the best interests of the corporation; and with the care that an ordinarily prudent person in a like position would use under similar circumstances.

178.   As a director and officer of the corporation, Mr. Haslam has a duty to not usurp, for his personal benefit, a business opportunity rightfully belonging to the corporation.

179.   As shareholders of the corporation, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer likewise owe duties of loyalty to the corporation, and may not usurp, for their own personal benefit, a business opportunity rightfully belonging to the corporation.

180.   Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer breached the above duties when they (a) formed a new entity, Madison Mechanical Contracting, LLC, to compete directly with Madison Mechanical OS Corp. and its subsidiary, Madison Mechanical, Inc.; (b) usurped the ongoing business of Madison Mechanical, Inc. for the benefit of their new entity and themselves; (c) usurped the name, goodwill, trade secrets, assets, and accounts receivable of Madison Mechanical, Inc.; (d) usurped corporate opportunities for the benefit of their new entity and themselves, which rightfully belonged to Madison Mechanical, Inc.; and (e) dissolved Madison Mechanical, Inc.

181.   Madison Mechanical OS Corp. has suffered monetary and non-monetary harm as a result of the above breaches of fiduciary duty.

182.   Mr. Buczkowski suffered direct harm as a result of these breaches, separate and distinct from the harm suffered by the corporation, in that Defendants wrongfully terminated his employment and demanded that he transfer his shares in Madison Mechanical OS Corp. back to the corporation for no consideration.

183.   Furthermore, unlike all of the other shareholders of Madison Mechanical OS Corp., Mr. Buczkowski is not a member of Madison Mechanical Contracting, LLC.

WHEREFORE, the Plaintiff demands:

a.   That the Court enter judgment in favor of Plaintiff and against Defendants, and award damages in an amount exceeding $75,000;

b.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. from December 13, 2007 to the present;

c.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical, Inc. from December 13, 2007 to the present;

d.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical Contracting, LLC from August 20, 2015 to the present;

e.   That the Court enter a preliminary and permanent injunction prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of themselves individually or Madison Mechanical Contracting, LLC; (ii) performing services for the benefit of Madison Mechanical Contracting, LLC under subcontracts entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison

43

Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or Madison Mechanical OS Corp.;

e.     That the Court issue a declaratory judgment that Defendants wrongfully and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation be revived;

f.     That the Court award Plaintiff his reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

g.     That the Court award the Plaintiff such other and further relief as in law and justice he may be entitled to receive.

<u>Count 6 – Breach of Fiduciary Duty</u>

**(Derivative Action on Behalf of Madison Mechanical OS Corp.)**

**(Against Glenn A. Haslam, Gary Garofalo, Richard Lombardo, and Lawrence Kraemer)**

184.     The Plaintiff incorporates by reference the substance of all the foregoing factual allegations.

185.     At all times relevant to this case, Mr. Buczkowski was, and remains, a 13% shareholder of Madison Mechanical OS Corp., a Maryland corporation.

186.     Defendants Glenn Haslam (54%), Gary Garofalo (13%), Lawrence Kraemer (10%), and Richard Lombardo (10%) are the other shareholders of Madison Mechanical OS Corp.

187.     Upon information and belief, Defendant Haslam is the sole Director of Madison Mechanical OS Corp., and is the President of the corporation.

44

188.   As a director and officer of Madison Mechanical OS Corp., Mr. Haslam owes fiduciary duties to the corporation and its shareholders.

189.   Among other duties, Mr. Haslam owes duties of care, loyalty, and good faith to the corporation and its shareholders.

190.   Under Md. Code, Corps. & Assocs. § 2-405.1(a), Mr. Haslam has a duty to, at all times, manage the corporation in good faith, in a manner he reasonably believes to be in the best interests of the corporation; and with the care that an ordinarily prudent person in a like position would use under similar circumstances.

191.   As a director and officer of the corporation, Mr. Haslam has a duty to not usurp, for his personal benefit, a business opportunity rightfully belonging to the corporation.

192.   As shareholders of the corporation, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer likewise owe duties of loyalty to the corporation, and may not usurp, for their own personal benefit, a business opportunity rightfully belonging to the corporation.

193.   In addition, as employees of Madison Mechanical OS Corp., Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer have a duty of loyalty to the corporation, and may not solicit for themselves business which their positions require them to obtain for the corporation, their employer. They have a duty to refrain from actively and directly competing with the corporation for customers and employees, and must continue to exert their best efforts on behalf of the corporation.

194.   Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer breached the above duties when they (a) formed a new entity, Madison Mechanical Contracting, LLC, to compete directly with Madison Mechanical OS Corp. and its subsidiary, Madison Mechanical, Inc.; (b) usurped the ongoing business of Madison Mechanical, Inc. for the benefit of their new entity and themselves; (c) usurped the name, goodwill, trade secrets, assets, and accounts receivable of Madison Mechanical, Inc.; (d) usurped corporate opportunities for the benefit of their new entity and themselves, which rightfully belonged to Madison Mechanical, Inc. and Madison Mechanical OS Corp.; and (e) dissolved Madison Mechanical, Inc.

195.   Madison Mechanical OS Corp. has suffered monetary and non-monetary harm as a result of the above breaches of fiduciary duty.

196.   Any demand by Mr. Buczkowski on Madison Mechanical OS Corp. to take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer would be futile because a majority of the directors and shareholders of the corporation are so personally and directly conflicted or committed to the decisions in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

197.   Nevertheless, on May 10, 2016, Mr. Buczkowski informed Mr. Haslam, the Director and President of the corporation, of these breaches of fiduciary duty and requested that the corporation take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer.

198. By letter from counsel on May 13, 2016, Mr. Haslam on behalf of Madison Mechanical OS Corporation informed Mr. Buczkowski that his demand "has been considered by the Corporation's Board and rejected as baseless."

WHEREFORE, the Plaintiff, on behalf of Madison Mechanical OS Corporation, demands:

a.    That the Court enter judgment in favor of Plaintiff and against Defendants, and award damages in an amount exceeding $75,000;

b.    That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. from December 13, 2007 to the present;

c.    That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical, Inc. from December 13, 2007 to the present;

d.    That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical Contracting, LLC from August 20, 2015 to the present;

e.    That the Court enter a preliminary and permanent injunction prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of themselves individually or Madison Mechanical Contracting, LLC; (ii) performing services for the benefit of Madison Mechanical Contracting, LLC under subcontracts

entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical

OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison

Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or

Madison Mechanical OS Corp.;

     e.    That the Court issue a declaratory judgment that Defendants wrongfully

and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation

be revived;

     f.    That the Court award Plaintiff his reasonable attorneys' fees, costs, and

expenses incurred in prosecuting this action; and

     g.    That the Court award the Plaintiff such other and further relief as in law

and justice he may be entitled to receive.

### Count 7 – Tortious Interference with Economic Relations

**(Against Glenn A. Haslam, Gary Garofalo,
Richard Lombardo, Lawrence Kraemer, Richard Arnold,
and Madison Mechanical Contracting, LLC)**

    199.    The Plaintiff incorporates by reference the substance of all the foregoing

factual allegations.

    200.    On or about August 20, 2015, Richard Arnold, Glenn Haslam, Gary

Garofalo, Richard Lombardo, and Lawrence Kraemer formed Madison Mechanical

Contracting, LLC.

    201.    Within months of its formation, Madison Mechanical Contracting, LLC

took over ongoing projects that were previously being performed by Madison

Mechanical, Inc. and began performing the projects for the benefit of Madison Mechanical Contracting, LLC and its members.

202.    Madison Mechanical Contracting, LLC assumed ongoing projects under subcontracts that were entered into by Madison Mechanical, Inc.

203.    Madison Mechanical Contracting, LLC misappropriated the name, goodwill, assets, trade secrets, and accounts receivable of Madison Mechanical, Inc.

204.    Defendants diverted corporate opportunities for new projects from Madison Mechanical, Inc. and Madison Mechanical OS Corp. to Madison Mechanical Contracting, LLC.

205.    Defendants used knowledge and information obtained through their positions as shareholders, officers, directors, and/or employees of Madison Mechanical OS Corp. to compete with Madison Mechanical OS Corp. and divert corporate opportunities from Madison Mechanical OS Corp. for the benefit of Madison Mechanical Contracting, LLC and its members.

206.    Defendants dissolved Madison Mechanical, Inc.

207.    Because Madison Mechanical, Inc. was a subsidiary of Madison Mechanical OS Corp., the above actions by Defendants was to the detriment of Madison Mechanical OS Corp.

208.    Defendants thus took intentional and willful actions, which were calculated to cause damage and loss to Madison Mechanical OS Corp. in its lawful

business, and which were done for the unlawful purpose of causing such damage and loss, and which resulted in damage and loss to the corporation.

209.   Mr. Buczkowski suffered direct harm as a result of the above tortious interference, separate and distinct from the harm suffered by the corporation, in that Defendants wrongfully terminated his employment and demanded that he transfer his shares in Madison Mechanical OS Corp. back to the corporation for no consideration.

210.   Furthermore, unlike all of the other shareholders of Madison Mechanical OS Corp., Mr. Buczkowski is not a member of Madison Mechanical Contracting, LLC.

WHEREFORE, the Plaintiff demands:

a.     That the Court enter judgment in favor of Plaintiff and against Defendants, and award damages in an amount exceeding $75,000;

b.     That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. from December 13, 2007 to the present;

c.     That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical, Inc. from December 13, 2007 to the present;

d.     That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical Contracting, LLC from August 20, 2015 to the present;

e.      That the Court enter a preliminary and permanent injunction

prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of

Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of

themselves individually or Madison Mechanical Contracting, LLC; (ii) performing

services for the benefit of Madison Mechanical Contracting, LLC under subcontracts

entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical

OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison

Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or

Madison Mechanical OS Corp.;

e.      That the Court issue a declaratory judgment that Defendants wrongfully

and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation

be revived;

f.      That the Court award Plaintiff his reasonable attorneys' fees, costs, and

expenses incurred in prosecuting this action; and

g.      That the Court award the Plaintiff such other and further relief as in law

and justice he may be entitled to receive.

### Count 8 – Tortious Interference with Economic Relations

**(Derivative Action on Behalf of Madison Mechanical OS Corp.)**

**(Against Glenn A. Haslam, Gary Garofalo,
Richard Lombardo, Lawrence Kraemer, Richard Arnold,
and Madison Mechanical Contracting, LLC)**

211.   The Plaintiff incorporates by reference the substance of all the foregoing factual allegations.

212.   On or about August 20, 2015, Richard Arnold, Glenn Haslam, Gary Garofalo, Richard Lombardo, and Lawrence Kraemer formed Madison Mechanical Contracting, LLC.

213.   Within months of its formation, Madison Mechanical Contracting, LLC took over ongoing projects that were previously being performed by Madison Mechanical, Inc. and began performing the projects for the benefit of Madison Mechanical Contracting, LLC and its members.

214.   Madison Mechanical Contracting, LLC assumed ongoing projects under subcontracts that were entered into by Madison Mechanical, Inc. Upon information and belief, Madison Mechanical Contracting, LLC is using the trade name, Madison Mechanical, Inc.

215.   Madison Mechanical Contracting, LLC misappropriated the name, goodwill, assets, trade secrets, and accounts receivable of Madison Mechanical, Inc.

216.   Defendants diverted corporate opportunities for new projects from Madison Mechanical, Inc. and Madison Mechanical OS Corp. to Madison Mechanical Contracting, LLC.

217.   Defendants used knowledge and information obtained through their positions as shareholders, officers, directors, and/or employees of Madison Mechanical OS Corp. to compete with Madison Mechanical OS Corp. and divert corporate

opportunities from Madison Mechanical OS Corp. for the benefit of Madison Mechanical Contracting, LLC and its members.

218.   Defendants dissolved Madison Mechanical, Inc.

219.   Because Madison Mechanical, Inc. was a subsidiary of Madison Mechanical OS Corp., the above actions by Defendants was to the detriment of Madison Mechanical OS Corp.

220.   Defendants thus took intentional and willful actions, which were calculated to cause damage and loss to Madison Mechanical OS Corp. in its lawful business, and which were done for the unlawful purpose of causing such damage and loss, and which resulted in damage and loss to the corporation.

221.   Any demand by Mr. Buczkowski on Madison Mechanical OS Corp. to take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison Mechanical Contracting, LLC would be futile because a majority of the directors and shareholders of the corporation are so personally and directly conflicted or committed to the decisions in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

222.   Nevertheless, on May 10, 2016, Mr. Buczkowski informed Mr. Haslam, the Director and President of the corporation, of the above tortious interference and requested that the corporation take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison Mechanical Contracting, LLC.

223.    By letter from counsel on May 13, 2016, Mr. Haslam on behalf of

Madison Mechanical OS Corporation informed Mr. Buczkowski that his demand "has

been considered by the Corporation's Board and rejected as baseless."

WHEREFORE, the Plaintiff demands:

a.    That the Court enter judgment in favor of Plaintiff and against

Defendants, and award damages in an amount exceeding $75,000;

b.    That the Court order Defendants to provide a full accounting of all

financial dealings and transactions of Madison Mechanical OS Corp. from December

13, 2007 to the present;

c.    That the Court order Defendants to provide a full accounting of all

financial dealings and transactions of Madison Mechanical, Inc. from December 13,

2007 to the present;

d.    That the Court order Defendants to provide a full accounting of all

financial dealings and transactions of Madison Mechanical Contracting, LLC from

August 20, 2015 to the present;

e.    That the Court enter a preliminary and permanent injunction

prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of

Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of

themselves individually or Madison Mechanical Contracting, LLC; (ii) performing

services for the benefit of Madison Mechanical Contracting, LLC under subcontracts

entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical

OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison

Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or

Madison Mechanical OS Corp.;

     e.     That the Court issue a declaratory judgment that Defendants wrongfully

and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation

be revived;

     f.     That the Court award Plaintiff his reasonable attorneys' fees, costs, and

expenses incurred in prosecuting this action; and

     g.     That the Court award the Plaintiff such other and further relief as in law

and justice he may be entitled to receive.

### Count 9 – Unjust Enrichment

**(Against Glenn A. Haslam, Gary Garofalo,
Richard Lombardo, Lawrence Kraemer, Richard Arnold,
and Madison Mechanical Contracting, LLC)**

     224.     The Plaintiff incorporates by reference the substance of all the foregoing

factual allegations.

     225.     On or about August 20, 2015, Richard Arnold, Glenn Haslam, Gary

Garofalo, Richard Lombardo, and Lawrence Kraemer formed Madison Mechanical

Contracting, LLC.

     226.     Within months of its formation, Madison Mechanical Contracting, LLC

took over ongoing projects that were previously being performed by Madison

Mechanical, Inc. and began performing the projects for the benefit of Madison Mechanical Contracting, LLC and its members.

227.    Madison Mechanical Contracting, LLC assumed ongoing projects under subcontracts that were entered into by Madison Mechanical, Inc. Upon information and belief, Madison Mechanical Contracting, LLC is using the trade name, Madison Mechanical, Inc.

228.    Madison Mechanical Contracting, LLC misappropriated the name, goodwill, assets, trade secrets, and accounts receivable of Madison Mechanical, Inc.

229.    Defendants diverted corporate opportunities for new projects from Madison Mechanical, Inc. and Madison Mechanical OS Corp. to Madison Mechanical Contracting, LLC.

230.    Defendants used knowledge and information obtained through their positions as shareholders, officers, directors, and/or employees of Madison Mechanical OS Corp. to compete with Madison Mechanical OS Corp. and divert corporate opportunities from Madison Mechanical OS Corp. for the benefit of Madison Mechanical Contracting, LLC and its members.

231.    Thus, benefits were conferred on Defendants by Madison Mechanical OS Corp.

232.    Defendants are aware and have knowledge of the benefits they received from Madison Mechanical OS Corp.

233.   Under the circumstances, in would be inequitable for Defendants to retain these benefits without paying the value of these benefits or returning the funds wrongfully obtained to Madison Mechanical OS Corp.

234.   Mr. Buczkowski suffered direct harm as a result of the above unjust enrichment, separate and distinct from the harm suffered by the corporation, in that Defendants wrongfully terminated his employment and demanded that he transfer his shares in Madison Mechanical OS Corp. back to the corporation for no consideration.

235.   Furthermore, unlike all of the other shareholders of Madison Mechanical OS Corp., Mr. Buczkowski is not a member of Madison Mechanical Contracting, LLC.

WHEREFORE, the Plaintiff demands:

a.      That the Court enter judgment in favor of Plaintiff and against Defendants, and award damages in an amount exceeding $75,000;

b.      That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. from December 13, 2007 to the present;

c.      That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical, Inc. from December 13, 2007 to the present;

d.      That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical Contracting, LLC from August 20, 2015 to the present;

e.      That the Court enter a preliminary and permanent injunction prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of themselves individually or Madison Mechanical Contracting, LLC; (ii) performing services for the benefit of Madison Mechanical Contracting, LLC under subcontracts entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or Madison Mechanical OS Corp.;

e.      That the Court issue a declaratory judgment that Defendants wrongfully and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation be revived;

f.      That the Court award Plaintiff his reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

g.      That the Court award the Plaintiff such other and further relief as in law and justice he may be entitled to receive.

### Count 10 – Unjust Enrichment

**(Derivative Action on Behalf of Madison Mechanical OS Corp.)**

58

(Against Glenn A. Haslam, Gary Garofalo,
Richard Lombardo, Lawrence Kraemer, Richard Arnold,
and Madison Mechanical Contracting, LLC)

236.   The Plaintiff incorporates by reference the substance of all the foregoing

factual allegations.

237.   On or about August 20, 2015, Richard Arnold, Glenn Haslam, Gary

Garofalo, Richard Lombardo, and Lawrence Kraemer formed Madison Mechanical

Contracting, LLC.

238.   Within months of its formation, Madison Mechanical Contracting, LLC

took over ongoing projects that were previously being performed by Madison

Mechanical, Inc. and began performing the projects for the benefit of Madison

Mechanical Contracting, LLC and its members.

239.   Madison Mechanical Contracting, LLC assumed ongoing projects under

subcontracts that were entered into by Madison Mechanical, Inc. Upon information

and belief, Madison Mechanical Contracting, LLC is using the trade name, Madison

Mechanical, Inc.

240.   Madison Mechanical Contracting, LLC misappropriated the name,

goodwill, assets, trade secrets, and accounts receivable of Madison Mechanical, Inc.

241.   Defendants diverted corporate opportunities for new projects from

Madison Mechanical, Inc. and Madison Mechanical OS Corp. to Madison Mechanical

Contracting, LLC.

242.    Defendants used knowledge and information obtained through their positions as shareholders, officers, directors, and/or employees of Madison Mechanical OS Corp. to compete with Madison Mechanical OS Corp. and divert corporate opportunities from Madison Mechanical OS Corp. for the benefit of Madison Mechanical Contracting, LLC and its members.

243.    Thus, benefits were conferred on Defendants by Madison Mechanical OS Corp.

244.    Defendants are aware and have knowledge of the benefits they received from Madison Mechanical OS Corp.

245.    Under the circumstances, in would be inequitable for Defendants to retain these benefits without paying the value of these benefits or returning the funds wrongfully obtained to Madison Mechanical OS Corp.

246.    Any demand by Mr. Buczkowski on Madison Mechanical OS Corp. to take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison Mechanical Contracting, LLC would be futile because a majority of the directors and shareholders of the corporation are so personally and directly conflicted or committed to the decisions in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

247.    Nevertheless, on May 10, 2016, Mr. Buczkowski informed Mr. Haslam, the Director and President of the corporation, of the above unjust enrichment and

requested that the corporation take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison Mechanical Contracting, LLC.

248.   By letter from counsel on May 13, 2016, Mr. Haslam on behalf of Madison Mechanical OS Corporation informed Mr. Buczkowski that his demand "has been considered by the Corporation's Board and rejected as baseless."

WHEREFORE, the Plaintiff demands:

a.   That the Court enter judgment in favor of Plaintiff and against Defendants, and award damages in an amount exceeding $75,000;

b.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. from December 13, 2007 to the present;

c.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical, Inc. from December 13, 2007 to the present;

d.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical Contracting, LLC from August 20, 2015 to the present;

e.   That the Court enter a preliminary and permanent injunction prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of themselves individually or Madison Mechanical Contracting, LLC; (ii) performing

services for the benefit of Madison Mechanical Contracting, LLC under subcontracts entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or Madison Mechanical OS Corp.;

  e.  That the Court issue a declaratory judgment that Defendants wrongfully and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation be revived;

  f.  That the Court award Plaintiff his reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

  g.  That the Court award the Plaintiff such other and further relief as in law and justice he may be entitled to receive.

### Count 11: Unfair Competition – Misappropriation of Trade Secrets

**(Against Glenn A. Haslam, Gary Garofalo,
Richard Lombardo, Lawrence Kraemer, Richard Arnold,
and Madison Mechanical Contracting, LLC)**

  249. The Plaintiff incorporates by reference the substance of all the foregoing factual allegations.

  250. On or about August 20, 2015, Richard Arnold, Glenn Haslam, Gary Garofalo, Richard Lombardo, and Lawrence Kraemer formed Madison Mechanical Contracting, LLC.

251.   Within months of its formation, Madison Mechanical Contracting, LLC took over ongoing projects that were previously being performed by Madison Mechanical, Inc. and began performing the projects for the benefit of Madison Mechanical Contracting, LLC and its members.

252.   Madison Mechanical Contracting, LLC assumed ongoing projects under subcontracts that were entered into by Madison Mechanical, Inc. Upon information and belief, Madison Mechanical Contracting, LLC is using the trade name, Madison Mechanical, Inc.

253.   Madison Mechanical Contracting, LLC misappropriated the name, goodwill, assets, trade secrets, and accounts receivable of Madison Mechanical, Inc.

254.   Defendants diverted corporate opportunities for new projects from Madison Mechanical, Inc. and Madison Mechanical OS Corp. to Madison Mechanical Contracting, LLC.

255.   Defendants used knowledge and information obtained through their positions as shareholders, officers, directors, and/or employees of Madison Mechanical OS Corp. to compete with Madison Mechanical OS Corp. and divert corporate opportunities from Madison Mechanical OS Corp. for the benefit of Madison Mechanical Contracting, LLC and its members.

256.   In doing so, Defendants improperly acquired trade secrets that were developed and/or possessed by Madison Mechanical OS Corp. and used those trade

secrets to the benefit of themselves individually and Madison Mechanical Contracting, LLC, and to the detriment of Madison Mechanical OS Corp.

257.   Defendants knew or should have known that the trade secrets were acquired by improper means.

258.   Madison Mechanical OS Corp. suffered, and continues to suffer, harm due to the misappropriation of its trade secrets.

259.   Mr. Buczkowski suffered direct harm as a result of the above misappropriation of trade secrets, separate and distinct from the harm suffered by the corporation, in that Defendants wrongfully terminated his employment and demanded that he transfer his shares in Madison Mechanical OS Corp. back to the corporation for no consideration.

260.   Furthermore, unlike all of the other shareholders of Madison Mechanical OS Corp., Mr. Buczkowski is not a member of Madison Mechanical Contracting, LLC.

WHEREFORE, the Plaintiff demands:

a.     That the Court enter judgment in favor of Plaintiff and against Defendants, and award damages in an amount exceeding $75,000;

b.     That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. from December 13, 2007 to the present;

    c.     That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical, Inc. from December 13, 2007 to the present;

    d.     That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical Contracting, LLC from August 20, 2015 to the present;

    e.     That the Court enter a preliminary and permanent injunction prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of themselves individually or Madison Mechanical Contracting, LLC; (ii) performing services for the benefit of Madison Mechanical Contracting, LLC under subcontracts entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or Madison Mechanical OS Corp.;

    e.     That the Court issue a declaratory judgment that Defendants wrongfully and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation be revived;

    f.     That the Court award Plaintiff his reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

g.     That the Court award the Plaintiff such other and further relief as in law and justice he may be entitled to receive.

### Count 12: Unfair Competition – Misappropriation of Trade Secrets

**(Derivative Action on Behalf of Madison Mechanical OS Corp.)**

**(Against Glenn A. Haslam, Gary Garofalo,
Richard Lombardo, Lawrence Kraemer, Richard Arnold,
and Madison Mechanical Contracting, LLC)**

261.    The Plaintiff incorporates by reference the substance of all the foregoing factual allegations.

262.    On or about August 20, 2015, Richard Arnold, Glenn Haslam, Gary Garofalo, Richard Lombardo, and Lawrence Kraemer formed Madison Mechanical Contracting, LLC.

263.    Within months of its formation, Madison Mechanical Contracting, LLC took over ongoing projects that were previously being performed by Madison Mechanical, Inc. and began performing the projects for the benefit of Madison Mechanical Contracting, LLC and its members.

264.    Madison Mechanical Contracting, LLC assumed ongoing projects under subcontracts that were entered into by Madison Mechanical, Inc. Upon information and belief, Madison Mechanical Contracting, LLC is using the trade name, Madison Mechanical, Inc.

265.    Madison Mechanical Contracting, LLC misappropriated the name, goodwill, assets, trade secrets, and accounts receivable of Madison Mechanical, Inc.

66

266.   Defendants diverted corporate opportunities for new projects from Madison Mechanical, Inc. and Madison Mechanical OS Corp. to Madison Mechanical Contracting, LLC.

267.   Defendants used knowledge and information obtained through their positions as shareholders, officers, directors, and/or employees of Madison Mechanical OS Corp. to compete with Madison Mechanical OS Corp. and divert corporate opportunities from Madison Mechanical OS Corp. for the benefit of Madison Mechanical Contracting, LLC and its members.

268.   In doing so, Defendants improperly acquired trade secrets that were developed and/or possessed by Madison Mechanical OS Corp. and used those trade secrets to the benefit of themselves individually and Madison Mechanical Contracting, LLC, and to the detriment of Madison Mechanical OS Corp.

269.   Defendants knew or should have known that the trade secrets were acquired by improper means.

270.   Madison Mechanical OS Corp. suffered, and continues to suffer, harm due to the misappropriation of its trade secrets.

271.   Any demand by Mr. Buczkowski on Madison Mechanical OS Corp. to take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison Mechanical Contracting, LLC would be futile because a majority of the directors and shareholders of the corporation are so personally and directly conflicted or committed to the decisions in dispute that they cannot reasonably be

67

expected to respond to a demand in good faith and within the ambit of the business judgment rule.

272.   Nevertheless, on May 10, 2016, Mr. Buczkowski informed Mr. Haslam, the Director and President of the corporation, of the above unfair competition and misappropriation of trade secrets, and requested that the corporation take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison Mechanical Contracting, LLC.

273.   By letter from counsel on May 13, 2016, Mr. Haslam on behalf of Madison Mechanical OS Corporation informed Mr. Buczkowski that his demand "has been considered by the Corporation's Board and rejected as baseless."

WHEREFORE, the Plaintiff demands:

a.   That the Court enter judgment in favor of Plaintiff and against Defendants, and award damages in an amount exceeding $75,000;

b.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. from December 13, 2007 to the present;

c.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical, Inc. from December 13, 2007 to the present;

d.      That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical Contracting, LLC from August 20, 2015 to the present;

e.      That the Court enter a preliminary and permanent injunction prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of themselves individually or Madison Mechanical Contracting, LLC; (ii) performing services for the benefit of Madison Mechanical Contracting, LLC under subcontracts entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or Madison Mechanical OS Corp.;

e.      That the Court issue a declaratory judgment that Defendants wrongfully and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation be revived;

f.      That the Court award Plaintiff his reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

g.      That the Court award the Plaintiff such other and further relief as in law and justice he may be entitled to receive.

### Count 13: Constructive Trust

**(Against Glenn A. Haslam, Gary Garofalo,
Richard Lombardo, Lawrence Kraemer, Richard Arnold,**

and Madison Mechanical Contracting, LLC)

274.    The Plaintiff incorporates by reference the substance of all the foregoing factual allegations.

275.    On or about August 20, 2015, Richard Arnold, Glenn Haslam, Gary Garofalo, Richard Lombardo, and Lawrence Kraemer formed Madison Mechanical Contracting, LLC.

276.    Within months of its formation, Madison Mechanical Contracting, LLC took over ongoing projects that were previously being performed by Madison Mechanical, Inc. and began performing the projects for the benefit of Madison Mechanical Contracting, LLC and its members.

277.    Madison Mechanical Contracting, LLC assumed ongoing projects under subcontracts that were entered into by Madison Mechanical, Inc. Upon information and belief, Madison Mechanical Contracting, LLC is using the trade name, Madison Mechanical, Inc.

278.    Madison Mechanical Contracting, LLC misappropriated the name, goodwill, assets, trade secrets, and accounts receivable of Madison Mechanical, Inc.

279.    Defendants diverted corporate opportunities for new projects from Madison Mechanical, Inc. and Madison Mechanical OS Corp. to Madison Mechanical Contracting, LLC.

280.    Defendants used knowledge and information obtained through their positions as shareholders, officers, directors, and/or employees of Madison Mechanical

OS Corp. to compete with Madison Mechanical OS Corp. and divert corporate opportunities from Madison Mechanical OS Corp. for the benefit of Madison Mechanical Contracting, LLC and its members.

281.   In doing so, Defendants improperly acquired trade secrets that were developed and/or possessed by Madison Mechanical OS Corp. and used those trade secrets to the benefit of themselves individually and Madison Mechanical Contracting, LLC, and to the detriment of Madison Mechanical OS Corp.

282.   Thus, Mr. Haslam, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison Mechanical Contracting, LLC acquired property in which Madison Mechanical OS Corp. and Mr. Buczkowski have a good and equitable interest and claim.

283.   Defendants acquired this property through fraud, misrepresentation, and/or other improper methods.

284.   Furthermore, Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr. Kraemer acquired this property in breach of their fiduciary duties to, and confidential relationship with, Madison Mechanical OS Corp. and Mr. Buczkowski.

285.   Defendants have been unjustly enriched by wrongfully misappropriating the name, goodwill, assets, records, trade secrets, accounts receivable, and corporate opportunities of Madison Mechanical OS Corp.

286.   Mr. Buczkowski suffered direct harm as a result of the above unjust enrichment, separate and distinct from the harm suffered by the corporation, in that

Defendants wrongfully terminated his employment and demanded that he transfer his shares in Madison Mechanical OS Corp. back to the corporation for no consideration.

287.   Furthermore, unlike all of the other shareholders of Madison Mechanical OS Corp., Mr. Buczkowski is not a member of Madison Mechanical Contracting, LLC.

WHEREFORE, the Plaintiff demands:

a.   That the Court charge upon Defendants a constructive trust consisting of the name, goodwill, assets, records, trade secrets, accounts receivable, and any revenue they wrongfully acquired from Madison Mechanical OS Corp., and order Defendants to convey this property back to Madison Mechanical OS Corp.;

b.   That the Court enter judgment in favor of Plaintiff and against Defendants, and award damages in an amount exceeding $75,000;

c.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. from December 13, 2007 to the present;

d.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical, Inc. from December 13, 2007 to the present;

e.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical Contracting, LLC from August 20, 2015 to the present;

f.      That the Court enter a preliminary and permanent injunction prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of themselves individually or Madison Mechanical Contracting, LLC; (ii) performing services for the benefit of Madison Mechanical Contracting, LLC under subcontracts entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or Madison Mechanical OS Corp.;

g.      That the Court issue a declaratory judgment that Defendants wrongfully and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation be revived;

h.      That the Court award Plaintiff his reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

i.      That the Court award the Plaintiff such other and further relief as in law and justice he may be entitled to receive.

## Count 14: Constructive Trust

### (Derivative Action on Behalf of Madison Mechanical OS Corp.)

**(Against Glenn A. Haslam, Gary Garofalo,
Richard Lombardo, Lawrence Kraemer, Richard Arnold,
and Madison Mechanical Contracting, LLC)**

288.   The Plaintiff incorporates by reference the substance of all the foregoing factual allegations.

289.   On or about August 20, 2015, Richard Arnold, Glenn Haslam, Gary Garofalo, Richard Lombardo, and Lawrence Kraemer formed Madison Mechanical Contracting, LLC.

290.   Within months of its formation, Madison Mechanical Contracting, LLC took over ongoing projects that were previously being performed by Madison Mechanical, Inc. and began performing the projects for the benefit of Madison Mechanical Contracting, LLC and its members.

291.   Madison Mechanical Contracting, LLC assumed ongoing projects under subcontracts that were entered into by Madison Mechanical, Inc. Upon information and belief, Madison Mechanical Contracting, LLC is using the trade name, Madison Mechanical, Inc.

292.   Madison Mechanical Contracting, LLC misappropriated the name, goodwill, assets, trade secrets, and accounts receivable of Madison Mechanical, Inc.

293.   Defendants diverted corporate opportunities for new projects from Madison Mechanical, Inc. and Madison Mechanical OS Corp. to Madison Mechanical Contracting, LLC.

294.   Defendants used knowledge and information obtained through their positions as shareholders, officers, directors, and/or employees of Madison Mechanical OS Corp. to compete with Madison Mechanical OS Corp. and divert corporate

opportunities from Madison Mechanical OS Corp. for the benefit of Madison

Mechanical Contracting, LLC and its members.

295.   In doing so, Defendants improperly acquired trade secrets that were

developed and/or possessed by Madison Mechanical OS Corp. and used those trade

secrets to the benefit of themselves individually and Madison Mechanical Contracting,

LLC, and to the detriment of Madison Mechanical OS Corp.

296.   Thus, Mr. Haslam, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr.

Arnold, and Madison Mechanical Contracting, LLC acquired property in which

Madison Mechanical OS Corp. and Mr. Buczkowski have a good and equitable interest

and claim.

297.   Defendants acquired this property through fraud, misrepresentation,

and/or other improper methods.

298.   Furthermore, Mr. Haslam, Mr. Garofalo, Mr. Lombardo, and Mr.

Kraemer acquired this property in breach of their fiduciary duties to, and confidential

relationship with, Madison Mechanical OS Corp. and Mr. Buczkowski.

299.   Defendants have been unjustly enriched by wrongfully misappropriating

the name, goodwill, assets, records, trade secrets, accounts receivable, and corporate

opportunities of Madison Mechanical OS Corp.

300.   Any demand by Mr. Buczkowski on Madison Mechanical OS Corp. to

take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr.

Arnold, and Madison Mechanical Contracting, LLC would be futile because a majority

of the directors and shareholders of the corporation are so personally and directly conflicted or committed to the decisions in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

301.   Nevertheless, on May 10, 2016, Mr. Buczkowski informed Mr. Haslam, the Director and President of the corporation, of the above actions and requested that the corporation take legal action against Mr. Haslam, Mr. Garofalo, Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison Mechanical Contracting, LLC.

302.   By letter from counsel on May 13, 2016, Mr. Haslam on behalf of Madison Mechanical OS Corporation informed Mr. Buczkowski that his demand "has been considered by the Corporation's Board and rejected as baseless."

WHEREFORE, the Plaintiff demands:

a.   That the Court charge upon Defendants a constructive trust consisting of the name, goodwill, assets, records, trade secrets, accounts receivable, and any revenue they wrongfully acquired from Madison Mechanical OS Corp., and order Defendants to convey this property back to Madison Mechanical OS Corp.;

b.   That the Court enter judgment in favor of Plaintiff and against Defendants, and award damages in an amount exceeding $75,000;

c.   That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. from December 13, 2007 to the present;

d.     That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical, Inc. from December 13, 2007 to the present;

e.     That the Court order Defendants to provide a full accounting of all financial dealings and transactions of Madison Mechanical Contracting, LLC from August 20, 2015 to the present;

f.     That the Court enter a preliminary and permanent injunction prohibiting Defendants from (i) using the name, goodwill, trade secrets, or assets of Madison Mechanical, Inc. or Madison Mechanical OS Corp. for the benefit of themselves individually or Madison Mechanical Contracting, LLC; (ii) performing services for the benefit of Madison Mechanical Contracting, LLC under subcontracts entered into by or for the benefit of Madison Mechanical, Inc. or Madison Mechanical OS Corp.; and (iii) usurping corporate opportunities for themselves or Madison Mechanical Contracting, LLC that rightfully belong to Madison Mechanical, Inc. or Madison Mechanical OS Corp.;

g.     That the Court issue a declaratory judgment that Defendants wrongfully and improperly dissolved Madison Mechanical, Inc. and ordering that the corporation be revived;

h.     That the Court award Plaintiff his reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

h.     That the Court award Plaintiff his reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

i.     That the Court award the Plaintiff such other and further relief as in law and justice he may be entitled to receive.

## JURY DEMAND

COMES NOW the Plaintiff, Robert Buczkowski, by and through counsel, and demands a trial by jury as to all issues triable by jury in this matter.

Respectfully submitted,

Timothy F. Maloney
Joseph M. Creed
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 (phone)
(301) 220-1214 (fax)
tmaloney@jgllaw.com
jcreed@jgllaw.com

*Counsel for Plaintiff*

75

## IN THE CIRCUIT COURT FOR BALTIMORE COUNTY, MARYLAND

MADISON MECHANICAL, INC.,
ET AL.,

     Plaintiffs

v.                               Case No. 03-C-17-003743

THE HARTFORD FINANCIAL
PRODUCTS, ET AL.,

     Defendants.

### ORDER

UPON CONSIDERATION of Defendant Robert Buczkowski's Motion to Dismiss Complaint or, in the Alternative, Motion to Stay this Action, any opposition thereto, it is this _____ day of _____, 2017, by the Circuit Court for Baltimore County, Maryland,

    ORDERED that Defendant Robert Buczkowski's motion to dismiss be and hereby is GRANTED; and it is further

    ORDERED that the Complaint be and hereby is DISMISSED; or, alternatively,

    ORDERED that the above-captioned action is STAYED pending the resolution of *Buczkowski v. Madison Mechanical Contracting, LLC, et al.*, Case No. 03-C-16-005782 (Cir. Ct. for Baltimore Cnty.).

 

                                          _____

                                          Judge,
                                          Circuit Court for Baltimore County

Copies To:

Timothy F. Maloney
Joseph M. Creed
Alyse L. Prawde
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770

Gary R. Jones
Siobhan R. Keenan
Danielle M. Vranian
120 E. Baltimore Street, Suite 2100
Baltimore, MD 21202

Charles C. Lemley
Wiley & Rein, LLP
1776 K Street, NW
Washington, D.C. 20006