# EXHIBIT 7



Deposition of:

**Gary J. Garofalo**

*August 22, 2019*

In the Matter of:

**Madison Mechanical, Inc. Vs. Twin City Fire Insurance Company**

Veritext Legal Solutions
800.808.4958 | calendar-dmv@veritext.com |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

MADISON MECHANICAL, INC.,:
et al. :
Plaintiffs :
Vs. : Case No.:
TWIN CITY FIRE INSURANCE : 1:17-cv-01357-GLR
COMPANY, et al. :
Defendants :

--------------------

Deposition of GARY GAROFALO, was taken on Thursday, August 22, 2019, commencing at 1:15 p.m., at Baxter, Baker, Sidle, Conn & Jones, 120 East Baltimore Street, 21st Floor, Baltimore, Maryland, before MICHELE D. LAMBIE, Notary Public.

--------------------

Reported By:

Michele D. Lambie, CSR-RPR

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

Baxter, Baker, Sidle, Conn & Jones
DANIELLE M. VRANIAN, ESQUIRE
dmv@bbsclaw.com
CAROLINE PAYTON, ESQUIRE
120 East Baltimore Street, 21st Floor
Baltimore, Maryland 21202
(410) 230-3800

ON BEHALF OF THE DEFENDANTS:

Wiley Rein LLP
CHARLES C. LEMLEY, ESQUIRE
clemley@wileyrein.com
ANNA J. SCHAFFNER, ESQUIRE
aschaffner@wileyrein.com
1776 K Street, N.W
Washington, D.C. 20006
(202) 719-7000

ALSO PRESENT: Edward J. Longosz, II, Esquire
Glenn Haslam

EXAMINATION INDEX

| WITNESS: GARY GAROFALO | PAGE |
| --- | --- |
| BY MR. LEMLEY | 4 |
| BY MS. VRANIAN | 56 |
| R BY MR. LEMLEY | 57 |

EXHIBIT INDEX
(Attached to Transcript.)

| GARY J. GAROFALO | MARKED |
| --- | --- |
| Exhibit 16 Affidavit of Gary J. Garofalo | 5 |
| Exhibit 17 Email dated March 3, 2014 | 26 |
| Exhibit 18 Email dated August 11, 2014 | 28 |
| Exhibit 19 Email dated November 23, 2015 | 30 |
| Exhibit 20 Hartford Insurance Policy | 41 |
| Exhibit 21 Email dated March 6, 2015 | 45 |
| Exhibit 22 Email dated April 9, 2016 | 49 |

P R O C E E D I N G S

GARY GAROFALO

the Deponent, called for examination by the Defendants, being first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. LEMLEY:

Q. How are you?
A. I'm under oath. I've been better. How is that?
Q. Yeah.
A. Okay.
Q. Well, it won't be too bad. Can you state your name for the record, please?
A. Gary Garofalo.
Q. What do you do for a living, Mr. Garofalo?
A. I'm CEO and president of Harkins Builders, which is a mid-Atlantic general contractor.

Q. So, Harkins is a general contractor. What kind of contracting do you do -- does Harkins do?
A. A lot, but it's mostly -- we're mostly known for doing wood-frame multifamily, but we do office stuff. We do a lot of senior living, student housing. We'll build you anything you want probably but a single-family home. We stay out of that market.
Q. How long have you been with Harkins?
A. Twenty-nine years.
Q. I'm going to mark a few documents as we go through to help us get through the facts here.

MR. LEMLEY: Can you mark that as the next one in line?

(Whereupon, Garofalo Deposition Exhibit 16, Affidavit of Gary J. Garofalo, marked for identification.)

BY MR. LEMLEY:

Q. So, what was marked as Exhibit 16 is an Affidavit that you signed that was filed in

Page 6

the -- one of the state court lawsuits. Do you recognize that document?

A. I do.

Q. It is dated March 25th -- I'm sorry, March 28th, 2019 is your signature on page 2; is that correct?

A. March what?

Q. Is that March 28th?

A. Did you say '19? I didn't hear it.

Q. It's March something 2019.

A. Yeah. Yeah. March 28th, 2019.

Q. Okay, yes. Number 3 says, I was a shareholder in Madison Mechanical OS Corp. at all times relevant to this lawsuit. When did you become a shareholder in Madison Mechanical OS Corp., if you recall?

A. I believe it was December 31st of '07.

Q. Okay. And how did you become a shareholder?

A. Madison was a company that was started, I want to say, in 1993 with Glenn and the CEO at the

Page 7

time at Harkins, a guy named Blase Cooke. He was a hundred percent owner. He got cancer and knew he was dying, and Glenn and I started the company, even though it was his money, just so as part of the transfer when he passed, he allowed Glenn and I to buy the company.

Q. It says, I also owned an ownership interest in Madison Mechanical Contracting, LLC. How much of an ownership interest do you own in Madison Mechanical Contracting, LLC?

A. Twelve percent.

Q. And how did you come to have that ownership interest?

A. At some point in time, we began to think about doing -- starting a new company. I believe it was in 2015. In 2016, I think we actually became active.

Q. Number 6 says, I have worked with Bill Franey and Franey, Parr & Muha, Inc./Alliant Insurance Services, Inc. for all years relevant to this lawsuit.

Page 8

How long have you been working with Bill Franey -- well, let's say with Bill Franey?

A. In any capacity or just with Madison?

Q. In any capacity.

A. Thirty years.

Q. Okay.

A. Twenty-nine years. Since I got to Harkins.

Q. And how about with Madison, how long with Madison?

A. I was -- I was there when it started. I was a consultant. I didn't own part of Madison. I think it was 1993 is when that was started.

Q. Did you work with Mr. Franey on behalf of Madison also?

A. I did, but for the most part, I -- I was CFO at the time at Harkins. And Glenn and Bob and whoever else was acting in the capacity of controller through Madison's history at some point took it over, but I just can't tell when that was.

Q. What was Mr. Franey's role with respect

Page 9

to Madison?

A. He was -- he was our agent. He was an insurance agent, and he provided -- he was an agent for our bonding company.

Q. Did he help you get insurance policies?

A. Yeah. That was -- his job was, yeah, to get us insurance, all of the different business insurances that we needed.

Q. Did you do business with a variety of insurance companies through Mr. Franey?

A. I'm not sure if I totally understand the question. Like underwriters or different agents?

Q. No. So, you had these insurance policies. The insurance policies here were issued by The Hartford Insurance Company or Twin City?

A. Yeah.

Q. Did you get insurance policies issued by other companies as well?

A. Of course, yes. Yes.

Q. Do you recall having directors and officers insurance from other companies?

Page 10

A. I do not, no.
Q. Did you also --
A. Excuse me. To make sure I'm answering the right question, different underwriters or different insurance agents on the D&O policy?
Q. So, when you say -- see, when I think of underwriters, I think of something more specialized. When you're saying underwriters, you're talking about like the policy, The Hartford policy you would call it The Hartford underwriters?
A. Yes.
Q. Okay. Yes. Do you recall getting D&O insurance from other underwriters?
A. I don't recall doing that, no.
Q. And did you also do your -- get your surety bonds and so forth through Mr. Franey?
A. We do.
Q. So, when it came to purchasing insurance policies, and specifically in 2015 and 2016, who dealt with Mr. Franey in that regard?
A. I didn't.

Page 11

Q. Okay.
A. I've -- I've learned it was Glenn and Bob, Bob Buczkowski.
Q. Other than -- did you ever work with Mr. Franey or anybody at his agency, Pat Bierderman or anybody else, in connection with making claims on insurance?
A. On, through Madison or --
Q. Yes, for Madison.
A. Is everything just related to Madison?
Q. Yes. Let's stick with Madison. If I mean something broader, I'll let you know.
A. Other than this letter that this Affidavit I think is going to -- that you're going to ask me about, I generally didn't get involved in that. They had a CFO.
Q. Okay.
A. Bob was the CFO, and before that, I would have no reason to talk to Mr. Franey.
Q. Number 7 says Mr. Franey was the insurance agent for The Hartford/Twin City Fire

Page 12

Insurance Company and surety bond broker for Madison Mechanical OS Corp. and Madison Mechanical, Inc. What did you mean by Mr. Franey was the insurance agent for The Hartford/Twin City Fire Insurance Company?
A. I think it had to do with the D&O policy that we were discussing. That's what I meant.
Q. Do you know what was meant by -- and I realize you may not have sat down and typed this yourself. Do you know what was meant by the phrase, Mr. Franey was the insurance agent for The Hartford/Twin City Fire Insurance Company?
A. That he was our agent is -- I guess if that's what you're asking me, that's I think what I meant.
Q. Number 8 says, In addition to being an owner of Madison Mechanical OS Corp., I assist Madison as its -- and its president, Glenn Haslam, as a financial advisor, and I'm involved in Madison's banking, bonding, and insurance relationships. As part of that role, I spoke with

Page 13

Mr. Franey often.
Why did you speak to Mr. Franey often as part of that role as financial advisor and in those other capacities?
A. I think multiple reasons. He does the exact -- he has the exact same role with Harkins, so we overlapped a lot. If -- by often, I meant if there were issues coming up, if he couldn't get information from Mr. Buczkowski, I couldn't get return calls or whatever it might be, but on a daily basis, you know, I wasn't talking to him about Madison. I mean, Madison is a relatively small company in comparison to our company, and Glenn is very capable as a CEO.
Q. Okay. You said he was a trusted insurance advisor. What did you mean by that?
A. Well, I had a deep amount of respect and did and still do for Mr. Franey. He -- he built a business that was very successful, and I trusted him completely with our insurance needs.
Q. Do you know what he advised Madison

Page 14

Mechanical with respect to like which insurance policies to buy, which surety bonds to get and that sort of thing?

A. I wasn't involved at that level.

Q. With respect to the one claim you got involved in, did you rely on him for advice about what to do about it, what to do about notice and tendering and that sort of thing?

A. I don't believe I ever asked him about notice. I would say I asked him about coverage, but no. If I talked to Bill about it, he was my insurance agent. He was notified.

Q. Did you ever read the -- read all or read part of the insurance policies that were issued by Twin City?

A. No.

Q. Did you ask Mr. Franey what the policies required with respect to giving notice to the insurance company?

A. I did not.

Q. Did you count on him to make sure that

Page 15

whatever notice needed to be given was given? Is that --

A. I count on him to do his job. So, if that's part of his job, yes.

Q. So, you consider part of his job to make sure proper notice was given to what you gave to him?

A. Yes.

Q. Do you recall -- I know that you say in here -- well, I'll just keep it in order.

So, paragraph 9 says, Robert Buczkowski was an owner and CFO for Madison Mechanical OS Corp.

Number 10 says, Madison terminated Mr. Buczkowski's employment on November 18th, 2015. Do you see that?

A. Yes.

Q. And there's a letter we can show you later that was sent to him on November 18th, 2015, and that's -- that was when his employment was actually officially terminated; is that right?

Page 16

A. Yes.

Q. Number 11 says, I received a letter dated November 11th, 2015 from Mr. Buczkowski's attorney, a copy attached, addressed to you and Mr. Haslam, Mr. Lombardo, Mr. Kraemer, and Mr. Arnold, which we can look at that again in a minute.

Paragraph 12 says, I called Mr. Franey on November 20th, 2015 and told him we received the November 11th, 2015 letter and asked whether we have officers liability insurance with The Hartford to represent us to a provide defense to Mr. Buczkowski's alleged claim.

Do you recall anything about that phone call, other than what you've written down here and already said?

A. No. I mean, other -- I just -- at the time, Madison was going through a lot of stuff. I typically wouldn't have gotten involved in this, and maybe because it was an officer I might have got involved with it, but Glenn was fighting a lot of battles, and this is something I thought I could

Page 17

help him with. So, I made the call to Mr. -- to Mr. Franey instead of Glenn.

Q. Do you recall anything about what Mr. Franey said to you?

A. Other than getting him the letter, which apparently took a lot of emails to get him to. For whatever reason, I couldn't get it to him, but other than that, I don't -- I don't remember what we talked about.

Q. Number 13 says, On the same day, Friday, November 20th, 2015, I also asked Glenn Haslam to hold off on hiring an attorney in response to this letter because I had a call in to Mr. Franey as to whether The Hartford would agree to have our directors and officers coverage provide a defense to us. Do you see that?

A. Yes.

Q. And that's just referring to the phone call that was talked about in paragraph 12?

A. Yes.

Q. On Monday, November 23rd, 2015, I had a

series of emails with Mr. Franey regarding the November 11th, 2015 letter and its contents.
Do you recall anything about that series of emails?
A. Other than having a problem getting them both pages, I just made sure that he got the letters, the two pages -- the two-page letter I received or we all received, actually.
Q. It says -- paragraph 15 says, I sent Mr. Franey screenshots of the November 11th, 2015 letter by email on November 23rd, 2015. And that's part of what you talked about in paragraph 14; is that correct?
A. That -- that was the letter I was talking about; yes.
Q. Do you recall any other kind of written communications with Mr. Franey during that time frame about the November 11th, 2015 letter? Any text messages, any letters, anything along those lines?
A. You said time frame?



Q. Yes. In the November, late November 2015.
A. It's my understanding when I went back and looked at all of my emails, this was completely everything that I had a record of giving him.
Q. Okay.
A. So, I have no recollection of a follow-up call or I don't think I would have texted him questions. I would have called him.
Q. Right. So, after -- so, November 23rd, 2015, do you recall, did Mr. Franey tell you anything about what you should do with the letter, other than send it to him?
A. I don't recall him saying anything other than, you know, -- I imagine he would have asked if that was all I got, and I would have said yes. But I don't recall a specific conversation about anything else, other than getting -- getting him the letter.
Q. Did he say anything to you about what he was going to do with respect to the letter?



A. He didn't have to. I don't have recall of whether he did, but generally if you hand your agent a letter that has to do with a claim, I'm kind of done with what I need to do. So, there would be no reason for me to ask him any other questions about that.
Q. Why is that? I'm just -- why is it when you give it to him, you think that you're done with what you need to do?
A. Well, in this time frame is what I'm talking about?
Q. Yes.
A. Well, that's all I know. I -- at this point, I believed we had insurance. I had something that I thought could trigger the insurance. So, my job is to get Bill what I had, and, I mean, as far as why is that, I mean, that's typically, 00you have agents so they can -- if I wanted to do the work myself, I wouldn't have an agent, but I wouldn't get anything done. So, that's why you have agents.



So, it was -- it was my intent that I gave it to Bill, and Bill would, as he always does, would -- would deal with it.
Q. I'm just trying to figure out, what did you -- because you know it has to get to the insurance company somehow. Were you just -- you say you would expect him to send it to whoever needed to receive it, is that what you're saying?
A. Yeah. When you're -- when you're in business, you look at it a little differently. I don't talk to the brokers. To my knowledge, I've never spoken to a broker in 30 years of doing what I do.
My -- my relationship is with the agent, and -- and so there would be no reason for me to say, Who is the underwriter? Let me go call Hartford. I would have never done that. It's just not how it works.
Q. You're saying brokers and agents. What are you -- how are you distinguishing between the two?

Page 22

A. If I said both of them in that, I meant agent in both. Sorry.
Q. Okay.
A. Because there's a difference or I believe there's a difference.
Q. What is the difference in your view?
A. I think an agency probably has more responsibility directly with the underwriter.
Q. So, why is that? Play that out for me.
A. I don't know the reason why, but when I think of it -- and I don't know if I have the right business definition in my mind of what it is, but I think agent carries a little bit more than a broker. I just feel like brokers are getting you insurance, and maybe you would have to do a whole lot more work. We didn't -- we operated, I believe, as an agent.
Q. When did -- why did you believe that?
A. Because I'm not -- I don't have any special expertise in insurance, and generally in business if you can't do it, you give it to

Page 23

somebody that can.
Q. No. What I'm saying is why did you believe that Mr. Franey was an agent as opposed to a broker?
A. I -- maybe status. He's been in the business a while. If it was a kid right out of high school or right out of college that started an insurance company, I don't think I would hold him in the same regard as -- I know I wouldn't hold him in the same regards as Bill. I probably would not hire that guy.
So, I considered Bill an agent. Whether it's relevant in this case or not, that's what I thought he was.
Q. Did you think that Mr. Franey worked for The Hartford, that he was --
A. I know it's a -- it's probably a weird relationship, but, no, I -- we paid him. I considered that he worked for us.
Q. Okay. Did you -- what was the next thing that you remember about this, how this letter was

Page 24

dealt with through Mr. Franey? What was the next communication you had with him? You don't have to tell me a date, but if you can remember, what was the next thing that you heard about this?
A. I -- I don't remember anything specifically. I'm sure some of the calls as far as whether we were going to terminate Bob -- I believe we terminated Bob before the letter was written. We certainly didn't -- I don't believe had notice of the letter.
I probably would have talked to him about what was going on operationally at Madison, which was there was -- we were having some difficulties, and generally when you fire the CFO, somebody has got to step in and do it. So, we were worried about that.
Fortunately, our assistant controller stepped up, and I was able to do some stuff. I probably would have talked to him about that, but I don't ever remember in this time period talking to Bill any more about what do we do next? I just

Page 25

figured he would get back to me on coverage.
Q. Did you have -- I understand that Mr. Haslam also dealt with this stuff. Did you have anything more to do with this claim after you submitted the notice and the things that are here or --
A. In what time period?
Q. After November 23rd, 2015, or did Mr. Haslam follow up with him after that, or do you recall?
A. I'm sure we -- at different times, I spoke to Bill about this. I -- it wasn't -- at some point, once I kind of hand it off, I figure somebody is just not going to write us a check. There's going to be a process that it goes through, and I figured it would go through the process. But I don't remember having any other conversations that followed up with this in asking him if he notified our underwriter or not, so just no recollection.
Q. Okay. You can set that aside.

Page 26

MR. LEMLEY: Let's mark this as whatever is next.

(Whereupon, Garofalo Deposition Exhibit 17, Email dated March 3, 2014, marked for identification.)

BY MR. LEMLEY:

Q. So, Mr. Garofalo, what we have handed you has been marked as Exhibit 17 for today, and you will see there's a bunch of other numbers down there. Just so you know, you will see those over the rest of the day. The number right in the middle, the PL number, that's from this litigation. It was produced in this litigation, and the other numbers show that it was a deposition exhibit in another lawsuit. And then the DEFS' number is the number that was put on it for the other litigation, but for today, it's Exhibit 17.

And this is from you dated March 3rd, 2014 to Dick Lombardo and Larry Kraemer, with a copy to Mr. Haslam, and it's talking about ownership change for BF purchase 10 percent, and it

Page 27

seems to be talking about Mr. Franey possibly buying into Madison Mechanical; is that right?

A. Can I have a chance just to read it?

Q. Yeah, sure.

(Whereupon, there was a pause for document examination.)

THE WITNESS: Okay.

BY MR. LEMLEY:

Q. So, what was -- how did it come about that Mr. Franey was considering investing in Madison?

A. My recollection was we sustained massive losses on these projects with Clark that triggered the whole financial crisis. So, we really needed a money partner. We also needed somebody that understood the business and had probably seen something like this before and worked through it, and Bill certainly had the money. He had the experience. He was dealing with clients, whether it be surety business, which the financial statements mean everything. Bill was very astute

Page 28

at that, and I thought he would be a really good match. He was somebody that we all respected.

So, he was one of -- I mean, I'm sure there are other emails out here. Obviously, we didn't do this with Bill, but we -- there were a number of different people that we considered coming into the company and giving us the -- a cash infusion to help us get through the cash crunch.

Q. Okay.

MR. LEMLEY: Mark that.

(Whereupon, Garofalo Deposition Exhibit 18, Email dated August 11, 2014, marked for identification.)

BY MR. LEMLEY:

Q. So, what's been marked as Exhibit --

MR. LEMLEY: I'm sorry, I didn't give my -- there you go.

BY MR. LEMLEY:

Q. This is from you dated August 11th, 2014 to Mr. Franey, Mr. Lombardo, Mr. Kraemer, and a copy to Mr. Haslam, talking about an accounting

Page 29

services proposal from Mike Arthur. Who was -- who is Mike Arthur?

A. Mike Arthur was a name, I believe, that Glenn offered up as somebody that might have done accounting work for him. It wasn't somebody that I knew firsthand. I believe it came through Glenn.

Q. It talks about -- in the second paragraph it says, Mike's first assignment will be to help Brant complete the due diligence items Bill requested.

Is that just still talking about when Bill was -- Franey was looking into investing in the company?

A. Let me just take a second to read the whole thing.

Q. Yeah, sure.

(Whereupon, there was a pause for document examination.)

THE WITNESS: Okay.

BY MR. LEMLEY:

Q. I just wondered, is this still -- the due

diligence that you're talking about there, is that due diligence in connection with the possible investment by Bill in Madison Mechanical?

A. Without possibly seeing another -- you know, the original thread, I'm not sure what that means by just looking at this document.

Q. Okay. Do you know why did Mr. Franey end up not investing in Madison?

A. I think it was our choice. I don't think -- we never asked Bill. He was just one of a few people that we considered as possible partners.

Q. Okay. You can set that aside.

MR. LEMLEY: Mark that one, please.

(Whereupon, Garofalo Deposition Exhibit 19, Email dated November 23, 2015, marked for identification.)

BY MR. LEMLEY:

Q. So, while you're looking at that, I'll just describe it for the record. This is Exhibit 19. It's an -- at the top of the page, it's an email dated November 23rd, 2015 from you to W.

Franey, and it's forwarding a November 14th, 2015 email from you to Marlene Marlatt Haslam?

A. Yes.

Q. And that describes, it looks like, some issues related to Mr. Buczkowski. So, do you know -- do you recall why you were forwarding that November 14th email to Mr. Franey?

A. I imagine I was just keeping him in the loop on what was going on with Bob. I think any insurance agent would want to know, in a company that's struggling financially, information like this. So, I believe that's why I would have sent it, but I don't remember.

Q. Just to point out, this is November 23rd, 2015, which is when your Affidavit says you sent some emails about the -- about the November 11th letter. So, could this be in connection with that?

A. If I hadn't -- if I didn't mention it in here, I don't think it was, but I can't say for sure by just looking at this.

Q. So, in the email, the November 14th email

that was being forwarded, the second paragraph says, The second attachment was close-out list that we give to Bob when the three of us agreed to meet on October 8th. I used 11-25-15 even though you said 11-23. At this point, since he chose to come after us legally, I think the 11-23 that you've communicated to him I think is the date you should use if you even want to pay him any severance. Do you see that?

A. Yes.

Q. You're talking about the date that his employment would end; is that correct?

A. Yes.

Q. You said, He will be fired for cause. Plus, he underfunded his capital and loan commitments to Madison by over $272,000. Do you know -- why did you specify that he would be fired for cause?

A. It might -- it's hard just to look at one email and do it. At one point, I'm sure we were trying to work things through with Bob. I might

have had that conversation with Bill, and this is kind of just trying to recall what would have happened. And then a series of events have happened, and it's no longer, Hey, we're going to work this out. We'll sure him up in accounting. We'll do whatever we have got to do.

Bob started acting in a way that he could no longer be working for us. His work -- him coming to work was detrimental to our company.

Q. So, Mr. Buczkowski was employed at will, right? Isn't that correct? He was an at-will employee? He could be terminated for any reason?

A. I'm terrible at that part of the law, but with my limited understanding of at will in the state of Maryland, I believe that's true, yeah.

Q. Is it accurate to say that the relevance of him being fired for cause is based on the shareholder agreement for the repurchase of his shares of stock?

MS. VRANIAN: Objection.

BY MR. LEMLEY:

Page 34

Q. Or do you know, is that -- is that not what you --

A. No, that's not what I recall at all. I listed seven reasons why he should be fired.

Q. No, no. I understand that. I'm saying the reason why you specified that it was for cause as opposed to just saying we're going to fire him?

A. I --

MS. VRANIAN: Objection. He's already answered it and said that he listed the seven reasons why he should be fired.

MR. LEMLEY: I understand. I'm not asking why he thought he had cause. I'm asking why he felt the need to specify that it was for cause. He could fire the guy for any reason.

THE WITNESS: I -- I don't -- to get back to your -- the first question my attorney just objected to, I was using cause more in the context of we got to get him out of here. I don't believe I was looking at a stockholder's agreement or an operative agreement or anything and saying, I've

Page 35

got to put cause in here to do it.

Q. Okay.

A. We fired him because he needed to be fired.

Q. Do you recall that became an issue in the litigation about whether he was fired for cause because that had something to do with the triggering of the repurchase and how his repurchase obligations would be executed?

A. I don't recall that, no.

Q. All right. You can set that aside.

MR. LEMLEY: Can you give him Exhibit 10?

MS. VRANIAN: Um-hmm.

MR. LEMLEY: I'm trying to see if it's easier to use ones that were already marked. It may not end up being easier.

MS. VRANIAN: Here we go.

MR. LEMLEY: Eleven. I was going to give it to him.

BY MR. LEMLEY:

Q. So, I was just going to show you

Page 36

exhibit -- what we have previously marked as Exhibit 11, and that is the settlement agreement from the underlying lawsuit. And if you flip back to -- there's page 9 of 9. There's several of them. They're signature pages. Do you see your signature page?

A. Yes.

Q. Your signature is, I think, on the second one, May 24th, 2019?

A. Yes.

Q. Were you involved in negotiating the settlement?

A. You said 2019? It's '18.

Q. What did I say? '18, excuse me. You're right. May 24, 2018. Were you involved in negotiating the settlement of the lawsuit?

A. I was involved, yes.

Q. On page 2 of 9, at the bottom, it's talking about the releases by Mr. Buczkowski. It says, In consideration of the sum of $725,000 to be paid as provided in paragraph 6, do you know how

Page 37

the $725,000 number was determined?

A. It was a negotiation. Obviously, he started at a lot higher number, and we started at a lower number. And this is the number it took to put an end to it, and that's why we came up with that number.

Q. He referred to a valuation of the business, that he had done a valuation of the business, and it was negotiating from -- that was his original number. Is that your understanding of the basis for the $725,000, it was some valuation of his share of the business?

A. I'm -- I'm sure to make the argument for a higher number, he found somebody that would say that the company was valued more than or at a higher number than it was currently at the time, which -- but I can't tell why Bob would have started with that number.

I assume that's -- if you ask somebody to give you a valuation, I assume that's what you're using them for.

Page 38

Q. Okay. And this was just the number that you -- your side was able to negotiate it down to; is that right?
A. Yes, and --
Q. Okay.
A. Okay.
Q. Okay. You can set that aside.
MS. SCHAFFNER: Exhibit 5.
BY MR. LEMLEY:
Q. Let me show you what's --
MS. VRANIAN: I've got it.
MR. LEMLEY: You've got it. Okay. I was going to try to make it quicker.
BY MR. LEMLEY:
Q. So, you have just been handed what was previously marked as Exhibit 5 today. That is the stockholder's agreement made effective as of the 31st day of December 2007 for Madison Mechanical OS Corp. Do you recognize that?
A. Yes.
Q. And this is the stockholder's agreement

Page 39

that was in place throughout the entire time that Madison Mechanical OS Corp. and Madison Mechanical, Inc. were in business, correct?
A. That's my understanding.
Q. If you look at page 4 of the document, and it's the number that is at the bottom right-hand corner, 4088.
A. Yes.
Q. Subparagraph 4 A 1, it's talking about transfers by reason of termination of employment. Paragraph 1 says, Unless the stockholder is terminated for cause as provided in paragraph A 3, the offering stockholder shall transfer the offering stockholder's stock according to the provisions of Section 3 at the price and terms as set forth in paragraph A 4 below. Do you see that?
A. Yes.
Q. And then paragraph -- subparagraph 3 says, In the event that a stockholder has been terminated for cause, then the purchase price shall be the lesser of the formula for the purchase price

Page 40

as determined in Section 6 or the amount the offering stockholder paid for such shares. Do you see that?
A. Yes.
Q. So, this is what I was referring to earlier when I was saying, Do you recall whether these provisions had anything to do with the fact that you specified that his termination was for cause?
A. I don't have recollection of that.
Q. You don't recall that being an issue that was -- that being an issue in the lawsuit with Mr. Buczkowski?
A. It may have been. I just -- when I was -- when I wrote that letter, I don't remember looking at a stockholder's agreement. I was looking at somebody that needed to be removed from our building as soon as possible.
Q. You can set that aside.
MR. LEMLEY: Mark this one, please.
(Whereupon, Garofalo Deposition Exhibit 20, Hartford Insurance Policy, marked for identification.)

Page 41

BY MR. LEMLEY:
Q. So, paragraph -- excuse me. Exhibit 20 is one of the insurance policies from The Hartford, and this is the one that was in place from May 1st, 2015 to May 1st, 2016, and that information is on the second page of the document?
A. Yes.
Q. Do you recall if you've ever seen this document before?
A. If I had, I would have quickly forgotten it. I never look at something like this.
Q. Okay. So, I assume that if you look on the first page in the big capital letters under Declarations, the first sentence talks about the liability coverage parts.
The second sentence says, Except as otherwise specified herein, coverage applies only to a claim first made against the insureds during the policy period, and payment of defense costs

Page 42

reduce the limit of liability.
And the third sentence says, Notice of a claim must be given to the insurer as soon as practicable after a notice manager becomes aware of such claim.
Do you recall ever seeing that or being told that notice of the claim had to be given to the insurer?
A. I don't know if I did it based on looking at this, but typically, as I testified previously, if we had an insurance claim, we would hand it to our insurance agent.
Q. Did you ever have -- now, let's look at -- if you'll look at the top page 5 of 76.
A. Five of 76?
MS. VRANIAN: Up at the top.
THE WITNESS: Oh.
MS. VRANIAN: The next one.
THE WITNESS: Okay.
BY MR. LEMLEY:
Q. Where it says -- item 9 says, Address for

Page 43

notices to insurer, and it has the address for claims, other than kidnap and ransom, and then the other address for notices for -- for notices other than claims, and there's addresses for The Hartford, the claims department, and The Hartford product services; do you see that?
A. Yes.
Q. Did you ever know that notices to the insurer were supposed to be sent to The Hartford itself at these specific addresses?
A. I did not. And just, for the record, I would have never looked at this policy when it was given. This was not what I did.
Q. All right. Did you expect Mr. Franey to know what needed to be done with notices and to make sure that the notice went to the right place? Is that what you were expecting?
A. Yes.
Q. Okay. You can set that aside.
MR. LEMLEY: Twelve.
MS. VRANIAN: Twelve, got it.

Page 44

BY MR. LEMLEY:
Q. So, what's been marked as Exhibit 12, at the top of the first page, it's an email from you dated October 19th, 2011 to Mr. Haslam, Mr. Buczkowski, Mr. Lombardo, Mr. Kraemer. The subject is the consequences of failure to pay call, and it says, At our September 1st meeting in Madison's office, we discussed that since the current stockholder's agreement, SA, was silent on what would happen if a shareholder did not make their requested cash-call obligation, that I would look into some alternatives from which we could generate a policy that we would use to amend the SA. It says, Attached are some suggestions that Bill Davidow came up with that are pretty straightforward to help us out.
If you look at the attachment, there are a number of memoranda to you from Mr. Davidow, Davidow, various alternatives for how to address a scenario where someone fails to make their call; do you see that?

Page 45

A. Yes.
Q. These were your -- you were proposing these as possible ways to amend the shareholder's agreement so that it would address that scenario, correct?
A. Yes.
Q. Because the original stockholder's agreement was silent on that issue, correct?
A. Yes.
Q. And the shareholder's agreement, though, was never modified, correct?
A. No.
Q. So, it was -- it remained silent on what would happen when someone failed to make their call?
A. Yes.
Q. All right. You can set that aside.
MR. LEMLEY: Mark this one.
(Whereupon, Garofalo Deposition Exhibit 21, Email dated March 6, 2015, marked for identification.)

Page 46

BY MR. LEMLEY:

Q. Exhibit 21 is from you dated March 6th, 2015 to Mr. Haslam, Mr. Lombardo, Mr. Kraemer, with a copy to Mr. Franey, and the subject is Madison equity. It was a spreadsheet, apparently.

It says, All of this makes no sense. We have loans made by shareholders -- by these shareholders, and separately we have capital call requested and made by the shareholders. These are entirely two different financial transactions.

The capital call should be treated as outlined in the stockholder's and operating agreements, and the loan should be treated as described in the loan documents.

Do you know, was there a separate operating agreement separate from the stockholder's agreement?

A. I thought there were both. I believe so. I might be mistaken, but I don't know why I would have referenced it, but I'm not sure on that.

Q. In the second paragraph, he's talking

Page 47

about using logic shown on the spreadsheet, that Dick and I now own 15.22 percent and 17.69 percent respectively, or does it change back to our original ownership percents when Bob decides to make his outstanding capital-call obligations? The answer is, You can't mix the two transactions together.

There was -- the bottom line here is -- and you can read as much of it as you want -- there was just no clear answer with respect to what would happen as a result of Mr. Buczkowski in this case not making his full capital call at the time, correct?

A. Rephrase that.

Q. There was just no clear answer in the shareholder's agreement as it existed in March of 2015 with respect to what would happen when Mr. Buczkowski didn't make his full capital contribution -- didn't make his full capital call?

MS. VRANIAN: You mean just with respect to the shareholder agreement?

Page 48

MR. LEMLEY: I guess.

THE WITNESS: Yeah, I believe what happened -- and it's pretty hard to recall stuff that happened five years ago, but this -- putting the two transactions together didn't make sense. We went back to the capital is capital, and a loan is a loan.

I think at some point, we were advised that if it remained silent in the agreement, the stockholder's agreement, that it would be treated the way we actually ended up treating it, as a dilution.

BY MR. LEMLEY:

Q. And how did you -- when did you come to that conclusion?

A. I don't know the date that I came for it, but it sounds like just from reading this one memo, which is hard to get context -- before -- before I read this memo, it sounded like we knew what to do, but I'm just not sure on that date.

Q. Okay.

Page 49

MR. LEMLEY: This is Number 22.

(Whereupon, Garofalo Deposition Exhibit 22, Email dated April 9, 2016, marked for identification.)

BY MR. LEMLEY:

Q. So, Number 22 is an email from you dated Saturday, April 9th, 2016 to Dick Lombardo, Larry Kraemer, and Glenn Haslam regarding MM loans and capital calls.

It says, Because Bob did not put in his share of the capital calls, we have recharacterized a portion of the capital we put in to loans to MM. Bob put $143,000 in as capital. So, based on his 13-percent ownership, the total capital call was $1.1 million. Accordingly, the capital contributions for each of your 10 percent ownerships were reduced to $110,000. Based on only owing $110,000 in capital, both of you had $108,160 recharacterized from capital to loans.

The worksheet attached shows that Dick and Larry now have loan amounts before interest due

Page 50

for Madison Mechanical at $358,169 and $183,160 respectively.

And if you look at the attached chart, it reflects Mr. Buczkowski owning 13 percent, and on the second page, it shows the capital call made by the shareholders after the conversion, the capital call percent paid after the conversion, and it still shows Mr. Garofalo -- excuse me, Mr. Buczkowski and Mr. Garofalo at 13 percent.

So, this, as I understand this, as of April 9th, 2016, Mr. Buczkowski's share of ownership had not been diluted, and what had happened was everybody else's capital contributions had been adjusted and, to the extent necessary, converted to loans, such that Mr. Buczkowski's capital call was funded at 13 percent; is that correct?

A. We -- that's exactly what this email said. We never -- we never implemented this. We didn't recharacterize some of the capital calls as loans to the people that -- that made the capital

Page 51

calls.

It was discussed. I don't remember how it was discussed. We had not filed the tax return for 2015 yet, and -- but by the time we got around to filing the return, the proper ownership for Bob was done on the tax return.

Q. Do you remember, have any sense of when it was that you filed the tax return for 2015?

A. It was after this date. I certainly couldn't tell you, but he was -- Bob was diluted I believe in April of '15, and then at the end of '15, he was diluted down to zero.

Q. You said he was diluted in April of '15. This is April of 2016, and he hasn't been diluted.

A. Well, that's actually right, because the tax return had not been filed. I mean, by looking at this and saying it's 2016, you must have filed your '15 return, I don't know when we filed our '15 return, but it was after this. Because I know what the percentages were on the 2015 return that we did.

Page 52

Do I have the day that we decided this? I have no idea. Typically, what we would do is we have got three other partners. We sat down, discussed it, and, obviously, we did not implement this. We -- we separated capital as capital and loans as loans, and the tax returns reflect Bob's dilution and then his ultimate dilution to zero by the end of 2015.

Q. Okay. So, some time after this, the tax returns were filed reflecting that Bob was diluted effective as of April of 2015; is that correct?

A. Yes, and then down to zero as of -- I think they probably had to prorate the income or the loss, because he was a certain percent from January 1st of '15 to whenever it happened in April, and then that was at 1 percent. And then the other one they prorated down to zero percent for the last eight months or whatever it was.

Q. But when April 9th, 2016 had actually rolled around, none of that had happened yet, correct?

Page 53

A. True.

Q. Did anybody, Mr. Lombardo, Mr. Kraemer, did they ever actually get these -- these amounts that were -- that says here were recharacterized from capital loans, did they ever get those repaid to them, the loans repaid?

A. Well, no, not these amounts, and we -- of the 250,000 that Mr. Haslam, Lombardo, myself put in, we have not been paid in full, and then Mr. Kraemer lent Madison less money than us, but he hasn't been repaid either. Mr. Buczkowski got paid in full, plus interest, plus legal fees.

MR. LEMLEY: Can you give him Exhibit 9?

BY MR. LEMLEY:

Q. Exhibit 9 is a Madison Mechanical OS Corp. consent of sole director dated September 15th, 2016, and it's signed by Mr. Haslam. Are you familiar with this document?

A. I didn't sign it, but I'm sure at some point I saw it. But right now, I have no recall of it, but it doesn't mean I didn't sign it or didn't

Page 54

know of it.

Q. So, the second Whereas clause says, The sole director of Madison Mechanical OS Corp. desires to take the actions hereinafter set forth. And then if you look down four Whereas clauses, it says, Whereas, the corporation wishes to issue additional shares of its common stock to reflect the aggregate capital contributions made by the stockholders, and then at the bottom of that page it says, Now, therefore, the undersigned, being the sole director of the corporation, does hereby declare that the actions expressed in the following resolutions shall be and are hereby taken by the director of the corporation as of the date first herein above written, which is September 15th, 2016.

On the next page under Resolved it says that, The corporation's -- effective April 1st, 2015, the corporation's stock certificates number 1 through 6 are hereby voided and that the corporation stock certificates number 7 through 11

Page 55

be issued to reflect the aggregate capital contributions set forth above, and the resulting shares of stock owned by the stockholder is calculated based on a consistent per share value of the corporation from March 1st, 2014 through March 31st, 2015, all such certificates to be dated as of April 1st, 2015. And here it shows Mr. Buczkowski diluted to 7.006 percent; do you see that?

A. Yes.

Q. So, on September 15th, 2016, is an action diluting Mr. Buczkowski to 7 point something percent effective April 1st, 2015? Is that the way you understand this?

A. Yes.

Q. Okay. Are you aware of anything, any action, any document before September 15th, 2016 that diluted Mr. Buczkowski's ownership to anything below 10 percent?

A. I don't recall any, seeing any.

MR. LEMLEY: I have no further questions.

MS. VRANIAN: I have one quick one. Give

Page 56

me a second. I have to go back through your exhibits.

EXAMINATION

BY MS. VRANIAN:

Q. Okay. You just testified that you haven't -- you don't recall any other document that you've seen where Mr. Buczkowski was diluted below 10 percent.

I just want you to look at what's been marked as Exhibit 13, which is dated -- it's an email from Mr. Haslam dated March 6th of 2015.

A. Okay. I almost corrected myself when I said it. When you said document, I was looking at a legal document. I meant it in the context of that legal document. I -- I -- I testified to this, so I'm obviously aware of this.

Q. Right. And does this document show that -- on the second page of it, it's a Madison equity balances. Does it show Mr. Buczkowski's failure to contribute his equitable share in capital, and he's, therefore -- and his percentage

Page 57

of capital funded is less than the 10 percent?

MR. LEMLEY: Object to the form.

BY MS. VRANIAN:

Q. You can answer.

A. Yes, it does. I answered what I thought was a -- more of a corporate document since I was looking at a document.

MR. LEMLEY: I have one question.

REEXAMINATION

BY MR. LEMLEY:

Q. Are you aware of any authority in the shareholder's agreement or anywhere else for the proposition that the percentage of capital funded, that this chart showing a percentage of capital funded has the effect of actually diluting Mr. Buczkowski's ownership?

MS. VRANIAN: I'm just going to object to the foundation, but you can answer.

THE WITNESS: Ask it again.

BY MR. LEMLEY:

Q. Are you aware of any authority for the

proposition that this reflection of a percentage of capital funded has the effect of actually diluting Mr. Buczkowski's ownership?

A. I was under the understanding that in the absence of having it in a stockholder's agreement that that was the way to do it, the way to do it.

Q. Do you have -- do you know what percentage ownership he had then or would have had if this had that effect?

A. Can I look at that, please?

Q. Yes. Oh, yeah.

MS. VRANIAN: I've got it.

MR. LEMLEY: He can use mine. I don't care.

THE WITNESS: Excuse me. What are you asking again?

BY MR. LEMLEY:

Q. What would his percentage ownership be? That's his percentage of capital funded, but that's only the percentage of the capital calls funded?

A. I think when you divide it by the

2,041,000, I think that's the 7 percent we're talking about. I think when you threw in the loans, it's still under 10 percent. I don't --

Q. Do you have any idea where you got this understanding from that you said you had an understanding?

A. I believe it was from our attorneys, who I believe you just asked me to fire.

MR. LEMLEY: I only said you could.

THE WITNESS: Okay.

MR. LEMLEY: That's it. Thank you.

MS. VRANIAN: We'll read and sign.

MR. LEMLEY: Okay.

(Whereupon, the deposition of Gary Garofalo was concluded at 2:26 p.m., and the reading and signing of the transcript was not waived.)

Madison Mechanical, Inc., et al. v.
Twin City Fire Ins.
Gary Garofalo

INSTRUCTIONS TO THE WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, what will be attached to the deposition.

It is imperative that you return the original errata sheet to the deposing attorney thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Job #3489183

Madison Mechanical, Inc., et al. v.
Twin City Fire Ins., et al.
Gary Garofalo

ERRATA

PAGE LINE CHANGE
--- --- --------------------------
Reason:____________________________
--- --- --------------------------
Reason:____________________________
--- --- --------------------------
Reason:____________________________
--- --- --------------------------
Reason:____________________________
--- --- --------------------------
Reason:____________________________
--- --- --------------------------
Reason:____________________________
--- --- --------------------------
Reason:____________________________
--- --- --------------------------
Reason:____________________________

Job #3489183

Page 62

Madison Mechanical, Inc., et al. v.
Twin City Fire Ins., et al.

Gary Garofalo

ACKNOWLEDGMENT OF DEPONENT

I, GARY GAROFALO, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached errata sheet.

________________ ________________

Date Signature

Job #3489183

Page 63

State of Maryland
County of Baltimore, to wit:

I, Michele D. Lambie, a Notary Public of the State of Maryland, County of Baltimore, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor related to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand this 27th day of August, 2019.

Michele D. Lambie

Michele D. Lambie

My Commission Expires: April 29, 2020