

EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MADISION MECHANICAL, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE HARTFORD FINANCIAL SERVICES, et al., <br><br> Defendants. | Civil Action No.: 1:17-cv-01357-GLR |

### PLAINTIFFS', MADISON MECHANICAL, INC., MADISON MECHANICAL OS CORP., MADISON MECHANICAL CONTRACTING, LLC, GLENN A. HASLAM, GARY J. GAROFALO, RICHARD ARNOLD, LAWRENCE P. KRAEMER, AND RICHARD M. LOMBARDO, DISCLOSURE OF EXPERT TESTIMONY

Pursuant to Federal Rule 26(a)(2) and the Scheduling Order entered in this matter, Plaintiffs, Madison Mechanical, Inc. ("MMI"), Madison Mechanical OS Corp. ("OS Corp"), Madison Mechanical Contracting, LLC ("MMCLLC"), Glenn A. Haslam, Gary J. Garofalo, Richard Arnold, Lawrence P. Kraemer, and Richard M. Lombardo, hereby disclose the following expert witnesses who may be called to testify at the time of trial:

1. **James Marshall, Jr., J.D., CPCU, ARM**
   President and Senior Consultant
   Siver Insurance Consultants
   801 94th Avenue North Suite 202
   St. Petersburg, Florida 33702-2479

Mr. Marshall is an insurance expert with more than 50 years of experience in this industry. A copy of his *Curriculum Vitae* is attached as Exhibit A to his report and the report provides an in depth summary of his education, training, and experience in the field of insurance. Mr. Marshall will offer expert opinions to a reasonable degree of probability on the policies at issue in this case,

the applicability of insurance industry customs and practices with respect to how notices of circumstances operate and the transmittal notices of circumstances to the insurer.   The opinions Mr. Marshall holds in this case relate to the matters pending before this Court but do not exclude any opinions he may hold with respect to *Madison Mechanical OS Corp., et al. v. Twin City Fire Insurance Co., et al.*, Case No. CAL 18-27026, currently pending in the Circuit Court for Prince George's County.   Mr. Marshall is also expected to testify as an expert in the case currently pending in the Circuit Court for Prince George's County and may have opinions in addition to those expressed in this case.   Specifically, with respect to the issues in the case *sub judice*, Mr. Marshall is expected to testify to the following:

A.   Alliant received a Notice of Circumstances in November of 2015 as the letter from Mr. Buczkowski's attorney was sent to Mr. William Franey.

B.   Alliant had the authority to accept this Notice of Circumstance.

C.   Alliant was obligated to inform Twin City of the Notice of Circumstance as soon as practicable.

D.   That Twin City/the Hartford understood that the receipt of claims against policies placed by the agent (Mr. Franey) was a part of the customary services of the agent.

E.   Mr. Franey and his agency had not only the authority but also the duty to accept this Notice of Circumstance on behalf of the insurer.

F.   Consequently, the Twin City Policy was triggered on November 20, 2015 when Mr. Franey received the November 11, 2015 letter from Mr. Buczkowski's attorney.

Mr. Marshall is qualified to render opinions in this case as he is an insurance professional with significant experience in the drafting, underwriting, rating, placement, analysis of, and claims handling of liability insurance policies such as the policy at issue in this case.   Mr. Marshall has

been with Siver Insurance Consultants since 1974 where he advises clients about their rights and obligations after a loss as well as a variety of other insurance issues. In short, Mr. Marshall has extensive education, training, and experience in evaluating policies of the same or similar type to the one at issue and offering opinions as to the rights and obligations of the parties after a loss.

Mr. Marshall's written report providing a summary statement of his opinions and the bases and reasons for them, as well as a listing of all documents reviewed, is attached as **Exhibit 1**. That report is incorporated by reference as if fully set forth herein. Additionally, this designation represents a broad summary of the opinions of Mr. Marshall. He reserves the right to modify, amend and/or supplement his opinions as further information about the case is made available to him. Plaintiffs will produce Mr. Marshall for deposition at a mutually convenient time.

2. Plaintiffs reserve the right to call any expert witness identified by any other party to this litigation.

3. Plaintiffs reserve the right to supplement this designation if additional information is received, after the depositions of fact and/or expert witnesses, and if the Defendant asserts defenses not specifically set forth at this point in discovery.

Respectfully submitted,

*Danielle M. Vranian*

Gary R. Jones (Fed. Bar No. 06402)
Danielle M. Vranian (Fed. Bar No. 29734)
Baxter, Baker, Sidle, Conn & Jones, P.A.
120 East Baltimore Street, Suite 2100
Baltimore, Maryland 21202
(410) 230-3800 (voice)
(410) 230-3801 (facsimile)
***Attorneys for Plaintiffs***

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this <u>14th</u> day of May 2019 a copy of Plaintiffs, Madison

Mechanical, Inc., Madison Mechanical OS Corp., Madison Mechanical Contracting, LLC, Glenn

A. Haslam, Gary J. Garofalo, Richard Arnold, Lawrence P. Kraemer, and Richard M. Lombardo,

Disclosure of Expert Testimony was emailed to:

Timothy F. Maloney, Esquire
Joseph M. Creed, Esquire
Alyse L. Prawde, Esquire
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
***Counsel for Defendant Robert Buczkowski***

Charles C. Lemley, Esquire
Nicole Richardson
Wiley Rein LLP
1776 K. Street, NW
Washington, D.C. 20006
***Counsel for Defendant Twin City Fire Insurance Co.***

Danielle M. Vranian (Fed. Bar No. 29734)

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MADISION MECHANICAL, INC., et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>THE TWIN CITY FINANCIAL SERVICES, et al.,<br><br>                              Defendants. | Civil Action No.: 1:17-cv-01357-GLR |

## EXPERT REPORT OF JAMES MARSHALL JR

The following report with respect to my opinions on insurance customs and practices, as such customs and practices relate to some of the issues in the above captioned matter ("this Coverage Litigation"), is furnished pursuant to Federal Rule of Civil Procedure 26(a)(2).

## PART I
## VITA & COMPENSATION

1.      My name is James Marshall, Jr., and I reside at 2672 66th Way North, St. Petersburg, Florida 33710.  I am a graduate of the University of Florida (Bachelor of Arts with honors - December 1964).  I am also a graduate of Stetson College of Law (Juris Doctorate, Magna Cum Laude and valedictorian - January 1977).  In addition, I hold the Chartered Property & Casualty Underwriter (CPCU) designation from the American Institute for Property & Liability Underwriters, Inc., and the Associate in Risk Management (ARM) designation from the Insurance Institute of America.

2.      My professional memberships include membership in the Society of Chartered Property & Casualty Underwriters, the Society of Risk Management Consultants, the Florida Bar, and the American Bar Association. I have previously served as the President, President-

Elect, Secretary, member of the Board of Directors, and Chair of the Legal Committee of the Society of Risk Management Consultants. I am a member of the Section of Tort Trial and Insurance Practice of the American Bar Association. As an underwriter in the early stage of my insurance career, I belonged to, and served as the President of, the Tampa Bay Underwriters Association.

3.      I began my insurance career in September 1965 and have been continually engaged in the insurance profession for 53 years. Prior to 1974, my experience included almost six years' experience as a Property & Casualty underwriter for major insurance companies (Sentry Insurance, Royal Globe, and Amerisure) and three years' experience as an agent/broker for a national insurance broker (now a part of Aon Group).

4.      I have been employed with Siver Insurance Consultants (hereinafter "Siver") since 1974. I am currently the President of, and a Senior Consultant with, Siver. Siver is in the principal business of providing objective and impartial advice to insurance buyers, typically governments and business organizations, but also has an active litigation support practice. I have been qualified as an expert witness on insurance issues in a number of courts, including courts in California, Florida, Iowa, Michigan, Minnesota, Missouri, and New Jersey.

5.      Throughout my career, I have been actively involved in continuing education, both as a participant and as a presenter. I have taught insurance classes, including classes for the CPCU and the Associate in Claims (AIC) designations.

6.      During most of my professional involvement in the insurance business, I have been actively involved in matters relating to the marketing, underwriting, rating, placement, analysis of, and claims reporting and handling with respect to, liability insurance policies. A substantial amount of my practice as a consultant at Siver has consisted of assisting clients in the

placement and analysis of insurance with respect to insurance coverages and the resulting rights and obligations of the parties after a loss occurs. I am frequently called upon by our consulting clients, counsel for our clients, and other counsel to provide advice on insurance issues, including especially where there has been a loss, or there might be a coverage issue.

7.      In my reading and study of the insurance industry, I have also reviewed insurance industry materials including underwriting and claims manuals, drafting history, textbooks, loss prevention and inspection reports, proposals, periodicals, and articles. In connection with previous matters in my litigation support practice, I have also reviewed numerous other insurance industry documents and testimony by insurance industry representatives (including underwriters, claims, and loss prevention personnel) with respect to insurance industry practices.

8.      During my career, I have reviewed and analyzed thousands of primary and excess liability insurance policies, which have certainly included more than a thousand claims-made polices such as the policies at issue in this Coverage Litigation. Since 1974, a substantial amount of my practice as a consultant at Siver has consisted of assisting clients in the placement and renewal of insurance coverage, including "claims-made" coverage such as the insurance coverage at issue in this Coverage Litigation. As a part of these activities, I have frequently assisted and advised clients with respect to "notices of circumstances" and similar provisions.

9.      I have been a guest speaker and lecturer on numerous occasions for various trade and legal organizations on various insurance issues including specifically, liability insurance, and have been qualified, and have testified on numerous occasions, as an expert witness with respect to industry customs and practices relating to liability insurance policies. Although I do not have an exact count, I believe I have testified in trial more than 15 times, including in courts in

California, Florida, Iowa, Michigan, Minnesota, Missouri, and New Jersey, and by deposition, more than 45 times.

10.     Attached to this report is my curriculum vitae as Exhibit A, and a listing of cases in which I have testified as an expert at trial or by deposition since 2013 as Exhibit B.  I have not authored any publications in the last ten years.  Our firm (Siver) is being compensated at the rate of $450.00 per hour for my time with lesser rates applicable to those assisting me.

## PART II
## BASIS, AND SUBJECTS, OF MY OPINIONS

*Basis of My Opinions*

11.     The opinions which I offer in this report are predicated on the customs and practices of the insurance industry.  For the purposes of brevity, I will not necessarily repeat this predicate each time I offer an opinion.

12.     My opinions, as expressed in this report, are based on my education, training, experience, extensive reading, and 53 years in the insurance industry as previously described.  In addition, for the purpose of becoming familiar with the factual background of this Coverage Litigation, I (or others at my firm at my direction) have reviewed and considered documents provided to me by counsel for Madison Mechanical, Inc. ("MMI"), the law firm of Baxter, Baker, Sidle, Conn & Jones, PA ("MMI's counsel").  A list of the documents provided to me by MMI's counsel which I reviewed in connection with this report is attached as Exhibit C.

*Subjects of My Opinions*

13.     In general, I have been asked by MMI's counsel to set forth my opinions about the applicability of insurance industry customs and practices with respect to "notice of circumstances" or similar provisions, often referred to as "notice of potential claims," in the context of claims-made policies.  More specifically, I have been asked to express my opinions

with respect to insurance industry customs and practices in connection with the "notice of circumstances" provision in Twin City Fire Insurance Company Policy 42 KB 0256935-15 ("the 2015 Twin City Policy"). I have also been asked to express my opinion about the customs and practices with respect to the providing of notice of such notices of circumstances, or claims, to agents or brokers[1] of the insurers, in general, and in particular, to Alliant Insurance Services, Inc. ("Alliant"), in the context of this Coverage Litigation.

*My Meaning of*
*Customs and Practices of Insurance Industry*

14.     I am often asked what I mean by "customs and practices of the insurance industry." By customs and practices of the insurance industry, I mean the usual ways that things have previously been done in the industry, which have resulted in expectations that, absent some specific law or contract to the contrary, will continue to be done in the same way.

15.     My opinions are based on the customs and practices of the insurance industry and not the law of a particular jurisdiction. However, in large measure, there is a close and ever evolving relationship between the customs and practices and the law. In some instances, the law develops grounded on existing customs and practices. In other instances, customs and practices change to comport with changes in the law.

16.     Except as otherwise stated, when I offer my opinions in this report, my opinions are with respect to the applicable insurance industry customs and practices. For the purposes of brevity, I will not necessarily repeat this predicate each time I offer an opinion.

---

[1]  In some instances, the extent to which the receipt of the notice will be imputed to the insurer will depend on whether the recipient of the notice is an agent. In this Coverage Litigation, as I will subsequently discuss, Alliant Insurance Services is an agent of the insurer Twin City Fire Insurance Company.

## PART III
## NOTICE OF CIRCUMSTANCES

### III.A
### WHAT IS CLAIMS-MADE INSURANCE

*Trigger*

17.    Insurance policies are written for a specified period of coverage. In order for a particular policy to respond to a claim (i.e., for the coverage to be triggered), something must happen during the period of coverage of that policy. This "something" which must happen during the period of coverage is typically referred to in the insurance industry as "the trigger" of coverage.

*Occurrence v. Claims-Made*

18.    Since 1966, most liability policies written in the United States have been written with either, what is referred to as an "occurrence," or "claims-made" trigger. In general, under an occurrence policy, for the policy to apply (i.e., be triggered), the injury or wrongful act must occur during the policy period, while notice can be given at a later time. In general, under a claims-made policy, in order for the policy to apply (i.e., be triggered), the claim must be asserted by the injured party against the insured during the policy period, or, as I will address, be deemed to have been asserted during the policy period.

### III.B
### NOTICES OF CIRCUMSTANCES

19.    Because insurance policies are written for a specified period of coverage, the policies are designed to avoid gaps in coverage which would otherwise occur when policies are renewed or replaced. Under the 2015 Twin City Policy (and typical claims-made policies), coverage does not apply with respect to claims where, prior to the policy period, the policyholder

or other insured[2] was aware of circumstances that had occurred which would likely result in a claim. The lack of coverage in subsequent policy periods is typically either the result of a specific exclusion in the subsequent policy period, or an action for rescission based on a failure to disclose the possibility of such a claim on an application.

20.     Because subsequent insurance policies would not typically cover such claims, in order to avoid gaps in the insurance coverage (and sometimes as the result of regulatory requirements), most claims-made policies include provisions which are intended to avoid such gaps. These provisions prevent an insurer from collecting premiums and then, when the insurer became aware that circumstances had occurred which indicated that there was a likelihood of a claim, cancelling or non-renewing the policy, or excluding coverage for claims arising out of such circumstances, before the claim was actually made (asserted) against the policyholder.

21.     One type of provision designed to protect against such coverage gaps is typically referred to as a "notice of circumstances" or a "notice of potential claims" provision. This type of provision provides that for the purposes of the trigger of coverage, if a policyholder becomes aware of circumstances in the policy period that might subsequently result in a claim, and the policyholder reports such circumstances to the insurer during the policy period, if the claim is subsequently made, the claim will be deemed to have been first made during the policy period in which the policyholder reported the circumstances to the insurer.

22.     Under insurance customs and practices, one of the main reasons insurers include notice of circumstances provisions in their claims-made policies is to provide an insurer with the opportunity to make whatever investigation, if any, is appropriate of the circumstances which

---

[2]  In the interest of brevity, unless the context indicates to the contrary, when I refer to "policyholder," I will be referring to the policyholder as the insured, and to other insureds under the policy.

might result in a claim, for the purposes of defending, or mitigating the amount of, any future claim.

23.     Although the notice of circumstances would prevent the insurer from denying claims which result from such circumstances, the notice of circumstances does allow the insurer to make premium or coverage adjustments for unrelated claims in the future policies.   In addition, the notice of circumstances allows the insurer to determine whether loss reserves might be appropriate, and if other claims arise out of the same or related circumstances, to limit all of the claims resulting from such circumstances to the limit of coverage available in the year when the notice of circumstances was first provided to the insurer.

III.C
TWIN CITY POLICY
<u>NOTICE OF CIRCUMSTANCES PROVISION</u>

*A Claims-Made Policy*

24.     The 2015 Twin City Policy is a claims-made policy.   The Policy Period of the 2015 Twin City Policy is May 1, 2015 to May 1, 2016.  Section VIII, Notice of Claim (B), ("the Notice of Circumstances") is the "notice of circumstances" provision in the 2015 Twin City Policy.  The Notice of Circumstances in the 2015 Twin City Policy provides that:

> If, during the Policy Period, the Insureds become aware of a Wrongful Act that may reasonably be expected to give rise to a Claim, and, if written notice of such Wrongful Act is given to the Insurer during the Policy Period, including the reasons for anticipating such a Claim, the nature and date of the Wrongful Act, the identity of the Insureds allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the Insureds first became aware of the Wrongful Act, then any Claim subsequently arising from such Wrongful Act shall be deemed to be a Claim first made during the Policy Period on the date that the Insurer receives the above notice.

III.D
### THE NOVEMBER 11, 2015 LETTER

*Addressed in Earlier Stage of this Coverage Litigation*

25.     On November 11, 2015, the attorney for Robert Buczkowski wrote a letter to Glenn A. Haslam, Gary J. Garofalo, Richard Arnold, Lawrence P. Kraemer, and Richard M. Lombardo ("the November 11, 2015 Letter"), a copy of which is attached as Exhibit D.  The November 11, 2015 Letter was thoroughly addressed in, and formed, in part, the basis of the March 30, 2018 order by Judge George L. Russell ("the Order") in an earlier stage of this Coverage Litigation. *Madison Mechanical, Inc. v. Twin City Insurance Co.*, No. 1:17-cv-01357-GLR, 2018 WL 1583519 (D. Md. Mar. 30, 2018)

26.     In the earlier phase of this Coverage Litigation, an issue was whether the coverage in the renewal of the 2015 Twin City Policy ("the 2016 Twin City Policy") would apply because of a Prior Knowledge Exclusion which "precludes coverage for 'any claim based upon, arising from, or in any way relating to… [an] act… or other matter of which there was knowledge or information' at the time" the application for the 2016 Twin City Policy was submitted to Twin City.

27.     In the Order, Judge Russell held, in part, that the November 11, 2015 Letter "certainly falls under the scope of 'other matter that may give rise or could have given rise to a claim,'" and, "[t]here is also no dispute of material fact that the Underlying Action arises from or relates to" the November 11, 2015 Letter.

28.     Although expressed differently, in my opinion, the undisputed facts cited by Judge Russell in the Order, and the Order itself, are clearly recognitions, about which I agree, that when the insureds received the November 11, 2015 Letter, the insureds had "become aware of a Wrongful Act that may reasonably be expected to give rise to a Claim."

*2015 Twin City Policy Triggered*
*If the November 11, 2015 Letter Was Provided During the Policy*

29.     Under the Notice of Circumstances provision in the 2015 Twin City Policy, "if written notice of such Wrongful Act is given to the Insurer during the Policy Period, ... any Claim subsequently arising from such Wrongful Act shall be deemed to be a Claim first made during the Policy Period on the date that the Insurer receives the above notice."

30.     In short, if the November 11, 2015 Letter was provided to Twin City during the 2015 Twin City Policy, the 2015 Twin City Policy was triggered, and the policy would be applicable to the Claim which is the subject of this Coverage Litigation.

31.     Interestingly, in the earlier phase of this Coverage Litigation, Twin City took the position that the November 11, 2015 Letter was a claim made under the 2015 Twin City Policy and reported under the 2016 Twin City Policy.  In the Order, Judge Russell noted that the "Court expresses no opinion on this issue."

## PART IV
## WHEN DID TWIN CITY RECEIVE NOTICE

### IV.A
### APPLICABLE CUSTOMS AND PRACTICES

*In General*

32.     Insurers recognize that there is a pervasive custom and practice of the insurance industry for commercial policyholders to provide notices of claims or similar notices[3] to their agents or brokers with the expectation that the agent or broker would review the notice, make

---

[3] In the interest of brevity, unless the context indicates to the contrary, when I refer to "claim," I will be referring to similar provisions such as "notice of circumstance" provision in a claims-made policy, or a notice of an occurrence in an occurrence type policy.

any appropriate changes[4], and then promptly forward the claim or notice to the appropriate address for the insurer or insurers.  This is especially the case where the agent or broker is perceived by the policyholder as having a greater level of expertise than that of the policyholder or, there is a "special relationship"[5] with agent or broker.

33.      Insurers recognize that this custom and practice applies even when the policy provides a specific insurer address to which the claim shall be provided.  Even in those instances where, because of a frequency of similar claims, there is a practice for policyholders to report directly to the insurers, policyholders will provide notices of claims to their agents or brokers for other claims, especially those which involve complex insurance policies, such as the 2015 Twin City Policy.

34.      Insurers recognize the pervasiveness of this practice of providing notice to the agents or brokers.  As a result, in their agreements with their agents, insurers often specifically will authorize the agent to receive notice on behalf of the insurer.  Even if not specifically authorized, insurers routinely, and as a matter of course, receive notices from their agents without reproach.

35.      Brokers are a major source of income for insurers, especially with respect to commercial policyholders, and even more so, with respect to large commercial policyholders. Even in the absence of a contractual relationship, insurers routinely, and as a matter of course, will receive notices from policyholders' brokers without reproach.  In fact, it is not uncommon

---

[4]  In many instances the original notice to the agent would be a telephone call or email from the policyholder.  One of the typical changes would be to use industry claim forms such as Acord forms.  The agent would typically provide the insurance policy or policies with potential coverage and provide available additional information.

[5]  As I will subsequently discuss in Part IV.C of this report, although not yet specifically adopted by all jurisdictions, many, and a growing number of jurisdictions, recognize that if there is a special relationship with the policyholder, including as a result of professed expertise by the agent or broker, the duties of an agent or broker to the policyholder are enhanced.

for the broker to be specifically designated in an insurance policy as the intended recipient of such notices.

IV.B
TWIN CITY POLICY
NOTICE PROVISIONS

*The Provisions*

36.     Section VIII. Notice of Claim of the 2015 Twin City Policy provides that:

Solely with respect to all Liability Coverage Parts:

(A)     As a condition precedent to coverage under this Policy, the Insureds shall give the Insurer written notice of any Claim as soon as practicable after a Notice Manager becomes aware of such Claim, but in no event later than sixty (60) calendar days after the termination of the Policy Period, or any Extended Reporting Period as described in Section IX. Such notice shall specify the Coverage Part under which notice is being given.

(B)     If, during the Policy Period, the Insureds become aware of a Wrongful Act that may reasonably be expected to give rise to a Claim, and, if written notice of such Wrongful Act is given to the Insurer during the Policy Period, including the reasons for anticipating such a Claim, the nature and date of the Wrongful Act, the identity of the Insureds allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the Insureds first became aware of the Wrongful Act, then any Claim subsequently arising from such Wrongful Act shall be deemed to be a Claim first made during the Policy Period on the date that the Insurer receives the above notice.
[Underling added for emphasis.]

37.     In an "Amend Mailing Address for Notice Endorsement," the 2015 Twin City Policy, provides that a notice "of any Claim or Wrongful Act shall be given in writing to" specified mail, email, and facsimile addresses.   A copy of the endorsement is attached as Exhibit E.

*Some Relevant Observations About the Provisions*

38.    In my opinion, under the customs and practices of the insurance industry, the following are among the relevant facts which would be considered when analyzing whether a notice provided by a policyholder has complied with these provisions.

39.    Under Section VIII(A), the notice of a Claim in the manner described in Section VIII(A) is a "condition precedent" to coverage.   There is no such condition precedent requirement, or any other impact on coverage specified, with respect to coverage for the notice of a Wrongful Act in Section VIII(B).

40.    Section VIII(A) with respect to notice of a Claim, requires that the Insured give the Insurer the notice "as soon as practicable." Section VIII(B) only requires that the notice of a Wrongful Act be given to the Insurer "during the Policy Period."

41.    Section VIII(A) with respect to notice of a Claim, requires that the Insured "give the Insurer" the notice. Section VIII(B) requires that the notice of a Wrongful Act be "given to the Insurer." Neither Section VIII(A), nor Section VIII(B), specifically require, that the notices the given to a specific mailing address, email address, or facsimile number.

42.    Under Section VIII(B), if the notice of the Wrongful Act is made during the Policy Period "then any Claim subsequently arising from such Wrongful Acts shall be deemed to be a Claim first made during the Policy Period on the date that the insurer receives the above notice." There is no requirement in the policy that the Claim subsequently arising arise within a particular time period.

43.    Although Twin City probably would be able to successfully defend a Claim subsequently arising on the basis of a statute of limitations or repose, presumably Twin City would have an obligation to defend the Claim even after the tolling of the statute of limitations or

repose.  Mailing addresses, email addresses, and facsimile numbers are subject to change over time and could occur both before the tolling, or after the tolling of the statute of limitations or repose.

44.     Unless Section VIII(B) is interpreted to allow flexibility with regard to where, or to whom, the notice of a Wrongful Act can the made, policyholders would lose coverage simply because Twin City changed its mailing address, email address, or facsimile number.

45.     In my opinion, under the customs and practices of the insurance industry, because of:

(a)     the lack of a condition precedent requirement, or any other impact on coverage specified, in Section VIII(B);

(b)     the lack of as "as soon as practicable" requirement in Section VIII(B);

(c)     the fact that neither Section VIII(A), nor Section VIII(B), specifically require, that the notices the given to a specific mailing address, email address, or facsimile number; and

(d)     that policyholders would lose coverage were Twin City to change its mailing address, email address, and facsimile number,

it is a reasonable interpretation that the providing of the notice of a Wrongful Act to an agent of Twin City, would not result in automatic forfeiture of the coverage.  Rather, it is a reasonable interpretation that the entire circumstances of the notice would be considered.

*Twin City Policy Is Decidedly Complex*

46.     As I have previously observed, the practice of policyholders providing notices of claims to their agents or brokers, is especially the case when the notice involves complex insurance policies.  The 2015 Twin City Policy is decidedly complex.

Page 14 of 24

47.     The 2015 Twin City Policy is a Hartford "Private Choice Encore!! Policy" ("Private Policy").     The Private Policy issued to Twin City is a 73-page policy which consists of the base Private Choice Encore!! Policy ("the Base Policy'), Four Coverage Parts; i.e, Coverage Parts for Directors, Officers and Entity Liability ("D&O"), Employment Practices Liability ("EPL"), Fiduciary Liability ("FL"), and Crime ("Crime'); and 15 endorsements.

48.     In addition to almost three pages of definitions in the Base Policy, which are common to all of the Coverage Parts, each Coverage Part contains its own set of definitions and other different terms and conditions.

49.     The Private Policy is unique to members of The Hartford Group of insurance companies.     Unlike the typical general liability insurance policies which contain standard coverage parts used by most insurers, in addition to being very complex, there are no standard D&O or EPL coverage parts or policies.[6]

50.     The following provisions in Section VIII, further illustrate why policyholders send such notices to their agents and brokers rather than directly to the insurers, and why insurers recognize and anticipate that this will occur.

51.     Under Section VIII(A), the "notice shall specify the Coverage Part under which notice is being given." The policy includes four separate Coverage Parts, at least two of which (D&O and EPL) are implicated by this Coverage Litigation.

52.     The Amend Mailing Address for Endorsement is found on the 67th page of the 73-page policy.   Because there are, or can be more, different notice requirements on these type policies, the endorsement specifies four different circumstances that might apply.

---

[6]   Alliant's 2015 website describes the extent of the complexity of just the D&O Coverage Part as: "It is, however, a specialized coverage with provisions that can take years to fully understand."
http://web.archive.org/web/20150127021933/http://alliant.com:80/Risk-Solutions/Pages/Directors-And-officers.aspx

IV.C
### ALLIANT RECEIVED THE
### NOTICE OF CIRCUMSTANCES IN NOVEMBER 2015

*How, When, And To Whom Notice Was Provided*

53.     Attached to this report as Exhibit F, is a March 25, 2019 affidavit of Gary J. Garofalo ("Garofalo") in which Garofalo, an owner, and a person involved in the insurance relationships of, MMI describes how, when and to whom the Notice of Circumstances was provided.

54.     As Garofalo testified in his March 25, 2019 affidavit ("the Garofalo Affidavit"), after Garofalo received the November 11, 2015 Letter, on November 20, 2015 Garofalo called Bill Franey ("Franey"), the person with Alliant with whom Garofalo had worked with for many years, and told Franey that the November 11, 2015 letter had been received and asked whether the individual recipients of the letter had officer's liability insurance with the Hartford to represent them and provide a defense to the allegations in the letter.

55.     In the Garofalo Affidavit, Garofalo also testified that Garofalo had a series of emails regarding the November 11, 2015 Letter, and that he provided Franey screenshots of the November 11, 2015 Letter by email on November 23, 2015.

*Alliant Assumedly Had Actual Authority*

56.     Attached to this report, as Exhibit G, is a copy of a March 1, 2001 Agency Agreement ("the 2001 Agency Agreement')[7] between the companies of The Hartford Financial Services Group, Inc. and Franey Parr & Muha, Inc. VA, which I believe is the predecessor of

---

[7] HART00002515 - HART00002522

Franey Muha Alliant Insurance Services, Inc. ("the Franey Agency"). The Franey Agency has been a part of Alliant since at least 2007.[8]

57.    The authority of the agent in the 2001 Agency Agreement is set forth in Section II of the Agency Agreement.    Under sub-paragraph (d) of Section II of the 2001 Agency Agreement, the agent is authorized on Hartford's behalf:

> To provide all usual and customary services of an insurance agent on all insurance policies you place with us.

58.    The duties of the agent in the 2001 Agency Agreement are set forth in Section III of the 2001 Agency Agreement, Duties of Agent.    Under sub-paragraph (b) of 3.1 of Section III of the 2001 Agency Agreement, the agent agrees:

> To provide all usual and customary services of an insurance agent on all insurance policies you place with us, except as otherwise agreed.

59.    Under sub-paragraph (e) of 3.1 of Section III of the 2001 Agency Agreement, the agent agrees:

> To notify us as soon as practicable of any actual or threatened claims, suits or losses under our policies or in connection with our business with you to cooperate in our investigation, adjustment, settlement and payment of all such claims.

60.    Exhibit G also includes a September 19, 2017 Amendatory Endorsement To Agency Agreement to the April 1, 2001 Agency Agreement between The Hartford Financial Services Group, Inc. and Alliant Insurance Services Inc. ("the 2017 Agency Amendment").[9]

61.    In the 2017 Agency Amendment, sub-paragraph (d) of Section II of the 2001 Agency Agreement is deleted and replaced by the following:

---

[8] Although I believe that the relationship with Alliant began many years before, on its 2007 website, the Franey Agency touts that the agency is "a part of Alliant Insurance Services, one of the nation's largest insurance brokers." https://web.archive.org/web/20070314020030/http:/franeyparrmuha.com/

[9] HART00002510 - HART00002522

> With respect to the Financial Products and Professional Liability lines of business only, to provide all usual and customary services of an insurance agent on all insurance policies you place with us, <u>except for accepting notice of claim(s)</u>.
> [Underlining added for emphasis.]

62.     In the 2017 Agency Amendment, sub-paragraph (b) of 3.1 of Section III is also deleted and replaced by the following:

> With respect to the Financial Products and Professional Liability lines of business only, to provide all usual and customary services of an insurance agent on all insurance policies you place with us, <u>except for accepting notice of claim(s)</u>.
> [Underlining added for emphasis.]

Significantly, sub-paragraph (b) of 3.1 of Section III of the 2001 Agency Agreement, which requires the agent to notify Hartford as soon as practicable of any actual or threatened claims, suits or losses, was not deleted by the 2017 Agency Amendment.

63.     Under the 2001 Agency Agreement, the agent had both the authority, and duty, to provide all usual and customary services of an insurance agent on all insurance policies placed with the Hartford, which would include the acceptance of claims with respect to such policies. As amended by the 2017 Agency Amendment, the usual and customary services of an insurance agency were amended to no longer include "accepting notice of claim(s)."

64.     That Hartford found the need to add the exception demonstrates that Hartford understood that, under the customs and practices of the insurance industry, absent the exception, the receipt of claims against policies placed by the agency was part of an agency's usual and customary services.

65.     That the 2017 Agency Amendment did not eliminate the agency's duty to report any actual or threatened claims, suits or losses under Hartford's policies, demonstrates that Hartford also understood that, under the customs and practices of the insurance industry, agents who had placed the coverage with an insurer were expected to report claims to the insurer.

66.     Given that the Franey Agency was a part of Alliant, it is a reasonable assumption that the exception for accepting notice of claims was not added to the March 1, 2001 Agency Agreement applicable to the Franey Agency until after November 2015, or alternatively, that prior to November 20, 2015, the Franey Agency had become subject to the April 1, 2001 Agency Agreement with Alliant Insurance Services, Inc.

67.     That being the case, when the screenshots of the November 11, 2015 Letter (i.e., the Notice of Circumstances) were sent by Garofalo to Franey, the Franey Agency would have had both the authority, and the duty, to accept the Notice of Circumstances.  As a result, the 2015 Twin City Policy assumedly[10] would have been triggered on November 20, 2015.

*Special Relationship*

68.     Even in the absence of a "special relationship," under the customs and practices of the insurance industry, when the agent of the insurer who placed the policy on behalf of the policyholder receives the notice of the claim or notice of circumstances, the agent has a responsibility to insure that the insurer receives the notice.

69.     As I previously observed, although not yet specifically adopted by all jurisdictions, many, and a growing number of jurisdictions, recognize that if there is a special relationship with the policyholder, including as a result of professed expertise by the agent or broker, the duties of an agent or broker to the policyholder are enhanced.

70.     As I have emphasized, the opinions I am expressing in this report are based on the customs and practices of the insurance industry, and not the law of a particular jurisdiction. However, parenthetically I would note that, as illustrated by the following excerpt from the

---

[10] The 2001 Agency Agreement and 2017 Agency Amendment were produced by Hartford in the earlier stage of this Coverage Litigation.

decision, the Court of Special of Appeals of Maryland is one of the jurisdictions that has recognized the concept of a special relationship in the insurance industry:

> A "special relationship" within the insurance industry is an important concept. A special relationship in the context of insurance requires more than the ordinary insurer-insured relationship. It may be shown when an insurance agent or broker holds himself or herself out as a highly skilled insurance expert, and the insured relies to his detriment on that expertise.
> *Sadler v. Loomis Co.,* 139 Md.App. 374, 392, 776 A.2d 25, 35-36 (2001)

71.     As I have previously indicated, there is a close and ever evolving relationship between the customs and practices and the law.  As is often the case, judicial decisions, or legal treatises or encyclopedia, include succinct, accurate descriptions of the generally prevailing relevant customs and practices.

72.     As an example, the factors which determine whether a special relationship exists are also identified in the following excerpt from the legal encyclopedia, Couch on Insurance:[11]

> Some of the factors relevant to a determination of whether a long-term relationship or special circumstance exists between an insurance broker and the insured sufficient to impose a duty on the broker to obtain additional information necessary for coverage include: (1) the broker's exercise of broad discretion in servicing the insured's needs, (2) the broker's counseling of the insured concerning specialized insurance coverage, (3) the broker's declaration that he is a highly skilled insurance expert, coupled with the insured's reliance upon the expertise, and (4) the broker's receipt of compensation above the customary premium paid for expert advice provided.

73.     Although Franey was the principal contact with MMI, the special relationship between Franey and MMI was not based only on his own expertise and activities, or even the expertise and activities of others such as Pat Biederman, who routinely performed services for, or in connection with, MMI.   Franey touted his relationship with Alliant and the recognized resources and expertise of Alliant to which Franey and his agency team had access.

---

[11]  3 Couch on Ins. § 46:38

74.     First, as is evident by its name, and as demonstrated by the agency's name included on the Notice of Premium Due for the 2016 Twin City Policy, the agency Franey Muha Alliant Insurance Services holds itself out as Alliant Insurance Services, Inc. This is further confirmed in Franey's deposition in the Underlying Action where he states that he started the Franey Insurance Agency, whose name changed in 2003 to Alliance[12] Insurance Services. [See Deposition of William Franey in Underlying Action dated August 29, 2017 (the "Franey Deposition"), attached to this report as Exhibit I.] Another significant indication that the agency holds itself out as Alliant is the email addresses used by Franey and his associates in communicating with MMI, which clearly indicate Franey and his associates are part of Alliant (e.g., Bill Franey Sr. <wfraney@alliant.com>; Pat Biederman <pbiederman@alliant.com>).

75.     As an additional example of such touting, the 2007 website of Franey Muha Alliant Insurance Services, Inc.[13] includes the following excerpt:

> We are Franey Muha Alliant Insurance Services, Inc. For more than 30 years, we have been a trusted insurance advisor to individuals, businesses, and nonprofit organizations. We are part of Alliant Insurance Services, one of the nation's largest insurance brokers. The Alliant member companies are committed to professionalism, integrity, and superior customer service. We offer property & casualty, management liability,[14] surety, and personal insurance products and services. We invite you to learn more.

The 2007 website also professes "industry focus solutions that deliver superior value" with a list of such industries that includes construction, financial services, healthcare, law firms, and real estate. With regard to construction, the website included the following:

> Construction Division   Our Construction Division offers a full range of property & casualty, specialty lines, and surety bonding supported by innovative services such as subcontractor certificate review and workers compensation mod management.

---

[12] Although the court reporter transcribed the agency name as "Alliance Insurance Services", in my opinion, it was simply a transcriptionist error due to the words "Alliant" and "Alliance" sounding similar.

[13] https://web.archive.org/web/20070314020030/http:/franeyparrmuha.com/

[14] The 2015 Twin City Policy is a "management liability" policy.

76.     The 2015 website of Alliant also emphasizes the expertise and resources which are available to Franey, and the Franey Agency[15] as a part of Alliant.  Of particular relevance to this Coverage Litigation, the 2015 website included the following excerpts from the D&O[16] and Claims Advocacy[17] pages:

D&O

... D&O covers corporate executives for losses that their company is prohibited from covering, reimburses a company for the D&O losses it advanced to its executives, and covers the company for its portion of liability in a securities-related loss.

It is, however, a specialized coverage with provisions that can take years to fully understand. Coverage for a claim can hinge on constructing policy language that broadens exclusions and knowing which insurers have a strong reputation for standing behind their word.

As the nation's premier specialty retail insurance brokerage company, Alliant Insurance Services has been working in the D&O market for decades. Our brokers know which provisions differentiate A side coverage in one insurer's policy from another's and how to build value into your D&O policy so your company's executives can make the strategic decisions that make a positive difference.

Claims Advocacy

Managing your risk doesn't end when the policies are delivered. At Alliant Insurance Services, that contact is only the beginning of a continuing process, which also includes prevention and claims advocacy.

That's why Alliant claims and risk specialists focus on working with you to develop targeted loss prevention strategies that can drive down the cost of losses for exposures your company or organization retains. They understand that reducing the frequency and severity of these retained claims is one way to attack the cost of your risk program.

---

[15]  The name of the agency under which Franey has traded has changed over the years.  In the balance of this report, I will simply refer to both any prior names, and Franey Muha Alliant Insurance Services, as "the Franey Agency."

[16]  http://web.archive.org/web/20150127021933/http://alliant.com:80/Risk-Solutions/Pages/Directors-And-Officers.aspx

[17]  http://web.archive.org/web/20151026145202/http://www.alliant.com/Risk-Solutions/Pages/Claims-Advocacy.aspx

It's a process that involves you in the development of a loss prevention plan. Just because a strategy looks good on paper doesn't mean it's going to work, nor does it mean that it is cost-effective. Alliant specialists recognize this fact of life.

And when a claim occurs, Alliant's seasoned claims and legal specialists will work with you to ensure that a policy delivers what it promises. Our claims and legal specialists are able to consistently deliver on this result because many have worked for insurers, know the claims process, and have developed top-notch negotiating skills. They understand that it's not a contest of wills but a matter of doing what's right for our clients.

77.    The breadth, depth and length of the Franey/Alliant relationship with MMI in 2015 was clearly much more than the ordinary insurer-insured relationship.   The documents which I have reviewed in preparation of this report contain numerous examples of Franey's relationship with MMI, which illustrate the scope and nature of activities performed by Franey and MMI's reliance upon such scope and activities.  Attached to this report is Exhibit H which contains some of the examples.

78.    In my opinion, based on Franey's and Alliant's history with MMI, it follows that MMI would rely on Franey and Alliant to provide the November 11, 2015 letter to Twin City. This reliance is demonstrated when, shortly after receiving the 2015 Letter, Garofalo reached out to Franey to determine "whether we have officers' liability to represent us" and forwarded the letter to Franey. [November 20, 2015 email from Garofalo to Haslam, Lombardo and Kraemer stating, "I have a call in to Bill Franey on whether we have officers' liability insurance to represent us."]

*Failure to Address Issue in Earlier Stage*

79.    It is my understanding that there had been limited discovery prior to the March 30, 2018 Order by Judge Russell.  That said, I would have assumed that the Hartford adjuster would have known about the circumstances of the November 11, 2015 letter, either because

Franey had volunteered that information, or that the adjuster would have asked Alliant what, if anything, Alliant knew about the November 11, 2015 Letter.

## PART V
## MODIFICATION OF MY OPINIONS

80.    Any opinions and conclusions expressed in this report are subject to change and revision pending my receipt, identification and/or review of additional relevant materials which have not yet been received or identified as of the date of this report.   Further, I expressly retain the right to alter, modify, change, or add to these opinions and conclusions, and offer additional opinions as further information, including reports, or rebuttal reports, by Defendants' experts, become available.

_____
James Marshall, Jr.

_____
MAy 14, 2019
Date

## JAMES (JIM) MARSHALL JR., JD, CPCU, ARM
### President and Senior Consultant

### EDUCATION

Magna cum laude and valedictorian graduate, Stetson University College of Law, (Juris Doctorate), January 1977; Honors graduate, University of Florida, (B.A. - Political Science, Phi Kappa Phi Honor Society), December 1964; received the Chartered Property and Casualty Underwriter (CPCU) designation from the American Institute for Property and Liability Underwriters, Inc. in 1970; and received the Associate in Risk Management (ARM) designation from the Insurance Institute of America in 1971.

### BUSINESS EXPERIENCE

Approximately six years' experience as property and casualty underwriter for major insurance companies (Sentry Insurance, Royal Globe, and Amerisure).  Three years' experience as an agent/broker for a national insurance broker (now Aon Companies). Consultant since 1974 with Siver Insurance Consultants.

### AREAS OF EXPERTISE

Senior consultant for property and casualty accounts.  Extensive experience in:  design, marketing (formal specifications), implementation and auditing of insurance and risk management programs for governments and private enterprise; design, formalization (by ordinance or formal policy), implementation and auditing of self-insurance program; drafting and negotiation of risk management terms with vendors and contractors; analysis of insurance coverage, expert testimony and litigation support for insurance claims and issues; drafting of manuscript or special coverages and endorsements.

### PROFESSIONAL MEMBERSHIPS

Florida Bar, including membership in the Health Law, City, County and Local Government Law, Real Property Probate and Trust Law, and Workers' Compensation Sections; American Bar Association, including Section of Tort Trial and Insurance Practice; Society of Chartered Property and Casualty Underwriters; Society of Risk Management Consultants (have served as Chairman of Legal Committee, Secretary, President-Elect, President and member of Board of Directors.)

**Jim Marshall, JD, CPCU, ARM** - (Continued)

POTPOURRI

Guest speaker and lecturer for various organizations including:  Risk and Insurance Management
Society, Inc. (RIMS), Catholic Charities USA, Florida School Board Attorneys Association, Public
Risk and Insurance Management Association (PRIMA), Florida Education Risk Managers
Association (FERMA), and Society of Risk Management Consultants (SRMC).  Past President,
Tampa Bay Underwriters Association; has taught Chartered Property and Casualty Underwriter
(CPCU) classes and an adjusting course.

## MARSHALL
## PRIOR EXPERT TESTIMONY

The following is a list of cases in which James (Jim) Marshall, Jr. has testified as an expert at trial or by deposition since 2013.

| APPROX. DATE | STYLE OF CASE | COURT |
|---|---|---|
| 8/7/2013<br>5/1/2014<br>5/2/2014 | Nooter Corp. v. Allianz, et al | Circuit Court for 22nd Circuit<br>St. Louis, Missouri |
| 2/19/2014 | Suffolk Construction Company, Inc. v. Twin City Fire Insurance Company a/k/a Hartford Fire Insurance Company a/k/a The Hartford | United State District Court<br>Southern District of Florida<br>(Fort Lauderdale Division) |
| 9/17/2014 | Domco Products, Texas, Inc., as successor in interest to Uvalde Rock Asphalt, Inc. v. The Continental Insurance Company, as successor in interest to Harbor Insurance Company | United States District Court<br>Southern District of Texas<br>Houston Division |
| 7/15/2015 | St. Paul Mercury Insurance Company v. Drextel Amy, James Bringley, Olga V. Lakes-Battle, Eric Rader, Thurman Smith, and the Federal Deposit Insurance Corporation as Receiver for ShoreBank. | United States District Court<br>Northern District of Illinois<br>Eastern Division |
| 7/12/2016 | New York State Electric & Gas Corporation v. Century Indemnity Company & Onebeacon America Insurance Company, | United States District Court<br>for the Northern District of<br>New York |
| 10/5/2018 | Cannon Electric, Inc., now known as ITT Cannon, Inc., v. Ace Property and Casualty Company, et al. | Supreme Court of The State of<br>California, County of Los Angeles |

**EXHIBIT C**
**Report of James Marshall, Jr.**

- December 2015 Application
- November 11, 2015 Letter from Scarlett, Croll & Myers, P.A.
- January 14, 2016 Letter to Scarlett, Croll & Myers, P.A.
- April 14, 2016 Renewal Application for The Hartford
- May 10, 2016 Letter from Robert Buczkowski
- May 11, 2016 Letter to Robert Buczkowski
- May 27, 2016 Complaint
- July 28, 2016 Letter to The Hartford
- October 18, 2016 Coverage Letter from The Hartford
- April 19, 2017 Letter from The Hartford
- May 2015 – May 2016 Policy
- Timeline from Bill Franey
- Affidavit of Robert Buczkowski
- Affidavit of Gary Garofalo
- Affidavit of Glenn Haslam
- Chronology – emails between Garofalo and Franey on 11-23-2015
- Secure link to Twin City's Production (entire production bates stamped (Hart00000001-Hart00002523)
- Deposition transcript – William Franey in *Buckowski* (taken on August 29, 2017)
- Agency Contracts between the Hartford and Franey Muha and Alliant Insurance Services, Inc.
- March 30, 2018 Order by Judge George L. Russell

Exhibit C
Page 1 of 1

# SCARLETT, CROLL & MYERS, P.A.

ATTORNEYS AT LAW
SUITE 600
201 NORTH CHARLES STREET
BALTIMORE, MARYLAND 21201-4110

———————
(410) 468-3100
TELEFAX (410) 332-4026

ROBERT B. SCARLETT*
ANDREW M. CROLL
MICHAEL S. MYERS

* ALSO ADMITTED IN D.C.

RScarlett@ScarlettCroll.com

VIRGINA OFFICE:
515 KING STREET
SUITE 400
ALEXANDRIA, VIRGINIA 22314

November 11, 2015

**VIA FEDERAL EXPRESS**

Mr. Glenn A. Haslam
12154 Mt. Albert Road
Ellicott City, MD 21042

Mr. Gary Garofalo
2818 Hunt Valley Drive
Glenwood, MD 21738

Mr. Richard Lombardo
3194 Danmark Drive
West Friendship, MD 21794

Mr. Lawrence Kraemer
c/o Harkins Builders, Inc.
2201 Warwick Way
Marriottsville, MD 21104

Mr. Richard G. Arnold
2929 Excelsior Springs Court
Ellicott City, MD 21042

Re:    Robert J. Buczkowski and Madison Mechanical, Inc.

Gentlemen:

The undersigned represents Robert Buczkowski with respect to his interests in Madison Mechanical OS Corp., which owns directly, or indirectly Madison Mechanical, Inc. and Madison Contracting, LLC. It is my understanding the ownership of Madison Mechanical OS Corp. ("Madison Mechanical") is as follows:

{00162128.DOCX.1}

Exhibit D
Page 1 of 3

Mr. Glenn A. Haslam
Mr. Gary Garofalo
Mr. Richard Lombardo
Mr. Lawrence Kraemer
Mr. Richard G. Arnold
November 11, 2015
Page 2

| | | |
|---|---|---|
| Glenn A. Haslam | - | 54% |
| Gary Garofalo | - | 13% |
| Richard Lombardo | - | 10% |
| Lawrence Kraemer | - | 10% |
| Robert Buczkowski | - | 13% |

Is also my understanding from my client that Madison Mechanical is currently operating and has assets, primarily being accounts receivables, trucks other fixed assets. In addition to these assets, Madison Mechanical also has work in progress.

It has come to my client's attention that a new limited liability company was formed on August 20, 2015 known as Madison Mechanical Contracting, LLC. The ownership of this company is divided among the following:

Glenn A. Haslam
Gary Garofalo
Richard Lombardo
Lawrence Kraemer
Richard G. Arnold

It appears to my client that the purpose of Madison Mechanical Contracting, LLC is to divert the business and client base of Madison Mechanical for the benefit of Madison Mechanical Contracting, LLC and to the detriment of Madison Mechanical. If that is true, please consider this letter notice that such action could be considered legally improper in that such a diversion is a diversion of business opportunity directly and financially harming my firm's client. On initial review, such actions, if true, could lead to a cause of action for breach of fiduciary duty, interference with a contractual relationship, interference with an economic relationship, civil conspiracy and other potential causes of action. I am especially suspicious that this diversion of corporate opportunity and contracts is an objective of Madison Mechanical Contracting, LLC simply by the fact that the name of Madison Mechanical and Madison Mechanical Contracting, LLC are so similar.

If it is your plan to divert the contracts and corporate opportunity of Madison Mechanical, please consider this letter putting you on notice of the potential litigation liability of such actions both on a corporate and personal level. Please cease and desist any such action to divert any corporate opportunity that Madison Mechanical has to either yourselves or Madison Mechanical Contracting, LLC without the consent of my firm's client, Robert Buczkowski.

{00162128.DOCX.1}

Mr. Glenn A. Haslam
Mr. Gary Garofalo
Mr. Richard Lombardo
Mr. Lawrence Kraemer
Mr. Richard G. Arnold
November 11, 2015
Page 3

My client has made it clear to me that he does not want to enter into civil litigation, given his long-standing relationship with each of you. He would prefer to sit down and try to work out any potential differences while at the same time preserving his thirteen percent (13%) interest in Madison Mechanical. I would suggest that each of you take this letter to your respective attorneys so they can advise you as to the law on this matter and then call me so we can schedule a convenient date and time to further discuss the issues set forth in this letter. Once again, I must emphasize that my client would rather discuss these matters with each of you and try to resolve the differences between the parties in an amicable fashion.

Please either contact me or have your counsel contact me within thirty (30) days from the date of this letter to avoid potential legal action.

I will look forward to working with each of you.

Very truly yours,

SCARLETT, CROLL & MYERS, P.A.

Robert B. Scarlett

RBS/akr

cc: Robert Buczkowski (via email)

{00162128.DOCX.1}

Exhibit D
Page 3 of 3

ENDORSEMENT NO:   13

This endorsement, effective 12:01 am,       5/01/15          forms part
of policy number       42 KB 0256935-15

issued to:       MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:       TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
## AMEND MAILING ADDRESS FOR NOTICE ENDORSEMENT

**I.   Notice of Claim or Wrongful Act**

A.   A notice of any **Claim** or **Wrongful Act** shall be given in writing to the following:

*Via mail:*          The Hartford

Claims Department

Hartford Financial Products

277 Park Avenue, 15th Floor

New York, New York 10172

or

*Via email:*          HFPClaims@thehartford.com

or

*Via Facsimile:*          (917) 464-6000

B.   Where it is stated in the policy or declarations page that a notice of any **Claim** or **Wrongful Act** shall be given in
writing to The Hartford, Hartford Plaza, Hartford CT 06115, it shall be deleted and replaced with the following:

Notice of any **Claim** or **Wrongful Act** shall be given in writing to the following:

*Via mail:*          The Hartford

Claims Department

Hartford Financial Products

277 Park Avenue, 15th Floor

New York, New York 10172

or

*Via email:*          HFPClaims@thehartford.com

or

*Via Facsimile:* (917) 464-6000

**II.   All Other Notices**

A.   All notices other than a notice of **Claim** or **Wrongful Act** shall be given in writing to the following:

The Hartford

Product Services

Hartford Financial Products

277 Park Avenue, 15th Floor

New York, New York 10172

HG 00 H009 01 0708                     © 2008, The Hartford                     Page 1 of 2

Exhibit E
Page 1 of 2

**ENDORSEMENT NO:   13**

B.   With the exception of notice of a **Claim** or **Wrongful Act**, where it is stated in the policy or declarations page that a notice shall be given in writing to The Hartford, Hartford Plaza, Hartford CT 06115 shall be deleted and replaced with the following:

All notices other than a notice of **Claim** or **Wrongful Act** shall be given in writing to the following:

The Hartford

Product Services

Hartford Financial Products

277  Park Avenue, 15th Floor

New York, New York 10172

All other terms and conditions remain unchanged.

*[signature]*

Juan Andrade, President & COO



MADISON MECHANICAL OS, et al.     \*    IN THE

     Plaintiffs             \*    CIRCUIT COURT

vs.                       \*    FOR

TWIN CITY FIRE INSURANCE CO.,    \*    PRINCE GEORGE'S COUNTY
    et al.

                                 \*

     Defendants                Civil Action No.: CAL-18-27076

\*   \*   \*   \*   \*   \*   \*   \*

## AFFIDAVIT OF GARY J. GAROFALO

I, Gary J. Garofalo, hereby state and affirm as follows:

1.     I am over the age of eighteen years and competent to testify.

2.     The following is based upon my personal knowledge.

3.     I was a shareholder in Madison Mechanical OS Corp. at all times relevant to this lawsuit.

4.     I became a shareholder of Madison Mechanical OS Corp. on December 31, 2007.

5.     I also own an ownership interest in Madison Mechanical Contracting, LLC.

6.     I have worked with Bill Franey and Franey Parr & Muha, Inc./Alliant Insurance Services, Inc. for all years relevant to this lawsuit.

7.     Mr. Franey was the insurance agent for The Hartford/Twin City Fire Insurance Co. and surety bond broker for Madison Mechanical OS Corp. and Madison Mechanical, Inc. at all times relevant to this lawsuit.

8.     In addition to being an owner of Madison Mechanical OS Corp., I assist Madison and its President, Glenn Haslam, as a financial advisor and I am involved in Madison's banking, bonding, and insurance relationships. As part of that role, I spoke with Mr. Franey often. He was a trusted insurance advisor.

9.      Robert Buczkowski was an owner and CFO for Madison Mechanical OS Corp.

10.     Madison terminated Mr. Buczkowski's employment on November 18, 2015.

11.     I received a letter dated November 11, 2015 from Mr. Buczkowski's attorney (copy attached), which was addressed to me, Glenn Haslam, Richard Lombardo, Lawrence Kraemer and Richard Arnold.

12.     I called Mr. Franey on November 20, 2015 and told him we received the November 11, 2015 letter and asked whether we have officer's liability insurance with the Hartford to represent us and provide a defense to Mr. Buczkowski's alleged claim.

13.     On this same day, Friday, November 20, 2015, I also asked Glenn Haslam to hold off on hiring an attorney in response to this letter because I had a call in to Mr. Franey as to whether the Hartford would agree to have our directors' and officers' coverage provide a defense to us.

14.     On Monday, November 23, 2015, I had a series of emails with Mr. Franey regarding the November 11, 2015 letter and its contents.

15.     I sent Mr. Franey screenshots of the November 11, 2015 by email on November 23, 2015.


I SOLEMNLY AFFIRM under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true.

3/28/19
_____
Date

_____
Gary J. Garofalo



**HARTFORD FINANCIAL PRODUCTS**
Amendment to the Agency Agreement

**THIS HARTFORD FINANCIAL PRODUCTS AMENDMENT (referred to as "Amendment" herein)** is intended to amend and supplement the basic commercial and personal lines agency agreements (collectively referred to herein as the "Agency Agreement") by and between the companies of The Hartford Financial Services Group, Inc. (referred to as "The Hartford" herein) and the Agent named in the Agency Agreement (referred to as "Agent" herein).

In consideration of the covenants and agreements described below, the parties mutually agree to amend the Agency Agreement as respects to the item(s) indicated below for designated HFP Sub Code(s) only with respect to the Financial Products and Professional Liability lines of business produced pursuant to this Addendum:

1.    Item 6 of The Hartford Agency Agreement Declarations Page shall be amended as follows:

      6.    Number of Days for Payment of Balances or Return of Audit Premium: 30 (Thirty)

2.    Section I of the Agency Agreement, Definitions, paragraph 1.6 of the Agency Agreement, is deleted and replaced by the following:

      With respect to the Financial Products and Professional Liability lines of business only, **"You"** and **"your"** means the producer designated in the declarations page and its subsidiary producers unless any of those producers are under separate Agency Agreement with us.

3.    Section II of the Agency Agreement, Authority of Agent, sub-paragraph (a) of 2.1 Scope, is deleted and replaced by the following:

      (a) With respect to the Financial Products and Professional Liability lines of business only, to submit applications and request quotes for insurance which we write in your territory. All such business produced pursuant to this Addendum shall be assigned to the HFP Sub Code(s) designated for such business. Your authority to quote on your own or bind policies and related coverage is suspended for all classes of business produced for Hartford Financial Products.

4.    Section II of the Agency Agreement, Authority of Agent, sub-paragraph (d) of 2.1 Scope, is deleted and replaced by the following:

      (d) With respect to the Financial Products and Professional Liability lines of business only, to provide all usual and customary services of an insurance agent on all insurance policies you place with us, except for accepting notice of claim(s).

5.    Section III of the Agency Agreement, Duties of Agent, sub-paragraph (b) of 3.1 Generally, is deleted and replaced by the following:

> (b) With respect to the Financial Products and Professional Liability lines of business only, to provide all usual and customary services of an insurance agent on all insurance policies you place with us, except for accepting notice of claim(s).

6.    Section VI of the Agency Agreement, Agency Billed Business, 6.1 Billing and Collection, subparagraphs (d), (e) and (f), are deleted and replaced by the following:

> (d) Premium is due and payable to us on or before the date indicated on our invoice.  This date is the later of thirty (30) days after the effective date of the policy or endorsement, or fifteen (15) days after the date the policy is entered into our system.  If payment is not received within the stipulated time, the coverage will be cancelled.

This endorsement forms a part of the AGENCY AGREEMENT entered into between The Hartford Financial Services Group, Inc. or companies and the Agent named herein.

**AMENDATORY ENDORSEMENT TO AGENCY AGREEMENT**



**THE HARTFORD**

1. Name and Address of Agent:
   **Alliant Insurance Services Inc**
   **701 B Street 6th Floor**
   **San Diego CA 92101**

2. Master Code Number: **72160200**

3. Effective Date of Agency Agreement: **April 1, 2001**

4. Effective Date of this Endorsement: **September 19, 2017**

5. *This Agency Agreement is hereby amended as respects the item(s) indicated below:*

The following Sub Code(s) are added:
42640007 42630420 42640066 42630851 39320337 16162692 42641212PAC 00880713HFP 00887663HFP 00891545HFP 00891546HFP 42641508HFP 42631272HFP 42631270HFP 16163214HFP 42630295PHS 42630852PHS 42640388PHS 42630482PHS 42640496 (closed) 00884165HFP (closed) 00887575HFP (closed) 42630131 (closed) 42640594 (closed) 42641503HFP (closed) 42641534HFP (closed) 75450007 (closed)
**Alliant Insurance Services Inc**
**701 B Street 6th Floor**
**San Diego Ca 92101**

The following Sub Code(s) are closed:
42640496 (closed)
**Alliant Insurance Services Inc**
**701 B Street 6th Floor**
**San Diego Ca 92101**

The following Line of Business is closed:
**Personal Lines (Applicable to codes 42640007, 42630420 only)**

6. Other:

**42640007, 42630420 42640066 42630851 39320337 is limited to Commercial Lines Only.**

**16162692 is limited to Bond Only.**

**42630295PHS 42630852PHS 42640388PHS 42630482PHS is subject to the Select Customer Insurance Service and Sales Agreement.**

**HFP AMENDMENT 2980254_1**

**00880713HFP 00887663HFP 00891545HFP 00891546HFP 42641508HFP 42631272HFP 42631270HFP 16163214HFP subject to the terms and conditions of the Agency Agreement as amended by the Hartford Financial Products Amendment to the Agency Agreement and any amendments thereto.**

**Code 42640496 is closed with no renewal extension.**

© 2017 by The Hartford. Classification: Company Confidential. All rights reserved.
No part of this document may be reproduced, published or used without the permission of The Hartford.

Form Endorsement  Printed in U.S.A.

When you do not waive your contractual right to renewal under the Agency Agreement, we will begin to non-renew policies in your terminated agency book beginning twelve (12) months after the effective date of termination, as permitted by law and our agency termination procedures. When you waive your contractual right to renewal under the Agency Agreement, we will begin to non-renew policies in your terminated agency book beginning on the effective date of termination, as permitted by law and our agency termination procedures. Where state law or our agency termination procedures restrict our ability to non-renew policies based on the termination of an agency relationship, we will offer to renew those policies by sending a renewal proposal to the policyholder as early as 120 days prior to the policy renewal date. We will offer to renew the policy through you unless or until state law permits us to offer the policy directly or through another Hartford agent designated by the policyholder or engaged by us to service the policy on our behalf. We will pay commission for policies renewed through you unless or until state law permits us to cease commission payments. Please be advised that we may non-renew policies for underwriting and other reasons, as permitted by law. Under the terms of your Agency Agreement, you are required to use your best efforts to replace all policies written by us with policies written by other insurers immediately upon the termination of your Agency Agreement. Under some circumstances, policies that are not replaced may be written directly or through another Hartford agent with no further commission paid to you.

Refer to the Agency Agreement, including all amendments, to determine the "master" agency's responsibility for the acts and omissions of the Sub Code(s).

Upon the submission of business by an un-appointed agent, The Hartford will automatically submit an appointment to the applicable state department of insurance.

This Agreement is executed on behalf of the Company or Companies of HARTFORD FINANCIAL SERVICES GROUP, INC for which appointments were or will be filed.

By: _____
Keith P. Lawler – AVP Agency Compensation

Date: November 7, 2017

Accepted by:

Name of Agent:
Alliant Insurance Services Inc

By: _____   Date: 11/15/17
Signature

Printed Name: Kenneth A. Zak, Esq
Title: General Counsel & SVP

© 2017 by The Hartford. Classification Company Confidential All rights reserved
No part of this document may be reproduced, published or used without the permission of The Hartford

09/30/2005 11:26 FAX 860 547 6487                                                      ☑001

PART 2 This Declarations Page, with AGENCY AGREEMENT (Form No AGTAGR00), and endorsements, schedules, and
   addenda if any, issued to form a part thereof, completes this Agency Agreement.

## THE HARTFORD AGENCY AGREEMENT DECLARATIONS

| | | | |
|---|---|---|---|
| 1 | Hartford Fire Insurance Company | F | Hartford Insurance Company of Illinois |
| 5 | Hartford Accident and Indemnity Company | G | Hartford Insurance Company of the Midwest |
| 3 | Hartford Casualty Insurance Company | H | Trumbull Insurance Company |
| 6 | Hartford Underwriters Insurance Company | J | Hartford Insurance Company of the Southeast |
| 7 | Twin City Fire Insurance Company | P | Property and Casualty Insurance Company of Hartford |
| 8 | Pacific Insurance Company | B | Hartford Lloyd's Insurance Company |
| -- | Omni Indemnity Company | -- | Omni Insurance Company |

```
Co. Code(s)
```

## DECLARATIONS

1. FRANEY PARR & MUHA INC-VA   42640007
   13921 PARK CENTER I,SUITE 160
   HERNDON, VA  20171

2. Effective Date of this Agreement – March 1, 2001

3. Types of Business Applicable to this Agreement:

   A. Personal Lines (the Personal Lines Agency Agreement):

      __ All Personal Lines;   __ All Personal Lines, excluding the Omni Auto Plan;   ___ the Omni Auto Plan only

      __ Other (as specified) _____

   B. Commercial Lines (the Commercial Lines Agency Agreement):

      __ All Commercial Lines

      __ Other (as specified) _____

4. Agency Code(s) Subject to this Agreement:

5. Applicable endorsements, schedules and addenda
   Form Numbers

6. Number of Days for Payment of Balances or Return of Audit Premiums

7. Additional Provisions  **"The information and content of the Declarations Page previously executed by the Company
   and the Agent, Form AG1140, as it may have been amended, are incorporated herein by reference and continue to
   apply to new agency agreement, Form AGTAGR00."**

This Agreement is executed on behalf of the Company
or Companies of HARTFORD FINANCIAL SERVICES GROUP, INC
designated above by Company Code(s).

                                                     Accepted by:

By: _____                          Name of Agent:  FRANEY PARR & MUHA INC-VA
Authorized Co. Representative
Title:  Director Sales Administration                By: _____



THE HARTFORD

**THE HARTFORD AGENCY AGREEMENT**

You and we mutually agree to the following:

## I. DEFINITIONS

1.1 **"Agreement"** means this document, the declarations page(s), and any and all schedules, addenda and amendments hereto.

1.2 **"Direct-billed"** business means business which we accept only on a direct-billed basis or which we accept on a direct-billed basis at your option.

1.3 **"Policy"** means a policy of insurance or bond or other contract of suretyship and includes any binder, endorsement or rider related thereto.

1.4 **"Territory"** means the states or jurisdictions for which we have authorized and appointed you to solicit insurance on our behalf.

1.5 **"We", "us"**, and **"our"** or the **"Company"** mean the companies of The Hartford Financial Services Group, Inc. signing this Agreement or designated in the declarations page and for which your agency has been appointed.

1.6 **"You"** and **"your"** or the **"Agent"** means the agency designated in the declarations page and its subsidiary agencies and agents unless any of those agencies and agents are under separate Agency Agreements with us.

## II. AUTHORITY OF AGENT

2.1 **Scope.** Subject to any requirements imposed by law, you are authorized on our behalf:

(a) To solicit, quote and bind insurance in your territory for those lines of insurance and classes of business shown on the Declarations page or otherwise in writing. We may amend such authority with respect to such lines of insurance, classes of business, products, coverages or limits immediately upon written notice to you. In quoting and binding coverage you agree to comply with any underwriting guidelines, rates and rules as we may publish and distribute to you.

(b) To deliver such policies as we may issue. We reserve the right to cancel at any time any policy you place with us. We shall give you notice of all such cancellations.

(c) To collect, receive and receipt for premiums on such policies, except as otherwise provided herein with respect to direct-billed business. All premiums collected on our behalf shall be held by you as our fiduciary.

(d) To provide all usual and customary services of an insurance agent on all insurance policies you place with us.

2.2 **Limitations.** You have the authority and power to act as our agent only to the extent expressly granted in this Agreement and no further authority or power is implied. You are an independent contractor and not an employee of ours for any purpose, and your right to represent other companies is not restricted by this Agreement. Any authority granted hereunder to solicit, quote or bind insurance products on our behalf is non-exclusive, unless we agree otherwise in writing.

## III. DUTIES OF AGENT

3.1. **Generally.** You agree:

(a) To comply with all laws affecting your operations, including, but not limited to, maintaining valid insurance licenses, resident, non-resident and surplus lines, as applicable, as well as complying with any countersigning and commission sharing requirements when writing risks outside of your resident state

(b) To provide all usual and customary services of an insurance agent on all insurance policies you place with us, except as otherwise mutually agreed to.

(c) You shall supervise and be responsible for the acts and omissions of all of your subproducers, including, but not limited to, any premiums or others monies due us from them.

(d) To submit to us all applications, and report to us all policies and coverages bound no later than five (5) business days after receipt or execution thereof or the effective date of coverage, whichever is sooner, or by such other time period as is required by law or by our rules and procedures. For Omni Auto Plan business the required time period is three (3) days.

(e) To notify us as soon as practicable of any actual or threatened claims, suits or losses under our policies or in connection with our business with you and to cooperate in our investigation, adjustment, settlement and payment of all such claims.

(f) Not to exceed the scope of your authority set forth herein, not to change or waive any provision of any policy we issue, not to extend the time of any premium due us, and not to compromise, adjust or settle any claim against us, other than as specifically authorized by us in writing.

(g) To maintain complete and accurate records and accounts relating to all of your business with us and to permit us or our representatives to audit your records and accounts upon reasonable advance notice and during reasonable business hours.

(h) To comply with all of our rules, procedures and policies, as communicated to you.

3.2. **Survival.** The Duties of the Agent hereunder shall survive any termination of this Agreement.

## IV. BROKER OF RECORD DESIGNATION BY POLICYHOLDER

4.1 **Designation.** If a conflict exists as to whether you or another licensed agent of ours is authorized to represent an existing or prospective policyholder, that policyholder's

@004

latest written instructions as to the designation of which agent is so authorized, shall
control, subject to our broker-of-record rules dealing with premiums, commissions and
mid-term changes.

## V. COMPENSATION

5.1 **Commissions.** We will pay you commissions at the rates specified in the schedule(s)
attached to this Agreement and/or in separate schedules or written documents we
provide to you.  We may change commission rates by providing you with at least
ninety (90) days written notice. We may change commission rates on Omni Auto Plan
business immediately upon written notice.

5.2 **Expenses.** The commissions and other compensation payable under this Agreement
shall be considered the full compensation on business you place with us.  Except as
may be specifically provided by separate written agreements between us, we shall not
be responsible for expenses you incur as an agent, including, but not limited to, rent,
transportation, solicitors' fees, postage, telephone, advertising, underwriting and
consumer reports ordered,  license fees, or the electronic equipment, software or other
costs of  interfacing or communicating with us electronically.

5.3 **Return Commissions.** You agree to return promptly to us commissions previously
paid to you or retained by you on premiums refunded under any policy for any reason,
whether the refund is made during the term of this Agreement or thereafter.

## VI.    AGENCY- BILLED BUSINESS

6.1 **Billing and Collection.**

   (a) You are responsible for the collection and accounting of all premiums on business
   placed with us, except direct-billed business. No commissions are payable on
   premiums which you may request us to collect. We will cancel agency-billed
   policies for non-payment of premium at your request, when permitted by law.

   (b) You may retain out of premiums you collect, except on direct billed business, the
   commissions due and payable to you on such business in accordance with this
   Agreement.

   (c) In the event of your breach of this Agreement we reserve the right to convert any
   or all agency-billed policies to a direct-billed basis.

   (d) You will submit to us by the tenth day of each month an account of all premiums
   on all business, except direct-billed business, placed with us during the previous
   month or not previously reported, unless we agree to render such accounts to you.

   (e) Regardless of whether you or we render the accounting, any balances shown as
   due to us shall be paid within the number of days specified in the Declarations
   after the end of the month for which the account was submitted or should have
   been timely submitted by you, whichever is earlier.

   (f) If you fail to pay us any premiums or other amount properly owed to us, within the
   time period specified by us, we may impose a late fee not to exceed one per-cent
   (1% ) per month on such amount.

09/30/2005 11:27 FAX 860 547 6487                                                    ☑005

## VII. DIRECT-BILLED BUSINESS

### 7.1 Billing and Collection.

(a) We are responsible for the billing and collection of premiums on all direct-billed business. We will pay you commissions only on premiums collected. If you should collect any premiums on direct-billed business, you will promptly account for them and pay the amounts due to us, without deducting commissions, when and as we direct.

(b) Unless otherwise mutually agreed upon, we will display your name on property and casualty policies, renewals, bills and other communications regarding continuation, non-renewal or termination of your insureds' policies.

(c) If upon termination of this Agreement you are entitled to the use and control of expirations under the terms of this Agreement, we will promptly provide to you at your request with a list of direct-billed policies in force, their expiration dates, and details of coverage.

## VIII. INDEMNIFICATION

### 8.1 Company Responsibility.
We will defend and indemnify you against civil and administrative liability imposed on you by law, including the reasonable costs of defense and settlement, caused by our acts or omissions, including, but not limited to, that imposed on you under any Federal or state Fair Credit Reporting Act or state Privacy Act arising out of your use of our insurance scoring system, provided you have not breached this Agreement or otherwise caused or contributed to such liability by your own acts or omissions. You agree, as a condition to such indemnification, to notify us promptly of any claim or suit against you and to allow us to make such investigation, settlement or defense thereof as we deem prudent.

## IX. OWNERSHIP OF EXPIRATIONS

### 9.1 Prior to Termination.
Unless we become entitled to the use and control of expirations hereunder, we will not, without your prior approval, use our records of the business we obtain through you to solicit insureds for other lines of insurance.

### 9.2 On Termination.
If upon termination of this Agreement you have promptly accounted for and paid to us all premiums and other amounts that may be due us or for which you may be liable, or have given us a bond satisfactory to us guaranteeing the payment thereof, your records and the use and control of expirations, including expirations on direct-billed business, shall remain your property and be left in your undisturbed possession; otherwise the right and title to the records and the use, control and ownership of expirations shall be vested in us.

### 9.3 Dispute.
For purposes of this section, you will not be considered in breach of your obligation to account for and pay to us premiums or other amounts due us, while the amount thereof is being reasonably disputed in writing and in good faith, provided you have promptly accounted for and paid to us all items about which there is no such dispute.

## X. SUBROGATION AND SALVAGE

### 10.1 Reporting.
Our agency experience exhibits will reflect recoveries through subrogation

09/30/2005 11:27 FAX 860 547 6487                                        ☑006

## XI. SUSPENSION

11.1 **Grounds.** We may immediately suspend all or any part of the authority granted to you under this Agreement:

    (a) With respect to any line of insurance, class of business, product, coverage, limits or special business relationship we may have with you, which we propose to suspend or cease writing in your area, or

    (b) For any period during which you are in breach of your obligations under this Agreement.

## XII. TERMINATION

12.1 **Grounds.** This Agreement may be terminated, in whole or in designated part:

    (a) At any time by mutual agreement,

    (b) Immediately by either party upon written notice to the other party based upon such breach of this Agreement,

    (c) Immediately without notice upon (i) the bankruptcy, insolvency, or dissolution of a party hereto, or the institution of a similar proceeding by or against a party, (ii) any suspension or revocation of your insurance license in any jurisdiction, as to all jurisdictions (iii) your failure to renew a necessary insurance license in a jurisdiction, as to that jurisdiction, or (iv) your commission of a felony, fraud, willful misconduct, or the misappropriation of funds,

    (d) By either party upon ninety (90) days written notice to the other.

## XIII. AFTER TERMINATION

13.1 **Return of Property.** Upon any termination of this Agreement, any equipment, electronic materials or software, unused policy forms, drafts, stamps, powers of attorney and any other supplies or property furnished to you by us remain our property and shall be accounted for and returned to us upon demand.

13.2 **Renewal Election.** If upon termination of this Agreement you are entitled to the ownership, use and control of expirations under the terms of this Agreement, then based upon your written election that you must deliver to us no later than five (5) business days after the effective date of termination, we will, subject to any applicable legal restrictions, continue outstanding in-force policies until their normal expirations and will renew policies expiring during a period of one year following the termination of this Agreement, subject to the following conditions:

    (a)    You must use your best efforts to replace all policies issued pursuant to this Agreement with policies of other insurers.

    (b)    We reserve all of our rights to cancel in-force policies and policies renewed under this section for non-payment of premium, underwriting reasons or other reasons permitted by law.

09/30/2005  11:28 FAX  860  547  8487                                                    ☑007

(c)     We shall not be obliged under this section to renew policies for a class of business, line of insurance, product, coverage or limit which we propose to cease writing in your territory.

(d)     With respect only to the servicing of policies continued in force or renewed after termination of this Agreement, you shall continue to be our duly authorized representative, subject to all of the provisions of this Agreement, except that you shall not, without our prior written approval, bind any new risk, renew any policy for more than one additional annual period, or increase our exposure under any in-force policy; provided, however, you shall remain authorized to make routine additions and changes to in-force policies in the normal course of business unless and until we advise you to the contrary

(e)     For any policy with a policy period greater than one year, we will extend the term of that policy for only one annual period following the renewal date.

(f)     We will pay, with respect to policies renewed under this section, commissions at the applicable rates specified as per this Agreement at the time or the general rate prevailing among our agents at the time of renewal, whichever is the lesser. We shall not be obligated to pay any commission on any policies we may, in accordance with law, renew or extend after such one additional annual period.

## XIV.   AMENDMENT

14.1 Notice. We may amend this Agreement at anytime by providing you with at least ninety (90) days written notice, except where this Agreement may provide for a shorter period. .

## XV.   GENERAL CONDITIONS

15.1 Involuntary Business. The provisions of this Agreement shall not apply to any business that is assigned to and written by us on an involuntary basis through any assigned risk plan, underwriting association, syndicate or pool.

15.2 Accounting. All premium, loss, compensation and other computations required under this Agreement, including the coding and classifying of all business written, shall be in accordance with our usual accounting, claims and statistical methods and procedures, as may be changed from time to time. The omission of any item from an accounting statement shall not affect the responsibility of either party to account for and pay all amounts due to the other, nor shall it prejudice the rights of either party to collect all such amounts due from the other.

15.3 Offset. We may offset against any sums owed to you or your subproducers under this Agreement or any other agreement or special relationship we may have with you or your subproducers any sums owed to us by you or your subproducers or for which either of you may be liable to us in damages.

15.4 Intellectual Property. Except as set forth below, you must obtain our prior written consent for any use of our name, logo, domain names, copyrighted materials, trademarks, servicemarks, software or other intellectual property (herein collectively "Intellectual Property"). You are permitted to use our name, logo, copyrighted materials distributed for use in advertising, and our product trademarks and

09/30/2005 11:28 FAX 860 547 6487                                                    ☑008

of business, provided you send us a copy of any such advertisements before publication. You shall use our Intellectual Property only in accordance with our written or published standards, rules and requirements. You shall not register any of our Intellectual Property, or use or register any derivatives of our Intellectual Property. You shall not acquire any rights or interests in our Intellectual Property and your permission to use it may be withdrawn by us at anytime.

15.5 **Confidentiality/Privacy.** As used herein, "Confidential Information" means all of our confidential, proprietary or trade secret information, including, but not limited to, underwriting criteria and guidelines, procedures and processes, studies, reports, compensation arrangements, and any other data or information developed by us and provided to you or which is subject to protection under any Federal or state privacy law. Notwithstanding the foregoing, the following shall not constitute "Confidential Information" for purposes of this Agreement: information which is obtained or was previously obtained by you from a third person who was not prohibited from transmitting the information by a contractual, legal or fiduciary obligation to us, or information which is or becomes generally available to the public other than as a result of a breach of this Agreement by you or a disclosure by you to another person.

(a) You shall maintain the confidentiality of the Confidential Information, shall use it only for purposes of this Agreement, and shall not disclose it to any other person except to employees, agents and other persons who need to know such Confidential Information to further the objectives of this Agreement and who agree in writing to maintain the confidentiality of the information as provided herein. In the event you are requested or required by law to disclose any Confidential Information, you shall provide us with prompt notice thereof and cooperate with any of our efforts to seek a protective court order.

(b) If the Gramm-Leach-Bliley Act, including the regulations promulgated thereunder, or other applicable law, now or hereafter in effect, imposes a higher standard of confidentiality with respect to the Confidential Information, such standard shall prevail over the provisions of this Agreement.

(c) You shall at all times comply with our published Privacy Policies, as may be amended from time-to-time, concerning financial, medical and other personal or personally identifiable information.

15.6 **Errors and Omissions Insurance.** You agree to maintain in force professional errors and omissions liability insurance.

15.7 **Pledge of Assets.** In the event you are in breach of any of your obligations under this Agreement, you shall not pledge, encumber, lien, grant any security interest in, or otherwise assign your use, control or ownership of any expirations of policies written by us without first securing our written consent. You shall provide us with prior written notice of any such intended action, regardless of the absence of any such breach.

15.8 **Waiver/Amendment.** The delay or failure of either party to enforce compliance with any term or condition of this Agreement shall not constitute a waiver of such term or condition. No waiver of any term, condition or breach hereunder shall be deemed valid unless in a writing signed by the party giving such waiver, and no waiver in one instance shall be deemed a waiver of any subsequent event of the same nature. No amendment to this Agreement shall be valid unless in a writing signed by us.

15.9 **Assignment.** This Agreement may not be assigned by you, in whole or in part,

☑009

**15.10 Force Majeure.** Neither party shall be liable to the other in monetary damages for delay or failure in performance, other than the obligation to pay monies hereunder, caused by acts of God, war, riot, strikes, fire, lightning, flood or other natural disaster, or power, communications or computer failures that are beyond the reasonable control of the party.

**15.11 Entire Agreement.** This Agreement constitutes the entire agreement of the parties as to the subject matter hereof and supersedes all previous agreements, oral or written, between the parties except as stated in the following sentence. If you are an existing agent of ours, any written amendment or written addendum to your prior base Agency Agreement and any special written side-agreement shall continue in-force but in the event of any conflict between such other document and this document, the provisions of this document shall control.

**15.11 Construction.** This Agreement is not intended to confer upon any third party any rights or remedies. This Agreement shall be construed under and in accordance with the laws of the State of Connecticut without giving effect to the conflicts of law rules. Any provision of this Agreement that conflicts with any applicable law or regulation shall be deemed amended to the minimum extent necessary to comply with such law or regulation The captions in this Agreement are included for convenience only and shall not be used to interpret any of the provisions of this Agreement.

EXHIBIT H
EXAMPLES OF FRANEY'S ACTIVITIES
WHICH ILLUSTRATE SPECIAL RELATIONSHIP WITH MMI

This following paragraphs in this exhibit describe some of the numerous examples of Franey's relationship with MMI, which illustrate the length, scope and nature of activities performed by Franey and MMI's reliance upon such scope and activities.

*Length*

1.     Franey began his relationship with MMI when its founder, Joseph P. Cooke, brought Franey on as the bonding agent when the company started. [See Deposition of William Franey in Underlying Action dated August 29, 2017 (the "Franey Deposition"), attached to this report as Exhibit I.]

2.     "The Madison entities have a long history of working with William Franey for insurance needs. Mr. Franey provided these services and was a key advisor to the Madison owners for many years, including many years prior to the formal formation of Madison Mechanical OS Corp in 2007." [Affidavit of Glenn Haslam dated May 8, 2019 (the "Haslam Affidavit"), attached to this report as Exhibit J.]

Claim Related Activities

3.     "Since at least 2009, all claims against Madison were reported through Mr. Franey or one of his associates. To my recollection claims were never reported directly to the insurance carrier." [Haslam Affidavit]

4.     When MMI received notice that it was served with a complaint in a lawsuit by Travelers, MMI's officers and shareholders turned to and relied upon Franey and Alliant for guidance, who responded by contacting the insurer, Swiss-Re, on MMI's behalf. [See July 17, 2017 email thread between Alliant (Franey) and MMI (Haslam) attached to this exhibit.]

*Coverage Advice*

5.      "Madison purchased directors' and officers' liability coverage and employment practices liability at Mr. Franey's suggestion." [Haslam Affidavit]  In addition to placing surety bonds, Franey and Alliant placed other insurance coverages for MMI including its property and casualty insurance, as well as its health benefits. [Franey Deposition]

6.      Franey continued to counsel MMI as to its insurance needs after the new Madison Mechanical Contracting, LLC entity was formed in August of 2015. According to Mr. Haslam's affidavit, "...Garofalo and I discussed the insurance needs for Madison Mechanical Contracting, LLC ("MMCLLC") with Mr. Franey. We discussed the need for all types of insurance policies like that of Madison Mechanical, Inc. This would include general liability, property, excess liability, worker's compensation, pollution, directors' and officers', and employers' practices liability insurance."

*Other Insurance Related Advice*

7.      In addition to its insurance needs, Franey and Alliant assisted and guided MMI with its needs beyond insurance through a wide-ranging number of ways. For example, Franey and Alliant assisted MMI with securing financing to pay its insurance premiums [See April 30, 2013 email from Alliant (Pat Biederman) to MMI attached to this exhibit], met with MMI to determine if use of a bonding company would assist with MMI's cash flow issues in order to finish outstanding construction projects [Franey Deposition], and drafted insurance requirements language for use in MMI's labor contracts. [See December 29, 2018 email thread between Alliant (Franey and Biederman) to MMI (Haslam and Geiman) attached to this exhibit.]

8.      According to Mr. Haslam, he considered Franey a "close advisor to the Madison entities" and stated in his affidavit that "Mr. Franey did not simply take orders from the

shareholders but rather offered advice, insight, and suggestions to the companies." [Haslam Affidavit]

**Michele J. Rogers**

| | |
|---|---|
| **From:** | Glenn Haslam <glennh@madisonmechanical.net> |
| **Sent:** | Friday, April 12, 2019 2:54 PM |
| **To:** | Gary R. Jones; Danielle Vranian |
| **Subject:** | FW: Traveler's Indemnity Suit |

**From:** Bill Franey, Sr. <wfraney@alliant.com>
**Sent:** Monday, July 17, 2017 1:24 PM
**To:** Glenn Haslam <glennh@madisonmechanical.net>
**Cc:** John Budds <jbudds@alliant.com>
**Subject:** RE: Traveler's Indemnity Suit

Glenn, he is contacting Swiss-Re to find out what is going on. John will let us know. Bill

**William G. Franey**
Executive Vice President
Commercial and Corporate Group
Alliant Americas

9901 Business Parkway
Ste  B
Lanham, MD  20706

D  301 306 3066
O  301 459 0055
C  410 980 9903
F  301 459 9521
www.alliant.com

CA License No. 0C36861



Alliant Americas is a division of Alliant Insurance Services, Inc.

**From:** Glenn Haslam [mailto:glennh@madisonmechanical.net]
**Sent:** Monday, July 17, 2017 1:02 PM
**To:** Bill Franey, Sr. <wfraney@alliant.com>
**Subject:** FW: Traveler's Indemnity Suit

Can you ask john buds what we should do here

*Glenn Haslam*
Madison Mechanical
5621 Old Frederick Road, Suite 1
Catonsville, MD 21228

**From:** Eliot Wagonheim [mailto:ewagonheim@wagonheim.com]
**Sent:** Monday, July 17, 2017 10:59 AM

**To:** Glenn Haslam; Brant Geiman
**Subject:** Traveler's Indemnity Suit



# WAGONHEIM LAW

Gentlemen,

As an FYI, the docket in the Travelers' case reflects that Madison was served on May 1, 2017. The company's Answer was due on or about June 1st, but no response has been filed. I'm well aware of the overall prospects for Madison, but I think it is in your best interest to at least ensure that there is no default judgment entered. You need to kick this can down the road ofr 60-90 days, per my conversation with Glenn.

From our last correspondence, your understanding was that another lawyer was filing a response on Madison's behalf. My recommendation is either to circle back with that lawyer to make sure that the response is filed IMMEDIATELY or have me file it.

There is, of course, the chance that a response was filed last week and has yet to be docketed, but that is certainly something you'd want to confirm.

As we discussed, I will not take any action until or unless you instruct me to do so.

Best,

Eliot

---

**Eliot M. Wagonheim**
**Wagonheim Law**
**4 North Park Drive, Suite 411**
**Hunt Valley, MD 21030**

Phone:  (410) 584-1110
Fax:     (410) 584-1120
Cell: (410) 925-6276
www.wagonheim.com

**Subscribe to our** business blog

   

This email and its attachments are for the exclusive use of the intended recipients, and may contain proprietary information and trade secrets of Alliant Insurance Services, Inc. and its subsidiaries. This email may also contain information that is confidential, or otherwise protected from disclosure by contract or law. Any unauthorized use, disclosure, or distribution of this email and its attachments is prohibited. If you are not the intended recipient, let us know by reply email and then destroy all electronic and physical copies of this message and attachments. Nothing in this

email or its attachments is intended to be legal, financial, or tax advice, and recipients are advised to consult with their appropriate advisors regarding any legal, financial, or tax implications.

## Michele J. Rogers

| | |
|---|---|
| **From:** | Brant Geiman <brantg@madisonmechanical.net> |
| **Sent:** | Friday, April 12, 2019 2:54 PM |
| **To:** | Gary R. Jones; Danielle Vranian |
| **Cc:** | Glenn Haslam |
| **Subject:** | FW: Insurance Program - Premium Payment Terms |

The email below is in regards to them helping us secure financing for our insurance premiums.

Brant

**From:** Bob Buczkowski
**Sent:** Tuesday, April 30, 2013 10:26 PM
**To:** Pat Biederman <pbiederman@alliant.com>
**Cc:** Bill Franey, Sr. <wfraney@alliant.com>; Kevin Bartley <kbartley@alliant.com>; Brant Geiman <brantg@madisonmechanical.net>
**Subject:** RE: Insurance Program - Premium Payment Terms

Pat,

We will take door #2. Brant will cut a check for the $55k and I will give to Bill on Thursday. Will you be sending an invoice for the first installment?

I just wanted to thank all of you for your efforts on this renewal. I know it wasn't the easiest.

Bob

Bob Buczkowski, CPA
Madison Mechanical, Inc. CFO
410-461-7301 (O)
410-461-8470 (F)
410-984-1636 (C)

**From:** Pat Biederman [mailto:pbiederman@alliant.com]
**Sent:** Tuesday, April 30, 2013 6:15 PM
**To:** Bob Buczkowski
**Cc:** Bill Franey, Sr.; Kevin Bartley
**Subject:** Insurance Program - Premium Payment Terms

Hello Bob

We have two options for payment of premium. Option 1 has the WC direct billed by the Hartford 25% down & 9 installs. All other policies would be premium financed. The premium finance arrangement is for 10 equal payments and at interest rate of 2.99%. Option 2 has all policies subject to premium finance under a single payment plan. The arrangement is for 10 equal payments and an interest rate of 2.99%

With interest rates so low, several of our clients have preferred the Option 2 method. That is not to mention the fact that it is 10 equal payments, saving on the 25% down payment requirement on the direct billed Hartford WC and you will have two payees.

**Option 1** - All policies but WC Premium Financed.  WC Direct billed by Hartford 25% down & 9. installs

|  | Financed Policies All but WC | WC Direct Bill paid to Hartford | Total |
|---|---|---|---|
| Down Payment | $ 32,941.17 | $ 55,886.00 | $ 88,827.17 |
| 9 Installs each at | $ 32,941.17 | $ 18,625.00 | $ 51,566.17 |

**Option 2** - All policies Premium Financed including WC.

|  | Financed Policies All, incl WC | None | Total |
|---|---|---|---|
| Down Payment | $ 55,543.40 | $ - | $ 55,543.40 |
| 9 Installs each at | $ 55,543.40 | $ - | $ 55,543.40 |

This is totally your preference.  What we will need is the signed finance agreement for the option selected and the down payment check made payable to Alliant for the policies subject to premium finance.  If option 1 is selected the Alliant check should be $32,941.17 (Hartford will bill the WC down payment of $55,886 separately.) If Option 2 is selected the Alliant check is $55,543.40.

I understand that Bill is meeting with you on Thursday morning, so he can pick up the signed agreement and check at that time.  If you know before then which option you will be selecting we will be able to get appropriate instruction to the Hartford.

Please let us know if there are any questions.

Thanks

Pat

Pat Biederman CPCU, ARM
Sr. Vice President
Alliant Insurance Services, Inc
9901 Business Parkway
Lanham, MD  20706
301.306.3054 · fax 301.459.9387
pbiederman@alliant.com   NEW!

This email and all attachments to it are for the sole use of the intended recipients and may contain proprietary information and trade secrets of Alliant Insurance Services, Inc and its subsidiaries. This email may also contain information which is confidential or which is protected from disclosure by privilege. Any unauthorized use, disclosure or distribution of this email and its attachments is prohibited. If you are not the intended recipient, let us know by reply email and then erase and destroy all electronic or other copies of this message.

This e-mail and all attachments to it are for the sole use of the intended recipients and may contain proprietary information and trade secrets of Alliant Insurance Services, Inc. and its subsidiaries. This e-mail may also contain

information which is confidential or which is protected from disclosure by privilege. Any unauthorized use, disclosure or distribution of this e-mail and its attachments is prohibited. If you are not the intended recipient, let us know by reply e-mail and then erase and destroy all electronic or other copies of this message.

## Michele J. Rogers

| | |
|---|---|
| **From:** | Glenn Haslam <glennh@madisonmechanical.net> |
| **Sent:** | Friday, April 12, 2019 2:44 PM |
| **To:** | Gary R. Jones; Danielle Vranian |
| **Subject:** | FW: Labor Services Agreement - Alliant Proposed Insurance Requirements |
| **Attachments:** | Labor Services Agreement (Form), 1.docx; Proposed Madison Subcontractor Insurance And Indemnification Requirements 12.28.2018.docx; Proposed Madison Subcontractor Insurance And Indemnification Requirements 12.28.2018.pdf |

**From:** Bill Franey, Sr. <wfraney@alliant.com>
**Sent:** Saturday, December 29, 2018 8:50 AM
**To:** Glenn Haslam <glennh@madisonmechanical.net>; Brant Geiman <brantg@madisonmechanical.net>
**Cc:** Pat Biederman <pbiederman@alliant.com>; Kathaleen Bowen <kbowen@alliant.com>
**Subject:** FW: Labor Services Agreement - Alliant Proposed Insurance Requirements

Gentlemen, attached for your convenience are suggestions by Pat concerning insurance under the Labor Services Agreement. We thank you for your business and hope you have a great New Year. Bill

William G. Franey
**Executive Vice President**
**Commercial and Corporate Group**
**Alliant Americas**

9901 Business Parkway
Ste. B
Lanham, MD  20706

D   301 306 3066
O   301 459 0055
C   410 980 9903
F   301 459 9521
W  www.alliant.com

**◢Alliant**

CA License No. 0C36861
Alliant Insurance Services, Inc.

**From:** Pat Biederman
**Sent:** Friday, December 28, 2018 3:48 PM
**To:** Bill Franey, Sr. <wfraney@alliant.com>
**Cc:** Kathaleen Bowen <kbowen@alliant.com>
**Subject:** FW: Labor Services Agreement - Alliant Proposed Insurance Requirements

I have attached both a pdf and Word Doc version of our recommendations for the Insurance Requirements in the Madison Agreement.

For the most part, many of the intended requirements or provisions were already in the Madison agreement draft, but not properly referenced by insurance industry standards. Those have been adjusted or moved to the appropriate line of coverage.

- It is for this reason that I moved the Pollution requirement included as an endorsement on the CGL policy to a separate policy requirement.

- I also changed the requirement for notice of cancellation from a requirement on the certificate to a separate line requirement. I also deleted the "Registered Mail" requirement for this notice and included 10 day notice in the event of Non-Payment. It still requires that the notice comes from the carrier in written form which will likely mean that Madison would need to be endorsed to the Suppliers policies.

Madison's GL carrier requires the GL to include Additional Insured coverage to include Products and Completed Operations and Primary & Non-Contributory wording. The Madison draft includes those phrases, but as noted above, they are now referenced appropriately as part of the CGL requirement.
The carrier also required Waiver of Subrogation provisions. I have added that language, as it was not in the draft.

I have added some addition Provisions/Requirements because I believe that they are needed.

- Added Automobile Liability Requirement – Madison does not need to get tagged for an auto loss, as the result of a Supplier/Sub's failure to have this coverage to protect itself from a lack of coverage of one of their "workers".

- Added Per Project Requirement to GL – This is pretty standard.

- Added provision to GL Additional Insured requirement that coverage be maintained for the benefit of the Additional Insured for a period of 5years or Statute of Repose whichever is greater. This is intended to apply clear definition for "required by written contract". It should not add to the cost of the Suppliers Insurance, but it should eliminate denial for the Additional Insured for the future products and completed ops claims.

- Added a provision that states that the limits indicated are minimum and do not limit the coverage afforded to the Additional Insured nor does it eliminate or limit the obligation under the Indemnification Provision. Carriers are interpreting as the "as required by written contract" in the automatic additional insured endorsements as a limitation of liability/coverage for that Additional Insured both under the Additional Insured Coverage and also under the contractual provisions (Indemnification).

I did not make any changes to the Indemnification Agreement as that was drafted by legal counsel.

While we offered these changes to their Labor Services Agreements document it is important that similar provisions be included in an agreement for any subcontracted work performed. If they not already have a standard for that agreement we should recommend that the develop one to include similar insurance requirement language. I would also note that they are requiring only $1M in limits. As this labor arrangement is with larger firms they may want to increase the limits requirements. They should look at the certificates that they are getting today as it may suggest what limits they are already requiring so increasing the requirement may not be a hardship.

Since their requirements are imbedded in the agreement itself rather than as a separate Exhibit, they may want to develop a sample cert or a checklist that they can provide separately to their subs. We find that when we get a separate listing of requirements from our accounts when they need a certificate it is easier for the agent to comply.

We do needed to get their revised and final document and implementation plan asap to properly address the binding condition of their GL carrier.

Let me know if you need anything else.

Pat

Pat Biederman CPCU, ARM
Senior Vice President
Alliant Americas

D 301 306 3054
W alliant.com

**Alliant**

CA License No. 0C36861
Alliant Insurance Services, Inc.

---

**From:** Bill Franey, Sr.
**Sent:** Thursday, December 27, 2018 2:52 PM
**To:** Pat Biederman <pbiederman@alliant.com>
**Cc:** Kathaleen Bowen <kbowen@alliant.com>
**Subject:** Fwd: Labor Services Agreement

This is the latest from Madison. Please give them wording to bring it into compliance. Thanks Bill

Sent from my iPhone

Begin forwarded message:

> **From:** Brant Geiman <brantg@madisonmechanical.net>
> **Date:** December 27, 2018 at 1:47:47 PM EST
> **To:** "Bill Franey, Sr." <wfraney@alliant.com>
> **Cc:** Glenn Haslam <glennh@madisonmechanical.net>
> **Subject: Fwd: Labor Services Agreement**
>
> This message has originated outside the organization.

---

Sent from my iPhone

Begin forwarded message:

> **From:** Kimberly Bohle <kbohle@wagonheim.com>
> **Date:** December 13, 2018 at 11:54:22 AM EST
> **To:** "brantg@madisonmechanical.net" <brantg@madisonmechanical.net>
> **Cc:** "glennh@madisonmechanical.net" <glennh@madisonmechanical.net>, "Eliot Wagonheim" <ewagonheim@wagonheim.com>
> **Subject: Labor Services Agreement**
>
> Brant:
>
> Eliot asked me to forward to you the attached draft Labor Services Agreement for your review.

Please let us know if you have any questions or comments.

Thanks.
Kim


Kimberly A. Bohle, Esq.
Wagonheim Law
4 North Park Drive, Suite 411
Hunt Valley, Maryland 21030
Phone: 410.584.1110
Cell:  410.303.8633
Fax: 410.584.1120
kbohle@wagonheim.com
www.wagonheim.com

Subscribe to our business blog at
www.bottomlinebusinessinsights.com

This email and its attachments are for the exclusive use of the intended recipients, and may contain proprietary information and trade secrets of Alliant Insurance Services, Inc. and its subsidiaries. This email may also contain information that is confidential, or otherwise protected from disclosure by contract or law. Any unauthorized use, disclosure, or distribution of this email and its attachments is prohibited. If you are not the intended recipient, let us know by reply email and then destroy all electronic and physical copies of this message and attachments. Nothing in this email or its attachments is intended to be legal, financial, or tax advice, and recipients are advised to consult with their appropriate advisors regarding any legal, financial, or tax implications.

## LABOR SERVICES AGREEMENT

THIS LABOR SERVICES AGREEMENT (this "Agreement") is entered into as of this _____ day of _____, 201__ by and between _____ ("Supplier") and Madison Mechanical Contracting, LLC ("Madison").

### Recitals

WHEREAS, Madison desires to retain services of Supplier, to provide labor services under Madison's direction for the performance of various projects;

WHEREAS, Supplier desires to provide services to Madison on a per project basis; and

WHEREAS, the parties hereto mutually agree that all labor services provided by Supplier to Madison shall be subject to and governed by the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties hereto agree as follows:

### Agreement

1.   Recitals.        The Recitals set forth above are hereby incorporated by reference into the body of this Agreement as it's fully set forth herein verbatim.

2.   Services.

a.    *Scope of Services.* Supplier shall provide experienced and qualified personnel to perform such services as may be requested by Madison from time to time in writing or email (the "Services"). As part of the Services, Supplier shall provide all personnel with all required tools and equipment necessary for the completion of work described in each Work Order. Such tools and equipment shall include, without limitation:

i.    Construction Work Boots
ii.   Hard Hat/Safety Glasses

b.    *Qualifications.* For each individual provided to Madison by Supplier to perform Services hereunder (each a "Worker" and collectively the "Workers"), Supplier shall provide copies of all licenses, accreditations, proof of citizenship, or other legally satisfactory governmental work authorizations, medical documentation, if necessary, and any other documentation that Madison may reasonably require for the performance of the Services.

c.    *Work Orders.* A request for the provision of services by Madison shall only become binding upon Supplier's acceptance of the request in writing or via email correspondence. Once accepted by Supplier, Madison's request for services shall be deemed a Work Order subject to the terms and conditions hereof.

3.   Payment for Services.

a.   Madison shall provide Supplier with time sheets generated by each worker for each Work Order. Madison shall submit the time sheets to Supplier no later than two (2) business days after the conclusion of the proceeding work week, itemizing all compensable time expended by each Worker on each Work Order during the preceding work week.

b.   Supplier shall submit and invoice to Madison for all Services performed during the preceding work week no later than two business days following Supplier's receipt of Madison's invoice. As a condition precedent to payment, Supplier shall provide Madison with: (i) a "Compliance Packet" for each Worker including the Worker's executed Contract Labor General Release (attached hereto as Exhibit A), physical fit test, current training certificate(s), and applicable license(s) as required for the type of work performed by the Worker; (iii) certificates of insurance in compliance with this Agreement; and (iii) releases of liens with respect to all prior payments.

c.   In the absence of any dispute, and subject to the terms, conditions, and requirements set forth in this Section 3, Madison shall render payment to Supplier no later than thirty (30) days following its receipt of Supplier's invoice. For purposes of this Agreement the work week will be from 12 o'clock AM on Sunday through 11:59 Saturday.

d.   No payment will be made by Madison to Supplier until or unless Supplier has satisfied all obligations set forth herein and in the Work Order (for the applicable time period), including without limitation, provision of back-up documentation such as certified payroll (if applicable).

e.   *FMLA.* If a Worker becomes eligible for or requests leave time under the Family and Medical Leave Act, Supplier and Madison will cooperate in providing mandated leave and complying with all other aspects of Federal and State Law.

f.   *Invoice Disputes.* In the event Madison disputes all or part of an invoice submitted by Supplier, Madison shall provide Supplier with a written explanation of the dispute within five (5) business days of Madison's receipt of Supplier's invoice. Madison shall also promptly pay any undisputed portion of Supplier's invoice within the time set forth in the preceding paragraph. The parties will work in good faith to resolve any dispute, if unable to do so, shall address the matter in accordance with Paragraph 11 hereof.

g.   *Travel and Expenses.* When needed in Madison's sole discretion, the parties shall mutually agree on reasonable payment or reimbursement for travel and expenses.

h.   *(INSERT LABOR RATES)*

> **Commented [EW1]:** We could attach an exhibit with current labor rates, write them in here, or just specify that they'll be listed in the Work Order. Your call.

Labor Services Agreement                                              Page 2

4.  <u>Relationship of Parties.</u> It is mutually understood and agreed that each Worker is, and at all times will be, an employee of Supplier and shall not, for any purposes, be deemed to be an employee of Madison. No Worker shall have the right or authority to bind Madison to any Agreement, Obligation, or Liability and Supplier agrees to specifically instruct each Worker not to hold himself or herself out to having such authority. Nothing contained herein will be construed to entitle any Worker to any benefits made available to Madison employees including without limitation, participation in any Madison retirement or medical plans.

Supplier shall be solely responsible for the payment and deduction as applicable of employment related Federal, State, and local income of other taxes, if any as well as any FICA, Medicare, employment and disability benefits, and Worker's Compensation obligations pertaining to monies earned by or to be paid to workers performing Services hereunder. Supplier shall render payment to each Worker in accordance with Supplier's customary payroll practices.

5.  <u>Rights and Duties of Supplier.</u>

    a.  *Personnel.* Madison shall have the right to inform Supplier at any time that it no longer wishes to utilize the services of a particular Worker.

    b.  *Safety.* Madison and Supplier agree to comply with all safety, health and work laws, regulations and rules, including without limitation, OSHA, MOSHA and Madison's safety programs. Supplier shall ensure compliance with safe work practices and use of protective equipment imposed by controlling federal, state and local government. All accidents or incidents involving Workers will be reported immediately to Supplier by Madison. Madison will cooperate with Supplier's workers compensation carrier and liability insurance carrier.

    c.  *Tools & Equipment.* Madison will furnish all tools and equipment deemed necessary in Madison's sole discretion to perform the work in a safe and orderly manner.

6.  <u>Supplier Standard of Care.</u> Supplier represents and warrants that all Services provided by Supplier and the Workers hereunder will be performed promptly and diligently and will be conducted in a manner consistent with that level of care and skill ordinarily exercised by individuals currently practicing the various trades and functions of the Workers under similar conditions.

7.  <u>Insurance.</u> Supplier shall maintain the following minimum insurance requirements as applicable:

    a.  Workers compensation insurance with statutory limits and employer's liability coverage in the amount of $1,000,000 per occurrence/aggregate.

    b.  Commercial general liability covering injury to persons or property arising during the performance of the Services hereunder, with limits of not less than $1,000,000 in case

Labor Services Agreement                                      Page 3

of death or injury to any one person, $2,000,000 aggregate. Such liability policy shall be Occurrence form and provide for contractual liability coverage, shall include coverage for asbestos and lead abatement activities (if applicable), and shall *not* contain a 'third party action over claim" exclusion. In addition, if the Work includes services performed in connection with hazardous substances/materials, the liability policy shall include an endorsement providing coverage for environmental impairment/ pollution liability or Subcontractor must provide evidence of a separate pollution liability policy.

        c.    Supplier shall provide Madison with certificates evidencing Supplier's compliance with the above-referenced insurance requirements prior to performance hereunder or within five (5) days of execution of this Agreement, whichever is earlier, and on the annual renewal date(s) of the policies for all coverages for the term of this Agreement, and any extensions thereof. The insurance coverage shall be in form(s) and from insurers acceptable to Madison and the certificates of insurance shall list Madison and the Customer(s) and/or Owner(s) as Certificate Holders and Additional Insureds. The certificates shall also provide that the insurance shall not be canceled without thirty (30) days prior written notice by registered mail to Madison. Supplier's insurance shall be primary; Madison's insurance shall be excess and not contributory.

        8.    Indemnification. To the fullest extent permitted by law, Supplier shall indemnify, defend, and hold harmless Madison and Madison's customer(s) from all claims, demands, causes of action and liabilities of every kind and nature whatsoever, including OSHA, MOSHA and other governmental claims, penalties and inquiries arising out of or in connection with the contract labor services provided under this Agreement and each Work Order issued pursuant to this Agreement, including all costs and expenses incurred by Madison in connection with same. This indemnification shall extend to claims occurring after this Agreement is terminated as well as while it is in force. Supplier shall not be obligated to indemnify any party for claims arising from the sole negligence or willful misconduct of Madison or Madison's customer(s). The indemnity set forth in this paragraph shall not be limited by the insurance requirements or by any other provision of this Agreement or the individual Work Orders. All Services covered by this Agreement and each Work Order shall be at the sole risk of the Supplier until the completed work is accepted by Madison. Notwithstanding the foregoing, and in the absence of a negligent act or omission by a Worker providing Services hereunder, Supplier shall not be liable for any damages to the extent such damages are attributable to a negligent act or omission on the part of Madison.

        9.    Supplier's Compliance with Laws. Supplier warrants and represents that it is an Equal Opportunity Employer and is compliant with all Federal, State and local laws pertaining to employment including all laws pertaining to Equal Opportunity and the Americans with Disabilities Act. Supplier shall be liable to Madison and or Madison's customer for all losses, including costs and expenses attributable to Supplier's failure to comply with such employment laws and regulations.

        10.    Termination for Convenience. Madison, for its convenience, may terminate the contract labor services provided pursuant to this Agreement and any Work Order(s), in whole or

Labor Services Agreement                         Page 4

in part, at any time by written notice to Supplier which shall state the extent and effective date of such termination. Supplier shall be entitled to be paid for accepted work in place in accordance with Section 3 of this Agreement. Nothing herein shall bar withholdings by Madison permitted by other provisions of this Agreement.

11.   Dispute Resolution. Any dispute arising from this Agreement or pertaining to Services rendered by a Worker to Madison shall be resolved in accordance with this Section 11.

a.   *Good Faith Discussion.* No later than ten (10) days following a party's receipt of notice of a claim or matter in dispute the receiving party shall schedule a discussion, either in person or by phone, between the parties' principal with an eye towards resolving the dispute in good faith.

b.   *Mediation.* In the event the claim or dispute exceeds $30,000.00 and could not be resolved through discussions as contemplated by the preceding paragraph, the parties agree to submit a dispute as well as any counter claims to mediation conducted under the auspices of the American Arbitration Association or such other form as may be mutually agreed by the parties. Each party will bear its own costs and expenses associated with the mediation. The mediation will take place within a 30 mile radius of the project for which the Services in dispute were rendered. The parties will use their best efforts to ensure that the mediation will take place no later than sixty (60) days from the date of the initial filing for mediation.

c.   *Arbitration.* For all dispute in excess of $30,000.00 for which no resolution was reached by the discussions and/or mediation contemplated in the preceding paragraphs, the dispute shall be referred to arbitration before a sole arbitrator under the auspices of the American Arbitration Association with each party barring its own costs and expenses. The location of the Arbitration shall be subject to the same geographical limitations as are set forth in the preceding paragraph.

d.   All disputes for which less than $30,000.00 are claimed may be filed in a court of competent jurisdiction in the county where the project at issue is located. THE PARTIES HERETO EACH WAVE ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY AS TO ANY COMPLAINT, CAUSE OF ACTION, DISPUTE, OR CLAIM RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE SERVICES HEREUNDER.

12.   Assignment. This Agreement may not be assigned without the prior written consent of Madison, which consent shall not be unreasonably withheld.

13.   Notices. All notices required by this Agreement and the Work Orders shall be furnished by hand delivery, or a nationally recognized overnight service to the following addresses:

If to Supplier:   _____

Labor Services Agreement                                        Page 5

|  |  |
| --- | --- |
| If to Madison: | Madison Mechanical Contracting, LLC |
|  | 5621 Old Frederick Road, Suite 1 |
|  | Catonsville, MD 21228 |
|  | Attn: _____ |

All notices shall be effective upon receipt by the party to whom the notice is sent. Either party may change the address to which notices may be sent by written notice to the other party in accordance with this Section.

14.   Severability. If any provisions of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable provision or provisions and the rights and obligations of the parties shall be construed as if not containing the particular invalid unenforceable provision or provisions and the rights and obligations of the parties shall be construed and enforced accordingly.

15.   No Waiver. Failure of a party to enforce any right or condition of this Agreement, in one or more instances, shall not be construed as thereafter waiving any right or condition.

16.   Governing Law. This Agreement shall be governed by the laws of the State of Maryland.

17.   Entire Agreement. This Agreement and any Work Orders as contemplated herein set forth the entire understanding of the parties as subject matter hereof and supersedes all prior and collateral representations. Any amendments or modifications hereto must be in writing and signed by Supplier and a duly authorized representative of Madison.

*[This space left blank intentionally; signatures follow.]*

Labor Services Agreement                                         Page 6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement of the date first written above.

WITNESS/ATTEST:                 Madison Mechanical Contracting, LLC

_____           By:_____
                                Name:_____
                                Title:_____

WITNESS/ATTEST:                 _____(Supplier)

_____           By:_____
                                Name:_____
                                Title:_____

7.   <u>Insurance</u>. Supplier shall purchase and maintain insurance as will protect the Supplier and Madison, (the Owners and others as required by Contract Documents) from and against injuries, claims, damages and expenses arising out of or resulting from performance of the Services or the Supplier's operations under this Agreement.  Such insurance shall be in a company or companies, acceptable to Madison with an A.M. Best rating of at least A-VII and lawfully authorized to do business in the jurisdiction where the Services are performed.

Supplier's coverage shall be written with forms of coverage and limits of liability not less than those specified or less than those set forth in Contract Documents in Contract Documents whichever is greater.

The requirement to procure and maintain insurance of certain coverage and minimum limits in no way alters or limits the Supplier's obligation under Paragraph 8 <u>Indemnification</u>, or as otherwise required in the Agreement or warrants that the coverage and limits required satisfy the Supplier's obligations under this Agreement.

a.   Workers Compensation insurance with statutory limits and employer's liability coverage in the amount of $1,000,000 separately for:  Each Accident; Each Employee for Injury by Disease; Aggregate for Injury by Disease.

b.   Commercial General Liability(CGL) insurance on a form at least as broad as Insurance Services Office (ISO) Commercial General Liability Coverage "Occurrence" Form CG00 01 and shall cover liability arising from premises, operations, independent contractor, products-completed operations, personal injury and advertising injury, and liability assumed under contract or agreement. CGL Minimum Limits: $1,000,000 each Occurrence; $2,000,000 General Aggregate; $2,000,000 Products and Completed Operations Aggregate.  The General Aggregate shall apply separately to each project. Madison, the Customer(s) and/or Owner(s) shall be named as Additional Insureds for ongoing operations and products/completed operations on Supplier's Commercial General Liability policy. This insurance shall be as broad as provided for the named insured, Supplier.  It shall apply as primary and non-contributory insurance before any other insurance or self-insurance, including deductible, maintained by, or provided to the additional insured.  This insurance shall be maintained for the benefit of the Supplier and the Additional Insured parties for a period of (5) years or the Statute of Repose, whichever is greater, following the completion of the Supplier's Services under this Agreement

c.   Pollution Liability Insurance covering all operations necessary to complete Supplier's Services.  Such insurance shall apply to bodily injury, property damage, including loss of use of damaged property that has been physically injured; clean-up costs; and defense, including costs and expenses incurred in the investigation, defense and settlement of claims.  Fungi (Mold) and Bacteria shall be specifically included. Minimum Pollution Liability limits: $1,000,000 per Pollution Condition. Madison, the Customer(s) and/or Owner(s) shall be included as Additional Insureds. If any coverage is written on a claims-made basis, the Supplier warrants that any retroactive date applicable to the coverage under the policy precedes the effective date of this contract and that continuous coverage will be maintained or an extended discovery period will be exercised for a period of 5 years beginning from the time that Services under the contract is completed.

**Alliant**

Proposed Madison Subcontractor - Insurance and Indemnification Requirements

     d.     Business Automobile Liability insurance covering liability arising out of any auto including owned, hired and non-owned autos. If there are no owned autos coverage is to be provided for hired and non-owned autos.  Minimum Limits Automobile Liability: $1,000,000 per Accident.

     e.     Waiver of Subrogation – Supplier waives all rights against Madison, the Customer(s) and/or Owner(s) and others as required by Contract Documents for recovery of damages to the extent these damages are covered by commercial general liability, automobile liability, workers compensation, employers liability and any excess or umbrella insurance maintained by Supplier.  Supplier's workers compensation policy shall include A Waiver of our Right to Recover from Others Endorsement (WC 00 03 13), or equivalent, naming on the schedule Madison, the Customer(s) and/or Owner(s) and others as required by Contract Documents.

     f.     Cancellation or other lapses in coverage  - All insurance policies provided in compliance with the insurance requirements set forth above must contain, from the Supplier's insurer, a provision that either the insurance company or its designee must give Madison 30 days (10 days for Non-Payment) written notice of cancellation of coverage by the insurance company. In addition, the Subcontractor shall provide Supplier with prompt notice of a lapse in coverage due to expiration, exhaustion of policy limits, or cancellation of policies.  This obligation of the Subcontract commences upon actual or constructive knowledge of the stipulated conditions.

     g.     Supplier shall provide Madison with certificates evidencing Supplier's compliance with the above-referenced insurance requirements prior to performance hereunder or within five (5) days of execution of this Agreement, whichever is earlier, and on the annual renewal date(s) of the policies for all coverages for the term of this Agreement, and any extensions thereof. The obligation to procure and maintain insurance responsibility of the Supplier and independent of the duty to furnish evidence of insurance.

     8.     <u>Indemnification</u>. To the fullest extent permitted by law, Supplier shall indemnify, defend, and hold harmless Madison and Madison's customer(s) from all claims, demands, causes of action and liabilities of every kind and nature whatsoever, including OSHA, MOSHA and other governmental claims, penalties and inquiries arising out of or in connection with the contract labor services provided under this Agreement and each Work Order issued pursuant to this Agreement, including all costs and expenses incurred by Madison in connection with same. This indemnification shall extend to claims occurring after this Agreement is terminated as well as while it is in force. Supplier shall not be obligated to indemnify any party for claims arising from the sole negligence or willful misconduct of Madison or Madison's customer(s). The indemnity set forth in this paragraph shall not be limited by the insurance requirements or by any other provision of this Agreement or the individual Work Orders. All Services covered by this Agreement and each Work Order shall be at the sole risk of the Supplier until the completed work is accepted by Madison. Notwithstanding the foregoing, and in the absence of a negligent act or omission by a Worker providing Services hereunder, Supplier shall not be liable for any damages to the extent such damages are attributable to a negligent act or omission on the part of Madison.

**⊿Alliant**

Proposed Madison Subcontractor - Insurance and Indemnification Requirements

      7.    <u>Insurance</u>. Supplier shall purchase and maintain insurance as will protect the Supplier and Madison, (the Owners and others as required by Contract Documents) from and against injuries, claims, damages and expenses arising out of or resulting from performance of the Services or the Supplier's operations under this Agreement. Such insurance shall be in a company or companies, acceptable to Madison with an A.M. Best rating of at least A-VII and lawfully authorized to do business in the jurisdiction where the Services are performed.

Supplier's coverage shall be written with forms of coverage and limits of liability not less than those specified or less than those set forth in Contract Documents in Contract Documents whichever is greater.

The requirement to procure and maintain insurance of certain coverage and minimum limits in no way alters or limits the Supplier's obligation under Paragraph 8 <u>Indemnification</u>, or as otherwise required in the Agreement or warrants that the coverage and limits required satisfy the Supplier's obligations under this Agreement.

      a.    Workers Compensation insurance with statutory limits and employer's liability coverage in the amount of $1,000,000 separately for: Each Accident; Each Employee for Injury by Disease; Aggregate for Injury by Disease.

      b.    Commercial General Liability(CGL) insurance on a form at least as broad as Insurance Services Office (ISO) Commercial General Liability Coverage "Occurrence" Form CG00 01 and shall cover liability arising from premises, operations, independent contractor, products-completed operations, personal injury and advertising injury, and liability assumed under contract or agreement. CGL Minimum Limits: $1,000,000 each Occurrence; $2,000,000 General Aggregate; $2,000,000 Products and Completed Operations Aggregate. The General Aggregate shall apply separately to each project. Madison, the Customer(s) and/or Owner(s) shall be named as Additional Insureds for ongoing operations and products/completed operations on Supplier's Commercial General Liability policy. This insurance shall be as broad as provided for the named insured, Supplier. It shall apply as primary and non-contributory insurance before any other insurance or self-insurance, including deductible, maintained by, or provided to the additional insured. This insurance shall be maintained for the benefit of the Supplier and the Additional Insured parties for a period of (5) years or the Statute of Repose, whichever is greater, following the completion of the Supplier's Services under this Agreement

      c.    Pollution Liability Insurance covering all operations necessary to complete Supplier's Services. Such insurance shall apply to bodily injury, property damage, including loss of use of damaged property that has been physically injured; clean-up costs; and defense, including costs and expenses incurred in the investigation, defense and settlement of claims. Fungi (Mold) and Bacteria shall be specifically included. Minimum Pollution Liability limits: $1,000,000 per Pollution Condition. Madison, the Customer(s) and/or Owner(s) shall be included as Additional Insureds. If any coverage is written on a claims-made basis, the Supplier warrants that any retroactive date applicable to the coverage under the policy precedes the effective date of this contract and that continuous coverage will be maintained or an extended discovery period will be exercised for a period of 5 years beginning from the time that Services under the contract is completed.



Proposed Madison Subcontractor - Insurance and Indemnification Requirements

      d.     Business Automobile Liability insurance covering liability arising out of any auto including owned, hired and non-owned autos. If there are no owned autos coverage is to be provided for hired and non-owned autos. Minimum Limits Automobile Liability: $1,000,000 per Accident.

      e.     Waiver of Subrogation – Supplier waives all rights against Madison, the Customer(s) and/or Owner(s) and others as required by Contract Documents for recovery of damages to the extent these damages are covered by commercial general liability, automobile liability, workers compensation, employers liability and any excess or umbrella insurance maintained by Supplier. Supplier's workers compensation policy shall include A Waiver of our Right to Recover from Others Endorsement (WC 00 03 13), or equivalent, naming on the schedule Madison, the Customer(s) and/or Owner(s) and others as required by Contract Documents.

      f.     Cancellation or other lapses in coverage - All insurance policies provided in compliance with the insurance requirements set forth above must contain, from the Supplier's insurer, a provision that either the insurance company or its designee must give Madison 30 days (10 days for Non-Payment) written notice of cancellation of coverage by the insurance company. In addition, the Subcontractor shall provide Supplier with prompt notice of a lapse in coverage due to expiration, exhaustion of policy limits, or cancellation of policies. This obligation of the Subcontract commences upon actual or constructive knowledge of the stipulated conditions.

      g.     Supplier shall provide Madison with certificates evidencing Supplier's compliance with the above-referenced insurance requirements prior to performance hereunder or within five (5) days of execution of this Agreement, whichever is earlier, and on the annual renewal date(s) of the policies for all coverages for the term of this Agreement, and any extensions thereof. The obligation to procure and maintain insurance responsibility of the Supplier and independent of the duty to furnish evidence of insurance.

    8.    <u>Indemnification</u>. To the fullest extent permitted by law, Supplier shall indemnify, defend, and hold harmless Madison and Madison's customer(s) from all claims, demands, causes of action and liabilities of every kind and nature whatsoever, including OSHA, MOSHA and other governmental claims, penalties and inquiries arising out of or in connection with the contract labor services provided under this Agreement and each Work Order issued pursuant to this Agreement, including all costs and expenses incurred by Madison in connection with same. This indemnification shall extend to claims occurring after this Agreement is terminated as well as while it is in force. Supplier shall not be obligated to indemnify any party for claims arising from the sole negligence or willful misconduct of Madison or Madison's customer(s). The indemnity set forth in this paragraph shall not be limited by the insurance requirements or by any other provision of this Agreement or the individual Work Orders. All Services covered by this Agreement and each Work Order shall be at the sole risk of the Supplier until the completed work is accepted by Madison. Notwithstanding the foregoing, and in the absence of a negligent act or omission by a Worker providing Services hereunder, Supplier shall not be liable for any damages to the extent such damages are attributable to a negligent act or omission on the part of Madison.





# Planet Depos

We Make It *Happen*™

# Transcript of William Franey

**Date:** August 29, 2017
**Case:** Buczkowski -v- Madison Mechanical Contracting, LLC, et al.

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of William Franey

1 (1 to 4)

Conducted on August 29, 2017

---

**Page 1**

```
1              IN THE CIRCUIT COURT
2         FOR BALTIMORE COUNTY, MARYLAND
3   - - - - - - - - - - - - - - - -x
4   ROBERT BUCZKOWSKI        )
5             Plaintiff    )
6        v.                 )  Case No.
7   MADISON MECHANICAL       )  03-C-16-005782
8   CONTRACTING, LLC, et al. )
9             Defendants    )
10  - - - - - - - - - - - - - - - -x
11
12        Deposition of WILLIAM FRANEY
13           Greenbelt, Maryland
14         Tuesday, August 29, 2017
15              2:10 p.m.
16
17
18
19
20  Job No.:  156509
21  Pages:  1 - 72
22  Reported By:  Karen Hinnenkamp, RMR
```

**Page 2**

```
1          Deposition of WILLIAM FRANEY, held at the
2   offices of:
3
4
5          Joseph, Greenwald & Laake, PA
6          6404 Ivy Lane
7          Suite 400
8          Greenbelt, Maryland   20770
9          (301) 220-2200
10
11
12
13
14
15
16          Pursuant to Notice, before Karen
17  Hinnenkamp, Registered Merit Reporter and Notary
18  Public in and for the State of Maryland.
19
20
21
22
```

**Page 3**

```
1          A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4       ALYSE L. PRAWDE, ESQUIRE
5       Joseph, Greenwald & Laake, PA
6       6404 Ivy Lane
7       Suite 400
8       Greenbelt, Maryland   20770
9       (301) 220-2200
10
11
12  ON BEHALF OF THE DEFENDANTS:
13      GARY R. JONES, ESQUIRE
14      Baxter, Baker, Sidle, Conn & Jones, PA
15      120 E. Baltimore Street
16      Suite 2100
17      Baltimore, Maryland   21202
18      (410) 385-8004
19
20
21
22
```

**Page 4**

```
1          A P P E A R A N C E S (Continued)
2
3   ON BEHALF OF THE WITNESS:
4       EDWARD J. LONGOSZ, II, ESQUIRE
5       Eckert, Seamans, Cherin & Mellott, LLC
6       1717 Pennsylvania Avenue, NW
7       Suite 1200
8       Washington, D.C.   20006
9       (202) 559-6619
10
11
12  ALSO PRESENT:  Robert Buczkowski
13
14
15
16
17
18
19
20
21
22
```

Transcript of William Franey
Conducted on August 29, 2017

2 (5 to 8)

---

**5**

```
            C O N T E N T S
EXAMINATION OF WILLIAM FRANEY        PAGE
   By Ms. Prawde                      6
   By Mr. Jones                      - - -
   By Mr. Longosz                    - - -


            E X H I B I T S
            (Attached to Transcript)
FRANEY DEPOSITION EXHIBIT NUMBER     PAGE
   1      Defs' 1294 and 1295          41
   2      Defs' 1065 and 1066          51
   3      Defs' 0042 and 0043          61
```

---

**6**

```
        P R O C E E D I N G S
          WILLIAM FRANEY
```
having been duly sworn, testified as follows:
    EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MS. PRAWDE:
    Q   Good afternoon, Mr. Franey.  We just met
off the record but if you could please state and
spell your full name for the record.
    **A   William, W-I-L-L-I-A-M, Franey,**
**F-R-A-N-E-Y.**
    Q   And your home address?
    **A   3 South Acton, A-C-T-O-N, Place,**
**Annapolis, Maryland.**
    Q   My name is Alyse Prawde. I'm one of the
attorneys representing Mr. Buczkowski.
Mr. Buczkowski had filed a lawsuit in the Circuit
Court for Baltimore County and a counterclaim was
brought against him and so you're here today because
we believe there may be some information you have
that's relevant to the lawsuits. Have you ever had
your deposition taken before?
    **A   Yes.**

---

**7**

    Q   How many times?
    **A   I don't know.**
    Q   More than five?
    **A   No, less than five.**
    Q   Okay.  When was the most recent
deposition?
    **A   Ten years ago.**
    Q   Okay.  Well, then we'll just go over some
of the instructions in terms of depositions.  So you
are sworn under oath so everything you say here
today needs to be truthful.  The court reporter is
going to be taking down everything that you say so
please try and talk slowly, speak up.  And please do
not talk over me when I'm asking a question.  I'll
do the same with you when you're giving your
answers.
        If you for whatever reason don't
understand my question or want me to rephrase it,
I'm happy to do so.  Just let me know.  Otherwise I
will understand that you have understood the
question.
        If at any point you need to take a break,

---

**8**

just let me know or let your attorney know and we
can certainly do so.  My only request is that if
there is a pending question that you answer the
question before we take the break.
    Q   Do you have any questions before we get
started?
    **A   No.**
    Q   Okay.  Have you ever previously been a
defendant in a lawsuit?
    **A   Yes.**
    Q   How many times?
    **A   Once.  Twice.**
    Q   What kind of matters were those?
    **A   One was a deal in Texas where I cosigned**
**a note and the maker defaulted.  Another was a**
**misunderstanding about a cable TV company and a bond**
**that we wrote.**
    Q   Do you know what state that lawsuit was
in, the second one?
    **A   The second one?  New York.**
    Q   Okay.  Can you walk me through your
educational history?

---

Transcript of William Franey
Conducted on August 29, 2017

3 (9 to 12)

---

**9**

1    A    I'm sorry?
2    Q    Can you walk me through your educational
3 history?
4    A    I attended the University of Maryland.
5 Did not graduate.
6    Q    What were you studying there, the
7 particular major?
8    A    Government and politics.
9    Q    What did you do after attending Maryland?
10    A    I went to work.
11    Q    Where did you start working?
12    A    At CM Corporation.
13    Q    What was your position there?
14    A    Salesman.
15    Q    How long were you there?
16    A    A couple years.
17    Q    What did you do after that?
18    A    I went to work for the Kemper Insurance
19 Company.
20    Q    What was your position there?
21    A    I'm sorry?
22    Q    What was your position there?

---

**10**

1    A    I was a claims adjuster.
2    Q    How long were you there?
3    A    Two years.
4    Q    Where did you work after that?
5    A    I went to work for a brokerage firm.
6    Q    What was the name of it?
7    A    Wow. I'm trying to get them in order.
8 E. Granville Smith and Associates.
9    Q    Did you work for other brokerage firms
10 after that?
11    A    Yes.
12    Q    Do you know the names of those firms?
13    A    Yes.
14    Q    What are those?
15    A    Professional Insurers and Associates and
16 Shivers Insurance Agency.
17    Q    Where else have you been employed?
18    A    The Franey Insurance Agency.
19    Q    What years did you work there?
20    A    1972 to the present.
21    Q    And what is your position there?
22    A    I'm a salesman.

---

**11**

1    Q    Did you start the company?
2    A    I did.
3    Q    Have you been employed anywhere else?
4    A    No.
5    Q    So Franey Insurance Agency is your only
6 employment at the moment?
7    A    Well, the name has changed so...
8    Q    What's the name of it now?
9    A    Alliance Insurance Services.
10    Q    When did the name change?
11    A    2003.
12    Q    Have you ever held any positions there
13 other than salesman?
14    A    My title is executive vice president.
15    Q    Currently?
16    A    Currently.
17    Q    When did you become the executive vice
18 president?
19    A    2003.
20    Q    Are you familiar with Madison Mechanical,
21 Incorporated?
22    A    I am.

---

**12**

1    Q    And are you familiar with Madison
2 Mechanical OS Corp.?
3    A    Yes.
4    Q    Do you recall who the shareholders were
5 of Madison Mechanical OS Corp.?
6    A    Mr. Buczkowski, Mr. Haslam, Mr. Garofalo,
7 Mr. Lombardo, and Mr. Kraemer.
8    Q    Were you the bonding agent for Madison?
9    A    Yes.
10    Q    How did you first get involved as their
11 bonding agent?
12    A    The company was started by a fellow by
13 the name of Joseph P. Cooke and that's when my
14 involvement began.
15    Q    How do you know Mr. Cooke, or how did you
16 know Mr. Cooke?
17    A    He was a customer.
18    Q    And he began Madison?
19    A    Yes.
20    Q    And he brought you on as the bonding
21 agent to work with Madison?
22    A    Yes.

---

Transcript of William Franey
Conducted on August 29, 2017

---

13

1    Q    Did you first meet Glenn Haslam through
2  Madison?
3    A    Yes.
4    Q    Did you first meet Gary Garofalo through
5  Madison?
6    A    No.
7    Q    How did you first need Mr. Garofalo?
8    A    Through Harkins Builders.
9    Q    Do you also do work for Harkins Builders?
10   A    Yes.
11   Q    Are you the bonding agent?
12   A    Yes.
13   Q    And are you currently Harkins' bonding
14 agent?
15   A    Yes.
16   Q    When did you first become their bonding
17 agent?
18   A    1980.
19   Q    Did you also meet Mr. Kraemer and
20 Mr. Lombardo through Harkins?
21   A    Yes.
22   Q    And did you meet Mr. Buczkowski through

14

1  Madison?
2    A    Yes.
3    Q    Do you socialize with any of them outside
4  of being their bonding agent?
5    A    No.
6    Q    As a subcontractor is Madison required to
7  obtain surety bonds to guarantee performance?
8    A    Would you repeat that, please?
9    Q    Sure.  As a subcontractor was Madison
10 required to obtain surety bonds?
11   A    Yes.
12   Q    Is that required on all projects?
13   A    No.
14   Q    What projects would Madison be required
15 to get such a bond?
16   A    Whenever it was required by the general
17 contractor.
18   Q    So it was a determination by the general
19 contractor?
20   A    That's correct.
21   Q    Is it based on the size of the project?
22   A    No.

15

1    Q    Solely based on whether the general
2  contractor wants there to be a surety bond?
3    A    That's correct.
4    Q    Are there different types of surety
5  bonds?
6    A    Yes.
7    Q    Well, you're an expert on this.  I am
8  nowhere near that so I'm just hoping to get some
9  background on that.  So can you just explain to me
10 what a surety bond is, what it would look like in
11 terms of the types of bonds that Madison was
12 receiving.
13   A    Madison would be getting bonds that
14 guaranteed their performance and payment on an
15 individual contract.
16   Q    Did Madison use any other bonding agents?
17   A    Not that I know of.
18   Q    And Madison pays for the bonds?
19   A    That's correct.
20   Q    How is the price of the bonds determined?
21   A    The rate is established by the surety
22 company.

16

1    Q    How does the surety company determine
2  what the rates are?
3    A    They file with the state and then you
4  utilize those rates.
5    Q    Are there qualification requirements that
6  a company has to go through in order to qualify for
7  a bond?
8    A    Yes.
9    Q    Describe for me what those requirements
10 usually are.
11   A    Generally speaking it's the financial
12 statements and the resumes of people that work
13 there.
14   Q    Anything else?
15   A    No.
16   Q    Did anyone other than you at your company
17 assist Madison with obtaining bonds?
18   A    With obtaining them?  No.
19   Q    Was there anyone else at your company
20 involved in the bond process with Madison?
21   A    Yes.
22   Q    Who are those people?

Transcript of William Franey
Conducted on August 29, 2017

17

1    A    Brenda Patterson and Jeri Russell.
2    Q    What are their titles?
3    A    I don't know.
4    Q    What are their positions?  What kind of
5 work do they do for the company?
6    A    They do processing of bonds.
7    Q    How often would you meet with someone
8 from Madison to discuss bonds?
9    A    Two, three times a year maybe.
10    Q    And how frequently would you talk to any
11 of the shareholders on the phone about Madison?
12    A    I don't know.  It wasn't monthly or
13 weekly.
14    Q    Meaning it's more than once a month?
15    A    No.
16    Q    I'm sorry.  Less frequently than once a
17 month?
18    A    Less frequently.
19    Q    And the two to three times a year that
20 you think you met with someone from Madison, was
21 that with all of the shareholders present?
22    A    Not usually.

18

1    Q    Who would you usually meet with?
2    A    Mr. Buczkowski.
3    Q    Would anyone else usually be present?
4    A    Sometimes Mr. Haslam would be present.
5    Q    Were these meetings usually at Madison?
6    A    Yes.
7    Q    Were there ever times when you had
8 meetings with all of the shareholders?
9    A    Not to my knowledge.
10    Q    If Madison needed to get a bond for a
11 job, what was the procedure that they would go
12 through?  Can you walk me through that?
13    A    Generally speaking someone from Madison
14 would send the contract and our request for bond
15 form and then the bond would be issued.
16    Q    Do you know who at Madison it usually was
17 who filled out the request for bond form?
18    A    I think it was Mr. Buczkowski.
19    Q    Unrelated to bonds, did you ever give
20 Madison just general business advice?
21    A    You would have to be a little more
22 specific.

19

1    Q    Did you do any other type of work for
2 Madison other than working with them on surety
3 bonds?
4    A    Property and casualty as well.
5    Q    I'm sorry?
6    A    Property and casualty as well.
7    Q    Tell me exactly what that meant that you
8 did.
9    A    General liability.  Workers'
10 compensation.  Umbrella.
11    Q    Is there anything else that you did for
12 them?
13    A    At one time we also did their health
14 benefits.
15    Q    Anything else?
16    A    Not to my knowledge.
17    Q    And with those other areas was
18 Mr. Buczkowski also your main point of contact with
19 Madison?
20    A    Yes.
21    Q    Did you ever have conversations with
22 Mr. Haslam about Madison's daily operations?

20

1    A    Yes.
2    Q    And how frequently would those
3 conversations occur?
4    A    How often?
5    Q    Yes.
6    A    They probably only occurred two or three
7 times in 20 years.
8    Q    Do you recall specifically what those
9 conversations were about?
10    A    No.
11    Q    Did you have conversations with
12 Mr. Garofalo about Madison's daily operations?
13    A    If I did, I don't remember them.
14    Q    How often would you talk on the phone or
15 e-mail with Mr. Garofalo?
16    A    Every couple of weeks.
17    Q    Is that specifically related to Madison
18 or just generally?
19    A    It was primarily related to Harkins.
20    Q    How often do you think you spoke with
21 Mr. Garofalo or e-mailed with him about Madison
22 matters?

Transcript of William Franey
Conducted on August 29, 2017

21

1    A    **In 20 years, maybe 20 times.**
2    Q    Did Mr. Garofalo ever seek advice from
3 you about Madison's operations generally?
4    A    **No.**
5    Q    So whenever you spoke with him it would
6 be strictly about bonds or other insurance matters?
7    A    **That's correct.**
8    Q    And is that typical for you when you were
9 interacting with your other clients, not to get
10 involved in their daily matters?
11   A    **That's correct.**
12   Q    How frequently would you say you
13 interacted or had contact with Mr. Buczkowski?
14   A    **At least two or three times a month.**
15   Q    And was that primarily by phone or by
16 e-mail?
17   A    **Both.**
18   Q    Did you ever have meetings with him to
19 talk about insurance renewals?
20   A    **Yes.**
21   Q    And how frequently would those meetings
22 usually occur?

22

1    A    **Every year.**
2    Q    Usually just one time a year?
3    A    **Yes.**
4    Q    Was it usually just the two of you in the
5 meeting?
6    A    **Yes.**
7    Q    And were you required to get financial
8 records from Madison in order to provide your
9 services?
10   A    **Yes.**
11   Q    And was it usually Mr. Buczkowski who
12 provided those to you?
13   A    **Yes.**
14   Q    Did you ever run into any problems with
15 your interactions or working with Mr. Buczkowski?
16   A    **Yes.**
17   Q    Tell me about those.
18   A    **Nonresponsive to requests.**
19   Q    Anything else?
20   A    **That's it.**
21   Q    And can you tell me specifically what you
22 mean by nonresponsiveness to requests?

23

1    A    **The surety would request some**
2 **information. We would go to Mr. Buczkowski and he**
3 **would be slow in getting it to us.**
4    Q    Can you give me a specific example of
5 when that happened?
6    A    **No.**
7    Q    Do you recall what sureties you ran into
8 problems with in this regard?
9    A    **I'm sorry?**
10   Q    Do you recall what specific surety you
11 ran into issues?
12   A    **Chubb.**
13   Q    Anyone else?
14   A    **No.**
15   Q    What kind of requests was Mr. Buczkowski
16 unresponsive to?
17   A    **Requests for financial information.**
18   Q    Anything else?
19   A    **No.**
20   Q    And how delayed would you say he was in
21 providing that information or in being responsive?
22   A    **I don't remember.**

24

1    Q    How frequently did Chubb or did you
2 request financial information from Madison on a job?
3    A    **It wouldn't be on a job. It would be**
4 **just the normal quarterly statements.**
5    Q    So there was quarterly statements and for
6 those it was required that the financial information
7 be provided, or Madison provided quarterly
8 statements to you?
9    A    **That's correct.**
10   Q    And what would happen when Mr. Buczkowski
11 would be nonresponsive?
12   A    **We would wait and then we would call**
13 **Mr. Haslam.**
14   Q    When you say we, would that be you or
15 would that be someone at Chubb?
16   A    **That would be me. No, that would be me.**
17   Q    And what would Mr. Haslam say when you
18 would call him about Mr. Buczkowski?
19   A    **That he would talk to him.**
20   Q    And did you usually receive the financial
21 information shortly after?
22   A    **Not always.**

Transcript of William Franey
Conducted on August 29, 2017

---

25

1    Q    And what would happen in those times when
2 you did not get it right away after speaking with
3 Mr. Haslam?
4    **A    What would happen?**
5    Q    Yeah.
6    **A    Nothing.**
7    Q    Would you call him again?
8    **A    Continually, yeah.**
9    Q    Do you know the reason for the delay in
10 getting this information?
11    **A    I do not.**
12    Q    Other than speaking with Mr. Haslam, did
13 you complain about Mr. Buczkowski to any of the
14 shareholders?
15    **A    Yes.**
16    Q    And who did you complain to?
17    **A    Mr. Garofalo.**
18    Q    What did you say to Mr. Garofalo?
19    **A    That we needed to get the financial**
20 **information.**
21    Q    And what would his response be?
22    **A    That he would work on it.**

---

26

1    Q    Was that on more than one occasion?
2    **A    Probably.**
3    Q    Do you know for sure if it was?
4    **A    No, I do not.**
5    Q    Do you know approximately how many times
6 you had to reach out to Mr. Haslam about following
7 up?
8    **A    I do not.**
9    Q    And what was the result of getting the
10 financial records later than requested?
11    **A    Was there a penalty?  No.**
12    Q    So there was no effect on the bond or
13 anything as a result.
14    **A    No.**
15    Q    Did Mr. Buczkowski ever give you reasons
16 for why there was a delay in providing the financial
17 records?
18    **A    Yes.**
19    Q    And what were the reasons that he gave?
20    **A    He was out working on jobs.**
21    Q    Were there any other reasons?
22    **A    No, I don't think so.**

---

27

1    Q    Were you aware that Mr. Buczkowski spent
2 some time out of the office going to jobs?
3    **A    Yes.**
4    Q    And do you recall or do you have
5 knowledge of any problems that Madison ran into
6 related to some Clark Construction jobs?
7    **A    Yes.**
8    Q    And is it your understanding that
9 Mr. Buczkowski occasionally went to those problem
10 jobs?
11    **A    Yes, he did.**
12    Q    Do you know if Mr. Haslam spent time at
13 those sites as well?
14    **A    No, I don't know that.**
15    Q    Did Mr. Buczkowski ever discuss with you
16 his position that Madison should explore filing for
17 bankruptcy?
18    **A    Yes.**
19    Q    Do you recall when he first told you
20 this?
21    **A    You mean the exact date?  No.**
22    Q    You can give me a year if you know it.

---

28

1    **A    I don't even know the year.  2013, '14.**
2 **I don't know.**
3    Q    Do you recall when he told you about
4 this?  Was it an in-person meeting?
5    **A    Yes.**
6    Q    Do you recall why you had this meeting?
7    **A    No.**
8    Q    Was it at one of your regularly scheduled
9 meetings where you were meeting to discuss other
10 things?
11    **A    I don't remember.**
12    Q    Do you recall what he said to you about
13 this?
14    **A    He said he thought that they should file**
15 **for bankruptcy.**
16    Q    Did he tell you anything else?
17    **A    Yes.**
18    Q    And what did he say?
19    **A    He told me that he was judgment-proof.**
20    Q    Did he tell you anything else
21 specifically about that?
22    **A    No.**

---

Transcript of William Franey
Conducted on August 29, 2017

---

29

1    Q    Did you ask him what he meant by him
2 being judgment-proof?
3    A    No.
4    Q    What's your understanding of what he
5 meant?
6    **A    That if he was sued, no one could**
7 **collect.**
8    Q    And what was your response to him
9 discussing bankruptcy with you?
10   **A    It was not my call.**
11   Q    Do you recall if you had a conversation
12 with him about whether it was a good idea or an
13 option for Madison?
14   **A    I don't remember.**
15   Q    Did you have any opinions at that time
16 about whether bankruptcy was something that Madison
17 should explore?
18   **A    I had no opinion on it, no.**
19   Q    What was your understanding of why he
20 decided to discuss this with you?
21   **A    I have no idea.**
22   Q    Did Mr. Buczkowski ever discuss his other

---

30

1 opinions with you about the direction of Madison?
2    **A    Not that I recall.**
3    Q    Did he tell you what the other
4 shareholders' views were regarding whether
5 bankruptcy was something to be explored?
6    **A    No.**
7    Q    Had you spoken with or after speaking
8 with Mr. Buczkowski did you speak with any of the
9 shareholders about what their views were on
10 bankruptcy?
11   **A    Mr. Haslam.**
12   Q    And do you recall when you spoke with him
13 about his views?
14   **A    No.**
15   Q    Was it after you had had that
16 conversation with Mr. Buczkowski?
17   **A    Yes.**
18   Q    Do you recall what he told you?
19   **A    No.**
20   Q    Is it your understanding that he had
21 different views than Mr. Buczkowski on the matter?
22   **A    You mean concerning bankruptcy?**

---

31

1    Q    Yes.
2    **A    I think he did, yes.**
3    Q    But you don't recall specifically what he
4 said?
5    **A    No.**
6    Q    Did you ever discuss bankruptcy with
7 Mr. Garofalo?
8    **A    Not to my knowledge.**
9    Q    Did you tell Mr. Haslam about what Bob
10 had told you regarding bankruptcy?
11   **A    Yes.**
12   Q    And why did you communicate this
13 information to him?
14   **A    Because he was the majority shareholder.**
15   Q    And why did you feel the need to tell
16 him?
17   **A    Good question.**
18   Q    Do you recall the reason why you decided
19 to tell him?
20   **A    No.**
21   Q    Were you concerned about what
22 Mr. Buczkowski had told you how it would affect

---

32

1 Madison?
2    **A    Yes.**
3    Q    How so?
4    **A    Well, if they filed for bankruptcy, then**
5 **the company would go down.**
6    Q    And why do you think it would go down?
7    **A    Because it wouldn't have sufficient**
8 **assets to pay its liabilities.**
9    Q    After filing for bankruptcy would Madison
10 in the future still be able to obtain loans?
11   **A    Obtain?**
12   Q    I'm sorry, bonds?
13   **A    Possibly.**
14   Q    Have you had situations where you have
15 had clients who have filed for bankruptcy and then
16 in the future still been able to obtain bonds?
17   **A    No.**
18   Q    Do you know who Scotty Williams is?
19   **A    Yeah.**
20   Q    Did he ever run into a situation with his
21 company where they filed for bankruptcy?
22   **A    Yes.  Well, no.  I don't think that he**

---

Transcript of William Franey
Conducted on August 29, 2017

33
1  did file.
2      Q    Were there talks about filing for
3  bankruptcy?
4      A    I wasn't privy to those.
5      Q    Does it sound familiar at all that he may
6  have discussed filing for bankruptcy?
7      A    I'm sure he discussed it with his
8  attorney.
9      Q    But you don't recall if he ended up
10 filing for bankruptcy?
11     A    I don't know.
12     Q    Were you surprised when Mr. Buczkowski
13 told you this information about his views on
14 bankruptcy?
15     A    His views about bankruptcy?
16     Q    Yes.
17     A    Was I surprised?
18     Q    Yes.
19     A    Yes.
20     Q    Had you heard anything prior to that from
21 anyone at Madison that that was something being
22 considered?

34
1      A    No.
2      Q    And did his statements affect your
3  relationship and your company's relationship with
4  Madison in any way?
5      A    No.
6      Q    Did it affect Madison's relationship with
7  Chubb in any way?
8      A    Yes.
9      Q    How so?
10     A    The company's net worth and working
11 capital were deteriorating.
12     Q    And how did that affect its relationship
13 with Chubb?
14     A    It worried them.
15     Q    And how do you know this?
16     A    Because they told me.
17     Q    And who's they?
18     A    Paul Rambo.
19     Q    And who is Paul Rambo?
20     A    He is the regional surety manager.
21     Q    At Chubb?
22     A    At Chubb, yes.

35
1      Q    And do you recall when he told you this?
2      A    No.
3      Q    Did you have multiple conversations with
4  him regarding his concerns?
5      A    Yes.
6      Q    And his concerns were related
7  specifically to Madison's deteriorating net worth,
8  not specifically about the possibility of
9  bankruptcy, correct?
10     A    That's correct.
11     Q    Do you recall anything else that
12 Mr. Rambo told you about their concerns?
13     A    No.
14     Q    Did you tell Chubb anything or anyone at
15 Chubb anything about your conversation with
16 Mr. Buczkowski about bankruptcy?
17     A    No.
18     Q    Are you aware if Mr. Buczkowski told
19 anyone at Chubb anything about his views?
20     A    That I don't know.
21     Q    How would filing for bankruptcy have
22 affected Madison's ability to obtain bonds in the

36
1  future, or to obtain bonds period?
2      A    There have been cases where people can
3  get bonds in bankruptcy as long as new collateral is
4  put up.
5      Q    If they had gone through with filing for
6  bankruptcy, how else would it have affected the
7  bonds that it currently had at that time?
8      A    That they currently had?
9      Q    The bonds that they had around that time.
10     A    It would have no effect.
11     Q    Was there ever a point where Chubb
12 required personal guarantees by the shareholders on
13 the bonds?
14     A    Yes.
15     Q    Do you recall what year that was?
16     A    2014.
17     Q    And do you recall why they required that?
18     A    Because the company was in trouble.
19     Q    Do you know whose decision it was at
20 Chubb?
21     A    No.
22     Q    Did they tell that directly to Madison,

37

1  or how was it communicated to Madison that there was
2  going to be personal guarantees required?
3     **A    I believe that I did.**
4     Q    Do you recall who you told at Madison?
5     **A    Mr. Haslam.**
6     Q    And so the personal guarantees would have
7  been on all bonds moving forward?
8     **A    The indemnity agreement speaks for**
9  **itself.**
10    Q    I'm sorry?
11    **A    The indemnity agreement speaks for**
12 **itself.**
13    Q    What do you mean by that?
14    **A    That means you're a lawyer, read it.  I**
15 **don't — I'm not going to opine on that.**
16         MR. LONGOSZ:  I think she is asking if
17 you know or don't know.  Do you know?
18         THE WITNESS:  I don't know.
19         MR. LONGOSZ:  Okay.  Sorry to interrupt,
20 counsel.
21         MS. PRAWDE:  Thank you.
22 BY MS. PRAWDE:

38

1     Q    Were the shareholders required to
2  personally guarantee prior surety bonds in order to
3  obtain new bonds?
4     **A    If that's what the indemnity agreement**
5  **says.**
6     Q    Do you recall if any of the indemnity
7  agreements for any of the bonds that Madison had
8  required that?
9     **A    You would have to rephrase that.**
10    Q    Do you recall if there was ever a time
11 where Madison was seeking to obtain new bonds but
12 had to personally guarantee the bonds that they
13 already had?
14    **A    If the indemnity agreement called for old**
15 **bonds and new bonds, then the answer would be yes.**
16    Q    Do you know if Madison, if there was any
17 indemnity agreements that did require that?
18    **A    I'm sorry?**
19    Q    Do you know if Madison did have any bonds
20 with those sorts of indemnity agreements that
21 required that?
22    **A    The indemnity agreements —**

39

1         MR. LONGOSZ:  She is asking if you know.
2  Yes or no.
3         THE WITNESS:  I don't know.
4  BY MS. PRAWDE:
5     Q    And what did Chubb say when they told you
6  that they were requiring personal guarantees?
7     **A    That they were requiring personal**
8  **guarantees.**
9     Q    Did they give you any sort of reason why?
10    **A    No.**
11    Q    And who told you this?
12    **A    I believe Paul Rambo.**
13    Q    And all he told you is that there was
14 going to be personal guarantees required?
15    **A    There would be personal guarantees**
16 **required if they wanted any new bonds.**
17    Q    What was your understanding of why this
18 was being done?
19    **A    Because the financial statement wouldn't**
20 **support what they have.**
21    Q    Was there any attempt by you or anyone at
22 Madison to negotiate this and not have the personal

40

1  guarantees be required?
2     **A    Not to my knowledge.**
3     Q    You think it was Mr. Haslam that you told
4  that the personal guarantees were going to be
5  required?
6     **A    I believe that I told, at the same time I**
7  **told Mr. Garofalo and Mr. Buczkowski too.**
8     Q    Do you think that was in a meeting?
9     **A    It might have been in an e-mail.**
10    Q    Do you know if the shareholders proceeded
11 with signing personal guarantees?
12    **A    Yes.**
13    Q    Do you know how much the personal
14 guarantees were for?
15    **A    They're unlimited.**
16    Q    Did you provide them any advice regarding
17 signing personal guarantees?
18    **A    No.**
19    Q    I'm assuming if they had not done so they
20 would not have been able to move forward with
21 getting bonds?
22    **A    That's correct.**

Transcript of William Franey
Conducted on August 29, 2017

41

1        MS. PRAWDE: Can you mark this as Exhibit
2  1, please.
3        (Franey Deposition Exhibit Number 1 was
4  marked for identification and was attached to the
5  transcript.)
6  BY MS. PRAWDE:
7     Q    Mr. Franey, you have been handed what's
8  marked as Franey Exhibit 1.  I will give you a
9  minute to take a look at it.
10       (Brief pause.)
11    A    Okay.
12    Q    Do you recall seeing these e-mails
13 previously?
14    A    No.
15    Q    You are copied on the top e-mail,
16 correct?  It's an e-mail from Mr. Kraemer to
17 Mr. Garofalo dated March 6th, 2015, correct?
18    A    That's correct.
19    Q    And the e-mail below is an e-mail from
20 Mr. Garofalo regarding capital calls and loans as to
21 the shareholders, correct?
22    A    Okay.

42

1     Q    Do you know why you were being sent an
2  e-mail regarding capital calls and loans amongst the
3  shareholders?
4     A    I don't see my name here.
5     Q    Is it your understanding that this e-mail
6  was forwarded to you?
7     A    I don't remember.
8     Q    Did you ever have any discussions with
9  any of the shareholders regarding capital calls or
10 loans amongst the shareholders?
11    A    Yes.
12    Q    Who did you have these conversations
13 with?
14    A    Mr. Garofalo.
15    Q    And what did Mr. Garofalo tell you
16 regarding capital calls?
17    A    That they were going to put money in the
18 company.
19    Q    Did he tell you how much money?
20    A    No.
21    Q    Did you have multiple conversations with
22 him about capital calls?

43

1     A    I'm sure I did.
2     Q    Do you recall when you had these
3  conversations?
4     A    No.
5     Q    You don't recall the year?
6     A    No.
7     Q    Were these conversations by e-mail or
8  over the phone?
9     A    I don't remember.
10    Q    Did he tell you anything else other than
11 that the shareholders were going to put money in?
12    A    No.
13    Q    Was he asking your advice regarding
14 capital calls and loans?
15    A    No.
16    Q    Why was he discussing capital calls with
17 you?
18    A    So that I would tell the surety what they
19 were doing.
20    Q    Was it required that you tell the surety
21 that there was capital calls and loans being made?
22    A    Please rephrase.

44

1     Q    Was it required that you communicate to
2  the surety that the shareholders were taking loans
3  or putting up capital calls?
4     A    Yes.
5     Q    And when was it required that you
6  communicate that?  Once the capital call had been
7  made?
8     A    As soon as I knew what the deal was,
9  yeah.
10    Q    Did you communicate with anyone other
11 than Mr. Garofalo about the capital calls?
12    A    Not that I remember.
13    Q    Did Mr. Garofalo discuss with you
14 anything about how much the shareholders ended up
15 putting in?
16    A    No.
17    Q    But he would have given you this
18 information?
19    A    Yes.
20    Q    And you would have communicated that to
21 the sureties?
22    A    That's correct.

Transcript of William Franey
Conducted on August 29, 2017

---

45

1    Q     Is it likely he would have communicated
2 that to you by e-mail?
3    A     **Possibly.**
4    Q     Did you ever discuss with Mr. Haslam the
5 capital calls?
6    A     **Not to my knowledge.**
7    Q     When did you find out that Mr. Buczkowski
8 had been terminated?
9    A     **Probably sometime in December after he**
10 **left.**
11    Q     Had you been given any notice by any of
12 the shareholders that they were planning to
13 terminate him?
14    A     **No.**
15    Q     So it was a surprise to you when he was
16 terminated?
17    A     **Yes and no.**
18    Q     What do you mean by that?
19    A     **Well, things weren't going well.**
20    Q     And what do you mean by they weren't
21 going well?
22    A     **They were continually losing money.**

---

46

1    Q     And what does that have to do with
2 Mr. Buczkowski?
3    A     **I have no idea.**
4    Q     But you think there was an association
5 between Madison losing money and Mr. Buczkowski.
6    A     **Solely?  No.**
7    Q     Do you think it was part of it?
8    A     **Yes.**
9    Q     And why do you think that?
10    A     **Because the financial statements spoke**
11 **for themselves.**
12    Q     Why do you think Mr. Buczkowski was the
13 cause of any of those financial problems?
14    MR. LONGOSZ:  Object.  He didn't say that
15 he was the cause.
16 BY MS. PRAWDE:
17    Q     Do you think Mr. Buczkowski was the cause
18 of any of Madison's financial problems?
19    A     **Yes.**
20    Q     And why do you think that?
21    A     **Because he was an executive officer of**
22 **the company.**

---

47

1    Q     So then do you think that Mr. Haslam was
2 also to blame for part of the financial issues?
3    A     **Yes.**
4    Q     And Mr. Garofalo and Mr. Kraemer and
5 Mr. Lombardo?
6    A     **No.**
7    Q     Mr. Garofalo?
8    A     **No.**
9    Q     Because they were not executive officers?
10    A     **Because they weren't there on a**
11 **day-to-day basis.**
12    Q     Do you know if Mr. Garofalo communicated
13 with Mr. Haslam on a day-to-day basis?
14    A     **I have no idea.**
15    Q     So you don't know whether Mr. Garofalo
16 was involved in the day-to-day of Madison.
17    A     **I don't think he was.**
18    Q     Do you know whether Mr. Garofalo was
19 communicating on a day-to-day basis with
20 Mr. Buczkowski?
21    A     **I have no idea.**
22    Q     What do you think was the cause of the

---

48

1 financial difficulties that Madison ran into?
2    A     **They were apparently undercapitalized.**
3    Q     Anything else?
4    A     **They got some bad jobs.**
5    Q     Any other reasons?
6    A     **No.**
7    Q     What role do you think Mr. Buczkowski
8 had, if any, in them being undercapitalized or the
9 bad jobs?
10    A     **I wasn't there on a day-to-day basis so I**
11 **have no idea.**
12    Q     Other than Mr. Buczkowski being an
13 executive officer, what are your other reasons for
14 thinking that he had a role in the financial
15 problems?
16    A     **He was a shareholder and the CFO of the**
17 **company.**
18    Q     Any other reason?
19    A     **No.**
20    Q     What about Mr. Haslam?  Any other reason?
21    A     **Other than?**
22    Q     Other than him being an executive

---

Transcript of William Franey
Conducted on August 29, 2017

---

49

1 officer.
2   **A    Well, he was in charge of the operations.**
3   Q    What specifically in regards to
4 Mr. Garofalo being in charge of the operations do
5 you think affected the trouble --
6   **A    Mr. Garofalo?**
7   Q    -- that Madison ran into?
8   **A    Mr. Garofalo?**
9   Q    I'm sorry.  Mr. Haslam.
10  **A    Would you repeat the question?**
11  Q    I can repeat that.
12  **A    Yeah, please.**
13  Q    The fact that Mr. Haslam was in charge of
14 the operations, how do you think that had any role,
15 if any, in the financial problems Madison
16 encountered?
17  **A    Because they took on jobs that they lost**
18 **money on.**
19  Q    Do you know who at Madison was in charge
20 of making the decisions about what jobs to take on?
21  **A    No.**
22  Q    Do you know who was in charge of bidding

---

50

1 on the jobs at Madison?
2   **A    No.**
3   Q    Did any of the shareholders discuss with
4 you prior to Mr. Buczkowski being terminated that
5 that was their plan?
6   **A    No.**
7   Q    When did you become aware that Madison
8 was going to be forming a new company?
9   **A    I'm trying to get the year right.  The**
10 **latter part of 2016 I guess.**
11  Q    The company was formed in late 2015 or
12 early 2016.
13  **A    Okay.  I'm sorry, then I will take that**
14 **back.  In the fall of 2015.**
15  Q    Had you had any conversations with any of
16 the shareholders about Mr. Buczkowski not becoming
17 part of the new company?
18  **A    No.**
19  Q    Do you know when you found out he was not
20 going to be part of the new company?
21  **A    After he was terminated.**
22      MS. PRAWDE:  Can you mark this as Franey

---

51

1 2, please.
2       (Franey Deposition Exhibit Number 2 was
3 marked for identification and was attached to the
4 transcript.)
5 BY MS. PRAWDE:
6   Q    I will give you a minute to take a look.
7 Do you recall seeing these e-mails before?
8       (Brief pause.)
9   **A    I'm sure I did.**
10  Q    So it appears that this was an e-mail
11 that was forwarded to you by Gary Garofalo, correct?
12  **A    That is correct.**
13  Q    And the e-mail is concerning reasons why
14 Mr. Buczkowski should have been terminated, correct?
15      I'm looking just specifically at the
16 third paragraph where it says "Other than the loans
17 and the capital call that I confronted him on a lot
18 the acts of behavior which should have led to his
19 termination years ago are below."  And if you'll
20 take a look at number 4.
21  **A    Hm-mm.**
22  Q    It says "Telling Bill Franey he didn't

---

52

1 care what happened with the bank because he had
2 protected himself from possible creditors."  Is that
3 regarding the conversation we've already talked
4 about?
5   **A    Yes.**
6   Q    Do you know why Mr. Garofalo was
7 forwarding this e-mail to you?
8   **A    I have no idea.**
9   Q    Did you have any conversations with him
10 afterwards regarding the reasons Mr. Buczkowski was
11 terminated?
12  **A    No.**
13  Q    So this was the first and only e-mail you
14 recall discussing Mr. Buczkowski and him not being
15 part of the new company or him being terminated?
16  **A    Well, I don't know where it talks about**
17 **the new company.  Am I missing something?**
18  Q    Well, do you think this is the first and
19 only e-mail you received about Mr. Buczkowski being
20 terminated?
21  **A    Yes.**
22  Q    Did he ever forward to you any other

Transcript of William Franey
Conducted on August 29, 2017

---

53

1  e-mails regarding any problems that the company was
2  having with Mr. Buczkowski?
3      A    I don't remember.
4      Q    There could have been e-mails that he
5  sent to you regarding those issues?
6      A    Could be.
7      Q    Do you recall any conversations you had
8  with Mr. Garofalo over the years about any concerns
9  or problems the shareholders had with
10 Mr. Buczkowski?
11     A    I don't recall.
12     Q    With the meeting where you had said that
13 Mr. Buczkowski told you that he didn't care what
14 happened with the bank because he had protected
15 himself from possible creditors, did you communicate
16 that to Mr. Garofalo?
17     A    I'm sure I did.
18     Q    Do you think you also communicated it to
19 Mr. Haslam?
20     A    I did.
21     Q    Do you know why you told Mr. Garofalo
22 this?

---

54

1      A    It came up in a conversation.
2      Q    How did it come up?
3      A    Mr. Haslam told him.  He asked me about
4  it.
5      Q    What did you say?
6      A    That that's what he said.
7      Q    Did you say anything else about that
8  conversation you had had?
9      A    No.
10     Q    Do you know what Mr. Garofalo said in
11 response to learning this?
12     A    No.
13     Q    You established you're also the bonding
14 agent for Harkins Builders, correct?
15     A    That's correct.
16     Q    So you're aware at all times that
17 Mr. Kraemer, Mr. Lombardo and Mr. Garofalo were
18 shareholders of Madison?
19     A    Yes.
20     Q    Was it your understanding that that was
21 information that they didn't want publicly known?
22     A    I'm sure they didn't.

---

55

1      Q    Did they ever tell you that they didn't
2  want it publicly known?
3      A    No.
4      Q    And why do you say you're sure they
5  didn't?
6      A    Because it could become a conflict.
7      Q    And how could it become a conflict?
8      A    Madison works for other general
9  contractors and they might not take kindly to the
10 executive officers of Harkins being involved in
11 Madison.
12     Q    Were you aware that Mr. Garofalo,
13 Mr. Lombardo and Mr. Kraemer's shares were in a
14 voting trust for Madison?
15     A    No.
16     Q    Do you know if they have a voting trust
17 as to the new company?
18     A    I don't know.
19     Q    And are you the bonding agent for the new
20 company?
21     A    Yes.
22     Q    Did you ever attend any meetings with any

---

56

1  of the shareholders at a country club?
2      A    I don't remember.
3      Q    Do you have any recollection of any
4  meetings that you attended where Mr. Buczkowski,
5  Mr. Haslam and the other shareholders were all
6  present?
7      A    I don't remember.
8      Q    Do you recall if you ever attended a
9  meeting where Mr. Haslam expressed his concerns for
10 what was happening with Madison?
11     A    I don't remember.
12     Q    Did Clark Construction ever express any
13 intent to call Madison's bonds?
14     A    Yes.
15     Q    Do you recall when that was?
16     A    No.
17     Q    Do you recall if at that time the
18 shareholders would have been personally liable for
19 those?
20     A    They would not have been.
21     Q    Did you have any meeting with
22 Mr. Buczkowski to discuss whether the bonding

Transcript of William Franey
Conducted on August 29, 2017

---

**57**

1  company could help with the cash flow in order to
2  finish the Clark projects?
3     A    Yes.
4     Q    Do you recall if that was more than one
5  meeting?
6     A    **I don't recall.**
7     Q    And do you recall when this meeting took
8  place?
9     A    **No.**
10    Q    Do you recall where it was?
11    A    **No.**
12    Q    Do you know if anyone was there other
13 than you and Mr. Buczkowski?
14    A    **I don't know.**
15    Q    Do you recall what was discussed at the
16 meeting?
17    A    **No.**
18    Q    Other than a request to see if the
19 bonding company could help with the cash flow?
20    A    **That was the essence of the meeting, yes.**
21    Q    And do you recall what your response was
22 to that?

**58**

1     A    **I think I laid out for them what the**
2  **steps Chubb would take.**
3     Q    Do you recall what those steps would have
4  been?
5     A    **No.**
6     Q    Do you know if there was any movement
7  forward on that?
8     A    **Not to my knowledge.**
9     Q    Do you know why that was?
10    A    **I assume because they were going to put**
11 **capital in.**
12    Q    Did you ever have any discussions about
13 you investing in Madison?
14    A    **Yes.**
15    Q    And when did you first have those
16 conversations?
17    A    **I don't remember.**
18    Q    Do you think it would have been before
19 2014?
20    A    **No.**
21    Q    So you think it was after Madison ran
22 into trouble with the Clark projects.

---

**59**

1     A    **Yes.**
2     Q    Do you recall how the conversations about
3  you investing came about?
4     A    **Initially, no.**
5     Q    Do you recall if someone approached you
6  about whether you would be interested in investing?
7     A    **I don't remember.**
8     Q    Do you recall who you spoke with at
9  Madison about investing?
10    A    **Glenn, Bob, and Gary Garofalo.**
11    Q    Anyone else?
12    A    **Not to my knowledge.**
13    Q    Do you recall if you had any in-person
14 meetings with them about talks about you investing?
15    A    **Would you rephrase that, please?**
16    Q    Do you recall if you had any meetings
17 with any of them in person to discuss you investing
18 in Madison?
19    A    **I'm sure I did.**
20    Q    Do you recall if you had a meeting with
21 the four of you:  you, Glenn, Bob, and Gary?
22    A    **I don't recall.**

**60**

1     Q    Do you recall any specific meetings that
2  you had with any of them --
3     A    **No.**
4     Q    -- to discuss investing?
5     A    **No.**
6     Q    What steps did you take in terms of
7  looking into whether you were going to invest?
8     A    **I tried to do some due diligence.**
9     Q    And what did that entail?
10    A    **Breaking down the financial statements.**
11    Q    Anything else?
12    A    **That was about it.**
13    Q    Did anyone at Madison assist you with
14 that?
15    A    **Mr. Buczkowski.**
16    Q    Did Brant Geiman assist you at all?
17    A    **He may have.**
18    Q    And Mr. Buczkowski assisted you in
19 helping break down the financials?
20    A    **I'm sorry, please rephrase that.**
21    Q    Mr. Buczkowski, what did he do to assist
22 you in the due diligence?

Transcript of William Franey
Conducted on August 29, 2017

---

61

1    A    He sent me e-mails.

2    Q    And what did he say in the e-mails?

3    A    He didn't say much in the e-mails.  It

4 was the financials.

5    Q    So he provided the financial statements

6 to you.

7    A    Yes.

8    Q    What percent interest were you

9 considering buying in the company?

10   A    That was never discussed.

11   Q    Do you recall if the sale was going to be

12 to you personally?

13   A    Yes.

14   Q    And so Madison was going to issue shares

15 to you, is that your understanding?

16   A    It never got that far.

17        MS. PRAWDE: If we can mark this as

18 Franey Exhibit 3, please.

19        (Franey Deposition Exhibit Number 3 was

20 marked for identification and was attached to the

21 transcript.)

22        (Brief pause.)

---

62

1 BY MS. PRAWDE:

2    Q    Have you ever seen the top e-mail before?

3    A    I can't recall.

4    Q    If you take a look at number 5 where

5 there is the list, it says "Bill will buy a 10

6 percent interest in MM," which I'm assuming means

7 Madison Mechanical.  "We wouldn't sell to Bill

8 personally."  Do you have any recollection of

9 discussing any of that with any of the shareholders?

10   A    No.

11   Q    So is it your understanding or your

12 recollection that you didn't get into the details of

13 what you buying in would look like?

14   A    That's correct.

15   Q    Do you know why none of this was

16 communicated to you?

17   A    Why what wasn't communicated to me?

18   Q    It appears that the shareholders were

19 discussing the percent interest that you were going

20 to buy in, correct, based on this e-mail?

21   A    That's what it appears, yeah.

22   Q    Do you know why the shareholders didn't

---

63

1 discuss that with you further?

2    A    They may have.

3    Q    You just don't have a recollection

4 whether it occurred or not?

5    A    No, I don't.

6    Q    And did you end up buying in at all to

7 Madison?

8    A    No.

9    Q    Was that your decision?

10   A    Yes.

11   Q    And why did you decide not to?

12   A    Because I was not going — I would put

13 money in but I wouldn't sign for bonds or for bank

14 debt.

15   Q    And the shareholders wanted you to do

16 that?

17   A    It would have been probably required.

18   Q    Why would you not do that?

19   A    Because I don't like debt.

20   Q    Any other reasons?

21   A    That's good enough for me.

22   Q    Do you recall when it was that you

---

64

1 decided not to buy in?

2    A    No.

3    Q    Do you have any interest in the LLC that

4 was formed?

5    A    No.

6    Q    Do you know if there was anyone else who

7 was also looking into investing or buying into

8 Madison?

9    A    Yes.

10   Q    And who was that?

11   A    Rick Arnold.

12   Q    Do you know whether he ended up buying

13 in?

14   A    To which entity?

15   Q    To Madison Mechanical, Inc., or to the OS

16 Corp.

17   A    Not to my knowledge.

18   Q    Did you have any discussions with him

19 when you were both thinking about investing?

20   A    Discussions with Rick Arnold?

21   Q    Yes.

22   A    No.

---

Transcript of William Franey
Conducted on August 29, 2017

17 (65 to 68)

---

65

1    Q     Did you have any discussions with Rick
2  Arnold about his involvement in forming a new
3  Madison company?
4    A     No.
5    Q     Did you provide any assistance to Madison
6  when they were forming the new company?
7    A     You would have to clarify that.
8    Q     When the new LLC was formed, how did that
9  affect the bonds that Madison, Inc., had?
10   A     The bonds that they already had?
11   Q     Did the formation of the new company have
12 any effects on those?
13   A     No.
14   Q     Did you have any role to play in the
15 decision to form the new company?
16   A     No.
17   Q     What is your understanding of how the new
18 company differs from Madison Mechanical, Inc.?
19   A     One was a corporation, the other was an
20 LLC.
21   Q     And other than that do you have any
22 understanding of what the differences are?

---

66

1    A     Different shareholders.  But that's it.
2    Q     Is there any difference in the types of
3  work or the types of projects that the new company
4  is doing?
5    A     They are not doing large projects.
6    Q     About what size are the projects that the
7  LLC is handling?
8    A     Up to $5 million.
9    Q     And what was the usual size of the
10 projects that Madison Mechanical, Inc., was
11 handling?
12   A     They handled from a couple hundred
13 thousand dollars up to $17 million.
14       MS. PRAWDE:  All right.  If we can just
15 take a five, ten minute break.
16       MR. LONGOSZ:  Sure.
17       MS. PRAWDE:  Thank you.
18       (Brief recess.)
19 BY MS. PRAWDE:
20   Q     Okay.  I just have a few more questions
21 for you, Mr. Franey.
22   A     Okay.

---

67

1    Q     Did you consider yourself to be an
2  advisor to Madison?
3    A     You would have to give me the definition
4  of advisor.
5    Q     However you consider the term advisor.
6        MR. LONGOSZ:  I will object to the form.
7  Go ahead.  If you can answer.  If you can't, just --
8        THE WITNESS:  No.
9  BY MS. PRAWDE:
10   Q     Do you think that any of the shareholders
11 considered you to be an advisor to them?
12   A     Within the confines of Madison?
13   Q     Yes.
14   A     No.
15   Q     Do you think any of them considered you
16 to be an advisor as to Harkins?
17   A     Yes.
18   Q     Did any of the shareholders come to you
19 and ask for your advice about how to proceed when
20 Madison was having financial difficulties?
21   A     No.
22   Q     The shareholders were being asked to

---

68

1  personally guarantee about $30 million, is that
2  correct?
3    A     I don't know the context.
4    Q     There came a point where there was two
5  new bonds that were obtained by Madison for about $2
6  million.  Do you recall that?
7    A     I recall, but I don't recall who the
8  bonds were for.
9    Q     And those bonds were being personally
10 guaranteed by the shareholders?
11   A     That's correct.
12   Q     Were they also personally guaranteeing
13 what was in arrears, so about $30 million?
14   A     As I said before, the indemnity agreement
15 speaks for itself.  I'm not going to opine on a
16 legal matter.
17   Q     So you don't have any sort of factual
18 knowledge about how much the shareholders were being
19 asked to personally guarantee at that time.
20   A     No.
21   Q     Do you know how much it was?
22   A     No.

Transcript of William Franey
Conducted on August 29, 2017

---

**69**

1    Q    Do you know if it was more than
2 $10 million?
3    A    I assume —
4         MR. LONGOSZ: He said he didn't know. I
5 will object.
6         THE WITNESS: Yeah.
7         MR. LONGOSZ: Don't speculate.
8         THE WITNESS: I would have to speculate.
9 BY MS. PRAWDE:
10   Q    The new bonds that the shareholders were
11 being asked to personally guarantee, do you know if
12 that was at the beginning or the middle or the end
13 of Madison's financial difficulties?
14   A    Probably in the middle.
15   Q    Would it be risky for the shareholders to
16 be personally guaranteeing these bonds when Madison
17 was in the middle of financial difficulties?
18        MR. LONGOSZ: Object to the question. If
19 you know without speculating.
20        THE WITNESS: You sign an agreement,
21 there is always a risk.
22        MS. PRAWDE: Okay. No further questions.

**70**

1         MR. LONGOSZ: Do you have anything?
2         MR. JONES: No.
3         MR. LONGOSZ: Okay. We'll read.
4         THE REPORTER: Do you want a copy?
5         MR. LONGOSZ: No.
6         MS. PRAWDE: We'll just take an
7 electronic copy.
8         THE REPORTER: Mr. Jones, anything?
9         MR. JONES: Yeah, a miniscript will be
10 fine.
11        THE REPORTER: What are you doing with
12 the exhibits?
13        MS. PRAWDE: If we can just attach them.
14        THE REPORTER: Mr. Jones, do you want a
15 cope of the exhibits?
16        MR. JONES: Sure.
17        (Signature having not been waived, the
18 deposition of William Franey was concluded at
19 3:30 p.m.)
20
21
22

**71**

1         ACKNOWLEDGEMENT OF DEPONENT
2         I, WILLIAM FRANEY, do hereby acknowledge
3 that I have read and examined the foregoing
4 testimony, and the same is a true, correct and
5 complete transcription of the testimony given by me
6 and any corrections appear on the attached Errata
7 sheet signed by me.
8
9
10
11
12    _____    _____
13    (DATE)                 (SIGNATURE)
14
15
16
17
18
19
20
21
22

**72**

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2         I, Karen Hinnenkamp, the officer before
3 whom the foregoing deposition was taken, do hereby
4 certify that the foregoing transcript is a true and
5 correct record of the testimony given; that said
6 testimony was taken by me stenographically and
7 thereafter reduced to typewriting under my
8 direction; that reading and signing was requested;
9 and that I am neither counsel for, related to, nor
10 employed by any of the parties to this case and have
11 no interest, financial or otherwise, in its outcome.
12        IN WITNESS WHEREOF, I have hereunto set
13 my hand and affixed my notarial seal this 31st day
14 of August 2017.
15 My commission expires:
16 March 16, 2021
17
18
19 *Karen Hinnenkamp*
20
21 NOTARY PUBLIC IN AND FOR
22 THE STATE OF MARYLAND

---

Transcript of William Franey
Conducted on August 29, 2017

19

| A | | | |
|---|---|---|---|
| **a-c-t-o-n**<br>6:12<br>**ability**<br>35:22<br>**able**<br>32:10, 32:16,<br>40:20<br>**about**<br>8:16, 17:11,<br>19:22, 20:9,<br>20:12, 20:21,<br>21:3, 21:6,<br>21:19, 22:17,<br>24:18, 25:13,<br>26:6, 28:3,<br>28:12, 28:21,<br>29:12, 29:16,<br>30:1, 30:9,<br>30:13, 31:9,<br>31:21, 33:2,<br>33:13, 33:15,<br>35:8, 35:12,<br>35:15, 35:16,<br>35:19, 42:22,<br>44:11, 44:14,<br>48:20, 49:20,<br>50:16, 52:4,<br>52:16, 52:19,<br>53:8, 54:3,<br>54:7, 58:12,<br>59:2, 59:3,<br>59:6, 59:9,<br>59:14, 60:12,<br>64:19, 65:2,<br>66:6, 67:19,<br>68:1, 68:5,<br>68:13, 68:18<br>**acknowledge**<br>71:2<br>**acknowledgement**<br>71:1<br>**acton**<br>6:12<br>**acts**<br>51:18<br>**address**<br>6:11 | **adjuster**<br>10:1<br>**advice**<br>18:20, 21:2,<br>40:16, 43:13,<br>67:19<br>**advisor**<br>67:2, 67:4,<br>67:5, 67:11,<br>67:16<br>**affect**<br>31:22, 34:2,<br>34:6, 34:12,<br>65:9<br>**affected**<br>35:22, 36:6,<br>49:5<br>**affixed**<br>72:13<br>**after**<br>9:9, 9:17,<br>10:4, 10:10,<br>24:21, 25:2,<br>30:7, 30:15,<br>32:9, 45:9,<br>50:21, 58:21<br>**afternoon**<br>6:6<br>**afterwards**<br>52:10<br>**again**<br>25:7<br>**against**<br>6:18<br>**agency**<br>10:16, 10:18,<br>11:5<br>**agent**<br>12:8, 12:11,<br>12:21, 13:11,<br>13:14, 13:17,<br>14:4, 54:14,<br>55:19<br>**agents**<br>15:16<br>**ago**<br>7:7, 51:19<br>**agreement**<br>37:8, 37:11, | 38:4, 38:14,<br>68:14, 69:20<br>**agreements**<br>38:7, 38:17,<br>38:20, 38:22<br>**ahead**<br>67:7<br>**al**<br>1:8<br>**all**<br>14:12, 17:21,<br>18:8, 33:5,<br>37:7, 39:13,<br>54:16, 56:5,<br>60:16, 63:6,<br>66:14<br>**alliance**<br>11:9<br>**already**<br>38:13, 52:3,<br>65:10<br>**also**<br>4:12, 13:9,<br>13:19, 19:13,<br>19:18, 47:2,<br>53:18, 54:13,<br>64:7, 68:12<br>**always**<br>24:22, 69:21<br>**alyse**<br>3:4, 6:14<br>**amongst**<br>42:2, 42:10<br>**annapolis**<br>6:13<br>**another**<br>8:15<br>**answer**<br>8:3, 38:15,<br>67:7<br>**answers**<br>7:16<br>**any**<br>7:22, 8:5,<br>11:12, 14:3,<br>15:16, 17:10,<br>19:1, 22:14,<br>25:13, 26:21, | 27:5, 29:15,<br>30:8, 34:4,<br>34:7, 38:6,<br>38:7, 38:16,<br>38:19, 39:9,<br>39:16, 39:21,<br>40:16, 42:8,<br>42:9, 45:11,<br>46:13, 46:18,<br>48:5, 48:8,<br>48:18, 48:20,<br>49:14, 49:15,<br>50:3, 50:15,<br>52:9, 52:22,<br>53:1, 53:7,<br>53:8, 55:22,<br>56:3, 56:12,<br>56:21, 58:6,<br>58:12, 59:13,<br>59:16, 59:17,<br>60:1, 60:2,<br>62:8, 62:9,<br>63:20, 64:3,<br>64:18, 65:1,<br>65:5, 65:12,<br>65:14, 65:21,<br>66:2, 67:10,<br>67:15, 67:18,<br>68:17, 71:6,<br>72:10<br>**anyone**<br>16:16, 16:19,<br>18:3, 23:13,<br>33:21, 35:14,<br>35:19, 39:21,<br>44:10, 57:12,<br>59:11, 60:13,<br>64:6<br>**anything**<br>16:14, 19:11,<br>19:15, 22:19,<br>23:18, 26:13,<br>28:16, 28:20,<br>33:20, 35:11,<br>35:14, 35:15,<br>35:19, 43:10,<br>44:14, 48:3,<br>54:7, 60:11, |

Transcript of William Franey
Conducted on August 29, 2017

20

70:1, 70:8
**anywhere**
11:3
**apparently**
48:2
**appear**
71:6
**appears**
51:10, 62:18,
62:21
**approached**
59:5
**approximately**
26:5
**areas**
19:17
**arnold**
64:11, 64:20,
65:2
**around**
36:9
**arrears**
68:13
**asked**
54:3, 67:22,
68:19, 69:11
**asking**
7:14, 37:16,
39:1, 43:13
**assets**
32:8
**assist**
16:17, 60:13,
60:16, 60:21
**assistance**
65:5
**assisted**
60:18
**associates**
10:8, 10:15
**association**
46:4
**assume**
58:10, 69:3
**assuming**
40:19, 62:6
**attach**
70:13

**attached**
5:9, 41:4,
51:3, 61:20,
71:6
**attempt**
39:21
**attend**
55:22
**attended**
9:4, 56:4, 56:8
**attending**
9:9
**attorney**
8:1, 33:8
**attorneys**
6:15
**august**
1:14, 72:14
**avenue**
4:6
**aware**
27:1, 35:18,
50:7, 54:16,
55:12
**away**
25:2

**B**

**back**
50:14
**background**
15:9
**bad**
48:4, 48:9
**baker**
3:14
**baltimore**
1:2, 3:15,
3:17, 6:17
**bank**
52:1, 53:14,
63:13
**bankruptcy**
27:17, 28:15,
29:9, 29:16,
30:5, 30:10,
30:22, 31:6,
31:10, 32:4,

32:9, 32:15,
32:21, 33:3,
33:6, 33:10,
33:14, 33:15,
35:9, 35:16,
35:21, 36:3,
36:6
**based**
14:21, 15:1,
62:20
**basis**
47:11, 47:13,
47:19, 48:10
**baxter**
3:14
**because**
6:18, 31:14,
32:7, 34:16,
36:18, 39:19,
46:10, 46:21,
47:9, 47:10,
49:17, 52:1,
53:14, 55:6,
58:10, 63:12,
63:19
**become**
11:17, 13:16,
50:7, 55:6, 55:7
**becoming**
50:16
**been**
6:3, 8:8,
10:17, 11:3,
32:16, 36:2,
37:7, 40:9,
40:20, 41:7,
44:6, 45:8,
45:11, 51:14,
53:4, 56:18,
56:20, 58:4,
58:18, 63:17,
70:17
**before**
2:16, 6:21,
8:4, 8:5, 51:7,
58:18, 62:2,
68:14, 72:2
**began**
12:14, 12:18

**beginning**
69:12
**behalf**
3:3, 3:12, 4:3
**behavior**
51:18
**being**
14:4, 23:21,
29:2, 33:21,
39:18, 42:1,
43:21, 48:8,
48:12, 48:22,
49:4, 50:4,
52:14, 52:15,
52:19, 55:10,
67:22, 68:9,
68:18, 69:11
**believe**
6:19, 37:3,
39:12, 40:6
**below**
41:19, 51:19
**benefits**
19:14
**between**
46:5
**bidding**
49:22
**bill**
51:22, 62:5,
62:7
**blame**
47:2
**bob**
31:9, 59:10,
59:21
**bond**
8:16, 14:15,
15:2, 15:10,
16:7, 16:20,
18:10, 18:14,
18:15, 18:17,
26:12
**bonding**
12:8, 12:11,
12:20, 13:11,
13:13, 13:16,
14:4, 15:16,

Transcript of William Franey
Conducted on August 29, 2017

21

54:13, 55:19,
56:22, 57:19
**bonds**
14:7, 14:10,
15:5, 15:11,
15:13, 15:18,
15:20, 16:17,
17:6, 17:8,
18:19, 19:3,
21:6, 32:12,
32:16, 35:22,
36:1, 36:3,
36:7, 36:9,
36:13, 37:7,
38:2, 38:3,
38:7, 38:11,
38:12, 38:15,
38:19, 39:16,
40:21, 56:13,
63:13, 65:9,
65:10, 68:5,
68:8, 68:9,
69:10, 69:16
**both**
21:17, 64:19
**brant**
60:16
**break**
7:22, 8:4,
60:19, 66:15
**breaking**
60:10
**brenda**
17:1
**brief**
41:10, 51:8,
61:22, 66:18
**brokerage**
10:5, 10:9
**brought**
6:18, 12:20
**buczkowski**
1:4, 4:12,
6:15, 6:16,
12:6, 13:22,
18:2, 18:18,
19:18, 21:13,
22:11, 22:15,

23:2, 23:15,
24:10, 24:18,
25:13, 26:15,
27:1, 27:9,
27:15, 29:22,
30:8, 30:16,
30:21, 31:22,
33:12, 35:16,
35:18, 40:7,
45:7, 46:2,
46:5, 46:12,
46:17, 47:20,
48:7, 48:12,
50:4, 50:16,
51:14, 52:10,
52:14, 52:19,
53:2, 53:10,
53:13, 56:4,
56:22, 57:13,
60:15, 60:18,
60:21
**builders**
13:8, 13:9,
54:14
**business**
18:20
**buy**
62:5, 62:20,
64:1
**buying**
61:9, 62:13,
63:6, 64:7,
64:12

---
**C**
---

**c-**
1:7
**cable**
8:16
**call**
24:12, 24:18,
25:7, 29:10,
44:6, 51:17,
56:13
**called**
38:14
**calls**
41:20, 42:2,

42:9, 42:16,
42:22, 43:14,
43:16, 43:21,
44:3, 44:11,
45:5
**came**
54:1, 59:3,
68:4
**can't**
62:3, 67:7
**capital**
34:11, 41:20,
42:2, 42:9,
42:16, 42:22,
43:14, 43:16,
43:21, 44:3,
44:6, 44:11,
45:5, 51:17,
58:11
**care**
52:1, 53:13
**case**
1:6, 72:10
**cases**
36:2
**cash**
57:1, 57:19
**casualty**
19:4, 19:6
**cause**
46:13, 46:15,
46:17, 47:22
**certainly**
8:2
**certificate**
72:1
**certify**
72:4
**cfo**
48:16
**change**
11:10
**changed**
11:7
**charge**
49:2, 49:4,
49:13, 49:19,
49:22

**cherin**
4:5
**chubb**
23:12, 24:1,
24:15, 34:7,
34:13, 34:21,
34:22, 35:14,
35:15, 35:19,
36:11, 36:20,
39:5, 58:2
**circuit**
1:1, 6:16
**claims**
10:1
**clarify**
65:7
**clark**
27:6, 56:12,
57:2, 58:22
**clients**
21:9, 32:15
**club**
56:1
**cm**
9:12
**collateral**
36:3
**collect**
29:7
**come**
54:2, 67:18
**commission**
72:15
**communicate**
31:12, 44:1,
44:6, 44:10,
53:15
**communicated**
37:1, 44:20,
45:1, 47:12,
53:18, 62:16,
62:17
**communicating**
47:19
**company**
8:16, 9:19,
11:1, 12:12,
15:22, 16:1,

16:6, 16:16,
16:19, 17:5,
32:5, 32:21,
36:18, 42:18,
46:22, 48:17,
50:8, 50:11,
50:17, 50:20,
52:15, 52:17,
53:1, 55:17,
55:20, 57:1,
57:19, 61:9,
65:3, 65:6,
65:11, 65:15,
65:18, 66:3
**company's**
34:3, 34:10
**compensation**
19:10
**complain**
25:13, 25:16
**complete**
71:5
**concerned**
31:21
**concerning**
30:22, 51:13
**concerns**
35:4, 35:6,
35:12, 53:8,
56:9
**concluded**
70:18
**confines**
67:12
**conflict**
55:6, 55:7
**confronted**
51:17
**conn**
3:14
**consider**
67:1, 67:5
**considered**
33:22, 67:11,
67:15
**considering**
61:9
**construction**
27:6, 56:12

**contact**
19:18, 21:13
**context**
68:3
**continually**
25:8, 45:22
**continued**
4:1
**contract**
15:15, 18:14
**contracting**
1:8
**contractor**
14:17, 14:19,
15:2
**contractors**
55:9
**conversation**
29:11, 30:16,
35:15, 52:3,
54:1, 54:8
**conversations**
19:21, 20:3,
20:9, 20:11,
35:3, 42:12,
42:21, 43:3,
43:7, 50:15,
52:9, 53:7,
58:16, 59:2
**cooke**
12:13, 12:15,
12:16
**cope**
70:15
**copied**
41:15
**copy**
70:4, 70:7
**corp**
12:2, 12:5,
64:16
**corporation**
9:12, 65:19
**correct**
14:20, 15:3,
15:19, 21:7,
21:11, 24:9,
35:9, 35:10,

40:22, 41:16,
41:17, 41:18,
41:21, 44:22,
51:11, 51:12,
51:14, 54:14,
54:15, 62:14,
62:20, 68:2,
68:11, 71:4,
72:5
**corrections**
71:6
**cosigned**
8:14
**could**
6:7, 29:6,
53:4, 53:6,
55:6, 55:7,
57:1, 57:19
**counsel**
6:4, 37:20,
72:9
**counterclaim**
6:17
**country**
56:1
**county**
1:2, 6:17
**couple**
9:16, 20:16,
66:12
**court**
1:1, 6:17, 7:11
**creditors**
52:2, 53:15
**currently**
11:15, 11:16,
13:13, 36:7,
36:8
**customer**
12:17

**D**
**daily**
19:22, 20:12,
21:10
**date**
27:21, 71:13
**dated**
41:17

**day**
72:13
**day-to-day**
47:11, 47:13,
47:16, 47:19,
48:10
**deal**
8:14, 44:8
**debt**
63:14, 63:19
**december**
45:9
**decide**
63:11
**decided**
29:20, 31:18,
64:1
**decision**
36:19, 63:9,
65:15
**decisions**
49:20
**defaulted**
8:15
**defendant**
8:9
**defendants**
1:9, 3:12
**definition**
67:3
**defs**
5:11, 5:12,
5:13
**delay**
25:9, 26:16
**delayed**
23:20
**deponent**
71:1
**deposition**
1:12, 2:1,
5:10, 6:21, 7:6,
41:3, 51:2,
61:19, 70:18,
72:3
**depositions**
7:9
**describe**
16:9

Transcript of William Franey
Conducted on August 29, 2017
23

details
62:12
deteriorating
34:11, 35:7
determination
14:18
determine
16:1
determined
15:20
difference
66:2
differences
65:22
different
15:4, 30:21,
66:1
differs
65:18
difficulties
48:1, 67:20,
69:13, 69:17
diligence
60:8, 60:22
direction
30:1, 72:8
directly
36:22
discuss
17:8, 27:15,
28:9, 29:20,
29:22, 31:6,
44:13, 45:4,
50:3, 56:22,
59:17, 60:4,
63:1
discussed
33:6, 33:7,
57:15, 61:10
discussing
29:9, 43:16,
52:14, 62:9,
62:19
discussions
42:8, 58:12,
64:18, 64:20,
65:1
doing
43:19, 66:4,

66:5, 70:11
dollars
66:13
done
39:18, 40:19
down
7:12, 32:5,
32:6, 60:10,
60:19
due
60:8, 60:22
duly
6:3

**E**

e-mail
20:15, 21:16,
40:9, 41:15,
41:16, 41:19,
42:2, 42:5,
43:7, 45:2,
51:10, 51:13,
52:7, 52:13,
52:19, 62:2,
62:20
e-mailed
20:21
e-mails
41:12, 51:7,
53:1, 53:4,
61:1, 61:2, 61:3
early
50:12
eckert
4:5
educational
8:22, 9:2
edward
4:4
effect
26:12, 36:10
effects
65:12
electronic
70:7
else
10:17, 11:3,
16:14, 16:19,

18:3, 19:11,
19:15, 22:19,
23:13, 23:18,
28:16, 28:20,
35:11, 36:6,
43:10, 48:3,
54:7, 59:11,
60:11, 64:6
employed
10:17, 11:3,
72:10
employment
11:6
encountered
49:16
end
63:6, 69:12
ended
33:9, 44:14,
64:12
enough
63:21
entail
60:9
entity
64:14
errata
71:6
esquire
3:4, 3:13, 4:4
essence
57:20
established
15:21, 54:13
et
1:8
even
28:1
ever
6:20, 8:8,
11:12, 18:7,
18:19, 19:21,
21:2, 21:18,
22:14, 26:15,
27:15, 29:22,
31:6, 32:20,
36:11, 38:10,
42:8, 45:4,

52:22, 55:1,
55:22, 56:8,
56:12, 58:12,
62:2
every
20:16, 22:1
everything
7:10, 7:12
exact
27:21
exactly
19:7
examination
5:2, 6:4
examined
71:3
example
23:4
executive
11:14, 11:17,
46:21, 47:9,
48:13, 48:22,
55:10
exhibit
5:10, 41:1,
41:3, 41:8,
51:2, 61:18,
61:19
exhibits
70:12, 70:15
expert
15:7
expires
72:15
explain
15:9
explore
27:16, 29:17
explored
30:5
express
56:12
expressed
56:9

**F**

f-r-a-n-e-y
6:10

Transcript of William Franey
Conducted on August 29, 2017

24

| | | | |
|---|---|---|---|
| **fact** | **finish** | 6:9, 10:18, | 15:1, 18:20, |
| 49:13 | 57:2 | 11:5, 41:3, | 19:9, 55:8 |
| **factual** | **firm** | 41:7, 41:8, | **generally** |
| 68:17 | 10:5 | 50:22, 51:2, | 16:11, 18:13, |
| **fall** | **firms** | 51:22, 61:18, | 20:18, 21:3 |
| 50:14 | 10:9, 10:12 | 61:19, 66:21, | **getting** |
| **familiar** | **first** | 70:18, 71:2 | 15:13, 23:3, |
| 11:20, 12:1, | 12:10, 13:1, | **frequently** | 25:10, 26:9, |
| 33:5 | 13:4, 13:7, | 17:10, 17:16, | 40:21 |
| **far** | 13:16, 27:19, | 17:18, 20:2, | **give** |
| 61:16 | 52:13, 52:18, | 21:12, 21:21, | 18:19, 23:4, |
| **feel** | 58:15 | 24:1 | 26:15, 27:22, |
| 31:15 | **five** | **full** | 39:9, 41:8, |
| **fellow** | 7:3, 7:4, 66:15 | 6:8 | 51:6, 67:3 |
| 12:12 | **flow** | **further** | **given** |
| **few** | 57:1, 57:19 | 63:1, 69:22 | 44:17, 45:11, |
| 66:20 | **following** | **future** | 71:5, 72:5 |
| **file** | 26:6 | 32:10, 32:16, | **giving** |
| 16:3, 28:14, | **follows** | 36:1 | 7:15 |
| 33:1 | 6:3 | | **glenn** |
| **filed** | **foregoing** | **G** | 13:1, 59:10, |
| 6:16, 32:4, | 71:3, 72:3, | **garofalo** | 59:21 |
| 32:15, 32:21 | 72:4 | 12:6, 13:4, | **go** |
| **filing** | **form** | 13:7, 20:12, | 7:8, 16:6, |
| 27:16, 32:9, | 18:15, 18:17, | 20:15, 20:21, | 18:11, 23:2, |
| 33:2, 33:6, | 65:15, 67:6 | 21:2, 25:17, | 32:5, 32:6, 67:7 |
| 33:10, 35:21, | **formation** | 25:18, 31:7, | **going** |
| 36:5 | 65:11 | 40:7, 41:17, | 7:12, 27:2, |
| **filled** | **formed** | 41:20, 42:14, | 37:2, 37:15, |
| 18:17 | 50:11, 64:4, | 42:15, 44:11, | 39:14, 40:4, |
| **financial** | 65:8 | 44:13, 47:4, | 42:17, 43:11, |
| 16:11, 22:7, | **forming** | 47:7, 47:12, | 45:19, 45:21, |
| 23:17, 24:2, | 50:8, 65:2, | 47:15, 47:18, | 50:8, 50:20, |
| 24:6, 24:20, | 65:6 | 49:4, 49:6, | 58:10, 60:7, |
| 25:19, 26:10, | **forward** | 49:8, 51:11, | 61:11, 61:14, |
| 26:16, 39:19, | 37:7, 40:20, | 52:6, 53:8, | 62:19, 63:12, |
| 46:10, 46:13, | 52:22, 58:7 | 53:16, 53:21, | 68:15 |
| 46:18, 47:2, | **forwarded** | 54:10, 54:17, | **gone** |
| 48:1, 48:14, | 42:6, 51:11 | 55:12, 59:10 | 36:5 |
| 49:15, 60:10, | **forwarding** | **gary** | **good** |
| 61:5, 67:20, | 52:7 | 3:13, 13:4, | 6:6, 29:12, |
| 69:13, 69:17, | **found** | 51:11, 59:10, | 31:17, 63:21 |
| 72:11 | 50:19 | 59:21 | **government** |
| **financials** | **four** | **gave** | 9:8 |
| 60:19, 61:4 | 59:21 | 26:19 | **graduate** |
| **find** | **franey** | **geiman** | 9:5 |
| 45:7 | 1:12, 2:1, 5:2, | 60:16 | **granville** |
| **fine** | 5:10, 6:2, 6:6, | **general** | 10:8 |
| 70:10 | | 14:16, 14:18, | |

Transcript of William Franey
Conducted on August 29, 2017

25

| | | | |
|---|---|---|---|
| greenbelt<br>1:13, 2:8, 3:8<br>greenwald<br>2:5, 3:5<br>guarantee<br>14:7, 38:2,<br>38:12, 68:1,<br>68:19, 69:11<br>guaranteed<br>15:14, 68:10<br>guaranteeing<br>68:12, 69:16<br>guarantees<br>36:12, 37:2,<br>37:6, 39:6,<br>39:8, 39:14,<br>39:15, 40:1,<br>40:4, 40:11,<br>40:14, 40:17<br>guess<br>50:10 | 18:4, 19:22,<br>24:13, 24:17,<br>25:3, 25:12,<br>26:6, 27:12,<br>30:11, 31:9,<br>37:5, 40:3,<br>45:4, 47:1,<br>47:13, 48:20,<br>49:9, 49:13,<br>53:19, 54:3,<br>56:5, 56:9<br>**health**<br>19:13<br>**heard**<br>33:20<br>**held**<br>2:1, 11:12<br>**help**<br>57:1, 57:19<br>**helping**<br>60:19 | 46:3, 47:14,<br>47:21, 48:11,<br>52:8<br>**identification**<br>41:4, 51:3,<br>61:20<br>**ii**<br>4:4<br>**in-person**<br>28:4, 59:13<br>**inc**<br>64:15, 65:9,<br>65:18, 66:10<br>**incorporated**<br>11:21<br>**indemnity**<br>37:8, 37:11,<br>38:4, 38:6,<br>38:14, 38:17,<br>38:20, 38:22,<br>68:14 | **interactions**<br>22:15<br>**interest**<br>61:8, 62:6,<br>62:19, 64:3,<br>72:11<br>**interested**<br>59:6<br>**interrupt**<br>37:19<br>**invest**<br>60:7<br>**investing**<br>58:13, 59:3,<br>59:6, 59:9,<br>59:14, 59:17,<br>60:4, 64:7,<br>64:19<br>**involved**<br>12:10, 16:20,<br>21:10, 47:16,<br>55:10 |
| **H** | | | |
| **hand**<br>72:13<br>**handed**<br>41:7<br>**handled**<br>66:12<br>**handling**<br>66:7, 66:11<br>**happen**<br>24:10, 25:1,<br>25:4<br>**happened**<br>23:5, 52:1,<br>53:14<br>**happening**<br>56:10<br>**happy**<br>7:19<br>**harkins**<br>13:8, 13:9,<br>13:13, 13:20,<br>20:19, 54:14,<br>55:10, 67:16<br>**haslam**<br>12:6, 13:1, | **here**<br>6:18, 7:10,<br>42:4<br>**hereby**<br>71:2, 72:3<br>**hereunto**<br>72:12<br>**himself**<br>52:2, 53:15<br>**hinnenkamp**<br>1:22, 2:17,<br>72:2<br>**history**<br>8:22, 9:3<br>**hm-mm**<br>51:21<br>**home**<br>6:11<br>**hoping**<br>15:8<br>**however**<br>67:5<br>**hundred**<br>66:12 | **individual**<br>15:15<br>**information**<br>6:19, 23:2,<br>23:17, 23:21,<br>24:2, 24:6,<br>24:21, 25:10,<br>25:20, 31:13,<br>33:13, 44:18,<br>54:21<br>**initially**<br>59:4<br>**instructions**<br>7:9<br>**insurance**<br>9:18, 10:16,<br>10:18, 11:5,<br>11:9, 21:6,<br>21:19<br>**insurers**<br>10:15<br>**intent**<br>56:13<br>**interacted**<br>21:13<br>**interacting**<br>21:9 | **involvement**<br>12:14, 65:2<br>**issue**<br>61:14<br>**issued**<br>18:15<br>**issues**<br>23:11, 47:2,<br>53:5<br>**itself**<br>37:9, 37:12,<br>68:15<br>**ivy**<br>2:6, 3:6 |
| | **I** | | **J** |
| | **idea**<br>29:12, 29:21, | | **jeri**<br>17:1<br>**job**<br>1:20, 18:11,<br>24:2, 24:3<br>**jobs**<br>26:20, 27:2,<br>27:6, 27:10,<br>48:4, 48:9,<br>49:17, 49:20, |

Transcript of William Franey
Conducted on August 29, 2017                                26

**jones**
3:13, 3:14,
5:4, 70:2, 70:8,
70:9, 70:14,
70:16
**joseph**
2:5, 3:5, 12:13
**judgment-proof**
28:19, 29:2

**K**

**karen**
1:22, 2:16,
72:2
**kemper**
9:18
**kind**
8:13, 17:4,
23:15
**kindly**
55:9
**knew**
44:8
**know**
7:2, 7:19, 8:1,
8:18, 10:12,
12:15, 12:16,
15:17, 17:3,
17:12, 18:16,
25:9, 26:3,
26:5, 27:12,
27:14, 27:22,
28:1, 28:2,
32:18, 33:11,
34:15, 35:20,
36:19, 37:17,
37:18, 38:16,
38:19, 39:1,
39:3, 40:10,
40:13, 42:1,
47:12, 47:15,
47:18, 49:19,
49:22, 50:19,
52:6, 52:16,
53:21, 54:10,
55:16, 55:18,
57:12, 57:14,

58:6, 58:9,
62:15, 62:22,
64:6, 64:12,
68:3, 68:21,
69:1, 69:4,
69:11, 69:19
**knowledge**
18:9, 19:16,
27:5, 31:8,
40:2, 45:6,
58:8, 59:12,
64:17, 68:18
**known**
54:21, 55:2
**kraemer**
12:7, 13:19,
41:16, 47:4,
54:17
**kraemer's**
55:13

**L**

**laake**
2:5, 3:5
**laid**
58:1
**lane**
2:6, 3:6
**large**
66:5
**late**
50:11
**later**
26:10
**latter**
50:10
**lawsuit**
6:16, 8:9, 8:18
**lawsuits**
6:20
**lawyer**
37:14
**learning**
54:11
**least**
21:14
**led**
51:18

**left**
45:10
**legal**
68:16
**less**
7:4, 17:16,
17:18
**liabilities**
32:8
**liability**
19:9
**liable**
56:18
**likely**
45:1
**list**
62:5
**little**
18:21
**llc**
1:8, 4:5, 64:3,
65:8, 65:20,
66:7
**loans**
32:10, 41:20,
42:2, 42:10,
43:14, 43:21,
44:2, 51:16
**lombardo**
12:7, 13:20,
47:5, 54:17,
55:13
**long**
9:15, 10:2,
36:3
**longosz**
4:4, 5:5,
37:16, 37:19,
39:1, 46:14,
66:16, 67:6,
69:18, 70:1,
70:3, 70:5
**look**
15:10, 41:9,
51:6, 51:20,
62:4, 62:13
**looking**
51:15, 60:7,

**64:7**
**losing**
45:22, 46:5
**lost**
49:17
**lot**
51:17

**M**

**made**
43:21, 44:7
**madison**
1:7, 11:20,
12:1, 12:5,
12:8, 12:18,
12:21, 13:2,
13:5, 14:1,
14:6, 14:9,
14:14, 15:11,
15:13, 15:16,
15:18, 16:17,
16:20, 17:8,
17:11, 17:20,
18:5, 18:10,
18:13, 18:16,
18:20, 19:2,
19:19, 20:17,
20:21, 22:8,
24:2, 24:7,
27:5, 27:16,
29:13, 29:16,
30:1, 32:1,
32:9, 33:21,
34:4, 36:22,
37:1, 37:4,
38:7, 38:11,
38:16, 38:19,
39:22, 46:5,
47:16, 48:1,
49:7, 49:15,
49:19, 50:1,
50:7, 54:18,
55:8, 55:11,
55:14, 56:10,
58:13, 58:21,
59:9, 59:18,
60:13, 61:14,
62:7, 63:7,

Transcript of William Franey
Conducted on August 29, 2017

27

64:8, 64:15,
65:3, 65:5,
65:9, 65:18,
66:10, 67:2,
67:12, 67:20,
68:5, 69:16
**madison's**
19:22, 20:12,
21:3, 34:6,
35:7, 35:22,
46:18, 56:13,
69:13
**main**
19:18
**major**
9:7
**majority**
31:14
**maker**
8:15
**making**
49:20
**manager**
34:20
**many**
7:1, 8:11, 26:5
**march**
41:17, 72:16
**mark**
41:1, 50:22,
61:17
**marked**
41:4, 41:8,
51:3, 61:20
**maryland**
1:2, 1:13, 2:8,
2:18, 3:8, 3:17,
6:13, 9:4, 9:9,
72:22
**matter**
30:21, 68:16
**matters**
8:13, 20:22,
21:6, 21:10
**maybe**
17:9, 21:1
**mean**
22:22, 27:21,

30:22, 37:13,
45:18, 45:20
**meaning**
17:14
**means**
37:14, 62:6
**meant**
19:7, 29:1,
29:5
**mechanical**
1:7, 11:20,
12:2, 12:5,
62:7, 64:15,
65:18, 66:10
**meet**
13:1, 13:4,
13:19, 13:22,
17:7, 18:1
**meeting**
22:5, 28:4,
28:6, 28:9,
40:8, 53:12,
56:9, 56:21,
57:5, 57:7,
57:16, 57:20,
59:20
**meetings**
18:5, 18:8,
21:18, 21:21,
28:9, 55:22,
56:4, 59:14,
59:16, 60:1
**mellott**
4:5
**merit**
2:17
**met**
6:6, 17:20
**middle**
69:12, 69:14,
69:17
**might**
40:9, 55:9
**million**
66:8, 66:13,
68:1, 68:6,
68:13, 69:2
**miniscript**
70:9

**minute**
41:9, 51:6,
66:15
**missing**
52:17
**misunderstanding**
8:16
**mm**
62:6
**moment**
11:6
**money**
42:17, 42:19,
43:11, 45:22,
46:5, 49:18,
63:13
**month**
17:14, 17:17,
21:14
**monthly**
17:12
**more**
7:3, 17:14,
18:21, 26:1,
57:4, 66:20,
69:1
**most**
7:5
**move**
40:20
**movement**
58:6
**moving**
37:7
**much**
40:13, 42:19,
44:14, 61:3,
68:18, 68:21
**multiple**
35:3, 42:21

**N**

**name**
6:8, 6:14,
10:6, 11:7,
11:8, 11:10,
12:13, 42:4
**names**
10:12

**near**
15:8
**need**
7:22, 13:7,
31:15
**needed**
18:10, 25:19
**needs**
7:11
**negotiate**
39:22
**neither**
72:9
**net**
34:10, 35:7
**never**
61:10, 61:16
**new**
8:20, 36:3,
38:3, 38:11,
38:15, 39:16,
50:8, 50:17,
50:20, 52:15,
52:17, 55:17,
55:19, 65:2,
65:6, 65:8,
65:11, 65:15,
65:17, 66:3,
68:5, 69:10
**none**
62:15
**nonresponsive**
22:18, 24:11
**nonresponsiveness**
22:22
**normal**
24:4
**notarial**
72:13
**notary**
2:17, 72:1,
72:21
**note**
8:15
**nothing**
25:6
**notice**
2:16, 45:11

Transcript of William Franey
Conducted on August 29, 2017

28

nowhere
15:8
number
5:10, 41:3,
51:2, 51:20,
61:19, 62:4
nw
4:6

### O

oath
7:10
object
46:14, 67:6,
69:5, 69:18
obtain
14:7, 14:10,
32:10, 32:11,
32:16, 35:22,
36:1, 38:3,
38:11
obtained
68:5
obtaining
16:17, 16:18
occasion
26:1
occasionally
27:9
occur
20:3, 21:22
occurred
20:6, 63:4
office
27:2
officer
46:21, 48:13,
49:1, 72:2
officers
47:9, 55:10
offices
2:2
often
17:7, 20:4,
20:14, 20:20
okay
7:5, 7:8, 8:8,
8:21, 37:19,

41:11, 41:22,
50:13, 66:20,
66:22, 69:22,
70:3
old
38:14
once
8:12, 17:14,
17:16, 44:6
one
6:14, 8:14,
8:19, 8:20,
19:13, 22:2,
26:1, 28:8,
29:6, 57:4,
65:19
only
8:2, 11:5,
20:6, 52:13,
52:19
operations
19:22, 20:12,
21:3, 49:2,
49:4, 49:14
opine
37:15, 68:15
opinion
29:18
opinions
29:15, 30:1
option
29:13
order
10:7, 16:6,
22:8, 38:2, 57:1
os
12:2, 12:5,
64:15
other
10:9, 11:13,
15:16, 16:16,
19:1, 19:2,
19:17, 21:6,
21:9, 25:12,
26:21, 28:9,
29:22, 30:3,
43:10, 44:10,
48:5, 48:12,

48:13, 48:18,
48:20, 48:21,
48:22, 51:16,
52:22, 55:8,
56:5, 57:12,
57:18, 63:20,
65:19, 65:21
otherwise
7:19, 72:11
out
18:17, 26:6,
26:20, 27:2,
45:7, 50:19,
58:1
outcome
72:11
outside
14:3
over
7:8, 7:14,
43:8, 53:8

### P

pa
2:5, 3:5, 3:14
page
5:2, 5:10
pages
1:21
paragraph
51:16
part
46:7, 47:2,
50:10, 50:17,
50:20, 52:15
particular
9:7
parties
72:10
patterson
17:1
paul
34:18, 34:19,
39:12
pause
41:10, 51:8,
61:22
pay
32:8

payment
15:14
pays
15:18
penalty
26:11
pending
8:3
pennsylvania
4:6
people
16:12, 16:22,
36:2
percent
61:8, 62:6,
62:19
performance
14:7, 15:14
period
36:1
person
59:17
personal
36:12, 37:2,
37:6, 39:6,
39:7, 39:14,
39:15, 39:22,
40:4, 40:11,
40:13, 40:17
personally
38:2, 38:12,
56:18, 61:12,
62:8, 68:1,
68:9, 68:12,
68:19, 69:11,
69:16
phone
17:11, 20:14,
21:15, 43:8
place
6:12, 57:8
plaintiff
1:5, 3:3, 6:4
plan
50:5
planning
45:12
play
65:14

Transcript of William Franey
Conducted on August 29, 2017                                    29

| | | | |
|---|---|---|---|
| please<br>6:7, 7:13,<br>14:8, 41:2,<br>43:22, 49:12,<br>51:1, 59:15,<br>60:20, 61:18<br>point<br>7:22, 19:18,<br>36:11, 68:4<br>politics<br>9:8<br>position<br>9:13, 9:20,<br>9:22, 10:21,<br>27:16<br>positions<br>11:12, 17:4<br>possibility<br>35:8<br>possible<br>52:2, 53:15<br>possibly<br>32:13, 45:3<br>prawde<br>3:4, 5:3, 6:5,<br>6:14, 37:21,<br>37:22, 39:4,<br>41:1, 41:6,<br>46:16, 50:22,<br>51:5, 61:17,<br>62:1, 66:14,<br>66:17, 66:19,<br>67:9, 69:9,<br>69:22, 70:6,<br>70:13<br>present<br>4:12, 10:20,<br>17:21, 18:3,<br>18:4, 56:6<br>president<br>11:14, 11:18<br>previously<br>8:8, 41:13<br>price<br>15:20<br>primarily<br>20:19, 21:15<br>prior<br>33:20, 38:2, | 50:4<br>privy<br>33:4<br>probably<br>20:6, 26:2,<br>45:9, 63:17,<br>69:14<br>problem<br>27:9<br>problems<br>22:14, 23:8,<br>27:5, 46:13,<br>46:18, 48:15,<br>49:15, 53:1,<br>53:9<br>procedure<br>18:11<br>proceed<br>67:19<br>proceeded<br>40:10<br>process<br>16:20<br>processing<br>17:6<br>professional<br>10:15<br>project<br>14:21<br>projects<br>14:12, 14:14,<br>57:2, 58:22,<br>66:3, 66:5,<br>66:6, 66:10<br>property<br>19:4, 19:6<br>protected<br>52:2, 53:14<br>provide<br>22:8, 40:16,<br>65:5<br>provided<br>22:12, 24:7,<br>61:5<br>providing<br>23:21, 26:16<br>public<br>2:18, 72:1, | 72:21<br>publicly<br>54:21, 55:2<br>pursuant<br>2:16<br>put<br>36:4, 42:17,<br>43:11, 58:10,<br>63:12<br>putting<br>44:3, 44:15<br>**Q**<br>qualification<br>16:5<br>qualify<br>16:6<br>quarterly<br>24:4, 24:5,<br>24:7<br>question<br>7:14, 7:18,<br>7:21, 8:3, 8:4,<br>31:17, 49:10,<br>69:18<br>questions<br>8:5, 66:20,<br>69:22<br>**R**<br>rambo<br>34:18, 34:19,<br>35:12, 39:12<br>ran<br>23:7, 23:11,<br>27:5, 48:1,<br>49:7, 58:21<br>rate<br>15:21<br>rates<br>16:2, 16:4<br>reach<br>26:6<br>read<br>37:14, 70:3,<br>71:3<br>reading<br>72:8 | reason<br>7:17, 25:9,<br>31:18, 39:9,<br>48:18, 48:20<br>reasons<br>26:15, 26:19,<br>26:21, 48:5,<br>48:13, 51:13,<br>52:10, 63:20<br>recall<br>12:4, 20:8,<br>23:7, 23:10,<br>27:4, 27:19,<br>28:3, 28:6,<br>28:12, 29:11,<br>30:2, 30:12,<br>30:18, 31:3,<br>31:18, 33:9,<br>35:1, 35:11,<br>36:15, 36:17,<br>37:4, 38:6,<br>38:10, 41:12,<br>43:2, 43:5,<br>51:7, 52:14,<br>53:7, 53:11,<br>56:8, 56:15,<br>56:17, 57:4,<br>57:6, 57:7,<br>57:10, 57:15,<br>57:21, 58:3,<br>59:2, 59:5,<br>59:8, 59:13,<br>59:16, 59:20,<br>59:22, 60:1,<br>61:11, 62:3,<br>63:22, 68:6,<br>68:7<br>receive<br>24:20<br>received<br>52:19<br>receiving<br>15:12<br>recent<br>7:5<br>recess<br>66:18<br>recollection<br>56:3, 62:8, |

Transcript of William Franey
Conducted on August 29, 2017

30

| | | | |
|---|---|---|---|
| **record**<br>6:7, 6:8, 72:5 | **reported**<br>1:22 | **right**<br>25:2, 50:9, | **seal**<br>72:13 |
| | | | |

62:12, 63:3
**record**
6:7, 6:8, 72:5
**records**
22:8, 26:10,
26:17
**reduced**
72:7
**regard**
23:8
**regarding**
30:4, 31:10,
35:4, 40:16,
41:20, 42:2,
42:9, 42:16,
43:13, 52:3,
52:10, 53:1,
53:5
**regards**
49:3
**regional**
34:20
**registered**
2:17
**regularly**
28:8
**related**
20:17, 20:19,
27:6, 35:6, 72:9
**relationship**
34:3, 34:6,
34:12
**relevant**
6:20
**remember**
20:13, 23:22,
28:11, 29:14,
42:7, 43:9,
44:12, 53:3,
56:2, 56:7,
56:11, 58:17,
59:7
**renewals**
21:19
**repeat**
14:8, 49:10,
49:11
**rephrase**
7:18, 38:9,

43:22, 59:15,
60:20
**reported**
1:22
**reporter**
2:17, 7:11,
70:4, 70:8,
70:11, 70:14,
72:1
**representing**
6:15
**request**
8:2, 18:14,
18:17, 23:1,
24:2, 57:18
**requested**
26:10, 72:8
**requests**
22:18, 22:22,
23:15, 23:17
**require**
38:17
**required**
14:6, 14:10,
14:12, 14:14,
14:16, 22:7,
24:6, 36:12,
36:17, 37:2,
38:1, 38:8,
38:21, 39:14,
39:16, 40:1,
40:5, 43:20,
44:1, 44:5,
63:17
**requirements**
16:5, 16:9
**requiring**
39:6, 39:7
**response**
25:21, 29:8,
54:11, 57:21
**responsive**
23:21
**result**
26:9, 26:13
**resumes**
16:12
**rick**
64:11, 64:20,

65:1
**right**
25:2, 50:9,
66:14
**risk**
69:21
**risky**
69:15
**rmr**
1:22
**robert**
1:4, 4:12
**role**
48:7, 48:14,
49:14, 65:14
**run**
22:14, 32:20
**russell**
17:1

---

**S**

---

**said**
28:12, 28:14,
31:4, 53:12,
54:6, 54:10,
68:14, 69:4,
72:5
**sale**
61:11
**salesman**
9:14, 10:22,
11:13
**same**
7:15, 40:6,
71:4
**say**
7:10, 7:12,
21:12, 23:20,
24:14, 24:17,
25:18, 28:18,
39:5, 46:14,
54:5, 54:7,
55:4, 61:2, 61:3
**says**
38:5, 51:16,
51:22, 62:5
**scheduled**
28:8

**scotty**
32:18
**seal**
72:13
**seamans**
4:5
**second**
8:19, 8:20
**see**
42:4, 57:18
**seeing**
41:12, 51:7
**seek**
21:2
**seeking**
38:11
**seen**
62:2
**sell**
62:7
**send**
18:14
**sent**
42:1, 53:5,
61:1
**services**
11:9, 22:9
**set**
72:12
**shareholder**
31:14, 48:16
**shareholders**
12:4, 17:11,
17:21, 18:8,
25:14, 30:4,
30:9, 36:12,
38:1, 40:10,
41:21, 42:3,
42:9, 42:10,
43:11, 44:2,
44:14, 45:12,
50:3, 50:16,
53:9, 54:18,
56:1, 56:5,
56:18, 62:9,
62:18, 62:22,
63:15, 66:1,
67:10, 67:18,

Transcript of William Franey
Conducted on August 29, 2017                                31

67:22, 68:10,
68:18, 69:10,
69:15
**shares**
55:13, 61:14
**sheet**
71:7
**shivers**
10:16
**shorthand**
72:1
**shortly**
24:21
**should**
27:16, 28:14,
29:17, 51:14,
51:18
**sidle**
3:14
**sign**
63:13, 69:20
**signature**
70:17, 71:13
**signature-si5t4**
72:18
**signed**
71:7
**signing**
40:11, 40:17,
72:8
**sites**
27:13
**situation**
32:20
**situations**
32:14
**size**
14:21, 66:6,
66:9
**slow**
23:3
**slowly**
7:13
**smith**
10:8
**socialize**
14:3
**solely**
15:1, 46:6

**some**
6:19, 7:8,
15:8, 23:1,
27:2, 27:6,
48:4, 60:8
**someone**
17:7, 17:20,
18:13, 24:15,
59:5
**something**
29:16, 30:5,
33:21, 52:17
**sometime**
45:9
**sometimes**
18:4
**soon**
44:8
**sorry**
9:1, 9:21,
17:16, 19:5,
23:9, 32:12,
37:10, 37:19,
38:18, 49:9,
50:13, 60:20
**sort**
39:9, 68:17
**sorts**
38:20
**sound**
33:5
**south**
6:12
**speak**
7:13, 30:8
**speaking**
16:11, 18:13,
25:2, 25:12,
30:7
**speaks**
37:8, 37:11,
68:15
**specific**
18:22, 23:4,
23:10, 60:1
**specifically**
20:8, 20:17,
22:21, 28:21,

31:3, 35:7,
35:8, 49:3,
51:15
**speculate**
69:7, 69:8
**speculating**
69:19
**spell**
6:8
**spent**
27:1, 27:12
**spoke**
20:20, 21:5,
30:12, 46:10,
59:8
**spoken**
30:7
**st**
72:13
**start**
9:11, 11:1
**started**
8:6, 12:12
**state**
2:18, 6:7,
8:18, 16:3,
72:22
**statement**
39:19
**statements**
16:12, 24:4,
24:5, 24:8,
34:2, 46:10,
60:10, 61:5
**stenographically**
72:6
**steps**
58:2, 58:3,
60:6
**still**
32:10, 32:16
**street**
3:15
**strictly**
21:6
**studying**
9:6
**subcontractor**
14:6, 14:9

**sued**
29:6
**sufficient**
32:7
**suite**
2:7, 3:7, 3:16,
4:7
**support**
39:20
**sure**
14:9, 26:3,
33:7, 43:1,
51:9, 53:17,
54:22, 55:4,
59:19, 66:16,
70:16
**sureties**
23:7, 44:21
**surety**
14:7, 14:10,
15:2, 15:4,
15:10, 15:21,
16:1, 19:2,
23:1, 23:10,
34:20, 38:2,
43:18, 43:20,
44:2
**surprise**
45:15
**surprised**
33:12, 33:17
**sworn**
6:3, 7:10

**T**

**take**
7:22, 8:4,
41:9, 49:20,
50:13, 51:6,
51:20, 55:9,
58:2, 60:6,
62:4, 66:15,
70:6
**taken**
6:21, 72:3,
72:6
**taking**
7:12, 44:2

Transcript of William Franey
Conducted on August 29, 2017

32

talk
7:13, 7:14,
17:10, 20:14,
21:19, 24:19
talked
52:3
talks
33:2, 52:16,
59:14
tell
19:7, 22:17,
22:21, 28:16,
28:20, 30:3,
31:9, 31:15,
31:19, 35:14,
36:22, 42:15,
42:19, 43:10,
43:18, 43:20,
55:1
telling
51:22
ten
7:7, 66:15
term
67:5
terminate
45:13
terminated
45:8, 45:16,
50:4, 50:21,
51:14, 52:11,
52:15, 52:20
termination
51:19
terms
7:9, 15:11,
60:6
testified
6:3
testimony
71:4, 71:5,
72:5, 72:6
texas
8:14
thank
37:21, 66:17
themselves
46:11

thereafter
72:7
things
28:10, 45:19
think
17:20, 18:18,
20:20, 26:22,
31:2, 32:6,
32:22, 37:16,
40:3, 40:8,
46:4, 46:7,
46:9, 46:12,
46:17, 46:20,
47:1, 47:17,
47:22, 48:7,
49:5, 49:14,
52:18, 53:18,
58:1, 58:18,
58:21, 67:10,
67:15
thinking
48:14, 64:19
third
51:16
thought
28:14
thousand
66:13
three
17:9, 17:19,
20:6, 21:14
through
8:21, 9:2,
13:1, 13:4,
13:8, 13:20,
13:22, 16:6,
18:12, 36:5
time
19:13, 22:2,
27:2, 27:12,
29:15, 36:7,
36:9, 38:10,
40:6, 56:17,
68:19
times
7:1, 8:11,
17:9, 17:19,
18:7, 20:7,

21:1, 21:14,
25:1, 26:5,
54:16
title
11:14
titles
17:2
today
6:18, 7:11
told
27:19, 28:3,
28:19, 30:18,
31:10, 31:22,
33:13, 34:16,
35:1, 35:12,
35:18, 37:4,
39:5, 39:11,
39:13, 40:3,
40:6, 40:7,
53:13, 53:21,
54:3
took
49:17, 57:7
top
41:15, 62:2
transcript
5:9, 41:5,
51:4, 61:21,
72:4
transcription
71:5
tried
60:8
trouble
36:18, 49:5,
58:22
true
71:4, 72:4
trust
55:14, 55:16
truthful
7:11
try
7:13
trying
10:7, 50:9
tuesday
1:14

tv
8:16
twice
8:12
two
10:3, 17:9,
17:19, 20:6,
21:14, 22:4,
68:4
type
19:1
types
15:4, 15:11,
66:2, 66:3
typewriting
72:7
typical
21:8

**U**

umbrella
19:10
under
7:10, 72:7
undercapitalized
48:2, 48:8
understand
7:18, 7:20
understanding
27:8, 29:4,
29:19, 30:20,
39:17, 42:5,
54:20, 61:15,
62:11, 65:17,
65:22
understood
7:20
university
9:4
unlimited
40:15
unrelated
18:19
unresponsive
23:16
use
15:16
usual
66:9

Transcript of William Franey
Conducted on August 29, 2017                                    33

usually
16:10, 17:22,
18:1, 18:3,
18:5, 18:16,
21:22, 22:2,
22:4, 22:11,
24:20
utilize
16:4

---
V
---

vice
11:14, 11:17
views
30:4, 30:9,
30:13, 30:21,
33:13, 33:15,
35:19
voting
55:14, 55:16

---
W
---

w-i-l-l-i-a-m
6:9
wait
24:12
waived
70:17
walk
8:21, 9:2,
18:12
want
7:18, 54:21,
55:2, 70:4,
70:14
wanted
39:16, 63:15
wants
15:2
washington
4:8
way
34:4, 34:7
we'll
7:8, 70:3, 70:6
we've
52:3
weekly
17:13

weeks
20:16
went
9:10, 9:18,
10:5, 27:9
weren't
45:19, 45:20,
47:10
whatever
7:17
whenever
14:16, 21:5
whereof
72:12
whether
15:1, 29:12,
29:16, 30:4,
47:15, 47:18,
56:22, 59:6,
60:7, 63:4,
64:12
william
1:12, 2:1, 5:2,
6:2, 6:9, 70:18,
71:2
williams
32:18
within
67:12
without
69:19
witness
4:3, 37:18,
39:3, 67:8,
69:6, 69:8,
69:20, 72:12
work
9:10, 9:18,
10:4, 10:5,
10:9, 10:19,
12:21, 13:9,
16:12, 17:5,
19:1, 25:22,
66:3
workers
19:9
working
9:11, 19:2,

22:15, 26:20,
34:10
works
55:8
worried
34:14
worth
34:10, 35:7
wouldn't
24:3, 32:7,
39:19, 62:7,
63:13
wow
10:7
wrote
8:17

---
X
---

x
1:3, 1:10

---
Y
---

yeah
25:5, 25:8,
32:19, 44:9,
49:12, 62:21,
69:6, 70:9
year
17:9, 17:19,
22:1, 22:2,
27:22, 28:1,
36:15, 43:5,
50:9
years
7:7, 9:16,
10:3, 10:19,
20:7, 21:1,
51:19, 53:8
york
8:20
yourself
67:1

---
$
---

$10
69:2
$17
66:13

$2
68:5
$30
68:1, 68:13
$5
66:8

---
0
---

0
2:9, 3:9
0042
5:13
0043
5:13
005782
1:7
03
1:7

---
1
---

10
1:15, 62:5
1065
5:12
1066
5:12
120
3:15
1200
4:7
1294
5:11
1295
5:11
14
28:1
156509
1:20
16
1:7, 72:16
1717
4:6
1972
10:20
1980
13:18

---
2
---

2
1:15

Transcript of William Franey
Conducted on August 29, 2017

34

**20**
20:7, 21:1
**20006**
4:8
**2003**
11:11, 11:19
**2013**
28:1
**2014**
36:16, 58:19
**2015**
41:17, 50:11,
50:14
**2016**
50:10, 50:12
**2017**
1:14, 72:14
**202**
4:9
**2021**
72:16
**20770**
2:8, 3:8
**2100**
3:16
**21202**
3:17
**220**
2:9, 3:9
**2200**
2:9, 3:9
**29**
1:14

_____ 3 _____

**3**
70:19
**30**
70:19
**301**
2:9, 3:9
**31**
72:13
**385**
3:18

_____ 4 _____

**400**
2:7, 3:7

**41**
5:11
**410**
3:18

_____ 5 _____

**51**
5:12
**559**
4:9

_____ 6 _____

**61**
5:13
**6404**
2:6, 3:6
**6619**
4:9
**6th**
41:17

_____ 7 _____

**72**
1:21

_____ 8 _____

**8004**
3:18

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MADISION MECHANICAL, INC., et al.,

                            Plaintiffs,

v.

THE HARTFORD FINANCIAL SERVICES,
et al.,

                            Defendants.

Civil Action No.: 1:17-cv-01357-GLR

## AFFIDAVIT OF GLENN A. HASLAM

I, Glenn A. Haslam, hereby state and affirm as follows:

1. I am over the age of eighteen years and competent to testify.

2. The following is based upon my personal knowledge.

3. I was the president of Madison Mechanical OS Corp. and Madison Mechanical, Inc. at all times relevant to this lawsuit.

4. I became president of Madison Mechanical OS Corp. on December 26, 2007.

5. In my role as president, I oversaw all operations of the Madison entities, including the handling of insurance and insurance claims that were submitted by a representative of our company.

6. The Madison entities have a long history of working with William Franey for insurance needs. Mr. Franey provided these services and was a key advisor to the Madison owners for many years, including many years prior to the formal formation of Madison Mechanical OS Corp in 2007.

7. As a close advisor to the Madison entities, Mr. Franey did not simply take orders from the shareholders but rather offered advice, insight, and suggestions to the companies.

8. In fact, Madison purchased directors' and officers' liability coverage and employment practices liability insurance at Mr. Franey's suggestion.

9. Since at least 2009, all claims against Madison were reported through Mr. Franey or one of his associates. To my recollection claims were never reported directly to the insurance carrier.

10. In August of 2015, a new entity was formed named Madison Mechanical Contracting, LLC. I have an ownership interest in this entity as well.

11. Around this same time in August of 2015, Gary Garofalo and I discussed the insurance needs for Madison Mechanical Contracting, LLC ("MMCLLC") with Mr. Franey. We discussed the need for all types of insurance policies like that of Madison Mechanical, Inc. This would include general liability, property, excess liability, worker's compensation, pollution, directors' and officers', and employers' practices liability insurance.

   I SOLEMNLY AFFIRM under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true.

_5/8/19_
Date

Glenn A. Haslam