# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MADISON MECHANICAL, INC., *et al.*,

      Plaintiffs,

vs.

TWIN CITY FIRE INSURANCE CO., *et al.*,

      Defendants.

Civil Action No.: 1:17-cv-01357-GLR

Judge George Levi Russell, III

## DEFENDANT TWIN CITY'S DISCLOSURE OF EXPERT TESTIMONY

Pursuant to Federal Rule 26(a)(2) and the Scheduling Order entered in this matter, Defendant Twin City Fire Insurance Co. ("Twin City") hereby discloses the following expert witness who may be called to testify at the time of trial:

1. **Larry Goanos**
   Andros Risk Services LLC
   50 Grand Tour
   Highlands, NJ  07732

Mr. Goanos will testify concerning the matters set forth in the attached report. His opinions and the bases and reasons for them are set forth in the attached report along with his resume. This designation represents a broad summary of the opinions of Mr. Goanos. He reserves the right to modify, amend, and/or supplement his opinions as further information about the case is made available to him. Twin City will produce Mr. Goanos for deposition at a mutually convenient time.

Twin City reserves the right to call any expert witness identified by any other party to this litigation. Twin City reserves the right to supplement this designation if any additional information is received, after the depositions of fact and/or expert witnesses.

Dated: June 14, 2019                    Respectfully submitted,


                                        By:/s/ Charles C. Lemley_____
                                             Charles C. Lemley
                                             clemley@wileyrein.com
                                             D. Md. Bar No. 15205
                                             WILEY REIN LLP
                                             1776 K Street, NW
                                             Washington, DC 20006
                                             Telephone: (202) 719-7000
                                             Facsimile: (202) 719-7049

                                             *Attorney for Defendant Twin City Fire*
                                             *Insurance Company.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th of June 2019, a true and correct copy of the foregoing was transmitted via electronic mail to the following counsel:

Gary R. Jones
Charles I. Joseph
Danielle M. Vranian
Baxter, Baker, Sidle, Conn & Jones, P.A.
120 East Baltimore Street, Suite 2100
Baltimore, Maryland 21202

*Counsel for Plaintiffs*

Timothy Maloney
Joseph M. Creed
Alyse L. Prawde
Joseph, Greenwald and Laake, PA
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770

*Counsel for Defendant Robert Buczkowski*

/s/ Charles C. Lemley
Charles C. Lemley

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MADISON MECHANICAL, INC., ET AL., <br>      **Plaintiffs,** <br><br>     v. <br><br> THE HARTFORD FINANCIAL PRODUCTS, ET AL., <br><br>      **Defendants.** | Civil Action No. 1:17-cv-01357-GLR <br><br> Judge George Levi Russell, III |

## EXPERT WITNESS REPORT OF LARRY GOANOS

I, Larry Goanos, report as follows:

1.  I have been retained as an expert witness for Defendant, Twin City Fire Insurance Company, in the lawsuit styled as <u>Madison Mechanical, Inc. et al., v. The Hartford Financial Products, et al.</u>, Civil Action No. 1:17-cv-01357-GLR, pending in the United States District Court for the District of Maryland (the "Captioned Lawsuit").

## QUALIFICATIONS

2.  A summary of my educational background, qualifications, publications, and professional experience is contained in my *curriculum vitae,* which is

attached hereto as Exhibit 1 and incorporated herein by reference as though fully set forth at length.

3.  I began in the insurance industry in 1989 as an attorney practicing insurance law. I worked at law firms in New York City (D'Amato & Lynch) and Boston (Parker, Coulter, Daley & White) for five years, handling various insurance matters, with an emphasis on coverage issues relating to claims. I represented clients such as AIG, Chubb, CNA, Reliance, Aetna/ERMA, Zurich, CIGNA, RLI, Western World and various Lloyd's of London syndicates, among others.

4.  In 1994, I became the Chief Underwriting Officer of the Financial Institutions Group of AIG subsidiary National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"). In that capacity, I was responsible for, among other things, drafting and editing primary and excess insurance policies, including Directors & Officers Liability (or "D&O") Insurance policies and Errors & Omissions (or "E&O") Insurance policies, applications, endorsements, letters of intent and warranty letters; training underwriters on various aspects of insurance underwriting and claims; negotiating coverage and pricing with insurance brokers and insureds; and working with National Union's Claims Department to help resolve complex claim issues.

5.  In 1996, I became an insurance broker with Marsh USA (as it was then called), one of the world's largest insurance brokerages, in its San Francisco, California office.  In that capacity, as a licensed California insurance broker, I handled a wide variety of insurance placements.  My duties included assessing client needs, soliciting quotes, negotiating terms and pricing with carriers, and structuring complex insurance programs.  I worked on some of the largest accounts in the San Francisco office, including Bank of America, Wells Fargo, E*Trade, AmeriTrade, Chevron, Union Bank of California, and Stanford University.  I was also a Claims Advocate at Marsh, in which capacity I worked with Marsh clients throughout the Western United States by explaining the claims process, analyzing the merits of individual claims, and assisting in the negotiation of coverage with insurers.

6.  In 1998, I returned to AIG, where I became the Executive Vice President of National Union's Financial Institutions Group, performing many of the duties that I previously had handled for AIG, including drafting policy wordings and working with its Claims Department to resolve difficult claims.  I also assumed greater responsibility for strengthening client and broker relations and ensuring that the group met its financial goals. Additionally, I represented National Union at speaking engagements on various insurance topics throughout the United States.

7.      In 2002, I became a Senior Vice President of ACE USA's Professional Risk

Group.  I supervised all management liability (D&O and related products)

underwriting for ACE USA, as well as professional liability (E&O)

underwriting for financial institutions.  In this capacity, I was responsible for

overseeing day-to-day operations, including negotiating policy wordings;

drafting and editing primary and excess policies; drafting applications,

endorsements, letters of intent and warranty letters; training underwriters on

various aspects of insurance underwriting and claims; representing ACE

USA at speaking engagements throughout the country; and working with

ACE's Claims Department to help resolve complex claims.

8.      In 2005, I returned to Marsh at its New York City headquarters.  I obtained

my New York State Property and Casualty Insurance Broker's License and

became a Managing Director, working with large clients nationwide on a

variety of professional lines insurance matters.

9.      In 2007, I became the President of Professional Indemnity Agency, Inc.

("PIA"), a wholly owned underwriting subsidiary of HCC Insurance

Holdings, Inc. (now known as Tokio Marine HCC).  In this role, I oversaw

the day-to-day operations of the entire subsidiary, including the Claims and

Underwriting units.  PIA underwrote a wide variety of insurance policies.

10. In 2008, I authored a book, *"Claims Made and Reported: A Journey Through D&O, E&O and Other Professional Lines of Insurance,"* [New York: Soho Publishing, 2008; 376 pages]. I interviewed over 400 individuals about various aspects of the insurance industry while performing research for the book. To date, approximately 3,000 copies have been sold and the book has been translated into Japanese and published in Japan. *Claims Made and Reported* has received praise from many insurance industry senior executives, including Warren Buffett.

11. In 2010, I founded Andros Risk Services, LLC, an independent insurance consulting firm. Among other services that I perform are: 1) Drafting policies for insurance carriers; 2) Providing training to insurance company Claims and Underwriting units, insurance brokerages, other insurance consultants, and law firms; 3) Acting as an outsourced insurance risk manager; 4) Conducting audits of insurance underwriting and claims operations; 5) Acting as an insurance coverage arbitrator; and 5) Serving as an expert witness in insurance disputes.

12. In 2014, I authored a book titled *"D&O 101: Understanding Directors and Officers Liability Insurance – A Holistic Approach,"* [San Diego: Wells Media, 2014, 214 pages]. This book discusses technical coverage aspects of Directors and Officers Liability Insurance and was praised by many

insurance industry veterans, including, as with my first book, Warren
Buffett. It is the best-selling book in its publisher's history.

13.    I was the Dean of The School of Professional Lines Claims within the
Claims College sponsored by The Claims and Litigation Management
Alliance ("The CLM") from July of 2012 until September of 2015. The
Claims College offers courses on best practices in claims handling for
insurance professionals and attorneys. I designed Claims courses with my
executive committee (comprised of senior claims executives from major
carriers). I also taught, and still teach, classes to a student body consisting of
Claims professionals from a wide array of carriers, as well as in-house and
outside counsel. The CLM, arguably the insurance industry's leading
claims-focused organization, has a membership comprised of more than
40,000 individuals, 2,000 law firms and 800 insurance companies.

14.    I became the president and chief underwriting officer of APRI Group, Inc. in
September 2015. APRI Group, Inc. was an independent managing general
underwriter (MGU) that acted as an outsourced underwriting arm of
insurance carriers. It ceased operations in October 2016.

15.    To summarize: I have over 30 years of insurance industry experience as: 1)
An outside attorney representing a variety of carriers in claims matters; 2)
An insurance company senior manager overseeing claims and underwriting

units; 3) An insurance broker (formerly licensed in California and New York) representing client companies of all sizes; 4) An independent insurance consultant providing services to insurance carriers, insurance brokerages and other clients; 5) Dean of a school dedicated to teaching best practices in claims handling; and 6) The president of two companies underwriting insurance on behalf of insurers.

## STATEMENT OF COMPENSATION

16.  I am being compensated at a rate of $800 per hour ($560 per hour for travel time) and my compensation is not contingent in any way on the outcome of this matter.

## PUBLICATIONS AND PRIOR TESTIMONY

17.  A listing of insurance publications that I have authored during the previous 10 years, as well as a listing of my testimony as an expert witness in the last 4 years, is attached as Exhibit 2 of this report.

## MATERIALS REVIEWED

18.  I have reviewed the materials listed in the attached Exhibit 3 of this report.

## FACTUAL BACKGROUND

19.  Madison Mechanical, Inc. ("MMI") purchased insurance from Twin City Fire Insurance Company ("Twin City) through Private Choice Encore!! Policy No. 42 KB 0256935-15 effective for the period from May 1, 2015 to

May 1, 2016 (the "Policy"). The Policy carries a $2 million limit of liability for claims covered under the Directors, Officers and Entity Liability section, subject to a $10,000 self-insured retention. The retention is increased to $15,000 for claims covered under the Policy's Employment Practices Liability section.

20. Franey Muha Alliant Insurance Services served as MMI's broker in connection with procuring the Policy. According to the plaintiffs' expert, Franey Muha Alliant Insurance Services at the relevant time was, and continues to be, a part of Alliant Insurance Services, Inc. ("Alliant").

21. The Policy's Header, on page 1 of 3 of the Declarations, identifies the issuing company of the Policy as "TWIN CITY FIRE INSURANCE CO. INDIANAPOLIS, IN 46268-0930 a stock insurance company, herein called the Insurer."

22. The Policy's preamble at the top of the Declarations Page says, in part, in boldfaced type: "...**NOTICE OF A CLAIM MUST BE GIVEN TO THE INSURER AS SOON AS PRACTICABLE AFTER A NOTICE MANAGER BECOMES AWARE OF SUCH CLAIM, BUT IN NO EVENT LATER THAN SIXTY (60) CALENDAR DAYS AFTER THE TERMINATION OF THE POLICY PERIOD, OR ANY EXTENDED**

**REPORTING PERIOD.**" [Note: Except where otherwise stated, all boldfaced type in this report appears as such in the Policy.]

23. Item 9 of the Policy's Declarations sets forth the following:

    **Address for Notices to Insurer: For Claims Other than Kidnap and Ransom/Extortion**:

    The Hartford
    Claims Department
    Hartford Financial Products
    277 Park Ave., 15th Floor
    New York, New York 10172

24. Item 9 of the Policy's Declarations also states that all other non-Claim notices are also to be sent directly to The Hartford but directed to its Product Services Department at the same New York address.

25. The Policy's **COMMON TERMS AND CONDITIONS**, in Section VIII, **NOTICE OF CLAIM**, states that "Solely with respect to all **Liability Coverage Parts**:

    **(A)** As a condition precedent to coverage under this Policy, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable after a **Notice Manager** becomes aware of such **Claim...**"

    **(B)** If, during the **Policy Period**, the **Insureds** become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim**, and, if written notice of such **Wrongful Act** is given to the Insurer during the **Policy Period...**

26.   The Policy's **COMMON TERMS AND CONDITIONS** in Section **XIII.**

**CANCELLATION,** states in section **(B)** that "….the **Insureds** may cancel

this Policy by sending written notice of cancellation to the Insurer."

27.   The Policy's **COMMON TERMS AND CONDITIONS** in Section **XIV.**

**CHANGES IN EXPOSURE,** directs the **Insureds** to notify the Insurer of

certain developments with respect to changes in control of the company or

the creation or acquisition of new subsidiaries.

28.   The Policy's **COMMON TERMS AND CONDITIONS** in Section **XXII.**

**ENTIRE AGREEMENT,** states that:

> This Policy, including the Declarations, Common Terms and
> Conditions, included Coverage Part(s), **Application** and any
> written endorsements attached hereto, constitute the entire
> agreement between the **Insureds** and the Insurer relating to this
> insurance.

29.   The Policy's **COMMON TERMS AND CONDITIONS** in Section **XXIII.**

**NOTICES,** states that:

> **(C)** All notices to the Insurer shall be sent to the address specified in
> ITEM 9 of the Declarations. Any such notice shall be effective
> upon receipt by the Insurer at such address.

30.   And, finally, with respect to all notices of any kind, the Policy's

Endorsement No. 13 amends all notification provisions in the Policy by

reiterating the New York, New York physical mailing address while also

providing supplemental options for transmitting notices of **Claim** via

facsimile or email. Each of these options, as with all notice provisions appearing elsewhere in the Policy, state that notice must be given to the Insurer. There is no option for the Insured to provide valid notice under the Policy to any person or entity other than the Insurer.

31.   By letter to certain owners and executives of MMI dated November 11, 2015, an attorney representing Robert Buczkowski, who was then a part owner and the chief financial officer of MMI, made allegations of improper activities by MMI and its executives. The letter demanded that the recipients cease and desist their alleged wrongful acts.

32.   It is my understanding that the Plaintiffs now assert that the November 11, 2015 letter (the "Claim Letter") constituted a **Claim** under the Policy.

33.   MMI subsequently forwarded the Claim Letter to Mr. William Franey, who, according to the plaintiffs' expert, was MMI's point of contact at Alliant, but neither MMI nor Alliant forwarded the Claim Letter to Twin City.

34.   Twin City did not receive notice of the Claim Letter until counsel for MMI sent to Twin City a copy of a complaint against MMI, which described the Claim Letter, at the address specified in the Policy via overnight letter dated July 28, 2016.

## ISSUE AND OPINION

**Issue**:  Does an insurance broker's receipt of notice of a claim or a potential claim from its client, the insured, constitute valid notice of claim to an insurance carrier under professional lines insurance policies according to insurance industry custom and practice?

**Opinion**:  No, it absolutely does not.

35.   I have been extensively involved with professional lines insurance products, including D&O Insurance, since 1989. I have been a coverage attorney, a senior underwriting manager, an insurance broker and the president of both a managing general agency and a managing general underwriter. I was also the dean of an organization dedicated to teaching best practices in claims handling.

36.   In all my years of dealing with professional lines insurance, I cannot recall a single instance of an insurance broker being authorized to accept notice of claim from its client in lieu of such notice being provided directly to the insurance carrier under a policy.

37.   Before I expound upon that point further, I think it is critical to understand the difference between an insurance agent and an insurance broker, particularly in the context of procuring professional lines insurance like the Hartford Financial Products Policy at issue here.

38. An insurance agent is a true agent of an insurance carrier. Agents typically are authorized to rate up policies (that is, determine the premiums and other policy features), issue binders and policies, collect premiums and receive notice of claims on behalf of the carrier (such notices to be timely forwarded to the carrier itself).

39. The loyalty of insurance agents always lies first with the carrier, not the insured and agents act with the carrier's best interests as their first priority.

40. An insurance broker, on the other hand, is <u>not</u> authorized to act on behalf of an insurance carrier for the most part. The broker's loyalties lie with the insured – which is the client who hired him.

41. Brokers, especially with respect to professional lines insurance, are typically only authorized to collect premiums and remit them in a timely manner to the carrier.

42. In my book "*D&O 101 – Understanding Directors & Officers Liability Insurance – A Holistic Approach*," (Wells Media 2014), I make this observation about insurance brokers,

> An Insurance Broker's primary loyalty lies with the client, not the carrier (as opposed to an **Insurance Agent**, defined above), and it is almost never authorized to perform any functions on the insurance carrier's behalf other than collect premiums from the insured and remit them to the carrier and, sometimes, perform tasks like issuing certificates of insurance. (pages 177-178)

43.    There are several reasons as to why insurance carriers do not allow brokers to accept notices of claims on their behalf. Before I go further, however, it is important to note that insurance brokers do routinely receive notice of claims from their clients, <u>however, that does not qualify as valid notice to a carrier</u>. Rather, the broker, in order to discharge its duties appropriately, must forward such notice of claim to the insurance carrier on behalf of the insured client.

44.    A broker's receipt of notice of claim from its client does not constitute notice to the carrier under any professional lines insurance policy that I have ever seen.

45.    One of the main reasons that carriers do not allow notice to a broker to constitute notice to the carrier is that in some states insurance law dictates that a carrier must issue a claim acknowledgement letter, and sometimes a coverage letter, within a prescribed period of time. Permitting the broker to accept notice of claims or potential claims on behalf of the insurer would be problematic because the carrier would be subjecting its ability to comply with applicable insurance laws to the broker's determination regarding whether, when, and how to forward such notices to the carrier - a decision that the broker is obligated to make in the best interests of the insured, to whom the broker owes its loyalty.

**46.** If the broker decided that the insured's interests would best be served by withholding or delaying notice to the carrier, the insurer might be unable to discharge its duties under the law.

**47.** If a broker failed to forward a claim notice to a carrier for a prolonged period of time, for whatever reason, intentional or not, the carrier could be subject to fines, penalties, bad-faith lawsuits and, possibly, the loss of important policy defenses to the late-reported claim. And, in the worst-case scenario, maybe even suspension of its license to write business in a state. No carrier wants to subject itself to penalties such as this based on the vagaries of whether a broker reports a claim in a timely manner.

**48.** Further, many insurers purchase reinsurance to protect themselves against excessive losses from claims. Reinsurers normally impose strict claim reporting guidelines – just as primary carriers do. Should a broker delay the reporting of a claim to the appropriate carrier, that carrier could lose critical reinsurance protection resulting from its own late reporting of the claim to its reinsurers due to the broker's error.

**49.** Insurers also regularly perform actuarial reviews of their books of business in order to determine adequate rates to charge based on claims activity and other factors. If insurance brokers were to be in possession of untold numbers of valid claims notices at any given time, it would subvert the

actuarial process. Insurance company personnel would have to call every

office of every broker that they do business with to learn of any outstanding

claims that had not yet been reported to the carrier. And if brokers

determined in the best interest of the insured not to forward certain

documents to the carrier, the carrier would be deemed to have possession of

documents of which it was entirely unaware.

50. The plaintiffs' expert witness states in his report that providing notice to a

broker makes sense because the carrier's address might change during the

policy period. This reasoning, to me, is absurd. First, why would the carrier

be any more likely to change addresses than the broker? Second, many

policies, including the Policy in question here, provide email and facsimile

contact information as well as physical addresses. I also feel compelled to

note that I have never heard of a reputable insurance carrier moving its

office without providing for the forwarding of mail and proper notice to all

of its insureds and brokers of its new address.

51. And, finally, having worked for the world's largest insurance brokerage for

four years, and having managed the underwriting of E&O insurance for

many insurance brokers, I know that brokers fear E&O lawsuits. By

agreeing to accept claim notices on behalf of insurers, brokers would be

opening themselves up to a whole world of potential E&O claims from

carriers for reporting notices late, or losing notices, or reporting claims in some deficient manner (e.g. omitting critical claim documents or sending them to the wrong contact person).

52.    The plaintiffs' expert also references a 2001 contract between Twin City and Franey Parr & Muha, Inc., which is cited as the predecessor of Franey Muha Alliant Insurance Services, Inc., which at the relevant time was, and continues to be, part of Alliant.  The plaintiffs' expert uses this 2001 contract to buttress his specious argument that notice to Mr. Franey and Alliant was enough to qualify as notice to Twin City. I disagree for two reasons.  First, MMI entered into a valid and binding contact, the Policy, directly with Twin City. The Policy sets forth the terms and conditions of the agreement between MMI and Twin City and how coverage operates.  In particular, it sets forth clearly and repeatedly where notice of claims or potential claims will be sent, and it emphasizes the importance of providing proper and timely notice of these coverage-triggering events.

53.    No other agreement, including any agreement between Twin City and Franey Parr & Muha, Inc., is relevant to the workings of the Policy. Every instance in the Policy where the giving of notice by the insured is referenced, as cited above, states that such notice <u>must be given to the insurer</u>. And, again, the Policy provides a physical mailing address, an email

address and a facsimile number for contacting Twin City. Nowhere at all is
notice to the broker referenced.

54.    Second, the agreement between Twin City and Franey Parr & Muha, Inc.
does not support the Plaintiffs' position. Contrary to the plaintiffs' expert's
opinion, it is my understanding that the Hartford Financial Products
Addendum ("HFP Addendum") was in force and applicable at all relevant
times to the extent that Franey Parr & Muha, Inc. or Alliant solicited
applications for Hartford Financial Products policies like the Policy. The
HFP Addendum states explicitly what I explained above - that the broker
never had authority to accept notices of claims on behalf of Twin City.

55.    Even without the HFP Addendum, however, my opinion would be the same.
Although the agreement is identified as an "agency" agreement, it does not
make Mr. Franey or Alliant the "agent" of the carrier. In the context of
professional lines, and more specifically claims-made insurance, the
ordinary and customary duties of an entity like Franey Parr & Muha, Inc. or
Alliant would <u>never</u> include accepting notice of claims on behalf of the
carrier.

56.    In addition, looking at it from the perspective of MMI, the insured, it is pure
nonsense to suggest that the agreement between Twin City and Franey Parr
& Muha, Inc. could in any way affect the insured's obligation to provide

notice of claim to Twin City. As is always the case, in my experience, the insured here received a copy of the Policy, which is the agreement setting forth its contractual rights and responsibilities, but it was not given a copy of the agreement between Twin City and Franey Parr & Muha, Inc. - nor would it ever be. To permit a document that the insured has never seen to alter the rights and obligations set forth in its insurance policy would be untenable.

57.     In summation, Mr. Franey and Alliant were not authorized to receive notices of claims under the Policy on behalf of Twin City. Nor would any broker in professional lines insurance be authorized to do so. Indeed, in more than 30 years of experience with professional lines insurance like the Policy, I have never seen, heard of, or been made aware of a single instance in which a broker like Mr. Franey or Alliant was authorized to accept notice of claims on the carrier's behalf. Such an arrangement, if it existed, would be the opposite of ordinary and customary.

The opinions above are my own, arrived at after a review of materials provided to me and with the benefit of my more than 30 years of experience in the insurance industry. I reserve the right to modify this report, if warranted, by my receipt of additional facts and information.

Larry Goanos

Highlands, New Jersey

Date: June 14, 2019

# EXHIBIT 1



**Larry Goanos**
**Andros Risk Services LLC**
lgoanos@androsriskservices.com
(917) 716.3964

## Overview of Andros Risk Services Expert Witness Capabilities

Andros Risk Services (ARS) provides consulting and expert witness services in a wide variety of insurance matters, including those involving claims handling, underwriting, insurance broker negligence and insurance coverage issues. The company boasts a high success rate for a simple reason: <u>ARS only accepts cases that have merit.</u> ARS conducts a thorough initial review of relevant materials (e.g. applicable insurance policies, coverage correspondence, pleadings, etc.) <u>before</u> deciding whether to accept an engagement. If ARS determines that it is not in agreement with the prospective client's position(s), it provides a detailed explanation of the case's strengths and weaknesses. Larry Goanos of ARS has never been disqualified as an expert witness in more than 140 matters in state and federal courts and arbitration tribunals nationwide.

Among representative work:

- ➢ ARS acted as the sole D&O expert for one of America's largest telecommunications companies in a lawsuit in which it was awarded $48 million in attorneys' fees from a group of insurance carriers
- ➢ ARS testified in California state court on behalf of three insurance carriers in a D&O coverage matter decided in their favor, saving $30 million in limits
- ➢ ARS testified for two days at an arbitration on behalf of a policyholder who was awarded full policy limits from two carriers in a Broker/Dealer E&O Insurance coverage dispute
- ➢ ARS provided deposition testimony and a written report in a California state court matter which resulted in a verdict for its client, an insurance carrier, allowing the carrier to recoup over $4 million in unwarranted defense cost payments due to an application misrepresentation
- ➢ ARS wrote a report and testified in federal court on behalf of an insurance brokerage that won a complete defense verdict in a broker negligence lawsuit
- ➢ ARS wrote two reports and testified at deposition on behalf of a policyholder's bankruptcy estate in a negligence lawsuit against a major insurance broker, resulting in a settlement of over $4 million being paid to ARS's client
- ➢ ARS wrote a report and testified at deposition on behalf of an insurance carrier which won a complete defense verdict at arbitration against a policyholder seeking recovery of more than $4 million

Attorney references available from leading U.S. law firms.

# Larry Goanos

50 Grand Tour
Highlands, NJ 07732
917.716.3964
lgoanos@androsriskservices.com

---

**Expert Qualifications:** I have served as an expert witness in more than 140 state and federal cases and arbitrations throughout the U.S. since becoming an independent insurance consultant in 2010. I have written two books on insurance and more than 90 expert witness reports. I have been deposed as an expert more than 15 times and have testified in U.S. Federal Court and California State Court. My insurer clients have included Zurich, CNA, Allied World, The Hartford, AXA XL, Travelers, AIG, Progressive, Endurance, Starr, Everest, Scottsdale, Axis and other major carriers. I have also done expert and consulting work for many policyholders, including Verizon Communications, J.P. Morgan Chase, Pfizer, EMC, First Horizon, IMG, Wellmark Blue Cross/Blue Shield and LifeLock/Symantec. I have never been disqualified as an expert witness. I have also served as an arbitrator in an insurance coverage dispute.

## Founder and CEO
## Andros Risk Services, LLC
Highlands, NJ
November 2010 to Present

> **Founder** of insurance consulting firm specializing in all aspects of professional lines insurance.  Among services offered: review and analysis of insurance program coverage and structure; risk analysis; claims advocacy; claims and underwriting portfolio audits and analysis; training of underwriters, brokers and attorneys in various insurance products; drafting of policies and applications; assistance in conducting RFPs; performing reinsurance audits; and providing expert witness services.

## President and Chief Underwriting Officer
## APRI Group, Inc.
Red Bank, NJ
September 2015 to November 2016

> **Managed day-to-day** functions of an insurance managing general agency (MGA) specializing in professional lines insurance. Products underwritten included Lawyers Professional Liability (LPL), Fidelity Bonds and Cyber Insurance. Had responsibility for all aspects of the business, including negotiating underwriting guidelines and coverage

2

terms with carriers, drafting insurance policy language and managing relationships with brokers and carriers. APRI Group was a licensed Lloyd's coverholder and was authorized to do business in all 50 states.

## Dean
## The CLM Claims College – School of Professional Lines
New York, NY
July 2012 to September 2015

**Served as Dean** of an educational organization dedicated to teaching insurance professionals best practices in every aspect of insurance claims handling. Played major role in creating and refining curriculum that focused on, among other things, drafting optimal coverage letters, mapping resolution strategies, avoiding allegations of bad faith claims handling and negotiating settlements. Worked with senior Claims managers from leading insurance carriers to create the foremost claims educational organization in the insurance industry.

## President and Chief Marketing Officer
## Professional Indemnity Agency
**(An underwriting subsidiary of HCC Insurance Holdings/Houston Casualty)**
Mt. Kisco, NY
March 2007 to June 2009

**Managed $350 million gross written premium (GWP) subsidiary** of HCC Insurance Holdings, Inc. Primary lines of business included Directors & Officers Liability Insurance, Employment Practices Liability Insurance, Fidelity Bonds, Kidnap & Ransom coverage and over 200 classes of Miscellaneous Professional Liability (MPL/E&O) Insurance. Responsible for all aspects of subsidiary, including underwriting, claims, human resources and other administrative/operational functions.

## Managing Director
## Marsh USA
New York, NY – June 2005 to March 2007
San Francisco, CA – November 1996 to November 1998

**Financial Institutions National Practice Leader** for Marsh's FINPRO (Financial and Professional) unit. Oversaw client relationships and coordinated new business initiatives with financial institution clients throughout the country. Served as a national resource on professional lines issues for all Marsh offices. Also worked with Marsh counterparts overseas on various international issues.

3

**Senior Vice President**
**ACE USA**
New York, NY
April 2002 to June 2005

**Managed ACE USA's Professional Risk's** Management Liability and Financial Institutions Professional Liability unit on a day-to-day basis. Insureds ranged from the largest Fortune 500 companies to smaller, privately-held organizations. Grew the group over three years from seven underwriters and $14 million in GWP to approximately 35 underwriters and over $300 million in GWP. Was told at first annual review: "*We gave you the keys to a jalopy, and you took it out on the highway and turned it into a sports car*." Also responsible for a number of other duties, including drafting policy language, negotiating policy terms and conditions, training underwriters and working with the Claims Department to help resolve complex claims.

**Executive Vice President**
**Chief Underwriting Officer**
**National Union Fire Insurance Company of Pittsburgh, Pa. (AIG)**
**Financial Institutions Group**
New York, NY – January 1994 to November 1996; November 1998 to April 2002

**Number-two person** in $350 million-plus GWP Financial Institutions Group at National Union. Duties performed included overseeing all underwriting activities, managing broker and insured relationships, reviewing, drafting and approving policy and endorsement language, developing new products, training and managing approximately 70 underwriters nationwide, working with the Claims Department to help resolve complex claims, and speaking at industry conferences throughout the country. Awarded SICO status at AIG, a prestigious designation reserved for approximately 400 of the company's 80,000 employees at the time.

**Practiced insurance law from 1989 to 1993** at law firms in New York (D'Amato & Lynch) and Boston (Parker, Coulter, Daley & White.) Coverage and litigation matters.

## Education

**Boston College Law School**
Newton Centre, MA
Juris Doctor 1987, *Cum Laude*

**Villanova University**
Villanova, PA.
BA, Political Science, 1984; *Cum Laude*

4

## Publications

### Books

**Author, <u>D&O 101: Understanding Directors and Officers Liability Insurance – A Holistic Approach</u>** (Wells Media: San Diego 2014; 214 pages). The biggest-selling book in its publisher's history, **<u>D&O 101</u>** provides an in-depth view of Directors and Officers Liability Insurance in a textbook-like manner that is infused with real-world war stories from the author's many years in the insurance industry.

**Warren Buffett** said of **<u>D&O 101</u>**: *"You write prose with great skill and I imagine you do the same when you write D&O policies...Congratulations on another terrific book."*

**Author, <u>Claims Made & Reported: A Journey Through D&O, E&O and Other Professional Lines of Insurance</u>** (Soho Publishing: New York 2008; 376 pages). Translated into Japanese and released in Japan in hard-copy and e-book form in November 2011. **<u>Claims Made & Reported</u>** has sold over 3,000 copies and has generated more than $85,000 in donations to five charities.

**Warren Buffett** said of **<u>Claims Made and Reported</u>**: *"I enjoyed it thoroughly. The section about 9/11 was particularly moving...I hope our insurance managers got copies as I know they would enjoy it as I did. It deserves accolades."*

**Risk & Insurance Magazine**, in a June 2009 review, said of **<u>Claims Made & Reported</u>**: *"In the final analysis, Goanos has written a book that will matter to the professional lines community. From the industry's struggle to survive in the early days, to the launch of new products to fill the needs of evolving industries, to the lives lost nearly a decade ago on that ghastly September morning, Goanos has done his part to shed more light on the hundreds of people involved with professional lines insurance, who they are and what they do."*

## Other

**Author of numerous articles** published in a variety of insurance industry periodicals.

**Speaker and moderator** on various panels nationwide at events sponsored by groups such as the Risk and Insurance Management Society (RIMS), the Professional Liability Underwriting Society (PLUS), the American Bankers Association (ABA), the Defense Research Institute (DRI), the CPCU Society, The Claims and Litigation Management Alliance (CLM) and the California State Bar Association.

5

**Formerly a licensed insurance broker**, originally in New York and California and then in all 50 U.S. states. Was licensed to practice law in New York, New Jersey and Massachusetts before retiring from active practice to pursue insurance career.

# EXHIBIT 2

| LARRY GOANOS |
| :---: |
| **INSURANCE PUBLICATIONS AND PRIOR EXPERT TESTIMONY** |

## INSURANCE PUBLICATIONS

### Books

D&O 101: Understanding Directors and Officers Liability Insurance – A Holistic Approach (Wells Media: San Diego 2014; 214 pages).

Claims Made & Reported: A Journey Through D&O, E&O and Other Professional Lines of Insurance (Soho Publishing: New York 2008; 376 pages).

### Articles

- *"AmWINS Insurance Q&A: Coverage Letters - What Are They and How Should They Be Handled?"* AmWINS Client Advisory, May 2013; www.amwins.com
- *"California Employers: Be Aware (and Beware!) of Employment Law Changes in 2013,"* AmWINS Client Advisory, February 2013; www.amwins.com
- *"Worth Investigating: D&O Insurance Coverage for Costs Arising from Investigations, Part 2,"* AmWINS Client Advisory, December 2012; www.amwins.com
- *"Worth Investigating: D&O Insurance Coverage for Costs Arising from Investigations,"* AmWINS Client Advisory, November 2012; www.amwins.com
- *"D&O Insurance for Healthcare Organizations: Our Prescription for Better Coverage, Part 2,"* AmWINS Client Advisory, October 2012; www.amwins.com
- *"D&O Insurance for Healthcare Organizations: Our Prescription for Better Coverage,"* AmWINS Client Advisory, September 2012; www.amwins.com
- *"D&O Policy Definitions: Don't Overlook These Critical Terms, Part 2"* AmWINS Client Advisory, July 2012; www.amwins.com
- *"D&O Policy Definitions: Don't Overlook These Critical Terms,"* AmWINS Client Advisory, June 2012; www.amwins.com

- *"Tuning Up Your Client's D&O Policy, Part 2,"* AmWINS Client Advisory, May 2012; www.amwins.com
- "Tuning Up Your Client's D&O Policy," AmWINS Client Advisory, April 2012; www.amwins.com
- *"Unlocking Dodd-Frank's Insurance Opportunities,"* AmWINS Client Advisory, February 2012; www.amwins.com
- *"Independent Directors' Liability Insurance: An Overview,"* AmWINS Client Advisory, January 2012; www.amwins.com
- *"What is Severability and Why is it Important?"* AmWINS Client Advisory, December 2011; www.amwins.com
- *"What is a Warranty Letter and Why is My Client Being Asked to Sign One?"* AmWINS Client Advisory, November 2011; www.amwins.com
- *"How to Soften the Insured vs. Insured Exclusion in Your Client's D&O Policy,"* AmWINS Client Advisory, October 2011; www.amwins.com
- *"Ten Years Later"* [A September 11th Retrospective] Advisen (www.advisen.com), September 10, 2011
- *"Key Considerations for Placing E&O Coverage,"* AmWINS Client Advisory, September 2011; www.amwins.com
- *"Navigating the Tricky Waters of EPL Claims Reporting,"* AmWINS Client Advisory, August 2011; www.amwins.com
- *"M&A Insurance: A Unique Solution for Helping a Client Through a Merger or Acquisition,"* AmWINS Client Advisory, July 2011; www.amwins.com
- *"Important Insurance Considerations When Performing Due Diligence for Clients,"* AmWINS Client Advisory, June 2011; www.amwins.com
- *"Essential Considerations When Buying D&O Run-Off Coverage,"* AmWINS Client Advisory, May 2011; www.amwins.com
- *"Excess D&O Follow Form Coverage: Does It Really Follow Form?"* AmWINS Client Advisory, April 2011; www.amwins.com
- *"Dealing With Insurer Litigation Guidelines: Best Practices,"* AmWINS Client Advisory, April 2011; www.amwins.com

## PRIOR EXPERT TESTIMONY

1. I was deposed on August 1, 2011 as an expert witness for the defense in the matter styled as The Upper Deck Company and The Upper Deck Company, Inc. v. Endurance American Specialty Insurance Company and Does 1Through 10 which was pending in the United States District Court for the Southern District of California.

2. I was deposed on October 2, 2013 as an expert witness for the plaintiff in the matter styled as Talmer Bancorp v. Gardiner Allen DeRoberts Insurance, LLC, which was pending in the Court of Common Pleas for Trumbull County, Ohio (Case No.: 2012 CV 00445).

3. I was deposed on October 10, 2013 as an expert witness for defendant Everest National Insurance Company in the matter styled as Association of California Water Agencies Joint Powers Insurance Authority, et al., v. The Insurance Company of the State of Pennsylvania, et al., which is pending in the United States District Court for the Central District of California, Southern Division (Case No.: 8:11-CV-01124-CIC).

4. I was deposed on November 15, 2013 as an expert witness for plaintiffs First Horizon National Corporation, FTN Financial Securities Corporation and First Tennessee Bank National Association in the matter styled as First Horizon National Corporation, et al. v. Certain Underwriters at Lloyd's, et al. which was pending in the

United States District Court for the Western District of Tennessee,
Western Division (Case No. 11-2608).

5.  I testified in an arbitration proceeding on March 17th and 18th, 2014 as
    an expert witness for the Pacific West Securities, Inc. and the Kim
    Creditors in the matter styled as <u>Endurance American Specialty
    Insurance Company and Illinois Union Insurance Company vs. Pacific
    West Securities, Inc. and Kim Creditors</u> which was pending before an
    International Arbitration Tribunal of the International Centre for
    Dispute Resolution, Case Number 50-20-1200-0143.

6.  I was deposed as an expert for the defense on June 12, 2014 in the
    lawsuit styled as <u>Northeast Utilities Service Company and the
    Connecticut Power and Light Company vs. St. Paul Fire and Marine
    Insurance Company and Utica Mutual Insurance Company</u>, Case No.
    3:08-CV-01673 (CSH) in the United States District Court for the
    District of Connecticut.

7.  I was deposed on September 13, 2014 as an expert witness for
    defendant Continental Casualty Company (CNA) in the arbitration
    styled as <u>Chatham Capital Holdings, Inc. vs. Continental Casualty
    Company</u> (CNA) AAA Case No. 13 195 Y 02652 13 (Hearing Locale:
    New York, New York).

8.  I was deposed on September 23, 2014 as an expert for the plaintiffs in
    the lawsuit styled as <u>JP Morgan Chase & Co., et al., v. Indian Harbor</u>

4

Insurance Company, et al., Index No. 603766/08, Supreme Court of the State of New York, New York County.

9.  I testified at trial as an expert for the defense on March 20, 2015 in the lawsuit styled as Northeast Utilities Service Company and the Connecticut Power and Light Company vs. St. Paul Fire and Marine Insurance Company and Utica Mutual Insurance Company, Case No. 3:08-CV-01673 (CSH) in the United States District Court for the District of Connecticut.

10. I was deposed on July 29, 2015 as an expert for the plaintiffs in the lawsuit styled as Timbervest , et al. vs. J. Smith Lanier & Company, Civil Action File No. 2014CV248420, pending in the Superior Court of Fulton County in the State of Georgia.

11. I was deposed on April 25, 2016 as an expert for the plaintiffs in the lawsuit styled as Verizon Communications, Inc., Verizon Financial Services, LLC and GTE Corporation vs. Illinois National Insurance Company, et al. Case No. N14C-06-048-WCC  (CCLD) pending in the Superior Court of Delaware in and for New Castle County.

12. I was deposed on January 24, 2017 as an expert for the plaintiffs in the lawsuit styled as First Horizon National Corporation and First Tennessee Bank National Association vs. Houston Casualty Company, Federal Insurance Company, XL Specialty Insurance Company, Alterrra America Insurance Company, Axis Insurance Company, National Union Fire Insurance Company of Pittsburgh, Pa.,

RSUI Indemnity Company and Everest National Insurance Company, Civil Action No. 2:15-cv-2235, pending in the United States District Court for the Western District of Tennessee.

13. I was deposed on September 13, 2017 as an expert for the plaintiff in the lawsuit styled as LifeLock, Inc. vs. ACE American Insurance Company, et al., Case No.: CV 2015-013959, pending in the Superior Court of Arizona, in and for the County of Maricopa.

14. I was deposed on November 13, 2017 as an expert for the defendant in Interstate Fire & Casualty Company, Personally and as Subrogee and/or Assignee of Kluger, Peretz, Kaplan & Berlin, P.L., vs. Axis Surplus Insurance Company, Case No. 2012-35828-CA-01 (31), in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

15. I was deposed on January 16, 2018 as an expert for three defendant insurance companies (Old Republic Insurance Company, RLI Insurance Company and Allied World Assurance Company, Inc.) in Onyx Pharmaceuticals, Inc. v. Old Republic Insurance Co., RLI Insurance Company, Allied World Assurance Company (U.S.) Inc. and Berkeley Insurance Company, Case No. CIV 538248 in the Superior Court of the State of California, County of San Mateo.

16. I was deposed on June 28, 2018 as an expert for the plaintiffs in Michael I. Goldberg, not individually but as Liquidating Trustee of the Rothstein Rosenfeldt Adler, P.A. Liquidating Trust, Robert C. Furr, not individually but as Chapter 7 Trustee of the estate of Banyon

<u>1030-32, LLC and as the Chapter 7 Trustee of the Estate of Banyon</u>
<u>Income Fund, LP v. Aon Risk Services Northeast, Inc.,</u> Case No.:
1:13-cv-21653-KMW in the United States District Court for the
Southern District of Florida (Miami Division).

17. I testified at trial on August 30, 2018 as an expert for three defendant
insurance companies (Old Republic Insurance Company, RLI
Insurance Company and Allied World Assurance Company, Inc.) in
<u>Onyx Pharmaceuticals, Inc. v. Old Republic Insurance Co., RLI</u>
<u>Insurance Company, Allied World Assurance Company (U.S.) Inc.</u>
<u>and Berkeley Insurance Company,</u> Case No. CIV 538248 in the
Superior Court of the State of California, County of San Mateo.

18. I was deposed on October 31, 2018 as an expert for the
defendant/counterclaim plaintiff in <u>Allied World Surplus Lines</u>
<u>Insurance Company v. Richard J. Goettle, Inc.,</u> Civil Action No. 1:17-
cv-00670S-JD in the United States District Court for the Southern
District of Ohio, Western Division.

19. I was deposed on January 7, 2019 as an expert for the
plaintiff/counterclaim defendant in <u>Scottsdale Insurance Company v.</u>
<u>CSC Agility Platform, Inc., fka ServiceMesh, Inc., Computer Sciences</u>
<u>Corporation and Eric Pulier,</u> Case No.: 2:17-cv-07762-PSG (GJSx) in
the United States District Court for the Central District of California,
Western Division.

20. I was deposed on January 18, 2019 as an expert for the claimant in
the arbitration styled as <u>Wind Point Partners VII-A, LP, as assignee of</u>

7

Performance Optics, LCC v. Lexington Insurance Company, AAA
Case No. 01-17-0005-4347 (Hearing locale: New York, New York).

21. I was deposed on February 1, 2019 as an expert for the plaintiff in
Axis Surplus Insurance Company v. Aletheia Research and
Management, Inc. and Does 1 Through 10, Inclusive, Case No.
BC485198 in the Superior Court of the State of California, County of
Los Angeles.

22. I testified at an arbitration on March 20, 2019 as an expert for the
claimant in the arbitration styled as Wind Point Partners VII-A, LP, as
assignee of Performance Optics, LCC v. Lexington Insurance
Company, AAA Case No. 01-17-0005-4347 (Hearing locale: New
York, New York).

23. I was deposed on April 25, 2019 as an expert for the defendant in
Allied World Specialty Insurance Company F/K/A Darwin National
Assurance Company v. Independence Blue Cross, LLC, Civil Action
No. 2:17-cv-01463-JS in the United States District Court for the
Eastern District of Pennsylvania.

24. I was deposed on May 3, 2019 as an expert for the plaintiff in
Pharmacia Corporation N/K/A Pfizer Inc. v. Arch Specialty Insurance
Company, Twin City Fire Insurance Company and Liberty Mutual
Insurance Company, Civil Action No. 2:18-cv-00510-ES-MAH in the
United States District Court for the District of New Jersey.

# EXHIBIT 3

## EXHIBIT 3
### Report of Larry Goanos

- Plaintiffs' Disclosure of Expert Testimony
- Plaintiffs' Expert Report of James Marshall Jr.
- May 2015 – May 2016 Policy
- 2001 Contract between Hartford and Franey Parr & Muha Inc.
- Signed Alliant Amendatory Endorsement
- Signed Franey Termination Agreement
- Madison Mechanical's Complaint (5/17/17)
- Twin City's Answer and Counterclaim (6/8/17)
- Madison Mechanical's Motion for Partial Summary Judgment (7/27/17)
- Twin City's Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment (8/31/17)
- Madison Mechanical's Reply (10/12/17)
- Twin City's Reply (11/2/17)
- Court's Memorandum Order on Plaintiffs' Motion to Dismiss Counterclaim and Motion for Partial Summary Judgment, and Twin City's Cross-Motion for Summary Judgment (3/30/18)
- Twin City's Motion for Entry of Judgment (11/7/18)
- Madison Mechanical's Opposition to Twin City's Motion for Entry of Judgment (12/14/18)
- Twin City's Reply (12/28/18)
- Court's Order Denying Motion for Entry of Judgment (2/8/19)
- Madison Mechanical's Complaint and Prayer for Jury Trial, Circuit Court for Prince George's County (7/27/18)
- D&O 101: Understanding Directors and Officers Liability Insurance – A Holistic Approach (Wells Media: San Diego 2014; 214 pages).