# EXHIBIT 14

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - -x

MADISON MECHANICAL, INC., :

et al., :

      Plaintiffs, : Civil Action No.

      v. : 1:17-CV-01357-GLR

THE HARTFORD FINANCIAL :

SERVICES, et al., :

      Defendants. :

- - - - - - - - - - - - -x

Deposition of MICHAEL S. KNOX, JD

Washington, D.C.

Tuesday, July 30, 2019

10:39 a.m.

Job No.: 252544

Pages: 1 - 97

Reported By: Paul P. Smakula

## Page 2

1    Deposition of MICHAEL S. KNOX, JD, held at the

2    offices of:

3

4

5          WILEY REIN LLP

6          1776 K Street Northwest

7          Washington, D.C. 20006

8          (202) 719-7049

9

10

11

12

13      Pursuant to notice, before Paul P. Smakula,

14    Notary Public in and for the District of Columbia.

15

16

17

18

19

20

21

22

## Page 3

1        A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFFS MADISON MECHANICAL:

3        GARY R. JONES, ESQUIRE

4        DANIELLE M. VRANIAN, ESQUIRE

5        BAXTER, BAKER, SIDLE, CONN & JONES, PA

6        120 East Baltimore Street

7        Suite 2100

8        Baltimore, Maryland 21202

9        (410) 230-3800

10

11    ON BEHALF OF DEFENDANTS THE HARTFORD:

12        CHARLES C. LEMLEY, ESQUIRE

13        WILEY REIN LLP

14        1776 K Street Northwest

15        Washington, D.C. 20006

16        (202) 719-7049

17

18

19

20

21

22

## Page 4

C O N T E N T S

EXAMINATION OF MICHAEL S. KNOX, JD    PAGE

By Mr. Jones    5

E X H I B I T S

(Attached to transcript.)

KNOX DEPOSITION EXHIBITS    PAGE

Exhibit 1  Notice of Deposition    8

Exhibit 2  Twin City Policy    10

Exhibit 3  11/11/15 Scarlett Letter    14

Exhibit 4  4/19/17 Letter    18

Exhibit 5  10/18/16 Letter    21

Exhibit 6  6/23 Garofalo Email    29

Exhibit 7  Binder    44

Page 5

```
1      PROCEEDINGS
2         MICHAEL S. KNOX, JD,
3  having been duly sworn, testified as follows:
4      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
5  BY MR. JONES:
6      Q  Good morning.
7      A  Good morning.
8      Q  Can you state your full name and address
9  for the record.
10     A  Michael Scott Knox, K-N-O-X.  120 East
11 34th Street, New York, New York 10016.
12     Q  Okay.  And your employer?
13     A  Hartford — Hartford Life Insurance
14 Company, I believe.
15     Q  Okay.
16     A  No, I take that back.  Now I remember.
17 Hartford Fire Insurance Company.  I'm sorry.
18     Q  It's all right.
19     A  Just started my coffee here.
20     Q  And how long have you been employed by
21 Hartford Fire Insurance?
22     A  Almost 10 years.
```

Page 6

```
1      Q  Give me a little bit of background,
2  education -- where did you go college?  Law
3  school?
4      A  I went to college at the University of
5  Iowa.  I went to law school at the University of
6  Minnesota.  I graduated from there in 1985.  I
7  went to work for a law firm in Chicago called
8  Peterson Ross as an associate.  And I was also an
9  associate at a spin off firm called McCullough,
10 Campbell & Lane.  M-C-C-U-L-L-O-U-G-H, Campbell &
11 Lane, L-A-N-E.
12     Q  And did you do any insurance coverage work
13 when you were in the private practice?
14     A  Yes.
15     Q  How much of a percentage of your work was
16 in insurance coverage?
17     A  I would say 100 percent.
18     Q  Okay.  And then at some point --
19     A  As monitoring counsel.  There's a
20 distinction in my business between coverage
21 counsel and monitoring counsel but on the company
22 side.
```

Page 7

```
1      Q  Okay.  And when you left private practice,
2  did you go straight to Hartford or was there other
3  companies?
4      A  I worked for a TPA, a claims TPA in
5  Chicago called CR Vince, V-I-N-C-E, and Associates
6  for 13 years, handling professional liabilities
7  claims.  And then I was in Florida for a few years
8  and then I joined Hartford in 2009.
9      Q  Okay.  What's your current title at
10 Hartford?
11     A  A claims consultant.
12     Q  Has that changed since 2009?
13     A  No.
14     Q  And tell me a little bit about what type
15 of claims you're involved with?
16     A  Professional liability, now it's primarily
17 management liability.  I'm a director and officers
18 claims.
19     Q  And tell me a little bit about what your
20 role is in terms of managing those types of D&O
21 claims?
22     A  It's the entire spectrum of handling a
```

Page 8

```
1  professional liability claim.  When we open the
2  claim we investigate the claim with the policy
3  holder, we appoint defense counsel if we have a
4  duty to defend.  We track the progress of the
5  underlying lawsuit.  We analyze the liability and
6  damages.  We make decisions as to settling the
7  case, trying the case.  So everything from the day
8  that the claim comes in to the day the case is
9  either dismissed or we pay a settlement or a
10 judgment.
11     Q  Okay.  And you're here today also as the
12 corporate designee of Twin City; is that correct?
13     A  That's my understanding, correct.
14        MR. LEMLEY:  On the claim issues that we
15 laid out?
16        MR. JONES:  Sure.  I think just to
17 document everything I'll mark this as Exhibit 1.
18 It's the notice.
19        (KNOX Deposition Exhibit 1 marked for
20 identification and attached to the transcript.)
21     Q  And my understanding from your counsel,
22 Mr. Lemley, is that all the documents that we had
```

Page 9

1  requested, he was kind enough to produce a few
2  months ago. So you're not producing any
3  additional documents today; is that correct?
4      A No.
5      Q Okay. And you're also here individually
6  as Michael Knox, so your role here is as corporate
7  designee for Twin City and also as you; is that
8  correct?
9      A That's my understanding, yes.
10     Q Okay. Now, Twin City, is -- the policy
11  that was issued to my client, to Madison
12  Mechanical was issued by Twin City; is that
13  correct?
14     A Yes.
15     Q And Twin City, I'm assuming, is admitted
16  paper in Maryland or regulated under the Maryland
17  Insurance Administration?
18     A I believe it is. I'm not sure if it is --
19  I think it's admitted. I don't know that for an
20  absolute fact.
21     Q Okay. What is the relationship between
22  your employer, which I think you said is Hartford

Page 10

1  Life?
2      A Hartford Fire.
3      Q I'm sorry. Hartford Fire and Twin City?
4      A I think Twin City is a subsidiary of
5  Hartford Fire, an operating company you would say.
6      Q And what is Hartford Financial Products?
7      A That's a trade name that we use. Most of
8  the policies that I've seen have been Twin City
9  Fire -- Twin City policies that we issue.
10  Hartford Financial Products is kind of a trade
11  name that we use for the section of Hartford that
12  writes mainly professional liability insurance.
13     Q Okay.
14     A It's not a company per se, it's a trade
15  name.
16     Q Okay. And would that also include EPL
17  type claims, employment practices?
18     A Yes.
19     Q Let's go ahead and mark the 2015 Twin City
20  policy as Exhibit 2.
21     (KNOX Deposition Exhibit 2 marked for
22  identification and attached to the transcript.)

Page 11

1      MR. JONES: Off the record.
2      (Off the record from 10:45 a.m. to 10:47
3  a.m.)
4      Q So Exhibit 2, though, the 2015 insurance
5  policy, if you'll take a look at that. Is that
6  the policy that was issued to Madison Mechanical,
7  Inc. and Madison Mechanical OS Corp. by Twin City?
8      A Yes, it does appear to be the policy that
9  was issued by Twin City.
10     Q Okay. And the inception date of the
11  policy, Exhibit 2, is May 1 of 2015; is that
12  correct?
13     A Yes.
14     Q And the policy, Exhibit 2, contains both a
15  directors and officers liability, or entity
16  liability coverage form as well as a employment
17  practices liability coverage form and fiduciary
18  liability; is that correct?
19     A Yes.
20     Q Okay. When it says prior pending date of
21  May 1 of 2009, what does -- what does that mean?
22     A There's an exclusion for any claims that

Page 12

1  were made prior to that date or were pending on
2  that date.
3      Q Okay. And it also lists next to Item 2,
4  producer's name and address, it lists Franey Muha
5  Alliant, is that agency the producer of this
6  policy?
7      A I believe so. I'm not involved in the
8  underwriting side, but that's what it says here.
9      Q Okay.
10     A I've heard their names so I presume that's
11  correct.
12     Q Have you had any conversations with a
13  fellow named Bill Franey about anything related to
14  Madison or anything related to this case?
15     A Bill Franey, I don't believe so.
16     Q Okay. Now, in reviewing the policy,
17  Exhibit 2, the employment practices liability in
18  the D&O section of the policy are combined in some
19  ways, they have certain common coverage forms; is
20  that accurate?
21     MR. LEMLEY: Objection to form. You can
22  answer.

Page 13

1    A  I wouldn't put it that way.  I would say
2    that they, you know, have separate coverage parts.
3    Q  Okay.
4    A  But they are -- the very first part in the
5    policy is the common terms and conditions that
6    apply to both.
7    Q  That's much better said than my question.
8    So there's separate coverage forms for D&O and
9    EPL.  Is that common or is it more common to have,
10   in your experience, a separate, a completely
11   separate policy for D&O and a completely separate
12   practice for employment practices liability?
13   A  I think in the private company space it's
14   fairly common to have these combined policies that
15   have both or multiple coverages.  In the public
16   company space, I think it's more common to have a
17   separate D&O policy and a separate EPL policy.
18   Q  And in terms of your handling of claims,
19   have you handled claims where there was a separate
20   policy for D&O and a separate policy for EPL but
21   they were both triggered in the same claim?
22   A  I've handled claims where the D&O part in,

Page 14

1    say, a public company claim was triggered.  I
2    don't remember one where there was also an EPL
3    part and a separate EPL policy that was triggered
4    at the same time.
5    Q  Okay.  What about in a situation such as
6    in Exhibit 2 where you have a separate policy form
7    for EPL and a separate policy form for D&O but
8    they were both triggered in the same claim; have
9    you had that in your experience?
10   A  Yes.
11   Q  Okay.  Now, let's mark the November 11th
12   letter as Exhibit 3?
13        MS. VRANIAN:  No.  He gets the marked one.
14        (KNOX Deposition Exhibit 3 marked for
15   identification and attached to the transcript.)
16   Q  So this is Exhibit 3.  Mr. Knox, can you
17   identify that document?
18   A  Yes, it's a letter from attorney
19   Robert Scarlett, S-C-A-R-L-E-T-T, of Scarlett
20   Croll, C-R-O-L-L, and Myers, M-Y-E-R-S.  Dated
21   November 11th, 2015, addressed to five individuals
22   who I think are directors and officers or

Page 15

1    shareholders of Madison Mechanical.
2    Q  Okay.  And do you know based on either
3    your review of the file or your handling of the
4    Buczkowski, B-U-C-Z-K-O-W-S-K-I, Buczkowski claim,
5    do you know if these five individuals were owners
6    or members of the Madison, Inc. or OS Corp.?  Or
7    are they members of the Madison Mechanical
8    Contracting, LLC?  Or do you know?
9    A  I think you wrote to me at one point and
10   explained that to me -- but I don't have that
11   information right in front of me at the moment.
12   Q  Okay.  When did you first become involved
13   in the Buczkowski claim with regard to Madison
14   Mechanical, do you know?
15   A  When you reported it on behalf of Madison
16   Mechanical on July 29, 2016.
17   Q  Okay.  And the claim was assigned to you?
18   A  Yes.
19   Q  And when did you first have any knowledge
20   of Exhibit 3, which is the November 11, 2015,
21   letter?
22   A  I think it was referenced in the

Page 16

1    complaint, in the original Buczkowski state court
2    -- the underlying state court action.
3    Q  Okay.
4    A  And I think it might have been an exhibit
5    but it wasn't attached to the materials that we
6    received with the original tender.
7    Q  Okay.  Now, in your role as corporate
8    designee of Twin City, can you tell me if Twin
9    City had a copy or had been provided with a copy
10   of the November 11, 2015, letter, Exhibit 3, at
11   any time in 2015?
12   A  No.
13   Q  And do you know when you were first
14   provided with a copy of Exhibit 3?
15   A  I think it was February 27th, 2017, when
16   you provided a copy -- or your office provided a
17   copy.
18   Q  Okay.  That's a good memory.  In
19   preparation for today, just tell me what, if
20   anything, you've reviewed?  Any documents?
21   A  I read the two coverage letters that we
22   sent -- that I wrote and we sent.  I looked at the

Page 17

1 complaint that you filed in the -- the original DJ
2 was in the state court, I read the complaint that
3 you filed, and I read the answer and counterclaim
4 that Wiley Rein filed. I read this letter again.
5 Q Exhibit 3?
6 A Exhibit 3. That was about it.
7 Q Okay. When you were provided a copy of
8 the letter, Exhibit 3, February 27 of 2017, did
9 you have that reviewed by anyone, any coverage
10 counsel?
11 A No.
12 Q Did you have any determination made as to
13 whether Exhibit 3 was a claim letter or a demand
14 letter as that's defined in the policy?
15 A I made that determination myself.
16 Q Okay. And tell me what determination you
17 made.
18 A That it's a claim. Because the definition
19 of entity claim talks about a written demand for
20 monetary relief or civil nonmonetary relief. And
21 I thought the attorney Scarlett was asking for
22 both. He was threatening to sue the directors and

Page 18

1 officers and other shareholders saying that you're
2 diverting corporate opportunities from my client,
3 you're costing my client money, and if you don't
4 rectify the situation either by paying money or by
5 other civil nonmonetary relief -- for example, I
6 think he says ceasing and desisting from
7 misappropriating corporate opportunities, then
8 we're going to file a lawsuit against you.
9 So to me that satisfied the definition of
10 a -- well, a claim under the policy, I guess,
11 would be an insured person claim because there
12 weren't any entities listed here. So under the
13 D&O coverage part, it's a claim and that subsumes
14 an insured person claim.
15 Q Okay. Now, let's look at -- keep that in
16 front of you, Exhibit 3. But let's look at the
17 second letter that you wrote that you referenced a
18 moment ago. And I'll mark this as Exhibit 4. And
19 I'll give you the stickered copy. This is the
20 April 19, 2017, letter.
21 (KNOX Deposition Exhibit 4 marked for
22 identification and attached to the transcript.)

Page 19

1 Q Mr. Knox, if you look at Exhibit 4, is
2 this a letter that you drafted?
3 A Yes.
4 Q And it's addressed to me; is that correct?
5 A Yes.
6 Q And at the bottom of page one of the
7 letter, Exhibit 4, it says the November 11th
8 demand letter was not provided to us until
9 February 27th, 2017; we take this opportunity to
10 update our October 18 letter based upon the
11 November 11, 2015, demand letter; do you see that?
12 A Yes.
13 Q And the November 11, 2015, demand letter
14 that you're referencing is Exhibit 3; is that
15 correct?
16 A Yes.
17 Q Okay. Now, in Exhibit 4, the April
18 letter, turn to the section dealing with EPL
19 coverage part. So it's on page 10 of Exhibit 4.
20 A Okay.
21 Q And in the paragraph that's labeled EPL
22 coverage part on page 10, you state under the EPL

Page 20

1 part of the 2015 policy, "In the absence of the
2 threshold coverage issues raised above, the suit
3 would be an employment practices claim with
4 respect to Madison Mechanical OS Corp., Haslam,
5 and Garofalo." Do you see that?
6 A Yes.
7 Q And then it says, "Count I seeks a
8 declaration from the court with respect to these
9 defendants that plaintiff was wrongfully
10 terminated and must be reinstated." Do you see
11 that?
12 A Yes.
13 Q Do you agree with me that the claims
14 trigger for the EPL coverage part was triggered by
15 the November 2015 claim letter?
16 A No.
17 Q Why?
18 A Because there's no reference to any
19 employment actions in this letter.
20 Q Do you agree with me that under the EPL
21 part of the 2015 policy, there would have been
22 coverage under the employment practice claim form

Page 21

1   if it had been reported in 2015?
2      A   No, it wouldn't have been.  Because there
3   aren't any references to any employment wrongful
4   acts.
5      Q   Okay.  Do you have knowledge as to when
6   Mr. Buczkowski was terminated?
7      A   I believe it was in November of 2015, same
8   month as this letter.  I'm not sure, but I think
9   it was in November of 2015.
10     Q   Okay.  Keep this one in front of you but
11  let's also mark the October 18, 2016, letter as
12  Exhibit 5.
13         (KNOX Deposition Exhibit 5 marked for
14  identification and attached to the transcript.)
15     Q   Now, is Exhibit 5 a letter that you
16  drafted?
17     A   Yes.
18     Q   And it's also addressed to me; is that
19  correct?
20     A   Yes.
21     Q   And it's dated October 18th, 2016?
22     A   Yes.

Page 22

1      Q   And turn again to the section under the
2   EPL coverage part, it's on page 12.  And under
3   that heading where it says EPL coverage part you
4   wrote, "Under the EPL part, the suit is an
5   employment practices claim with respect to Madison
6   Mechanical OS Corp., Haslam, and Garofalo.
7   Count I seeks a declaration from the court with
8   respect to these defendants that plaintiff was
9   wrongfully terminated and must be reinstated."  Do
10  you see that?
11     A   Yes.
12     Q   And then it says, "Twin City will provide
13  a defense for this claim as well with respect to
14  these defendants."  Correct?
15     A   Yes.
16     Q   So is it accurate that as of the time you
17  wrote the letter in October 2016 that the
18  employment practices claim trigger had been
19  triggered under the Madison policy?
20         MR. LEMLEY:  Objection to form of the
21  question.
22     Q   You can answer.

Page 23

1      A   Yeah.  I mean, my feeling today is that
2   it's really not a wrongful termination claim.
3   It's not an EPL claim, because there's no cause of
4   action for wrongful termination.  They weren't
5   seeking relief under that tort or anything
6   similar.  And the case is really a minority
7   shareholder oppression case -- about how
8   Buczkowski was ousted from the company.  And the
9   wrongful termination was part and parcel of what
10  they were -- their, you know, alleged strategy to
11  force him out of the company, so...
12     Q   Okay.  So it's your testimony today that
13  the claim was only triggered under the D&O
14  coverage form and not the EPL?
15     A   Correct.
16     Q   Is that what you said in the letter,
17  Exhibit 5, October 18, 2016?
18     A   No, that's not what I said.
19     Q   Okay.  In fact, in Exhibit 5 you say that
20  Count I seeks a declaration from the court with
21  respect to these defendants that plaintiff was
22  wrongfully terminated and must be reinstated;

Page 24

1   correct?
2      A   Yes.
3      Q   And then you go on to say that Twin City
4   will provide a defense for the claim with respect
5   to these defendants, and you're talking about a
6   claim under the employment practices liability
7   portion of the policy; correct?
8      A   Yes.
9      Q   Okay.  And then you say that because,
10  "Both the EPL part and the D&O part are in part
11  triggered, please note the section Roman numeral
12  VIII, 'Coordination of Coverage in the EPL Part,'
13  provides that loss shall be first covered and paid
14  under the EPL part."  What does that mean?
15     A   This coordination of coverage provision
16  says that if both parts are triggered, the EPL
17  part will pay first.
18     Q   Okay.  And I think what you're saying in
19  the October 2016 letter was both the EPL part and
20  the D&O part are triggered in this claim; correct?
21     A   That's what it says.
22     Q   Okay.  And that the EPL part will pay

Page 25

1  first. Do you mean defense cost? Or what do you
2  mean by pay first -- pay what first?
3    A Defense costs and indemnity.
4    Q Okay. So that if under the policy there
5  is a limit of liability of -- I'm back to
6  Exhibit 2 -- a limited liability for directors and
7  officers of 2 million with a $10,000 retention or
8  deductible and an aggregate limit of liability of
9  2 million under the employment practices
10  liability, you're saying that the EPL portion,
11  that 2 million, would be paid first?
12    A Yes.
13    Q Okay. And also defense cost would be
14  allocated toward the EPL portion of the policy
15  before being allocated to the D&O portion?
16    MR. LEMLEY: Object to the form.
17    A I'll take a quick look.
18    Q Yeah. And I'm not sure about -- that
19  question, it's an open ended question because I'm
20  not sure how it works. But if there were, let's
21  say hypothetically, one $100,000 of defense costs,
22  would that hypothetical $100,000 be all allocated

Page 26

1  in total to the EPL portion of the policy?
2    A Hang on one second.
3    Q Sure.
4    A Yes, if there was $100,000 in defense
5  costs and/or indemnity, it would be paid first
6  under the EPL part.
7    Q Okay.
8    A But notice that there's a $2 million
9  aggregate limit of liability. So if $2 million
10  was paid under the EPL part, there wouldn't be
11  anything left to put in the --
12    Q Correct. And you don't have 4 million in
13  coverage. I got that.
14    A Right.
15    Q But the fist 2 million in defense costs
16  would be paid under the Employment Practices
17  Liability portion of the policy, not the D&O
18  portion; is that right?
19    A Correct.
20    Q Okay. Now, do you have any understanding
21  as to when Mr. Buczkowski was told that he was
22  being terminated from Madison?

Page 27

1    A I think it was in November 2015.
2    Q Okay. And how do you know that?
3    A I either saw a letter or I was told that
4  there was a letter from counsel to Buczkowski
5  telling him that his employment was terminated.
6    Q Okay. And I believe that letter was
7  Wednesday November 2018, but do you know if
8  Mr. Buczkowski was told prior to that that he was
9  being terminated?
10    A I don't know.
11    Q Okay. Do you have any testimony as to
12  whether or not to the extent that Mr. Buczkowski
13  was making a wrongful termination claim whether
14  that claim was made in 2015?
15    A I'm not aware of any wrongful termination
16  claim in 2015.
17    Q Are you aware of any wrongful termination
18  claim in 2016?
19    A I don't think there was one in 2016
20  either.
21    Q Okay. Would you agree with me that
22  hypothetically to the extent that there's an

Page 28

1  employment practices liability claim, the
2  exclusion for the 10 percent shareholder exclusion
3  is not an exclusion under the EPL coverage part of
4  the policy, only the D&O?
5    A Under the 2015 policy?
6    Q Uh-huh. Or '16. I think it's the same.
7  I think it's in endorsement four?
8    A Two in 2015. Right. It only applies to
9  the D&O coverage part.
10    Q Okay. And it does not apply to the EPL
11  coverage part; correct?
12    A Correct. I do not have a copy of the '16
13  policy in front of me here, but you're right as to
14  the '15 policy.
15    Q Okay. And also under -- and this question
16  is still under the 2015 policy that you have in
17  front of you, the insured versus insured
18  exclusion, are you familiar with that?
19    A Yes.
20    Q And that also applies to the D&O coverage
21  part of the policy; is that correct?
22    A Yes.

Page 29

1    Q  And it does not apply to the EPL portion
2    of the policy; is that correct?
3    A  Yes.
4    Q  Okay.  We'll mark this as six.
5        MR. JONES:  This one, Charlie, I don't
6    know if you've seen.  I think -- off the record.
7        (Brief conversation took place off the
8    record.)
9        (KNOX Deposition Exhibit 6 marked for
10   identification and attached to the transcript.)
11   Q  Take a minute, Mr. Knox, and look at that.
12   A  Thank you.
13   Q  And if you look it's Bates-stamped
14   MMOO1243, at the top there's an email from
15   Gary Garofalo from Tuesday June 23rd to
16   Bill Franey; do you see that?
17   A  Yes.
18   Q  And it says, "FYI, Glen let Bob know he
19   was not part of Madison's or Newco's future.  I'm
20   not sure if he will be retained on the 1099 basis
21   going forward to close out Madison issues."  Do
22   you know what he's referring to in terms of Glen

Page 30

1    let Bob know he would not be part of Madison's or
2    Newco's future?
3    A  No.
4    Q  Do you know what he's referring to when he
5    says Newco?
6    A  I don't know but I would presume he's
7    referring to the new Madison Mechanical entity.
8    But I don't know.
9    Q  All right.  And the new Madison Mechanical
10   entity would have been Madison Mechanical
11   Contracting, LLC; is that correct?
12       MR. LEMLEY:  Objection to the form.  You
13   can answer the question.
14   A  That's my speculation that that's what
15   they're referring to.
16   Q  All right.  Are you aware that the entity,
17   Madison Mechanical Contracting, LLC was formed in
18   August 2015?
19   A  No, I was not aware of that.
20   Q  Are you aware of whether or not
21   Mr. Buczkowski was an owner or member of Madison
22   Mechanical Contracting, LLC?

Page 31

1    A  I think you said in the letter of November
2    11th and the lawsuit that he wasn't.
3    Q  He was not?
4    A  He was not.
5    Q  All right.  If Madison Mechanical
6    Contracting, LLC had been formed in August of
7    2015, would it have automatically been made part
8    of the coverage issued under that 2015 policy
9    that's Exhibit 2?
10       MR. LEMLEY:  I'd object that it's calling
11   for a legal conclusion unless you've already done
12   the analysis.
13   A  They would have had to comply with
14   Section 14 in the common terms and conditions,
15   referring to changes in exposure.
16   Q  Okay.  What's the -- what's the -- is that
17   numbered?  Is there either a page number or Bates
18   stamp?  Give me the Bates stamp number at the
19   bottom?
20   A  PL009604.
21   Q  All right.  And read to me again the
22   section you're referencing?

Page 32

1    A  Section 14, and it's referring to changes
2    in exposure.
3    Q  And what does it say?
4    A  It says if the insured entity creates a
5    subsidiary -- well, let me go back.  I don't know
6    if Madison Mechanical Contracting was a
7    subsidiary.
8    Q  Okay.
9    A  I don't think it was, because otherwise it
10   would have been OS Madison Mechanical and
11   Buczkowski still would have owned his 13 percent.
12   So it was a separate company.
13   Q  Okay.  Do you know when, if at all, the
14   Madison Mechanical Contracting, LLC was added to
15   the coverage under the policy, Exhibit 2?
16   A  I think it was on January 1st, 2016.
17   Q  All right.  And how was it added?
18   A  There was an endorsement to the 2015
19   policy adding that company.
20   Q  Okay.  Do you know why it was added as
21   opposed to a new policy issued for Madison
22   Mechanical Contracting LLC?

Page 33

1    A  I don't know.  That was an underwriting
2  decision.
3    Q  Okay.  Now in the October letter, the
4  October '16 letter that you wrote, you're agreeing
5  on behalf of Twin City that Twin City will provide
6  a defense of the lawsuit for the covered entities
7  and persons as described below subject to a
8  reservation of rights or subject to its
9  reservation of rights; do you see that?
10    A  The October 18, 2016, letter?
11    Q  October 17, 2016, letter, yes.
12    A  October 17?
13    MR. JONES:  Off the record a second.
14    (Off the record from 11:20 a.m. to 11:20
15  a.m.)
16    Q  What's the exhibit sticker for the
17  October '16 letter?  What's the number?
18    A  Five.
19    Q  Okay.  Exhibit 5 on page one, which is the
20  October 2016 letter, you wrote that this confirms
21  that Twin City will provide a defense of the
22  lawsuit for the covered entities and persons as

Page 34

1  described below subject to its reservation of
2  rights.  Do you see that?
3    A  Yes.
4    Q  And what did you mean by that?
5    A  That we would appoint and pay for the
6  counsel to defend the entities and insured persons
7  subject to a reservation of rights.
8    Q  Okay.  And who was appointed, if anyone,
9  to provide a defense?
10    A  Well, at that point your firm was
11  defending the case and so we allowed your firm to
12  continue defending the case.
13    Q  Okay.  And at that time was the defense
14  being provided on behalf of the D&O coverage part
15  or the EPL coverage part of the policy or both?
16    A  With respect to any entities or persons
17  who were insured under both the D&O part and the
18  EPL part, I would say both.
19    Q  Okay.  And were any defense costs actually
20  paid?
21    A  I don't believe so.
22    Q  Do you know why?

Page 35

1    A  We were still investigating the coverage
2  issues and we had requested additional information
3  from Madison Mechanical, including the
4  November 11, 2015, Buczkowski letter, all
5  correspondence between -- among Buczkowski, the
6  insured persons, and the companies.  And we also
7  requested additional information on the percentage
8  shareholder endorsement because Buczkowski was
9  alleging that he was a 13 percent shareholder and
10  that was in an application that he submitted to us
11  that he signed as the CFO.  And Madison Mechanical
12  was telling us that he was either diluted down to
13  seven percent or he lost all of his shares when he
14  was terminated.
15    Q  Okay.
16    A  So we were trying to understand how to
17  apply the percentage shareholder exclusion.
18    Q  Okay.  And the application that you're
19  referring to that Mr. Buczkowski signed was in
20  April of 2015 that he signed as CFO for Madison;
21  is that correct?
22    A  Correct.

Page 36

1    Q  And in that policy he lists himself as a
2  13 percent shareholder of Madison; is that
3  correct?
4    MR. LEMLEY:  Objection to form.
5    A  In the application.  I think you said
6  policy.  In the application.
7    Q  I misspoke.  In the application.  Okay.
8  But I think we talked about a few minutes ago that
9  the endorsement with regard to the percentage
10  shareholder exclusion would not apply to the EPL
11  part of the policy; is that correct?
12    A  Yes.
13    Q  So even if he were a 13 percent
14  shareholder there still would have been a -- at a
15  minimum, a defense cost obligation under the EPL
16  part of the policy?
17    A  Correct.  Sorry, I'm looking.
18    Q  It's all right.  For the record, I think
19  he's looking at Exhibit 2.
20    A  Yes.  Sorry.  Gary, could you repeat the
21  question?
22    Q  Sure.  Even if the -- you said you were

Page 37

1 evaluating this percentage shareholder exclusion.
2 Even if Mr. Buczkowski was a 13 percent owner of
3 Madison, which would've triggered the
4 endorsement -- the percentage shareholder
5 exclusion, under that scenario would not there be
6 a duty of defense under the EPL coverage part of
7 the policy?
8     MR. LEMLEY:  Object to the form.
9     A  I don't think so, because the letter had
10 been received by the other directors and officers
11 of the company before the application was
12 submitted so they had knowledge of this claim that
13 Buczkowski was making.  And then one of the Ds and
14 Os, Haslam I think, signed an application for the
15 new company which said that they had no knowledge
16 of any claims or potential claims and that there
17 weren't any lawsuits or claims out there.  And
18 that was incorrect.  And there's a prior knowledge
19 exclusion and there's a lost history exclusion
20 that would bar coverage for both D&O claims and
21 EPL claims because of that failure to advise Twin
22 City about the Buczkowski claim.

Page 38

1     Q  Okay.  So I think what you're saying is
2 that the duty of defense and the coverage would
3 not be applicable under the policy because the
4 November 11, 2015, letter had already triggered a
5 claim; correct?
6     A  Yes.
7     Q  And it was not reported to The Hartford
8 and Mr. Haslam signed a questionnaire on December
9 27 or 29 of 2015 and he checked off no to question
10 number three; is that correct?
11     A  The prior knowledge questions, and the
12 lost history questions.
13     Q  Okay.  But what you're referring to is as
14 of the time at the end of December where
15 Mr. Haslam signed off on the questionnaire, the
16 claim had already occurred and Madison and its
17 owners knew about the claim because they got the
18 November 11 letter; is that correct?
19     A  Yes.
20     Q  Okay.  So when you issued the next
21 coverage letter, which I believe is in April of
22 2017, you at that point deny coverage on behalf of

Page 39

1 Twin City for the claim; is that correct?
2     A  Yes.
3     Q  And so the position that -- the coverage
4 position that is taken in April of '17 with regard
5 to a denial of coverage, is different than the
6 coverage position in October of '16 where you're
7 providing a duty of defense pursuant to a
8 reservation of rights; correct?
9     MR. LEMLEY:  Objection to form.
10     Q  Go ahead.
11     A  We were providing the defense in October
12 of 2016 contingent on receiving the information --
13     Q  Sure.
14     A  -- which we clearly laid out in the close
15 of the letter and bullet pointed at the end of the
16 letter that we need especially this Buczkowski
17 letter which we had never seen.
18     Q  Sure.
19     A  So I would say that we were providing a
20 defense contingent on receiving that information
21 so we could complete our coverage investigation
22 and determine whether this claim was actually

Page 40

1 covered or not.
2     Q  I understand.  And I believe you.  And
3 that's not my question.  But between October of
4 '16 and April of '17, the only thing that changed
5 is in August -- excuse me, in October of '16 you
6 did not have the November 11 letter.  In April of
7 '17 you did because I gave it to you on
8 February 27th.  And that's what's changed the
9 coverage position was the November 11 letter; is
10 that correct?
11     A  That was important to the question of when
12 was the claim made.  We learned then it was made
13 in the 2015 policy, not the 2016 policy.  We
14 learned that the application for the edition of
15 the new entity had misrepresentations on it with
16 regard to the prior knowledge and --
17     Q  I'm sorry, I didn't mean to interrupt you.
18     A  -- the lost history.
19     Q  But the misrepresentation is based upon
20 the November 11 letter and nothing else; is that
21 correct?
22     A  Well, I haven't seen all the

Page 41

1  correspondence that was going back and forth
2  between the entities at that time. We felt like
3  that was enough to show that the claim was in 2015
4  and they knew about it. But there may be other
5  correspondence that I'm not aware of. And also
6  I'd point out we were still investigating the
7  percentage shareholder issue. Madison Mechanical
8  was telling us that he was diluted to seven
9  percent or didn't have any shares at all because
10 he was terminated. So we were investigating both
11 those issues.
12     MR. LEMLEY: I think he's just worried
13 about the "only," the emphasis on only --
14     MR. JONES: I got it. I think we're on
15 the same wave length.
16     Q  The -- you've told me that the percentage
17 shareholder exclusion does not apply to the EPL
18 coverage part of the policy; is that correct?
19     A  Yes.
20     Q  We've been over that?
21     A  Yes.
22     Q  All right. So I think what you're saying

Page 42

1  is between October of 2016 where you had agreed to
2  provide a defense pursuant to a reservation of
3  rights while you investigate all these issues, and
4  April of '17, the only additional document that
5  you had that's determinative is the November 11
6  letter, there's nothing else; is that correct?
7     A  Just on this issue of putting aside the
8  percentage shareholder exclusion issue?
9     Q  Yes, because you just told me it didn't
10 apply to the EPL coverage part?
11     A  Yes, that was the main piece of
12 information that we had received that changed our
13 view on when the claim was made and whether we had
14 been given the information we asked for in the
15 application.
16     Q  It was the only piece of information.
17 That was the only piece of information that you
18 had in April that you did not have in October?
19     A  I don't recall if that was the only piece
20 of information we received. I think we requested
21 and received quite a bit of information from you.
22     Q  That's true. But is there anything else

Page 43

1  other than the November 11 letter that changed the
2  position of Twin City from the position it took in
3  October to the position it took in April?
4     A  On this issue?
5     Q  Yes.
6     A  This issue of the application?
7     Q  On the issue of the application, on the
8  issue of it being a 2015 claim, on the issue of
9  providing a defense and on the issue of
10 misrepresentation in the December questionnaire.
11 That's the only piece of evidence that you can
12 point to. If you can point to another one, tell
13 me.
14     MR. LEMLEY: Objection form. It's been
15 asked and answered.
16     Q  And I'm not trying to argue with you.
17     A  Yeah, I don't recall any others sitting
18 here right now. This was two years ago.
19     Q  Okay.
20     MR. LEMLEY: Can we take a break?
21     MR. JONES: Yeah.
22     (Off the record from 11:33 a.m. to 11:37

Page 44

1  a.m.)
2     (KNOX Deposition Exhibit 7 marked for
3  identification and attached to the transcript.)
4     Q  We were talking about what had changed
5  between the October 2016 letter and the April 2017
6  letter. Do you have anything you wanted to add,
7  Mr. Knox?
8     A  Yes. I don't recall all of the
9  information that we received and that we reviewed
10 and we considered in making that change in our
11 coverage position, but certainly the November 11,
12 2015, letter was an essential part of the decision
13 that we made, essential basis for the decision we
14 made.
15     Q  All right. Thank you. So in the next
16 exhibit, Exhibit 7, which is the binder, turn to
17 Tab 5. And I believe this is a Hartford document
18 or Twin City document from your file; is that
19 correct?
20     A  Yeah. It looks like it's redacted, but it
21 looks like a claim we call a claim alert. It's an
22 internal -- see subject is claim alert. It's

Page 45

1    called a claim alert and it's an internal Hartford
2    document.
3        Q   Okay.  And what's the purpose of the claim
4    alert?  Is that alerting you to the claim and
5    opening up the file or what is it?
6        A   It's -- see the two lines to Amy Hoodling,
7    who was the underwriter at the time?  And the CCs
8    are all underwriters -- I think with a couple of
9    exceptions.  It's to alert the underwriters when a
10   claim is set up that there's a new claim.
11       Q   Okay.
12       A   On their account -- Amy's boss was alerted
13   and all these people on the underwriting side to
14   let them know there was a new claim.
15       Q   Okay.  Thank you.  Turn to the next tab,
16   Tab 6.  Tab 6, for the record, is an email from
17   Danielle Vranian to Michael Knox October 6, 2016,
18   enclosing some documents.  Do you see that?
19       A   Yes.
20       Q   And it says attached are the resolutions
21   that you asked us to send that cover
22   Mr. Buczkowski's diluted ownership interest.  And

Page 46

1    attached to that email are -- are five pages of
2    documents; do you see that?
3        A   Yes.
4        Q   And it's Hartford Bates stamp 49, 50, 51,
5    52, 53.  Did you receive these documents back in
6    October of 2016?
7        A   I think so, yes.
8        Q   Okay.  Were these some of the documents
9    that you referred to earlier that you had
10   requested?
11       A   Yes.
12       Q   And this was part of the inquiry with
13   regard to the dilution of Mr. Buczkowski's
14   ownership that Madison had told you about; is that
15   right?
16       A   Yes.
17       Q   Okay.  And if you look at the document
18   that's Hartford 52 and Hartford Bates stamp 53, it
19   shows that there's a listing by Robert Buczkowski
20   that's showing a percentage share of 7 percent or
21   7.006, that's on Bates stamp 53; do you see that?
22       A   Yes.

Page 47

1        Q   All right.  Do you have -- strike that.
2            Do you dispute that Mr. Buczkowski's
3    shares in Madison Mechanical OS Corp. were diluted
4    to seven -- approximately 7 percent?
5        A   Do I dispute it?
6        Q   Uh-huh.
7        A   I don't know.
8        Q   Okay.
9        A   I know that he was alleging that he owned
10   13 percent.  And I'm not admitted to the bar in
11   Maryland, nor am I a corporate lawyer, so I don't
12   know.
13       Q   Okay.  And you agree with me that in the
14   complaint that Mr. Buczkowski filed in May of 2016
15   that he alleges in the complaint that he's a
16   13 percent shareholder; is that correct?
17       A   Yes.
18       Q   And you also mentioned that in the renewal
19   questionnaire from April of 2015, which
20   Mr. Buczkowski signed, he lists himself as a
21   13 percent shareholder; correct?
22       A   Correct.

Page 48

1        Q   Why was it important to you as the claims
2    handler on the file to find out information with
3    regard to the dilution of Mr. Buczkowski's
4    ownership?
5        A   Because if he owned 10 percent or more of
6    the shares in the company his claim under the D&O
7    coverage part would have been barred by the
8    percentage shareholder exclusion.
9        Q   Okay.  Does it make a difference as to at
10   what point in time Mr. Buczkowski owned 13 percent
11   of Madison Mechanical OS Corp.?
12           MR. LEMLEY:  Object to the form.
13       A   I think the relevant time period is the
14   date the claim was made.
15       Q   All right.  And I think we've established
16   that the date the claim was made was
17   November 11th, 2015; correct?
18       A   Yes.
19       Q   So the inquiry with regard to the
20   percentage shareholder exclusion would be at that
21   point in time on November 11th, 2015, what
22   Mr. Buczkowski's ownership interest in Madison

Page 49

1    Mechanical OS Corp. was; is that correct?
2       A Yes.
3       Q Mr. Knox, if you skip to Tab 8, there's an
4    email it looks like from me to you December 15 of
5    2016, where it says, "Mike, for your file.
6    Opinion is value of Madison OS Corp. is zero and
7    plaintiff's loss is zero." Do you recall what
8    that referred to? And if you don't that's okay,
9    because I don't remember.
10      A Sorry, Gary, what was your question again?
11      Q Do you recall -- and I don't know if the
12   attachment is on here, but it says, "For your
13   file, opinion is value of Madison OS Corp. is zero
14   and plaintiff's loss is zero." I think it's
15   referring to the Hertzbach expert designation, but
16   in your file there was nothing attached to it.
17   And if you don't recall, it's okay.
18      A In my file there was no attachments to
19   this email?
20      Q Not attached to the email. There's copies
21   of the Hertzbach report in your file. And if you
22   don't know, it's okay.

Page 50

1       A I remember receiving the November 11th,
2    2015, letter.
3       Q Okay. That's okay.
4       A I think that's as far as I went.
5       Q Let me ask a different question. The page
6    that you're referring to, The Hartford 203 page,
7    do you see that? The Bates stamp? It's the
8    Monday February 27, 2017, email and transmittal.
9    Is this what you're referring to earlier in the
10   deposition where you said that you got the
11   November 11 letter on February 27th, 2017?
12      A Yes, I think so.
13      Q Okay. And it also lists some other
14   information and documents in the body of the email
15   where it says Friday, February 24, 2017, and then
16   it's forwarded to you on Monday, February 27; do
17   you see that?
18      A Yes.
19      Q Going back to this November 11 letter,
20   when you got it in February, did you ever ask
21   anyone at Alliant about the letter? Mr. Franey?
22   Mrs. Bederman? Anyone else?

Page 51

1       A I don't think so, no.
2       Q And you never recall Mr. Franey calling
3    you about the claim?
4       A No.
5       Q Okay. Turn all the way to Tab 12 of
6    Exhibit 7. Tab 12.
7       A I'm sorry, I'm at the wrong place.
8       Q It's a May 12, 2016, letter?
9       A Yes, sorry about that.
10      Q Have you seen this letter before, if you
11   recall?
12      A I think so. Was it part of the original
13   tender that we received from you?
14      Q Yes.
15      A I do remember seeing this.
16      Q And would you agree that this May 10,
17   2016, letter from Mr. Buczkowski is a derivative
18   demand?
19      A As that term is defined in --
20      Q In Exhibit 2?
21      A -- in the 2015 policy?
22      Q Yes. And specifically at Hartford Bates

Page 52

1    stamp 218 of Mr. Buczkowski's letter, it says,
2    "This letter shall constitute a demand that the
3    board of directors of Madison Mechanical OS corp.
4    vote to institute legal action against you,
5    Mr. Garofalo, Mr. Lombardo, Mr. Kraemer,
6    Mr. Arnold, and Madison Mechanical Contracting,
7    LLC. Should the board fail to do so within
8    15 days of the date of this letter I intend to
9    bring a derivative action on behalf of Madison
10   Mechanical OS Corp. against you, Mr. Garofalo,
11   Mr. Lombardo, Mr. Kraemer, Mr. Arnold, and Madison
12   Mechanical Contracting, LLC." My question is,
13   does this constitute a derivative demand as that's
14   defined in the 2015 policy, Exhibit 2?
15      A 2015 policy. Even though I think it was
16   in the 2016 policy. But I'm looking at the 2015
17   policy.
18      Q That's fine.
19      A And I don't think it changed. I would say
20   yes with the caveat that there's a requirement in
21   the definition of derivative demand in the policy
22   that the demand be made without the assistance,

Page 53

1  participation, or solicitation of any manager.
2  And Buczkowski was a manager at one point in time
3  anyway, he was the CFO. If he was still a manager
4  then the question is whether this requirement is
5  satisfied.
6      Q  Okay. But as of the date of the letter,
7  May 10 of 2016, he wasn't a manager any longer,
8  was he? He was terminated in November of '15?
9      A  That's my understanding.
10     Q  All right. Turn to Tab 14. This is
11  Hartford Bates stamp 222, and following the entire
12  tab is a tax form. Do you see that?
13     A  Yes.
14     Q  This was part of your file?
15     A  Okay.
16     Q  Do you know?
17     A  I believe you.
18     Q  Okay. Hartford Bates stamp 222, which is
19  a Schedule K-1, it lists Mr. Buczkowski's
20  shareholder percentage as 7.774, do you see that?
21     A  Yes.
22     Q  Okay. I may have asked you this before,

Page 54

1  and I apologize if I did, but do you have an
2  opinion factually as to whether Mr. Buczkowski's
3  ownership interest was 7.774 in 2015?
4      A  I don't have a legal opinion on that.
5      Q  Okay.
6      A  I made my judgment based on the
7  application where he said he was a 13 percent
8  shareholder, the original claim, the demand letter
9  of November 11th, 2015, where he said he was a
10  13 percent shareholder, and the lawsuit where he
11  said he was a 13 percent shareholder.
12     Q  Okay. And if you turn to Tab 15, there's
13  another email from Danielle Vranian to you from
14  Friday, March 10, 2017, do you see that?
15     A  Yes.
16     Q  And this email sets forth some analysis
17  with regard to the dilution of Mr. Buczkowski's
18  ownership interest in Madison Mechanical OS Corp,
19  do you see that?
20     A  Yes.
21     Q  As of March 10, 2017, were you still
22  evaluating whether the percentage shareholder

Page 55

1  exclusion applied to this claim?
2      A  Yes.
3      Q  And as of that date, March 10, 2017, had
4  you concluded one way or the other whether you
5  thought that the percentage shareholder exclusion
6  barred coverage under the D&O coverage part for
7  this claim?
8      A  I felt it did because the shareholder
9  agreement didn't have any provisions for the type
10  of dilution that Danielle was talking about under
11  Maryland law.
12     Q  Okay.
13     A  And I thought -- I'm not a corporate
14  lawyer, but I was looking at the shareholder
15  agreement and I was looking at what he was saying
16  in his lawsuit, and he was saying based on the
17  shareholder agreement, I own 13 percent of the
18  company.
19     Q  Okay. I don't want you to tell me any
20  communications, but did you seek any counsel, to evaluate
21  either in-house or outside counsel to evaluate
22  this, what you're saying is a corporate issue or a

Page 56

1  legal issue with regard to the dilution?
2      A  I don't think so.
3      Q  Okay. Do you dispute or do you know one
4  way or the other whether Mr. Buczkowski failed to
5  make capital contributions into Madison Mechanical
6  OS Corp.?
7      A  I don't really know what capital
8  contributions were required or made.
9      Q  Okay. During your evaluation of the
10  claim, did you ask for information with regard to
11  capital contributions made by the owners of
12  Madison OS Corp. and whether Mr. Buczkowski had
13  put all his money in that was required, if you
14  remember?
15     A  I don't recall.
16     Q  Okay. Would you agree with me that the
17  inquiry with regard to this percentage shareholder
18  exclusion is not limited to just the allegations
19  in the Buczkowski lawsuit?
20     A  Well, I think it was his position based on
21  the shareholder agreement and based on his history
22  with the company that he owned 13 percent, that

| | Page 57 |
|---|---|

1  was very clear.  Obviously, Madison Mechanical had
2  a different view of things.  We operate off the --
3  what's in the four corners of the complaint or the
4  demand, claim, and so that was my main focus
5  during this process.
6      Q  Okay.  But I think you also said that you
7  were focused on the November 11th, 2015, letter
8  that -- the claim letter that triggered the claim;
9  correct?
10     A  Yes.
11     Q  And I think you said in that letter he
12  alleges he's a 13 percent owner; correct?
13     A  Yes.
14     Q  And you also referenced at one point the
15  questionnaire that he filled out in April of 2015
16  and signed as CFO; is that correct?
17     A  Yes.
18     Q  So it's not limited to the four corners of
19  the complaint, you're looking at other things in
20  addition to that?
21     A  Right.  That application he signed as the
22  CFO, said he owned 13 percent, so the company

| | Page 58 |
|---|---|

1  represented to us as the insurance company that he
2  owned 13 percent.
3      Q  Okay.  Is it significant at all to your
4  analysis on the 13 percent and the shareholder
5  exclusion that the resolution that the board
6  passed documenting the dilution wasn't issued
7  until September 15 of 2016?
8      MR. LEMLEY:  Object to the form.
9      A  The what?
10     Q  The resolution that -- off the record.
11     (Off the record from 12:06 p.m. to 12:07
12  p.m.)
13     Q  Tab 6, we looked at this a few seconds
14  ago.
15     A  Yeah.
16     Q  There's some attached documents, including
17  Hartford Bates 49, 50, 51, 52, and 53.  If you
18  look at Hartford 52 and 53, there's a Madison
19  Mechanical OS Corp. consent of sole director dated
20  September 15, 2016.  That was the document I was
21  referring to.
22     A  Okay.

| | Page 59 |
|---|---|

1      Q  And my question is, is there any
2  significance to the fact that, assume Mr. Haslam
3  will testify that Mr. Buczkowski's ownership
4  interest was diluted to 7 percent back as of
5  April 1, 2015, but he didn't issue this consent of
6  sole director until September 15 of 2016, is that
7  significant at all to your analysis on the
8  shareholder percentage exclusion?
9      MR. LEMLEY:  Object to the form.
10     A  Yes, because this consent was dated
11  September 15, 2016, and that was after the claim
12  was first made in 2015 and after the lawsuit was
13  filed.
14     Q  Okay.  Why is that significant to you?
15     A  Because that's the date the alleged
16  dilution -- assuming there was a dilution at all,
17  and I don't know.
18     Q  I understand.
19     A  I know there was a fight over it and maybe
20  it's been resolved now, but Buczkowski was
21  alleging that he owned 13 percent; the company was
22  alleging that he owned 7 percent.  This document

| | Page 60 |
|---|---|

1  is dated September 15, 2016, so this dilution
2  apparently took place on that date.  That was
3  after the claim was already made.
4      Q  Okay.  And just a couple of references
5  back in your binder.  The stockholders agreement
6  that I believe you mentioned a few minutes ago,
7  look at Tab 17 in Exhibit 7.  And do you see a
8  document that's labeled stockholders agreement?
9      A  Yes.
10     Q  And it's Bates stamped Hartford 373
11  through 392.  Is this document part of your file?
12     A  Yes, I think it was.
13     Q  Okay.  Did you review it?
14     A  Yes.
15     Q  And then if you look at Tab 18, there's a
16  letter, Hartford 398, dated November 18, 2015.  Do
17  you see that?
18     A  Yes.
19     Q  And is this the letter that you referred
20  to earlier that was on the occasion of
21  Mr. Buczkowski being terminated from Madison?
22     A  Yes, I think this was the letter by which

Page 61

1 Buczkowski's employment was terminated.
2    Q  Okay.  And this is part of your file,
3 Hartford Bates 398?
4    A  So we produced this if it says Hartford.
5    Q  Yes.  Do you recall seeing this letter
6 before?
7    A  It does look familiar, yes.
8    Q  Okay.  All right.  Now, if you go to
9 Tab 19, there's an email from me to you dated
10 October 13, 2016.  This is in response to your
11 questions, and there's a letter attached to it;
12 it's Hartford 539.  Do you see that?
13    A  Yes.
14    Q  And in that letter, you're receiving
15 information with regard to Mr. Lombardo,
16 Mr. Kraemer, Mr. Arnold, Mr. Haslam, and
17 Mr. Garofalo and their various roles within
18 Madison; do you see that?
19    A  Yes.
20    Q  Did you request that information?
21    A  Yes.
22    Q  Why?

Page 62

1    A  I was trying to determine which
2 individuals were insured persons under the policy.
3    Q  Okay.  Why was that important to you?
4    A  Because only insured persons are covered.
5    Q  All right.  And at that point, October of
6 2016, we were under the reservation of rights and
7 you were providing a defense to the claim.  Was
8 this analysis being done with regard to making any
9 determination about who insured persons under the
10 applicable policy but also any portion of defense
11 costs that would be paid, if you recall?
12    A  I think you said that we were already
13 providing a defense as of this date?
14    Q  Yes.
15    A  That was actually effective on
16 October 18th.
17    Q  Okay.  That's fine.  But in terms of the
18 determination of who are insured persons under the
19 applicable policy, were you doing this to make any
20 type of pro rata payment of defense cost or not or
21 do you remember?
22    A  Yeah, we would -- well, it's possible.  We

Page 63

1 would have tried to allocate defense costs between
2 the insured persons and the uninsured persons if
3 we felt like we should use one lawyer to defend
4 everybody, which could make sense, they're all Ds
5 and Os of the same company.  So yeah, it would
6 here's 100 percent of the defense cost you pay a
7 certain fraction of those and we'll pay a certain
8 fraction of those the insurance company pay a
9 certain fraction.
10    Q  Okay.  Was that analysis being done by you
11 as part of your evaluation of this claim?
12    A  Yes.
13    Q  Okay.  And then if you go to the next tab,
14 there's Tab 20, it's a cover letter from me to you
15 with regard to a series of invoices, it looks
16 like, and I believe the invoices are in your file.
17 Do you recall receiving invoices with regard to
18 defense costs?
19    A  I don't recall specifically.
20    Q  Okay.  Do you recall a period of time
21 where I came up to New York to meet with you?
22    A  Yes.

Page 64

1    Q  And do you recall when that was?
2    A  Not specifically, no.
3    Q  Okay.  And during that meeting was there
4 any discussion with regard to providing a defense
5 subject to a reservation of rights to this claim?
6    A  I think so, yes.
7    Q  And during that meeting was there a
8 discussion that Hartford or Twin City would use my
9 firm to provide a defense and that we were
10 currently defending the case?
11    A  I don't recall specifically.
12    Q  Okay.  Do you recall any discussion with
13 regard to whether defense costs, legal fees that
14 had previously been paid by Madison would be
15 reimbursed to Madison?
16    A  What was the date of the meeting?
17    Q  It was right before Thanksgiving of 2016.
18    A  Yeah, I don't recall specifically what we
19 discussed.
20    Q  Okay.  Do you remember any discussion
21 about experts or expert fees?
22    A  No.

Page 65

1      Q  Now, turn to Tab 22.  And there's a series
2  of documents that start Hartford 590 through
3  Hartford 616, do you see that?
4      A  Yes.
5      Q  All right.  And if you look at Bates stamp
6  Hartford 596, you can see that Mr. Buczkowski
7  signed this renewal application questionnaire on
8  April 6, 2015, as CFO for the company, do you see
9  that?
10     A  Yes.
11     Q  Is this the questionnaire you were
12  referring to earlier that I believe listed himself
13  as a 13 percent owner?
14         MR. LEMLEY:  Object to the form.
15     A  We call it an application, but the answer
16  is yes.
17     Q  Okay.  Then on Hartford page 592 of the
18  application, you can see that the ownership's
19  listed and Mr. Buczkowski is listed as a
20  13 percent owner?
21     A  Yes.
22     Q  And that's what you were referring to

Page 66

1  earlier as the April 2015 application that
2  Mr. Buczkowski signed; correct?
3      A  Yes.
4      Q  Okay.  Now, if you go to the next page
5  starting on Hartford 597, and if you go to
6  Hartford 606.  This is a document, it looks like,
7  that Mr. Haslam signed as president of Madison
8  dated December 29, 2015; correct?
9      A  Yes.
10     Q  Okay.  And is this an application that was
11  filled out for insurance coverage for the new
12  entity for the Madison Mechanical Contracting,
13  LLC?
14     A  Yes.
15     Q  And if you look at Hartford 598, there's
16  questions with regard to prior knowledge, then
17  there's a question 3A and 3B, do you see that?
18     A  Yes.
19     Q  And they're checked off no?
20     A  Yes.
21     Q  Do you know if these questions in this
22  application even needed to be answered at all?

Page 67

1      A  I think they should have been because
2  they're adding a brand new entity to the coverage,
3  so they're expanding the coverage quite a bit.
4  And as we learned in the future, it's being done
5  with the alleged intent of misappropriating
6  corporate opportunities from the Oldco to the
7  Newco, so when you're talking about expanding the
8  coverage, yes, these questions should have been
9  answered, and they were.
10     Q  Okay.  And expanding the coverage for --
11  for which entity?  For the new Madison Mechanical
12  Contracting, LLC, or for Madison Mechanical OS
13  Corp. and Madison Mechanical Inc.?
14     A  You're adding a brand new entity and
15  you're expanding the risk for the entire corporate
16  organization because of what's going on behind the
17  scenes with Buczkowski.
18     Q  Okay.  Is it your position that 3A and 3B
19  should have been checked off yes given the
20  November 11th letter?
21     A  Yes.
22     Q  Okay.  Do you know who submitted this

Page 68

1  application?  I know who signed it, but do you
2  know who submitted it to The Hartford?
3      A  I don't know.  That would have been done
4  on the underwriting side.
5      Q  Okay.  And then if you go to the next, if
6  you start at The Hartford 608, which is right
7  behind that application and go to Hartford 616,
8  which is an attachment, you can see on Hartford
9  614 that the application -- this application was
10  signed on April 14, 2016, by Glenn Haslam as
11  president of Madison Mechanical Contracting, LLC;
12  is that correct?
13     A  Sir, again, what was the question?
14     Q  If you look at Hartford 614?
15     A  Yes.
16     Q  This is the signature of Glenn Haslam on
17  the application dated -- or he signed it on
18  April 14, 2016, as president of Madison Mechanical
19  Contracting; is that true?
20     A  Well, he signed on behalf of the applicant
21  company, which is Item 1A.
22     Q  Okay.

Page 69

1    A  And that's Madison Mechanical Contracting,
2    LLC, Madison Mechanical --
3    Q  Right.
4    A  -- Inc. --
5    Q  Inc., and Madison Mechanical OS Corp.  If
6    you look at the next page, Hartford 609, there's
7    another question three, prior knowledge?
8    A  Hartford 609?
9    Q  Uh-huh.  Yes.
10   A  Yes.
11   Q  If you read question three, you see it's
12   checked off no?
13   A  Yes.
14   Q  Is it your position that question three
15   under prior knowledge of this application should
16   have been checked off yes?
17       MR. LEMLEY:  Object to the form.
18   A  Yes.
19   Q  Okay.  And same question on this
20   application, do you know who submitted this
21   application to The Hartford?
22   A  No, I don't know.

Page 70

1    Q  Okay.  And if you look at Hartford 616?
2    A  Yes.
3    Q  There's a schedule of -- it's an
4    attachment to the application, but there's a
5    schedule of directors, officers, Madison
6    Mechanical OS Corp., and it lists Mr. Buczkowski,
7    previous ownership, 13 percent; current ownership,
8    zero percent, do you see that?
9    A  Yes.
10   Q  Okay.  Now, go to Tab 23.  With regard to
11   the application that we looked at a minute ago,
12   the one dated December 29 of 2015, that was being
13   done as a standalone policy for the new company or
14   was it to endorse the new company onto the old
15   policy?
16   A  I wasn't involved in the underwriting
17   issues --
18   Q  Okay.
19   A  -- but what I understand is that the
20   broker was seeking a standalone policy for the new
21   company.
22   Q  Okay.  That's correct.  And you see on

Page 71

1    Hartford 617, there's an email from Daniel -- I'm
2    going to mispronounce this -- but
3    A-N-T-R-O-S-I-G-L-I-O to Nancy Cuter dated January
4    11th?
5    A  Yes.
6    Q  And it says, "I am thinking the best,
7    cleanest option at this time is to add the new
8    entity to our current policy.  As we discussed
9    last week, in essence we are ensuring the same
10   company business practices for both entities, and
11   I'm treating this as a nuptial name change with
12   some minor shareholder change."  Do you see that?
13   A  Yes.
14   Q  And that's what actually occurred, they
15   added the new company as an endorsement to Madison
16   Inc.'s policy; is that correct, if you know?
17   A  That's my understanding, yes.
18   Q  Now, back to the December 29
19   questionnaire, which we looked at a minute ago, so
20   go back to Bates stamp Hartford 590 through 597,
21   it's the tab previous.
22   A  Okay.  590?

Page 72

1    Q  Yeah.  590 through 597.  And if you look
2    at 597, it's the first page of the application
3    dated December 29.  And again, I know you're not
4    the underwriter, but as of the time that this
5    application was submitted on December 29th, this
6    would have been an application for a standalone
7    policy for the new company; is that accurate?
8    A  I'm not the underwriter, as you said, but
9    yes, it's my understanding that the broker and the
10   applicant were seeking a standalone policy.
11   Q  Okay.  And the standalone policy would
12   have been at the same aggregate limit of liability
13   of $2 million; is that accurate or do you know?
14   A  It doesn't say.
15   Q  Okay.
16   A  On page 2, it's being asked what limits
17   are you requesting, and it's just blank.
18   Q  Okay.  Who is Nancy Cuter?
19   A  She's an underwriter at Hartford Financial
20   Products.
21   Q  Have you ever had any discussions with
22   Nancy Cuter about this claim?

Page 73

```
 1      A  Yes.
 2      Q  Have you discussed with her the
 3   November 11th letter?
 4      A  Yes, I think we've discussed that.
 5      Q  Did you have any discussions with Nancy
 6   Cuter about the nonrenewal of the policy in 2017
 7   to Madison?
 8      A  No, I was not involved in that.
 9      Q  Okay.  Do you know what the basis of the
10   nonrenewal was?
11      A  No.
12      Q  Okay.  If you turn -- look at Tab 23 and
13   go to Hartford, the Bates is 623.
14      A  Okay.
15      Q  And there's an email from Nancy Cuter to,
16   it looks like Jennifer C-O-T-R-O-N-E-O?
17      A  February 17th?
18      Q  Yes, sir.
19      A  Yes, I see it.
20      Q  And it says "Hi, Jennifer.  The reason we
21   want to non-renew, it's more about the nature of
22   the claim than it is about question three.  There
```

Page 74

```
 1   are serious ethical concerns about the honesty and
 2   integrity of their management and how they handle
 3   their business operations.  In addition, this
 4   appears it will be a costly claim with no entity
 5   coverage and possibly some coverage for insured
 6   persons still as yet to be determined."  Do you
 7   know what Ms. Cuter's talking about when she says,
 8   "Serious ethical concerns about the honesty and
 9   integrity of their management"?
10      A  I don't know.
11      Q  Did you ever discuss with Mr. Cuter
12   whether she had any serious ethical concerns about
13   the honesty and integrity of the Madison
14   management?
15      A  I don't recall a discussion like that.
16      Q  Did it ever come up in the context of
17   discussing the November 11th letter and whether
18   Ms. Cuter had any opinions with regard to the fact
19   that the November 11th letter was not disclosed to
20   The Hartford in 2015?
21      A  Could you repeat the question?
22      Q  In the context of discussions with Nancy
```

Page 75

```
 1   Cuter about the November 11th letter, if you had
 2   any, did any issues come up from Ms. Cuter with
 3   regard to the honesty and integrity of management
 4   of Madison in the context of the November 11th and
 5   her position that it wasn't reported to The
 6   Hartford in 2015?
 7      A  Oh, yes.  I mean, she was --
 8      Q  Tell me about that.
 9      A  -- concerned that the letter had never
10   been reported to us, and that's a clear
11   requirement in the 2015 policy.  And she was
12   concerned that it hadn't been reported on the
13   application for the Newco when there are multiple
14   questions asking about claims or potential claims.
15   So she was concerned that they had never disclosed
16   that to us.  Even as they're applying for coverage
17   for the new entity, which is being used to mis --
18   allegedly being used to misappropriate the
19   corporate opportunities from the Oldco that
20   Buczkowski was a shareholder in.
21      Q  Okay.  Do you recall her ever making a
22   statement to you that she felt there was a
```

Page 76

```
 1   material misrepresentation by Madison?
 2      A  I don't know if we ever discussed that
 3   issue.  I mean, I was told that they would -- if
 4   they had known about it they would have either
 5   excluded it from coverage, the claim, they
 6   would've -- they would have reduced the limits or
 7   increased the premiums, so based on that
 8   discussion, I would say she didn't think it was
 9   material.
10      Q  Okay.  I understand about reducing limits.
11   They could have also increased premiums, couldn't
12   they?
13      A  Increasing premiums, sure.
14      Q  How would they exclude the claim when the
15   claim already occurred?
16      A  They could have for the new entity, at a
17   minimum.
18      Q  Okay.  Even if it was endorsed onto the
19   old policy, does that make a difference?
20      A  I don't think they would've done that
21   without adding an endorsement saying we're not
22   covering this claim because it's already in the
```

Page 77

1    door.

2        Q  Yes, because the November 11th claim had

3    already occurred as of December 29th; correct?

4        A  Yes.

5        Q  Okay.  I think I understand what you're

6    saying as to the new company.  But the claim

7    already occurred as to Madison Inc. and Madison

8    OS, Corp.; correct?  It occurred on November 11th?

9        A  Yes.

10       Q  So Hartford wouldn't endorse out that

11   claim, it already occurred?

12       MR. LEMLEY:  Object to the form.

13       A  Well, it would've opened a whole can of

14   worms because we would have seen that there was a

15   misrepresentation on the application, we would've

16   seen that the prior knowledge questions were

17   answered incorrectly, that the lost history

18   questions were answered incorrectly, that the

19   warranty exclusion weren't exclusions, the one for

20   prior knowledge and the one for lost history were

21   triggered and excluded coverage.  So I think a --

22   I don't -- it's speculation as to what they could

Page 78

1    have done or would have done, but in hindsight you

2    can see that the claim wasn't covered at all

3    because of the misrepresentations.

4        Q  Okay.  I understand that from a coverage

5    position standpoint, but from an underwriting

6    standpoint, they wouldn't have excluded the claim,

7    there was coverage for the claims anyway based on

8    your analysis, and the claim had already occurred

9    as of November 11th, isn't that true?

10       A  It occurred on November 11th, 2015, I

11   agree with that.

12       Q  Okay.  So the underwriting standpoint, the

13   options, it seems to me, would've been either

14   non-renew the policy because the underwriter felt

15   that they were not being honest or didn't have

16   integrity and so forth or increase the premium or

17   modify the limits down to effectively take into

18   consideration the risk going forward; correct?

19       MR. LEMLEY:  I just want to make clear, he

20   is not testifying on the grounds of defense.  He

21   knows -- if he knows --

22       Q  If you don't know, that's fine, I can ask

Page 79

1    Ms. Cuter or someone else.

2        A  Yeah, I don't have an opinion on that

3    because I'm not an underwriter and I wasn't

4    involved in this.

5        Q  I understand.  Let me ask you this, if the

6    November 11th had been reported to Hartford, to

7    you, in November of 2015 as opposed to when you

8    received the letter after the lawsuit was filed,

9    and I think in February of '17, what would -- from

10   your claims handling standpoint, what would you

11   have done differently?

12       A  Oh, I mean, we would have had the right to

13   investigate the claim and determine what the

14   underlying facts were.  We would've had the right

15   to appoint a defense counsel of our choosing to

16   defend the Ds and Os and shareholders in the

17   company.  And we would've had the right to try to

18   resolve the situation in some form or fashion

19   before it turned into a lawsuit.

20       Q  Okay.  Is it your testimony that The

21   Hartford was prejudiced because they were not

22   given the opportunity to do that between

Page 80

1    November 11th and July of 2016 when the claim was

2    reported?

3        A  Yes.

4        Q  What's the basis of that?  Why?

5        A  I just told you, we would have the right

6    to investigate the claim; we were denied that

7    opportunity.  We would've had the right to appoint

8    counsel of our own choosing to defend the case,

9    and we could've tried to resolve the claim before

10   the lawsuit was filed.

11       Q  Okay.

12       A  We didn't have a chance to do any of those

13   things because of the late notice.

14       Q  Okay.  Let's break that down.  In terms of

15   investigating the claim, when the claim was

16   reported in July, what actions did The Hartford or

17   you take to investigate the claim at that time?

18       A  We spoke to the principals, we looked at

19   the documents, we, you know, analyzed the

20   liability issues.

21       Q  Okay.  Which principals of Madison did you

22   speak with?

Page 81

1   A I don't recall now.
2   Q Do you know if you spoke to anyone?
3   A I don't recall.
4   Q And in terms of The Hartford or Twin City,
5   if anybody spoke to the principals or investigated
6   the claim, it would have been you, is that
7   accurate?
8   A Yes.
9   Q Looked at documents, you did request
10  documents and were provided documents and looked
11  at those document, the documents in your file;
12  correct?
13  A Yes.
14  Q Okay. And I think you said analyzed
15  liability issues as opposed to coverage issues?
16  A Or doing both. We're analyzing the
17  coverage issues, the liability issues, and the
18  damages issues.
19  Q Okay. What did you do or what did
20  Hartford or Twin City do to analyze liability and
21  damage issues?
22  A I don't recall specifically. This was

Page 82

1   three years ago.
2   Q Did Twin City or The Hartford interview
3   any potential witnesses?
4   A I don't recall.
5   Q Was there any assessment of damages in the
6   lawsuit?
7   A Yeah, we were trying to figure out what
8   was the -- what the value of Buczkowski's shares
9   were.
10  Q The value or were you trying to figure out
11  what his percentage shares of ownership was?
12  A Well, both. There was a dispute as to
13  what he owned and the question was how much --
14  whatever he does own, how much is it worth.
15  Q Okay. What did Hartford or Twin City or
16  you do to evaluate the value, how much it was
17  worth?
18  A I don't recall.
19  Q Was there -- other than Hertzbach, who we
20  retained, was there any expert retained by The
21  Hartford or Twin City to evaluate the value of
22  either the lawsuit or Mr. Buczkowski's claim?

Page 83

1   A I think at that point we were relying at
2   least on the preliminary evaluation from defense
3   counsel and from the experts that were already on
4   board.
5   Q Okay. And then you told me a minute ago
6   when you talked about what you would have done
7   differently if the November 11 letter had been
8   reported in '15, you talked about appointing
9   defense counsel. I think I understand what you
10  mean by that, but why -- in what way was The
11  Hartford or Twin City prejudiced by not being able
12  to initially appoint defense counsel?
13  A Well, if we had been given that
14  opportunity, our defense counsel could've analyzed
15  the liability and damages issues in the case and
16  tried to achieve a resolution of the matter.
17  Q Okay.
18  A In discussions with claimant's counsel.
19  Q Okay. I got part of that, but let me
20  break it down. The -- if you would have known
21  about the claim back in November, I think what
22  you're saying is that you would have been given

Page 84

1   the opportunity either directly or through defense
2   counsel to try to negotiate a settlement before
3   suit was filed in May of '16; correct?
4   A I think that's one of the options that
5   would have been on the table, sure.
6   Q Okay. Once the claim was reported, was
7   there any attempt to negotiate settlement?
8   A I don't recall any settlement negotiations
9   at the time the claim was reported to us.
10  Q Okay. And did you or The Hartford or Twin
11  City have any discussions with Mr. Buczkowski's
12  counsel, either Mr. Scarlett that wrote the
13  November letter or Tim Maloney who filed the
14  lawsuit?
15  A No, I don't recall speaking to either one
16  of them.
17  Q Did you establish a reserve for the claim?
18  MR. LEMLEY: Objection to the extent that
19  you said the reserve referring to counsel, it
20  could be privileged. You can answer whether you
21  did or you didn't.
22  A I don't think we ever established a

## Page 85

1  reserve on the case beyond the initial coded
2  reserve.
3      Q  Explain what that is, initial coded
4  reserve?
5      A  I think there was a coded reserve that
6  just indicated that it was a new claim and it was
7  too early in the process to establish a true
8  reserve.
9      Q  Okay.  If you go all the way back, I'll
10  just pull it out in my binder, it's Hartford Bates
11  stamp four.  This was that initial email that set
12  up the claim for The Hartford, and there's some
13  numbers down here.  What is that?  Are these
14  reserves?
15      A  You mean these $500,000 numbers?
16      Q  Yeah.
17      A  I don't know what those numbers are.  I
18  think they may refer to reinsurance treaties that
19  we have.
20      Q  Okay.  So I think what you're saying is as
21  of the time that the claim was reported in July of
22  '16, that you may have talked to some principals

## Page 86

1  but you can't recall; correct?
2      A  Yes.
3      Q  And specifically, do you recall any
4  discussions directly with Mr. Haslam or
5  Mr. Garofalo?
6      A  I don't recall specifically.
7      Q  And I asked you about Mr. Franey, but did
8  you talk to anyone at Alliant to seek -- to find
9  out information with regard to the claim, either
10  the damages or liability?
11      A  I remember speaking to the claims manager
12  over there.
13      Q  Who was that, do you remember?
14      A  I don't remember his name.
15      Q  Kevin Sexton or John Butts?
16      A  John Butts.
17      Q  John Butts.  What did you talk to
18  Mr. Butts about?
19      A  The nature of the claim, the extent of
20  liability, damages.
21      Q  Okay.  What did he tell you?
22      A  I don't recall.

## Page 87

1      Q  Other than Mr. Butts, did you talk to
2  anyone else at Alliant?
3      A  I don't recall talking to anyone else over
4  there.
5      Q  And I think you said that other than what
6  we did retaining Hertzbach to evaluate the
7  damages, there wasn't any expert review that was
8  obtained directly by you or The Hartford or by
9  Twin City with regard to evaluation of either the
10  liability or the damages of the claim; is that
11  true?
12      MR. LEMLEY:  Object to the form.
13      A  We were relying on the analysis from
14  defense counsel, from your firm, and the analysis
15  of the experts that were retained.
16      Q  Okay.
17      A  I didn't see the need for an independent
18  expert.
19      Q  Okay.  If you look to Tab 29, there's an
20  email from you to me, January 31, 2017, talking
21  about raising a few allocation issues with respect
22  to covered and uncovered items in the legal bills.

## Page 88

1  Did you address those in the billing process?  Do
2  you recall what you're referring to?
3      A  I think I was referring to the fact that
4  some of the individuals were covered, insured
5  persons, and some were not.
6      Q  Okay.
7      A  And some of the entities were covered and
8  some were not.
9      Q  Okay.  So, for example, there was
10  discussion about Garofalo and Haslam being covered
11  individuals but Lombardo and Kraemer not be, do
12  you recall that?
13      A  Right.  Because they were shareholders
14  only.
15      Q  That's fair.
16      A  Yes.
17      Q  Okay.  Now, turn to Tab 36 and the Bates
18  stamp beginning Hartford 2510.  It runs from
19  Hartford 2510 through 2522.
20      Q  2522?
21      Q  It's cut off.  There's 2522, which is the
22  page right before Tab 37, and then 2523 is after

Page 89

1   Tab 37.
2       A   I see it.
3       Q   Have you seen these documents before?
4   They're part of your production, they're part of
5   The Hartford's document production.
6       A   I've seen some or all of these documents.
7       Q   Okay.  What are they?
8       A   It's the contract between Hartford and the
9   broker.
10      Q   Okay.  And we used the word broker; do you
11  have a position with regard to whether or not
12  Mr. Franey and Alliant are a broker or an agent?
13      A   In my view, they're a broker.
14      Q   Why?
15      A   Because they — kind of begs the question,
16  but because they represent the policy holder, not
17  the insurance company in place of insurance, they
18  act on behalf of the policy holder to look at a
19  variety of insurance companies and coverages, they
20  negotiate with the insurance companies on behalf
21  of the policy holder what the coverages should be,
22  they'll compare and contrast coverages and rates

Page 90

1   from different companies, give them a spreadsheet
2   that shows, here are the different companies, here
3   are your options, and here's what we recommend or
4   don't recommend.
5       Q   Okay.
6       A   So they act — in my 34 years of
7   experience, brokers act — commercial insurance
8   brokers in professional liability insurance act on
9   behalf of the policy holder exclusively, never on
10  behalf of the insurance company.
11      Q   Okay.  Turn to Hartford 2515 and 2516.
12  And again, these are part of The Hartford's
13  document production, but it talks about The
14  Hartford agency agreement and the authority of the
15  agent on page 2515; do you see that?
16      A   Yes.
17      Q   And then on page 2516, it talks about the
18  duties of the agent?
19      A   Yes.
20      Q   This was the contract that was in place
21  between The Hartford and Mr. Franey's agency.  Do
22  you dispute that Mr. Franey and his agency were

Page 91

1   acting under the authority of The Hartford as an
2   agent of The Hartford?
3       MR. LEMLEY:  I object to that question.
4   This is not the full agreement between Franey and
5   the HFP agreement would be the agreement.
6       MR. JONES:  This is what we produced, but
7   okay.
8       MR. LEMLEY:  We produced the HFP amendment
9   too.
10      MR. JONES:  Yeah, but the amendment is
11  from 2017.
12      Q   But go ahead.  This is an agreement
13  between The Hartford and what you're calling the
14  broker.  But — and it's titled agency agreement.
15  But from what you're saying, you don't agree with
16  that, you're saying that Mr. Franey and his agency
17  are not agents of The Hartford; is that true?
18      A   Yes.
19      Q   Do you have a position as to whether or
20  not Mr. Franey can accept the reporting of a claim
21  from the insured such as the November 11th, 2015,
22  letter?

Page 92

1       A   Yes.
2       Q   What's your position?
3       A   He absolutely does not have the authority
4   to accept notice of a claim on behalf of The
5   Hartford.
6       Q   Why?
7       A   Well, number one, what governs the
8   reporting of a claim is the policy, not this
9   agency agreement.  The policy says the claim must
10  be reported to Hartford, and gives physical
11  address and email address and a fax address.
12  That's the relevant contract to reporting claims,
13  not this agency agreement, number one.  And number
14  two, this HFP, Hartford Financial Products'
15  amendment makes it very clear that he doesn't have
16  the authority to accept claims on behalf of
17  Hartford.
18      Q   But the amendment, as I see it, is from
19  November of 2017; right?  Hartford 2513.
20      A   I don't see a date on here, but my
21  understanding of this amendment was on every
22  agency, slash, broker agreement where that broker

Page 93

1  was writing HFP business.
2      Q  Okay.  That's fine.  But is it your
3  position that Bates stamp 2510 and 2511, which
4  Hartford Financial Products' amendment to the
5  agency agreement, is it your position that this
6  amendment was on as of 2015?
7          MR. LEMLEY:  Object to form.
8      A  That's my understanding.
9      Q  What's that based on?
10     A  In the first place, I don't see a 2017
11 date on this document that we're looking at, but
12 I've advised that whenever a broker wants to write
13 who may have been writing non-HFP business before
14 decides they want to write HFP business, this
15 amendment goes on to the contract, otherwise we
16 can't issue a policy through that broker, we won't
17 deal with them on HFP business.
18     Q  Where's that understanding when you say
19 you're advised?
20     A  I just heard that from claims people, from
21 management.  I don't remember specific
22 conversations with people --

Page 94

1      Q  Okay.
2      A  -- but that's my understanding.  I'm not
3  involved in this.
4      Q  Okay.
5      A  I don't see contracts.
6      Q  Go back to page 2516.
7      A  Okay.
8      Q  And if you look under Roman numeral III --
9  and again, this is from your document
10 production -- Roman numeral III, duties of agent
11 under 3.1E; do you see that?
12     A  Yes.
13     Q  Do you have a position as to whether
14 Mr. Franey and his agency had a duty to notify The
15 Hartford of any actual or threatened claims when
16 Mr. Franey received the November 11 letter on
17 November 23rd of 2015?
18     A  I think he absolutely had a duty to report
19 the claim to Hartford on behalf of his client,
20 Madison Mechanical, not saying that he had the
21 right to receive notice on our behalf, but in
22 terms of representing his own client and giving

Page 95

1  notice of a claim, that's what it says here.  And
2  I think it's pretty well known in the industry
3  that that's one of the most important functions of
4  a broker, when the policy holder tells you about a
5  claim, you have to give notice to the insurance
6  company.
7      Q  Okay.  And we've talked about this before,
8  but based on a review of your file, anything that
9  you were told by anyone at The Hartford or anybody
10 else, you have no knowledge that Mr. Franey
11 reported the November 11 letter back in 2015 to
12 anyone at The Hartford or Twin City; is that
13 correct?
14     A  I have no knowledge of Mr. Franey or the
15 broker here --
16     Q  Alliant.
17     A  -- Alliant ever reporting the claim to
18 Hartford.
19         MR. JONES:  Okay.  Give me a few minutes.
20 Can we take a quick break?
21         MR. LEMLEY:  Sure.
22         (Off the record from 12:58 p.m. to 1:09

Page 96

1  p.m.)
2      Q  You mentioned John Butts, who's at
3  Alliant, a claims manager, I think you referred to
4  him as, have you dealt with him or Alliant on any
5  other claims or was it just this claim?
6      A  I don't think so.
7      Q  Okay.  Do you have any knowledge as to
8  Madison about their history of reporting claims
9  through Alliant as opposed to directly to the
10 insurance carrier?
11     A  No.
12         MR. JONES:  Okay.  Charlie, that's all I
13 have.
14         MR. LEMLEY:  All right, sir.
15         MR. JONES:  Thank you.
16         (Off the record at 1:10 p.m.)
17
18
19
20
21
22

Page 97

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2       I, PAUL P. SMAKULA, the officer before whom

3    the foregoing deposition was taken, do hereby

4    certify that the foregoing transcript is a true

5    and correct record of the testimony given; that

6    said testimony was taken by me stenographically

7    and thereafter reduced to typewriting under my

8    direction; that reading and signing was not

9    requested; and that I am neither counsel for,

10   related to, nor employed by any of the parties to

11   this case and have no interest, financial or

12   otherwise, in its outcome.

13

14   IN WITNESS WHEREOF, I have hereunto set my hand

15   and affixed my notarial seal this 12th day of

16   August, 2019.

17

18   My commission expires:  May 14, 2021.

19

20   _____

21   NOTARY PUBLIC IN AND FOR

22   THE DISTRICT OF COLUMBIA



**CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY**
14735 Main Street, Upper Marlboro, Maryland 20772
Phone: (301) 952-3318 Maryland Relay call: 711
Toll-free (in Maryland) 800-937-1335

Case No. CAL-18-27076 _____

STATE OF MARYLAND
or
MADISON MECHANICAL OS, et al. _____    vs.   TWIN CITY FIRE INSURANCE CO, et al. _____
Plaintiff                                                                                       Defendant

TO:  Michael S. Knox, JD _____                              Issue Date: 06/20/2019
Name                                                                                  Service Deadline: 60 days after Issue Date.
c/o Charles C. Lemley, Esquire _____      **SUBPOENA**
Address 1
Wiley Rein LLP, 1776 K. St NW _____
Address 2
Washington, DC 20006 _____
City, County, State, Zip

You are hereby compelled to appear at a ☐ court proceeding ☑ deposition at the following location:

120 E. Baltimore Street, Suite 2100 _____     On  July 19, 2019 ____  at  10:00 ____  ☑ a.m. or ☐ p.m.
Address of court or other location                                              Date                   Time

Baltimore, MD 21202 _____
City, State, Zip

☑ To testify in the above case, and/or
☑ To produce the following documents, items, and information, not privileged: _____
    See attached Notice to Take Deposition Duces Tecum, Schedule of Documents to be Produced _____
☐ To produce, permit inspection and copying of the following documents or other tangible items: _____
_____

Plaintiffs _____ requested issuance of this subpoena. Questions should be referred to:
Requested By
Gary R. Jones, Esquire & Danielle M. Vranian, Esquire _____     120 E. Baltimore Street, Suite 2100 _____
Name                                                                                  Address
410-230-3800 _____                               Baltimore, MD 21202 _____
Phone                                                                                City, State, Zip

Special Message: _____

☑ If this subpoena compels the production of financial information, or information derived from financial records, the requestor
   of this subpoena hereby certifies having taken all necessary steps to comply with the requirements of Md. Code Ann., Fin.
   Inst. §1-304 and any other applicable law.
☐ If this subpoena compels the production of medical records, the requestor of this subpoena hereby certifies having taken all
   necessary steps to comply with the requirements of Md. Code Ann., Health-Gen.§4-306 and any other applicable law.

*Sydney Harrison*                     **Sydney Harrison, Clerk**
                                       **Circuit Court for Prince George's County**
**NOTICE:**
1. YOU ARE LIABLE TO BODY ATTACHMENT AND/OR FINE FOR FAILURE TO OBEY THIS SUBPOENA.
2. This subpoena is effective for the date and time stated and any subsequent dates as directed by the court.
3. If this subpoena is for attendance at a deposition and the party served is an organization, notice is hereby given that the organization must
   designate one or more persons who will testify on its behalf, pursuant to Rule 2-412(d).
4. Serving or attempting to serve a subpoena more than 60 days after the date of issuance is prohibited.

**RETURN OF SERVICE**
I certify that I delivered the original of this Subpoena to the following person(s): _____
on the following date: _____ by the following method (specified as required by Rule 2-126): _____
_____

CC-004 (Rev. 07/01/2015)

EXHIBIT
i Knox
7/30  PK

Signature _____
Printed Name _____

| MADISON MECHANICAL OS, et al. | * | IN THE |
|---|---|---|
| Plaintiffs | * | CIRCUIT COURT |
| vs. | * | FOR |
| TWIN CITY FIRE INSURANCE CO., et al. | * | PRINCE GEORGE'S COUNTY |
| | * | |
| Defendants | | Civil Action No.: CAL-18-27076 |

*   *   *   *   *   *   *   *   *

## NOTICE TO TAKE DEPOSITION DUCES TECUM

PLEASE TAKE NOTICE that Plaintiffs, Madison Mechanical OS Corp., Madison Mechanical Contracting, LLC, Glenn A. Haslam and Gary J. Garofalo, by their undersigned counsel, pursuant to the Maryland Rules, will take the deposition of:

**Michael S. Knox, JD**
**The Hartford**
**277 Park Avenue, 16th Floor**
**New York, New York 10172**
**c/o Charles C. Lemley, Esquire**
**Wiley Rein LLP**
**1776 K. Street, NW**
**Washington, D.C. 20006**

On **Friday, July 19, 2019, at 10:00 a.m.** at the following location:

**Baxter, Baker, Sidle, Conn & Jones, P.A.**
**120 E. Baltimore Street, Suite 2100**
**Baltimore, Maryland 21202**

for the purposes of discovery and/or evidence at the trial of the above matter. Said deposition shall be taken before an officer authorized to administer oath in the State of Maryland.

## SCHEDULE OF DOCUMENTS TO BE PRODUCED

1.      The entire file for Twin City Fire Insurance Company with respect to the lawsuit captioned *Robert Buczkowski v. Madison Mechanical Contracting, LLC, et al.*, No. 03-C-16-005782, under Twin City Policy Nos. 42 KB 0256935-15 and/or 42 KB 0256935-16.

2.      The entire claim file for Claim No. 16413079 of The Hartford, Hartford Financial Products and/or Twin City Fire Insurance Company.

3.      The entire file of Michael S. Knox, JD, RPLU with regard to Claim No. 16413079 including, but not limited to email, texts and/or claim file electronic diary entries.

4.      Any and all communications between Twin City Fire Insurance Company, Michael Knox and any other employee of Twin City or The Hartford Financial products with any employee of Alliant Insurance Services, Inc., William Franey, and/or Patricia Biederman regarding Madison Mechanical, Inc., Madison Mechanical OS Corp., Madison Mechanical Contracting, LLC from March 2015 through April 19, 2017.

5.      Any and all communications between Twin City Fire Insurance Company and/or Michael S. Knox with Alliant Insurance Services, Inc., William Franey, and/or Patricia Biederman regarding a letter dated November 11, 2015 from counsel for Robert Buczkowski, including documentation as to when Twin City first received a copy of the November 11, 2015 letter and whether Michael Knox ever inquired of Alliant or William Franey about the November 11, 2015 letter.

6.      Any and all communications by Twin City Fire Insurance Company's underwriters concerning the 2015 policy (42 KB 0256935-16) issued to Madison Mechanical, Inc./OS Corp. and the addition of Madison Mechanical Contracting, LLC to the policy on or about January 1, 2016 (the underwriting file).

7.    Any and all written agreements between Twin City Fire Insurance Company, The Hartford, The Hartford Financial Products and Alliant Insurance Services, Inc., William Franey and/or Patricia Biederman including any agency agreements, commission agreements, broker agreements and/or compensation agreements.

_____
Gary R. Jones
grj@bbsclaw.com
Danielle M. Vranian
dmv@bbsclaw.com
Baxter, Baker, Sidle, Conn & Jones, P.A.
120 East Baltimore Street, Suite 2100
Baltimore, Maryland 21202
(410) 230-3800 (voice)
(410) 230-3801 (facsimile)
*Attorneys for Plaintiffs*

| | | |
|---|---|---|
| MADISON MECHANICAL OS, et al. | * | IN THE |
| Plaintiffs | * | CIRCUIT COURT |
| vs. | * | FOR |
| TWIN CITY FIRE INSURANCE CO., et al. | * | PRINCE GEORGE'S COUNTY |
| | * | |
| Defendants | | Civil Action No.: CAL-18-27076 |

*   *   *   *   *   *   *   *   *

## NOTICE OF SERVICE OF DISCOVERY

I HEREBY CERTIFY that on this 20 day of June 2019, a copy of the Notice to Take

Deposition *Duces Tecum* of Michael S. Knox, JD, and a copy of this Notice of Service of

Discovery, was mailed first class, postage prepaid, to:

> Edward J. Longosz, II, Esquire
> Daniel A. Glass, Esquire
> Eckert Seamans Cherin & Mellott, LLC
> 1717 Pennsylvania Avenue, N.W., 12th Floor
> Washington, DC 20006
> ***Attorneys for Defendants, Alliant Insurance Services,***
> ***Inc. and William Franey***

> Charles C. Lemley, Esquire
> Nicole Richardson
> Wiley Rein LLP
> 1776 K. Street, NW
> Washington, D.C. 20006
> ***Counsel for Defendant Twin City Fire Insurance Co.***

Gary R. Jones
grj@bbsclaw.com
Danielle M. Vranian
dmv@bbsclaw.com
Baxter, Baker, Sidle, Conn & Jones, P.A.
120 East Baltimore Street, Suite 2100
Baltimore, Maryland 21202
(410) 230-3800 (voice)
(410) 230-3801 (facsimile)
*Attorneys for Plaintiffs*

# IMPORTANT NOTICE
## (Privately Held)

As a Hartford insured, you now have free and exclusive access to a service designed to help you better protect your company from employment-related litigation. Go to our website, www.hartfordhelp.com and register your company today.

**Your registration Code is: HFP2-07**

This site provides you with timely information on employment litigation trends, laws and best practices. As a Hartford EPL policyholder, you have access to enhanced services such as:

- Online Sexual Harassment training for your employees
- Anti-Discrimination training
- Training designed to help you to comply with California AB 1825
- Sample policies and procedures

We hope you take advantage of these valuable services offered free of charge exclusively to Hartford Employment Practices Liability customers.

Thank you for choosing The Hartford.



EXHIBIT
2 Knox
7/30   PS

HR 00 H094 00 0307                    © 2007, The Hartford                    Page 1 of 1

42 KB 0256935-15    5/01/15

PL009591

TWIN CITY FIRE INSURANCE CO.
INDIANAPOLIS, IN 46268-0930

a stock insurance company, herein
called the Insurer




THE
HARTFORD

# PRIVATE CHOICE ENCORE!! POLICY

## DECLARATIONS

**Policy Number:**  42 KB 0256935-15

**NOTICE: THE LIABILITY COVERAGE PARTS SCHEDULED IN ITEM 5 OF THE DECLARATIONS PROVIDE CLAIMS MADE COVERAGE. EXCEPT AS OTHERWISE SPECIFIED HEREIN, COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND PAYMENT OF DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY. NOTICE OF A CLAIM MUST BE GIVEN TO THE INSURER AS SOON AS PRACTICABLE AFTER A NOTICE MANAGER BECOMES AWARE OF SUCH CLAIM, BUT IN NO EVENT LATER THAN SIXTY (60) CALENDAR DAYS AFTER THE TERMINATION OF THE POLICY PERIOD, OR ANY EXTENDED REPORTING PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**ITEM 1:  Named Entity and Address:**

> MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.
> 1539 FANNIE DORSEY ROAD
> SYKESVILLE, MD 21784

**ITEM 2:  Producer's Name and Address:**

> 80713
> FRANEY MUHA ALLIANT INS SVCS I
> 9901 BUSINESS PARKWAY SUITE B
> LANHAM, MD 20706

**ITEM 3:  Policy Period:**

> **(A)**  Inception Date:  5/01/15
>
> **(B)**  Expiration Date:  5/01/16
> 12:01 a.m. local time at the address shown in ITEM 1

**ITEM 4:  Premium:**  $14,561



PE 00 H002 03 0507

PL009592

**ITEM 5:**   **Liability Coverage Part Elections:**

Only those **Liability Coverage Parts** and Coverage Features that are designated with an "X" are included under this Policy

[X]   "Combined Aggregate Limit of Liability For All **Liability Coverage Parts**" $ __2,000,000__

[ ]   "Defense Outside the Limit of Liability (50%) for the following coverage parts:

    [ ]   Directors, Officers and Entity Liability Coverage Part

    [ ]   Employment Practices Liability Coverage Part

    [ ]   Fiduciary Liability Coverage Part
       [ ]   Additional Fiduciary Liability Coverage Part Defense Outside the Limit of Liability

If both the :"Combined Aggregate Limit of Liability For All **Liability Coverage Parts**" and the "Defense Outside the Limit of Liability (50%)" options are selected, the maximum aggregate defense outside the limits paid by the Insurer shall be equal to 50% of the "Combined Aggregate Limit of Liability For All **Liability Coverage Parts**".

| COVERAGE PART | AGGREGATE LIMIT OF LIABILITY | RETENTION | PRIOR OR PENDING DATE | COVERAGE FEATURES |
|---|---|---|---|---|
| [X] Directors, Officers and Entity Liability | $ __2,000,000__ | Insured Person Liability $ 0<br><br>Corporate Reimbursement $ __10,000__ | __05/01/09__ | [X] **Entity Liability Coverage**<br>Retention:<br>$ __10,000__<br>Prior or Pending Date: __05/01/09__ |
| [X] Employment Practices Liability | $ __2,000,000__ | $ __15,000__ | __05/01/09__ | [X] **Third Party Liability Coverage**<br>Sublimit of Liability:<br>$ __2,000,000__<br>Retention:<br>$ __15,000__<br>Prior or Pending Date: __05/01/09__ |
| [X] Fiduciary Liability | $ __2,000,000__ | $ __0__ | __05/01/09__ | [X] **Settlement Program Coverage**<br>Retention:<br>$ 0<br>Prior or Pending Date: __05/01/09__<br><br>[X] HIPAA Sub-Limit of Liability:<br>$ __25,000__ |
| [ ] Miscellaneous Professional Liability | $ NOT COVERED | $ NOT COVERED | NOT COVERED | Per Claim Limit of Liability $ NOT COVERED<br>[ ] Retroactive Date:<br>NOT COVERED |

 © 2007, The Hartford

PL009593

**ITEM 6:   Non-Liability Coverage Part Elections:**

Only those **Non-Liability Coverage Parts** that are designated with an "X" are included under this Policy

| COVERAGE PART | LIMIT(S) OF INSURANCE | RETENTION |
|---|---|---|
|  Crime | See Crime Coverage Part Dec. Page, Form No. PE00H11702 0507 | See Crime Coverage Part Dec. Page, Form No. PE00H11702 0507 |
| ☐ Kidnap and Ransom/Extortion | See Kidnap and Ransom/Extortion Coverage Part Dec. Page, Form No. NOT COVERED | See Kidnap and Ransom/Extortion Coverage Part Dec. Page, Form No. NOT COVERED |

**ITEM 7:   Extended Reporting Period:**

**(A)** Duration:   12 MONTHS

**(B)** Premium*:   100%

* Premium for the Extended Reporting Period elected shall be the indicated percentage of the sum of the annual premium specified for all **Liability Coverage Parts**, plus the annualized amounts of any additional premiums charged during the Policy Period. The Extended Reporting Period is not available for the **Non-Liability Coverage Parts.**

**ITEM 8:   Endorsements:**

This Policy includes the following endorsements at issuance:

   SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

**ITEM 9:   Address For Notices to Insurer:**

**For Claims other than Kidnap and Ransom/Extortion:**

The Hartford
Claims Department
Hartford Financial Products
277 Park Ave., 15 th Floor
New York, New York  10172

**For all notices other than Claims:**

The Hartford
Product Services
Hartford Financial Products
277 Park Ave., 15 th Floor
New York, New York  10172

For Kidnap and Ransom/Extortion Claims see Kidnap and Ransom/Extortion Coverage Part Declarations.

This Policy shall not be valid unless countersigned by the Insurer's duly authorized representative.

Date of Issue:   05/01/15

Countersigned by: _Thomas C. Tucker_
                  **Authorized Representative**

PE 00 H002 03 0507                © 2007, The Hartford                Page 3 of 3



**THE HARTFORD**

# PRIVATE CHOICE ENCORE®!! POLICY
# CRIME COVERAGE PART
# DECLARATIONS

In return for the payment of the premium, and subject to all the terms of this **Non-Liability Coverage Part**, we agree with you to provide the insurance stated in this **Non-Liability Coverage Part**.

**ITEM:**

**1. Coverages, Limits of Insurance and Retentions:**
Insuring Agreements, Limits of Insurance and Retention Amounts shown below are subject to all of the terms of this **Non-Liability Coverage Part** that apply.

| Insuring Agreements Forming Part of This Non-Liability Coverage Part | Limit(s) of Insurance | Retention Amount(s) |
|---|---|---|
| 1.   Employee Theft | $   500,000 | $   5,000 |
| 2.   Depositors Forgery or Alteration | $   500,000 | $   5,000 |
| 3.   Inside The Premises - *Money, Securities and Other Property* | $   25,000 | $   1,000 |
| 4.   Outside The Premises - *Money, Securities and Other Property* | $   25,000 | $   1,000 |
| 5.   Computer and Funds Transfer Fraud | $   500,000 | $   5,000 |
| 6.   Money Orders and Counterfeit Currency | $   50,000 | $   0 |

**2. Cancellation of Prior Insurance:** By acceptance of this **Non-Liability Coverage Part** you give us notice canceling prior policies or bonds numbered 42 KB 0256935-14_____. The cancellation(s) is effective at the time this **Non-Liability Coverage** Part becomes effective.

**3. Form Numbers of Endorsements Forming Part of This Non-Liability Coverage Part When Issued:**

SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)



PE 00 H117 02 0507                    © 2007, The Hartford                    Page 1 of 1
    42 KB 0256935-15      5/01/15

PL009595

**ENDORSEMENT**

GU 207
(6-78)

This endorsement, effective on    5/01/15                              at 12:01 A.M. standard time, forms a part of

Policy No.  42 KB 0256935-15          of the            TWIN CITY FIRE INSURANCE CO.

Issued to    MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

André A. Napoli, President

SCHEDULE OF FORMS AND ENDORSEMENTS

|     |            |       |                                                                                   |
|-----|------------|-------|-----------------------------------------------------------------------------------|
|     | RN00N02600 | 5/93  | IN WITNESS PAGE                                                                   |
|     | PE00H55500 | 5/07  | PRIVATE CHOICE ENCORE!! POLICY                                                    |
|     | PE00H01302 | 5/07  | DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART                            |
|     | PE00H01401 | 5/07  | EMPLOYMENT PRACTICES LIABILITY COVERAGE PART                                      |
|     | PE00H01503 | 6/08  | FIDUCIARY LIABILITY COVERAGE PART                                                 |
|     | PE00H11802 | 5/07  | CRIME COVERAGE PART                                                               |
| 1   | HG00H06801 | 2/12  | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM                                    |
| 2   | PE00H01101 | 5/07  | PERCENTAGE SHAREHOLDER EXCLUSION (DIRECTORS, OFFICERS AND ENTITY LIABILITY)       |
| 3   | PE00H07402 | 6/08  | ADD SUBSIDIARY ENDORSEMENT                                                        |
| 4   | PE00H18601 | 5/07  | AMENDED DECLARATIONS - SPLIT PRIOR OR PENDING DATE FOR EMPLOYMENT PRACTICES LIABILITY |
| 5   | PE00H18701 | 5/07  | AMENDED DECLARATIONS SPLIT PRIOR OR PENDING DATE FOR DIRECTORS,OFFICERS AND ENTITY |
| 6   | PE00H18801 | 5/07  | AMENDED DECLARATIONS - SPLIT PRIOR OR PENDING DATE FOR FIDUCIARY LIABILITY        |
| 7   | PE00H27601 | 5/07  | STATE AMENDATORY INCONSISTENCY ENDORSEMENT                                        |
| 8   | PE00H62900 | 7/09  | EMPLOYEE DATA PRIVACY LIABILITY ENDORSEMENT (EMPLOYMENT PRACTICES LIABILITY)      |
| 9   | PE00H68500 | 1/11  | WORKPLACE BULLYING COVERAGE                                                       |
| 10  | PE19H00401 | 10/11 | MARYLAND AMENDATORY ENDORSEMENT                                                   |

Ed. Date (04/02)
GU 207 (6-78)

GU 207
(6-78)

# ENDORSEMENT

This endorsement, effective on   5/01/15                          at 12:01 A.M. standard time, forms a part of

Policy No.   42 KB 0256935-15      of the              TWIN CITY FIRE INSURANCE CO.

Issued to   MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

André A. Napoli, President

## SCHEDULE OF FORMS AND ENDORSEMENTS

| | | | |
|---|---|---|---|
| 11 | PE00H70900 | 12/14 | DECEPTION FRAUD ENDORSEMENT     (CRIME COVERAGE PART) |
| 12 | PE00H71000 | 12/14 | INCLUDE COVERAGE FOR VIRTUAL   CURRENCY - SUBLIMITED (CRIME COVERAGE PART) |
| 13 | HG00H00901 | 7/08 | AMEND MAILING ADDRESS FOR NOTICE ENDORSEMENT |
| 14 | PE00H08801 | 5/07 | NUCLEAR LIABILITY EXCLUSION |
| 15 | HR19H00304 | 8/09 | MARYLAND CANCELLATION AND NONRENEWAL ENDORSEMENT |
| | HG00H05602 | 2/12 | CONFIRMATION OF ACCEPTANCE OF CERTIFIED ACTS OF TERRORISM |
| | HR00H09300 | 2/07 | PRODUCER COMPENSATION NOTICE |



Ed. Date (04/02)
GU 207 (6-78)

PL009597

## PRIVATE CHOICE ENCORE®II POLICY

**NOTICE: THE LIABILITY COVERAGE PARTS SCHEDULED IN ITEM 5 OF THE DECLARATIONS PROVIDE CLAIMS MADE COVERAGE. EXCEPT AS OTHERWISE SPECIFIED HEREIN, COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND PAYMENT OF DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY. NOTICE OF A CLAIM MUST BE GIVEN TO THE INSURER AS SOON AS PRACTICABLE AFTER A NOTICE MANAGER BECOMES AWARE OF SUCH CLAIM, BUT IN NO EVENT LATER THAN SIXTY (60) CALENDAR DAYS AFTER THE TERMINATION OF THE POLICY PERIOD, OR ANY EXTENDED REPORTING PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

In consideration of the payment of the premium, the Insurer and the **Insureds** agree as follows:

**COMMON TERMS AND CONDITIONS**

**I.     TERMS AND CONDITIONS**

   (A)   All Coverage Parts included in this Policy are subject to the following Common Terms and Conditions. If any provision in these Common Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

   (B)   Except as otherwise provided by specific reference to other Coverage Parts, the terms and conditions of each Coverage Part shall apply only to such Coverage Part.

**II.    COMMON DEFINITIONS**

   The following terms, whether used in the singular or plural, shall have the meanings specified below:

 (A)   **"Affiliate"** means any insurance company controlling, controlled by or under common control with the Insurer.

   (B)   **"Application"** means: the application for this Policy, including any materials or information submitted therewith or made available to the Insurer during the underwriting process, which application shall be on file with the Insurer; or the application for any policy in an uninterrupted series of policies issued by the Insurer or any insurance company controlling, controlled by or under common control with the Insurer of which this Policy is a renewal or replacement. Such **Application** shall be deemed a part of this Policy and attached hereto.

   (C)   **"Claim"** shall have the meaning specified for such term in each Coverage Part.

   (D)   **"Controlled Partnership"** means a limited partnership in which and so long as the **Named Entity** owns or controls, directly or indirectly, more than 50% of the limited partnership interest and an **Insured Entity** is the sole general partner.

   (E)   **"Debtor in Possession"** means a "debtor in possession" as such term is defined in Chapter 11 of the United States Bankruptcy Code as well as any equivalent status under any similar law.

   (F)   **"Defense Costs"** means reasonable and necessary legal fees and expenses incurred in the investigation, defense or appeal of a **Claim**. **Defense Costs** shall include the costs of appeal, attachment or similar bonds, provided that the Insurer shall have no obligation to furnish such bonds. **Defense Costs** shall not include salaries, wages, remuneration, overhead or benefit expenses associated with any **Insureds**.

   (G)   **"Domestic Partner"** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

   (H)   **"Employee"** means any natural person while such person was or is a(n):

PE 00 H555 00 0507                                      © 2007, The Hartford                              Page 1 of 10
        42 KB 0256935-15     5/01/15

PL009598

**(1)** employee of an **Insured Entity** including any part time, seasonal, temporary, leased, or loaned employee; or



**(2)** volunteer with an **Insured Entity**.

However, this definition of **Employee** shall hereby expressly not apply for purposes of the **Non-Liability Coverage Parts**.

**(I)** "ERISA" means the Employee Retirement Income Security Act of 1974.

**(J)** "Financial Insolvency" means the status of an **Insured Entity** as a result of:

**(1)** the appointment of any conservator, liquidator, receiver, rehabilitator, trustee, or similar official to control, supervise, manage or liquidate such **Insured Entity**; or

**(2)** such **Insured Entity** becoming a **Debtor in Possession**.

**(K)** "Insured Entity" means:

**(1)** the **Named Entity**; or

**(2)** any **Subsidiary**.

**Insured Entity** shall include any such entity as a **Debtor in Possession**.

**Insured Entity** shall also include any such entity in its capacity as a general partner of a **Controlled Partnership**.

**(L)** "Insured Person" shall have the meaning specified for such term in each Coverage Part.

**(M)** "Insureds" shall have the meaning specified for such term in each Coverage Part.

**(N)** "Interrelated Wrongful Acts" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives, methodologies or causes.

**(O)** "Liability Coverage Part" means the Directors, Officers and Entity Liability, Employment Practices Liability, Fiduciary Liability and Miscellaneous Professional Liability Coverage Parts, if included in ITEM 5 of the Declarations.

**(P)** "Loss" shall have the meaning specified for such term in each Coverage Part.

**(Q)** "Manager" means any natural person while such person was or is a(n):

**(1)** duly elected or appointed director, officer, member of the board of managers or management committee member of an **Insured Entity**;

**(2)** **Employee** in his/her capacity as legal counsel to an **Insured Entity**; or

**(3)** executive of an **Insured Entity** created outside the United States of America to the extent that such executive holds a position equivalent to those described in (1) or (2).

However, this definition of **Manager** shall hereby expressly not apply for the purposes of the Kidnap and Ransom/Extortion Coverage Part.

**(R)** "Named Entity" means the entity named in ITEM 1 of the Declarations.

PE 00 H555 00 0507                           © 2007, The Hartford                           Page 2 of 10
      42 KB 0256935-15    5/01/15

PL009599

(S)   "Non-Liability Coverage Part" means the Crime and Kidnap and Ransom/Extortion Coverage Parts in ITEM 6 of the Declarations.

(T)   "Notice Managers" means the natural persons in the offices of the chief executive officer, chief financial officer, general counsel or risk manager of an Insured Entity.

(U)   "Policy Period" means the period from the Inception Date to the Expiration Date set forth in ITEM 3 of the Declarations or any earlier cancellation date.

(V)   "Pollutants" means any solid, liquid, gaseous or thermal irritant, nuisance or contaminant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalies, chemicals, odors, noise, lead, oil or oil product, radiation, asbestos or asbestos-containing product, waste and any electric, magnetic or electromagnetic field of any frequency. Waste includes, without limitation, material to be recycled, reconditioned or reclaimed. Pollutants also means any substance located anywhere in the world identified on a list of hazardous substances issued by any federal agency (including, nonexclusively, the Environmental Protection Agency) or any state, county, municipality or locality or counterpart thereof, or any foreign equivalent thereof.

(W)   "Subsidiary" means any:

   (1)   corporation in which and so long as the Named Entity owns or controls, directly or indirectly, more than 50% of the outstanding securities representing the right to vote for the election of the board of directors of such corporation;

   (2)   limited liability company in which and so long as the Named Entity owns or controls, directly or indirectly, the right to elect, appoint or designate more than 50% of such entity's managers;

   (3)   a Controlled Partnership;

   (4)   corporation operated as a joint venture in which and so long as the Named Entity owns or controls, directly or indirectly, exactly 50% of the issued and outstanding voting stock and which, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock of such corporation, the Named Entity solely controls the management and operation of such corporation; or

   (5)   foundation, charitable trust or political action committee in which and so long as such entity or organization is controlled by the Named Entity or any Subsidiary as defined (1) through (4) above.

However, this definition of Subsidiary shall hereby expressly not apply for purposes of the Miscellaneous Professional Liability Coverage Part.

(X)   "Wrongful Act" shall have the meaning specified for such term in each Coverage Part.

## III.   COVERAGE EXTENSIONS

(A)   Spousal/Domestic Partner Liability Coverage

Coverage shall apply to the lawful spouse or Domestic Partner of an Insured Person for a Claim made against such spouse or Domestic Partner, provided that:

   (1)   such Claim arises solely out of:

      (a)   such person's status as the spouse or Domestic Partner of an Insured Person; or

      (b)   such spouse or Domestic Partner's ownership of property sought as recovery for a Wrongful Act;

   (2)   the Insured Person is named in such Claim together with the spouse or Domestic Partner; and

   (3)   coverage of the spouse or Domestic Partner shall be on the same terms and conditions, including any applicable Retention, as apply to coverage of the Insured Person for such Claim.

PL009600



No coverage shall apply to any **Claim** for a **Wrongful Act** of such spouse or **Domestic Partner**.

**(B) Estates and Legal Representatives**

In the event of the death, incapacity or bankruptcy of an **Insured Person,** any **Claim** made against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** shall be deemed to be a **Claim** made against such **Insured Person.** No coverage shall apply to any **Claim** for a **Wrongful Act** of such estate, heirs, legal representatives or assigns.

**IV.  LIMIT OF LIABILITY**

Solely with respect to all **Liability Coverage Parts:**

**(A)**  The Limit of Liability for each Coverage Part in ITEM 5 of the Declarations shall be the maximum aggregate amount that the Insurer shall pay under such Coverage Part for all **Loss** from all **Claims** covered under such Coverage Part.

**(B)**  Notwithstanding the above, if a Combined Aggregate Limit of Liability For All Coverage Parts is included in ITEM 5 of the Declarations, then:

**(1)**  such single Limit of Liability shall be the maximum aggregate amount that the Insurer shall pay for all **Loss** from all **Claims** covered under all included Coverage Parts combined; and

**(2)**  any amount specified as a Limit of Liability for any individual Coverage Part in ITEM 5 of the Declarations shall be subject to, part of, and not in addition to, the amount stated as the Combined Aggregate Limit of Liability For All Coverage Parts.

If any Limit of Liability is exhausted, the premium for this Policy shall be deemed fully earned.

**V.  DEFENSE COSTS**

Solely with respect to all **Liability Coverage Parts:**

**(A)**  **Defense Costs** shall be part of, and not in addition to, each applicable Limit of Liability. Payment of **Defense Costs** by the Insurer shall reduce each Limit of Liability.

**(B)**  Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then payment of **Defense Costs** shall be in addition to any applicable Limit of Liability, provided that:

**(1)**  if a Limit of Liability is specified for any individual Coverage Part in ITEM 5 of the Declarations, then the maximum aggregate amount that the Insurer shall pay for all **Defense Costs** from all **Claims** covered under such Coverage Part shall be 50% of such Limit of Liability; provided, however, that if the Additional Fiduciary Liability Coverage Part Defense Outside the Limit of Liability option is selected, the amount the Insurer shall pay for all **Defense Costs** from all **Claims** covered under the Fiduciary Liability Coverage Part shall be 100% of such Limit of Liability;

**(2)**  if a Combined Aggregate Limit of Liability For All Coverage Parts is included in ITEM 5 of the Declarations, then:

**(a)**  the single maximum aggregate amount that the Insurer shall pay for all **Defense Costs** from all **Claims** covered under all included Coverage Parts combined shall be 50% of such Limit of Liability; and

**(b)**  any amount of **Defense Costs** available for any individual Coverage Part shall be subject to, part of, and not in addition to, the single maximum amount of **Defense Costs** available for all included Coverage Parts combined specified in (a) above; and



PL009601

**(3)** if the amount available for **Defense Costs** in (1) or (2) above is exhausted by the payment of **Defense Costs**, then **Defense Costs** shall be paid by the Insurer out of any remaining applicable Limit of Liability until the exhaustion of the applicable Limit of Liability.

## VI. RETENTION

Solely with respect to all **Liability Coverage Parts**:

**(A)** The Insurer shall pay **Loss** in excess of the Retention applicable to each **Claim** as specified in ITEM 5 of the Declarations.

**(B)** All Retentions shall be borne by the **Insureds** at their own risk; they shall not be insured.

**(C)** Any **Defense Costs** incurred by the Insurer shall apply to the Retention. The **Insureds** shall reimburse the Insurer upon request for any amounts paid regarding a **Claim** that are within the applicable Retention for such **Claim**.

**(D)** If a **Claim** is covered under more than one Coverage Part, the applicable Retention for each Coverage Part shall be applied separately to such **Claim**, provided that the maximum Retention applied to such **Claim** shall not exceed the highest of such applicable Retentions.

**(E)** No Retention shall apply to **Loss** incurred by any **Insured Person** that an **Insured Entity** is not permitted by common or statutory law to indemnify, or is permitted or required to indemnify, but is not able to do so by reason of **Financial Insolvency**.

**(F)** If an **Insured Entity** is permitted or required by common or statutory law to indemnify an **Insured Person** for any **Loss**, or to advance **Defense Costs** on their behalf, and does not do so other than because of **Financial Insolvency**, then such **Insured Entity** and the **Named Entity** shall reimburse and hold harmless the Insurer for the Insurer's payment or advancement of such **Loss** up to the amount of the Retention that would have applied if such indemnification had been made.

**(G)** If a **Subsidiary** is unable to indemnify an **Insured Person** for any **Loss**, or to advance **Defense Costs** on their behalf, because of **Financial Insolvency**, then the **Named Entity** shall reimburse and hold harmless the Insurer for the Insurer's payment or advancement of such **Loss** up to the amount of the applicable Retention that would have applied if such indemnification had been made.

## VII. DEFENSE AND SETTLEMENT

Solely with respect to those **Liability Coverage Parts** other than the Miscellaneous Professional Liability Coverage Part:

**(A)** The Insurer shall have the right and duty to defend any **Claim** for which the **Insureds** give notice to the Insurer, even if such **Claim** is groundless, false or fraudulent. The Insurer may make any investigation it deems appropriate.

**(B)** The Insurer's duty to defend any **Claim** shall cease upon exhaustion of any applicable Limit of Liability.

Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then the Insurer's duty to defend any **Claim** shall cease upon exhaustion of the maximum aggregate amount of **Defense Costs** available under Section V. DEFENSE COSTS, and any applicable Limit of Liability.

**(C)** The **Insureds** shall not admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any admission, assumption, settlement, stipulation, or **Defense Costs** to which it has not consented.



PL009602

**(D)** The Insurer may, with the written consent of the **Insureds**, settle any **Claim** for a monetary amount that the Insurer deems reasonable.

**(E)** Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then the Insurer may settle any **Claim** for a monetary amount that the Insurer deems reasonable and the consent of the **Insureds** shall not be required to settle a **Claim**.

**(F)** The **Insureds** shall give to the Insurer all information and cooperation as the Insurer may reasonably request.

## VIII. NOTICE OF CLAIM

Solely with respect to all **Liability Coverage Parts:**

**(A)** As a condition precedent to coverage under this Policy, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable after a **Notice Manager** becomes aware of such **Claim**, but in no event later than sixty (60) calendar days after the termination of the **Policy Period**, or any Extended Reporting Period as described in Section IX. Such notice shall specify the Coverage Part under which notice is being given.

**(B)** If, during the **Policy Period**, the **Insureds** become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim**, and, if written notice of such **Wrongful Act** is given to the Insurer during the **Policy Period**, including the reasons for anticipating such a **Claim**, the nature and date of the **Wrongful Act**, the identity of the **Insureds** allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act**, then any **Claim** subsequently arising from such **Wrongful Act** shall be deemed to be a **Claim** first made during the **Policy Period** on the date that the Insurer receives the above notice.

## IX.  EXTENDED REPORTING PERIOD

Solely with respect to all **Liability Coverage Parts:**

**(A)** If any **Liability Coverage Part** is cancelled or non-renewed for any reason other than non-payment of premium, the **Insureds** shall have the right to elect an extension of time to report **Claims** under such **Liability Coverage Part** (the "Extended Reporting Period").

**(B)** To elect the Extended Reporting Period, the **Insureds** shall send a written notice of election of the Extended Reporting Period to the Insurer together with the premium therefor. The right to elect the Extended Reporting Period shall end unless the Insurer receives such notice and premium within sixty (60) days of cancellation or non-renewal. There shall be no right to elect the Extended Reporting Period after such time.

**(C)** The premium for the Extended Reporting Period shall be that percentage specified in ITEM 7 of the Declarations of the sum of the original annual premium plus the annualized amount of any additional premium charged by the Insurer during the **Policy Period**. Such premium shall be deemed fully earned at the inception of the Extended Reporting Period.

**(D)** The Extended Reporting Period shall be for the duration specified in ITEM 7 of the Declarations following the end of the **Policy Period**.

**(E)** Coverage during the Extended Reporting Period shall apply to **Claims** made for **Wrongful Acts** occurring prior to the earlier of the end of the **Policy Period** or the time of any transaction described in Section XIV. CHANGES IN EXPOSURE, (B) Takeover of Named Entity. No coverage shall apply for any **Wrongful Act** occurring after such time.

**(F)** There is no separate or additional Limit of Liability for any Extended Reporting Period.

## X.   INTERRELATIONSHIP OF CLAIMS

Solely with respect to all **Liability Coverage Parts:**

PE 00 H555 00 0507                                    © 2007, The Hartford                                    **Page 6 of 10**
     42 KB 0256935-15    5/01/15

PL009603

All **Claims** based upon, arising from or in any way related to the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** for all purposes under this Policy first made on the earliest date that:



(A) any of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period;**

(B) notice of any **Wrongful Act** described above was given to the Insurer under this Policy pursuant to Section VIII. NOTICE OF CLAIM (B); or

(C) notice of any **Wrongful Act** described above was given under any prior insurance policy.

## XI. ALLOCATION

Solely with respect to all **Liability Coverage Parts** other than the Miscellaneous Professional Liability Coverage Part:

Where **Insureds** who are afforded coverage for a **Claim** incur an amount consisting of both **Loss** that is covered by this Policy and also loss that is not covered by this Policy because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, then coverage shall apply as follows:

(A) 100% of **Defense Costs** shall be allocated to covered **Loss**; and

(B) **Loss** other than **Defense Costs** shall be allocated between covered **Loss** and non-covered loss based upon the relative legal exposure of all parties to such matters.

## XII. OTHER INSURANCE

If **Loss** arising from any **Claim** is insured under any other valid and collectible policy or policies, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number.

## XIII. CANCELLATION

(A) The Insurer may cancel this Policy for non-payment of premium by sending not less than 10 days notice to the **Named Entity**. This Policy may not otherwise be cancelled by the Insurer.

(B) Except as provided in Section XIV. CHANGES IN EXPOSURE, (B) Takeover of Named Entity, the **Insureds** may cancel this Policy by sending written notice of cancellation to the Insurer. Such notice shall be effective upon receipt by the Insurer unless a later cancellation time is specified therein.

(C) If the Insurer cancels this Policy, unearned premium shall be calculated on a pro rata basis. If the **Insureds** cancel this Policy, unearned premium shall be calculated at the Insurer's customary short rates. Payment of any unearned premium shall not be a condition precedent to the effectiveness of a cancellation. The Insurer shall make payment of any unearned premium as soon as practicable.

## XIV. CHANGES IN EXPOSURE

Solely with respect to all **Liability Coverage Parts**:

(A) **Mergers and New Subsidiaries**

If, before or during the **Policy Period**, any **Insured Entity**:

(1) merges with another entity such that the **Insured Entity** is the surviving entity; or



(2) acquires or creates a **Subsidiary**,

PE 00 H555 00 0507
    42 KB 0256935-15    5/01/15

© 2007, The Hartford

PL009604



then such merged, acquired or created entity and its subsidiaries, managers, directors, officers, and employees shall be **Insureds** to the extent such entities and persons would otherwise qualify as **Insureds** under the **Liability Coverage Parts**, but only for a **Wrongful Act** occurring after such merger, acquisition or creation. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring before such merger, acquisition or creation, or for any **Interrelated Wrongful Acts** thereto.

If the fair value of the assets of any newly merged, acquired or created entity exceed 25% of the total assets of the **Named Entity** as reflected in its most recent consolidated audited financial statements prior to such merger, acquisition or creation, the **Insureds** shall give the Insurer full details of the transaction in writing as soon as practicable and the Insurer shall be entitled to impose such additional terms, conditions, and premium as the Insurer, in its absolute discretion, chooses. There shall be no coverage under the **Liability Coverage Parts** for any newly merged, acquired or created entity or any of its subsidiaries, managers, directors, officers, or employees unless the **Insureds** comply with the terms of this provision.

**(B) Takeover of Named Entity**

If, during the **Policy Period**:

**(1)** the **Named Entity** merges into or consolidates with another entity such that the **Named Entity** is not the surviving entity; or

**(2)** more than 50% of the securities representing the right to vote for the **Named Entity's** board of directors or managers is acquired by another person or entity, group of persons or entities, or persons and entities acting in concert,

then coverage shall continue under the **Liability Coverage Parts**, but only for a **Wrongful Act** occurring before any such transaction. No coverage shall be available for any **Wrongful Act** occurring after such transaction. Upon such transaction, this Policy shall not be cancelled and the entire premium for this Policy shall be deemed fully earned.

The **Insureds** shall give the Insurer written notice of such transaction as soon as practicable, but not later than ninety (90) days after the effective date of such transaction.

**(C) Loss of Subsidiary Status**

If, before or during the **Policy Period**, any entity ceases to be a **Subsidiary**, then coverage shall be available under the **Liability Coverage Parts** for such **Subsidiary** and its **Insured Persons**, but only for a **Wrongful Act** of such **Insureds** occurring before such transaction. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring after such transaction.

## XV. SUBROGATION

The Insurer shall be subrogated to all of the **Insureds'** rights of recovery regarding any payment of **Loss** by the Insurer under this Policy. The **Insureds** shall execute all papers required and do everything necessary to secure and preserve such rights, including the execution of any documents necessary to enable the Insurer to effectively bring suit in the name of the **Insureds**. The **Insureds** shall do nothing to prejudice the Insurer's position or any potential or actual rights of recovery.

## XVI. APPLICATION

**(A)** The **Insureds** represent that the declarations and statements contained in the **Application** are true, accurate and complete. This Policy is issued in reliance upon the **Application**.

**(B)** If the **Application** contains intentional misrepresentations or misrepresentations that materially affect the acceptance of the risk by the Insurer:



PL009605

(1) For the purpose of determining coverage under all Coverage Parts other than the Directors, Officers and Entity Liability Coverage Part, no coverage shall be afforded under this Policy for any **Insureds** who knew on the Inception Date of this Policy of the facts that were so misrepresented, provided that:

    (a) knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**; and

    (b) knowledge possessed by any chief executive officer, general counsel, or chief financial officer of the **Named Entity**, or anyone signing the **Application**, shall be imputed to all **Insured Entities**. No other person's knowledge shall be imputed to an **Insured Entity**.

(2) For the purpose of determining coverage under the Directors, Officers and Entity Liability Coverage Part, no coverage shall be afforded under this Policy for:

    (a) any **Insured Persons,** under Insuring Agreement (A), who knew as of the Inception Date of this Policy the facts that were so misrepresented in the **Application**, provided, however, that knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**. This shall be the Insurer's sole remedy under this Insuring Agreement (A). Under no circumstances shall the Insurer be entitled to rescind this Insuring Agreement (A).

    (b) an **Insured Entity**, under Insuring Agreement (B), to the extent it indemnifies any **Insured Person** referenced in subparagraph (2)(a), above, and

    (c) an **Insured Entity**, under Insuring Agreements (C) and (D), if any chief executive officer, general counsel, or chief financial officer of the **Named Entity**, or anyone signing the **Application**, knew as of the Inception Date of this Policy the facts that were so misrepresented in the **Application**.

## XVII.   ACTION AGAINST THE INSURER

Solely with respect to all **Liability Coverage Parts:**

(A) No action shall be taken against the Insurer unless there shall have been full compliance with all the terms and conditions of this Policy.

(B) No person or organization shall have any right under this Policy to join the Insurer as a party to any **Claim** against the **Insureds** nor shall the Insurer be impleaded by the **Insureds** in any such **Claim**.

Solely with respect to the **Crime Coverage Part:**

(A) No legal action shall be taken against the Insurer involving loss unless the **Insured** has complied with all the terms of this Policy; and

(B) No legal action shall be taken against the Insurer involving loss until ninety (90) days after the **Insured** has filed proof of loss with us; and

(C) No legal action shall be taken against the Insurer involving loss unless such action is brought within two (2) years from the date that the **Insured** discovers such loss.

Solely with respect to the **Kidnap And Ransom/Extortion Coverage Part:**

No suit, action or proceeding for recovery of any claim under this Policy shall be sustainable in any court of law, equity or other tribunal unless all the requirements of this Policy shall have been complied with and the same be commenced within twenty-four (24) months after a claim for actual loss or expenses has been reported to the Insurer by the **Insured**.

## XVIII.   ASSIGNMENT

Assignment of interest under this Policy shall not bind the Insurer without its consent as specified in a written endorsement issued by the Insurer to form a part of this Policy.

PL009606

**XIX. BANKRUPTCY OR INSOLVENCY**



Bankruptcy or insolvency of any **Insureds** shall not relieve the Insurer of any of its obligations under this Policy.

**XX. AUTHORIZATION OF NAMED ENTITY**

The **Named Entity** shall act on behalf of all **Insureds** with respect to all matters under this Policy, including, without limitation, giving and receiving of notices regarding **Claims**, cancellation, election of the Extended Reporting Period, payment of premiums, receipt of any return premiums, and acceptance of any endorsements to this Policy.

**XXI. CHANGES**

This Policy shall not be changed or modified except in a written endorsement issued by the Insurer to form a part of this Policy.

**XXII.   ENTIRE AGREEMENT**

This Policy, including the Declarations, Common Terms and Conditions, included Coverage Part(s), **Application** and any written endorsements attached hereto, constitute the entire agreement between the **Insureds** and the Insurer relating to this insurance.

**XXIII.   NOTICES**

   **(A)**  All notices to the **Insureds** shall be sent to the **Named Entity** at the address specified in ITEM 1 of the Declarations.

   **(B)**  All notices to the Insurer shall be sent to the address specified in ITEM 9 of the Declarations. Any such notice shall be effective upon receipt by the Insurer at such address.

**XXIV.   HEADINGS**

The headings of the various sections of this Policy are intended for reference only and shall not be part of the terms and conditions of coverage.

**XXV.   REFERENCES TO LAWS**

   **(A)**  Wherever this Policy mentions any law, including, without limitation, any statute, Act or Code of the United States of America, such mention shall be deemed to include all amendments of, and all rules or regulations promulgated under, such law.

   **(B)**  Wherever this Policy mentions any law or laws, including, without limitation, any statute, Act or Code of the United States of America, and such mention is followed by the phrase "or any similar law", such phrase shall be deemed to include all similar laws of all jurisdictions throughout the world, including, without limitation, statutes and any rules or regulations promulgated under such statutes as well as common law.

**XXVI.   COVERAGE TERRITORY**

Coverage under this Policy applies worldwide.



PE 00 H555 00 0507           © 2007, The Hartford               Page 10 of 10
     42 KB 0256935-15    5/01/15

PL009607



IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

### TWIN CITY FIRE INSURANCE COMPANY
#### HOME OFFICE - INDIANAPOLIS, INDIANA
#### ADMINISTRATIVE OFFICES - HARTFORD, CONNECTICUT
#### (A STOCK INSURANCE COMPANY MEMBER OF THE HARTFORD)

Lisa Levin, Secretary

Douglas Elliot, President

RN 00 N026 00 0593
ILBP 83 01 05 89 RN

42 KB 0256935-15    5/01/15

PL009608

**DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART**

I. INSURING AGREEMENTS

   **(A) Insured Person Liability**

The Insurer shall pay **Loss** on behalf of the **Insured Persons** resulting from an **Insured Person Claim** first made against the **Insured Persons** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insured Persons**, except for **Loss** that an **Insured Entity** pays to or on behalf of the **Insured Persons** as indemnification.

   **(B) Corporate Reimbursement**

The Insurer shall pay **Loss** on behalf of an **Insured Entity** that such **Insured Entity** has, to the extent permitted or required by law, indemnified the **Insured Persons** resulting from an **Insured Person Claim** first made against the **Insured Persons** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insured Persons**.

   **(C) Entity Liability (Elective)**

If Entity Liability Coverage is included in Item 5 of the Declarations, the Insurer shall pay **Loss** on behalf of an **Insured Entity** resulting from an **Entity Claim** first made against such **Insured Entity** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by an **Insured Entity**.

This Insuring Agreement shall be subject to the Entity Liability Coverage Retention and Prior or Pending Date in Item 5 of the Declarations.

   **(D) Derivative Demands**



The Insurer shall pay **Investigation Costs** on behalf of an **Insured Entity** that such **Insured Entity** incurs resulting from a **Derivative Demand** first made during the **Policy Period** or Extended Reporting Period, if applicable.

This Insuring Agreement shall be subject to a Sublimit of Liability of $250,000. Such Sublimit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sublimit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part**. No Retention shall apply to this Insuring Agreement.

II. **DEFINITIONS**

The following terms, whether used in the singular or plural, shall have the meanings specified below:

   **(A) "Claim"** means any:

      **(1) Insured Person Claim**;

      **(2) Entity Claim**; or

      **(3) Derivative Demand.**

   **(B) "Derivative Action"** means any civil proceeding against a **Manager** for a **Wrongful Act** of such **Manager** made on behalf of, or in the name or the right of, an **Insured Entity** by any security holders of such **Insured Entity**, in their capacity as such, if such proceeding is made without the assistance, participation or solicitation of any **Manager**.

PL009609

(C) **"Derivative Demand"** means any written demand by any security holders of an **Insured Entity**, in their capacity as such, upon the board of directors or managers of such **Insured Entity** to bring a civil proceeding against a **Manager** for a **Wrongful Act** of such **Manager** if such demand is made without the assistance, participation or solicitation of any **Manager**. A **Derivative Demand** shall be deemed commenced by the receipt of such demand.

(D) **"Entity Claim"** means any:

    (1) written demand for monetary damages or other civil relief commenced by the receipt of such demand;

    (2) civil proceeding, including an arbitration or other alternative dispute proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

    (3) criminal proceeding commenced by the return of an indictment, or formal administrative or regulatory proceeding commenced by the filing of a notice of charges, or similar document;

against an **Insured Entity**.

**"Entity Claim"** also means a written request to an **Insured Entity** to toll or waive a statute of limitations regarding a potential **Entity Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

(E) **"Insured Person"** means any:

    (1) **Manager**; or

    (2) **Employee.**

(F) **"Insured Person Claim"** means any:

    (1) written demand for monetary damages or other civil relief commenced by the receipt of such demand;

    (2) civil proceeding, including an arbitration or other alternative dispute proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

    (3) criminal proceeding commenced by the return of an indictment, or formal administrative or regulatory proceeding commenced by the filing of a notice of charges, or similar document;

against an **Insured Person**.

**"Insured Person Claim"** also means a formal civil, criminal, administrative, or regulatory investigation commenced by the service upon or other receipt by an **Insured Person** of a written notice from an investigating authority specifically identifying such **Insured Person** as a target individual against whom formal charges may be commenced.

**"Insured Person Claim"** also means a written request to an **Insured Person** to toll or waive a statute of limitations regarding a potential **Insured Person Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

(G) **"Insured(s)"** means any:

    (1) **Insured Entity**; or

    (2) **Insured Person**.

(H) **"Investigation Costs"** means reasonable and necessary expenses incurred in the investigation and evaluation of a **Derivative Demand** by an **Insured Entity**, including its board of directors, board of managers, or any

committee thereof, provided that **Investigation Costs** shall not include salaries, wages, remuneration, overhead or benefit expenses associated with any **Insureds**.

 (I)   "**Loss**" means the amount that the **Insureds** are legally liable to pay solely as a result of a **Claim** covered by this **Liability Coverage Part**, including **Defense Costs**, compensatory damages, settlement amounts, pre- and post-judgment interest, costs awarded pursuant to judgments, and, regarding Insuring Agreement (D), **Investigation Costs**.

**Loss** also includes punitive and exemplary damages, and the multiple portion of any multiplied damage award.

However, **Loss** shall not include:

(1)   taxes, fines or penalties imposed by law;

(2)   non-monetary relief;

(3)   any other matters uninsurable pursuant to any applicable law; provided, however, that with respect to punitive, exemplary, multiple or liquidated damages, the insurability of such damages shall be governed by the internal laws of any applicable jurisdiction that most favors coverage of such damages.

(J)   "**Outside Capacity**" means service by an **Insured Person** as a director, officer, trustee, regent, governor or equivalent executive of an **Outside Entity** with the knowledge and consent of or at the request of an **Insured Entity**.

(K)   "**Outside Entity**" means any:

(1)   not-for-profit corporation, community chest, fund or foundation that is exempt from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986,

 (2)   entity organized for a religious or charitable purpose under any not-for-profit statute, or

(3)   entity listed as an **Outside Entity** in a written endorsement issued by the Insurer to form a part of this Policy,

that is not an **Insured Entity**.

(L)   "**Sarbanes-Oxley Whistle-blowing**" means the lawful act of a **Manager**, in which such **Manager** provides information, causes information to be provided, or otherwise assists in an investigation regarding any conduct which the **Manager** reasonably believes constitutes a violation:

(1)   of any rule or regulation of the Securities and Exchange Commission, or

(2)   any provision of Federal, state or foreign law relating to fraud against shareholders,

when the information or assistance is provided to, or the investigation is conducted by:

(a)   a Federal, state or foreign regulatory or law enforcement agency;

(b)   any Member of Congress or any committee of Congress; or

(c)   a person with supervisory authority over the **Manager** (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

(M)   "**Wrongful Act**" means any actual or alleged:

(1)   error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed by an **Insured Person** in their capacity as such or in their **Outside Capacity**, or, with regard to Insuring Agreement (C) an **Insured Entity**; or

PE 00 H013 02 0507                          © 2007, The Hartford                          Page 3 of 8
   42 KB 0256935-15      5/01/15

PL009611

**(2)** matter claimed against an **Insured Person**, solely by reason of their serving in such capacity, including service in an **Outside Capacity**.

**COVERAGE EXTENSION FOR OUTSIDE DIRECTORSHIP LIABILITY**

Subject to the terms and conditions of this Policy and **Liability Coverage Part**, coverage is afforded for **Loss** resulting from any **Insured Person Claim** against an **Insured Person** for a **Wrongful Act** in an **Outside Capacity**. Such coverage shall be specifically excess of any indemnity and insurance available from or provided by the **Outside Entity**. Payment by the Insurer or any **Affiliate** under any other insurance policy as a result of such **Claim** shall reduce, by the amount of such payment, the Insurer's Limit of Liability available under this Policy for such **Claim**.

## IV.   EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

The Insurer shall not pay **Loss**:

**(A)** for bodily injury, sickness, disease, emotional distress, mental anguish, or death of any person, or damage to or destruction of any tangible property, including loss of use or diminution of value thereof;

**(B)** in connection with any **Claim** based upon, arising from, or in any way related to any prior or pending demand, suit or proceeding against any **Insureds** as of the applicable Prior or Pending Date in Item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit or proceeding;

**(C)** in connection with any **Claim** based upon, arising from, or in any way related to any fact, circumstance, situation or **Wrongful Act** that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other directors and officers, management liability, or similar insurance policy;

**(D)** in connection with any **Claim** based upon, arising from, or in any way related to any:

   **(1)** actual or alleged discharge, dispersal, release, or escape of **Pollutants**, or any threat of such discharge, dispersal, release or escape; or

   **(2)** direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**;

**(E)** in connection with any **Claim** based upon, arising from, or in any way related to any:

   **(1)** claims for unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits, improper payroll deductions, improper employee classification, failure to maintain accurate time records, failure to grant meal and rest periods, or social security benefits; or

   **(2)** actual or alleged violation of the Fair Labor Standards Act, Equal Pay Act, Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, or any similar law;

**(F)** in connection with any **Claim** based upon, arising from, or in any way related to the rendering of, or failure to render, any professional services for others, including, without limitation, services performed by the **Insureds** for or on behalf of a customer or client;

Exclusions (D), (E) and (F) above shall not apply to the portion of **Loss** directly resulting from: (i) a civil proceeding brought by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**; or (ii) a **Derivative Action** or a **Derivative Demand**.

**(G)** in connection with any **Claim** based upon, arising from, or in any way related to any actual or alleged violation of **ERISA** or any similar law;

© 2007, The Hartford

PL009612



**(H)** in connection with any **Claim** brought or maintained by or on behalf of any **Insureds** (in any capacity) or any security holder of an **Insured Entity**, provided that this exclusion shall not apply to the portion of **Loss** directly resulting from:

    **(1)** a civil proceeding by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**;

    **(2)** a **Derivative Action** or a **Derivative Demand**;

    **(Sarbanes-Oxley Whistle-blowing** alone shall not be deemed solicitation, assistance or participation for purposes of paragraphs (1) and (2) above.)

    **(3)** an **Insured Person Claim** by or on behalf of an **Employee** who is not a past or present **Manager** if such **Claim** is made without the assistance, participation or solicitation of any **Manager**;

    **(4)** an **Insured Person Claim** by or on behalf of a **Manager** for wrongful termination of such **Manager**;

    **(5)** a civil proceeding by or on behalf of a former **Manager** who has not served in such capacity for at least three years prior to such **Claim** being made, provided that such **Claim** is made without the assistance, participation or solicitation of any current **Manager** or any former **Manager** who has served in such capacity during the three years prior to such **Claim** being made;

    **(6)** a civil proceeding by or on behalf of an **Insured Person** for contribution or indemnification if such **Claim** directly results from a **Claim** that is otherwise covered under this **Liability Coverage Part**;

    **(7)** an **Insured Person Claim** brought and maintained in a jurisdiction outside the United States of America, Canada, Australia or any other common law country (including territories thereof) by a **Manager** due to a pleading requirement of such jurisdiction; or



    **(8)** a civil proceeding by any bankruptcy trustee, examiner, receiver, liquidator or rehabilitator (or any assignee thereof).

**(I)** of an **Insured Person** based upon, arising from, or in any way related to such **Insured Person's** service, at any time, as a director, officer, trustee, regent, governor or equivalent executive or as an employee of any entity other than an **Insured Entity** even if such service is at the direction or request of such **Insured Entity**, provided that this exclusion shall not apply to coverage afforded under Section III. of this **Liability Coverage Part** for a **Claim** for a **Wrongful Act** by an **Insured Person** while serving in an **Outside Capacity**;

**(J)** in connection with any **Claim** by or on behalf of any **Outside Entity** upon which an **Insured Person** is serving or has served in an **Outside Capacity**, or any past or present director, officer, trustee, regent, governor or equivalent executive of such **Outside Entity**, provided that this exclusion shall not apply to the portion of **Loss** directly resulting from:

    **(1)** a derivative action made on behalf of an **Outside Entity** by any persons who are not:

        **(a)** **Insured Persons**; or

        **(b)** directors, officers, trustees, regents, governors or equivalent executives of the **Outside Entity**,

    and who make such **Claim** without the solicitation, assistance or participation of any such persons; or

    **(2)** a civil proceeding brought and maintained by any:

        **(a)** **Insured Persons**; or



        **(b)** directors, officers, trustees, regents, governors or equivalent executives of an **Outside Entity**,

PL009613

for contribution or indemnification if such **Claim** directly results from a **Claim** that is otherwise covered under this **Liability Coverage Part**;

(K) in connection with any **Claim** based upon, arising from, or in any way related to any public listing or offering of securities of an **Insured Entity** or the purchase or sale of such securities subsequent to such public listing or offering; provided that this exclusion shall not apply to that portion of **Loss** directly resulting from:

    (1) a **Wrongful Act** in any private placement of an **Insured Entity's** securities exempted from the registration requirements of the Securities Act of 1933; or

    (2) a civil proceeding brought and maintained by any security holders of an **Insured Entity** for the failure of the **Insured Entity** to undertake or complete an initial public offering or sale of securities of such **Insured Entity**;

(L) of an **Insured**, based upon, arising from, or in any way related to the gaining of any personal profit, remuneration or advantage to which such **Insured** is not legally entitled if a judgment or other final adjudication establishes that such a gain did occur; or

(M) of an **Insured**, based upon, arising from, or in any way related to any criminal or deliberately fraudulent act or omission or any willful violation of law by such **Insured** if a judgment or other final adjudication establishes such an act, omission or violation; provided, however, that this exclusion shall only apply to **Insured Entities** under Insuring Agreement (C), if elected, if a past or present chief executive officer, chief financial officer or general counsel of the **Named Entity** committed such an act, omission or willful violation.

Regarding exclusions (L) and (M) above: The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured**.

## V. EXCLUSIONS APPLICABLE TO INSURING AGREEMENT (C)

(A) The Insurer shall not pay **Loss** under Insuring Agreement (C) in connection with any **Claim** based upon, arising from, or in any way related to any actual or alleged:

    (1) liability under any contract or agreement, provided that this exclusion shall not apply to the extent that liability would have been incurred in the absence of such contract or agreement;

    (2) employment-related **Wrongful Act**;

    (3) discrimination or sexual harassment;

    (4) false arrest or imprisonment, abuse of process, malicious prosecution, defamation (including libel and slander), invasion of privacy, trespass, nuisance or wrongful entry or eviction, assault, battery or loss of consortium;

    (5) price fixing, restraint of trade, monopolization, unfair trade practices or any violation of the Federal Trade Commission Act, Sherman Antitrust Act, Clayton Act, or any similar law regulating antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities; provided, however, this exclusion shall not apply to **Defense Costs** incurred to defend such allegations up to a maximum of the lesser of (i) the remaining amount of the applicable limit of liability listed on the Declarations or (ii) $1,000,000;

    In the event that the Defense Outside the Limit of Liability option in Item 5 of the Declarations is selected, **Defense Costs** for all such **Claims** shall be limited to the lesser of (i) the remaining **Defense Costs** available pursuant to Section V.(B) of the COMMON TERMS AND CONDITIONS of this Policy or (ii) $1,000,000.

    (6) infringement, dilution or misappropriation of copyright, patent, trademark, trade name, trade dress, service mark, trade secrets, or other intellectual property; provided, however that this exclusion shall not apply to the portion of **Loss** directly resulting from:



PL009614



(a) a civil proceeding brought and maintained by a security holder(s) of an **Insured Entity,** in their capacity as such;

(b) a **Derivative Action** or a **Derivative Demand**; or

(B) The Insurer shall not pay **Loss** under Insuring Agreement (C) for any **Claim** based upon, arising from, or in any way related to the actual or alleged payment by an **Insured Entity** of inadequate consideration in connection with an **Insured Entity's** purchase of securities issued by any **Insured Entity**; provided, however, that this exclusion shall not apply to the portion of **Loss** representing **Defense Costs** incurred to defend such allegations.

## VI.  ADDITIONAL LIMIT OF LIABILITY FOR CLAIMS AGAINST MANAGERS

Subject to the terms and conditions of this Policy and **Liability Coverage Part**, an additional Limit of Liability of $500,000 shall be available for **Loss** resulting from **Insured Person Claims** against **Managers**, provided that:

(A) such **Claims** are covered under Insuring Agreement (A);

(B) such additional Limit of Liability shall be excess of all other insurance available to pay **Loss** for such **Claims**, including, without limitation, this Policy and insurance written specifically as excess over this Policy, which such insurance must be exhausted prior to this additional Limit of Liability becoming available to pay **Loss**; and

(C) such additional Limit of Liability shall be available for the second covered **Claim** made during the **Policy Period** and all subsequent **Claims**. This Limit of Liability shall not be provided for the first **Claim** made for which coverage is provided under this Policy. The first **Claim** made for which coverage is provided under this Policy shall be determined by the chronological time such **Claim** was made regardless of when coverage is acknowledged by the Insurer for such **Claim**.

The additional Limit of Liability described above shall be the maximum aggregate amount that the Insurer shall pay for all **Loss** from all **Claims** covered under this provision.

## VII.  SECURITIES OFFERINGS

If any public offering of an **Insured Entity's** securities occurs during the **Policy Period** that is not exempt from registration under the Securities Act of 1933, the Insurer shall furnish the **Insureds** with a quote for insurance coverage of such offering, provided that:

(A) at least 30 days prior to the effective date of such offering, the **Insureds** shall give the Insurer written notice of such offering together with all information requested by the Insurer;

(B) such quote shall be on such terms and conditions, including any additional premium, as the Insurer, in its absolute discretion, chooses;

(C) any coverage provided shall be on such forms as are in use by the Insurer for public companies at the time of such offering; and

(D) if the **Insureds** choose to cancel this Policy to accept a coverage form offered in such quote, unearned premium for this Policy shall be calculated on a pro rata basis.

## VIII.  ORDER OF LOSS PAYMENTS

(A) If **Loss** is incurred that is acknowledged by the Insurer to be covered under this **Liability Coverage Part** except that such **Loss** exceeds the remaining available Limit of Liability for this **Liability Coverage Part**, the Insurer shall first pay **Loss** covered under Insuring Agreement (A) prior to paying **Loss** under any other Insuring Agreements.



42 KB 0256935-15     5/01/15

© 2007, The Hartford

PL009615

**(B)** If **Loss** is incurred that is acknowledged by the Insurer to be covered under any Insuring Agreement other than (A), the **Named Entity** shall have the right to direct the Insurer to delay payment of such **Loss** until such time as the **Named Entity** specifies. Any such direction by the **Named Entity** to delay or make payment of **Loss** shall be by written notice to the Insurer. Any such delayed payment of **Loss** shall be available to the Insurer to pay **Loss** covered under Insuring Agreement (A). Any payment of **Loss** under Insuring Agreement (A) out of funds withheld by the Insurer pursuant to this provision shall terminate the Insurer's liability to make a delayed payment of **Loss** under any Insuring Agreement other than (A) by the amount of the payment under Insuring Agreement (A). No interest shall be due regarding any delayed payment of **Loss**. Nothing in this provision shall increase the Insurer's Limit of Liability applicable to this **Liability Coverage Part**.

## IX.  RETENTION WAIVER

No Retention shall apply to **Defense Costs** incurred in connection with a **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Retention otherwise applicable to such **Claim**, if a:

**(A)**  final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

**(B)**  complete and final settlement with prejudice;

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.



## EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

**I.   INSURING AGREEMENTS**



**(A)   Employment Practices Liability**

The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the **Insureds**.

**(B)   Third Party Liability (Elective)**

If Third Party Liability Coverage is included in Item 5 of the Declarations, the Insurer shall pay **Loss** on behalf of the **Insureds** resulting from a **Third Party Claim** first made against the **Insureds** during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Third Party Wrongful Act** by the **Insureds.**

This Insuring Agreement shall be subject to the Third Party Liability Coverage Sublimit of Liability, Retention, and Prior or Pending Date in Item 5 of the Declarations. Such Sublimit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sublimit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part**.

**II.   DEFINITIONS**

The following terms, whether used in the singular or plural, shall have the meanings specified below:

**(A)   "Benefits"** means perquisites, fringe benefits, deferred compensation and any other form of compensation (other than salaries, wages, or bonuses as a component of a front or back pay award).

**(B)   "Claim"** means any:



    **(1)   Employment Practices Claim**; or

    **(2)   Third Party Claim.**

**(C)   "Employment Practices Claim"** means any:

    **(1)**   written demand for monetary damages or other civil relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

    **(2)**   civil proceeding, including an arbitration or other alternative dispute resolution proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

    **(3)**   formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the filing of a notice of charges, formal investigative order or similar document;

by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor**.

**"Employment Practices Claim"** also means an audit conducted by the United States of America Office of Federal Contract Compliance Programs commenced by the receipt of a notice of violation, order to show cause, or a written demand for monetary or injunctive relief.

**"Employment Practices Claim"** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Employment Practices Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

                              © 2007, The Hartford                            
    42 KB 0256935-15      5/01/15

PL009617

However, **"Employment Practices Claim"** shall not include any labor or grievance proceeding or arbitration that is subject to a collective bargaining agreement.



(D)   **"Employment Practices Wrongful Act"** means a **Wrongful Act** involving any:

    **(1)**   wrongful dismissal, discharge, or termination of employment (including constructive dismissal, discharge, or termination), wrongful failure or refusal to employ or promote, wrongful discipline or demotion, failure to grant tenure, negligent employment evaluation, or wrongful deprivation of career opportunity;

    **(2)**   sexual or other workplace harassment, including quid pro quo and hostile work environment;

    **(3)**   employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, gender identity or expression, genetic makeup, or refusal to submit to genetic makeup testing, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state, or local law;

    **(4)**   **Retaliation;**

    **(5)**   breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising from a personnel manual, employee handbook, or policy statement; or

    **(6)**   violation of the Family and Medical Leave Act.

    **Employment Practices Wrongful Act** shall also mean the following, but only when alleged in addition to or as part of any **Employment Practices Wrongful Act** described above:

    **(i)**   employment-related wrongful infliction of emotional distress;

    **(ii)**   failure to create, provide for or enforce adequate or consistent employment-related policies and procedures;

    **(iii)**   negligent retention, supervision, hiring or training; or

    **(iv)**   employment-related: invasion of privacy, defamation, or misrepresentation.

(E)   **"Independent Contractor"** means any natural person working in the capacity of an independent contractor pursuant to an **Independent Contractor Agreement.**

(F)   **"Independent Contractor Agreement"** means any express contract or agreement between an **Independent Contractor** and an **Insured Entity** specifying the terms of the **Insured Entity's** engagement of such **Independent Contractor.**

(G)   **"Insured Person"** means any:

    **(1)**   **Employee;**

    **(2)**   **Manager;** or

    **(3)**   regarding Insuring Agreement (A), an **Independent Contractor** provided that within 30 days of an **Employment Practices Claim** having been made against such **Independent Contractor** that the **Insured Entity** agrees in writing to indemnify such **Independent Contractor** for any **Loss** arising out of such **Claim.**

(H)   **"Insureds"** means any:

    **(1)**   **Insured Entity;** or

    **(2)**   **Insured Person.**

PL009618



**(I)**    "**Loss**" means the amount that the **Insureds** are legally liable to pay solely as a result of a **Claim** covered by this **Liability Coverage Part**, including **Defense Costs**, compensatory damages, including front pay and back pay, settlement amounts, pre- and post-judgment interest, and costs awarded pursuant to judgments.

**Loss** also includes punitive and exemplary damages, the multiple portion of any multiplied damage award, and liquidated damages under the Age Discrimination in Employment Act.

However, **Loss** shall not include:

**(1)**    taxes, fines or penalties imposed by law;

**(2)**    non-monetary relief;

**(3)**    **Benefits**;

**(4)**    future compensation for any person hired, promoted, or reinstated pursuant to a judgment, settlement, order or other resolution of a **Claim**;

**(5)**    **Stock Benefits**;

**(6)**    costs associated with providing any accommodations required by the Americans with Disabilities Act or any similar law;

**(7)**    any other matters uninsurable pursuant to any applicable law; provided, however, that with respect to punitive, exemplary, multiple or liquidated damages, the insurability of such damages shall be governed by the internal laws of any applicable jurisdiction that most favors coverage of such damages.

**(J)**    "**Retaliation**" means adverse treatment of an **Employee** or **Independent Contractor** based upon such person:

**(1)**    exercising any rights under law, including, without limitation, rights under any workers compensation laws, the Family and Medical Leave Act, **ERISA**, or the Americans with Disabilities Act;

**(2)**    refusing to violate any law;

**(3)**    assisting, testifying, or cooperating with a proceeding or investigation regarding alleged violations of law by any **Insured**;

**(4)**    disclosing or threatening to disclose alleged violations of law to a superior or to any governmental agency; or

**(5)**    filing any "whistle blower" claim against any **Insured** under the federal False Claims Act, the Sarbanes-Oxley Act of 2002, or any similar law.

**(K)**    "**Stock Benefits**" means any offering, plan or agreement between an **Insured Entity** and any **Employee** that grants stock, stock options or stock appreciation rights in the **Insured Entity** to such person, including, without limitation, restricted stock or any other stock grant. **Stock Benefits** shall not include employee stock ownership plans or employee stock purchase plans.

**(L)**    "**Third Party**" means any natural person who is a customer, vendor, service provider or other business invitee of an **Insured Entity**. **Third Party** shall not include **Employees**.

**(M)**    "**Third Party Claim**" means any:

**(1)**    written demand for monetary damages or other civil relief commenced by the receipt of such demand;

**(2)**    civil proceeding, including an arbitration or other alternative dispute resolution proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

PL009619

       **(3)**    formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;



by or on behalf of a **Third Party**.

**"Third Party Claim"** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Third Party Claim** as described above.  Such **Claim** shall be commenced by the receipt of such request.

**(N)**    **"Third Party Wrongful Act"** means a **Wrongful Act** involving any:

       **(1)**    discrimination against a **Third Party** based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law; or

       **(2)**    sexual harassment against a **Third Party**, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature.

**(O)**    **"Wrongful Act"** means any actual or alleged:

       **(1)**    error, misstatement, misleading statement, act, omission, neglect or breach of duty; or

       **(2)**    matter claimed against an **Insured Person** solely by reason of their serving in such capacity.

## III.  EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

**(A)**    The Insurer shall not pay **Loss**:



       **(1)**    for bodily injury, sickness, disease, death, false arrest or imprisonment, abuse of process, malicious prosecution, trespass, nuisance or wrongful entry or eviction, or for injury to or destruction of any tangible property including loss of use or diminution of value thereof;

       **(2)**    for any actual or alleged **Wrongful Act** by **Insured Persons** of any **Subsidiary** in their capacities as such, or by any **Subsidiary**, if such **Wrongful Act** actually or allegedly occurred when such entity was not a **Subsidiary**;

       **(3)**    in connection with any **Claim** based upon, arising from, or in any way related to any:

          **(a)**    prior or pending demand, suit, or proceeding against any **Insured** as of; or

          **(b)**    audit initiated by the Office of Federal Contract Compliance Programs before

       the applicable Prior or Pending Date in Item 5 of the Declarations, or the same or substantially similar fact, circumstance, or situation underlying or alleged in such demand, suit, proceeding, or audit;

       **(4)**    in connection with any **Claim** based upon, arising from, or in any way related to any fact, circumstance, or situation that, before the inception date in Item 3 of the Declarations, was the subject of any notice given under any other employment practices liability policy, management liability policy or other insurance policy which insures **Wrongful Acts** covered under this Policy;

       **(5)**    in connection with any **Claim** based upon, arising from, or in any way related to the liability of others assumed by an **Insured** under any contract or agreement; provided, however, this exclusion shall not apply to liability that would have been incurred in the absence of such contract or agreement;

       **(6)**    for breach of any **Independent Contractor Agreement**; or

       **(7)**    for a lockout, strike, picket line, hiring of replacement workers or similar action in connection with any labor dispute, labor negotiation or collective bargaining agreement.

PL009620

**(B)**   The Insurer shall not pay **Loss** in connection with any **Claim** based upon, arising from, or in any way related to:



    **(1)**   any claims for actual or alleged unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits, improper payroll deductions, improper employee classification, failure to maintain accurate time records, failure to grant meal and rest periods, or social security benefits; or

    **(2)**   any actual or alleged violation of the Fair Labor Standards Act (except for Equal Pay Act), Worker Adjustment and Retraining Notification Act, the National Labor Relations Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, **ERISA**, or any similar law;

Provided that this exclusion (B) shall not apply to that portion of **Loss** that represents a specific amount the **Insureds** become legally obligated to pay solely for a **Wrongful Act of Retaliation.**

**(C)**   The Insurer shall not pay **Loss** in connection with any **Claim** based upon, arising from, or in any way related to liability incurred for breach of any oral, written, or implied employment contract; provided, however, this exclusion shall not apply to liability that would have been incurred in the absence of such contract; provided, however, that this exclusion shall not apply to the portion of **Loss** representing **Defense Costs** incurred to defend against such liability.

## IV.   EXCLUSIONS APPLICABLE TO INSURING AGREEMENT (B)

Solely with respect to Insuring Agreement (B), the Insurer shall not pay **Loss** in connection with any **Third Party Claim** based upon, arising from or in any way related to any price discrimination or violation of any anti-trust law or any similar law designed to protect competition or prevent unfair trade practices.

## V.   OTHER INSURANCE



**(A)**   The coverage provided under this Policy for any **Employment Practices Claim** shall be primary.

**(B)**   Notwithstanding the above, the coverage provided under this Policy for any **Employment Practices Claim** made against a temporary, leased or loaned **Employee** or an **Independent Contractor** shall be excess of the amount of any deductible, retention and limits of liability under any other policy or policies applicable to such **Claim**, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number.

## VI.   CHANGES IN EXPOSURE

**(A)**   This section shall supplement, and not replace, Common Terms and Conditions Section XIV. Changes in Exposure.

**(B)**   In addition to the asset percentage size limit for automatic coverage of any newly merged or acquired entity specified in Common Terms and Conditions Section XIV. Changes in Exposure (A), if the number of employees of a newly merged or acquired entity exceeds 25% of the number of employees of all **Insured Entities** combined prior to such merger or acquisition, the **Insureds** shall give the Insurer full details of the transaction in writing as soon as practicable and the Insurer shall be entitled to impose such additional terms, conditions, and premium as the Insurer, in its absolute discretion, chooses. There shall be no coverage for any newly merged or acquired entity or any of its subsidiaries, managers, directors, officers, or employees unless the **Insureds** comply with the terms of this provision.

## VII.   RETENTION WAIVER

Regarding a **Claim** that is a class action civil proceeding, no Retention shall apply to **Defense Costs** incurred in connection with such **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Retention otherwise applicable to such **Claim**, if a:

PL009621

**(A)**   final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

**(B)**   complete and final settlement with prejudice;



establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.

**VIII.   COORDINATION OF COVERAGE**

If this **Liability Coverage Part** and either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part are included under this Policy, and a **Claim** is covered under this **Liability Coverage Part** and any such other **Liability Coverage Part**, **Loss** shall be first covered and paid under this **Liability Coverage Part**.

If notice of a **Claim** has been given under either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part and a determination is made by the Insurer that such **Claim** would be covered under this **Liability Coverage Part** if notice had been given under this **Liability Coverage Part**, then the **Insureds** shall be deemed to have given notice of such **Claim** under this **Liability Coverage Part** at the same time that notice was given under such other **Liability Coverage Part**.



PE 00 H014 01 0507                          © 2007, The Hartford                          Page 6 of 6
       42 KB 0256935-15      5/01/15

PL009622

# FIDUCIARY LIABILITY COVERAGE PART

## I.   INSURING AGREEMENTS

 **(A)  Fiduciary Liability**

The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from a **Fiduciary Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds** or by any person for whose **Wrongful Acts** the **Insureds** are legally responsible.

**(B)  Settlement Programs (Elective)**

If Settlement Program Coverage is included in Item 5 of the Declarations, the Insurer shall pay **Settlement Fees** on behalf of the **Insureds** resulting from a **Settlement Program** for which a **Settlement Program Notice** is received by the Insurer during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds.**

This Insuring Agreement shall be subject to a Sublimit of Liability of $100,000. Such a Sublimit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sublimit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part.** This Insuring Agreement shall also be subject to the Settlement Program Coverage Retention and Prior or Pending Date in Item 5 of the Declarations.

## II.   DEFINITIONS

The following terms, whether used in the singular or plural, shall have the meanings specified below:

**(A)  "Claim"** means any:

  **(1)  Fiduciary Claim**; or

**(2)  Settlement Program Notice**.

**(B)  "Employee Stock Ownership Plan"** means any **Insured Plan** that invests more than 10% of its assets in securities of **Insured Entities.**

**(C)  "Fiduciary Claim"** means any:

**(1)**   written demand for monetary damages or other civil relief commenced by the receipt of such demand;

**(2)**   civil proceeding, including an arbitration or other alternative dispute resolution proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading;

**(3)**   criminal proceeding commenced by the return of an indictment; or

**(4)**   formal administrative or regulatory proceeding commenced by the filing or service of a notice of charges, formal investigative order or similar document, including an investigation by the Department of Labor or Pension Benefit Guaranty Corporation.

**"Fiduciary Claim"** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Fiduciary Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

**(D)  "Insured Person"** means any:

  **(1)  Manager**;

PE 00 H015 03 0608
42 KB 0256935-15     5/01/15

© 2008, The Hartford

Page 1 of 5

PL009623

    **(2)  Employee**; or

    **(3)**  past or present natural person trustee of an **Insured Plan** while in such person's capacity as a trustee, which shall also include the functional equivalent of a trustee while serving in such a position outside of the United States of America.

**(E)  "Insured Plan"** means any past, present, or future:

    **(1)**  employee welfare benefit plan or employee pension benefit plan, as defined in **ERISA**, sponsored solely by an **Insured Entity**, or jointly by an **Insured Entity** and a labor organization, for the benefit of **Employees** only;

    **(2)**  employee benefit plan, including an excess benefit plan, not subject to Title 1 of **ERISA**, sponsored solely by an **Insured Entity** for the benefit of **Employees** only;

    **(3)**  government-mandated insurance program for unemployment, social security or disability benefits for **Employees** other than workers compensation; or

    **(4)**  any other plan, fund, or program specifically included as an **Insured Plan** in a written endorsement issued by the Insurer to form a part of this Policy.

Notwithstanding the above, an **Insured Plan** shall not include any:

    **i.**  **Employee Stock Ownership Plan**; or

    **ii.**  any multi-employer plan.

**(F)  "Insured(s)"** means any:

    **(1)  Insured Entity**;

    **(2)  Insured Person**; or

    **(3)  Insured Plan.**

**(G)  "Loss"** means the amount that the **Insureds** are legally liable to pay solely as a result of a **Claim** covered by this **Liability Coverage Part**, including **Defense Costs**, compensatory damages, settlement amounts, pre- and post-judgment interest, and costs awarded pursuant to judgments.

**Loss** also includes punitive and exemplary damages and the multiple portion of any multiplied damage award where insurable by law.

However, **Loss** shall not include:

    **(1)**  taxes, fines or penalties imposed by law; provided, however, the foregoing shall not apply to:

        **(a)  Settlement Fees,** provided that Settlement Program Coverage is elected;

        **(b)**  civil penalties of up to 5% imposed upon the **Insureds** pursuant to **ERISA** Section 502(i) or up to 20% imposed pursuant to **ERISA** Section 502(l); or

        **(c)**  civil penalties imposed upon the **Insureds** under the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Coverage for such civil penalties referred to in this subparagraph (G)(1)(c) is conditioned upon the following: (i) payment of such **Loss** shall be subject to the sub-limit of liability specified in Item 5 of the Declarations and (ii) such sub-limit of liability shall be part of, and not in addition to, the Aggregate Limit of Liability for this **Liability Coverage Part** shown on the Declarations;



PE 00 H015 03 0608                © 2008, The Hartford                Page 2 of 5

    42 KB 0256935-15    5/01/15

(2) non-monetary relief; and

(3) any other matters uninsurable pursuant to any applicable law; provided, however, that with respect to punitive, exemplary, multiple or liquidated damages, the insurability of such damages shall be governed by the internal laws of any applicable jurisdiction that most favors coverage of such damages.

(H) **"Settlement Fees"** mean any fees, penalties or sanctions imposed by law under a **Settlement Program** that any **Insureds** become legally obligated to pay as a result of a **Wrongful Act**. **Settlement Fees** shall not include costs of corrections, other than fees or penalties.

(I) **"Settlement Program"** means any voluntary compliance resolution program or similar voluntary settlement program administered by the United States of America Internal Revenue Service or any other governmental body that is entered into by an **Insured Entity**.

(J) **"Settlement Program Notice"** means a prior written notice to the Insurer by any **Insured Entity** of its intent to enter into a **Settlement Program** that includes a detailed description of the **Wrongful Act** for which notice will be given under the **Settlement Program**.

(K) **"Wrongful Act"** means any actual or alleged:

(1) error, misstatement, misleading statement, act, omission, neglect or breach of duty constituting a violation of any responsibilities, obligations or duties imposed upon fiduciaries of an **Insured Plan** by ERISA or any similar law;

(2) breach of the responsibilities, obligations or duties imposed upon an **Insured** by HIPAA in connection with an **Insured Plan**;

(3) error, misstatement, misleading statement, act, omission, neglect or breach of duty in counseling, providing interpretations, handling records, or effecting enrollment, termination or cancellation of **Employees**, participants, or beneficiaries under an **Insured Plan**; or

(4) matter claimed against an **Insured** solely due to such **Insured** acting in the capacity of a fiduciary of an **Insured Plan**.

## III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

(A) The Insurer shall not pay **Loss**:

(1) for bodily injury, sickness, disease, emotional distress, mental anguish, or death of any person, or damage to or destruction of any tangible property, including loss of use or diminution of value thereof;

(2) in connection with any **Claim** based upon, arising from, or in any way related to any prior or pending demand, suit or proceeding against any **Insureds** as of the applicable Prior or Pending Date in Item 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit or proceeding;

(3) in connection with any **Claim** based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in Item 3 of the Declarations, was the subject of any notice given under any other insurance policy;

(4) in connection with any **Claim** based upon, arising from, or in any way related to any:

(a) discharge, dispersal, release, or escape of **Pollutants**, or any threat of such discharge, dispersal, release or escape; or

(b) direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**;

PE 00 H015 03 0608                    © 2008, The Hartford                    Page 3 of 5

42 KB 0256935-15    5/01/15

PL009625



**(5)** in connection with any **Claim** based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability:

**(a)** that would have been incurred in the absence of such contract or agreement; or

**(b)** assumed under any agreement or declaration of trust under which any **Insured Plan** was established;

**(6)** in connection with any **Claim** based upon, arising from, or in any way related to any:

**(a)** claims for unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits, or failure to grant meal and rest periods; or

**(b)** actual or alleged violation of the Fair Labor Standards Act, Equal Pay Act, Worker Adjustment and Retraining Notification Act, or any rule or regulation promulgated thereunder, or similar federal, state, local or common laws, rules or regulations;

**(7)** of an **Insured** based upon, arising from, or in any way related to the gaining, in fact, of any personal profit, remuneration or advantage to which such **Insured** is not legally entitled; or

**(8)** of an **Insured** based upon, arising from, or in any way related to any criminal or deliberately fraudulent act or omission or any willful violation of law by such **Insured** if a judgment or other final adjudication establishes such an act, omission or violation; provided, however, that this exclusion shall only apply to **Insured Entities** if a past or present chief executive officer, chief financial officer or general counsel of the **Named Entity** committed such an act, omission or willful violation.

Regarding exclusions (7) and (8) above: The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured**.



**(B)** Other than that portion of **Loss** that represents **Defense Costs** incurred to defend the following allegations or demands, the Insurer shall not pay **Loss** for any **Claim**:

**(1)** for the actual or alleged failure to pay benefits pursuant to any **Insured Plan**, provided that this exclusion shall not apply to the extent that recovery of such benefits is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Insured Person**;

**(2)** based upon, arising from, or in any way related to the actual or alleged failure to fund, or collect contributions owed to, an **Insured Plan**; or

**(3)** for return or reversion of any contributions or assets to an **Insured Entity** from an **Insured Plan**.

## IV.   WAIVER OF RECOURSE

The Insurer shall have no right of recourse against any **Insureds** for any payment of **Loss** made by the Insurer under this **Liability Coverage Part** because of a **Wrongful Act** by such **Insureds** if the premium for this Policy was paid for by other than an **Insured Plan**.

## V.   CHANGES IN EXPOSURE

**(A)** This Section shall supplement, and not replace, Common Terms and Conditions Section XIV. Changes in Exposure.

**(B)** The provisions of Common Terms and Conditions Section XIV. Changes in Exposure (A) Mergers and New Subsidiaries shall also apply to any employee benefit plan of any newly merged or acquired entity and to any trustee of such plan to the extent that such plan and trustee would otherwise qualify as **Insureds** under this Policy. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring before the merger or acquisition of the entity or for any **Interrelated Wrongful Acts** thereto.



**(C)** The provisions of Common Terms and Conditions Section XIV. Changes in Exposure (C) Loss of Subsidiary Status shall also apply to any **Insured Plan** of a former **Subsidiary** and any trustee of such plan. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring after an entity ceases to be a **Subsidiary**.

## TERMINATED PLAN COVERAGE

Subject to the terms and conditions of this Policy and **Liability Coverage Part**, coverage shall be afforded for **Loss** resulting from any **Claim** against the **Insureds** for a **Wrongful Act** involving any **Insured Plan** terminated by an **Insured Entity**, including post-termination **Wrongful Acts**.

## VII. RETENTION WAIVER

No Retention shall apply to **Defense Costs** incurred in connection with a **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Retention otherwise applicable to such **Claim**, if a:

**(A)** final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

**(B)** complete and final settlement with prejudice,

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.



# CRIME COVERAGE PART

## I.   INSURING AGREEMENTS

Coverage for the **Insureds'** loss is provided under the following Insuring Agreements for which there is a Limit of Insurance shown in the Declarations.

### (A)   INSURING AGREEMENT 1. - EMPLOYEE THEFT

The Insurer will pay for loss of or damage to **Money, Securities** and **Other Property** that results directly from **Theft** by an **Employee**, whether or not identifiable, while acting alone or in collusion with other persons.

### (B)   INSURING AGREEMENT 2. - DEPOSITORS FORGERY OR ALTERATION

**(1)**   The Insurer will pay for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in **Money** that are:

   **(a)**   made or drawn upon an **Insured**; or

   **(b)**   made or drawn by one acting as an **Insured's** agent and drawn on an **Insured's** account or that are purported to have been so made or drawn.

**(2)**   The Insurer will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

**(3)**   If an **Insured** is sued for refusing to pay any instrument in B.1. above, on the basis that it has been forged or altered and the **Insured** has the Insurer's written consent to defend against that suit, the Insurer will pay for any reasonable legal expenses that the **Insured** incurs and pays in such defense. The amount that the Insurer will pay is in addition to the Limit of Insurance applicable to this Insuring Agreement. If a Retention Amount applies to this Insuring Agreement, the Insurer will also apply it to the amount of legal expenses incurred in this Insuring Agreement.

**(4)**   The **Insured** must include with its proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss and describing both sides of said instrument.

### (C)   INSURING AGREEMENT 3. – INSIDE THE PREMISES - *Money, Securities and Other Property*

**(1)**   The Insurer will pay for loss of **Money** and **Securities** inside the **Premises** or **Banking Premises** resulting directly from **Theft**, disappearance or destruction.

**(2)**   The Insurer will pay for loss of or damage to **Other Property:**

   **(a)**   inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; or

   **(b)**   inside the **Premises** in a safe or vault resulting directly from an actual or attempted **Safe Burglary**.

**(3)**   The Insurer will pay for loss from damage to the **Premises** or its exterior resulting from an actual or attempted:

   **(a)**   **Theft** of **Money** or **Securities**; or

   **(b)**   **Robbery** or **Safe Burglary** of **Other Property;**

   if an **Insured** is the owner of the **Premises** or is liable for damage to it.



© 2007, The Hartford

42 KB 0256935-15    5/01/15

PL009628

**(4)** The Insurer will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft** or unlawful entry into those containers.



**(D) INSURING AGREEMENT 4. – OUTSIDE THE PREMISES** - *Money, Securities and Other Property*

**(1)** The Insurer will pay for loss of **Money and Securities** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from **Theft**, disappearance or destruction.

**(2)** The Insurer will pay for loss of or damage to **Other Property** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from an actual or attempted **Robbery**.

**(E) INSURING AGREEMENT 5. - COMPUTER AND FUNDS TRANSFER FRAUD**

The Insurer will pay for loss of and loss from damage to **Money, Securities** and **Other Property** following and directly related to the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**:

**(1)** to a person (other than a **Messenger**) outside those **Premises**; or

**(2)** to a place outside those **Premises**.

And, the Insurer will pay for loss of **Money** or **Securities** through **Funds Transfer Fraud** resulting directly from **Fraudulent Transfer Instructions** communicated to a **Financial Institution** and instructing such institution to pay, deliver, or transfer **Money** or **Securities** from an **Insured's Transfer Account**.

**(F) INSURING AGREEMENT 6. - MONEY ORDERS AND COUNTERFEIT CURRENCY**

The Insurer will pay for loss resulting directly from an **Insured's** having accepted in good faith and in the regular course of business, in exchange for merchandise, **Money** or services;

**(1)** money orders issued by any post office, express company or bank in the United States of America or Canada that are not paid upon presentation; and

**(2)** **Counterfeit** currency of the United States of America, Canada, or any other country in which an **Insured** maintains physical premises.

Unless otherwise shown in the Declarations for this **Non-Liability Coverage Part**, the Limit of Insurance under this insuring agreement is $50,000. There is no retention applying to loss covered under this agreement unless otherwise shown in the Declarations for this **Non-Liability Coverage Part**.

## II.   LIMIT OF INSURANCE

The most that the Insurer will pay for loss in any one **Occurrence** is the applicable Limit of Insurance shown in the Declarations.

## III.   RETENTION

The Insurer will not pay for loss in any one **Occurrence** unless the amount of the loss exceeds the Retention Amount shown in the Declarations. The Insurer will then pay the amount of loss in excess of the Retention Amount, up to the Limit of Insurance. In the event that more than one Retention Amount could apply to the same loss, only the highest Retention Amount will be applied.

## IV.   DEFINITIONS

**(A)** **"Banking Premises"** means the interior portion of that part of any building occupied by a banking institution or similar safe depository.

PE 00 H118 02 0507                    © 2007, The Hartford                    Page 2 of 13

42 KB 0256935-15      5/01/15

PL009629

**(B)** **"Counterfeit"** means an imitation of an actual valid original that is intended to deceive and to be taken as an original.

**(C)** **"Custodian"** means an **Insured**, or any of the **Insureds'** partners, or members or any **Employee** while having the care and custody of property inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor.

**(D)** **"Employee"** means:

**(1)** a natural person:

**(a)** while in any **Insured's** service or for 60 days after termination of such service; and

**(b)** whom the **Insured** compensates directly by salary, wages, commissions; and

**(c)** whom the **Insured** has the right to direct and control while performing services for it;

**(2)** a natural person who is:

**(a)** a trustee, officer, employee, administrator or manager of any **Employee Benefit Plan(s)** insured under this **Non-Liability Coverage Part**; or

**(b)** an **Insured's** director or trustee while that person is handling **Money** or **Securities** or **Other Property** of **Employee Benefit Plan(s)** insured under this **Non-Liability Coverage Part**;

**(3)** a natural person who is a director or trustee of an **Insured** while performing acts coming within the scope of the usual duties of an **Employee** or while acting as a member of any of an **Insured's** elected or appointed committees to perform on an **Insured's** behalf, as distinguished from general directorial acts;

**(4)** a natural person who is furnished temporarily to an **Insured** by a temporary employment service firm to substitute for a permanent **Employee** as defined in sub-paragraph (1) above, who is on leave, or to meet seasonal or short-term work load conditions and who such **Insured** has the right to direct and control while performing services for such **Insured**; provided, however, such persons are excluded while having care and custody of property outside the **Premises**.

**(5)** a natural person who is leased to an **Insured** under a written agreement between such **Insured** and a labor leasing firm, to perform duties related to the conduct of such **Insured's** business;

**(6)** a natural person who is a former **Employee** while retained as a consultant for an **Insured**;

**(7)** a natural person who is a non-compensated officer of an **Insured**;

**(8)** a natural person who is a volunteer of an **Insured** who is not compensated, other than one who is a fund solicitor, while performing services for the **Insured** that are usual to the duties of an **Employee**;

**(9)** a natural person who is a former employee, director, partner, member or trustee of an **Insured** retained as a consultant while performing services for the **Insured**;

**(10)** a natural person who is a guest student or intern of an **Insured** while pursuing studies or duties with the guidance or direction of such **Insured**; or

**(11)** a natural person who is an **Insured's** partner or limited liability member, but the Insurer will not pay for loss caused by any partner or limited liability member, unless the amount of the loss exceeds the sum of:

**(a)** any amounts an **Insured** owes that partner or limited liability member; and

**(b)** the value of that partner's partnership interest, or that limited liability member's ownership interest determined by the closing of the **Insured's** organization's books on the date of discovery of the loss by the **Insured's** organization by anyone not in collusion with the person causing the loss, and

42 KB 0256935-15     5/01/15

PL009630

**(c)** any applicable Retention Amount; then the Insurer will pay the amount of loss excess of that sum, up to the Limit of Insurance applicable to Insuring Agreement 1.



However, **Employee** does not mean any agent, broker, factor, commission merchant, consignee, or representative of the same general character, nor any independent contractor (other than those specified in (6) and (9) above).

**(E)** "Employee Benefit Plan(s)" means any welfare or pension plan(s) as defined in **ERISA** and which is sponsored by one or more of the **Insureds**.

**(F)** "Financial Institution" means a bank, savings bank, savings and loan association or similar thrift institution, a stockbroker, mutual fund, liquid assets fund, or similar investment institution in which an **Insured** maintains a **Transfer Account**.

**(G)** "Forgery" means the signing of the name of another person or organization with intent to deceive; provided, however, that it does not mean a signature that consists in whole or in part of one's own name signed with or without authority, in any capacity, for any reason.

**(H)** "Fraudulent Transfer Instructions" means:

    **(1)** fraudulent electronic, telegraphic, facsimile, cable, teletype or telephone instructions to a **Financial Institution** to debit a **Transfer Account** and to pay, transfer or deliver **Money** or **Securities** from such account and which instructions purport to have been authorized by an **Insured** but which have been fraudulently transmitted by another; or

    **(2)** fraudulent written instructions to a **Financial Institution** to debit a **Transfer Account** and to pay, transfer or deliver **Money** or **Securities** from such account through an electronic funds transfer system at specified times or under specified conditions and which instructions purport to have been duly authorized by an **Insured** but which have been fraudulently issued, forged or altered by another.

**(I)** "Funds Transfer Fraud" means **Theft** of **Money** or **Securities** from any of the **Insureds' Transfer Accounts** at a **Financial Institution** and occurring through **Fraudulent Transfer Instructions** communicated to such **Financial Institution**.

**(J)** "Insured(s)" shall mean any **Insured Entity**.

**(K)** "Investigative Expenses" means reasonable expenses incurred and paid by an **Insured** in establishing the existence and amount of any direct loss covered under an Insuring Agreement within this **Non-Liability Coverage Part**. The reasonableness of such expenses shall be determined by the Insurer and shall not include any **Insured's** internal corporate obligations such as **Employee** wages or any other internal costs.

**(L)** "Messenger" means an **Insured**, any of the **Insured's** partners or members or any **Employee** while having care and custody of property outside the **Premises**.

**(M)** "Money" means currency, coins and bank notes in current use and having a face value; and travelers checks, register checks and money orders held for sale to the general public.

**(N)** "Occurrence" means

    **(1)** as respects the Employee Theft Insuring Agreement, all loss caused by, or involving, one or more **Employees**, whether the result of a single act or a series of acts.

    **(2)** as respects the Forgery or Alteration Insuring Agreement, all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments.

    **(3)** as respects all other Insuring Agreements, an act or series of related acts involving one or more persons; or an act or event or a series of related acts or events not involving any person.



PE 00 H118 02 0507            © 2007, The Hartford            Page 4 of 13

42 KB 0256935-15     5/01/15

PL009631

(O) **"Other Property"** or property means any tangible property other than **Money** or **Securities** that has intrinsic value but does not include any property excluded under this **Non-Liability Coverage Part**. **Other Property** does not include trade secrets, proprietary information, confidential information or any copyrights, patents, trademarks, proprietary manufacturing or processing procedures, or secret or confidential information, including but not limited to credit card numbers, bank account numbers or any similar information.

(P) **"Premises"** means the interior of that portion of any building that an **Insured** occupies in conducting its business.

(Q) **"Robbery"** means the unlawful taking of property from the care and custody of a person, by one who has caused or threatened to cause that person bodily harm or committed an obviously unlawful act witnessed by that person, to the deprivation of an **Insured**. ·

(R) **"Safe Burglary"** means the unlawful taking of property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior, or, the taking of a safe or vault from inside the **Premises**.

(S) **"Securities"** means negotiable or non-negotiable instruments or contracts representing either **Money** or property and includes tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use and evidences of debt issued in connection with credit or charge cards, which cards are not issued by an **Insured**. However, **securities** do not include **Money**.

(T) **"Theft"** means the unlawful taking of **Money, Securities** or **Other Property** to the deprivation of an **Insured**.

(U) **"Transfer Account"** means an account maintained by an **Insured** at a **Financial Institution** from which the **Insured** or its authorized representative may cause the payment, transfer or delivery of **Money** or **Securities** by any means described in the **Fraudulent Transfer Instructions** definition.

(V) **"Watchperson"** means any person whom an **Insured** retains specifically to have the care and custody of property inside the **Premises** and who has no other duties.

**EXCLUSIONS** *(Applying To All Insuring Agreements Unless Otherwise Specified)*

This Coverage Part Does Not Apply To And The Insurer Will Not Pay For:

(A) **Accounting or Arithmetical Errors or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

(B) **Acts Committed By The Insured's Partners**

Loss resulting from **Theft,** or **Forgery** committed by any partner of an **Insured** whether acting alone or in collusion with others; provided that, if such **Theft** or **Forgery** would otherwise be covered under INSURING AGREEMENTS 1 or 2, this exclusion shall not apply to the extent coverage under this coverage section is excess of the amount of such partner's percentage ownership of such **Insured**, on the day immediately preceding the date of discovery, multiplied by such **Insured's** total assets as reflected in such **Insured's** most recent audited financial statements;

(C) **Acts of Employees, Managers, Directors or Trustees**

Loss resulting from **Theft** or any other dishonest or criminal act committed by any of the **Insureds' Employees**, managers, directors or trustees whether acting alone or in collusion with other persons or while performing services for any **Insured** or otherwise, except when covered under Insuring Agreement 1.

(D) **Employee Cancelled Under Prior Insurance**

Loss caused by any of any **Insured's Employees** or by any **Employee** of any **Insured's** predecessor in interest, for whom similar prior insurance has been cancelled and not reinstated since the last cancellation.

42 KB 0256935-15     5/01/15

PL009632

**(E) Exchanges or Purchases**

Loss resulting from the giving or surrendering of **Money, Securities** or **Other Property** in any exchange or purchase.

**(F) Fire**

Loss from damage to the premises resulting from fire, however caused, except for loss of or damage to **Money** or **Securities** and loss from damage to a safe or vault under Insuring Agreement 3.

**(G) Governmental Action**

Loss resulting from seizure or destruction of **Money, Securities** or **Other Property** by order of governmental authority.

**(H) Indirect Loss**

Loss that is an indirect result of any act or **Occurrence** covered by this **Non-Liability Coverage Part** including but not limited to loss resulting from:

**(1)** any **Insured's** inability to realize income that it would have realized had there been no loss of or damage to **Money, Securities** or **Other Property**.

**(2)** payment of damages of any type for which any **Insured** is legally liable; provided, however, that the Insurer will pay compensatory damages arising directly from a loss covered under this **Non-Liability Coverage Part**.

**(3)** payment of costs, fees or other expenses any **Insured** incurs in establishing either the existence of or the amount of loss under this **Non-Liability Coverage Part**, provided, however, that:

**(a)** the Insurer will reimburse the **Insured** for **Investigative Expenses** up to $5,000 (Five Thousand Dollars) it incurs per **Occurrence** subject to the Insurer's determination that such **Investigative Expenses** were reasonable and incurred in establishing either the existence or amount of such loss covered under this **Non-Liability Coverage Part**; and

**(b)** the amount of direct covered loss exceeds the Retention Amount for the applicable Insuring Agreement.

Such reimbursement is part of, and not in addition to, the Limit of Insurance for the applicable Insuring Agreement.

**(I) Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon

**(1)** an inventory computation; or

**(2)** a profit and loss computation.

However, where the **Insured** establishes wholly apart from such inventory computations that it has sustained a loss covered under this **Non-Liability Coverage Part**, then the **Insured** may offer its inventory records and actual physical count of inventory in support of the amount of loss claimed.

**J) Legal Expenses**

Expenses related to any legal action; provided however that this shall not apply to expenses covered under Insuring Agreement 2 that meet the following conditions precedent: The **Insured** shall immediately notify the Insurer of any claim or suit generating such expenses and shall not settle such claim or suit, or incur any related costs or expenses, without the Insurer's prior written authorization, nor shall the **Insured** admit liability in any

PL009633



such claim or suit. The Insurer shall have no duty to defend any such claim or suit, but shall have the right to investigate, negotiate or settle any such claim or suit or to take over the conduct of the defense thereof. Moreover, if, in the Insurer's discretion, the Insurer advances payments for such suit, the Insurer may require a written undertaking, on its terms and conditions, guaranteeing the repayment of any expenses it pays that are determined to be not covered hereunder.

**(K)  Money Operated Devices**

Loss of **Money** contained in any money operated device unless a continuous recording instrument in the device records the amount of any **Money** deposited in it.

**(L)  Motor Vehicles or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers, or semi-trailers or equipment or accessories attached to them. This exclusion shall apply only to Insuring Agreement 4.

**(M)  Nuclear**

Loss resulting directly or indirectly from:

**(1)**  discharge, dispersal, release or escape of nuclear material, nuclear waste or radiation or any threat of such discharge, dispersal, release or escape; or

**(2)**  direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize nuclear material, nuclear waste or radiation

**(N)  Risks Inherent in Insurance Operations**

Loss resulting directly or indirectly from contractual or extra contractual liability sustained by any **Insured** in connection with the issuance of contracts or purported contracts of insurance, indemnity or suretyship.

**(O)  Trading Losses**

Loss resulting directly or indirectly from any authorized or unauthorized trading of **Money**, **Securities** or **Other Property**, whether in any **Insured's** name or in a genuine or fictitious account.

**(P)  Transfer or Surrender of Property**

Loss of or damage to **Money**, **Securities** or **Other Property** after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises**

**(1)**  on the basis of unauthorized instructions, unless covered under Insuring Agreement 5.; or

**(2)**  as a result of a threat to do bodily harm to any person; or

**(3)**  as a result of a threat to do damage to any property.

But this Exclusion does not apply under Insuring Agreement 4. to loss of **Money**, **Securities** and **Other Property** while outside the **Premises** or **Banking Premises** in the care and custody of a **Messenger** if the **Insured**:

**(a)**  had no knowledge of any threat at the time that the conveyance began; or

**(b)**  had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**(Q)  Vandalism**

Loss from damages to the **Premises** or to the exterior of any safe, vault, cash box, cash drawer or cash register by vandalism or mischief.

42 KB 0256935-15      5/01/15

PL009634

**(R) Voluntary Parting of Title To or Possession of Property**



Loss resulting from any **Insured**, or anyone acting on its express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property. This exclusion shall apply only to Insuring Agreements 3. and 4.

**(S) War and Similar Actions**

Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion, or revolution, or any related act or incident.

**(T) Warehouse Receipts Losses**

Loss resulting from fraudulent or dishonest signing, issuing, canceling or failing to cancel, a warehouse receipt or any papers connected with it.

## VI. GENERAL CONDITIONS

**(A) ARMORED MOTOR VEHICLE COMPANIES**

Under Insuring Agreement 4. the Insurer will pay only for the amount of loss the **Insured** cannot recover:

**(1)** under its contract with the armored motor vehicle company; and

**(2)** from any insurance or indemnity carried by or for the benefit of customers of the armored motor vehicle company, or from the armored motor vehicle company.

**(B) CANCELLATION AS TO ANY EMPLOYEE**

Insuring Agreement 1. is cancelled as to any **Employee**:

**(1)** immediately upon discovery by a member of the Risk Management Department or any officer, manager, or supervisor of an **Insured's** not in collusion with the **Employee** of **Theft** or any dishonest act in excess of $1,000 committed by the **Employee** whether before or after becoming employed by the **Insured**; or

**(2)** on the date specified in a notice mailed to an **Insured**. The date will be at least 30 days after the date of the mailing. The mailing of notice to the **Insured** at the last mailing address known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

**(C) CONCEALMENT, MISREPRESENTATION OR FRAUD**

This **Non-Liability Coverage Part** is void in any case of fraud by any **Insured** as it relates to this **Non-Liability Coverage Part** at any time. It is also void if any **Insured** at any time intentionally conceals or misrepresents a material fact, whether in the **Application** or otherwise, concerning:

**(1)** this **Non-Liability Coverage Part**;

**(2)** the property covered under this **Non-Liability Coverage Part**;

**(3)** any **Insured's** interest in the property covered under this **Non-Liability Coverage Part**; or

**(4)** a loss under this **Non-Liability Coverage Part**.

**(D) CONSOLIDATION OR MERGER**

If through consolidation or merger with, or purchase or acquisition of assets or liabilities of, some other entity, any additional persons become **Employees** or an **Insured** acquires the use and control of any additional **Premises**:

42 KB 0256935-15     5/01/15

PL009635

(1) an **Insured** must give us written notice within 90 days after the effective date of such consolidation or merger, or purchase or acquisition of assets or liabilities, and obtain the Insurer's written consent to extend this insurance to such additional **Employees** or **Premises**. The Insurer may condition its consent upon payment of an additional premium; but there shall only be a premium charge if such merger or acquisition results in a 15%, or greater, increase in the number of **Employees**, assets or revenues acquired through the merger or acquisition.

(2) For the first 90 days after the effective date of such consolidation or merger, or purchase or acquisition of assets or liabilities, any insurance afforded for **Employees** or **Premises** also applies to these additional **Employees** or **Premises** for acts committed within this 90-day period.

**(E) DISCOVERY**

(1) The Insurer will pay for loss which an **Insured** sustains through acts or events committed or occurring at any time and which are discovered by the **Insured** during the **Policy Period** or during the period provided in General Condition G. DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS.

(2) Discovery of loss occurs when a member of the Risk Management Department or any officer, manager, or supervisor of an **Insured's** first becomes aware of facts which would cause a reasonable person to assume that a loss covered by this **Non-Liability Coverage Part** has been, or may be incurred even though the exact amount or details of the loss may not then be known.

(3) Discovery also occurs when an **Insured** receives notice of an actual or potential claim against it alleging facts, which if true, would constitute a covered loss under this policy.

(4) No coverage will be available under this **Non-Liability Coverage Part** for any loss of which an **Insured** was aware prior to the inception date of this **Non-Liability Coverage Part**.

**(F) DISCOVERY SUPERSEDING LOSS SUSTAINED COVERAGE – LIABILITY FOR PRIOR LOSSES**

(1) If this **Non-Liability Coverage Part** has replaced similar prior insurance written by a company other than the Insurer, and such other insurance provided a period of time to discover loss occurring prior to the termination or cancellation of that coverage, and a loss is discovered within the period provided by prior insurance to discover losses, the Insurer will not pay for such loss unless the amount exceeds the Limit of Insurance under said prior Policy. The Insurer will then only pay the **Insured** for any excess loss subject to the Insuring Agreements, Exclusions and General Conditions of this **Non-Liability Coverage Part**.

(2) Any payment that the Insurer makes to an **Insured** under this insurance shall not exceed the difference between the amount of insurance under the **Insured's** prior Policy and the Limit of Insurance shown in the Declarations and the Insurer will not apply its Retention Amount to any excess loss payment.

**(G) DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS**

The Insurer will pay for loss that an **Insured** sustained prior to the effective date of termination or cancellation of this **Non-Liability Coverage Part**, which is discovered by the **Insured**:

(1) no later than 60 days from the date of the termination, cancellation or non-renewal; and

(2) as respects any **Employee Benefit Plan(s)**, no later than 1 year from the date of that termination, cancellation or non-renewal.

However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** to replace, in whole or in part, the insurance afforded by this **Non-Liability Coverage Part**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(H) DUTIES IN THE EVENT OF LOSS**



PE 00 H118 02 0507                    © 2007, The Hartford                              Page 9 of 13

42 KB 0256935-15      5/01/15

PL009636

After a member of the Risk Management Department or an officer, manager or supervisor of an **Insured's** discovers a loss or a situation which may result in a loss of or damage to **Money**, **Securities** or **Other Property**, the Risk Management Department member or officer, manager or supervisor must:



(1) notify the Insurer as soon as possible but no later than 90 days after discovery of loss;

(2) submit to an examination under oath at the Insurer's request and give it a signed statement;

(3) give the Insurer a detailed, sworn proof of loss within 120 days;

(4) cooperate with the Insurer in the investigation and settlement of any claim; and

(5) with respect to Insuring Agreements 3. and 4., notify the police if an **Insured** has reason to believe that its loss involves a violation of the law.

**(I)   EMPLOYEE BENEFIT PLANS PROVISION**

(1) The Insurer will pay for loss of or damage to **Money**, **Securities** or **Other Property** of any **Employee Benefit Plan(s)** sponsored exclusively by any **Insured** resulting directly from **Theft** by an **Employee**. The Limit of Insurance applicable to any **Employee Benefit Plan** shall equal the lesser of ten percent (10%) of the **Employee Benefit Plan** assets as of the beginning of such **Employee Benefit Plan** fiscal year or five hundred thousand dollars ($500,000). Such Limit shall be part of and not in addition to the Limit of Insurance for Employee Theft stated on the Declarations.

(2) Any payments the Insurer makes to an **Insured** for loss sustained by any **Employee Benefit Plan** will be held by that **Insured** for the use and benefit of the **Employee Benefit Plan** sustaining the loss.

(3) If two or more **Employee Benefit Plans** are insured under this **Non-Liability Coverage Part**, any payment which the Insurer makes for loss sustained by two or more **Employee Benefit Plans**, or of commingled funds or **Other Property** of two or more **Employee Benefit Plans**, which arises out of one **Occurrence**, is to be shared by each **Employee Benefit Plan** sustaining loss in the proportion that the Limit of Insurance required for each **Employee Benefit Plan** bears to the total of those limits.



(4) The Retention Amount which applies to the Employee Theft Insuring Agreement shall not apply to loss sustained by any **Employee Benefit Plans** subject to **ERISA** and which plan is covered under this insurance.

**(J)   JOINT INSURED**

(1) The **Named Entity** will act for itself and for every other **Insured** for all purposes of this **Non-Liability Coverage Part**.

(2) If any **Insured**, partner, member or officer of an **Insured** has knowledge of any information relevant to this **Non-Liability Coverage Part**, that knowledge is considered to be knowledge of every **Insured**.

(3) An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

(4) If this **Non-Liability Coverage Part** or any of its Insuring Agreements is cancelled, terminated or non-renewed as to any **Insured**, loss sustained by that **Insured** is covered only if discovered by the **Insured** during the period of time provided in General Condition G. DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS. This extended period to discover loss also terminates in accordance with paragraph 2 of that condition.

(5) The Insurer will not pay a greater amount for loss sustained by more than one **Insured** than the Insurer would pay if all of the loss had been sustained by one **Insured**.

**(K)   OWNERSHIP OF PROPERTY; INTERESTS COVERED**

PE 00 H118 02 0507                         © 2007, The Hartford                         Page 10 of 13

42 KB 0256935-15      5/01/15

PL009637

**(1)** The property covered under this **Non-Liability Coverage Part** is limited to **Money, Securities** or **Other Property:**

    **(a)** that an **Insured** owns or leases; or

    **(b)** owned by an **Insured's** client and which the **Insured** holds on its **Premises** or which is in the custody of one acting as the **Insured's Messenger** and while such **Money, Securities** or **Other Property** is in transit; or

    **(c)** for which an **Insured** is legally liable excepting loss of client **Money, Securities** or **Other Property** occurring on such client's premises.

**(2)** However, this **Non-Liability Coverage Part** is for the **Insureds'** benefit alone and no other person or organization has any rights or benefits. Any claim for a loss of client **Money, Securities** or **Other Property** occurring on an **Insured's Premises** or while in transit in the custody of a **Messenger** may only be made by an **Insured** in its proof of loss.

## (L)  VALUATION

**(1)** Subject to the applicable Limit of Insurance, the Insurer will pay for:

    **(a)** loss of **Money** but only up to and including its face value. The Insurer may, at its option, pay for a loss of **Money** issued by any country other than the United States of America in either the face value in the **Money** issued in that country, or, in the United States of America dollar equivalent determined by the rate of exchange as stated in the *Wall Street Journal* on the day that the loss occurred.

    **(b)** loss of **Securities** but only up to and including their value as stated in the *Wall Street Journal* at the close of business on the day that the loss was discovered. However, the Insurer may, at its option, 1) pay the value of such **Securities**, 2) replace them in kind in which event an **Insured** must assign to the Insurer all its rights, title and interest in and to those **Securities** or 3) pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the Insurer will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of

        **i.** the value of the **Securities** as stated in the *Wall Street Journal* at the close of the business on the day the loss was discovered; or

        **ii.** the Limit of Insurance.

    **(c)** loss of or damage to **Other Property** or loss from damage to the **Premises** or its exterior for the replacement cost of the property without deduction for depreciation, subject to 2. below. However, the Insurer will not pay for more than the lesser of:

        **i.** the Limit of Insurance applicable to the lost or damaged property; or

        **ii.** the cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or

        **iii.** the amount that any **Insured** actually spends that is necessary to repair or replace the lost or damaged property.

**(2)** The Insurer will not pay on a replacement cost basis for any loss or damage:

    **(a)** until the lost or damaged property is actually repaired or replaced; and

    **(b)** unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

    If the lost or damaged property is not repaired or replaced, the Insurer will pay based on actual cash value.

42 KB 0256935-15     5/01/15

PL009638

**(3)** The Insurer may, at its option, pay for loss of or damage to property other than **Money** in the **Money** of the country in which the loss occurred; or in the United States of America dollar equivalent of the **Money** of the country where the loss occurred determined by the rate of exchange on the day the loss was discovered. Any property that the Insurer pays for or replaces becomes its property.

**(4)** Loss of or loss from damage to any books or records of account or other records, tapes, disks, or electronic media used by an **Insured** in the business but only if such books, records, tapes or disks are actually reproduced and then only for not more than the blank books, pages, tapes and disks or other materials plus the cost of labor for the actual transcription or copying of data which an **Insured** shall furnish to reproduce such books, records, tapes or disks.

**(M) RECORDS**

The **Insured** must keep records of all property covered under this **Non-Liability Coverage Part** so that the Insurer can verify the amount of any loss.

**(N) RECOVERIES**

**(1)** Any recoveries made before the resolution of all or any part of a claim under this policy shall be distributed/applied in the following order of priority:

**(a)** to the party (either the **Insured** or Insurer) to reimburse it for the reasonable and necessary costs of obtaining the recovery; and then

**(b)** to the **Insured** to reduce the amount of covered loss.

**(2)** Any recoveries made after the resolution of all or any part of a claim under this policy shall be distributed/applied in the following order of priority:

**(a)** to reimburse the party (either the **Insured** or Insurer) for the reasonable and necessary costs of obtaining the recovery; and then

**(b)** to the **Insured**, until reimbursed for any excess covered loss sustained that exceeds the Limit of Insurance and the Retention Amount, if any; and then

**(c)** to the Insurer, until reimbursed for the amount paid; and then

**(d)** to the **Insured**, until reimbursed for that part of the loss equal to the Retention Amount, if any; and then

**(e)** to the **Insured** for any loss not covered.

**(3)** Recoveries do not include any recovery:

**(a)** from insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

**(b)** of original securities after duplicates of them have been issued.

**(O) Takeover of Named Entity**

**(1)** the **Named Entity** merges into or consolidates with another entity such that the **Named Entity** is not the surviving entity; or

**(2)** all, or substantially all of the assets of the **Named Entity** are acquired by another person or entity, group of persons or entities, or persons and entities acting in concert such that the **Named Entity** is not the surviving entity; or



PL009639

**(3)** more than 50% of the securities representing the right to vote for the **Named Entity's** board of directors or managers is acquired by another person or entity, group of persons or entities, or persons and entities acting in concert,



then coverage under this **Non-Liability Coverage Part** shall immediately terminate as of the date of such transaction and any incident occurring upon or after such date shall not be covered hereunder.



PL009640

ENDORSEMENT NO:   1

This endorsement, effective 12:01 am,      5/01/15                                   forms part
of policy number     42 KB 0256935-15

issued to:          MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP. .

by:                 TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under all lines of insurance in this policy subject to the Terrorism Risk Insurance Act.

### A. Disclosure Of Federal Participation In Payment Of Terrorism Losses

The United States Department of the Treasury will reimburse insurers for 85% of that portion of insured losses attributable to "certified acts of terrorism" that exceed the applicable insurer deductible. However, if aggregate insured losses under the Terrorism Risk Insurance Act, as amended (TRIA), exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of such losses that exceeds $100 billion. The United States government has not charged any premium for their participation in covering terrorism losses.

### B. Cap On Certified Terrorism Losses

A "certified act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism under TRIA. The criteria contained in TRIA, for a "certified act of terrorism" include the following:

1.   The act results in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

2.   The act results in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

3.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to "certified acts of terrorism" under TRIA, exceeds $100 billion in a Program Year (January 1 through December 31) and we have met, or will meet, our insurer deductible under TRIA, we shall not be liable for the payment of any portion of such losses that exceeds $100 billion. In such case, your coverage for terrorism losses may be reduced on a pro rata basis in accordance with procedures established by the Treasury,, based on its estimates of aggregate industry losses and our estimate that we will exceed our insurer deductible. In accordance with the Treasury's procedures, amounts paid for losses may be subject to further adjustments based on differences between actual losses and estimates.

### C. Application Of Other Exclusions

The terms and limitations of any terrorism exclusion, or the inapplicability or omissions of a terrorism exclusion, or inclusion of coverage for terrorism, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion, War Exclusion or the War And Military Action Exclusion.


All other terms and conditions remain unchanged.


G 2435-0                              © 2012, The Hartford                              Page 1 of 1
00 H068 01 0212
         (Includes copyrighted material of the Insurance Services Office, Inc., with its permission.)

ENDORSEMENT NO:    2

**This endorsement, effective 12:01 am,**     5/01/15                 forms part
 **of policy number**    42 KB 0256935-15

**issued to:**      MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

**by:**       TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### PERCENTAGE SHAREHOLDER EXCLUSION

### (DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE®II POLICY**

**DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART,** section **IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS** is amended to add:

- in connection with any **Claim** brought or maintained by or on behalf of any owner of .10_____% or more of the outstanding securities of an **Insured Entity**, either directly or beneficially.



All other terms and conditions remain unchanged.

David Zwiener, President



ENDORSEMENT NO:    3

This endorsement, effective 12:01 am,        5/01/15                                        forms part
of policy number    42 KB 0256935-15

issued to:        MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:          TWIN CITY FIRE INSURANCE CO.


## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADD SUBSIDIARY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE!! POLICY**

**COMMON TERMS AND CONDITIONS**, section II. COMMON DEFINITIONS, (W) "Subsidiary", is amended by the addition of the following:

   **Subsidiary also means:**

   MADISON CONTRACTING, LLC


All other terms and conditions remain unchanged.


David Zwiener, President

PE 00 H074 02 0608                    © 2008, The Hartford                    Page 1 of 1


PL009643

ENDORSEMENT NO:    4

forms part

This endorsement, effective 12:01 am,        5/01/15
of policy number        42 KB 0256935-15

issued to:        MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:        TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDED DECLARATIONS- SPLIT PRIOR OR PENDING DATE

## FOR EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

This endorsement modifies insurance provided under:

**PRIVATE CHOICE ENCORE®II POLICY**

**Declarations, Item 5: Liability Coverage Part Elections, is amended as follows:**

I.    **PRIOR OR PENDING DATE** for the **COVERAGE PART** Employment Practices Liability, is deleted and replaced with the following:

    **PRIOR OR PENDING DATES**

    **Employment Practices Liability**

    Prior or Pending Date shall be: ____5/01/09____, solely with respect to the first $ 1,000,000 _____ of the Aggregate Limit of Liability under this **Liability Coverage Part**.

    Prior or Pending Date shall be: ____5/01/11____, solely with respect to the portion of the Aggregate Limit of Liability of this **Liability Coverage Part** that is $ 1,000,000 _____ in excess of the first $ 1,000,000 _____.

    Prior or Pending Date shall be: ____0/00/00____, solely with respect to the portion of the Aggregate Limit of Liability of this **Liability Coverage Part** that is $_____ in excess of the first $_____.

II.    The Prior or Pending Date stated in **COVERAGE FEATURES** for the Third Party Liability Coverage of the **Employment Practices Liability Coverage Part**, is hereby deleted and replaced with the following:

    Third Party Liability Coverage

    Prior or Pending Date shall be: ____5/01/09____, solely with respect to the first $ 1,000,000 _____ of the Sublimit of Liability under this elected Coverage Feature.

    Prior or Pending Date shall be: ____5/01/11____, solely with respect to the portion of the Sublimit of Liability of this elected Coverage Feature that is $1,000,000 _____ in excess of the first $1,000,000 _____.

    Prior or Pending Date shall be: ____0/00/00____, solely with respect to the portion of the Sublimit of Liability of this elected Coverage Feature that is $_____ in excess of the first $_____.

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 H186 01 0507        © 2007, The Hartford        Page 1 of 1

PL009644

ENDORSEMENT NO:   5

forms part

This endorsement, effective 12:01 am,          5/01/15
of policy number          42 KB 0256935-15

issued to:          MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:          TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDED DECLARATIONS- SPLIT PRIOR OR PENDING DATE

## FOR DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART

This endorsement modifies insurance provided under:

**PRIVATE CHOICE ENCORE®II POLICY**

Declarations, **Item 5: Liability Coverage Part Elections**, is amended as follows:

I.    **PRIOR OR PENDING DATE** for the **COVERAGE PART Directors, Officers and Entity Liability**, is deleted and replaced with the following:

**PRIOR OR PENDING DATES**

**Directors, Officers and Entity Liability**

Prior or Pending Date shall be:    5/01/09    , solely with respect to the first $ 1,000,000    of the Aggregate Limit of Liability under this **Liability Coverage Part**.

Prior or Pending Date shall be:    5/01/11    , solely with respect to the portion of the Aggregate Limit of Liability of this **Liability Coverage Part** that is $ 1,000,000    in excess of the first $ 1,000,000    .

Prior or Pending Date shall be:    0/00/00    , solely with respect to the portion of the Aggregate Limit of Liability of this **Liability Coverage Part** that is $    in excess of the first $    .

II.    The Prior or Pending Date stated in **COVERAGE FEATURES** for the Entity Liability Coverage (if elected) of the **Directors, Officers and Entity Liability Coverage Part**, is hereby deleted and replaced with the following:

**Entity Liability Coverage**

Prior or Pending Date shall be:    5/01/09    , solely with respect to the first $ 1,000,000    of the Aggregate Limit of Liability of this **Liability Coverage Part**.

Prior or Pending Date shall be:    5/01/11    , solely with respect to the portion of the Aggregate Limit of Liability of this **Liability Coverage Part** that is $1,000,000    in excess of the first $ 1,000,000    .

Prior or Pending Date shall be:    0/00/00    , solely with respect to the portion of the Aggregate Limit of Liability of this **Liability Coverage Part** that is $    in excess of the first $    .

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 H187 01 0507          © 2007, The Hartford          Page 1 of 1

PL009645

ENDORSEMENT NO:     6

forms part

This endorsement, effective 12:01 am,      5/01/15
of policy number      42 KB 0256935-15

issued to:        MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:        TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDED DECLARATIONS- SPLIT PRIOR OR PENDING DATE

## FOR FIDUCIARY LIABILITY COVERAGE PART

This endorsement modifies insurance provided under:

**PRIVATE CHOICE ENCORE®II POLICY**

**DECLARATIONS, ITEM 5: Liability Coverage Part Elections**, is amended as follows:

I.     **PRIOR OR PENDING DATE** for the Fiduciary Liability Coverage Part is deleted and replaced with the following:

   **PRIOR OR PENDING DATES**

   **Fiduciary Liability**

   Prior or Pending Date shall be:   __5/01/09__, solely with respect to the first $ 1,000,000 _____ of the Aggregate Limit of Liability under this **Liability Coverage Part**.

   Prior or Pending Date shall be:   __5/01/11__, solely with respect to the portion of the Aggregate Limit of Liability of this **Liability Coverage Part** that is $ 1,000,000 _____ in excess of the first $ 1,000,000 _____.

   Prior or Pending Date shall be:   __0/00/00__, solely with respect to the portion of the Aggregate Limit of Liability of this **Liability Coverage Part** that is $_____ in excess of the first $_____.

II.    The Prior or Pending Date stated in **COVERAGE FEATURES** for the Settlement Program Coverage (if elected) of the **Fiduciary Liability Coverage Part** is hereby deleted and replaced with the following:

   Settlement Program Coverage Prior or Pending Dates:

   Prior or Pending Date shall be:   __5/01/09__, solely with respect to the first $100,000 _____ of the Aggregate Limit of Liability of this **Liability Coverage Part**.

   Prior or Pending Date shall be:   __0/00/00__, solely with respect to the portion of the Aggregate Limit of Liability of this **Liability Coverage Part** that is $_____ in excess of the first $_____.

   Prior or Pending Date shall be:   __0/00/00__, solely with respect to the portion of the Aggregate Limit of Liability of this **Liability Coverage Part** that is $_____ in excess of the first $_____.

All other terms and conditions remain unchanged.

David Zwiener, President



PE 00 H188 01 0507                              © 2007, The Hartford                              Page 1 of 1

PL009646

ENDORSEMENT NO:    7

**This endorsement, effective 12:01 am,**          5/01/15                                    forms part
**of policy number**     42 KB 0256935-15

**issued to:**          MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

**by:**          TWIN CITY FIRE INSURANCE CO.



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## STATE AMENDATORY INCONSISTENCY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE®II POLICY**

**COMMON TERMS AND CONDITIONS** are amended by the addition of the following:

- **STATE AMENDATORY INCONSISTENCY**

  In the event that there is an inconsistency between (i) the terms and conditions that are required to meet minimum
  standards of a state's law (pursuant to a state amendatory endorsement attached to this Policy) and (ii) any other term
  or condition of this Policy, it is understood and agreed that, where permitted by law, the Insurer shall apply those
  terms and conditions of (i) or (ii) that are more favorable to the **Insured**.

All other terms and conditions remain unchanged.



David Zwiener, President



ENDORSEMENT NO:    8

forms part

This endorsement, effective 12:01 am,      5/01/15
of policy number      42 KB 0256935-15

issued to:        MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:        TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EMPLOYEE DATA PRIVACY LIABILITY ENDORSEMENT
## (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under:

**PRIVATE CHOICE ENCORE!! POLICY**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART** section **II. DEFINITIONS,** is amended as follows:

I.   Definition **(D) "Employment Practices Wrongful Act,"** sub-paragraph **(iv)** is deleted and replaced with the following:

(iv)   employment-related: defamation, misrepresentation or invasion privacy including any **Employee Data Privacy Wrongful Act.**

II.   The following definitions are added:

- **"Employee Data Privacy Wrongful Act"** means either:

    (1)   The failure to prevent any unauthorized access to or use of, data containing **Private Employment Information** of any **Employee** or applicant for employment with the **Insured Entity**.

    (2)   The failure to notify any **Employee** or applicant for employment with the **Insured Entity,** of any actual or potential unauthorized access to or use of **Private Employment Information** of any **Employee** or applicant for employment with the **Insured Entity,** if such notice was required by state or federal regulation or statute.

- **"Private Employment Information"** means any information regarding an **Employee** or applicant for employment with the **Insured Entity,** which is collected or stored by an **Insured** for the purposes of establishing, maintaining or terminating an employment relationship.

All other terms and conditions remain unchanged.

*Neal Wolin*

Neal S. Wolin, President & COO


PE 00 H629 00 0709                      © 2009, The Hartford                      Page 1 of 1

PL009648

**ENDORSEMENT NO:**   9

forms part

This endorsement, effective 12:01 am,      5/01/15
of policy number      42 KB 0256935-15

issued to:           MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:                  TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WORKPLACE BULLYING COVERAGE

## (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under:

**PRIVATE CHOICE ENCORE®II POLICY**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART** section II., DEFINITIONS, (D) "Employment Practices Wrongful Act," is amended to include any actual or alleged bullying in the workplace.

All other terms and conditions remain unchanged.

Juan Andrade, President & COO

 785 00 0111                    © 2011, The Hartford                    Page 1 of 1

PL009649

ENDORSEMENT NO:   10

This endorsement, effective 12:01 am,        5/01/15                              forms part
of policy number       42 KB 0256935-15

issued to:          MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:                 TWIN CITY FIRE INSURANCE CO.


## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## MARYLAND AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE®II POLICY**

I.    **DECLARATIONS, ITEM 7. EXTENDED REPORTING PERIOD**, is deleted and replaced by the following:

ITEM 7:  **Extended Reporting Period:**

**Option 1**

**(A)**  Duration:  Unlimited

**(B)**  Premium*:  750%
or
**Option 2**

**(A)**  Duration:  12 months

**(B)**  Premium*:  100%

*       Premium for the Extended Reporting Period elected shall be the indicated percentage of the sum of
        the annual premium specified for all **Liability Coverage Parts** plus the annualized amounts of any
        additional premiums charged during the Policy Period. The Extended Reporting Period is not
        available for the **Non-Liability Coverage Parts**.

II.   **COMMON TERMS AND CONDITIONS**, Section **IX. EXTENDED REPORTING PERIOD**, paragraph **(A)**, is
      amended to include the following:

      The **Insured** will have multiple Extended Reporting Period options. One option will be for an unlimited Extended
      Reporting Period.

III.  **COMMON TERMS AND CONDITIONS**, section **XVII. ACTION AGAINST THE INSURER** , solely with respect to the
      **Crime Coverage Part** and the **Kidnap And Ransom/Extortion Coverage Part** is deleted and replaced by the
      following:

      XVII.    **ACTION AGAINST THE INSURER**

               Solely with respect to the **Crime Coverage Part**:

PE 19 H004 01 1011                        © 2011, The Hartford                        Page 1 of 2

PL009650

**ENDORSEMENT NO:**   10

**(A)** No legal action shall be taken against the Insurer involving loss unless the **Insured** has complied with all the terms of this Policy; and

**(B)** No legal action shall be taken against the Insurer involving loss until 90 days after the **Insured** has filed proof of loss with us; and

**(C)** No legal action shall be taken against the Insurer involving loss unless such action is brought within 3 years from the date of the accrual thereof.

Solely with respect to the **Kidnap And Ransom/Extortion Coverage Part**:

No suit, action or proceeding for recovery of any claim under this policy shall be sustainable in any court of law, equity or other tribunal unless all the requirements of this Policy shall have been complied with and the same be commenced within 3 years from the date of the accrual thereof.

All other terms and conditions remain unchanged.

André A. Napoli, President



PL009651

ENDORSEMENT NO:   11

This endorsement, effective 12:01 am,          5/01/15          forms part
of policy number      42 KB 0256935-15



issued to:          MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:          TWIN CITY FIRE INSURANCE CO.


## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
### DECEPTION FRAUD ENDORSEMENT
### (CRIME COVERAGE PART)


This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE!! POLICY**


The **Crime Coverage Part** is amended as follows:

I.     Section I. **INSURING AGREEMENTS**, is amended by the addition of the following:

**DECEPTION FRAUD**

The Insurer will pay for loss of **Money** or **Securities** resulting from **Deception Fraud**, subject to the Limit of Insurance and Retention stated in the SCHEDULE below.

**Deception Fraud SCHEDULE**

Limit of Insurance          $15,000          **Retention**          $5,000

The above Limit of Insurance and Retention apply per **Occurrence**.

II.     Section IV. **DEFINITIONS**, is amended by the addition of the following:

- **Deception Fraud** means the intentional misleading of a person to induce the **Insured** to part with **Money** or **Securities** by someone pretending to be an **Employee,** owner of the **Insured** or one of the following business relations:

    (1)  A **Vendor**;

    (2)  A **Customer**;

    (3)  A **Custodian**; or

    (4)  A **Messenger**.

- **Customer** means a natural person or entity for whom the **Insured** provides goods or services.

- **Vendor** means a business entity that sells goods or services to the **Insured**.

III.     Section V. **EXCLUSIONS**, is amended in the following manner:

    (1)  Exclusion (B) is deleted and replaced with the following:

          Loss resulting from **Theft, Deception Fraud** or **Forgery** committed by any partner of an **Insured** whether acting alone or in collusion with others; provided that, if such **Theft** or **Forgery** would otherwise be covered under INSURING AGREEMENTS 1 or 2, this exclusion shall not apply to the extent coverage under this coverage section is excess of the amount of such partner's percentage

0 H709 00 1014                    © 2014, The Hartford                    Page 1 of 3


PL009652

**ENDORSEMENT NO:**     11

ownership of such **Insured**, on the day immediately preceding the date of discovery, multiplied by such **Insured's** total assets as reflected in such **Insured's** most recent audited financial statements.

**(2)** Exclusion (C) is deleted and replaced with the following:

Loss resulting from **Theft, Deception Fraud** or any other dishonest or criminal act committed by any of the **Insureds' Employees**, managers, directors or trustees whether acting alone or in collusion with other persons or while performing services for any **Insured** or otherwise, except when covered under Insuring Agreement 1.

**(3)** Exclusion (E) is amended to include the following:

This exclusion shall not apply to the Deception Fraud Insuring Agreement

**(4)** The following exclusions are added:

- Loss or damage resulting directly or indirectly from **Deception Fraud.** This exclusion shall not apply to the Deception Fraud Insuring Agreement.

- Loss or damage:

    **(1)** resulting from **Theft by an Employee;**

    **(2)** resulting from **Forgery** or alteration of:

    **(a)** checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in **Money**; or

    **(b)** written instruments required in conjunction with any credit, debit or charge card;

**(3)** directly related to the use of any computer to fraudulently cause a transfer of **Money** or **Securities** from inside the **Premises** or **Banking Premises;**

**(4)** resulting from **Funds Transfer Fraud;**

**(5)** resulting from the **Insureds** having accepted in good faith and in the regular course of business, in exchange for merchandise, **Money** or services:

**(a)** money orders issued by any post office, express company or bank in any country that are not paid upon presentation; or

**(b)** **Counterfeit** paper currency of any country;

**(6)** resulting from any investments in **Securities** or ownership in any corporation, partnership, real property, or similar instrument, whether or not such investment is genuine;

**(7)** resulting from the failure, malfunction, inadequacy or illegitimacy of any product or service, including in the advertisement or labelling thereof;

**(8)** resulting from the failure of any party to perform, in whole or in part, under a contract;

**(9)** resulting from gambling, game of chance, lottery or similar game; and

**(10)** resulting from any party's use or acceptance of any credit card, debit or similar instrument, whether or not genuine.

This exclusion shall apply only to the Deception Fraud Insuring Agreement.

- Loss of or damage to **Other Property.** This exclusion shall apply only to the Deception Fraud Insuring Agreement.

- Loss of **Money** or **Securities:**

**(1)** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company; or

**(2)** inside the **Premises** or **Banking Premises** resulting directly from disappearance or destruction.

This exclusion shall apply only to the Deception Fraud Insuring Agreement.

 H709 00 1014                    © 2014, The Hartford                    Page 2 of 3

PL009653

ENDORSEMENT NO:      11

All other terms and conditions remain unchanged.



André A. Napoli, President

PL009654

ENDORSEMENT NO:   12

This endorsement, effective 12:01 am,          5/01/15                                    forms part
of policy number        42 KB 0256935-15

issued to:          MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:             TWIN CITY FIRE INSURANCE CO.


## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## INCLUDE COVERAGE FOR VIRTUAL CURRENCY - SUBLIMITED

## (CRIME COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE!! POLICY**

The **Crime Coverage Part** is amended as follows:

I.      Section II. **LIMIT OF INSURANCE**, is amended by the addition of the following:

Any coverage for loss of **Virtual Currency** under this Policy is subject to a sublimit of $15,000 per **Occurrence**, which sublimit is part of and not in addition to any other applicable Limit of Insurance under this Policy.

II.     Section III. **RETENTION**, is amended by the addition of the following:

The foregoing notwithstanding, any coverage for loss of **Virtual Currency** under this Policy is subject to a Retention Amount of $5,000 per **Occurrence**.

III.    Section IV. **DEFINITIONS, (M) Money** is amended by the addition of the following:

**Money** shall also include **Virtual Currency**.

IV.     Section IV. **DEFINITIONS**, is amended by the addition of the following:

- "**Virtual Currency**" means a virtual or digital representation of value that is not issued by a central bank or a public authority, but may be accepted as a means of payment and can be transferred, stored or traded electronically, whether or not it is recognized as, or exchangeable for, legal tender.

V.      Section VI., **GENERAL CONDITIONS, (L), VALUATION**, is amended by the addition of the following:

- The foregoing notwithstanding, in the event of loss of **Virtual Currency** covered under this Policy, the Insurer may, at its option:

    (1)  tender the value of the **Virtual Currency** in actual currency of the country in which the loss was sustained, or in the United States of America dollar equivalent, by taking the weighted average of the values of **Virtual Currency** in such actual currency as posted on the three largest relevant **Virtual Currency** exchanges, based on the volume of **Virtual Currency** exchanged, as of 12:00 PM EST on the day the loss is discovered; or



PE 00 H710 00 1014                          © 2014, The Hartford                          Page 1 of 2


PL009655

**ENDORSEMENT NO:**    12

**(2)**  replace the quantity of **Virtual Currency** of such loss.



All other terms and conditions remain unchanged.

André A. Napoli, President



PL009656

ENDORSEMENT NO:  13

forms part

This endorsement, effective 12:01 am,        5/01/15
of policy number        42 KB 0256935-15

issued to:        MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:        TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
## AMEND MAILING ADDRESS FOR NOTICE ENDORSEMENT

**I.   Notice of Claim or Wrongful Act**

   A.   A notice of any **Claim** or **Wrongful Act** shall be given in writing to the following:

   *Via mail:*              The Hartford

                         Claims Department

                         Hartford Financial Products

                         277 Park Avenue, 15th Floor

                         New York, New York 10172

                                    or

   *Via email:*            HFPClaims@thehartford.com

                                    or

   *Via Facsimile:*           (917) 464-6000

   B.   Where it is stated in the policy or declarations page that a notice of any **Claim** or **Wrongful Act** shall be given in writing to The Hartford, Hartford Plaza, Hartford CT 06115, it shall be deleted and replaced with the following:

   Notice of any **Claim** or **Wrongful Act** shall be given in writing to the following:

   *Via mail:*              The Hartford

                         Claims Department

                         Hartford Financial Products

                         277 Park Avenue, 15th Floor

                         New York, New York 10172

                                    or

   *Via email:*            HFPClaims@thehartford.com

                                    or

   *Via Facsimile:* (917) 464-6000

**II.   All Other Notices**

   A.   All notices other than a notice of **Claim** or **Wrongful Act** shall be given in writing to the following:

                         The Hartford

                         Product Services

                         Hartford Financial Products

                         277 Park Avenue, 15th Floor

                         New York, New York 10172

HG 00 H009 01 0708                    © 2008, The Hartford                    Page 1 of 2

PL009657

B.   With the exception of notice of a **Claim** or **Wrongful Act**, where it is stated in the policy or declarations page that a notice shall be given in writing to The Hartford, Hartford Plaza, Hartford CT 06115 shall be deleted and replaced with the following:

All notices other than a notice of **Claim** or **Wrongful Act** shall be given in writing to the following:

The Hartford

Product Services

Hartford Financial Products

277 Park Avenue, 15th Floor

New York, New York 10172

All other terms and conditions remain unchanged.

Juan Andrade, President & COO

PL009658

ENDORSEMENT NO:   14

This endorsement, effective 12:01 am,        5/01/15                              forms part
of policy number        42 KB 0256935-15

issued to:        MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

by:        TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NUCLEAR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE ENCORE®II POLICY**

If purchased:

I.   **DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART**, section **IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**, is amended to add:

   •   in connection with any **Claim** based upon, arising from, or in any way related to any:

      1.   discharge, dispersal, release or escape of nuclear material, nuclear waste or radiation or any threat of such discharge, dispersal, release or escape; or

      2.   direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize nuclear material, nuclear waste or radiation;

      provided that this exclusion shall not apply to any **Derivative Action** otherwise covered under Insuring Agreement (A).

II.   **FIDUCIARY LIABILITY COVERAGE PART**, section **III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS, (A)**, and **MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE PART**, section **IV. EXCLUSIONS**, are amended to add:

   •   in connection with any **Claim** based upon, arising from, or in any way related to any:

      1.   discharge, dispersal, release or escape of nuclear material, nuclear waste or radiation or any threat of such discharge, dispersal, release or escape; or

      2.   direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize nuclear material, nuclear waste or radiation;

All other terms and conditions remain unchanged.

David Zwiener, President

PE 00 H088 01 0507                        © 2007, The Hartford                        Page 1 of 1

PL009659

ENDORSEMENT NO:   15

**This endorsement, effective 12:01 am,**     5/01/15                          forms part
**of policy number**     42 KB 0256935-15

**issued to:**     MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

**by:**     TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## MARYLAND CANCELLATION AND NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Name of Insured, Name of Company, Name of Partnership, Parent Company, Name of Insured Plan or Trust, Name of Insured Entity, Named Entity, Named Real Estate Investment Trust(s), Name of Sponsor Company or Insured stated in ITEM A or ITEM 1 of the Declarations Page.

I.   The Cancellation provision of this Policy is deleted and replaced by the following:

### NOTICE OF CANCELLATION

A.   The **Insured** shown in the Declarations may cancel this Policy by mailing advance written Notice of Cancellation to the **Insurer** stating when thereafter such cancellation shall be effective.

B.   The **Insurer** may only cancel this policy for nonpayment of premium. The **Insurer** may cancel this policy by mailing to the **Insured** written Notice of Cancellation at least ten (10) days before the effective date of cancellation.

C.   The **Insurer** will mail its notice to the **Insured's** last mailing address known to the **Insurer**. Notice of Cancellation will state the specific reasons for cancellation.

D.   Notice of Cancellation will state the effective date of cancellation. The **Policy Period** will end on that date.

E.   If this Policy shall be cancelled by the **Insured**, the **Insurer** shall retain the customary short rate proportion, which is ninety (90) percent of the pro-rata premium hereon, except as otherwise provided in this Policy. If the **Insurer** cancels this Policy, the **Insurer** shall retain the pro rata proportion of the premium hereon. However, if this Policy is financed by a premium finance company and the **Insurer** or the premium finance company or the **Insured** cancels the Policy, the refund of any gross unearned premiums will be computed pro rata excluding any expense constant, administrative fee or nonrefundable charge filed with and approved by the insurance commissioner. The cancellation will be effective even if we have not made or offered a refund.

F.   A certificate of mailing will be proof of mailing and sufficient proof of notice.

II.   The following provision is added:

### NOTICE OF NONRENEWAL

A.   If the **Insurer** decides not to renew this Policy, it will mail or deliver to the **Insured** shown in the Declarations written Notice of the Nonrenewal not less than forty-five (45) days before the expiration date or anniversary date of this Policy.

B.   A certificate of mailing will be proof of mailing and sufficient proof of notice.

© 2009, The Hartford                      Page 1 of 2

PL009660

ENDORSEMENT NO:    15

All other terms and conditions remain unchanged.

Juan Andrade, President & COO

PL009661

**Named Insured:**   MADISON MECHANICAL, INC. MADISON MECHANICAL OS CORP.

**Policy Number:**   42 KB 0256935-15

**Effective Date:**   5/01/15

**Insurer:**   TWIN CITY FIRE INSURANCE CO.

## TERRORISM RISK INSURANCE ACT

### CONFIRMATION OF ACCEPTANCE OF CERTIFIED ACTS OF TERRORISM

We previously notified you that in accordance with the federal Terrorism Risk Insurance Act, as amended (TRIA), we must make "certified acts of terrorism" coverage available in the policies we offer.

The terrorism coverage as defined by the Act does not apply to Crime or Miscellaneous Professional Liability coverage parts, if any or all of those coverage parts are elected under this policy.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism. The criteria contained in TRIA for "certified act of terrorism" include the following:

1.   The act results in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

2.   The act results in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

3.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The United States Department of the Treasury will reimburse insurers for 85% of that portion of  insured losses attributable to certified acts of terrorism that exceeds the applicable insurer deductible. However, if aggregate insured losses under TRIA exceed $100 billion in a Program Year (January 1 through December 31) the Treasury shall  not make any payment for any portion of the amount of such losses that exceeds $100 billion. The United States government has not charged any premium for their participation in covering terrorism losses.

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a Program Year (January 1 through December 31) and we have met, or will meet, our insurer deductible under TRIA, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, your coverage for terrorism losses may be reduced on a pro rata basis in accordance with procedures established by the  Treasury, based on its estimates of aggregate industry losses and our estimate that we will exceed our insurer deductible. In accordance with the Treasury's procedures, amounts paid for losses may be subject to further adjustments based on differences between actual losses and estimates.

At that time we advised you that you will not be required to pay a premium for "certified acts of terrorism" coverage at this time. As a result of our notification, you have accepted "certified acts of terrorism" coverage. If, upon renewal of your policy, a premium is going to be charged for "certified acts of terrorism" coverage, we will provide you with notification of what that premium will be.

 0 H056 02 0212                **© 2012, The Hartford**                **Page 1 of 1**
Includes copyrighted material of Insurance Services Office, Inc. with its permission

PL009662

**Producer Compensation Notice**



THE
HARTFORD

You can review and obtain information on The Hartford's
producer compensation practices at www.thehartford.com
or at 1-800-592-5717.

PL009663

# SCARLETT, CROLL & MYERS, P.A.

ATTORNEYS AT LAW
SUITE 600
201 NORTH CHARLES STREET
BALTIMORE, MARYLAND 21201-4110

(410) 468-3100
TELEFAX (410) 332-4026

ROBERT B. SCARLETT*
ANDREW M. CROLL
MICHAEL S. MYERS

* ALSO ADMITTED IN D.C.

RScarlett@ScarlettCroll.com

VIRGINA OFFICE:
515 KING STREET
SUITE 400
ALEXANDRIA, VIRGINIA 22314

November 11, 2015

**VIA FEDERAL EXPRESS**

Mr. Glenn A. Haslam
12154 Mt. Albert Road
Ellicott City, MD 21042

Mr. Gary Garofalo
2818 Hunt Valley Drive
Glenwood, MD 21738

Mr. Richard Lombardo
3194 Danmark Drive
West Friendship, MD 21794

Mr. Lawrence Kraemer
c/o Harkins Builders, Inc.
2201 Warwick Way
Marriottsville, MD 21104

Mr. Richard G. Arnold
2929 Excelsior Springs Court
Ellicott City, MD 21042

     Re:   <u>Robert J. Buczkowski and Madison Mechanical, Inc.</u>

Gentlemen:

    The undersigned represents Robert Buczkowski with respect to his interests in Madison Mechanical OS Corp., which owns directly, or indirectly Madison Mechanical, Inc. and Madison Contracting, LLC.  It is my understanding the ownership of Madison Mechanical OS Corp. ("Madison Mechanical") is as follows:

{00162128.DOCX.1}



EXHIBIT
3 Knox
7/30   P3

Mr. Glenn A. Haslam
Mr. Gary Garofalo
Mr. Richard Lombardo
Mr. Lawrence Kraemer
Mr. Richard G. Arnold
November 11, 2015
Page 2

|                    |   |      |
|--------------------|---|------|
| Glenn A. Haslam    | - | 54%  |
| Gary Garofalo      | - | 13%  |
| Richard Lombardo   | - | 10%  |
| Lawrence Kraemer   | - | 10%  |
| Robert Buczkowski  | - | 13%  |

Is also my understanding from my client that Madison Mechanical is currently operating and has assets, primarily being accounts receivables, trucks other fixed assets. In addition to these assets, Madison Mechanical also has work in progress.

It has come to my client's attention that a new limited liability company was formed on August 20, 2015 known as Madison Mechanical Contracting, LLC. The ownership of this company is divided among the following:

Glenn A. Haslam
Gary Garofalo
Richard Lombardo
Lawrence Kraemer
Richard G. Arnold

It appears to my client that the purpose of Madison Mechanical Contracting, LLC is to divert the business and client base of Madison Mechanical for the benefit of Madison Mechanical Contracting, LLC and to the detriment of Madison Mechanical. If that is true, please consider this letter notice that such action could be considered legally improper in that such a diversion is a diversion of business opportunity directly and financially harming my firm's client. On initial review, such actions, if true, could lead to a cause of action for breach of fiduciary duty, interference with a contractual relationship, interference with an economic relationship, civil conspiracy and other potential causes of action. I am especially suspicious that this diversion of corporate opportunity and contracts is an objective of Madison Mechanical Contracting, LLC simply by the fact that the name of Madison Mechanical and Madison Mechanical Contracting, LLC are so similar.

If it is your plan to divert the contracts and corporate opportunity of Madison Mechanical, please consider this letter putting you on notice of the potential litigation liability of such actions both on a corporate and personal level. Please cease and desist any such action to divert any corporate opportunity that Madison Mechanical has to either yourselves or Madison Mechanical Contracting, LLC without the consent of my firm's client, Robert Buczkowski.

{00162128.DOCX.1}

Mr. Glenn A. Haslam
Mr. Gary Garofalo
Mr. Richard Lombardo
Mr. Lawrence Kraemer
Mr. Richard G. Arnold
November 11, 2015
Page 3

My client has made it clear to me that he does not want to enter into civil litigation, given his long-standing relationship with each of you.   He would prefer to sit down and try to work out any potential differences while at the same time preserving his thirteen percent (13%) interest in Madison Mechanical.   I would suggest that each of you take this letter to your respective attorneys so they can advise you as to the law on this matter and then call me so we can schedule a convenient date and time to further discuss the issues set forth in this letter.   Once again, I must emphasize that my client would rather discuss these matters with each of you and try to resolve the differences between the parties in an amicable fashion.

Please either contact me or have your counsel contact me within thirty (30) days from the date of this letter to avoid potential legal action.

I will look forward to working with each of you.

Very truly yours,

SCARLETT, CROLL & MYERS, P.A.

Robert B. Scarlett

RBS/akr

cc: Robert Buczkowski (via email)

{00162128.DOCX.1}



THE
HARTFORD

Michael S. Knox, JD, RPLU
Commercial D&O
Hartford Financial Products

April 19, 2017

**By email only:** grj@BBSCLaw.com

Gary R. Jones, Esq.
Baxter, Baker, Sidle, Conn & Jones, P.A.
120 E. Baltimore Street
Suite 2100
Baltimore, MD 21202-1643

| | |
|---|---|
| **Insured:** | Madison Mechanical, Inc. |
| **Insurer:** | Twin City Fire Insurance Company |
| **Coverage:** | Private Choice Ovation |
| **Policy No.:** | 42 KB 0256935-15 |
| | 42 KB 0256935-16 |
| **Policy Period:** | 5/1/15 – 5/1/16 |
| | 5/1/16 – 5/1/17 |
| **Matter:** | Robert Buczkowski |
| **Our File No.:** | 16413079 |

Dear Mr. Jones,

This will supplement our coverage letter of October 18, 2016, which is incorporated herein by reference.  In that letter, as you know, Twin City Fire Insurance Company ("Twin City") analyzed potential coverage in response to the submission by Madison Mechanical, Inc. ("Madison") of a lawsuit captioned <u>Robert Buczkowski v. Madison Mechanical Contracting, LLC</u>, in the Circuit Court for Baltimore County, Maryland (Case No. 03-C-16-005782)(the "Action").  Subject to its reservation of rights, Twin City agreed to provide a defense of the Action for the **Insured Entit[ies]**[1] and **Insured Persons**.  Twin City also requested a copy of a demand letter dated November 11, 2015 from Robert Buczkowski, the claimant, in which he alleged (through counsel) that the members of Madison Mechanical Contracting ("MMC") were wrongfully diverting business and corporate opportunities from Madison Mechanical, Inc. ("Madison Mechanical") and Madison Mechanical OS ("Madison OS") Corp. and demanded that the members cease this allegedly wrongful conduct (the "November 11, 2015 Demand Letter").

The November 11 Demand Letter was not provided to us until February 27, 2017.  We take this opportunity to update our October 18 letter based upon the November 11, 2015 Demand Letter.

---

[1] Bolded and capitalized terms herein are defined in the Policy.

277 Park Avenue, 16th Floor
New York, NY 10172
Telephone 212 277-0859
Facsimile 917 464-6837
michael.knox@thehartford.com

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved.
No part of this document may be reproduced, published or posted without the permission of The Hartford.



EXHIBIT
4 Knox
7/30    PS

Gary R. Jones, Esq.
April 19, 2017
Page 2

In the letter, Buczkowski (through counsel) alleges that the ownership of Madison OS
Corporation is as follows:

| | | |
|---|---|---|
| Glenn A. Haslam | - | 54% |
| Gary Garofalo | - | 13% |
| Richard Lombardo | - | 10% |
| Lawrence Kraemer | - | 10% |
| Robert Buczkowski | - | 13% |

Buczkowski also alleges that MMC is a new limited liability company that was formed on
August 20, 2015 with ownership divided among the following persons:

Glenn A. Haslam
Gary Garofalo
Richard Lombardo
Lawrence Kraemer
Richard G. Arnold

In the November 11, 2015 Demand Letter, Buczkowski alleges that the purpose of MMC is to
divert the business and client base of Madison Mechanical to MMC.  He demands that any such
diversion cease and desist and threatens to file litigation unless a settlement is reached that
preserves his 13% interest in Madison Mechanical.

The November 11 Demand Letter constitutes a **Claim** under the Policy, and it was first made
during the 2015 Policy (effective from 5/1/15 – 5/1/16), *not* the 2016 Policy (effective 5/1/16 –
5/1/17).  Accordingly, because it now is clear that Buczkowski's **Claim** was not first made
during the 2016 Policy Period, Twin City denies coverage, both for the Demand Letter and the
ensuing and interrelated Action, under the 2016 Policy.  (As you know from our prior
correspondence, we were previously handling this matter under the 2016 Policy based on the
service date of Buczkowski's Action).

While no coverage is available for the **Claim** under the 2016 Policy, on behalf of our **Insureds**,
Twin City takes this opportunity to consider the potential for coverage under the Twin City
Policy that was in effect when the November 11, 2015 Demand Letter was received:  the 2015
Policy.

**The Policies**

*2015 Policy*

"Madison Mechanical, Inc. Madison Mechanical OS Corp." is the **Named Entity** under the 2015
Policy.  The **Policy Period** is 5/1/15 – 5/1/16.  The combined aggregate limit of liability for all
**Liability Coverage Parts** is $2,000,000.  There is a $10,000 retention under the Directors,

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved.
No part of this document may be reproduced, published or posted without the permission of The Hartford.

Gary R. Jones, Esq.
April 19, 2017
Page 3

Officer and Entity Liability coverage part (the "D&O coverage part") for Entity Liability Coverage and Corporate Reimbursement of **Insured Persons**. There is a $15,000 retention under the Employment Practices Liability coverage part (the "EPL coverage part"). Endorsement No. 3 added Madison Contracting, LLC as a **Subsidiary**. Endorsement No. 16 added Madison Mechanical Contracting, LLC as a **Subsidiary**, effective on 1/1/16.

<u>2016 Policy</u>

Madison Mechanical, Inc. is the **Named Entity** under the 2016 Policy. The **Policy Period** is 5/1/16 – 5/1/17. Madison Mechanical OS Corp. and Madison Mechanical Contracting LLC were named as **Subsidiaries** in Endorsement No. 2. Endorsement No.18 deleted Endorsement No. 2 and replaced it with Endorsement No. 19, which provides that the definition of **Subsidiary** is amended by the addition of the following:

- Madison Contracting, LLC
- Madison Mechanical Contracting, LLC
- Madison Mechanical OS Corp.

The combined aggregate limit of liability for all **Liability Coverage Parts** is $2,000,000. There is a $10,000 retention under the D&O coverage part for Entity Liability Coverage and Corporate Reimbursement of **Insured Persons**. There is a $15,000 retention under the EPL coverage part.

<u>**Coverage Analysis**</u>

As noted above, the November 11, 2015 Demand Letter from Buczkowski is a **Claim** under the Policy, and it was made during the 2015 Policy (effective from 5/1/15 – 5/1/16). Section X of the terms and conditions of that Policy ("Interrelationship of Claims") provides in relevant part as follow:

> All **Claims** based upon, arising from or in any way related to the same **Wrongful Act or Interrelated Wrongful Acts** shall be deemed to be a single **Claim** for all purposes under this Policy first made on the earliest date that:
>
> **(A)** any of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period**;

Our letter of October 18, 2016 discussed in some detail the lawsuit captioned <u>Robert Buczkowski v. Madison Mechanical Contracting, LLC</u>, in the Circuit Court for Baltimore County, Maryland (Case No. 03-C-16-005782). The lawsuit and the November 11, 2015 Demand Letter from Buczkowski are based upon, arising from, and related to the same **Wrongful Act** or **Interrelated Wrongful Acts**, namely, the alleged diversion of corporate opportunities from Madison Mechanical to MMC and the oppression of Buczkowski as a minority shareholder in Madison Mechanical. Therefore they are deemed to be a single **Claim** first made on the earliest date that any of such **Claims** was first made, which was November 11, 2015, the date of the Buczkowski Demand Letter.

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved. No part of this document may be reproduced, published or posted without the permission of The Hartford.

Gary R. Jones, Esq.
April 19, 2017
Page 4

### *Prior Knowledge or Information*

Madison Mechanical Contracting LLC submitted a Private Company Application to Twin City dated 12/29/15 indicating that Madison Mechanical Contracting was a new operation effective 1/1/16 with projected revenue of $15m as a Mechanical and HVAC Contractor.  The application had the following questions and answers with respect to prior knowledge:

**3.  PRIOR KNOWLEDGE**

a) Answer the following question if any coverage currently purchased has a "date coverage first purchased" that falls within 36 months of the date that this application is executed:

With respect to each coverage currently purchased, did any Applicant or any natural person for whom insurance is intended have any knowledge or information, as of the "date coverage first purchased," of any error, misstatement, misleading statement, act, omission, neglect, breach of duty or other matter that may give rise to a claim or could have given rise to a claim?

☐ Yes  ☑ No

If "YES," provide full details (attach a separate sheet if necessary).

IT IS AGREED THAT IF ANY SUCH KNOWLEDGE OR INFORMATION EXISTED, ANY CLAIM BASED ON, ARISING FROM, OR IN ANY WAY RELATING TO SUCH ERROR, MISSTATEMENT, MISLEADING STATEMENT, ACT, OMISSION, NEGLECT, BREACH OF DUTY OR OTHER MATTER OF WHICH THERE WAS KNOWLEDGE OR INFORMATION SHALL BE EXCLUDED FROM COVERAGE REQUESTED.

b) The following question must be answered if the Applicants are requesting higher limits than current limits, including requesting coverage which is not currently purchased.

Does an Applicant or any natural person for whom insurance is intended have any knowledge or information of any error, misstatement, misleading statement, act, omission, neglect, breach of duty or other matter that may give rise to a claim?

☐ Yes  ☑ No

If "YES," provide full details (attach a separate sheet if necessary).

IT IS AGREED THAT IF ANY SUCH KNOWLEDGE OR INFORMATION EXISTS, ANY CLAIM BASED ON, ARISING FROM, OR IN ANY WAY RELATING TO SUCH ERROR, MISSTATEMENT, MISLEADING STATEMENT, ACT, OMISSION,

HR 00 H102 00 1114                    © 2014, The Hartford                    Page 2 of 11

NEGLECT, BREACH OF DUTY OR OTHER MATTER OF WHICH THERE IS KNOWLEDGE OR INFORMATION SHALL BE EXCLUDED FROM COVERAGE REQUESTED. HOWEVER, THIS EXCLUSION SHALL APPLY UNDER A SPECIFIC COVERAGE PART ONLY TO THE EXTENT THAT THE "LIMITS REQUESTED" ARE HIGHER THAN THE "CURRENT LIMITS" PURCHASED FOR THAT COVERAGE PART.

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved.
No part of this document may be reproduced, published or posted without the permission of The Hartford.

Gary R. Jones, Esq.
April 19, 2017
Page 5

The application had the following questions and answers with respect to loss history:

**9. LOSS HISTORY (RENEWAL APPLICANTS OF THE HARTFORD NEED NOT ANSWER THIS QUESTION).**

If "YES" to any of the questions below, full details will be required.

With respect to the Applicants and any natural person for whom this insurance is intended:

a) Have there been any actual or potential lawsuits or claims that may fall within the scope of the coverage requested?  ☐ Yes  ☒ No

b) Has any insurer cancelled or refused to renew any Directors and Officers, Employment Practices, Fiduciary, Crime, Kidnap Ransom or similar insurance within the past 36 months?  ☐ Yes  ☒ No

* **MISSOURI APPLICANTS NEED NOT REPLY.**

Applicable to Liability Coverage Parts Only:

c) Are there any pending claims or demands against an Applicant or any natural person for whom this insurance is intended that may fall within the scope of coverage afforded by any previously or currently purchased insurance policy?  ☐ Yes  ☒ No

d) Has an Applicant or any natural person for whom this insurance is intended given notice under the provisions of any other previously or currently purchased insurance policy of any facts or circumstances which may give rise to a claim against any of them?  ☐ Yes  ☒ No

> REGARDING THESE QUESTIONS C & D, IT IS AGREED THAT IF ANY SUCH CLAIMS, DEMANDS OR NOTICES EXIST, ANY CLAIM BASED UPON, ARISING FROM OR IN ANY WAY RELATED TO SUCH MATTERS SHALL BE EXCLUDED FROM THE INSURANCE BEING APPLIED FOR. THE INFORMATION PROVIDED IN THIS APPLICATION IS FOR UNDERWRITING PURPOSES ONLY AND DOES NOT CONSTITUTE NOTICE TO THE COMPANY OF A CLAIM OR POTENTIAL CLAIM UNDER ANY POLICY. IF YOU INTEND TO NOTICE A CLAIM OR POTENTIAL CLAIM FOR POSSIBLE COVERAGE, PLEASE COMPLY WITH THE NOTICE OF CLAIM CONDITIONS/PROVISIONS FOUND IN YOUR POLICY.

Based on these representations in the **Application**, Twin City agreed to its **Insureds'** request to add Madison Mechanical Contracting to the 2015 Policy effective on 1/1/16 pursuant to Endorsement No. 16.

The answers to question 3 (seeking information regarding the **Insureds'** "Prior Knowledge") and question 9 (seeking information regarding the **Insureds'** "Loss History") on the **Application** were not accurate. Indeed, based upon the November 11, 2015 Demand Letter recently provided to Twin City in response to its October 18, 2016 request, it is clear that the Applicants did have knowledge or information of an alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty or other matter that not only could give rise to a claim, but had already given rise to a claim; namely, the November 11, 2015 Demand Letter from Buczkowski that alleged the wrongful diversion of assets that later became the subject of the Action. Because such knowledge or information existed, any claim—including the November 11, 2015 Demand Letter and the lawsuit captioned Robert Buczkowski v. Madison Mechanical Contracting, LLC, in the Circuit Court for Baltimore County, Maryland— are excluded from coverage under the 2015 Policy. Such demand letter demonstrates that the Action is based on, arises from, and/or is

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved. No part of this document may be reproduced, published or posted without the permission of The Hartford.

Gary R. Jones, Esq.
April 19, 2017
Page 6

related to such error, misstatement, misleading statement, act, omission, neglect, breach of duty
or other matter of which there was knowledge or information and shall be excluded from the
coverage based on the warranty exclusions included in both questions 3 and 9 of the
**Application**.

In addition, Section XVI of the common terms and conditions in both Policies provides as
follows with respect to the **Application**:

### XVI. APPLICATION

(A) The **Insureds** represent that the declarations and statements contained in the **Application** are true, accurate and complete. This Policy is issued in reliance upon the **Application**.

(B) If the **Application** contains intentional misrepresentations or misrepresentations that materially affect the acceptance of the risk by the Insurer:

(1) For the purpose of determining coverage under all Coverage Parts other than the Directors, Officers and Entity Liability Coverage Part, no coverage shall be afforded under this Policy for any **Insureds** who knew on the Inception Date of this Policy of the facts that were so misrepresented, provided that:

(a) knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**; and

(b) knowledge possessed by any chief executive officer, general counsel, chief financial officer, human resources director or any position equivalent to the foregoing of the **Named Entity**, or anyone signing the **Application**, shall be imputed to all **Insured Entities**. No other person's knowledge shall be imputed to an **Insured Entity**.

(2) For the purpose of determining coverage under the Directors, Officers and Entity Liability Coverage Part, no coverage shall be afforded under this Policy for:

(a) any **Insured Persons**, under Insuring Agreement (A), who knew as of the Inception Date of this Policy the facts that were so misrepresented in the **Application**, provided, however, that knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**. This shall be the Insurer's sole remedy under this Insuring Agreement (A). Under no circumstances shall the Insurer be entitled to rescind this Insuring Agreement (A).

(b) an **Insured Entity**, under Insuring Agreement (B), to the extent it indemnifies any **Insured Person** referenced in subparagraph (2)(a), above, and

(c) an **Insured Entity**, under Insuring Agreements (C) and (D), if any chief executive officer, general counsel, chief financial officer or any position equivalent to the foregoing of the **Named Entity**, or anyone signing the **Application**, knew as of the Inception Date of this Policy the facts that were so misrepresented in the **Application**.

In light of the allegations raised by Buczkowski in the November 11, 2015 Demand Letter, it
appears that the **Application** contained inaccurate representations that, at a minimum, materially
affected the acceptance of the risk by the Insurer – by illustration and not limitation, Twin City's
agreement to add coverage for MMC, the new company that claimant had already alleged was
created in order to divert corporate opportunities -- no coverage shall be afforded for (a) any
**Insured Person** who knew as of the Inception Date of the Policy the facts that were so
misrepresented; (b) an **Insured Entity**, to the extent it indemnifies any **Insured Person**
referenced in Paragraph (a); and (c) an **Insured Entity**, if any chief executive officer, general
counsel, chief financial officer or any position equivalent to the foregoing of the **Named Entity**,

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved.
No part of this document may be reproduced, published or posted without the permission of The Hartford.

Gary R. Jones, Esq.
April 19, 2017
Page 7

or anyone signing the **Application**, knew as of the Inception Date of the Policy the facts that were so misrepresented in the **Application**.

*Late Notice*

The 2015 Policy requires that timely notice of a **Claim** be given to Twin City.  Section VIII of the common terms and conditions provides as follows:

**VIII. NOTICE OF CLAIM**

**Solely with respect to all Liability Coverage Parts:**

(A) As a condition precedent to coverage under this Policy, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable after a **Notice Manager** becomes aware of such **Claim**, but in no event later than sixty (60) calendar days after the termination of the **Policy Period**, or any **Extended Reporting Period** as described in Section IX. Such notice shall specify the Coverage Part under which notice is being given.

(B) If, during the **Policy Period**, the **Insureds** become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim**, and, if written notice of such **Wrongful Act** is given to the Insurer during the **Policy Period**, including the reasons for anticipating such a **Claim**, the nature and date of the **Wrongful Act**, the identity of the **Insureds** allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act**, then any **Claim** subsequently arising from such **Wrongful Act** shall be deemed to be a **Claim** first made during the **Policy Period** on the date that the Insurer receives the above notice.

Twin City was only provided notice of the November 11, 2015 Demand Letter by Buczkowski on February 27, 2017, and only in response to our request for this correspondence.  Such notice is plainly not "as soon as practicable" nor "within sixty (60) calendar days after the termination of the Policy Period ...."  Therefore, the **Insureds** failed to satisfy a condition precedent to coverage under the 2015 Policy during which this **Claim** was first made.  Twin City has been prejudiced by the failure of the **Insureds** to provide timely notice, and also denies coverage on this alternative basis.

*Percentage Shareholder Exclusion*

Endorsement No. 2 ("Percentage Shareholder Exclusion") of the 2015 Policy adds the following exclusion to Section IV ("Exclusions Applicable to All Insuring Agreements") in the D&O part:

The Insurer shall not pay **Loss**:

♦ in connection with any **Claim** brought or maintained by or on behalf of any owner of <u>10%</u> or more of the outstanding securities of an **Insured Entity**, either directly or beneficially

The **Application** for the 2015 Policy, which was signed by the CFO of Madison Mechanical (apparently Buczkowski) on 4/6/15 and submitted to Twin City, states at Question 5 that Buczkowski owns 13% of the stock in Madison Mechanical:

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved.
No part of this document may be reproduced, published or posted without the permission of The Hartford.

Gary R. Jones, Esq.
April 19, 2017
Page 8

**6. DIRECTORS, OFFICERS & ENTITY LIABILITY COVERAGE PART (Complete Only if Renewing this Coverage)**

   a)  How many total individuals/entities own shares in the Applicant listed in 1(a) above? 5

   b)  What is the total number of outstanding shares in the Applicant listed in 1(a) above? 200

   c)  What is the total number of shares referenced in question (b) above held directly or beneficially by directors, officers or equivalents? 194

| For all classes of stock or other ownership of the Applicant listed in 1(a) above, list all shareholders over 5% (attach additional sheet if required) | Percentage Held | Is share currently a Director or Officer? |
|---|---|---|
| Glenn Haslam | 54 | yes |
| Robert Buczkowski | 13 | yes |
| Larry Kraemer | 10 | no |
| Richard Lombardo | 10 | no |
| Gary Garofalo | 13 | no |

In his letter of November 11 and in his lawsuit, Buczkowski similarly alleges that he owns 13% of the outstanding shares of Madison Mechanical OS Corp.  If that is true, his **Claim** is barred from coverage under the D&O part by Endorsement No. 2.

You have advised me that at the time suit was filed, Buczkowski was no longer a 10% shareholder because his interest was, by then, diluted below the 10% threshold when he failed to make a required capital contribution.  More specifically, you have provided me a copy of the counterclaim filed by the defendants against Buczkowski, which alleges in Paragraph 9 that, pursuant to the shareholders' agreement, Buczkowski's equity position was diluted to 7% when he contributed only $143,000 in capital to the company at the time that his required contribution was $283,609.  Twin City reserves all rights under Endorsement No. 2.

### *Additional Coverage Issues*

Under the D&O part of the 2015 Policy, and were coverage not otherwise excluded on the basis of the Warranty Exclusions and Notice condition precedent discussed above, the November 11, 2015 Demand Letter and the Action would qualify as both an **Insured Person Claim** (with respect to Haslam, and Garofalo) and an **Entity Claim** (with respect to Madison Mechanical OS Corp. and Madison Mechanical Contracting LLC).  These **Claims** trigger Exclusion IV(H) (the "Insured v. Insured Exclusion"), which provides that the Insurer shall not pay **Loss**:

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved.
No part of this document may be reproduced, published or posted without the permission of The Hartford.

Gary R. Jones, Esq.
April 19, 2017
Page 9

(H) in connection with any **Claim** brought or maintained by or on behalf of any **Insureds** (in any capacity) or any security holder of an **Insured Entity**, provided that this exclusion shall not apply to the portion of **Loss** directly resulting from:

(1) a civil proceeding by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**; or

(2) a **Derivative Action** or a **Derivative Demand**;

Note. **Sarbanes-Oxley Whistle-blowing** alone shall not be deemed solicitation, assistance or participation for purposes of paragraphs (1) and (2) above.

(3) an **Insured Person Claim** by or on behalf of an **Employee** who is not a past or present **Manager** if such **Claim** is made without the assistance, participation or solicitation of any **Manager**;

(4) an **Insured Person Claim** by or on behalf of a **Manager** for wrongful termination of such **Manager**;

(5) a civil proceeding by or on behalf of a former **Manager** who has not served in such capacity for at least one year prior to such **Claim** being made, provided that such **Claim** is made without the assistance, participation or solicitation of any current **Manager** or any former **Manager** who has served in such capacity during the one year prior to such **Claim** being made;

(6) a civil proceeding by or on behalf of an **Insured Person** for contribution or indemnification if such **Claim** directly results from a **Claim** that is otherwise covered under this **Liability Coverage Part**;

(7) an **Insured Person Claim** brought and maintained in a jurisdiction outside the United States of America, Canada, Australia or any other common law country (including territories thereof) by a **Manager** due to a pleading requirement of such jurisdiction; or

(8) a civil proceeding by any bankruptcy trustee, examiner, receiver, liquidator, creditor(s) committee of the **Insured Entity** or rehabilitator (or any assignee thereof) after such bankruptcy trustee, examiner, receiver, liquidator or rehabilitator has been appointed;

The "Ivl" Exclusion bars coverage for the **Entity Claim** in its entirety under the D&O part, and none of the exceptions apply. However, the potential **Insured Person Claim** may fall within the fourth exception to the Exclusion, which applies to "an **Insured Person Claim** by or on behalf of a **Manager** for wrongful termination of such **Manager**." Plaintiff is a former **Manager**, and he alleges wrongful termination in the lawsuit, although there is no cause of action for wrongful termination.

Coverage for the **Entity Claim** against Madison Mechanical OS Corp. under the D&O part is also barred by Exclusion V(A)(1), which provides that the Insurer shall not pay **Loss** under Insuring Agreement (C) in connection with any **Claim** based upon arising from, or in any way related to any actual or alleged:

(1) liability under any contract or agreement, provided that this exclusion shall not apply to the extent that liability would have been incurred in the absence of such contract or agreement;

Count 2 of the complaint alleges that **Entity Claim** against Madison Mechanical OS Corp. is based upon arising from, and related to actual or alleged liability under a contract or agreement, namely, the Stockholders Agreement dated December 31, 2007 among Madison Mechanical OS Corp., Buczkowski, Haslam, Garofalo, Lombardo, and Kraemer. The complaint alleges that

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved.
No part of this document may be reproduced, published or posted without the permission of The Hartford.

Gary R. Jones, Esq.
April 19, 2017
Page 10

Haslam's effort to terminate Buczkowski "for cause" on November 18, 2015 was an attempt to force a transfer of his stock in Madison Mechanical OS Corp., in violation of the Stockholders Agreement.

Plaintiff alleges he was wrongfully terminated and asks the court to reinstate his employment. Exclusion V(A)(2) provides that the Insurer shall not pay **Loss** under Insuring Agreement (C) in connection with any **Claim** based upon arising from, or in any way related to any actual or alleged:

> (2)  employment-related **Wrongful Act**;

Because Buczkowski alleges employment-related **Wrongful Acts** against entity defendants Madison Mechanical OS Corp. and Madison Mechanical Contracting, LLC, coverage for these **Insured Entities** is barred by Exclusion V(A)(2) and Twin City reserves its rights accordingly.

Counts 11 and 12 of the complaint allege unfair competition and misappropriation of trade secrets. Exclusions V(A)(6) and V(A)(7) provide that the Insurer shall not pay **Loss** under Insuring Agreement (C) in connection with any **Claim** based upon arising from, or in any way related to any actual or alleged:

> (6)  infringement, dilution or misappropriation of copyright, patent, trademark, trade name, trade dress, service mark, trade secrets, or other intellectual property; provided, however that this exclusion shall not apply to the portion of **Loss** directly resulting from:
>
> > (a)  a civil proceeding brought and maintained by a security holder(s) of an **Insured Entity**, in their capacity as such; or
> >
> > (b)  a **Derivative Action** or a **Derivative Demand**; or
>
> (7)  unfair trade practices or any violation of the Federal Trade Commission Act or any similar law.

Twin City reserves its rights under these exclusions.

<u>*EPL Coverage Part*</u>

Under the EPL part of the 2015 Policy, in the absence of the threshold coverage issues raised above, the suit would be an **Employment Practices Claim** with respect to Madison Mechanical OS Corp., Haslam, and Garofolo. Count 1 seeks a declaration from the court with respect to these defendants that plaintiff was wrongfully terminated and must be reinstated. However, there does not appear to be any coverage under this coverage part with respect to Madison Mechanical Contracting LLC because there is no **Employment Practices Claim** alleged against this entity.

<u>*Other Coverage Issues*</u>

There are at least two additional coverage issues:

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved.
No part of this document may be reproduced, published or posted without the permission of The Hartford.

Gary R. Jones, Esq.
April 19, 2017
Page 11

First, Counts 9 and 10 of the complaint seek recovery for unjust enrichment.  Recovery for unjust enrichment—otherwise known as restitution and disgorgement—does not constitute covered **Loss** or **Damages**, and is generally uninsurable.

Second, in addition to the claim for unjust enrichment, the complaint also includes causes of action for breach of fiduciary duty and minority shareholder oppression.  Although we understand that the plaintiff has provided no evidence of this alleged misconduct to date, the allegations implicate two additional exclusions under the D&O coverage part.  Exclusions (IV)(L) and (IV)(M) in the D&O part provide that the Insurer shall not pay **Loss**:

> **(L)** of an **Insured**, based upon, arising from, or in any way related to the gaining of any personal profit, remuneration or advantage to which such **Insured** is not legally entitled if a judgment or other final adjudication establishes that such a gain did occur; or
>
> **(M)** of an **Insured**, based upon, arising from, or in any way related to any criminal or deliberately fraudulent act or omission or any willful violation of law by such **Insured** if a judgment or other final adjudication establishes such an act, omission or violation; provided, however, that this exclusion shall only apply to **Insured Entities** under Insuring Agreement (C), if elected, if a past or present chief executive officer, chief financial officer or general counsel of the **Named Entity** committed such an act, omission or willful violation.

Twin City reserves its rights on these two issues.  Please note that Exclusions (IV)(L) and (IV)(M) both require a final adjudication.

## Conclusion

Based upon the additional information recently provided to Twin City in connection with the November 11, 2015 Demand Letter, this confirms that Twin City declines coverage under the 2016 Policy as the claim was first made during the 2015 Policy.  This further confirms that Twin City denies coverage under the 2015 Policy based upon:  (1) the Warranty Exclusion within question 3 (Prior Knowledge) of the Application; (2) the Warranty Exclusion within Question 9 (Loss History) of the Application; and (3) Late Notice.  Twin City additionally reserves all rights including those described above.  Our comments are based upon the facts received to date and Twin City reserves the right to further investigate and to request additional information and documents as may be indicated.

Please be advised that Twin City is reserving all of its rights and defenses under the Policy and applicable law, whether or not specifically identified in this letter.  If you have any information or documents that you believe may affect the coverage position set forth herein, please forward it to my attention immediately.

Please let me know if you have any questions or comments.  You can call me at (212) 277-0859, or you can reach me through e-mail at Michael.Knox@thehartford.com

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved.
No part of this document may be reproduced, published or posted without the permission of The Hartford.

Gary R. Jones, Esq.
April 19, 2017
Page 12

Sincerely,


Michael S. Knox, JD, RPLU
Claims Consultant

cc:    Danielle Vranian
       Baxter, Baker, Sidle, Conn & Jones, P.A.
       dmv@bbsclaw.com

Copyright © 2017 by The Hartford. Classification: Publicly Available for approved external distribution. All rights reserved
No part of this document may be reproduced, published or posted without the permission of The Hartford.



**THE HARTFORD**

Michael S. Knox, JD, RPLU
Commercial D&O
Hartford Financial Products

October 18, 2016

**By email only:** grj@BBSCLaw.com

Gary R. Jones, Esq.
Baxter, Baker, Sidle, Conn & Jones, P.A.
120 E. Baltimore Street
Suite 2100
Baltimore, MD 21202-1643

| | |
|---|---|
| **Insured:** | Madison Mechanical, Inc. |
| **Insurer:** | Twin City Fire Insurance Company |
| **Coverage:** | Private Choice Ovation |
| **Policy No.:** | 42 KB 0256935-16 |
| **Policy Period:** | 5/1/16 – 5/1/17 |
| **Matter:** | Robert Buczkowski |
| **Our File No.:** | 16413079 |

Dear Mr. Jones,

Hartford Financial Products is responsible for the handling of claims reported under the above-referenced Policy (the "Policy") on behalf of Twin City Fire Insurance Company ("Twin City" or the "Insurer"). In our email correspondence dated August 11, 2016 we previously acknowledged receipt of and generally reserved Twin City's rights with respect to your submission of a copy of the complaint filed in an action captioned Robert Buczkowski v. Madison Mechanical Contracting, LLC, Circuit Court for Baltimore County, Maryland, Case No. 03-C-16-005782.

This confirms that Twin City will provide a defense of the lawsuit for the covered entities and persons, as described below, subject to its reservation of rights. By commenting on coverage herein, we do not mean to suggest that the allegations in the complaint—which are completely unsubstantiated—have any merit.

**Background**

According to the complaint, Madison Mechanical, Inc. is a construction subcontractor formed in 1993. Robert Buczkowski, the plaintiff, became its CFO in 2002. He was allegedly told by

277 Park Avenue, 16th Floor
New York, NY 10172
Telephone 212 277-0859
Facsimile 917 464-6837
michael.knox@thehartford.com



EXHIBIT

5 Knox
7/30   PS

Gary R. Jones, Esq.
October 18, 2016
Page 2

defendant Glenn Haslam, the CEO, that he would receive a 20% ownership interest and 10% of the profits when Haslam exercised his right to purchase the company from the founder.

In December 2007, Buczkowski, Haslam, and three other partners formed a new entity called Madison Mechanical OS Corp. The purpose of this company was to purchase all the stock of Madison Mechanical, Inc. and operate Madison Mechanical, Inc. as a wholly-owned subsidiary. The shares of Madison Mechanical OS Corp. were owned as follows:

|  |  |
|---|---|
| Glenn Haslam: | 54% |
| Gary Garofalo: | 13% |
| Robert Buczkowski: | 13% |
| Richard Lombardo: | 10% |
| Lawrence Kraemer: | 10% |

The company was profitable from 2007 to 2012. Then the company took on six large projects simultaneously. The projects were allegedly incorrectly bid, insufficiently staffed, and mismanaged. As a result, Madison Mechanical, Inc. allegedly incurred severe financial difficulties in 2013-2015. The complaint further alleges that, unbeknownst to Buczkowski, in August 2015 the other shareholders of Madison Mechanical OS Corp., along with defendant Richard Arnold, formed a new entity called Madison Mechanical Contracting, LLC, which consisted of the following members:

|  |  |
|---|---|
| Richard Arnold: | 34% |
| Glenn Haslam: | 34% |
| Gary Garofalo: | 12% |
| Richard Lombardo: | 10% |
| Lawrence Kraemer: | 10% |

The alleged purpose of this new company was to take business and corporate opportunities from Madison Mechanical, Inc. and Madison Mechanical OS Corp. On November 11, 2015, Buczkowski demanded, through counsel, that the members of the new company cease their diversion of business and corporate opportunities from Madison Mechanical, Inc. and Madison Mechanical OS Corp.

On November 18, 2015, Buczkowski was terminated from the company, effective November 24, 2015. He was given a letter of termination on Madison Mechanical, Inc. letterhead, even though he was actually employed by Madison Mechanical OS Corp. The letterhead stated that he was being terminated for cause, but the cause was not identified and Buczkowski alleges there was no valid cause and Haslam admitted as much to him. Instead, Buczkowski alleges, the termination was an attempt to force a transfer of his stock in Madison Mechanical OS Corp.

Gary R. Jones, Esq.
October 18, 2016
Page 3

On January 14, 2016, counsel for Madison Mechanical OS Corp. demanded that Buczkowski sell his shares back to the company based on the book value in 2014, which was negative, so the purchase price would be $0. Buczkowski refused to sell his shares.

Unbeknownst to Buczkowski, according to the Complaint, on December 21, 2015, the defendants allegedly dissolved Madison Mechanical, Inc. without holding a meeting of the stockholders of Madison Mechanical OS Corp. Thereafter, the defendants allegedly diverted corporate opportunities from Madison Mechanical, Inc. and Madison Mechanical OS Corp. to Madison Mechanical Contracting, LLC, including projects that were previously being performed by Madison Mechanical, Inc., as well as several contracts that had been negotiated under Madison Mechanical, Inc.'s name, and began performing the projects for the benefit of Madison Mechanical Contracting, LLC. All Madison Mechanical, Inc. employees became employed by Madison Mechanical Contracting, LLC. Plaintiff alleges that Madison Mechanical Contracting LLC misappropriated the name, goodwill, records, trade secrets, assets, and accounts receivable of Madison Mechanical, Inc. for no consideration.

Plaintiff alleges the following causes of action:

- Count 1 – Declaratory Judgment (against Madison Mechanical OS Corp., Glenn Haslam, Gary Garofalo, Richard Lombardo, and Lawrence Kraemer)

- Count 2 – Breach of Contract (against Madison Mechanical OS Corp., Haslam, Garofalo, Lombardo, and Kraemer)

- Count 3 – Oppression of Minority Shareholder (against Haslam, Garofalo, Lombardo, and Kraemer)

- Count 4 – Oppression of Minority Shareholder (Derivative Action on Behalf of Madison Mechanical OS Corp.) (against Haslam, Garofalo, Lombardo, and Kraemer)

- Count 5 – Breach of Fiduciary Duty (against Haslam, Garofalo, Lombardo, and Kraemer)

- Count 6 – Breach of Fiduciary Duty (Derivative Action on Behalf of Madison Mechanical OS Corp.) (against Haslam, Garofalo, Lombardo, and Kraemer)

- Count 7 – Tortious Interference with Economic Relations (against Haslam, Garofalo, Lombardo, Kraemer, Richard Arnold, and Madison Mechanical Contracting, LLC)

- Count 8 – Tortious Interference with Economic Relations (Derivative Action on Behalf of Madison Mechanical OS Corp.) (against Haslam, Garofalo, Lombardo, Kraemer, Arnold, and Madison Mechanical Contracting, LLC)

Gary R. Jones, Esq.
October 18, 2016
Page 4

- Count 9 – Unjust Enrichment (against Haslam, Garofalo, Lombardo, Kraemer, Arnold, and Madison Mechanical Contracting, LLC)

- Count 10 – Unjust Enrichment (Derivative Action on Behalf of Madison Mechanical OS Corp.) (against Haslam, Garofalo, Lombardo, Kraemer, Arnold, and Madison Mechanical Contracting, LLC)

- Count 11 – Unfair Competition – Misappropriation of Trade Secrets (against Haslam, Garofalo, Lombardo, Kraemer, Arnold, and Madison Mechanical Contracting, LLC)

- Count 12 – Unfair Competition – Misappropriation of Trade Secrets (Derivative Action on Behalf of Madison Mechanical OS Corp.) (against Haslam, Garofalo, Lombardo, Kraemer, Arnold, and Madison Mechanical Contracting, LLC)

- Count 13 – Constructive Trust (against Haslam, Garofalo, Lombardo, Kraemer, Arnold, and Madison Mechanical Contracting, LLC)

- Count 14 – Constructive Trust (Derivative Action on Behalf of Madison Mechanical OS Corp.) (against Haslam, Garofalo, Lombardo, Kraemer, Arnold, and Madison Mechanical Contracting, LLC)

With respect to damages and other relief, plaintiff demands:  (a) a declaratory judgment from the court that he remains an employee and shareholder of Madison Mechanical OS Corp. along with injunctive relief ordering defendants to take all actions necessary to recognize his continued employment and ownership of shares; (b) compensatory damages; (c) a full accounting of all financial dealings and transactions of Madison Mechanical OS Corp. and Madison Mechanical, Inc. from December 13, 2007 to the present; (d) an injunction prohibiting defendants from using the assets or usurping the corporate opportunities of Madison Mechanical OS Corp. or Madison Mechanical, Inc.; (e) that the court charge a constructive trust upon defendants for assets they wrongfully acquired from Madison Mechanical OS Corp. and Madison Mechanical, Inc.; and (f) attorney's fees, costs, and expenses as provided in the Stockholders Agreement and available at law.

**The Policy**

Madison Mechanical, Inc. is the **Named Entity** under the Policy.  Madison Mechanical OS Corp. and Madison Mechanical Contracting LLC were named as **Subsidiaries** in Endorsement No. 2.  Endorsement No.18 deleted Endorsement No. 2 and replaced it with Endorsement No. 19, which provides that the definition of **Subsidiary** is amended by the addition of the following:

- Madison Contracting, LLC
- Madison Mechanical Contracting, LLC
- Madison Mechanical OS Corp.

Gary R. Jones, Esq.
October 18, 2016
Page 5

The **Policy Period** is 5/1/16 – 5/1/17.  The combined aggregate limit of liability for all **Liability Coverage Parts** is $2,000,000.   There is a $10,000 retention under the Directors, Officer and Entity Liability coverage part (the "D&O coverage part") for Entity Liability Coverage and Corporate Reimbursement of **Insured Persons**.  There is a $15,000 retention under the Employment Practices Liability coverage part (the "EPL coverage part").

<u>Coverage Analysis</u>

The Policy has four coverage parts.  The lawsuit is being analyzed for coverage under the D&O and EPL coverage parts, which are the only ones with potential applicability here.  If coverage is being sought under any other part, please advise me immediately.

Madison Mechanical OS Corp., and Madison Mechanical Contracting LLC are **Insured Entities** under the Policy pursuant to Endorsement No. 19 (Madison Mechanical, Inc., the **Named Entity** under the Policy, is also an **Insured Entity**, but it is not a defendant in the lawsuit).

You advised me on October 13 that:

> Richard Lombardo and Lawrence Kraemer are shareholders in all three entities (MMI, OS Corp., and MMCLLC). Their membership shares in MMCLLC are held in a voting trust.
>
> Rick Arnold is a Managing Member, Manager, resident agent, and holds Class A membership shares in MMCLLC. He has no affiliation with MMI and OS Corp.
>
> Glenn Haslam is an officer (president), director, general manager, and shareholder of both MMI and OS Corp.  He is also a Managing Member, Manager, and holds class A membership shares in MMCLLC.
>
> Gary Garofalo was a Manager along with being a financial and business consultant and Officer (corporate secretary) and shareholder in both MMI and OS Corp.  He also holds membership shares in MMCLLC through a voting trust.

Rick Arnold therefore qualifies as an **Insured Person** because he is a **Manager** of Madison Mechanical Contracting, LLC.  Glenn Haslam qualifies as an **Insured Person** because he is a **Manager** of Madison Mechanical, Inc., Madison Mechanical OS Corp., and Madison Mechanical Contracting, LLC.  Gary Garofalo qualifies as an **Insured Person** because he is a **Manager** of Madison Mechanical, Inc. and Madison Mechanical OS Corp.

However, Richard Lombardo and Lawrence Kraemer do not qualify as **Insured Persons**, because they are not **Managers** or **Employees** of the **Insured Entities**.  Shareholders do not qualify as **Insured Persons**. Twin City will not provide a defense for Lombardo and Kraemer.

Gary R. Jones, Esq.
October 18, 2016
Page 6

### *D&O and EPL coverage parts*

Madison Mechanical Contracting LLC submitted a Private Company Application dated 12/29/15 indicating that Madison Mechanical Contracting is a new operation effective 1/1/16 with projected revenue of $15m. The application had the following questions and answers with respect to prior knowledge:

**3. PRIOR KNOWLEDGE**

a) Answer the following question if any coverage currently purchased has a "date coverage first purchased" that falls within 36 months of the date that this application is executed:

With respect to each coverage currently purchased, did any Applicant or any natural person for whom insurance is intended have any knowledge or information, as of the "date coverage first purchased," of any error, misstatement, misleading statement, act, omission, neglect, breach of duty or other matter that may give rise or could have given rise to a claim?

☐ Yes  ☑ No

If "YES," provide full details (attach a separate sheet if necessary).

IT IS AGREED THAT IF ANY SUCH KNOWLEDGE OR INFORMATION EXISTED, ANY CLAIM BASED ON, ARISING FROM, OR IN ANY WAY RELATING TO SUCH ERROR, MISSTATEMENT, MISLEADING STATEMENT, ACT, OMISSION, NEGLECT, BREACH OF DUTY OR OTHER MATTER OF WHICH THERE WAS KNOWLEDGE OR INFORMATION SHALL BE EXCLUDED FROM COVERAGE REQUESTED.

b) The following question must be answered if the Applicants are requesting higher limits than current limits, including requesting coverage which is not currently purchased.

Does an Applicant or any natural person for whom insurance is intended have any knowledge or information of any error, misstatement, misleading statement, act, omission, neglect, breach of duty or other matter that may give rise to a claim?

☐ Yes  ☑ No

If "YES," provide full details (attach a separate sheet if necessary).

IT IS AGREED THAT IF ANY SUCH KNOWLEDGE OR INFORMATION EXISTS, ANY CLAIM BASED ON, ARISING FROM, OR IN ANY WAY RELATING TO SUCH ERROR, MISSTATEMENT, MISLEADING STATEMENT, ACT, OMISSION,

HR 00 H102 00 1114              © 2014, The Hartford              Page 2 of 11

NEGLECT, BREACH OF DUTY OR OTHER MATTER OF WHICH THERE IS KNOWLEDGE OR INFORMATION SHALL BE EXCLUDED FROM COVERAGE REQUESTED. HOWEVER, THIS EXCLUSION SHALL APPLY UNDER A SPECIFIC COVERAGE PART ONLY TO THE EXTENT THAT THE "LIMITS REQUESTED" ARE HIGHER THAN THE "CURRENT LIMITS" PURCHASED FOR THAT COVERAGE PART.

Gary R. Jones, Esq.
October 18, 2016
Page 7

The application had the following questions and answers with respect to loss history:

**9.   LOSS HISTORY (RENEWAL APPLICANTS OF THE HARTFORD NEED NOT ANSWER THIS QUESTION).**

If "YES" to any of the questions below, full details will be required.

With respect to the Applicants and any natural person for whom this insurance is intended:

a)   Have there been any actual or potential lawsuits or claims that may fall within the scope    ☐ Yes   ☑ No
of the coverage requested?

b)   Has any insurer cancelled or refused to renew any Directors and Officers, Employment    ☐ Yes   ☑ No
Practices, Fiduciary, Crime, Kidnap Ransom or similar insurance within the past 36
months?

* **MISSOURI APPLICANTS NEED NOT REPLY.**

Applicable to Liability Coverage Parts Only:

c)   Are there any pending claims or demands against an Applicant or any natural person for    ☐ Yes   ☑ No
whom this insurance is intended that may fall within the scope of coverage afforded by
any previously or currently purchased insurance policy?

d)   Has an Applicant or any natural person for whom this insurance is intended given notice    ☐ Yes   ☑ No
under the provisions of any other previously or currently purchased insurance policy of
any facts or circumstances which may give rise to a claim against any of them?

REGARDING THESE QUESTIONS C & D, IT IS AGREED THAT IF ANY SUCH CLAIMS, DEMANDS OR NOTICES
EXIST, ANY CLAIM BASED UPON, ARISING FROM OR IN ANY WAY RELATED TO SUCH MATTERS SHALL BE
EXCLUDED FROM THE INSURANCE BEING APPLIED FOR. THE INFORMATION PROVIDED IN THIS APPLICATION
IS FOR UNDERWRITING PURPOSES ONLY AND DOES NOT CONSTITUTE NOTICE TO THE COMPANY OF A CLAIM
OR POTENTIAL CLAIM UNDER ANY POLICY. IF YOU INTEND TO NOTICE A CLAIM OR POTENTIAL CLAIM FOR
POSSIBLE COVERAGE, PLEASE COMPLY WITH THE NOTICE OF CLAIM CONDITIONS/PROVISIONS FOUOND IN
YOUR POLICY.

A Private Company Renewal Application was then submitted for Madison Mechanical
Contracting, LLC, Madison Mechanical Inc, and Madison Mechanical OS Corp.  This
application was dated 4/14/15, just prior to the renewal on 5/1/16.  It contained the following
question and answer with respect to prior knowledge:

Gary R. Jones, Esq.
October 18, 2016
Page 8

**3. PRIOR KNOWLEDGE**

The following question must be answered if the Applicants are requesting higher limits at renewal.

Does an Applicant or any natural person for whom insurance is intended have any knowledge or information of any error, misstatement, misleading statement, act, omission, neglect, breach of duty or other matter that may give rise to a claim?  ☐ Yes ☑ No
If "YES," provide full details (attach a separate sheet if necessary).

IT IS AGREED THAT IF ANY SUCH KNOWLEDGE OR INFORMATION EXISTS, ANY CLAIM BASED ON, ARISING FROM, OR IN ANY WAY RELATING TO SUCH ERROR, MISSTATEMENT, MISLEADING STATEMENT, ACT, OMISSION, NEGLECT, BREACH OF DUTY OR OTHER MATTER OF WHICH THERE IS KNOWLEDGE OR INFORMATION SHALL BE EXCLUDED FROM COVERAGE REQUESTED. HOWEVER, THIS EXCLUSION SHALL APPLY UNDER A SPECIFIC COVERAGE PART ONLY TO THE EXTENT THAT THE "LIMITS REQUESTED" ARE HIGHER THAN THE "CURRENT LIMITS" PURCHASED FOR THAT COVERAGE PART.

With respect to these questions and answers on prior knowledge and loss history, please send us the November 11, 2015 correspondence from Buczkowski wherein he allegedly demanded, through counsel, that the members of the new company cease their alleged diversion of business and corporate opportunities from Madison Mechanical, Inc. and Madison Mechanical OS Corp. Please also send us all other correspondence among Buczkowski, the **Insured Entities**, and the **Insured Persons** with respect to this matter prior to the filing of the lawsuit, including the January 14, 2016 letter whereby counsel for Madison Mechanical OS Corp. demanded that Buczkowski sell his shares back to the company based on the book value in 2014, and Buczkowski's response to that letter.

Twin City reserves its rights with respect to the applications, including its rights to disclaim coverage for any prior claims or any claim based upon, arising from, or in any way related to any error, misstatement, misleading statement, act, omission, neglect or breach of duty of which there was knowledge or information at the time any application was signed.

Section XVI of the common terms and conditions provides as follows:

Gary R. Jones, Esq.
October 18, 2016
Page 9

**XVI.  APPLICATION**

(A) The **Insureds** represent that the declarations and statements contained in the **Application** are true, accurate and complete. This Policy is issued in reliance upon the **Application**.

(B) If the **Application** contains intentional misrepresentations or misrepresentations that materially affect the acceptance of the risk by the Insurer:

   (1) For the purpose of determining coverage under all Coverage Parts other than the Directors, Officers and Entity Liability Coverage Part, no coverage shall be afforded under this Policy for any **Insureds** who knew on the Inception Date of this Policy of the facts that were so misrepresented, provided that:

      (a) knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**; and

      (b) knowledge possessed by any chief executive officer, general counsel, chief financial officer, human resources director or any position equivalent to the foregoing of the **Named Entity**, or anyone signing the **Application**, shall be imputed to all **Insured Entities**. No other person's knowledge shall be imputed to an **Insured Entity**.

   (2) For the purpose of determining coverage under the Directors, Officers and Entity Liability Coverage Part, no coverage shall be afforded under this Policy for:

      (a) any **Insured Persons**, under Insuring Agreement (A), who knew as of the Inception Date of this Policy the facts that were so misrepresented in the **Application**, provided, however, that knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**. This shall be the Insurer's sole remedy under this Insuring Agreement (A). Under no circumstances shall the Insurer be entitled to rescind this Insuring Agreement (A).

      (b) an **Insured Entity**, under Insuring Agreement (B), to the extent it indemnifies any **Insured Person** referenced in subparagraph (2)(a), above, and

      (c) an **Insured Entity**, under Insuring Agreements (C) and (D), if any chief executive officer, general counsel, chief financial officer or any position equivalent to the foregoing of the **Named Entity**, or anyone signing the **Application**, knew as of the Inception Date of this Policy the facts that were so misrepresented in the **Application**.

Twin City reserves its rights under this section while we investigate whether the **Application** contained intentional misrepresentations or misrepresentations that materially affected the acceptance of the risk by the Insurer.

*D&O coverage part*

Endorsement No. 4 ("Percentage Shareholder Exclusion") adds the following exclusion to the Section IV ("Exclusions Applicable to All Insuring Agreements") in the D&O part:

The Insurer shall not pay **Loss**:

   • in connection with any **Claim** brought or maintained by or on behalf of any owner of 10% or more of the outstanding securities of an **Insured Entity**, either directly or beneficially

Buczkowski alleges that he owns 13% of the outstanding shares of Madison Mechanical OS Corp. If that is true, his **Claim** is barred from coverage under the D&O part by this endorsement. You have advised me that at the time suit was filed, Buczkowski was no longer a 10% shareholder because his interest was, by then, diluted below the 10% threshold when he

Gary R. Jones, Esq.
October 18, 2016
Page 10

failed to make a required capital contribution. More specifically, you have provided me a copy
of the counterclaim filed by the defendants against Buczkowski, which alleges in Paragraph 9
that, pursuant to the shareholder's agreement, Buczkowski's equity position was diluted to 7%
when he contributed only $143,000 in capital to the company when his required contribution was
$283,609. Could you point me to the relevant language in the shareholder's agreement that leads
to this dilution as a result of failing to make the capital contribution? In addition, please provide
me any additional documentation that establishes the correct amount of shares owned by
Buczkowski at the time the suit was filed. For example, you indicate in your letter to Twin City
dated July 28, 2016 that, by the time the suit was filed, Buczkowski was no longer a shareholder.
I understand from our subsequent discussions that it is the Insured's position that plaintiff
automatically ceased to be a shareholder due to his termination. Please promptly provide to us
any documents or other information that you may have to demonstrate this relinquishment of
shares by operation of his termination. While our investigation of this issue continues, Twin
City reserves all rights under Endorsement No. 4.

Under the D&O part, the lawsuit is both an **Insured Person Claim** (with respect to Arnold,
Haslam, and Garofalo) and an **Entity Claim** (with respect to Madison Mechanical OS Corp. and
Madison Mechanical Contracting LLC). These **Claims** trigger Exclusion IV(H) (the "Insured v.
Insured Exclusion"), which provides that the Insurer shall not pay **Loss**:

(H) in connection with any **Claim** brought or maintained by or on behalf of any **Insureds** (in any capacity) or any security holder of an **Insured Entity**, provided that this exclusion shall not apply to the portion of **Loss** directly resulting from:

(1) a civil proceeding by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**; or

(2) a **Derivative Action** or a **Derivative Demand**;

Note: **Sarbanes-Oxley Whistle-blowing** alone shall not be deemed solicitation, assistance or participation for purposes of paragraphs (1) and (2) above.

(3) an **Insured Person Claim** by or on behalf of an **Employee** who is not a past or present **Manager** if such **Claim** is made without the assistance, participation or solicitation of any **Manager**;

(4) an **Insured Person Claim** by or on behalf of a **Manager** for wrongful termination of such **Manager**;

(5) a civil proceeding by or on behalf of a former **Manager** who has not served in such capacity for at least one year prior to such **Claim** being made, provided that such **Claim** is made without the assistance, participation or solicitation of any current **Manager** or any former **Manager** who has served in such capacity during the one year prior to such **Claim** being made;

(6) a civil proceeding by or on behalf of an **Insured Person** for contribution or indemnification if such **Claim** directly results from a **Claim** that is otherwise covered under this **Liability Coverage Part**;

(7) an **Insured Person Claim** brought and maintained in a jurisdiction outside the United States of America, Canada, Australia or any other common law country (including territories thereof) by a **Manager** due to a pleading requirement of such jurisdiction; or

(8) a civil proceeding by any bankruptcy trustee, examiner, receiver, liquidator, creditor(s) committee of the **Insured Entity** or rehabilitator (or any assignee thereof) after such bankruptcy trustee, examiner, receiver, liquidator or rehabilitator has been appointed;

Gary R. Jones, Esq.
October 18, 2016
Page 11

The Exclusion bars coverage for the **Entity Claim**, and none of the exceptions apply. However, the potential **Insured Person Claim** falls within the fourth exception to the Exclusion, which applies to "an **Insured Person Claim** by or on behalf of a **Manager** for wrongful termination of such **Manager**." Plaintiff is a **Manager**, and he is alleging wrongful termination. Subject to our ongoing coverage investigation and reservation of rights, Twin City will provide a defense for the **Insured Person Claim** against Arnold, Haslam, and Garofalo.

Coverage for the **Entity Claim** against Madison Mechanical OS Corp. under the D&O part is also barred by Exclusion V(A)(1), which provides that the Insurer shall not pay **Loss** under Insuring Agreement (C) in connection with any **Claim** based upon arising from, or in any way related to any actual or alleged:

> **(1)** liability under any contract or agreement, provided that this exclusion shall not apply to the extent that liability would have been incurred in the absence of such contract or agreement;

Count 2 of the complaint alleges that **Entity Claim** against Madison Mechanical OS Corp. is based upon arising from, and related to actual or alleged liability under a contract or agreement, namely, the Stockholders Agreement dated December 31, 2007 among Madison Mechanical OS Corp., Buczkowski, Haslam, Garofalo, Lombardo, and Kraemer. The complaint alleges that Haslam's effort to terminate Buczkowski "for cause" on November 18, 2015 was an attempt to force a transfer of his stock in Madison Mechanical OS Corp., in violation of the Stockholders Agreement.

Plaintiff alleges he was wrongfully terminated and asks the court to reinstate his employment. Exclusion V(A)(2) provides that the Insurer shall not pay **Loss** under Insuring Agreement (C) in connection with any **Claim** based upon arising from, or in any way related to any actual or alleged:

> **(2)** employment-related **Wrongful Act**;

Because Buczkowski does allege employment-related **Wrongful Acts** against entity defendants Madison Mechanical OS Corp. and Madison Mechanical Contracting, LLC, coverage for these **Insured Entities** is barred by Exclusion V(A)(2) and Twin City reserves its rights accordingly.

Counts 11 and 12 allege unfair competition and misappropriation of trade secrets. Exclusion V(A)(6) and V(A)(7) provide that the Insurer shall not pay **Loss** under Insuring Agreement (C) in connection with any **Claim** based upon arising from, or in any way related to any actual or alleged:

Gary R. Jones, Esq.
October 18, 2016
Page 12

    **(6)** infringement, dilution or misappropriation of copyright, patent, trademark, trade name, trade dress, service mark, trade secrets, or other intellectual property; provided, however that this exclusion shall not apply to the portion of **Loss** directly resulting from:

        **(a)** a civil proceeding brought and maintained by a security holder(s) of an **Insured Entity**, in their capacity as such; or

        **(b)** a **Derivative Action** or a **Derivative Demand**; or

    **(7)** unfair trade practices or any violation of the Federal Trade Commission Act or any similar law.

Twin City reserves its rights under these exclusions.

### *EPL coverage part*

Under the EPL part, the suit is an **Employment Practices Claim** with respect to Madison Mechanical OS Corp., Haslam, and Garofolo. Count 1 seeks a declaration from the court with respect to these defendants that plaintiff was wrongfully terminated and must be reinstated. Twin City will provide a defense for this **Claim** as well with respect to these defendants.

However, there does not appear to be coverage under either coverage part with respect to Madison Mechanical Contracting LLC because there is no **Employment Practices Claim** alleged against this entity. Twin City will not provide a defense or indemnity to this entity.

Because both the EPL part and the D&O part are, in part, triggered, please note that the Section VIII ("Coordination of Coverage") in the EPL part provides that **Loss** shall be first covered and paid under the EPL part:

    **VIII.   COORDINATION OF COVERAGE**

      If this **Liability Coverage Part** and either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part are included under this Policy, and a **Claim** is covered under this **Liability Coverage Part** and any such other **Liability Coverage Part**, **Loss** shall be first covered and paid under this **Liability Coverage Part**.

      If notice of a **Claim** has been given under either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part and a determination is made by the Insurer that such **Claim** would be covered under this **Liability Coverage Part** if notice had been given under this **Liability Coverage Part**, then the **Insureds** shall be deemed to have given notice of such **Claim** under this **Liability Coverage Part** at the same time that notice was given under such other **Liability Coverage Part**.

### *Other coverage issues*

There are at least two additional coverage issues:

First, Counts 9 and 10 of the complaint seek recovery for unjust enrichment. Recovery for unjust enrichment—otherwise known as restitution and disgorgement—does not constitute covered **Loss** or **Damages**, and is generally uninsurable.

Gary R. Jones, Esq.
October 18, 2016
Page 13

Second, in addition to the claim for unjust enrichment, the complaint also includes cause of action for breach of fiduciary duty and minority shareholder oppression. Although we understand that the plaintiff has provided no evidence of this alleged misconduct to date, the allegations implicate two additional exclusions under the D&O coverage part. Exclusions (IV)(L) and (IV)(M), as modified by Endorsement No. 6, provide that the Insurer shall not pay **Loss**:

    **(L)** of an **Insured**, based upon, arising from, or in any way related to the gaining of any personal profit, remuneration or financial advantage to which such **Insured** is not legally entitled if a judgment or other non-appealable final adjudication in the underlying action establishes that such a gain did occur; or

    **(M)** of an **Insured**, based upon, arising from, or in any way related to any criminal or deliberately fraudulent act or omission or any willful violation of law by such **Insured** if a judgment or other non-appealable final adjudication in the underlying action establishes such an act, omission or violation; provided, however, that this exclusion shall only apply to **Insured Entities** under Insuring Agreement (C), if elected, if a past or present chief executive officer, chief financial officer, general counsel or any position equivalent to the foregoing of the **Named Entity** committed such an act, omission or willful violation.

Twin City reserves its rights on these two issues. Please note that Exclusions (IV)(L) and (IV)(M) both require a final adjudication before they apply.

## Conclusion

Please send us the following information as soon as possible:

- The November 11, 2015 correspondence from Buczkowski wherein he demanded, through counsel, that the members of the new company cease their diversion of business and corporate opportunities from Madison Mechanical, Inc. and Madison Mechanical OS Corp.

- All other correspondence among Buczkowski, the Insured Entities, and the Insured Persons with respect to this matter prior to the filing of the lawsuit, including the January 14, 2016 letter whereby counsel for Madison Mechanical OS Corp. demanded that Buczkowski sell his shares back to the company based on the book value in 2014, and Buczkowski's response to that letter.

- Could you point me to the relevant language in the shareholder's agreement that leads to the dilution of Buczkowski's shareholdings as a result of failing to make the capital contribution?

- Any additional documentation that establishes the correct amount of shares owned by Buczkowski at the time the suit was filed. For example, you indicate in your letter to Twin City dated July 28, 2016 that, by the time the suit was filed, Buczkowski was no longer a shareholder at all. I understand from our subsequent discussions that it is the Insured's position that plaintiff automatically ceased to be a shareholder due to his

Gary R. Jones, Esq.
October 18, 2016
Page 14

      termination.  Please promptly provide to us any documents or other information that you
      may have to demonstrate this relinquishment of shares by operation of his termination.

Twin City reserves the right to further investigate and to request additional information and
documents as this matter develops.  Our comments are based upon the facts received to date.  We
reserve our rights to amend our coverage assessment at any time, for example, if further
investigation or additional information indicates that other policy provisions apply to this claim.

Twin City recognizes a full and mutual reservation of rights in this matter.  Please be advised
that Twin City is reserving all of its rights and defenses under the Policy and applicable law,
whether or not specifically identified in this letter.

If you have any information or documents that you believe may affect the coverage position set
forth herein, please forward it to my attention immediately.  We look forward to working with
you towards a successful resolution of this matter.

Please let me know if you have any questions or comments.  You can call me at (212) 277-0859,
or you can reach me through e-mail at Michael.Knox@thehartford.com

Sincerely,


Michael S. Knox, JD, RPLU
Claims Consultant

cc:     Danielle Vranian
        Baxter, Baker, Sidle, Conn & Jones, P.A.
        dmv@bbsclaw.com

**From:**       Gary Garofalo
**Sent:**       Tuesday, June 23, 2015 5:15 PM
**To:**         Bill Franey, Sr.
**Subject:**    RE: City Market - Colony Hardware - 040515027040  //  Advanced Thermal Solutions
                047515018335

*FYI Glenn let Bob know he was not part of Madison's or Newco's future. Not sure if he will be retained on a 1099 basis going forward to closeout old Madison issues. Really going to miss getting emails forwarded from Derrick because Bob can't communicate.*

Gary J Garofalo
CFO/Senior VP of Finance
Harkins Builders Inc.
2201 Warwick Way
Marriottsville, MD 21104
410.480.4232 (Office)
443.277.1555 (Cell)
410.480.4020 (Fax)
ggarofalo@harkinsbuilders.com

**From:** Bill Franey, Sr. [mailto:wfraney@alliant.com]
**Sent:** Tuesday, June 23, 2015 3:35 PM
**To:** Gary Garofalo
**Subject:** Fwd: City Market - Colony Hardware - 040515027040 // Advanced Thermal Solutions 047515018335

FYI

Sent from my iPhone

Begin forwarded message:

> **From:** <dpopeil@chubb.com>
> **Date:** June 23, 2015 at 8:27:59 PM GMT+1
> **To:** Bob Buczkowski <bobb@madisonmechanical.net>
> **Cc:** Glenn Haslam <glennh@madisonmechanical.net>, "jquillinan@chubb.com"
> <jquillinan@chubb.com>, "Bill Francy, Sr. (wfrancy@alliant.com)" <wfrancy@alliant.com>
> **Subject: RE: City Market - Colony Hardware - 040515027040  //  Advanced Thermal
> Solutions 047515018335**
>
> Bob:
>
> As you can tell from the e-mail exchanges with Colony today, they do not currently agree that they have been paid in full. Please advise as to Madison's position on the credit issue raised by Colony.
>
> As for Advanced Thermal, unless you can point to a paid when paid or paid if paid provision in a subcontract with them, this claim needs to be paid. Please advise as to how you intend to proceed.
>
> Derek
>
> **Derek Popeil**

1



**MM001243**

Assistant Vice President & Senior Surety Claims Counsel

**Chubb & Son, a division of Federal Insurance Company**
15 Mountainview Road, Warren, NJ 07059
Phone: 908-903-3182 | Fax: 908-903-5537 | dpopeil@chubb.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

From:      Bob Buczkowski <bobb@madisonmechanical.net>
To:        "dpopeil@chubb.com" <dpopeil@chubb.com>, Glenn Haslam <glennh@madisonmechanical.net>
Cc:        "Bill Franey, Sr. (wfraney@alliant.com)" <wfraney@alliant.com>, "jquillinan@chubb.com" <jquillinan@chubb.com>
Date:      06/22/2015 04:58 PM
Subject:   RE: City Market - Colony Hardware - 040515027040  //  Advanced Thermal Solutions 047515018335

---

Derek,

See comments:

Advanced Thermal the money is owed to them for services provided and we do not have any defense other than waiting on money from Clark.

Colony Hardware- the invoices they provided were both City Market and Non-City Market jobs. For the City Market invoices- #322602 and 294037- these were paid as part of a joint check disbursement from Clark back around May 18, 2015. Copy of this is att5ached. These two invoices were paid and were offset by credit invoices for a net check of $312.19.

The other invoices that were not City Market have also been paid with the exception of # 115602 for $98.05. We have no record of that in our system and will get it cleared up between us.

Thanks-Bob

Bob Buczkowski. CPA
Madison Mechanical, Inc. CFO
410-461-7301 (O)
410-461-8470 (F)
410-984-1636 (C)

**From:** dpopeil@chubb.com [mailto:dpopeil@chubb.com]
**Sent:** Thursday, June 18, 2015 10:25 AM
**To:** Bob Buczkowski; Glenn Haslam
**Cc:** Bill Franey, Sr. (wfraney@alliant.com); jquillinan@chubb.com
**Subject:** RE: City Market - Colony Hardware - 040515027040 // Advanced Thermal Solutions

2

**MM001244**

047515018335

Bob and Glenn:

It's been nearly 2 weeks and I still have not had a response to my requests regarding the 2 above claims. Please advise.

Derek

**Derek Popeil**
Assistant Vice President & Senior Surety Claims Counsel

**Chubb & Son, a division of Federal Insurance Company**
15 Mountainview Road, Warren, NJ 07059
Phone: 908-903-3182 | Fax: 908-903-5537 | dpopeil@chubb.com

*This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.*

| | |
|---|---|
| From: | Derek Popeil/ChubbMail |
| To: | Bob Buczkowski <bobb@madisonmechanical.net> |
| Cc: | Glenn Haslam <glennh@madisonmechanical.net> |
| Date: | 06/11/2015 12:49 PM |
| Subject: | RE: City Market - Colony Hardware - 040515027040  //  Advanced Thermal Solutions 047515018335 |

----------------------------------------------------------------------------------------------------

Bob:

Please advise.

Derek

**Derek Popeil**
Assistant Vice President & Senior Surety Claims Counsel

**Chubb & Son, a division of Federal Insurance Company**
15 Mountainview Road, Warren, NJ 07059
Phone: 908-903-3182 | Fax: 908-903-5537 | dpopeil@chubb.com

*This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.*

| | |
|---|---|
| From: | Glenn Haslam <glennh@madisonmechanical.net> |

3

**MM001245**

To:       "dpopeil@chubb.com" <dpopeil@chubb.com>
Date:     06/05/2015 11:22 AM
Subject:  RE: City Market - Colony Hardware - 040515027040 // Advanced Thermal Solutions 047515018335

--------------------------------------------------------------------------------------------------------------------------------

Bob can u respond


Sent via the Samsung GALAXY S® 5, an AT&T 4G LTE smartphone


-------- Original message --------
From: dpopeil@chubb.com
Date: 06/05/2015 10:19 (GMT-05:00)
To: Bob Buczkowski <bobb@madisonmechanical.net>
Cc: Glenn Haslam <glennh@madisonmechanical.net>, wfraney@alliant.com
Subject: City Market - Colony Hardware - 040515027040 // Advanced Thermal Solutions
047515018335

Bob:

Previously you were provided with the claim information on the 2 above matters. Madison has not
provided me with its position and I need to provided responses. Please advise.

Regards,

Derek

**Derek Popeil**
Assistant Vice President & Senior Surety Claims Counsel

**Chubb & Son, a division of Federal Insurance Company**
15 Mountainview Road, Warren, NJ 07059
Phone: 908-903-3182 | Fax: 908-903-5537 | dpopeil@chubb.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

[attachment "Colony NON CMO Invoices.pdf" deleted by Derek Popeil/ChubbMail] [attachment
"Colony CMO Invoices.pdf" deleted by Derek Popeil/ChubbMail]

4

This e-mail and all attachments to it are for the sole use of the intended recipients and may contain proprietary information and trade secrets of Alliant Insurance Services, Inc. and its subsidiaries. This e-mail may also contain information which is confidential or which is protected from disclosure by privilege. Any unauthorized use, disclosure or distribution of this e-mail and its attachments is prohibited. If you are not the intended recipient, let us know by reply e-mail and then erase and destroy all electronic or other copies of this message.

5

MM001247